UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

AMY PALMER,

    Plaintiff,

        v.

CHAMPION MORTGAGE,

    Defendant.

Civil Action No. 04-11-954-RCL

## APPENDIX OF AUTHORITY TO CHAMPION MORTGAGE, A DIVISION OF KEYBANK NATIONAL ASSOCIATION'S MOTION TO DISMISS

M109337.1

# INDEX

## FEDERAL CASES

*Melvin v. United States Bank, N.A.*,
2001 U.S. Dist. LEXIS 24716 (D. Mass. 2001) .................................................................1

*Nichols v. Mid-Penn Consumer Discount Co.*,
1989 U.S. Dist. LEXIS 4796 (E.D. Pa. 1989) ...................................................................2

*Salois v. Dime Savings Bank*,
1996 U.S. Dist. LEXIS 21901 (D. Mass. 1996) ................................................................3

## STATE CASES

*Mayo v. Key Financial Services, Inc.*,
1994 WL. 879676 (Ma. Super. 1994)..................................................................................4

## FEDERAL STATUTES

12 U.S.C. § 24  ..................................................................................................................5

12 U.S.C. § 93a  ................................................................................................................6

15 U.S.C. § 1633 ...............................................................................................................7

15 U.S.C. § 1635 ...............................................................................................................8

15 U.S.C. § 1640 ...............................................................................................................9

12 C.F.R. § 5.34.................................................................................................................10

12 C.F.R. § 34.1...................................................................................................11

12 C.F.R. § 226....................................................................................................12

48 Fed. Reg. 14882..............................................................................................13

48 Fed. Reg. 14890 (April 6, 1983).....................................................................14

69 Fed. Reg. at 1904, et seq.................................................................................15

## OTHER AUTHORITIES

Ralph J. Rohrer,
*The Law of Truth in Lending* 833, 8.03[2][a] (1984) ........................................16

Charles A. Wright & Arthur R. Miller,
*Federal Practice & Procedure*, § 1277 n.13 (1990) ........................................17

2001 U.S. Dist. LEXIS 24716

THOMAS MELVIN, Plaintiff v. U.S. BANK N.A. ND., Defendant

CIVIL ACTION NO. 01-30082-FHF

UNITED STATES DISTRICT COURT FOR THE DISTRICT OF MASSACHUSETTS

2001 U.S. Dist. LEXIS 24716

September 28, 2001, Decided

**DISPOSITION:** [*1] Defendant's motion to dismiss plaintiff's complaint and amended complaint allowed.

## CASE SUMMARY

**PROCEDURAL POSTURE:** Plaintiff borrower's action alleged disclosure violations under the Truth in Lending Act (TILA), 15 U.S.C.S. § 1601 et seq., and the Massachusetts Consumer Credit Cost Disclosure Act (CCCDA), Mass. Gen. Laws ch. 140D, § 1 et seq., and sought rescission and statutory damages. Defendant lender moved to dismiss arguing the TILA claims failed because the CCCDA solely governed rescission, and the damages claims were barred by 15 U.S.C.S. § 1640(e).

**OVERVIEW:** Under 12 C.F.R. § 226.29(b)(1), the Massachusetts borrower could bring a claim for damages under 15 U.S.C.S. § 1640, but could not rescind a credit transaction under 15 U.S.C.S. § 1635. He could pursue that remedy only under the CCCDA. As such, the borrower had no viable rescission claim under TILA. The borrower was left with rescission claims under the CCCDA, and with statutory damages claims under TILA and the CCCDA, to the extent the damages claims were not time-barred. The loan was consummated well before the one-year period specified in 15 U.S.C.S. § 1640(e). As such, the federal damages claim under 15 U.S.C.S. § 1640 was time barred. The borrower was left with a state law damage claim under the four-year statute of limitations of Mass. Gen. Laws ch. 260, § 5A. It was conceded that diversity jurisdiction did not exist under 28 U.S.C.S. § 1332. Noting the early stage of the litigation, the existence of uncertainty in circumscribing the contours of CCCDA, and the uncertainty of whether a state court, in construing the CCCDA, would follow the lead of the federal courts construing TILA, the court declined to exercise supplemental jurisdiction.

**OUTCOME:** The motion to dismiss was allowed. However, the state claims were dismissed without prejudice as to being subsequently filed in the state court.

**CORE TERMS:** rescission, state law, supplemental jurisdiction, statute of limitations, federal claim, consumer, viable, damage claim, time-barred, exemption, motion to dismiss, federal statute, set forth, et seq, disclosure, state-law, complains, one-year, pleads, statutory scheme, construing

## LexisNexis(TM) Headnotes

*Civil Procedure > Pleading & Practice > Defenses, Objections & Demurrers > Failure to State a Cause of Action*

[HN1]The standard for ruling on a motion to dismiss under Fed. R. Civ. P. 12(b)(6) requires the court to accept the factual averments contained in the complaint as true, indulging every reasonable inference helpful to the plaintiff's cause. The court may grant such a motion only if it clearly appears, according to the facts alleged, that the plaintiff cannot recover on any viable theory.

*Banking Law > Bank Activities > Consumer Protection > Truth in Lending*

[HN2]The Truth in Lending Act (TILA), 15 U.S.C.S. § 1601 et seq., and the Massachusetts Consumer Credit Cost Disclosure Act (CCCDA), Mass. Gen. Laws ch. 140D, § 1 et seq., were both enacted to assure a meaningful disclosure of credit terms so that consumers would be able to compare more readily the various credit terms available to them and avoid the uninformed use of credit, and to protect consumers against inaccurate and unfair credit billing and credit card practices. 15 U.S.C.S. § 1601(a). Both statutes provide consumers with remedies in the forms of a right of rescission and a right to damages. 15 U.S.C.S. § 1635(a) provides a right to rescission under TILA. 15 U.S.C.S. § 1640 provides a right to damages under TILA. Mass. Gen. Laws ch. 140D, § 10(a) provides a right to rescission under CCCDA. Mass. Gen. Laws ch. 140D, § 32 provides a right to damages under CCCDA.

*Banking Law > Bank Activities > Consumer Protection > Truth in Lending*

[HN3]Pursuant to authority granted in 15 U.S.C.S. § 1633, the Board of Governors of the Federal Reserve System exempted credit transactions subject to the

Massachusetts Consumer Credit Cost Disclosure Act (CCCDA), Mass. Gen. Laws ch. 140D, § 1 et seq., from chapters 2 and 4 of the Truth in Lending Act (TILA), 15 U.S.C.S. § 1601 et seq. 48 Fed. Reg. 14882, 14890 (April 6, 1983). Chapter 2 includes 15 U.S.C.S §§ 1631-1646 and would preclude the federal remedies from the claims of a Massachusetts borrower. However, the Board revived the federal damages remedy from exemption when it enacted a regulation providing that no exemptions granted under 12 C.F.R. 226.29 shall extend to the civil liability provisions of 15 U.S.C.S. § 1640. 12 C.F.R. § 226.29(b)(1). Accordingly, a Massachusetts resident can bring a claim for damages under 15 U.S.C.S. § 1640, but cannot rescind a credit transaction under 15 U.S.C.S. § 1635; he or she can pursue that remedy only under CCCDA.

### Banking Law > Bank Activities > Consumer Protection > Truth in Lending

[HN4]The Truth in Lending Act, 15 U.S.C.S. § 1601 et seq., contains a one-year statute of limitations for a damage claim, while the limitation period for a claim for damages under the Massachusetts Consumer Credit Cost Disclosure Act, Mass. Gen. Laws ch. 140D, § 1 et seq., is four years. 15 U.S.C.S. § 1640(e); Mass. Gen. Laws ch. 260, § 5A.

### Civil Procedure > Jurisdiction > Subject Matter Jurisdiction > Supplemental Jurisdiction

[HN5]The power of a federal court to hear and to determine state-law claims in non-diversity cases depends upon the presence of at least one "substantial" federal claim in the lawsuit. However, supplemental jurisdiction is discretionary when federal claims are dismissed early in the litigation, as in a federal-question case, the termination of the foundational federal claim does not divest the district court of power to exercise supplemental jurisdiction but, rather, sets the stage for an exercise of the court's informed discretion.

### Civil Procedure > Jurisdiction > Subject Matter Jurisdiction > Supplemental Jurisdiction

[HN6]As a general principle, the unfavorable disposition of a plaintiff's federal claims at the early stages of a suit, before the commencement of trial, will trigger the dismissal without prejudice of any supplemental state-law claims. Likewise, another factor to be weighed is the clarity of the law that governs a pendent claim, for a federal court may be wise to forego the exercise of supplemental jurisdiction when the state law that undergirds the nonfederal claim is of dubious scope and application.

**COUNSEL:** For Thomas Melvin, PLAINTIFF: Christopher M Lefebvre, Claude Lefebvre & Christopher M, Lefevbre Law Offices, Pawtucket, RI USA.

For Thomas Melvin, PLAINTIFF: Cathleen M Combs, Edelman, Combs & Latturner, Chicago, IL USA.

For US Bank NA ND, DEFENDANT: Kevin C Maynard, Bulkley, Richardson & Gelinas, Springfield, MA USA.

**JUDGES:** Frank H. Freedman, Senior United States District Judge.

**OPINIONBY:** Frank H. Freedman

**OPINION:** MEMORANDUM AND ORDER

September 28, 2001

FREEDMAN, S.J.

I. INTRODUCTION

Thomas Melvin ("plaintiff") brings this proposed class action and complains that his loan, and numerous other similarly situated loans, violate the federal Truth in Lending Act, 15 U.S.C. § 1601 et seq., ("TILA") (as amended by the Home Ownership and Equity Protection Act, 15 U.S.C. §§ 1602(aa) and 1639 ("HOEPA")), and/or violate the Massachusetts Consumer Credit Cost Disclosure Act, Mass. Gen. Laws ch. 140D § 1, et seq. [*2] ("CCCDA"), and are therefore subject to rescission and statutory damages. Specifically, plaintiff complains that statutory disclosures were not made to him prior to the consummation of his loan transaction on August 18, 1998, and that his loan documentation did not include terms that preclude application of a prepayment penalty if the prepayment is the result of refinancing with the same lender.

Defendant moves to dismiss plaintiff's Complaint pursuant to Federal Rule of Civil Procedure 12(b)(6), arguing that Counts I and II of the Complaint fail to state a federal claim because the Massachusetts statute, CCCDA, solely governs any claim for rescission, and that Count III is barred by the applicable federal statute of limitations. Following a hearing on August 29, 2001, the Court took both the Motion to Dismiss the Complaint and the Motion to Dismiss the Amended Complaint n1 under advisement.

- - - - - - - - - - - - - - Footnotes - - - - - - - - -
- - - - - -

n1 Plaintiff has amended his complaint to include claims under CCCDA and thus

defendant has filed separate but interrelated motions responsive to both the Complaint and the Amended Complaint.


- - - - - - - - - - - - End Footnotes- - - - - - - - - - - - -

[*3]

## II. DISCUSSION

### A. Standard of Review

[HN1]The standard for ruling on a motion to dismiss under Federal Rule of Civil Procedure 12(b)(6) requires the Court to accept the "factual averments contained in the complaint as true, indulging every reasonable inference helpful to the plaintiff's cause." Garita Hotel Ltd. P'ship v. Ponce Fed. Bank, 958 F.2d 15, 17 (1st Cir. 1992). The Court may grant such a motion "only if it clearly appears, according to the facts alleged, that the plaintiff cannot recover on any viable theory." Id. (quoting Correa-Martinez v. Arrillaga-Belendez, 903 F.2d 49, 52 (1st Cir. 1990)).

A decision on defendant's motion to dismiss requires resolving the nexus of the federal TILA statutory scheme with the exemption granted to the co-existing CCCDA, to glean whether federal or Massachusetts law controls each of plaintiff's claims. After this initial determination as to the applicable law, the appropriate statute of limitation may thereafter be applied to demonstrate whether the damage claim is time-barred, and whether jurisdiction shall continue to be most appropriate in this court.


### B. TILA and CCCD

Plaintiff has [*4] set forth various rescission and damage claims and pleads that each is governed by TILA. However, with the submission of his Amended Complaint, he additionally pleads that each claim may be governed by CCCDA. In general, as to both the Complaint and the Amended Complaint, Count I seeks a declaration of the entitlement to rescission on behalf of a class. See Complaint at PP 30-38; Amended Complaint at PP 32-40. Count II is an individual claim by plaintiff seeking a judgment of rescission along with related attorney's fees, litigation expenses and costs, and "such other or further relief as the Court deems appropriate." See Complaint at PP 39-41; Amended Complaint at PP 41-43. Count III is a claim for statutory damages under both the federal statute, as provided for in 15 U.S.C. § 1640 ("section 1640"), and the state statute as provided in Mass. Gen. Laws ch. 140D, § 32. See Complaint at PP 42-44; Amended Complaint at PP 44-46.

[HN2]TILA and CCCDA were both enacted "to assure a meaningful disclosure of credit terms so that . . . consumer[s] would be able to compare more readily the various credit terms available to [them] and avoid the uninformed [*5] use of credit, and to protect . . . consumer[s] against inaccurate and unfair credit billing and credit card practices." 15 U.S.C. § 1601(a). Both statutes provide consumers with remedies in the forms of a right of rescission and a right to damages. See 15 U.S.C. § 1635(a) (right to rescission under TILA); 15 U.S.C. § 1640 (right to damages under TILA); Mass. Gen. Laws ch. 140D, § 10(a) (right to rescission under CCCDA); Mass. Gen. Laws ch. 140D, § 32 (right to damages under CCCDA).

[HN3]Pursuant to authority granted in 15 U.S.C. § 1633, the Board of Governors of the Federal Reserve System (the "Board") exempted credit transactions subject to CCCDA "from chapters 2 and 4 of the Federal act." See 48 Fed. Reg. 14882, 14890 (April 6, 1983). Chapter 2 includes TILA sections 1631 through 1646 and would preclude the federal remedies from the claims of a Massachusetts borrower. However, the Board revived the federal damages remedy from exemption when it enacted a regulation providing that "no exemptions granted under this section shall extend to the civil liability provisions [*6] of section [1640]." See 12 C.F.R. § 226.29(b)(1) . Accordingly, a Massachusetts resident can bring a claim for damages under section 1640 of TILA, but cannot rescind a credit transaction under section 1635 of that statute; he or she can pursue that remedy only under CCCDA. See, e.g., In re Fidler, 226 B.R. 734, 736 (Bankr. D. Mass. 1998); In re Desrosiers, 212 B.R. 716, 722 (Bankr. D. Mass. 1997); In re Myers, 175 B.R. 122, 125-126 (Bankr. D. Mass. 1994). As such, the Court concludes that plaintiff has no viable rescission claim under the federal statutory scheme and therefore will dismiss Count I and Count II to the extent a TILA claim is stated. n2

- - - - - - - - - - - - - - Footnotes - - - - - - - - -

n2 The Court notes that as to Count I and Count II plaintiff is left with rescission claims under CCCDA, and as to Count III he is left with statutory damages claims under both TILA and CCCDA, to the extent the damages claims do not prove time-barred below.


