**1904** Federal Register / Vol. 69, No. 8 / Tuesday, January 13, 2004 / Rules and Regulations

*enforce/enf_search.htm.* Indeed, as recently observed by the Superior Court of Arizona, Maricopa County, in an action brought by Arizona against a national bank, among others, the restitution and remedial action ordered by the OCC in that matter against the bank was "comprehensive and significantly broader in scope than that available through [the] state court proceedings." *State of Arizona* v. *Hispanic Air Conditioning and Heating, Inc.*, CV 2000–003625, Ruling at 27, Conclusions of Law, paragraph 50 (Aug. 25, 2003). Thus, the OCC has ample legal authority and resources to ensure that consumers are adequately protected.

**List of Subjects in 12 CFR Part 7**

Credit, Insurance, Investments, National banks, Reporting and recordkeeping requirements, Securities, Surety bonds.

**Authority and Issuance**

■ For the reasons set forth in the preamble, the OCC amends part 7 of chapter I of title 12 of the Code of Federal Regulations as follows:

**PART 7—BANK ACTIVITIES AND OPERATIONS**

■ 1. The authority citation for part 7 continues to read as follows:

**Authority:** 12 U.S.C. 1 *et seq.*, 71, 71a, 92, 92a, 93, 93a, 481, 484, 1818.

**Subpart D—Preemption**

■ 2. In § 7.4000:
■ a. Add a new paragraph (a)(3); and
■ b. Revise paragraph (b) to read as follows:

**§ 7.4000  Visitorial powers.**

(a) * * *

(3) Unless otherwise provided by Federal law, the OCC has exclusive visitorial authority with respect to the content and conduct of activities authorized for national banks under Federal law.

(b) *Exceptions to the general rule.* Under 12 U.S.C. 484, the OCC's exclusive visitorial powers are subject to the following exceptions:

(1) *Exceptions authorized by Federal law.* National banks are subject to such visitorial powers as are provided by Federal law. Examples of laws vesting visitorial power in other governmental entities include laws authorizing state or other Federal officials to:

(i) Inspect the list of shareholders, provided that the official is authorized to assess taxes under state authority (12 U.S.C. 62; this section also authorizes inspection of the shareholder list by shareholders and creditors of a national bank);

(ii) Review, at reasonable times and upon reasonable notice to a bank, the bank's records solely to ensure compliance with applicable state unclaimed property or escheat laws upon reasonable cause to believe that the bank has failed to comply with those laws (12 U.S.C. 484(b));

(iii) Verify payroll records for unemployment compensation purposes (26 U.S.C. 3305(c));

(iv) Ascertain the correctness of Federal tax returns (26 U.S.C. 7602);

(v) Enforce the Fair Labor Standards Act (29 U.S.C. 211); and

(vi) Functionally regulate certain activities, as provided under the Gramm-Leach-Bliley Act, Pub. L. 106–102, 113 Stat. 1338 (Nov. 12, 1999).

(2) *Exception for courts of justice.* National banks are subject to such visitorial powers as are vested in the courts of justice. This exception pertains to the powers inherent in the judiciary and does not grant state or other governmental authorities any right to inspect, superintend, direct, regulate or compel compliance by a national bank with respect to any law, regarding the content or conduct of activities authorized for national banks under Federal law.

(3) *Exception for Congress.* National banks are subject to such visitorial powers as shall be, or have been, exercised or directed by Congress or by either House thereof or by any committee of Congress or of either House duly authorized.

\*   \*   \*   \*   \*

John D. Hawke, Jr.,
*Comptroller of the Currency.*
[FR Doc. 04–585 Filed 1–12–04; 8:45 am]
**BILLING CODE 4810–33–P**

---

**DEPARTMENT OF THE TREASURY**

**Office of the Comptroller of the Currency**

**12 CFR Parts 7 and 34**

[Docket No. 04–04]

**RIN 1557–AC73**

**Bank Activities and Operations; Real Estate Lending and Appraisals**

**AGENCY:** Office of the Comptroller of the Currency, Treasury.
**ACTION:** Final rule.

**SUMMARY:** The Office of the Comptroller of the Currency (OCC) is publishing a final rule amending parts 7 and 34 of our regulations to add provisions clarifying the applicability of state law to national banks' operations. The provisions concerning preemption identify types of state laws that are preempted, as well as the types of state laws that generally are not preempted, with respect to national banks' lending, deposit-taking, and other operations. In tandem with these preemption provisions, we are also adopting supplemental anti-predatory lending standards governing national banks' lending activities.