- - - - - - - - - - - - End Footnotes- - - - - - - - - - - - -

### C. Statute of Limitations [*7]

In Count III, plaintiff states a claim for damages under section 1640, or alternatively under CCCDA. See Complaint at PP 42-44; Amended Complaint at PP 44-46. [HN4]TILA contains a one-year statute of limitations for a damage claim, while the limitation period for CCCDA damages is four years. See 15 U.S.C. § 1640(e); Mass. Gen. Laws ch. 260 § 5A. Therefore, because the closing of the loan occurred on August 18, 1998, the loan was consummated well before the one-year period specified in the federal statute. See Complaint at P 14; Amended Complaint at P 14. As such, the federal damages remedy provided by section 1640 is clearly time barred and must be dismissed, leaving plaintiff with a state law damage claim under the four-year statute of limitations of CCCDA.

D. Jurisdiction

To recount, the Court is dismissing plaintiff's federal rescission claims as exempt from TILA and plaintiff's federal section 1640 damages claim as time-barred. The Court, however, notes that plaintiff is still left with state law claims under CCCDA. Accordingly, the Court must now consider whether it will retain jurisdiction over the remaining state law claims.

At the [*8] hearing on August 29, 2001, plaintiff's counsel conceded that diversity jurisdiction did not exist between the parties. See 28 U.S.C. § 1332. Thus, the Court is left to decide whether supplemental jurisdiction shall continue to be entertained upon the dismissal of the federal claims.

It is a fundamental principle that [HN5]"the power of a federal court to hear and to determine state-law claims in non-diversity cases depends upon the presence of at least one 'substantial' federal claim in the lawsuit." Newman v. Burgin. 930 F.2d 955, 963 (1st Cir. 1991) (citing United Mine Workers v. Gibbs, 383 U.S. 715, 726, 16 L. Ed. 2d 218, 86 S. Ct. 1130 (1966)). However, supplemental jurisdiction is discretionary when federal claims are dismissed early in the litigation, as "in a federal-question case, the termination of the foundational federal claim does not divest the district court of power to exercise supplemental jurisdiction but, rather, sets the stage for an exercise of the court's informed discretion." Roche v. John Hancock Mutual Life Ins. Co., 81 F.3d 249, 256-257 (1st Cir. 1996). See also [*9] 28 U.S.C. § 1367(c)(3) ("district court may decline to exercise supplemental jurisdiction if [federal claims are dismissed]").

As to the discretion of the district court, the First Circuit Court of Appeals has held that [HN6]"as a general principle, the unfavorable disposition of a plaintiff's federal claims at the early stages of a suit, before the commencement of trial, will trigger the dismissal without prejudice of any supplemental state-law claims." Rodriguez v. Doral Mortgage Corp., 57 F.3d 1168, 1177 (1st Cir. 1995). Likewise, "another factor to be weighed is the clarity of the law that governs a pendent claim, for a federal court may be wise to forego the exercise of supplemental jurisdiction when the state law that undergirds the nonfederal claim is of dubious scope and application." Id.

After weighing all the attendant circumstances in this case, most particularly noting the early stage of this litigation, the existence of some uncertainty in circumscribing the contours of CCCDA, and the uncertainty whether the Massachusetts Supreme Judicial Court, in construing CCCDA, will follow the lead of the federal courts construing TILA, this Court deems that the most appropriate [*10] disposition at this time is to dismiss plaintiff's state law claims without prejudice. Therefore, for the reasons set forth, the Court will allow both defendant's Motion to Dismiss the Complaint and Motion to Dismiss the Amended Complaint. However, given that plaintiff appears to have viable claims under state law, the CCCDA claims in Count I, Count II, and Count III shall be dismissed without prejudice.

III. CONCLUSION

For the foregoing reasons, defendant's Motion to Dismiss the Complaint and defendant's Motion to Dismiss the Amended Complaint are hereby ALLOWED. To the extent that Count I, Count II, and Count III set forth CCCDA claims, each is dismissed without prejudice as to being subsequently filed in the Massachusetts courts.

It is So Ordered.

Frank H. Freedman

Senior United States District Judge

1989 U.S. Dist. LEXIS 4796

LOIS M. NICHOLS v. MID-PENN CONSUMER DISCOUNT CO.

Civil Action No. 88-1253

UNITED STATES DISTRICT COURT FOR THE EASTERN DISTRICT OF PENNSYLVANIA

1989 U.S. Dist. LEXIS 4796

April 28, 1989, Decided and Filed; May 1, 1989, Entered

**CORE TERMS:** refinancing, borrower, mortgage, disclosure, consumer, rescission, unearned, lender, security interest, rebate, right to rescind, cancel, disclosure statement, finance, finance charge, disclose, retention, state law, residency, rescind, duty, notice, formula, refund, discount, reconsideration, supplemental, prepayment, actionable, computed

**COUNSEL: [*1]**

Arthur J. Matusow, Esq., Philadelphia PA, Susan DeJarnatt, Esq., Community Legal Services, Philadelphia PA, Joseph Simmons, Deputy in Charge of Bankruptcy Operations, Phila PA, for Plaintiffs.

**OPINIONBY:** BECHTLE

**OPINION:** MEMORANDUM AND ORDER

LOUIS C. BECHTLE, UNITED STATES DISTRICT JUDGE

Presently before the court is this appeal from the bankruptcy court pursuant to 28 U.S.C. § 1334. For the reasons stated herein, after full consideration of the supporting legal briefs, reply briefs, supplemental briefs and affidavits, the decision of the bankruptcy court will be affirmed.

**I. BACKGROUND**

This is a cross-appeal from the January 15, 1988 Order of the bankruptcy court granting in part and denying in part, the parties' cross-motions for summary judgment in this action brought by the appellee/cross-appellant Nichols ("Nichols" or "debtor") alleging numerous violations of the Truth in Lending Act (15 U.S.C. § 1601, et seq.) ("TILA" or "Act") and Regulation Z (12 C.F.R. § 226.1, et seq.) ("Reg Z") The appellant/cross-appellee Mid-Penn Consumer Discount Company ("Mid Penn" or "Lender") also appeals the bankruptcy court's order denying its motion for reconsideration of its decision in this matter. [*2]

In the time period preceding April, 1984, Nichols borrowed money from Mid-Penn on at least five occasions. In each of these transactions, Mid-Penn obtained a mortgage in the debtor's residency and recorded it in Philadelphia's City Hall Department of Records. The following chart contains the relevant information as to each of the five loans between the parties:

| Date | Amt. Financed Not Provided("NP") | Finance Charge | Mortgage Satisfaction Date | Date Satisfaction Recorded |
|---|---|---|---|---|
| 03/19/82 | NP | NP | 07/06/83 | 12/07/83 |
| 12/17/82 | NP | NP | 07/06/83 | 12/07/83 |
| 07/05/83 | $ 1,950.72 | $ 857.28 | 01/19/84 | 02/10/84 |
| 11/30/83 | $ 2,301.08 | $ 1,010.92 | NP | NP |
| 04/16/84 | $ 2,502.00 | $ 1,098.00 | NP | NP |

The terms of these loans were as follows:

| DATE | AMOUNT FINANCED | APR | FINANCE CHARGE | TOTAL PRICE |
|---|---|---|---|---|

Not Available ("NA")

| | | | | |
|---|---|---|---|---|
| 03/26/82 | NA | NA | NA | NA |
| 12/17/82 | NA | NA | NA | NA |
| 07/05/83 | NA | NA | NA | NA |
| 11/30/83 | $ 2,301.28 | $ 25.42 | $ 1,010.92 | $ 3,312.00 |
| 04/16/84 | $ 2,502.00 | $ 25.39 | $ 1,098.00 n1 | $ 3,600.00 |

[*3]

n1 In the last two financings, Mid-Pen levied service charges of $ 67.00 and $ 72.00 respectively upon the loans.

With each of these loans, Mid-Penn gave Nichols a TILA Disclosure Statement and a Notice of Right to Cancel. The 1984 Notice of Right to Cancel advised Nichols of the following:

You are entering into a transaction that will result in a (mortgage/lien/security interest) (on/in) your home.

. . . . .

If you cancel the transaction, the (mortgage/lien/security interest is also cancelled.

On November 24, 1986, Nichols, through her attorney, notified Mid-Penn that she was rescinding both the November 30, 1983 and April 16, 1984 loans. By letter dated December 12, 1986, Mid-Penn told Nichols that it would not rescind either of the transactions. The total credit extended to Nichols in connection with the last two (2) loans was $ 4,649.69. Nichols had paid Mid-Penn, directly or through refinancing, a total of $ 4,362.06 prior to the November 24, 1986 demand for rescission.

The bankruptcy court decided this action on the parties' agreed stipulation of facts. The court held that there was no right to rescind the April 16, 1984 loan, but permitted rescission of the November 30, [*4] 1983 loan because it concluded Mid-Penn misinformed Nichols in the Notice of Right to Cancel as to the number of mortgages of record the lender would have against the debtor's home. The court found that Mid-Penn failed to immediately satisfy the prior mortgage it had in Nichols' residency after the November 30, 1983 transaction which resulted in the lender holding multiple mortgages in the property which it never disclosed to the debtor. The mortgage obtained as a result of the 1983 loan was eventually "satisfied" by Mid-Penn on January 19, 1984, but was never formally recorded until February 10, 1984. Nichols was awarded $ 1,000.00 in damages under the TILA for Mid-Penn's failure to rescind the November, 1983 loan.

Subsequent to this decision, motions for reconsideration were filed by both parties. Mid-Penn claimed that the bankruptcy court erred by imposing a duty upon it not legally mandated in holding that a mortgage securing a previous loan transaction must be satisfied immediately upon the passing of the three day rescission period prescribed in the TILA. Nichols sought reconsideration of the court's Order denying the right to rescind the April, 1984 loan based on Mid-Penn's [*5] failure to disclose hidden finance changes and its classifying charges and "total of payments" as estimates. Each of these motions was denied by the bankruptcy court below, and the contentions raised therein now form the basis of the present appeal.

II. DISCUSSION

A. The Purpose and Enforcement of the TILA and Reg Z.

The courts in this Circuit recognize that the purpose of the TILA is to inform consumers of the true cost of credit:

The Truth in Lending Act was passed primarily to aid the unsophisticated consumer so that he would not be easily misled as to the total costs of financing . . . Thus, the Act seeks "to assure a meaningful disclosure of credit terms so that the consumer will be able to compare more readily the various terms available to him and avoid the uninformed use of credit". 15 U.S.C. § 1601.

Thomka v. A.Z. Chevrolet Inc., 619 F.2d 246, 248 (3d Cir. 1980). Accord, Mourning v. Family Publications Service, 411 U.S. 356, 364-65 (1973); Gennuso v. Commercial Bank and Trust Company, 566 F.2d 437, 441 (3d Cir. 1977).

The TILA is a remedial statute designed to protect consumers who are not on an equal footing with creditors, either in bargaining [*6] for credit terms or in knowledge of credit provisions. As such, it is liberally construed in favor of the consumer. See, e.g., N.C. Freed Co., Inc. v. Bd. of Governors of Federal Reserve System, 473 F.2d 1210, 1214 (2d Cir. 1973); Sellers v. Wolman, 510 F.2d 119, 122 (5th Cir. 1975).

To accomplish its purpose, the TILA and its implementing regulation, Reg Z, requires creditors to disclose to borrowers certain credit terms and dictate the manner in which they must be made. The Act is enforced by a system of "strict liability in favor of consumers." Thomka v. A.Z. Chevrolet Inc., supra, 619 F.2d at 248. Even a single actionable violation of the TILA gives rise to full liability for statutory damages. This "private attorney general" scheme of enforcement was intended to obviate the need for a large federal bureaucracy performing the task. See Ives v. W.T. Grant Co., 522 F.2d 749, 756 (2d Cir. 1975). While the statutory damages may not be related to the actual injury in a particular case (for which there is additional compensation over and above the statutory amount), the certainty of their automatic assessment was intended to have a deterrent effect on creditors.

There [*7] is strong evidence that this deterrence scheme has worked as intended. In 1973, when Congress considered amendments restricting Truth-In-Lending class actions, the two agencies principally charged with administrative enforcement of the TILA both argued strongly that creditors' exposure to civil liability for violations was crucial to the TILA's enforcement. According to the Federal Reserve Board, the threat of sizable damage awards was necessary to "insure that management will strive with diligence to achieve compliance." Hearings on S.1630 and S.914. before the Subcommittee on Consumer Credit of the Senate on Banking, Housing and Urban Affairs, 93d Cong., 1st Sess. 54 (1973). The Chairman of the Federal Trade Commission stated:

Our experience in enforcing Truth-in-Lending legislation persuades us that only a high degree of civil liability can provide that deterrence essential to achieving compliance with these provisions.

Id. at 90.

Hence, it is not surprising that this Circuit has repeatedly held that the literal language of the damage provisions must be followed, and that damages must be awarded whenever an actionable violation exists, even in the face of creditor protestation [*8] that the violation was only "technical" or "minor." Thomka v. A.Z. Chevrolet, Inc., supra, 619 F.2d at 250; Gennuso v. Commercial Bank and Trust Company, supra, 566 F.2d at 441-2. Only such unswervingly strict enforcement by the courts can assure that creditors will continue to be diligent in complying with all of the requirements of the Act.

The TILA enforcement scheme was refined by the 1980 Truth-in-Lending Simplification and Reform Act, 15 U.S.C. §§ 1601-1693 ("the simplified TILA") and revisions to Reg Z, effective on October 1, 1982. The amendments apply to both loans at issue here. Under the simplified TILA, borrowers can sue creditors in two separate circumstances.

First, the TILA and Reg Z continue to guarantee meaningful disclosure of credit terms by requiring the creditor to give the borrower a Disclosure Statement specifying the credit terms in clear and straight forward language. TILA, 15 U.S.C. § 1601, 1638; Reg Z, 12 C.F.R. § 226.1, 226.17-18. Within one (1) year of the transaction, the borrower can sue the creditor for actual damages and twice the finance charge (up to a maximum of $ 1,000.00), if the Disclosure Statement violates the TILA in any of the ways [*9] enumerated in 15 U.S.C. § 1640(a). These actionable violations include the failure to disclose the security interest accurately on the Disclosure Statement itself. Id.

Second, the TILA gives an important additional right to the borrower who gives up a non-purchase money security interest in his or her home. Such borrowers have the right to rescind the transaction, whether it is an original loan or a refinancing with new funds, for three (3) days. 15 U.S.C. § 1635(a). The creditor must notify the borrower of this right; how to exercise it; and the effect of a rescission. Id; Reg Z, 12 C.F.R. § 226.23(b). The Notice must also clearly disclose the retention or acquisition of a security interest in the borrower's home. TILA at § 1635(a), Reg Z at § 226.23. If the creditor fails to give borrower a Notice that fully complies with § 226.23, then the right to rescind the transaction is extended for up to three (3) years. Reg Z, 12 C.F.R. 226.23(a)(3). The right to rescind is also extended if the creditor's Disclosure Statement does not accurately provide material disclosures, such as finance charges and the total of payments. Id., at n. 48.