**EFFECTIVE DATE:** February 12, 2004.

**FOR FURTHER INFORMATION CONTACT:** For questions concerning the final rule, contact Michele Meyer, Counsel, or Mark Tenhundfeld, Assistant Director, Legislative and Regulatory Activities Division, (202) 874–5090.

**SUPPLEMENTARY INFORMATION:**

**I. Introduction**

The OCC is adopting this final rule to specify the types of state laws that do not apply to national banks' lending and deposit taking activities *and* the types of state laws that generally *do* apply to national banks. Other state laws not specifically listed in this final rule also would be preempted under principles of preemption developed by the U.S. Supreme Court, if they obstruct, impair, or condition a national bank's exercise of its lending, deposit-taking, or other powers granted to it under Federal law.

This final rule also contains a new provision prohibiting the making of any type of consumer loan based predominantly on the bank's realization of the foreclosure value of the borrower's collateral, without regard to the borrower's ability to repay the loan according to its terms. (A consumer loan for this purpose is a loan made for personal, family, or household purposes). This anti-predatory lending standard applies uniformly to all consumer lending activities conducted by national banks, wherever located. A second anti-predatory lending standard in the final rule further specifically prohibits national banks from engaging in practices that are unfair and deceptive under the Federal Trade Commission Act (FTC Act) [1] and regulations issued thereunder, in connection with all types of lending.

The provisions concerning preemption of state laws are contained in 12 CFR part 34, which governs national banks' real estate lending, and in three new sections to part 7 added by this final rule: § 7.4007 regarding deposit-taking activities; § 7.4008 regarding non-real estate lending

---

[1] 15 U.S.C. 45(a)(1).

**1906** Federal Register / Vol. 69, No. 8 / Tuesday, January 13, 2004 / Rules and Regulations

*B. Proposed Amendments to Part 7—Deposit-Taking, Other Lending, and Bank Operations*

The proposal also added three new sections to part 7: § 7.4007 regarding deposit-taking activities, § 7.4008 regarding non-real estate lending activities, and § 7.4009 regarding other national bank operations. The structure of the proposed amendments was the same for §§ 7.4007 and 7.4008 and was similar for § 7.4009. For §§ 7.4007 and 7.4008, the proposal first set out a statement of the authority to engage in the activity. Second, the proposal stated that state laws that obstruct, in whole or in part, a national bank's exercise of the Federally-authorized power in question are not applicable, and listed several types of state laws that are preempted. As with the list of preempted state laws set forth in the proposed amendments to part 34, this list reflects judicial precedents and OCC interpretations concerning the types of state laws that can obstruct the exercise of national banks' deposit-taking and non-real estate lending powers. Finally, the proposal listed several types of state laws that, as a general matter, are not preempted.

As with the proposed amendments to part 34, the proposed amendment to part 7 governing non-real estate lending included a safety and soundness-based anti-predatory lending standard. As proposed, § 7.4008(b) stated that a national bank shall not make a loan described in § 7.4008 based predominantly on the foreclosure value of the borrower's collateral, rather than on the borrower's repayment ability, including current and expected income, current obligations, employment status, and other relevant financial resources. The preamble to the NPRM pointed out that non-real estate lending also is subject to section 5 of the FTC Act.

For proposed § 7.4009, as with proposed §§ 7.4007 and 7.4008, the NPRM first stated that a national bank could exercise all powers authorized to it under Federal law. To address questions about the extent to which state law may permissibly govern powers or activities that have not been addressed by Federal court precedents or OCC opinions or orders, proposed new § 7.4009(b) provided that state laws do not apply to national banks if they obstruct, in whole or in part, a national bank's exercise of powers granted to it under Federal law. Next, proposed § 7.4009(c) noted that the provisions of this section apply to any national bank power or aspect of a national bank's operation that is not otherwise covered by another OCC regulation that specifically addresses the applicability of state law. Finally, the proposal listed several types of state laws that, as a general matter, are not preempted.

As with the proposed changes to part 34, and for the same reasons, the proposal's changes to part 7 would be applicable to both national banks and their operating subsidiaries by virtue of an existing OCC regulation.