In other words, if either the [*10] Disclosure Statement or the Notice of Right to Cancel fails to comply with the TILA's specified disclosure requirements, the consumer has a continuous right to rescind for as long as the creditor fails to comply, to a maximum of three (3) years. 15 U.S.C. § 1635(f). See e.g., Ljepava v. M.L.B.C. Properties, Inc., 511 F.2d 935 (9th Cir. 1975); Sosa v. Fite, 498 F.2d 114 (5th Cir. 1974); Cerasta v. Hibernia National Bank, 411 F.Supp. 176 (E.D. Pa. 1976); aff'd on this issue, rev'd and remanded on other grounds, 575 F.2d 580 (5th Cir. 1978). See also, Aquino v. Public Finance Consumer Discount Co., 606 F.Supp. 504 (E.D. Pa. 1985). Exercise of the right to rescind under section 1635(a) results in the consumer's discharge of liability for any finance or other charges, and any security interest which has been taken becomes void. 15 U.S.C. § 1635(b). Further, within twenty (20) days of receiving

notice of rescission, the creditor must return any money given by the borrower, including loan payments, and must take appropriate steps to terminate any security interest created. Once the creditor has performed these obligations, the consumer must tender the property obtained [*11] by the loan or its reasonable value. 15 U.S.C. § 1635(b). Aquino, supra, 606 F.Supp. at 509. If a creditor fails to fulfill its duties where the borrower properly rescinds, the creditor is liable for damages for that failure in addition to its liability for damages for an underlying disclosure violation. 15 U.S.C. § 1635(g).

With these general principles in mind, the Court now turns its attention to the specific issues raised by the parties on this appeal.

**B. The bankruptcy court did not err in allowing rescission of the November 30, 1983 loan**

The gist of Mid-Penn's argument on appeal is that the bankruptcy court erred in holding that a lender's failure to satisfy a mortgage from a prior transaction "immediately" upon passage of the three-day rescission period amounts to a retention of multiple mortgages in a debtor's residency that must be disclosed even when the lender has no intention of maintaining the prior mortgage, and plans on satisfying such obligations. Mid-Penn argues that because the July, 1983 mortgage was ultimately "satisfied," the inaccuracies in the 1983 Notice of Right to Cancel did not violate either the TILA or Reg Z. Furthermore, Mid-Penn contends [*12] that, because it ultimately satisfied the pre-1984 mortgages, and the November, 1983 loan was paid in full as a result of the 1984 refinancing it could have done nothing in response to the debtor's demand for rescission of the November 1983 loan. The Court finds neither of these arguments persuasive.

As indicated above, the TILA and Reg Z are designed to ensure that borrowers receive accurate and complete information about credit transactions in order for them to make an informed decision as to the type of loan obligations that are assumed, as well as to allow for comparison of alternative credit options. To this end, § 226.23(b)(1) of Reg Z provides that a creditor must "clearly and conspicuously disclose the retention or acquisition of a security interest in the consumer's principal dwelling." The record clearly indicates that the 1983 Notice of Right to Cancel did not satisfy this requirement, because Mid-Penn failed to inform Nichols that it would hold, though only for a short time, multiple mortgages in her home. As this court stated in Bookhart v. Mid Penn Consumer Discount Co., 559 F.Supp. 208 (E.D. Pa. 1983), the borrower's interest in her home is greatly affected [*13] by the total encumbrances on that interest and her ability to

get additional credit could turn on the number of mortgages recorded against her home. Id. at 211. Thus, all encumbrances against the borrower's principal residency should have been revealed in the disclosure statement and Notice of Right to Cancel.

Mid-Penn's assertion that its ultimate satisfaction of the pre-1984 mortgages absolves it of its disclosure responsibilities under the TILA is incorrect. It cannot be stressed enough that the TILA imposes no duty on a creditor to satisfy prior mortgages. It is a disclosure statute. All the Act requires is that a creditor tell the borrower whether it has retained or will acquire a mortgage in the borrower's home. The TILA does not preclude a creditor from retaining multiple mortgages; it does, however, require disclosure of the nature of the credit transaction at the time of its inception. The notice Mid-Penn gave to Nichols in November, 1983 failed to do this. As a result, the debtor was entitled to rescind the transaction for up to three (3) years, a right properly exercised here.

Furthermore, this court is not persuaded by Mid-Penn's assertion that it could not have done [*14] anything in response to Nichols' demand for rescission of the November, 1983 loan. This argument ignores a creditor's rescission duties under the TILA. If a loan is rescinded, § 1635 of the TILA provides:

Within 20 days after receipt of a notice of rescission, the creditor shall return to the obligor any money or property given as earnest money, down payment, or otherwise . .

Thus, Mid-Penn could have returned any monies Nichols paid in connection with the transaction as § 1635 requires. Thus, it is disingenuous for Mid-Penn to now say that it could have taken no action in response to the debtor's rescission of the 1983 loan.

In view of the above, the court holds that it was not improper for the bankruptcy court to have concluded that Mid-Penn violated the TILA and Reg Z by failing to disclose the fact that it would retain multiple mortgages in the borrower's residency. Thus, the bankruptcy court's decision on this issue is now affirmed. n2

> n2 In supplemental briefs, Mid-Penn advised the court that the Federal Reserve Board recently amended its official staff commentary regarding Reg Z's Requirement of disclosure of security interests. The change became effective as of February 28, 1989, and the amended commentary now states:
>
> 2(a)(25) "Security Interest"

"6. Specificity of disclosure. A creditor need not separately disclose multiple security interests that it may hold in the same collateral. The creditor need only disclose that the transaction is secured by collateral, even when security interests from prior transactions remain of record and a new security interest is taken in connection with the transaction."

Mid-Penn presently argues that this new commentary, along with the other points raised in its previous briefs, shows that the bankruptcy court erred on the disclosure issue. The Court does not think that this change in the agency's commentary rectifies the aforementioned problem with Mid-Penn's arguments on this issue. Mid-Penn was obligated to satisfy the disclosure requirements outlined in Reg Z as it existed at the time of the November, 1983 loan transaction. A subsequent change in the agency's official commentary concerning regulations it has promulgated does not exonerate Mid-Penn's actions in this regard.

[*15]
C. The bankruptcy court did not err in denying rescission of the April 16, 1984 loan

Nichols contends that she should have been allowed to rescind the April, 1984 loan due to Mid-Penn's failure to disclose hidden finance charges imposed on her in the April, 1984 transaction. It is alleged that these finance charges were improperly included within the "amount financed" portion of the disclosure statement rather than within the "finance charge" section, rendering each of these disclosures inaccurate. Relying on its earlier decision in Jones v. Mid-Penn, slip op. Civ. 86-05212 (Bankr. E.D. Pa. Oct. 23, 1987) the bankruptcy court summarily rejected this claim, concluding that because the Pennsylvania law authorized the rebate formula Mid-Penn used in its refinancings, it was not required to disclose to the borrower the retention of unearned interest that the rebate formula provided. The debtor claims that the bankruptcy court misperceived her argument on this point and now seeks a reversal of its order denying rescission of the April, 1984 loan.

Nichols contends that an interest charge for a fractional month after the date of a refinancing transaction is a cost of credit in the [*16] "refinancing transaction" that must be disclosed as part of the "finance charges," rather than as part of the "amount financed" in a TILA disclosure for refinancing transactions. The debtor further argues that, at the very least, Mid-Penn should

have calculated "time unearned interest" for credit cost disclosure purposes by prorating the difference between the rebate figures for remaining periods of thirty-one and thirty-two months to account for the portion of the fifth month that had not yet expired. Applying this approach, Nichols maintains that the time amount of unearned interest with proper proration should have been the sum of $ 732.67. The debtor now claims that because Mid-Penn did not rebate $ 28.73 of this amount, it should have disclosed this amount as part of the loan's "finance charges," because it was a retention of unearned interest, and deducted $ 28.73 from the "amount financed" portion of the statement. Since Mid-Penn failed to do this, Nichols asserts that she properly exercised her rights of rescission in the April, 1984 loan.

The crucial question here is whether the disclosures contained in the Truth in Lending Disclosure Statement given to the debtor in connection [*17] with the April 16, 1984 transaction complied with the requirements of Reg Z, § 226.20. Section 226.20 states:

A refinancing occurs when an existing obligation that was subject to this subpart is satisfied and replaced by a new obligation undertaken by the same consumer. A refinancing is a new transaction requiring new disclosures to the consumer. The new finance charge shall include any unearned portion of the finance charge that is not credited to the existing obligation.

(Emphasis added)

Thus, the basic question that must now be considered is whether the interest retained by Mid-Penn in connection with the refinancing was "earned" or "unearned." If this retained interest was "unearned," the debtor was improperly denied her right to rescind the April 16, 1984 loan.

The debtor bases her present arguments on the case of Steele v. Ford Motor Credit Company, 783 F.2d 1016 (11th Cir. 1986). In Steele, the Court found that interest retained on the refinancing at issue was "unearned" and therefore should have been disclosed by defendant upon its refinancing of a previous loan. The similarity between Steele and the case at bar is only that in both cases the creditor, [*18] in calculating the amount of rebate to which the debtor was entitled on refinancing, computed the interest to the end of the month in which the refinancing occurred rather than to the date of the payoff of the prior loan.

As previously stated, Section 226.20 of Reg Z requires that when a refinancing occurs, the new finance charge shall include any unearned portion of the old finance

charge that is not credited to the existing obligation. Steele points out that neither the Act nor Reg Z define when interest is earned or when it is unearned. Thus, courts confronted with this question turn to state law. The district court in Steele held that the interest retained was unearned under Georgia law and therefore should have been disclosed.

As stated in Steele, anything above that to which a lender is properly entitled is considered "unearned" which must be disclosed to a borrower if the lender plans to retain such interest after its refinancing of a previous loan. Steele, supra, 783 F.2d at 1017. The issue is whether Mid-Penn was "properly entitled" to the interest it retained after its refinancing of the April, 1984 loan. To make this determination, the court must look to [*19] Pennsylvania's law governing the calculation of rebates on loan refinancings. The present transaction was governed by the Pennsylvania Consumer Discount Company Act, 7 Pa.Cons.Stat.Ann § 6201, et seq. ("PCDCA"). This act specifies the method to be used upon a prepayment or refinancing in order to calculate the rebate due the consumer. The PCDCA states in pertinent part:

On any contract which is wholly prepaid by cash, renewal or otherwise, at any time prior to maturity, the licensee shall refund to the consumer a portion of the interest or discounts. The portion to be refunded shall be that proportion of the interest or discount which the sum of the monthly balances originally scheduled to be outstanding during the full months following such prepayment in full bears to the sum of all monthly balances originally scheduled to be outstanding, both sums to be determined by the schedule of payments in the original contract . . . Such refund shall be computed and paid or credited at the time of prepayment on the contract.

7 Pa.Cons.Stat.Ann § 6214D. The regulations promulgated by the Department state:

On a loan contract which is wholly prepaid prior to maturity, licensee shall [*20] refund to the consumer the unearned portion of the interest or discount. The refund shall be computed in accordance with the formula contained in Section 14 D of the Act (7 P.S. Section 6214 D), which formula is the sum of the digits method commonly known as the Rule of 78's." 10 Pa. Code Section 41.3 (f)

This issue was addressed at length by the bankruptcy court in the Jones case cited earlier. In Jones, the court held that if the method of calculation of rebates utilized by a lender is authorized under state law, interest which accrues should be considered "earned" for

purposes of the TILA and Reg Z. Jones, slip op. pg. 12. In rejecting the rule outlined in the Steele case, this court stated:

The decision in Steele v. Ford Motor Credit Co., 783 F.2d 1016 (11th Cir. 1986), the sole authority relied upon by her, is therefore of little help to the Debtor. The court there states that "[n]either the (TILA) nor Regulation Z says anything about when interest is earned and when it is unearned. Thus, courts confronted with that question turn to state law." Id. at 1018. We believe that this statement meant that interest charges allowable under state law must be deemed [*21] "earned." This is another way of stating our initial observation, at page 10 Supra, that 12 C.F.R. Sec. 226.20 (a) does not require a lender to utilize a "fair" method of calculating rebates in financing transactions, like the actuarial method, but only the method required by state law. In Steele, the applicable state law obviously did not, as we hold the PCDCA does, permit the lender to calculate rebates by considering a partial month as a full month.

Id. at pg. 13.

The bankruptcy court found that the method of calculation used by Mid-Penn was authorized by § 6201 of the PCDCA. There appears to be no reason for disturbing this conclusion. Thus, in view of this fact, the court concludes that the interest taken in the refinancing was "earned" for purposes of the TILA and Reg Z. Consequently, there was no duty under § 226.20 to disclose separately the interest retained by Mid-Penn upon its refinancing of the previous loan. Accordingly, the bankruptcy court's decision on this issue will be affirmed.

CONCLUSION

For the foregoing reasons, the bankruptcy court's January 15, 1988 decision in this matter will be affirmed.

An appropriate Order will be entered.

ORDER [*22] - April 28, 1989, Filed

AND NOW, to wit, this 28th day of April, 1989, in accordance with the accompanying Memorandum, after thorough consideration of the supporting legal briefs, reply briefs, supplemental briefs, and affidavits, IT IS ORDERED that the bankruptcy court's decision of January 15, 1988 in this matter is hereby affirmed.

1996 U.S. Dist. LEXIS 21901

ROBERT SALOIS AND DIANNE E. SALOIS, NINON R.L. FREEMAN, AND DAVID M. LEARY AND LINDA SCURINI-LEARY, INDIVIDUALLY AND ON BEHALF OF OTHERS SIMILARLY SITUATED, Plaintiffs, v. THE DIME SAVINGS BANK OF NEW YORK, FSB, HARRY W. ALBRIGHT, JR., JOHN B. PETTIT, JR., WILLIAM J. MELLIN, WILLIAM J. CANDEE III, WILLIAM A. VOLCKHAUSEN, JAMES E. KELLY, RALPH SPITZER, ROBERT G. TURNER, BRIAN GERAGHTY, LAWRENCE W. PETERS, E. JUDD STALEY III, AND JOHN DOE COMPANIES, Defendants.

CIVIL ACTION NO. 95-11967-PBS

UNITED STATES DISTRICT COURT FOR THE DISTRICT OF MASSACHUSETTS

1996 U.S. Dist. LEXIS 21901

November 13, 1996, Decided

**DISPOSITION:** [*1] Defendants' motion to dismiss (Docket No. 51) ALLOWED without prejudice.

## CASE SUMMARY

**PROCEDURAL POSTURE:** Defendant bank and its employees filed a motion to dismiss plaintiff borrowers class action suit which alleged the bank violated federal and state law with respect to the advertisement, sale, and servicing of the negative-amortization mortgages that it issued, arguing that all claims were barred by the statutes of limitations because they were filed over seven years after the execution of the plaintiffs' loan agreements.

**OVERVIEW:** The borrowers filed their class action suit over seven years after the last corrective document was sent by the bank and its employees. The statutes of limitations on the federal claims ranged from one year to four years. Unless the actions had accrued at a later date, or had been tolled by fraudulent concealment, all federal claims were time-barred. Any claims which accrued prior to four years prior to the date of filing were time-barred. The borrowers' RICO injuries were sustained, if at all, when their mortgages were issued, and when payments were made under the mortgages. At least two predicate acts had been committed by the second mortgage payment, and the statute of limitations began to run. The statute of limitations was not tolled because they could not have known of the injuries, despite the allegations that their loan documents omitted important information, and were sufficiently complicated that the actual material terms were concealed from all but a few well-trained mortgage analysts.