**III. Overview of Comments**

The OCC received approximately 2,600 comments, most of which came from the following groups:

*Realtors.* The vast majority—approximately 85%—of the opposing comments came from realtors and others representing the real estate industry, who expressed identical concerns about the possibility that national banks' *financial subsidiaries* would be permitted to engage in real estate brokerage activities [11] and that, if that power were authorized, the proposal would permit them to do so without complying with state real estate brokerage licensing laws. This final rule will not have that result because it does not apply to the activities of national bank financial subsidiaries. Thus, should the Department of the Treasury (Treasury) and the Board of Governors of the Federal Reserve System (Board) proposal to permit financial subsidiaries and financial holding companies to engage in real estate brokerage activities go forward, this final rule would not affect the application of state real estate licensing requirements to national bank financial subsidiaries.

Many realtor comments also raised arguments concerning the impact of this rulemaking on consumers and market competition and some argued that preemption of state licensing requirements related to real estate *lending* is inappropriate on the basis of field or conflict preemption. These issues also were raised by other commenters and are addressed in sections IV and VI of this preamble.

*Community and consumer advocates.* In addition to the comments from realtors, the OCC received opposing comments from community and consumer advocates. These commenters argued that the OCC should not adopt further regulations preempting state law and, in particular, should not adopt in the final rule an "occupation of the field" preemption standard for national banks' real estate lending activities. The community and consumer advocates also asserted that the proposed "obstruct, in whole or in part" preemption standard is inconsistent with, and a lowering of, the preemption standards articulated by the U.S. Supreme Court. Whatever the standard, the community and consumer advocates expressed concern that preemption would allow national banks to escape some state tort, contract, debt collection, zoning, property transfer, and criminal laws, and would expose consumers to wide-spread predatory and abusive practices by national banks. These commenters asserted that the OCC's proposed anti-predatory lending standard is insufficient and urged the OCC to further strengthen consumer protections in parts 7 and 34, including prohibiting specific practices characterized as unfair or deceptive. These issues are addressed in sections IV and VI of this preamble.

*State officials and members of Congress.* State banking regulators, the Conference of State Bank Supervisors (CSBS), the National Conference of State Legislators, individual state legislators, the National Association of Attorneys General (NAAG), and individual state attorneys general questioned the legal basis of the proposal and argued that the OCC lacks authority to adopt it. These commenters, like the community and consumer advocates, also challenged the OCC's authority to adopt in the final rule either a "field occupation" preemption standard or the proposed "obstruct, in whole or in part" standard. These commenters raised concerns about the effect of the proposal, if adopted, on the dual banking system, and its impact on what they assert is the states' authority to apply and enforce consumer protection laws against national banks, and particularly against operating subsidiaries. Several members of Congress submitted comments, or forwarded letters from constituents and state officials, that echoed these concerns. The arguments concerning the dual banking system are addressed in the discussion of Executive Order 13132 later in this preamble.[12] The remaining issues raised by the state commenters are addressed in sections IV and VI of this preamble.[13]

---

[11] Pursuant to procedures established by the Gramm-Leach-Bliley Act, Pub. L. 106–102, 113 Stat. 1338 (Nov. 12, 1999), for determining that an activity is "financial in nature," and thus permissible for financial holding companies and financial subsidiaries, the Board and Treasury jointly published a proposal to determine that real estate brokerage is "financial in nature." See 66 FR 307 (Jan. 3, 2001). No final action has been taken on the proposal.

[12] See also OCC publication entitled *National Banks and the Dual Banking System* (Sept. 2003).

[13] See also Letter from John D. Hawke, Jr., Comptroller of the Currency, to Senator Paul S. Sarbanes (Dec. 9, 2003), available on the OCC's Web site at http://www.occ.treas.gov/foia/SarbanesPreemptionletter.pdf; and identical letters sent to nine other Senators; and Letters from John

Federal Register/Vol. 69, No. 8/Tuesday, January 13, 2004/Rules and Regulations    1907

*National banks and banking industry trade groups.* National banks, other financial institutions, and industry groups supported the proposal. Many of these commenters argued that Congress has occupied the fields of deposit-taking and lending in the context of national banks and urged the OCC to adopt a final rule reflecting an extensive occupation of the field approach. These commenters concluded that various provisions of the National Bank Act establish broad statutory authority for the activities and regulation of national banks, and that these provisions suggest strongly that Congress did in fact intend to occupy the fields in question. In addition to these express grants of authority, the commenters noted that national banks may, under 12 U.S.C. 24(Seventh), "exercise * * * all such incidental powers as shall be necessary to carry on the business of banking," and that this provision has been broadly construed by the Supreme Court.[14] These commenters concluded that this broad grant of Federal powers, coupled with equally broad grants of rulemaking authority to the OCC,[15] effectively occupy the field of national bank regulation.