**OUTCOME:** The bank and it's employees' motion for summary judgment was granted as all claims arising out of the representations, disclosures, and fees at the time the loans were issued were time-barred. The breach of contract claims that the loans continued to be serviced improperly throughout the repayment period were also time-barred.

**CORE TERMS:** statute of limitations, mortgage, time-barred, disclosure, interest rate, fraudulent concealment, amortization, monthly payments, deferred, monthly, fiduciary relationship, motion to dismiss, cause of action, corrective, discover, tolling, monthly payment, borrower, cap, breach of contract, four-year, breached, tolled, servicing, concealed, consumer, Parity Act, limitations period, fiduciary duty, et seq

**LexisNexis(TM) Headnotes**

*Civil Procedure > Pleading & Practice > Defenses, Objections & Demurrers > Failure to State a Cause of Action*

*Torts > Business & Employment Torts > Deceit & Fraud*

[HN1]In ruling on a motion to dismiss for failure to state a claim, a court may look only to the complaint itself, even if the defendant raises affirmative defenses. The motion shall be allowed if it appears beyond doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief. The court must accept all factual allegations in the complaint as true, and draw all reasonable inferences in favor of the plaintiff. Although fraud must be pled with particularity, Fed. R. Civ. P. 9(b), other claims require only a short and plain statement of the claim showing that the pleader is entitled to relief. Fed. R. Civ. P. 8(a). However, the court need not accept legal conclusions or bald assertions made without factual support.

*Civil Procedure > Pleading & Practice > Defenses, Objections & Demurrers > Affirmative Defenses*

Page 1

*Civil Procedure > Pleading & Practice > Defenses, Objections & Demurrers > Failure to State a Cause of Action*

*Governments > Legislation > Statutes of Limitations > Statutes of Limitations Generally*

[HN2]The statute of limitations defense may be addressed in a Fed. R. Civ. P. 12(b)(6) motion when the defense is obvious on the face of the pleadings.

*Criminal Law & Procedure > Criminal Offenses > Racketeering > Racketeer Influenced & Corrupt Organizations*

[HN3]The Racketeer Influenced and Corrupt Organizations Act (RICO), 18 U.S.C.S. §§ 1962(c) and 1964(c), imposes civil liability for injury to business or property by reason of a violation of 18 U.S.C.S. § 1962, which in turn makes it a crime for any person employed by or associated with any enterprise to conduct or participate, directly or indirectly, in the conduct of such enterprise's affairs through a pattern of racketeering activity. An act of racketeering activity is the commission of one of the crimes enumerated in the statute pursuant to 18 U.S.C.S. § 1961(1). A pattern of racketeering activity requires at least two acts of racketeering activity under 18 U.S.C.S. § 1961(5).

*Criminal Law & Procedure > Criminal Offenses > Racketeering > Racketeer Influenced & Corrupt Organizations*

*Governments > Legislation > Statutes of Limitations > Statutes of Limitations Generally*

[HN4]Because Racketeer Influenced and Corrupt Organizations Act (RICO) does not include a limitations period, the Clayton Act's four-year period, 18 U.S.C.S. § 15b, applies to civil RICO claims. The four-year period begins to run when a plaintiff knew or should have known of his injury. Once each element of RICO has been satisfied, and the plaintiff has cause to know of the injury, the statute will run. Even an additional predicate act within the limitations period will not save the action.

**COUNSEL:** For ROBERT SALOIS, DIANNE E. SALOIS, Plaintiffs: Dana L. Mason, Hargraves, Karb, Wilcox & Galvani, Framingham, MA.

For DIANNE E. SALOIS, Plaintiff: Evans J. Carter, Hargraves, Karb, Wilcox & Galvani, Framingham, MA.

For DIME BANCORP, INC. aka Dime Savings Bank of New York FSB, HARRY W. ALBRIGHT, JOHN B. PETTIT, JR., WILLIAM A. VOLCHAUSEN, LAWRENCE W. PETERS, E. JUDD STALEY,

RALPH SPITZER, WILLIAM J. CANDEE, Defendants: William S. Eggeling, Roscoe Trimmier, Darlene C. Lynch, Ropes & Gray, Boston, MA.

For JAMES E. KELLY, Defendant: William S. Eggeling, Roscoe Trimmier, Darlene C. Lynch, Theodore W. Ruger, Ropes & Gray, Boston, MA.

For WILLIAM J. MELLIN, Defendant: William S. Eggeling, Roscoe Trimmier, Ropes & Gray, Boston, MA.

**JUDGES:** PATTI B. SARIS, United States District Judge.

**OPINIONBY:** PATTI B. SARIS

**OPINION: MEMORANDUM AND ORDER**

November 13, 1996

SARIS, U.S.D.J.

## I. INTRODUCTION

Plaintiffs filed this proposed class action on September 1, 1995, alleging that the Dime Savings Bank ("Dime") and its employees violated federal and state law with respect to the advertisement, sale, **[*2]** and servicing of the negative-amortization mortgages that it issued in Massachusetts from 1986 to 1989. n1 The graduated payment, variable rate mortgages were designed so that the monthly payments would not cover the monthly interest, causing the principal balance to increase over the repayment period. Plaintiffs complain that Dime, on its own and through its subsidiary Dime Real Estate Services of Massachusetts, misrepresented the nature of the mortgages, failed to make the required statutory disclosures, and made the loan documents sufficiently complicated that the ordinary consumer would be unable to understand the terms of the loan. They also allege that the servicing of the loans was contrary to the loan documents and Massachusetts law.

- - - - - - - - - - - - - - Footnotes - - - - - - - - - - - - - - - -

n1 The thirteen count, 277 paragraph, second amended complaint dated February 15, 1996 added new named plaintiffs, Ms. Ninon Freeman and the Leary's. The statute of limitations analysis does not hinge on when the parties were named as plaintiffs. The second amended complaint alleges violations of the Racketeer Influenced Corrupt Organizations Act, 18 U.S.C. §§ 1961-1968 (RICO) (Count II), the Truth-In-Lending Act, 15 U.S.C. §

1601 et seq. (Count III), the Real Estate Settlement Procedures Act, 12 U.S.C. §§ 2601-2617 (RESPA) (Count IV), the Parity Act, 12 U.S.C. §§ 3801-3806 (Count V), the Massachusetts Consumer Credit Cost Disclosure Act, Mass. Gen. L. ch. 140D (Count VI), the Massachusetts Consumer Protection Act, Mass. Gen. L. ch. 93A (Count VII), breach of contract (Count VIII - Recission), breach of the covenant of good faith & fair dealing (Count IX), breach of fiduciary duty (Count X), fraud, deceit, and misrepresentation (Count XI), civil conspiracy (Count XII), and negligent misrepresentation, negligent hiring and supervision, and vicarious liability (Count XIII). Plaintiffs make a jury demand, and seek declaratory judgment (Count I), certification of a class, damages, rescission, injunction against foreclosure, and attorney's fees.

- - - - - - - - - - - - End Footnotes- - - - - - - - - - - - -

**[*3]**

Defendants move to dismiss, arguing that all claims are barred by the statutes of limitations because they were filed over seven years after the execution of the plaintiffs' loan agreements. Plaintiffs respond that the inadequate and misleading disclosures prevented them from discovering their claims despite the exercise of reasonable diligence, and that defendants fraudulently concealed their claims. Defendants also argue that the complaint fails to state a claim on the merits, and that they are not properly subject to the personal jurisdiction of this court.

The Court concludes that all claims arising out of the representations, disclosures, and fees at the time the loans were issued are time-barred. The breach of contract claims that the loans continued to be serviced improperly throughout the repayment period are also time-barred with respect to the specific allegations and attachments to the Second Amended Complaint. Accordingly, defendants' motion for summary judgment is **ALLOWED** without prejudice to the Salois' claim of breach of the settlement agreement.

## II. FACTUAL BACKGROUND

Accepting all facts pled in the complaint as true for the purposes of this **[*4]** motion, the Court treats the following facts as undisputed.

The Dime Savings Bank of New York, FSB ("Dime"), a federally chartered savings bank, set up and controlled subsidiaries in states throughout the eastern United States, including Massachusetts. Operating as The Dime Real Estate Services - Massachusetts ("DRES-MA"), defendants conducted loan transactions out of a number of offices in Massachusetts, between July 1, 1986 and December 31, 1989. The bank made more than four thousand mortgage loans in Massachusetts during that time period, totalling in excess of six hundred million dollars. (Compl. P 4.) By 1990 DRES-MA was dissolved and/or merged into Dime. (Compl. P 12.) Dime continued to service at least some of the loans. (Compl. Ex. F.) The current holders of the outstanding mortgage loans which Dime originated have been designated the "John Doe Companies."

### A. The Alleged Product and Sales Scheme

In Massachusetts, Dime marketed primarily the "Impact Loan", instructing loan production representatives ("LPRs") who marketed the loans to the public to push the sale of that type of loan to the exclusion of other options. (Compl. P 79.) Dime's "Impact Loan" featured both **[*5]** graduated monthly payments and a variable interest rate. It had two additional distinctive features. First, it was designed to negatively amortize. Second, it required very little verification of employment, income, or assets. (Compl. PP 36-37.)

### 1. Negative amortization

Monthly loan payments are fully "amortizing" when they cover the monthly interest on the loan and pay down the principal. "Negative amortization" occurs when the monthly payment is insufficient to cover the monthly interest. The unpaid interest is added to the principal, and begins to accrue interest itself. Thus, despite the borrower's regular payments, the principal owed on the loan increases over time. Under the Dime agreements, no payments were applied to the principal until all deferred interest had been paid. (Compl. P 53.)

Dime made its loans more attractive to plaintiffs and others by offering a discounted interest rate of 7.5% for the first six months, and a cap of 9.5% for the second six months. (Compl. P 57.) Only after that time would the rate charged conform to the Cost of Funds index plus three per cent, as described in the loan agreement, with a cap of 13.875%. (Compl. Ex. C.) Once the interest **[*6]** rate rose, the principal would begin to negatively amortize, unless and until falling interest rates and/or increased monthly payments resulted in a payment which covered the monthly interest. (Compl. P 40.)

After the first six months, the monthly statements showed increases in the principal balance "like clockwork." (P40, 62). "Deferred interest" began to

1996 U.S. Dist. LEXIS 21901

appear on the statements in the second year of the loan. (Compl. P 62.) Once the principal balance reached 110% of the original principal, the borrower would be required to make fully amortizing payments. (Compl. P 42.)

## 2. Loan verification

Dime instructed its managers and LPRs to ensure that the loan verification supported the application. As a matter of policy, loan approvals were granted on the basis of the value of the real estate being sold, rather than on the basis of the borrowers' down payment or financial credentials. (Compl. Ex. X.) In addition, LPRs and attorneys were instructed not to investigate the existence or source of down payment funds and closing costs. (Compl. P 86.) In some cases, the down payment would come from a second mortgage on the property being purchased. (Compl. P 161.)

## 3. Marketing

The [*7] complaint alleges that defendants engaged in a calculated scheme to market their loans which included: (1) fraudulent mortgage advertisements, disclosures, and loan documents; (2) federal Truth-in-Lending Disclosure Statements, Loan Commitments, and mortgage loan documents which omitted important information and were sufficiently complicated that the actual material terms would be concealed from all but a few well-trained mortgage analysts; and (3) unfair and/or deceptive marketing tactics such as product tampering and equity skimming. (Compl. P 43.) At no time in the "typical" transaction would the LPR tell the borrower the loan was a negative amortization loan. (Compl. P 165.)

As part of the general scheme of loan sales, Dime told potential borrowers "We always do it this way," and "You don't need an attorney. Dime's attorney will handle things." The Salois' were instructed that they would not need their own attorney, so they did not hire one. (Compl. P 162.)

## 4. Foreclosure

In the event of foreclosure on a property, Dime would typically debit the entire amount of the mortgage loan as a "tax loss carry forward," and expend a lesser amount to purchase the property. This allowed [*8] the bank to avoid the paper loss through a tax savings. (Compl. P 103.) From 1990 to 1993, Dime had a foreclosure rate of sixty per cent, the highest rate in the country. (Compl. P 104.) In 1993, Dime was able to shield approximately forty-four million dollars of income from any federal corporate income taxes and still had approximately two-hundred thirty-nine million dollars worth of "tax loss carry forward." (Compl. P 105.)

## B. The Plaintiffs' Loans

There are three loans specifically at issue in this complaint. Ninon R.L. Freeman, who was added as a plaintiff in the amended complaint, obtained a loan from Dime with her then-husband for $ 150, 000 to refinance their Newton, Massachusetts home on November 18, 1986. This loan was paid off in full in December 1993 and Ms. Freeman still resides at that residence.

The Learys put down $ 70,000 on their first home in Tewksbury and executed a $ 100,000 loan from Dime on April 15, 1987. This property was foreclosed upon in May 1991. (Compl. P 182.)

Robert and Dianne Salois entered a loan agreement with Dime for $ 145,600 on or about June 16, 1987, when they signed the Adjustable Rate Note and executed a mortgage security interest [*9] in the home they were purchasing. They had made a $ 36,400 down payment, and at the time the initial complaint was filed, still resided in that home. (Compl. P 174.)

## 1. The Loan Documents

The plaintiffs signed Adjustable Rate Notes as part of their loan application processes. (Compl. Ex. C.) They understood the Adjustable Rate Note to be a final contract between Dime and themselves. They took the Note to be a complete and integrated document. (Compl. PP 174-175.)

The Salois' loan documents are attached to the complaint as a representative example. Under the title "ADJUSTABLE RATE MORTGAGE," appears the following: THIS NOTE CONTAINS PROVISIONS ALLOWING FOR CHANGES IN MY INTEREST RATE AND MY MONTHLY PAYMENT, WITH LIMITATIONS, AND ALLOWS FOR INCREASES IN THE PRINCIPAL AMOUNT TO BE REPAID (Negative Amortization). The document describes how the interest rate on the mortgage will be calculated throughout the course of the loan. On the second page of the three-page document, under the heading "Additions to My Unpaid Principal (Negative Amortization)", is a section which reads in full,The amount of my monthly payment could be less than the amount of the interest portion of [*10] the Full Payment Amount after each Interest Change Date. If so, each month that my monthly payment is less than the interest portion, the Note Holder will subtract the amount of my monthly payment from the amount of the interest portion and will add the difference to my unpaid principal. The Note Holder will also add interest on the amount of this difference to my unpaid principal each month. The interest rate on the interest

added to the principal will be the rate required by Section 4(A) above.

Additionally, the Federal Truth in Lending Disclosure Statement, a one-page document signed by both Salois' on May 7, 1987, explained negative amortization under a bold-faced heading directly above their signatures. This section indicates the amount by which the loan principal would increase if monthly payments were insufficient to cover the interest rate differential. (Compl. Ex. L.)