Many of the supporting commenters also urged the adoption of the proposal for the reasons set forth in its preamble. These commenters agreed with the OCC's assertion in the preamble that banks with customers in more than one state "face uncertain compliance risks and substantial additional compliance burdens and expense that, for practical purposes, materially impact their ability to offer particular products and services."[16] The commenters stated that, in effect, a national bank must often craft different products or services (with associated procedures and policies, and their attendant additional costs) for each state in which it does business, or elect not to provide all of its products or services (to the detriment of consumers) in one or more states. These commenters believe that the proposal, if adopted, would offer much-needed clarification of when state law does or does not apply to the activities of a national bank and its operating subsidiaries. Such clarity, these commenters argued, is critical to helping national banks maintain and expand provision of financial services. Without such clarity, these commenters assert, the burdens and costs, and uncertain liabilities arising under a myriad of state and local laws, are a significant diversion of the resources that national banks otherwise can use to provide services to customers nationwide, and a significant deterrent to their willingness and ability to offer certain products and services in certain markets. These issues are addressed in sections IV and VI of this preamble.

**IV. Reason and Authority for the Regulations**

*A. The Regulations Are Issued in Furtherance of the OCC's Responsibility To Ensure That the National Banking System Is Able To Operate As Authorized by Congress*

As the courts have recognized, Federal law authorizes the OCC to issue rules that preempt state law in furtherance of our responsibility to ensure that national banks are able to operate to the full extent authorized under Federal law, notwithstanding inconsistent state restrictions, and in furtherance of their safe and sound operations.

Federal law is the exclusive source of all of national banks' powers and authorities. Key to these powers is the clause set forth at 12 U.S.C. 24(Seventh) that permits national banks to exercise "all such incidental powers as shall be necessary to carry on the business of banking." This flexible grant of authority furthers Congress's long-range goals in establishing the national banking system, including financing commerce, establishing private depositories, and generally supporting economic growth and development nationwide.[17] The achievement of these goals required national banks that are safe and sound and whose powers are dynamic and capable of evolving so that they can perform their intended roles. The broad grant of authority provided by 12 U.S.C. 24(Seventh), as well as the more targeted grants of authority provided by other statutes,[18] enable national banks to evolve their operations in order to meet the changing needs of our economy and individual consumers.[19]

The OCC is charged with the fundamental responsibility of ensuring that national banks operate on a safe and sound basis, and that they are able to do so, if they choose, to the full extent of their powers under Federal law. This responsibility includes enabling the national banking system to operate as authorized by Congress, consistent with the essential character of a national banking system and without undue confinement of their powers. Federal law gives the OCC broad rulemaking authority in order to fulfill these responsibilities. Under 12 U.S.C. 93a, the OCC is authorized "to prescribe rules and regulations to carry out the responsibilities of the office"[20] and, under 12 U.S.C. 371, to "prescribe by regulation or order" the "restrictions and requirements" on national banks" real estate lending power without state-imposed conditions.[21]

In recent years, the financial services marketplace has undergone profound changes. Markets for credit (both consumer and commercial), deposits, and many other financial products and services are now national, if not international, in scope. These changes are the result of a combination of factors, including technological innovations, the erosion of legal barriers, and an increasingly mobile society.

Technology has expanded the potential availability of credit and made possible virtually instantaneous credit decisions. Mortgage financing that once took weeks, for example, now can take only hours. Consumer credit can be obtained at the point of sale at retailers and even when buying a major item such as a car. Consumers can shop for investment products and deposits on-line. With respect to deposits, they can compare rates and duration of a variety of deposit products offered by financial institutions located far from where the consumer resides.

Changes in applicable law also have contributed to the expansion of markets for national banks and their operating subsidiaries. These changes have affected both the type of products that may be offered and the geographic region in which banks—large and small—may conduct business. As a result of these changes, banks may branch across state lines and offer a broader array of products than ever before. An even wider range of

---

D. Hawke, Jr., Comptroller of the Currency, to Representatives Sue Kelly, Peter King, Carolyn B. Maloney, and Carolyn McCarthy (Dec. 23, 2003).

[14] *See, e.g., Nationsbank of North Carolina, N.A. v. Variable Annuity Life Ins. Co.,* 513 U.S. 251, 258 n.2 (1995) (VALIC).