The Adjustable Rate Note provided that in the event of changes in the amount of monthly payments a telephone number of a person who would answer questions would be provided. (Compl. P 65, Ex. C.) However, when borrowers, including plaintiffs, called Dime to find out what "deferred interest" was, customer **[*11]** service representatives did not accurately answer their questions. (Compl. P 65.)

2. The Correction of the Salois' Note

On February 29, 1988 and June 1, 1988, Dime sent the Salois' new Adjustable Rate Notes to execute. The new notes were to change what Dime first said was "procedural only", and then said was only a typewriting error. (Compl. PP 184-85.) The original note (Compl. Ex. C.) states the loan was capped at two-per-cent change in interest rate per "Interest Rate Change Date", i.e. per month, as defined by the preceding paragraph of that document. The corrected documents, which plaintiffs allege were not signed until "at least 1988," would have removed the cap on monthly interest adjustments, leaving only the overall 13.875% rate cap. (Compl. Exs. D, E.). The cover letter signed by Dana S. Cohen, Esq. explains that the initial note "incorrectly reflects the limits on your interest rate, by stating that the cap is two (2%) percent per change date." (Ex. D). The changes were made by crossing out the 2 percent cap and writing in "N/A".

3. The Salois' back charges

In February 1995, the Salois' were notified that they owed Dime $ 12,575.95 in back charges, and that if **[*12]** they would make such a payment their account would be fully up-to-date and their loan would be reinstated. (Compl. P 191.) The Salois' paid the full amount but on or about March 10, 1995 were notified that $ 1,115.50 was still outstanding ($ 15 in returned check fees, $ 496.95 in unpaid late charges, and $ 604.05 for a short-fall in the escrow balance). (Compl. P 192.)

D. The Instant Action

This action was commenced on September 1, 1995. The Salois' state they were not aware of their claims until advised by their attorney in the last week of September, 1994. (Compl. P 153.) Ms. Freeman and the Learys were advised by the same attorney in the summer of 1995. The plaintiffs do not allege facts to explain what prompted them to consult legal counsel.

III. DISCUSSION

A. Motion to Dismiss for Failure to State a Claim

[HN1]In ruling on a motion to dismiss for failure to state a claim, the Court may look only to the complaint itself, Harper v. Cserr, 544 F.2d 1121, 1122 (1st Cir. 1976), even if the defendant raises affirmative defenses, DiMella v. Gray Lines of Boston, Inc., 836 F.2d 718, 719-20 (1st Cir. 1988). The motion shall be allowed if "it appears beyond **[*13]** doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief." Roeder v. Alpha Indus., Inc., 814 F.2d 22, 25 (1st Cir. 1987) (quoting Conley v. Gibson, 355 U.S. 41, 45-46, 2 L. Ed. 2d 80, 78 S. Ct. 99 (1957)).

The Court must accept all factual allegations in the complaint as true, United States v. Mississippi, 380 U.S. 128, 143, 13 L. Ed. 2d 717, 85 S. Ct. 808 (1965), and draw all reasonable inferences in favor of the plaintiff, Coyne v. City of Somerville, 972 F.2d 440, 442-42 (1st Cir. 1992). Although fraud must be pled with particularity, Fed. R. Civ. P. 9(b), other claims require only "a short and plain statement of the claim showing that the pleader is entitled to relief," Fed. R. Civ. P. 8(a). However, the court need not accept "legal conclusions or . . . bald assertions" made without factual support. Resolution Trust Corp. v. Driscoll, 985 F.2d 44, 48 (1st Cir. 1993); see generally Boston & Maine Corp. v. Town of Hampton, 987 F.2d 855, 863 (1st Cir. 1992) (discussing the tension among First Circuit cases with respect to the particularity required in pleadings).

Defendants move for dismissal of this case **[*14]** on the basis of the affirmative defense of limitation of the action, as well as on the merits. [HN2]The statute of limitations defense may be addressed in a Rule 12(b)(6) motion when the defense is obvious on the face of the pleadings. See Aldahonda-Rivera v. Parke Davis & Co., 882 F.2d 590, 592 (1st Cir. 1989); see also 5 Charles A. Wright & Arthur R. Miller, Federal Practice & Procedure § 1277 n.13 (1990).

B. Federal claims

The plaintiffs' mortgages were issued November 18, 1986, April 15, 1987, and June 16, 1987, and corrected mortgage documents were presented to the Salois' in February and June, 1988. This action was not filed

until September 1, 1995, over seven years after the last corrective document was sent. The statutes of limitations on the federal claims range from one year to four years. Therefore, unless the actions accrued at a later date, or were tolled by fraudulent concealment, all federal claims are time-barred. Federal common law determines when the statute begins to run on the federal claims. See Maggio v. Gerard Freezer & Ice Co., 824 F.2d 123, 127 (1st Cir. 1987).

1. RICO (Count II)

[HN3]RICO imposes civil liability for injury to business [*15] or property "by reason of a violation of section 1962," which in turn makes it a crime "for any person employed by or associated with any enterprise . . . to conduct or participate, directly or indirectly, in the conduct of such enterprise's affairs through a pattern of racketeering activity." 18 U.S.C. §§ 1962(c), 1964(c). An act of "racketeering activity" is the commission of one of the crimes enumerated in the statute. § 1961(1). A "pattern of racketeering activity" requires at least two acts of racketeering activity. § 1961(5).

[HN4]Because RICO does not include a limitations period, the Clayton Act's four-year period, 18 U.S.C. § 15b, has been held to apply to civil RICO claims. See Agency Holding Corp. v. Malley-Duff & Assoc., Inc., 483 U.S. 143, 156, 107 S. Ct. 2759, 2767, 97 L. Ed. 2d 121 (1987). The four-year period begins to run "when a plaintiff knew or should have known of his injury." Rodriguez v. Banco Central, 917 F.2d 664, 666 (1st Cir. 1990). Once each element of RICO has been satisfied, and the plaintiff has cause to know of the injury, the statute will run. See id. at 667. Even an additional predicate act within the limitations period will not save the [*16] action. See id. at 666-67. As the complaint was filed September 1, 1995, any claims which accrued prior to September 1, 1991, are time-barred.

Plaintiffs allege that the defendants, through DRES-MA, engaged in a pattern of racketeering activities between July 1, 1986, and December 31, 1989, while "developing, marketing, providing, and servicing 'Impact Loans' in Massachusetts." They allege that defendants committed mail and wire fraud by defrauding the plaintiffs and others "into taking mortgage loan(s) with Dime and making down payments and monthly payments that they otherwise would not have entered into or have been obligated to make, in order to benefit the defendants." Under the plaintiffs' theory, then, they sustained injuries when they were defrauded into taking out the mortgages and continuing to make payments under the mortgages.

These RICO injuries were sustained, if at all, when the mortgages were issued, and when payments were made under the mortgages. At least two predicate acts had been committed by the second mortgage payment, and the statute of limitations began to run. n2 Plaintiffs argue, however, that the statute of limitations ought to be tolled because they [*17] could not have known of the injuries. They argue that their loan documents omitted important information, and were sufficiently complicated that the actual material terms were concealed from all but a few well-trained mortgage analysts.



- - - - - - - - - - - - - - Footnotes - - - - - - - - - - - - - -

n2 Even if the two predicate acts were the two corrective loan documents mailed in 1988, the claim is still time-barred.

- - - - - - - - - - - - - End Footnotes- - - - - - - - - - - - - -

However, all information necessary to ascertain the cause of action was in the plaintiffs' possession from the time they entered the loan agreements. See Maggio, 824 F.2d at 129 (tolling unavailable where plaintiff had ample information at his disposal to suggest cause of action). Any failure to provide a required disclosure would have been discoverable as soon as the loan transaction was completed. Cf. Lynch v. Signal Finance Co., 367 Mass. 503, 507-08, 327 N.E.2d 732, 734 (1975) (rejecting tolling where "plaintiffs knew the terms of the loan and knew what had been disclosed to them and what had not"). The loan documents notified plaintiffs of the possibility [*18] of negative amortization, when it would apply, and how it would work. If the LPR's had misrepresented the nature of the loans, the loan documents plaintiffs signed would have put them on notice of the fraud.

Plaintiffs acknowledge that the loan documents revealed the possibility of negative amortization (Compl. P 55), but complain that the documents failed to disclose the certainty of negative amortization. In the seventh month of the loan, however, the increasing principal began to appear on the bills. In the second year, the deferred interest began to appear. Reasonable diligence would have led the plaintiffs to discover by 1988 that the negative amortization described in the loan documents had begun. See Aldahonda-Rivera v. Parke Davis & Co., 882 F.2d 590, 594 (1st Cir. 1989) ("The limitations period will be suspended only upon a clear showing of diligent efforts to discover the cause of the injury . . . ."); see also Maggio, 824 F.2d at 128 ("Whether a plaintiff should have discovered the fraud

is an objective question requiring the court to determine if the plaintiff possessed such knowledge as would alert a reasonable investor to the possibility of fraud.") (internal **[\*19]** quotations omitted).

Plaintiffs have failed to allege facts to show reasonably diligent efforts to understand their loans or to make them understandable. Cf. Lynch, 367 Mass. at 508, 327 N.E.2d at 735 (rejecting tolling where "discovery of the nondisclosure may have required merely the making of mathematical computations from known data or the receipt of information as to the governing legal requirements"). Plaintiffs signed their loan documents when the loans were issued, and received statements every month thereafter. No facts are alleged as to what prompted plaintiffs to consult an attorney, if not their loan documents and monthly statements. As in Aldahonda-Rivera, here "the only logical conclusion that can be drawn is that [the plaintiffs] filed [their] complaint [several] years too late because it took [them] that long to consult an attorney." n3 882 F.2d at 593. If the plaintiffs' loan documents and statements prompted them to consult an attorney in 1994 and 1995, unprompted by any new disclosure, there is no reason they could not have consulted an attorney several years earlier.

- - - - - - - - - - - - - - Footnotes - - - - - - - - - - - - - - - -

n3 The briefs suggest that the Salois' were prompted to seek legal advice because financial circumstances led to their inability to meet their monthly payments.

- - - - - - - - - - - - End Footnotes- - - - - - - - - - - - - -

**[\*20]**

Plaintiffs further allege that defendants fraudulently concealed the cause of action, such that the statute of limitations should be tolled in their favor. In federal question cases, the fraudulent concealment doctrine "operates to toll the statute of limitations where a plaintiff has been injured by fraud and remains in ignorance of it without any fault or want of diligence or care on his part . . . until the fraud is discovered." Maggio, 824 F.2d at 127 (quoting Cook v. Avien, 573 F.2d 685, 694-95 (1st Cir. 1978)). Plaintiffs "must demonstrate that (1) defendants engaged in a course of conduct designed to conceal evidence of their alleged wrongdoing and that (2) [the plaintiffs] were not on actual or constructive notice of the evidence, despite (3) their exercise of reasonable diligence." J. Geils Band Employee Benefit Plan v. Smith Barney Shearson, Inc., 76 F.3d 1245, 1255 (1st Cir. 1996), cert. denied, 519 U.S. 823, 136 L. Ed. 2d 39, 117 S. Ct.

81 (1996). "Furthermore, it is [plaintiffs'] burden under Federal Rule of Civil Procedure 9(b) to plead with particularity the facts giving rise to the fraudulent concealment claim." Id.

As discussed above, the explanations of **[\*21]** negative amortization in the loan documents, combined with the appearance of increased principal and deferred interest on the monthly statements by the second year, constituted notice of any misrepresentations with respect to whether or not the loans would negatively amortize. There is no indication that plaintiffs, if they did not understand their loans, exercised reasonable diligence in seeking an explanation. Therefore they cannot take advantage of the federal fraudulent concealment doctrine.

The motion to dismiss is **ALLOWED** with respect to Count II, because it is barred by the four-year statute of limitations and no viable theory for tolling has been advanced.

2. TILA, Parity Act and RESPA Claims (Counts III, IV, IV)

Claims for rescission under the federal Truth-in-Lending Act (TILA), 15 U.S.C. § 1601 et seq., must be brought within three years of the "consummation of the transaction or upon the sale of the property, whichever occurs first, notwithstanding the fact that the disclosures required under this section or any other material disclosures required under this chapter have not been delivered to the obligor." 15 U.S.C. § 1635(f). As this language elucidates, **[\*22]** nondisclosure is not a continuing violation for purposes of the statute of limitations. See Moor v. Travelers Ins. Co., 784 F.2d 632, 633 (5th Cir. 1986) (citing In re Smith, 737 F.2d 1549, 1552 (11th Cir. 1984)). The last contract was consummated in June 1987 and "corrected" in 1988, and the complaint was not filed until September 1995. To the extent the plaintiffs seek rescission under TILA, the claim is time-barred.

Failure to make the disclosures required by the TILA also creates liability for damages. An action for damages must be brought "within one year from the date of the occurrence of the violation." 15 U.S.C. § 1640(e). Although the one-year period typically runs from the consummation of the transaction, King v. California, 784 F.2d 910, 915 (9th Cir. 1986), cert. denied, 484 U.S. 802, 98 L. Ed. 2d 11, 108 S. Ct. 47 (1987); Moor, 784 F.2d at 633, "the doctrine of equitable tolling may, in the appropriate circumstances, suspend the limitations period until the borrower discovers or had reasonable opportunity to discover the fraud or nondisclosures that form the basis of the TILA action," King, 784 F.2d at 915; see also Jones v. TransOhio Sav. Ass'n, **[\*23]** 747 F.2d 1037,

1041 (6th Cir. 1984). "To clothe himself in the protective garb of the tolling doctrine, a plaintiff must show that the defendant concealed the reprobated conduct and despite the exercise of due diligence, he was unable to discover that conduct." Moor, 784 F.2d at 634 (refusing to toll statute because, by the consummation of the loan, plaintiff knew or should have known that the required information had not been disclosed). As discussed above, plaintiffs have failed to plead facts constituting reasonable diligence sufficient to toll the statute of limitations.

Acts in violation of the Alternative Mortgage Transactions Parity Act (Parity Act), 12 U.S.C. § 3801 et seq., are to be treated as violations of TILA. See 12 U.S.C. § 3806. The Parity Act claim is therefore time-barred for the reasons stated.

Finally, plaintiffs allege in their Real Estate Settlement Practices (RESPA) claim, 12 U.S.C. § 2601 et seq., that defendants failed to make required disclosures, overcharged for certain services, and took kickbacks at the time the loans were issued. RESPA provides a one-year statute of limitations "from the date of the occurrence of the violation." 12 [*24] U.S.C. § 2614. As discussed above, with the notable exception of the alleged kickbacks, most of the missing disclosures or overcharges would have been apparent at the issuance of the loans. In the second-amended complaint, plaintiffs allege for the first time that defendants charged more for the title insurance premium than was paid to the title insurance company and obtained discounts and/or kickbacks from title insurance companies. P 126(c)(vi). Although, to be sure, kickbacks are by their nature fraudulent and secret, the doctrine of equitable tolling does not apply. Hardin v. City Title & Escrow Co., 254 U.S. App. D.C. 370, 797 F.2d 1037, 1039 (D.C. Cir. 1986). This claim is therefore also time-barred.

Accordingly, the motion to dismiss is **ALLOWED** with respect to Counts III, IV, and V.

## C. State claims

Plaintiffs' state claims accrue according to Massachusetts' "discovery rule" and may be tolled under the Massachusetts doctrine of fraudulent concealment.