[15] *See, e.g.,* 12 U.S.C. 93a.

[16] 68 FR 46119, 46120.

[17] For a more detailed discussion of Congress's purposes in establishing a national banking system that would operate to achieve these goals distinctly and separately from the existing system of state banks, *see* the preamble to the proposal, 68 FR 46119, 46120, and *National Banks and the Dual Banking System, supra* note 12.

[18] *See, e.g.,* 12 U.S.C. 92a (authorizing national banks to engage in fiduciary activities) and 371 (authorizing national banks to engage in real estate lending activities).

[19] The Supreme Court expressly affirmed the dynamic, evolutionary character of national bank powers in *VALIC,* in which it held that the "business of banking" is not limited to the powers enumerated in 12 U.S.C. 24(Seventh) and that the OCC has the discretion to authorize activities beyond those specifically enumerated in the statute. *See* 513 U.S. at 258 n.2.

[20] 12 U.S.C. 93a.

[21] 12 U.S.C. 371(a).

**1908** Federal Register / Vol. 69, No. 8 / Tuesday, January 13, 2004 / Rules and Regulations

customers can be reached through the use of technology, including the Internet. Community national banks, as well as the largest national banks, use new technologies to expand their reach and service to customers.

Our modern society is also highly mobile. Forty million Americans move annually, according to a recent Congressional report issued in connection with enactment of the Fair and Accurate Credit Transactions Act of 2003.[22] And when they move, they often have the desire, if not the expectation, that the financial relationships and status they have established will be portable and will remain consistent.

These developments highlight the significance of being able to conduct a banking business pursuant to consistent, national standards, regardless of the location of a customer when he or she first becomes a bank customer or the location to which the customer may move *after* becoming a bank customer. They also accentuate the costs and interference that diverse and potentially conflicting state and local laws have on the ability of national banks to operate under the powers of their Federal charter. For national banks, moreover, the ability to operate under uniform standards of operation and supervision is fundamental to the character of their national charter.[23] When national banks are unable to operate under national standards, it also implicates the role and responsibilities of the OCC.

These concerns have been exacerbated recently, by increasing efforts by states and localities to apply state and local laws to bank activities. As we have learned from our experience supervising national banks, from the inquiries received by the OCC's Law Department, by the extent of litigation in recent years over these state efforts, and by the comments we received on the proposal, national banks' ability to conduct operations to the full extent authorized by Federal law has been curtailed as a result.

Commenters noted that the variety of state and local laws that have been enacted in recent years—including laws regulating fees, disclosures, conditions on lending, and licensing—have created higher costs and increased operational challenges.[24] Other commenters noted the proliferation of state and local anti-predatory lending laws and the impact that those laws are having on lending in the affected jurisdictions. As a result, national banks must either absorb the costs, pass the costs on to consumers, or eliminate various products from jurisdictions where the costs are prohibitive. Commenters noted that this result is reached even in situations where a bank concludes that a law is preempted, simply so that the bank may avoid litigation costs or anticipated reputational injury.

As previously noted, the elimination of legal and other barriers to interstate banking and interstate financial service operations has led a number of banking organizations to operate, in multi-state metropolitan statistical areas, and on a multi-state or nationwide basis, exacerbating the impact of the overlay of state and local standards and requirements on top of the Federal standards and OCC supervisory requirements already applicable to national bank operations. When these multi-jurisdictional banking organizations are subject to regulation by each individual state or municipality in which they conduct operations, the problems noted earlier are compounded.

Even the efforts of a single state to regulate the operations of a national bank operating only within that state can have a detrimental effect on that bank's operations and consumers. As we explained in our recent preemption determination and order responding to National City Bank's inquiry concerning the Georgia Fair Lending Act (GFLA),[25] the GFLA caused secondary market participants to cease purchasing certain Georgia mortgages and many mortgage lenders to stop making mortgage loans in Georgia. National banks have also been forced to withdraw from some products and markets in other states as a result of the impact of state and local restrictions on their activities.