### 1. Discovery rule

Under the Massachusetts "discovery rule," an action accrues when the injured party knew or, in the exercise of reasonable diligence, should have known, the factual basis for the [*25] cause of action. See Tagliente v. Himmer, 949 F.2d 1, 4 (1st Cir. 1991) (citing Maggio, 824 F.2d at 130); Puritan Medical

Center, Inc. v. Cashman, 413 Mass. 167, 175, 596 N.E.2d 1004, 1010 (1992). "The standard set forth by the discovery rule is an objective one. . . . In order for the statute of limitations to be tolled pursuant to the discovery rule, the factual basis for the cause of action must have been 'inherently unknowable' at the time of injury." Tagliente, 949 F.2d at 4. The burden is on the plaintiff to prove that in the exercise of reasonable diligence he could not have known of the misrepresentation within the statute of limitations. Id. at 5 (citing Friedman v. Jablonski, 371 Mass. 482, 485-87, 358 N.E.2d 994, 998 (1976)).

### 2. Fraudulent Concealment

Massachusetts law also provides for the tolling of statutes of limitations by fraudulent concealment. Under Mass. Gen. L. ch. 260 § 12 (1990):If a person liable to a personal action fraudulently conceals the cause of action from the knowledge of the person entitled to bring it, the period prior to the discovery of his cause of action by the person so entitled shall be excluded in determining [*26] the time limited for the commencement of the action.In Massachusetts, fraudulent concealment requires either (1) an affirmative act of concealment done with intent to deceive, or (2) breach of a fiduciary duty of full disclosure. Puritan Medical Center v. Cashman, 413 Mass. 167, 176, 596 N.E.2d 1004, 1010 (1992) (where "a fiduciary relationship exists between plaintiff and defendant . . . mere failure to reveal information may be sufficient to constitute fraudulent concealment for the purposes of § 12") (internal quotations and citations omitted). Plaintiffs have not alleged any affirmative acts of concealment.

Instead, plaintiffs argue that Dime owed them fiduciary duties. A fiduciary relationship exists when a party places special trust and confidence in another who knowingly accepts the responsibility. In re Fordham, 130 B.R. 632, 648-49 (Bankr. D. Mass. 1991). "Plaintiff alone, by reposing trust and confidence in the defendant, cannot thereby transform a business relationship into one which is fiduciary in nature." Broomfield v. Kosow, 349 Mass. 749, 755, 212 N.E.2d 556, 560 (Mass. 1965); see also In re Fordham, 130 B.R. at 649 ("Although [plaintiffs] [*27] avow that they placed trust and confidence in [defendants] they may not abandon all caution and responsibility for their own protection and unilaterally impose a fiduciary relationship."). "Traditionally, Massachusetts courts have viewed a bank's relationship to its customers as one of creditor and debtor, a relationship which imposes no duty to counsel or make disclosures to the customer." Flaherty v. Baybank Merrimack Valley, N.A., 808 F. Supp. 55, 64 (D. Mass. 1992).

It is true that Dime had a statutory duty, under Mass. Gen. L. ch. 184 § 17B, to inform plaintiffs of their right to obtain separate counsel and to explain that Dime's attorneys represented Dime's interests. Plaintiffs allege these disclosures were never made. However, there is no authority for the proposition that failure to comply with this statutory requirement is sufficient to impose a fiduciary duty upon a bank for the purposes of fraudulent concealment. Cf. Lynch, 367 Mass. at 507-08, 327 N.E.2d at 735 (rejecting contention that "breach of the statutory duty imposed by the TILA should be given the same effect as breach of a fiduciary duty" in tolling statute of limitations).

In support of their argument [*28] that there was a fiduciary relationship, plaintiffs allege having been told that they did not need their own attorney and that Dime's attorney would "handle things." Significantly, there is no allegation that anyone told plaintiffs that Dime's attorney would represent their interests. Rather, the allegation is that plaintiffs were told an attorney was not necessary for the completion of the transaction. Cf. Flaherty, 808 F. Supp. at 61 (holding reliance on attorneys "patently unreasonable" as a matter of law, where the "attorneys clearly represented the banks" and the "plaintiffs failed to communicate, either by words or actions, that they were relying on these attorneys to serve their interests"). The discouragement of the retainer of separate counsel that is alleged here is, without more, an insufficient basis for the formation of a fiduciary relationship between parties to a one-time business transaction.

The cases relied upon by plaintiffs are distinguishable. Both concerned long-time friends and advisors of plaintiffs, who clearly knew they were being relied upon and accepted that trust. In Broomfield v. Kosow, 349 Mass. at 757, 212 N.E.2d at 561, for two years there [*29] had been "a close business relationship and business friendship between the two men." In Reed v. A.E. Little Co., 256 Mass. 442, 446, 152 N.E. 918, 919 (Mass. 1926), plaintiff called upon defendant and asked him to "advise him as a friend in the interest of the plaintiff, in respect to the matters therein contained, and whether it was for the plaintiff's best interest to sign such an agreement." That court found the crucial determinant of a fiduciary relationship to be whether the defendant could exert influence over the person trusting him. Given that there is no such long-standing friendship, or ability to exert influence in the case at bar, the plaintiffs have not alleged sufficient facts to establish a fiduciary relationship between the parties.

Therefore, the Massachusetts statutes of limitations cannot be tolled on the basis of breach of fiduciary duty.

### 3. Massachusetts Consumer Credit Cost Disclosure Act (Count VI)

The requirements of the Massachusetts Consumer Credit Cost Disclosure Act ("MCCCDA"), Mass. Gen. L. ch. 140D, are substantially the same as the requirements of the federal TILA. Plaintiffs allege that Dime violated MCCCDA by failing to give complete and [*30] accurate disclosures with respect to the loan. This claim is governed by a four-year statute of limitations. Mass. Gen. L. ch. 140D § 10(f). It is time-barred for the same reasons discussed in the context of the TILA claim. Moreover, "in Massachusetts, one who signs an agreement is presumed to have read and understood its contents." Lerra v. Monsanto Co., 521 F. Supp. 1257, 1262 (D. Mass. 1981). Thus plaintiffs cannot rely on the argument that they were unable to understand their loan documents. The motion to dismiss is **ALLOWED** with respect to Count VI.

### 4. Chapter 93A (Count VII)

Chapter 93A makes unlawful "unfair methods of competition and unfair or deceptive acts or practices in the conduct of any trade or commerce," Mass. Gen. L. ch. 93A § 2, and authorizes any person injured by such acts to bring an action for damages and/or injunctive relief, ch. 93A § 9(1). Under the Attorney General's regulations enacted under Chapter 93A, an act or practice violates section two if it "fails to comply with existing statutes, rules, regulations or laws, meant for the protection of the public's health, safety, or welfare promulgated by the Commonwealth or any political subdivision [*31] thereof intended to provide the consumers of this Commonwealth protection," 940 Code Mass. Regs. § 3.16(3), or if it "violates the Federal Trade Commission Act, the Federal Consumer Credit Protection Act or other Federal consumer protection statutes," § 3.16(4). Chapter 93A claims are subject to a four-year statute of limitations. Mass. Gen. L. ch. 260 § 5A.

Plaintiffs allege first that Dime violated the requirements for "graduate payment mortgages" in Mass. Gen. L. ch. 167E by failing to provide the option to change to a more conventional mortgage, failing to offer a conventional mortgage, and failing sufficiently to explain the terms of the mortgage. These claims, however, accrued and should have been discovered at the time the loan was issued and are therefore time-barred.

Plaintiffs also allege that Dime violated Chapter 93A by "bait and switch" advertising, product tampering, and equity skimming in the development and marketing of its loans. Compl. PP 200-207. These claims are also barred by the four-year statute of limitations. All the information necessary to discover

these claims was in the plaintiffs' possession from the time they entered into the loans. The alleged violation [*32] of Mass. Gen. L. ch. 183 § 63, which regulates the fees charged at the time the loan is issued, is also time-barred, as are the alleged violations of Mass. Gen. L. ch. 184 §§ 17B & 17D, which mandate that certain disclosures be made at the time of the loan. n4 As the complaint does not allege that Dime's duty to pay real estate taxes in accordance with Mass. Gen. L. ch. 183 § 62 continued beyond the first year of the loan (Compl. P 137), this claim is also time-barred.

- - - - - - - - - - - - - - Footnotes - - - - - - - - - - - - - - - - - -

n4 Defendants correctly point out that Chapter 184, § 17D, did not go into effect until 1988, which was after the issuance of the plaintiffs' loans.

- - - - - - - - - - - - End Footnotes- - - - - - - - - - - - - -

On the other hand, several of plaintiffs' claims are continuing violations that are not barred by the statute of limitations. Plaintiffs allege that Dime violated Mass. Gen. L. ch. 167E § 2(B)(9) by changing the payment amount more than once a year. If the evidence shows that the monthly payment has changed more than once a year within the past four years, this claim is not time-barred. The complaint [*33] does not foreclose this possibility. Additionally, plaintiffs allege that Dime violated the requirements for variable rate mortgages in Mass. Gen. L. ch. 167E § 2(B)(10), by changing the rate of interest more than once every six months. As the interest changed five times in 1995, this claim is not time-barred.

However, defendants argue that Chapter 167E doesn't apply to Dime because a federal bank is not subject to regulation by the Massachusetts commissioner of banks. n5 Mass. Gen. L. ch. 167E, § 1 (defining bank as a savings bank, co-operative bank, or trust company subject to the supervision of the Commissioner of banks). The second amended complaint does not allege defendants fall within this definition of bank.

- - - - - - - - - - - - - - Footnotes - - - - - - - - - - - - - - - - - -

n5 Dime does not argue that this statute is in applicable due to pre-emption. See generally Grunbeck v. Dime Sav. Bank of New York, FSB, 74 F.3d 331 (1st Cir. 1996) (state statute requiring computation of interest on a simple interest basis not pre-empted).

- - - - - - - - - - - - End Footnotes- - - - - - - - - - - - - -

Finally, plaintiffs allege that Dime [*34] violated federal fair debt collection protections when, on February 24, 1994, it sent a collection letter on another's letterhead to create the false belief that an entity other than Dime was participating in the collection process. Compl. P 208; see 15 U.S.C. § 1692j ("It is unlawful to design, compile, and furnish any form knowing that such form would be used to create the false belief in a consumer that a person other than the creditor of such consumer is participating in the collection of or in attempt to collect a debt such consumer allegedly owes such creditor, when in fact such person is not so participating."). However, this claim arose on February 24, 1994 and the complaint was filed on September 1, 1995. Therefore, this Court lacks jurisdiction pursuant to 15 U.S.C. § 1692j(b) and § 1692K(d) (permitting federal jurisdiction over claims brought within one year from the date on which the violation occurs). Cf. Mattson v. U.S. West Communications, Inc., 967 F.2d 259, 261 (8th Cir. 1992) (holding that the statute of limitations was jurisdictional).

The motion to dismiss Count VII is therefore ALLOWED.

5. Breach of contract and the covenant of good [*35] faith and fair dealing (Counts VIII & IX)

The plaintiffs also allege that Dime has breached its contract on several occasions. "Actions of contract . . . shall, except as otherwise provided, be commenced only within six years next after the cause of action accrues." Mass. Gen. L. ch. 260 § 2.

First, plaintiffs argue that Dime breached its contractual promise to provide "the name and telephone number of a person who will answer any question [they] may have regarding the notice" (Compl. Ex. C, P 4(E)), when its customer service representatives would not accurately answer questions about deferred interest. (Compl. P 65.) The complaint states that the plaintiffs called Dime to inquire about the deferred interest "when 'deferred interest' started appearing on the plaintiffs' monthly payment statements." (Compl. P 194.) As the deferred interest appeared on the statements at the latest in mid-1988, seven years before the complaint was filed, this claim is time-barred. If the failure to answer questions over the phone was a breach of contract, plaintiffs had all information necessary to discover their cause of action as soon as the phone conversations took place.

Next, the Salois' [*36] argue that Dime breached its contract in 1988 when it sent them letters requesting that they sign the 'corrective' documents, because the

letters materially altered the terms of the loan. (Compl. P 253.) However, this claim is barred by the six-year statute of limitations because the Salois were on notice of the precise change in the proposed modified contract by June, 1988.

The Salois' also argue that "Dime breached the Adjustable Rate Note by servicing it as if the purported 'corrective' documents had been signed, even before they had been signed." (Compl. P 253.) Specifically, they allege that Dime did not comply with the cap on variation in the interest rate that appeared in the original loan documents and instead applied a rate permitted only by the corrective documents. Whether or not this claim would be time-barred, it must be dismissed based on the documents attached to the complaint. Although the complaint alleges that the original note capped the interest rate variation at 2% per year, the attached note makes clear that the interest cap was per "Interest Rate Change Date," or per month. (Compl. Ex. C.) Plaintiffs own charts reveal that the interest rate never changed [*37] more than 2% per month. (Compl. Ex. Y.)

Plaintiffs' memorandum of law specifies the basis for Ms. Freeman's breach of contract claim. Ms. Freeman alleges that defendants breached the loan which called for a 7.5% rate cap for twelve months. (Exh. A, P2(D)). However, plaintiff was aware of this no later than 1987. Therefore, her contract claim is time-barred.

Finally, the Salois' allege that in February 1995, Dime agreed with the Salois' that their account would be fully up to date if they paid $ 12,575.95 by the end of the month. Compl. P 191. After paying the required amount on time, however, the Salois' were informed that additional funds were due. The plaintiffs do not assert this alleged breach of a settlement agreement as a basis for its breach of contract claim. (See PP 252-259). Even if it had been adequately alleged, it does not involve enough money to support this Court's diversity jurisdiction.

The motion to dismiss Counts VIII and IX is therefore **ALLOWED** without prejudice to filing an action for breach of the settlement agreement in state court. n6



n6 There are also conclusory allegations that Dime failed to service the contract properly within the six years prior to the commencement of the suit. This dismissal is without prejudice to any claims of breach of contract based on inadequate servicing not addressed in this opinion.

- - - - - - - - - - - - End Footnotes- - - - - - - - - - - - -

[*38]

6. Remaining tort claims (Counts X, XI, XII, & XIII)

Finally, plaintiffs bring several tort claims. In Massachusetts, "actions of tort . . . shall be commenced only within three years next after the cause of action accrues." Mass. Gen. L. ch. 260 § 2A.

Plaintiffs allege in Count X that Dime breached a fiduciary duty by (1) telling the plaintiffs they could afford the monthly payments when they couldn't; and (2) failing to give proper disclosures. However, as discussed above, the plaintiffs have failed to plead facts sufficient to establish a fiduciary relationship between the parties.

Plaintiffs claim in Count XI that Dime acted fraudulently by misrepresenting (1) whether the loan would be certain to enter negative amortization, (2) whether the plaintiffs could afford the monthly payments on their loan, and (3) whether the corrective notes materially altered the terms of the loan. Next, plaintiffs allege (Count XII) that defendants conspired to wrongfully procure their mortgage notes. Compl. P 268. In their final claim (Count XIII), plaintiffs allege that the defendants' employees negligently induced them to enter into the loan agreements. Compl. P 274. Because the latest [*39] of the alleged misrepresentations, conspiracies, and negligent acts occurred in 1988, when the corrective notes were sent, all are barred by the three-year statute of limitations for Massachusetts torts. See Mass. Gen. L. ch. 260 § 2A.