When national banks are unable to operate under uniform, consistent, and predictable standards, their business suffers, which negatively affects their safety and soundness. The application of multiple, often unpredictable, different state or local restrictions and requirements prevents them from operating in the manner authorized under Federal law, is costly and burdensome, interferes with their ability to plan their business and manage their risks, and subjects them to uncertain liabilities and potential exposure. In some cases, this deters them from making certain products available in certain jurisdictions.[26]

The OCC therefore is issuing this final rule in furtherance of its responsibility to enable national banks to operate to the full extent of their powers under Federal law, without interference from inconsistent state laws, consistent with the national character of the national banking system, and in furtherance of their safe and sound operations. The final rule does not entail any new powers for national banks or any expansion of their existing powers. Rather, we intend only to ensure the soundness and efficiency of national banks' operations by making clear the standards under which they do business.

*B. Pursuant to 12 U.S.C. 93a and 371, the OCC May Adopt Regulations That Preempt State Law*

The OCC has ample authority to provide, by regulation, that types of state laws are not applicable to national banks. As mentioned earlier, 12 U.S.C. 93a grants the OCC comprehensive rulemaking authority to further its responsibilities, stating that—

Except to the extent that authority to issue such rules and regulations has been expressly and exclusively granted to another regulatory agency, the Comptroller of the Currency is authorized to prescribe rules and regulations to carry out the responsibilities of the office * * *.[27]

This language is significantly broader than that customarily used to convey rulemaking authority to an agency, which is typically focused on a particular statute. This was recognized, some 20 years ago, by the United States Court of Appeals for the D.C. Circuit in

---

[22] See S. Rep. No. 108–166, at 10 (2003) (quoting the hearing testimony of Secretary of the Treasury Snow).

[23] As we explained last year in the preamble to our amendments to part 7 concerning national banks' electronic activities, "freedom from State control over a national bank's powers protects national banks from conflicting local laws unrelated to the purpose of providing the uniform, nationwide banking system that Congress intended." 67 FR 34992, 34997 (May 17, 2002).

[24] Illustrative of comments along these lines were those of banks who noted that various state laws would result in the following costs: (a) Approximately $44 million in start-up costs incurred by 6 banks as a result of a recently-enacted California law mandating a minimum payment warning; (b) 250 programming days required to change one of several computer systems that needed to be changed to comply with anti-predatory lending laws enacted in three states and the District of Columbia; and (c) $7.1 million in costs a bank would incur as a result of complying with mandated annual statements to credit card customers.

[25] See 68 FR 46264 (Aug. 5, 2003).

[26] As was recently observed by Federal Reserve Board Chairman Alan Greenspan (in the context of amendments to the Fair Credit Reporting Act), "[l]imits on the flow of information among financial market participants, or increased costs resulting from restrictions that differ based on geography, may lead to an increase in the price or a reduction in the availability of credit, as well as a reduction in the optimal sharing of risk and reward." Letter of February 28, 2003, from Alan Greenspan, Chairman, Board of Governors of the Federal Reserve System, to The Honorable Ruben Hinojosa (emphasis added).

[27] 12 U.S.C. 93a.

(8) Any other law the effect of which the OCC determines to be incidental to the non-real estate lending operations of national banks or otherwise consistent with the powers set out in paragraph (a) of this section.

■ 4. A new § 7.4009 is added to read as follows:

### § 7.4009  Applicability of state law to national bank operations.

(a) *Authority of national banks.* A national bank may exercise all powers authorized to it under Federal law, including conducting any activity that is part of, or incidental to, the business of banking, subject to such terms, conditions, and limitations prescribed by the Comptroller of the Currency and any applicable Federal law.

(b) *Applicability of state law.* Except where made applicable by Federal law, state laws that obstruct, impair, or condition a national bank's ability to fully exercise its powers to conduct activities authorized under Federal law do not apply to national banks.

(c) *Applicability of state law to particular national bank activities.* (1) The provisions of this section govern with respect to any national bank power or aspect of a national bank's operations that is not covered by another OCC regulation specifically addressing the applicability of state law.

(2) State laws on the following subjects are not inconsistent with the powers of national banks and apply to national banks to the extent that they only incidentally affect the exercise of national bank powers:

(i) Contracts;
(ii) Torts;
(iii) Criminal law [8]
(iv) Rights to collect debts;
(v) Acquisition and transfer of property;
(vi) Taxation;
(vii) Zoning; and
(viii) Any other law the effect of which the OCC determines to be incidental to the exercise of national bank powers or otherwise consistent with the powers set out in paragraph (a) of this section.