The motion to dismiss is therefore **ALLOWED** with respect to Counts X, XI, XII, and XIII.

IV. **ORDER**

Defendants' motion to dismiss (Docket No. 51) is therefore **ALLOWED** without prejudice to filing a breach of settlement agreement claim in state court.

PATTI B. SARIS

United States District Judge

Westlaw.

1994 WL 879676                                                          Page 1
2 Mass.L.Rptr. 269, 1994 WL 879676 (Mass.Super.)
**(Cite as: 1994 WL 879676 (Mass.Super.))**

H

Superior Court of Massachusetts.

David MAYO and others [FN1]

FN1. Thelma Mayo, Leonora Mayo, Calvin
Smith, and Sarah Smith.

v.
KEY FINANCIAL SERVICES, INC. and another
[FN2]

FN2. Advanced Financial Services, Inc.

**No. 926441D.**

June 22, 1994.

FLANNERY, J.

**\*1** Plaintiffs, David, Thelma, and Leonora Mayo
(hereinafter "the Mayos") and Calvin and Sarah
Smith (hereinafter "the Smiths"), bring this action
against the defendants, Key Financial Services, Inc.
(Key) and Advanced Financial Services, Inc.
(Advanced), seeking rescission of their respective
loan agreements pursuant to the Massachusetts
Consumer Credit Disclosure Act, G.L.c. 140D § 10
(MCCDA) (Count II), and restitution of alleged
excessive points paid on the loans (Count III). [FN3]
On Count II, the plaintiffs contend that Advanced
understated the finance charges on their loan
applications. and that the understatements amount to
material nondisclosures under MCCDA, allowing the
plaintiffs to rescind the agreements.  As to Count III,
the plaintiffs assert that the points they were charged
on the loans were excessive in violation of G.L.c.
183, § 63, and they seek restitution from the
defendants of the allegedly excessive points.

> FN3. The plaintiffs have chosen not to
> pursue their usury claim (Count I).  The
> word "point" as used in real estate financing
> denotes a fee or charge equal to one percent
> of the principal amount of the loan which is
> collected by the lender.  The point (or
> points) is paid in addition to the stated
> interest rate on the face of the loan.  Black's

Law Dictionary 1156 (rev. 6th ed.1990).

Key and Advanced claim that any understatement of
the respective finance charges is immaterial as a
matter of law and further assert that Massachusetts
law does not apply to this action.  Key also claims
that G.L.c. 183, § 63, does not provide a private right
of action, and alternatively, that as assignee of the
plaintiffs' loans, it did not receive any excessive
points.

Key also argues that the statute of limitations has
expired on all claims.  The parties cross-move for
summary judgment on Count II pursuant to
Mass.R.Civ.P. 56 and the defendants move for
summary judgment on Count III. For the following
reasons, the plaintiffs' motion for summary judgment
is allowed on Count II and the defendants' motion for
summary judgment is denied.

## BACKGROUND

On May 6, 1989, the Smiths and Advanced entered
into a loan agreement in which Advanced loaned the
Smiths $12,100.   The Smiths executed a note in
favor of Advanced and repayment was secured by a
mortgage on the Smith residence, located in Hyde
Park, Massachusetts.        The Truth-In-Lending
Disclosure form states the Smiths' finance charge as
$15,575.80. [FN4] The "Itemization of the Amount
Financed" form for the Smith loan states that the
Smiths were charged a $50 public official recording
fee and were also charged $35 for title insurance.
These charges were not included in the finance
charge calculation.

> FN4. The finance charge is the cost of
> consumer credit as a dollar amount.    It
> includes any charge payable directly or
> indirectly by the consumer and imposed
> directly or indirectly by the creditor as an
> incident to or a condition of the extension of
> credit.  It does not include any charge of a
> type payable in a comparable cash
> transaction. 209 CMR 32.04(A).

Recording the documents of the Smith loan at the
Registry of Deeds cost Advanced $32.   The $32 cost
is broken down as follows:

Copr. © 2004 West. No Claim to Orig. U.S. Govt. Works.

2 Mass.L.Rptr. 269, 1994 WL 879676 (Mass.Super.)
**(Cite as: 1994 WL 879676 (Mass.Super.))**

```
1 four-page mortgage         $20.00
1 one-page mortgage rider     $1.00
1 one-page legal description  $1.00
1 one-page assignment        $10.00
Total:                       $32.00
```

(Advanced exhibit, Dennis Hardiman affidavit, ¶ 4; Plaintiffs' exhibit D, Powers affidavit, ¶ 19).

Advanced, a Rhode Island corporation, assigned the agreement to Key, a New York corporation.

On May 8, 1989, the Mayos and Advanced entered into a loan agreement in the amount of $171,600. The Mayos executed a note secured by a mortgage on their home located in Dorcester, Massachusetts, in favor of Advanced. The TruthIn-Lending Disclosure form provided to the Mayos by Advanced states that the Mayos' finance charge was $26,009.45. On the "Itemization of the Amount Financed in your Mortgage Loan" form, the Mayos were charged $50 as a public officials recording fee. The Mayos were also charged $515 for title insurance. The recording fees and title insurance charge were excluded from the calculation of the finance charge. Advanced assigned the agreement to Key.

**\*2** The Mayos and Smiths executed the agreement at Advanced's office, located in Rhode Island.

### DISCUSSION

Summary judgment shall be granted where there are no genuine issues as to any material fact and where the moving party is entitled to judgment as a matter of law. *Kourouvacilis v. General Motors Corp.,* 410 Mass. 706, 716 (1991); *Cassesso v. Commissioner of Correction,* 390 Mass. 419, 422 (1983); Mass.R.Civ.P. 56(c). The moving party bears the burden of affirmatively demonstrating the absence of a triable issue "and [further,] that the moving party is entitled to judgment as a matter of law." *Pederson v. Time, Inc.,* 404 Mass. 14, 16-17 (1989). Where both parties have moved for summary judgment and "in essence there is no real dispute as to the salient facts or if only a question of law is involved," summary judgment shall be granted to the party entitled to judgment as a matter of law. *Cassesso, supra.*

General Laws c. 140D § 10(a) permits obligors who use their residence for security on a loan the right to rescind the transaction until midnight of the third business day following the consummation of the transaction. The three-day period allowing

rescission is extended to four years if the lender failed to deliver *material disclosures* to the obligors. *Id.*

In the case at bar, the Mayos and Smiths contend that the finance charge disclosed to each of them by Advanced was understated and that failure to disclose an accurate finance charge amounts to a material nondisclosure, entitling them to rescind the agreement. [FN5] For plaintiffs to prevail and rescind the loan agreements, the finance charge must have been understated and the understatement must be material within the meaning of G.L.c. 140D, § 10.

> FN5. The only issue before the court on Count II is whether an understatement of the finance charge disclosed to a material nondisclosure. Since the parties did not argue or brief whether the plaintiffs followed the appropriate procedural steps to rescind, the court assumes these steps were followed. See plaintiffs' exhibit B, rescission notices dated October 23, 1992.

### Count IIoRescission

### I. Did Advanced understate the Smiths' and Mayos' respective finance charges? The Smith Transaction

As discussed above, the Smiths were charged a $50 recording fee and a $35 title insurance fee, which were not included in the finance charge. The Code of Massachusetts Regulations, c. 209, § 32.04(c)(7), the promulgated regulations to G.L.c. 140D, allows the lender to exclude from the finance charge title insurance fees and recording fees if the fees are "bona fide and reasonable in amount." In other words, if the amount charged for these fees is not reasonable or bona fide, the overcharge must be included in the finance charge.

a. Recording fees

General Laws c. 262, § 38 dictates public official recording fees necessary to record documents affecting title to Massachusetts real estate. Under the statute, recording a four-page mortgage is $20 and $1 for each additional page. *Id.* For recording

other papers, such as assignments or discharges, the fee is $10.

There is no dispute between the parties that recording the Smith transaction at the Registry of Deeds cost $32. (Hardiman's aff't, ¶ 4; Powers aff't, ¶ 19.) Accordingly, the Smiths were overcharged at least $18 to record the transaction, and this amount should have been included in the finance charge since it is the amount in excess of the bona fide or reasonable amount of recording fees.

*3 In addition, the $10 assignment recording fee should also have been included in the finance charge. 209 CMR 32.04(b)(6) states that a finance charge includes:

Charges imposed on a creditor by another person for purchasing or accepting a consumer's obligation, if the consumer is required to pay the charges in cash, as an addition to the obligation, or as a deduction from the proceeds of the obligation.

This section of the Code of Massachusetts Regulations is the analog to 12 CFR § 226.4(b)(6), which was promulgated under the federal Truth-in-Lending Act. The Massachusetts Truth-in-Lending Act is closely modeled on the federal Truth-in-Lending Act. *Lynch v. Signal Finance Co. of Quincy,* 367 Mass. 503, 505 (1975). Where a statute is drafted to parallel a federal statute, it should be construed in accordance with federal law. *Vasys v. Metropolitan District Commission,* 387 Mass. 51, 54 (1982).

The bankruptcy court has interpreted 12 CFR § 226.4(b)(6) to mean that where a creditor separately imposes a charge on the customer to cover the cost of making an assignment, the charge is a finance charge which must be included in the finance charge calculation. *In re Brown,* 106 B.R. 852, 858-59 (1989). The court, relying on the plain language and the official commentary to § 226.4(b)(6), further stated that requiring the consumer to pay for the assignment may not be excluded from the finance charge even if disclosed. *Id.* at 859. Since the failure of the lender to include the cost of the assignment in the finance charge resulted in the finance charge being understated, the court determined this understatement to be a material nondisclosure, allowing the obligor to rescind the transaction. *Id.* at 863; see also *Cheshire Mortgage Service, Inc. v. Montes,* 223 Conn. 80, 100- 01 (1992) (holding that failure to include cost of future assignment in finance charge amounts to a material nondisclosure giving the defendants the right to rescind under the federal

Truth-in-Lending Act).

Since the Smiths were charged for the assignment of the transaction to Key, evidenced by Hardiman's affidavit and the disclosure form, under 209 CMR 32.04(b)(6) this charge was either in addition to the obligation of the loan agreement or the amount was deducted from the loan proceeds. The $10 assignment cost which Advanced charged the Smiths should have been included in the total finance charge. As a result, Advanced understated the Smiths' finance charge by $28.

b. Title insurance.

The Smiths were charged $35 for title insurance on a $12,100 loan. The Smiths contend that the defendants charged them $3 per $1,000 loaned to them and that in 1989 a reasonable and bona fide rate for title insurance was $1.25/ $1.50 per $1,000. Accordingly, the Smiths contend that their title insurance should have cost $25 dollars, and the $10 overcharge should have been included in the finance charge because the amount was not bona fide or reasonable.

*4 To support their argument, the Smiths offer affidavit evidence of three real estate attorneys who state that the reasonable rate for title insurance on Massachusetts property in 1989 was $1.25/$1.50 per thousand dollars loaned. (See plaintiffs' exhibit D, Powers aff't, ¶ 8; Marioles aff't, ¶ 8(a); Campbell aff't, ¶ 5.) To counter the Smiths' evidence, Advanced offers Hardiman's affidavit and a rate chart from the title insurer, which states that Advanced actually paid $50 for the Smiths' title insurance. Hardiman states that $50 was the minimum amount the insurer would accept. (Hardiman aff't, § 5 and exhibit D attached--Title Insurance Company "Schedule of Title Insurance Premium Rates, Commonwealth of Massachusetts.") Accordingly, there exists an issue of fact as to whether the Smiths were overcharged or undercharged for title insurance. [FN6] Although this fact remains in dispute, it is not necessary to decide this issue since the Smiths were overcharged for recording fees by $28 resulting in an understatement of the finance charge.

> FN6. Even if the Smiths were undercharged for the title insurance, the undercharge cannot offset the overcharge on the recording fee because the $35 title insurance fee would be bona fide and the $28 overcharge on the recording fees is not bona fide and should have been included in the

2 Mass.L.Rptr. 269, 1994 WL 879676 (Mass.Super.)
**(Cite as: 1994 WL 879676 (Mass.Super.))**

finance charge.

### The Mayo transaction

The Mayos contend that to record the proper documents at the Registry of Deeds cost only $32 but they were charged $50, and that the title insurance only cost $215 but Advanced charged them $515.

#### a. The Recording fee

```
4-page mortgage              $20
1 one-page rider             $1
1 one-page legal description $1
1 mortgage discharge         $10
Total:                       $32
```

Advanced counters this evidence by offering Hardiman's affidavit which states that the total recording fee cost $52. Hardiman breaks down the $52 figure as Powers does but also offers exhibits that demonstrate an additional one-page discharge, adding another $10, as well as a $10 cost to assign the agreement to Key, totalling $52. As discussed above, the $10 assignment fee should have been included in the finance charge bringing Advanced's total cost to record down to $42. Accordingly, the Mayos were overcharged $8 which was not bona fide or reasonable. In regard to the recording fee, there is no dispute Advanced understated the Mayos' finance charge by $8.

#### b. The Title insurance fees

In accordance with the Smiths, the Mayos contend that the reasonable and bona fide rate of title insurance in 1989 was $1.25/$1.50 per $1,000 loaned and under such rates, on a $171,600 loan, they should have been charged $215, not the $515 they were charged. The Mayos offer affidavit evidence that the cost of the title insurance should have been $215. (Powers aff't.) Hardiman's affidavit states that charging the Mayos $3 per $1000 borrowed was not unreasonable and that lenders who do business in several states (such as Advanced) frequently see title insurance rates much higher than $1.25/$1.50. (Hardiman aff't, ¶ 10.) To buttress Hardiman's opinion, rate cards for title insurance in Rhode Island from two major insurers are attached to his affidavit. Upon close examination of these exhibits Hardiman offers, the court finds that the rate the Mayos were charged was unreasonable and not bona fide.

**\*5** The rate cards are very similar in regards to title insurance fees. (Hardiman aff't, exhibit H.) Under

The Mayos offer Powers's affidavit to demonstrate that the bona fide and reasonable costs of the recording fees that could be excluded from the finance charge amounted to $32. (Plaintiffs' exhibit D, Powers aff't, ¶ 19.) The $32 fee is comprised of the following:

either rate card, a $100,000 mortgage loan would cost $225 for insurance and $1.75 per $1,000 over the base amount of $100,000. Since the Mayos were loaned $171,600, the maximum fee the Mayos should have been charged that could be excluded from the finance charge would be $350.30 ($225 for the first $100,000 plus $125.30 for the $71,600 over the initial $100,000 at a rate of $1.75 = $350.30). Hardiman's assertion that a $2.50/$3 rate was reasonable is inaccurate because a $2.50 rate was only charged on loans between $0 and $50,000, and the rate decreased as the loan value increased. Since the Mayos borrowed $171,600 the rates are substantially lower as is evidenced by the exhibits provided by Hardiman. Accordingly, applying the rates Hardiman offers to support his assertion of reasonableness, Advanced still understated the Mayos' finance charge by $164.70 ($515/ $350.30 = $164.70). [FN7]

FN7. Furthermore, the court also notes that Hardiman offers a premium rate chart from American Title Insurance Company for rates in the Commonwealth of Massachusetts in order to establish that the Smiths' title insurance cost a minimum of $50. In an attempt to establish that $515 fee for title insurance charged to the Mayos was reasonable, Advanced offers rate charts from the state of Rhode Island. The use of different states' insurance rate charts for different loans, where both loans involve property located in the Commonwealth, leads to a reasonable inference that Hardiman's attempt to justify the insurance fees is inconsistent. This inference is buttressed by the plaintiffs' affidavit evidence in which real estate attorney

1994 WL 879676
2 Mass.L.Rptr. 269, 1994 WL 879676 (Mass.Super.)
**(Cite as: 1994 WL 879676 (Mass.Super.))**

Marioles states that property located in Massachusetts is subject to Massachusetts insurance rates, not Rhode Island. (Marioles aff't, ¶ 8.)