### PART 34—REAL ESTATE LENDING AND APPRAISALS

### Subpart A—General

■ 5. The authority citation for part 34 continues to read as follows:

**Authority:** 12 U.S.C. 1 *et seq.*, 29, 93a, 371, 1701j–3, 1828(o), and 3331 *et seq.*

■ 6. In § 34.3, the existing text is designated as paragraph (a), and new paragraphs (b) and (c) are added to read as follows:

### § 34.3  General rule.

\* \* \* \* \*

(b) A national bank shall not make a consumer loan subject to this subpart based predominantly on the bank's realization of the foreclosure or liquidation value of the borrower's collateral, without regard to the borrower's ability to repay the loan according to its terms. A bank may use any reasonable method to determine a borrower's ability to repay, including, for example, the borrower's current and expected income, current and expected cash flows, net worth, other relevant financial resources, current financial obligations, employment status, credit history, or other relevant factors.

(c) A national bank shall not engage in unfair or deceptive practices within the meaning of section 5 of the Federal Trade Commission Act, 15 U.S.C. 45(a)(1), and regulations promulgated thereunder in connection with loans made under this part.

■ 7. Section 34.4 is revised to read as follows:

### § 34.4  Applicability of state law.

(a) Except where made applicable by Federal law, state laws that obstruct, impair, or condition a national bank's ability to fully exercise its Federally authorized real estate lending powers do not apply to national banks. Specifically, a national bank may make real estate loans under 12 U.S.C. 371 and § 34.3, without regard to state law limitations concerning:

(1) Licensing, registration (except for purposes of service of process), filings, or reports by creditors;

(2) The ability of a creditor to require or obtain private mortgage insurance, insurance for other collateral, or other credit enhancements or risk mitigants, in furtherance of safe and sound banking practices;

(3) Loan-to-value ratios;

(4) The terms of credit, including schedule for repayment of principal and interest, amortization of loans, balance, payments due, minimum payments, or term to maturity of the loan, including the circumstances under which a loan may be called due and payable upon the passage of time or a specified event external to the loan;

(5) The aggregate amount of funds that may be loaned upon the security of real estate;

(6) Escrow accounts, impound accounts, and similar accounts;

(7) Security property, including leaseholds;

(8) Access to, and use of, credit reports;

(9) Disclosure and advertising, including laws requiring specific statements, information, or other content to be included in credit application forms, credit solicitations, billing statements, credit contracts, or other credit-related documents;

(10) Processing, origination, servicing, sale or purchase of, or investment or participation in, mortgages;

(11) Disbursements and repayments;

(12) Rates of interest on loans;[1]

(13) Due-on-sale clauses except to the extent provided in 12 U.S.C. 1701j–3 and 12 CFR part 591; and

(14) Covenants and restrictions that must be contained in a lease to qualify the leasehold as acceptable security for a real estate loan.

(b) State laws on the following subjects are not inconsistent with the real estate lending powers of national banks and apply to national banks to the extent that they only incidentally affect the exercise of national banks' real estate lending powers:

(1) Contracts;
(2) Torts;
(3) Criminal law;[2]
(4) Homestead laws specified in 12 U.S.C. 1462a(f);
(5) Rights to collect debts;
(6) Acquisition and transfer of real property;
(7) Taxation;
(8) Zoning; and
(9) Any other law the effect of which the OCC determines to be incidental to the real estate lending operations of national banks or otherwise consistent with the powers and purposes set out in § 34.3(a).

Dated: January 6, 2004.

**John D. Hawke, Jr.,**
*Comptroller of the Currency.*
[FR Doc. 04–586 Filed 1–12–04; 8:45 am]
**BILLING CODE 4810-33-P**

---

[1] The limitations on charges that comprise rates of interest on loans by national banks are determined under Federal law. *See* 12 U.S.C. 85 and 1735f–7a; 12 CFR 7.4001. State laws purporting to regulate national bank fees and charges that do not constitute interest are addressed in 12 CFR 7.4002.

[2] *But see* the distinction drawn by the Supreme Court in *Easton v. Iowa,* 188 U.S. 220, 238 (1903) between "crimes defined and punishable at common law or by the general statutes of a state and crimes and offences cognizable under the authority of the United States." The Court stated that "[u]ndoubtedly a state has the legitimate power to define and punish crimes by general laws applicable to all persons within its jurisdiction * * *. But it is without lawful power to make such special laws applicable to banks organized and operating under the laws of the United States." *Id.* at 239 (holding that Federal law governing the operations of national banks preempted a state criminal law prohibiting insolvent banks from accepting deposits).

---

[8] *Id.*