In addition, to show that Advanced inflated the title insurance fee, the Mayos offer the insurance policy issued to them from American Title Insurance Company which states that the premium paid to the insurer for title insurance on the Mayos' loan was $215. This fee is at the rate of $1.25 per $1,000 for $172,000 of the amount borrowed. Accordingly, the policy demonstrates that the bona fide and reasonable rate for title insurance for the Mayos' loan in May 1989 was $215 and the $300 overcharge should have been included in the finance charge. Reviewing all the evidence presented on the Mayos' title insurance fee, it is undisputed that Advanced understated the Mayos' finance charge between $164.70 and $300.

II. Does the understatement of the respective finance charges extend the period of rescission from three days to four years?

The Mayos and Smiths contend that because their respective finance charges were understated, the rescission period extended from three days to four years. [FN8] The issue presented is whether the respective understated amounts in the finance charge amount to "material nondisclosures." Footnote 48 to § 32.23(a)(3) defines "material nondisclosures" as "the required disclosures of the annual percentage rate, the *finance charge,* the amount financed, the total payments, and the payment schedule. 209 CMR § 32.23(a)(3) n. 48 (emphasis added). The Code of Federal Regulation, c. 12, u226.23(a)(3) n. 48 defines "material disclosure" for the federal Truth-in-Lending Act using exactly the same language as 209 CMR 32.23(a)(3) n. 48. Accordingly, this court looks to federal interpretation of 12 CFR § 226.23(a)(3) n. 48 to determine whether the understated finance charges amount to material nondisclosures. See *Vasys, supra.*

FN8. The parties place much emphasis on whether an inaccuracy of the finance charge by $10 is the "bright line" for determining whether the understatement of the finance charge amounts to a material nondisclosure. Since both the Mayos' and Smiths' finance charges were understated in excess of $10, the court does not need to decide whether an understatement of the finance charge less than $10 amounts to a material nondisclosure. *Steele v. Ford Motor Credit Co., 783 F.2d 1016, 1018-19 n. 3 (11th* Cir.1986).

In 1980, the federal Truth-in-Lending Act was amended. *In re Brown, supra* at 853. A material disclosure relates to information that would affect the credit shopper's decision to use the credit, and materiality should be determined by an objective standard based upon what a reasonable consumer would find significant. See *Steele v. Ford Motor Credit Co., 783 F.2d 1016, 1019 (11th Cir.1986).* Since the amendment, the federal courts have generally held that where the finance charge is understated, the inaccuracy amounts to a material nondisclosure extending the period of rescission. See *Smith v. Fidelity Consumer Discount Company, 898 F.2d 896, 899-905 (3d Cir.1990)* (holding that 12 CFR § 226.23(a)(3) n. 48 means that failure to accurately disclose the finance charge is a material violation of the federal Truth-in-Lending Act, entitling the borrower to rescind the loan transaction); *Steele, supra,* at 1019-20 (any understatement of the finance charge is material because any understatement would be of some significance to the reasonable consumer since it represents the total cost of the loan to the borrower); *In re Brown, supra,* at 861-62 (understated finance charge amounts to a material nondisclosure extending the rescission period of the borrower); see also *Bustamante v. First Federal S. & L. Ass'n, 619 F.2d 360, 364 (5th Cir.1980),* citing *Harris v. Tower Loan of Mississippi, Inc., 609 F.2d 120, 122-23 (5th Cir.1980)* (understated finance charge is a material nondisclosure); *Brodo v. Bankers Trust Co., 847 F.Supp. 353, 356 (1994)* (failure to disclose proper finance charge or amount financed constitutes a material violation which entitles the borrower to rescind the loan).

**\*6** Advanced and Key attempt to demonstrate that even if the finance charges were understated, the understatements do not amount to material nondisclosures. The defendants rely on *Malfa v. Household Bank, F.S.B., 825 F.Supp. 1018 (S.D.Fla.1993).* In *Malfa,* the plaintiff asserted that the defendant had not made three material disclosures, entitling the plaintiff to extend the rescission period. *Id. at 1020-22.* The plaintiff argued that the defendant failed to disclose 1) the annual percentage rate and finance charge in a manner more conspicuous than the other terms within the agreement; 2) that certain charges amounting to a fee and tax had been improperly excluded from the finance charge; and 3) that pest control inspection fees should have been included in the finance charge. [FN9] *Id.* The court determined that the "more conspicuous rule" amounted to a technical violation

1994 WL 879676                                                                Page 6
2 Mass.L.Rptr. 269, 1994 WL 879676 (Mass.Super.)
**(Cite as: 1994 WL 879676 (Mass.Super.))**

and that the terms had been disclosed. *Id.* at 1021. The court also determined that the pest inspection fees were properly excluded from the finance charge. *Id.* at 1022.

> FN9. The court also examined whether the rescission notice contained sufficient information regarding the plaintiff's rights. *Malfa, supra* at 1022.

In examining the fee and tax excluded from the finance charge, the *Malfa* court found that these charges were disclosed on a HUD-1 Settlement Statement where the federal Truth-in-Lending Act required the disclosure of these fees be on a Disclosure Statement. *Id.* at 1021. If these charges were itemized and disclosed on a Disclosure Statement, they could be excluded from the finance charge. *Id.* The court also determined that since the fees were not disclosed on the proper form, the charges should have been included in the finance charge. *Id.* However, the court also determined that disclosure of these charges on the wrong form amounted to a technical violation because they were still itemized and disclosed, and, in addition, the charges would have to be paid as a matter of law regardless of the lender chosen. *Id.* at 1021-22. In essence, the court noted that these charges do not affect the consumer's decision in choosing a lender. *Id.* The court relied on *Steele, supra,* in reaching its decision, distinguishing the fees in *Malfa* as ones prescribed by law. *Id.*

The case at bar is closer to the facts of *Steele* than *Malfa.* Like *Steele,* the amounts that Advanced and Key should have included in the finance charge calculations were not prescribed by law but were merely inflated fees which the defendants retained for themselves. Furthermore, the fee and tax in *Malfa* could be excluded from the finance charge if disclosed on the proper Disclosure Statement form. In *Malfa,* the defendant disclosed charges but on the wrong form. Here, the inflated fees had to be included in the finance charge even if disclosed elsewhere. Only bona fide and reasonable fees could be excluded from the finance charge. In addition, unlike *Malfa,* the inflated amounts charged to the Mayos and Smiths were not disclosed elsewhere and were required to be included in the finance charge. These inflated charges were not prescribed by law and the understatement of the finance charge would be of some significance to a reasonable consumer shopping for loans. The plaintiffs' motion for summary judgment on Count II is allowed and the defendants' motion for summary judgment on Count

II is denied.

### Count III--Restitution

**\*7** General Laws c. 183, § 63 states in relevant part that: A mortgagee shall not charge ... points ... or similar fees in a mortgage transaction involving a residential property located in the commonwealth ... except to the extent such ... points constitute reimbursement for reasonable originating or underwriting expenses, as determined by the commissioner, incurred by the mortgagee for the intended purpose of selling mortgage loans in the secondary mortgage market ...

> The plaintiffs allege that they were charged excessive points on their respective loan agreements in violation of G.L.c. 183, § 63, entitling them to restitution. Key contends that the restitution claim is barred by the tort three-year statute of limitations. Key also argues that under G.L.c. 183, § 63, there exists no private right of action, and even if a right of action does exist, Key, as assignee, did not collect any points from the Smiths and only collected one point from the Mayos.

Under G.L.c. 260, § 2A, the statute of limitations for a tort action is three years. General Laws c. 183, § 63, is designed to protect consumers from sharp practices of mortgage lenders. Thus the statute has characteristics that are common to consumer protection statutes. Claims arising under G.L.c. 183, § 63 must adhere to the procedural requirements of G.L.c. 260, § 5A. See *Micera v. Neworld Bank,* 412 Mass. 728, 732 (1992) (holding statute protecting consumer in mortgage loan transaction is a consumer protection statute). General Laws c. 260, § 5A requires the consumers to bring an action within four years from the accrual of the action. The plaintiffs have brought this action within the four-year statute of limitations and the action is not barred.

Since G.L.c. 183, § 63 does not expressly provide for a private right of action and there is no case law deciding this issue, *Ludlow Education Association v. Ludlow,* 31 Mass. 110 (1991), offers guidance. In *Ludlow,* the Court of Appeals held that:

> where the applicable law evidences a special legislative concern for an identified interest of a group of which the plaintiff is a member, and not merely a concern for the public generally, a private cause of action will be implied if the injury suffered falls within the area of concern.

*Id.* at 120. Under the principle in *Ludlow,* the right

Copr. © 2004 West. No Claim to Orig. U.S. Govt. Works.

1994 WL 879676
2 Mass.L.Rptr. 269, 1994 WL 879676 (Mass.Super.)
(**Cite as: 1994 WL 879676 (Mass.Super.)**)

under the statute may be asserted by any appropriate common law remedy that is available. *Id.* at 119.

General Laws c. 183, § 63 evidences a special legislative concern for mortgagors dealing with lenders taking advantage of unequal bargaining power. The Smiths and Mayos assert that they have suffered the harm the statute seeks to prevent. The common law remedy that the plaintiffs have chosen is restitution. Under the principle discussed in *Ludlow,* I conclude that G.L.c. 183, § 53 affords a private right of action.

Key's contention that it did not receive any excessive points from the Smiths and Mayos remains in dispute. The Hardiman affidavit states that any prepaid points charged to the Smiths or Mayos were collected by Advanced and that Key only received one point on the Mayo loan. (Hardiman aff't, ¶ 11.)

**\*8** The plaintiffs counter Hardiman's affidavit by offering evidence that shows Key's desire to continue to collect points and that Advanced was merely acting as Key's agent. To establish an agency relationship, the plaintiffs' evidence demonstrates that Key controlled the loan closings and that Key provided the funds for the Smith and Mayo transactions. The documents further demonstrate that Key controlled and approved all phases of the loan transactions between the parties. (See plaintiffs' opposition to cross-motions for summary judgment, ex. C, Key memorandum showing a desire to continue to collect points; ex. D, Key's confirmation to Advanced approving Mayo and Smith loan.) The evidence the plaintiffs offer establishes that there exists a genuine issue of material fact as to whether Key collected any of the points in the Mayo and Smith transactions and whether Advanced acted as Key's agent. If Advanced was acting as Key's agent, Key would be vicariously responsible for the unlawful conduct of its agent. *Kelley v. Rossi,* 395 Mass. 659, 661 (1985). Accordingly, the defendants' motion for summary judgment as to Count III is denied.

### Choice of Law

The defendants assert that Massachusetts law is inapplicable to this action since Key is a New York corporation and Advanced is a Rhode Island corporation, and the loans were signed in Rhode Island. The defendants argue that Rhode Island law applies to this action, and that the Massachusetts consumer protection statutes that the plaintiffs rely on are inapplicable. The defendants' argument is

without merit.

A choice-of-law analysis is necessary where the law of the forum does not coincide with the law of the sister state. *Chas. T. Main, Inc. v. Fireman's Fund Ins. Co.,* 406 Mass. 862, 863 (1990); see also *Cosme v. Whitin Machine Works, Inc.,* 417 Mass. 643, 644 (1994) (applying Connecticut's statute of repose to an action brought in Massachusetts would bar plaintiff's claim); *Bushkin Associates, Inc. v. Raytheon Co.,* 393 Mass. 622 (1985) (choice-of-law analysis necessary where action would be barred by New York statute of frauds but not barred by Massachusetts statute).

Applying a choice-of-law analysis to the case at bar clearly shows that Massachusetts law applies. A choice-of-law question does not turn on where the contract was made. *Id.* at 630. In Massachusetts, the Supreme Judicial Court has adopted a functional choice-of-law approach by examining various choiceinfluencing factors. *Id.* at 631. The court determines which state has the most significant relationship to the transaction and the parties. In determining which law should apply, the court begins by examining the contacts which the relevant states have with the parties and occurrence in the case. *Cosme, supra* at 647.

Here, the mortgages that the plaintiffs signed state that the law governing the transaction is the jurisdiction where the property is located, which is Massachusetts (Hardiman aff't, ex. C, G/¶ 13). The plaintiffs are residents of Massachusetts and the subject property is located in Massachusetts. The soliciting for the loans occurred in Massachusetts. (See Complaint, ex. 1.) The injurious consequences of the material nondisclosures result in Massachusetts. The only contact of states other than Massachusetts is that the defendants are from New York and Rhode Island and the agreements were signed in Rhode Island.

**\*9** In examining the relevant interests of Massachusetts and Rhode Island, it is obvious that Rhode Island has an interest in protecting against fraud in its state. Massachusetts shares this interest in its own state and enacted General Law c. 140D and G.L.c. 183, § 63 to protect the Massachusetts consumer from fraud and to ensure mortgagees are held accountable for any unscrupulous conduct.

The justified expectations of the parties also favor applying Massachusetts law. As discussed above, the signed mortgages inform each party that the law of Massachusetts shall apply to transactions arising

Copr. © 2004 West. No Claim to Orig. U.S. Govt. Works.

1994 WL 879676
2 Mass.L.Rptr. 269, 1994 WL 879676 (Mass.Super.)
**(Cite as: 1994 WL 879676 (Mass.Super.))**

Page 8

from the mortgage transaction.    Accordingly, Massachusetts has a more significant relationship to the parties and the occurrence than does Rhode Island.  Massachusetts law applies to this action.

### ORDER

For the foregoing reasons, it is hereby ORDERED that the plaintiffs' motion for summary judgment on Count II is ALLOWED and the defendants' motion for summary judgment on Count II and Count III is DENIED.    It is further DECLARED that the plaintiffs have validly rescinded their respective loan agreements with the defendants.   The parties shall arrange a proper schedule for return of all consideration thus far exchanged.   If the parties fail to agree upon an appropriate schedule for return of all the consideration, a motion may be brought to determine the schedule of repayment.

The plaintiffs are entitled to costs and reasonable attorneys fees pursuant to G.L.c. 140D, § 32(3).

2 Mass.L.Rptr. 269, 1994 WL 879676 (Mass.Super.)

END OF DOCUMENT

Copr. © 2004 West. No Claim to Orig. U.S. Govt. Works.