UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

AMY PALMER,

      Plaintiff,

          v.

CHAMPION MORTGAGE,

      Defendant.

Civil Action No. 04-11-954-RCL

**APPENDIX TO
DEFENDANT CHAMPION MORTGAGE,
A DIVISION OF KEYBANK NATIONAL ASSOCIATION'S
MEMORANDUM OF LAW IN SUPPORT OF ITS MOTION TO DISMISS
<u>AMENDED COMPLAINT</u>**

W. Scott O'Connell (#559669)
Patricia L. Peard (#642213)
NIXON PEABODY LLP
889 Elm Street
Manchester, NH 03101
(603) 628-4000
soconnell@nixonpeabody.com
ppeard@nixonpeabody.com

Exhibit B

## TABLE OF CASES

**TAB**

*Barnett Bank, N.A. v. Nelson,*
517 U.S. 25 (1996) ............................................................................................1

*Botelho v. Citicorp Mortgage,*
195 B.R. 558 (Bankr. D. Mass. 1996) ...............................................................2

*Bourisquot v. Citibank F.S.B.,*
323 F. Supp. 2d 350 (D. Conn. 2004) ...............................................................3

*Christensen v. Kingston School Committee,*
2005 U.S. Dist LEXIS 3484 (D. Mass. 2005) ...................................................4

*Conference of State Bank Supervisors v. Conover,*
710 F.2d 878 (D.C. Cir. 1983) ..........................................................................5

*Davis v. Elmira Savings Bank,*
161 U.S. 275 (1896) ...........................................................................................6

*In re Desrosiers,*
212 B.R. 716 (Bankr. D. Mass. 1997) ...............................................................7

*In re Fidler,*
226 B.R. 734 (Bankr. D. Mass. 1998) ...............................................................8

*Ford Motor Credit Co., v. Hilhollin,*
444 U.S. 555 (1980) ...........................................................................................9

*M. Nahas & Co., Inc. v. First National Bank of Hot Springs,*
930 F.2d 608 (8th Cir. 1991) ...........................................................................10

*Marquette Nat'l Bank of Minneapolis v. First of Omaha Serv. Corp.,*
439 U.S. 299 (1978) .........................................................................................11

*Mayo v. Key Financial Services, Inc.,*
1994 WL. 879676 (Ma. Super. 1994) .............................................................12

*McCulloch v. Maryland,*
17 U.S. 316 (1819) ...........................................................................................13

*Melvin v. United States Bank, N.A.,*
2001 U.S. Dist. LEXIS 24716 (D. Mass. 2001) ..............................................14

*In re Mourer,*
309 B.R. 501 (W.D. Mich. 2004) .................................................................15

*In re Myers,*
175 B.R. 122 (Bankr. D. Mass. 1994) ...........................................................16

*Nationsbank of North Carolina, N.A. v. Variable Annuity life Ins. Co.,*
513 U.S. 251 (1995) .....................................................................................17

*Nichols v. Mid-Penn Consumer Discount Co.,*
1989 U.S. Dist. LEXIS 4796 (E.D. Pa.), *aff'd,* 893 F.2d 1331 (1989)..............18

*Rodrigues v. Members Mortgage Co.,*
323 F. Supp. 2d 202 (D. Mass. 2004)............................................................19

*Salois v. Dime Savings Bank,*
1996 U.S. Dist. LEXIS 21901 (D. Mass. 1996) ..............................................20

*Semar v. Platte Valley Federal Savings & Loan Ass'n,*
791 F.2d 699 (9th Cir. 1986) ........................................................................21

*Smith v. American Financial Systems, Inc.,*
737 F.2d 1549 (11th Cir. 1984) .....................................................................22

*Stein v. Royal Bank of Canada,*
239 F.3d 389 (1st Cir. 2001)..........................................................................23

*Tiffany v. Nat'l Bank of Missouri,*
85 U.S. 409 (1874) .......................................................................................24

*United States v. Locke,*
529 U.S. 89 (2000) .......................................................................................25

*United States of America v. Harris,*
530 F.2d 576 (4th Cir. 1976) .........................................................................26

*Wells Fargo Bank, N.A. v. Boutris,*
265 F. Supp. 2d 1162 (E.D. Cal. 2003) ..........................................................27

517 U.S. 25; 116 S. Ct. 1103; 134 L. Ed. 2d 237; 1996 U.S. LEXIS 2161; 64 U.S.L.W. 4161; 96 Fulton County D. Rep. 1197; 96 Cal. Daily Op. Service 2000; 9 Fla. L. Weekly Fed. S 451

BARNETT BANK OF MARION COUNTY, N. A., PETITIONER v. BILL NELSON, FLORIDA INSURANCE COMMISSIONER, ET AL.

No. 94-1837.

SUPREME COURT OF THE UNITED STATES

517 U.S. 25; 116 S. Ct. 1103; 134 L. Ed. 2d 237; 1996 U.S. LEXIS 2161; 64 U.S.L.W. 4161; 96 Fulton County D. Rep. 1197; 96 Cal. Daily Op. Service 2000; 9 Fla. L. Weekly Fed. S 451

January 16, 1996, Argued
March 26, 1996, Decided

**PRIOR HISTORY:** [****1] ON WRIT OF CERTIORARI TO THE UNITED STATES COURT OF APPEALS FOR THE ELEVENTH CIRCUIT.

**DISPOSITION:** 43 F.3d 631, reversed.

### CASE SUMMARY

**PROCEDURAL POSTURE:** Petitioner, an affiliated national bank, sought review of a judgment from the United States Court of Appeals for the Eleventh Circuit, which held petitioner was prohibited from selling insurance by Fla. Stat. Ann. § 626.988(2). Respondent, the Florida Insurance Commissioner, argued a federal statute permitting national banks to sell insurance in small towns did not preempt § 626.988(2), under the McCarran-Ferguson Act, 15 U.S.C.S. § 1012(b).

**OVERVIEW:** Petitioner, an affiliated national bank, sought review of a judgment that held petitioner was prohibited from selling insurance by Fla. Stat. Ann. § 626.988(2) (Supp. 1996). The judgment was premised on a holding that a federal statute permitting national banks to sell insurance in small towns, 12 U.S.C.S. § 92, did not preempt § 626.988(2), because § 92 did not specifically relate to the business of insurance and thus was subject to the McCarran-Ferguson Act (Act), 15 U.S.C.S. § 1012(b), which prohibited an act of Congress to be construed to invalidate, impair, or supersede any law enacted by a state for the regulation of insurance. The court held that the Act was inapplicable because § 92 specifically related to the business of insurance. The court further held because § 92 authorized petitioner to engage in activities prohibited under § 626.988(2), the two statutes were in direct conflict, and under ordinary legal principles of preemption, the federal law preempted the state law. Accordingly, the judgment that prohibited petitioner from selling insurance was reversed.

**OUTCOME:** The judgment that held petitioner, an affiliated national bank, was prohibited from selling

insurance was reversed because the federal statute empowering national banks to sell insurance specifically related to the business of insurance and was in direct conflict with a state statute prohibiting such activities, such that the federal law preempted the state law.

**CORE TERMS:** federal statute, state law, state statute, business of insurance, pre-empt, pre-emption, permission, regulation, anti-pre-emption, state regulation, small town, selling, banking, national bank, federal law, insurance business, normally, pre-emptive, regulating, obstacle, deposit, forbid, insurance industry, insurance policies, insurance-related, unanticipated, pre-empted, forbidding, taxation, silence

### LexisNexis(TM) Headnotes

*Constitutional Law > Supremacy Clause*

*Insurance Law > Regulation of Insurance*

[HN1]A federal statute will not pre-empt a state statute enacted for the purpose of regulating the business of insurance -- unless the federal statute specifically relates to the business of insurance. 15 U.S.C.S. § 1012(b).

*Insurance Law > Regulation of Insurance > Insurance Company Operations*

*Banking Law > National Banks > Insurance Brokerage*

[HN2]See 12 U.S.C.S. § 92.

*Insurance Law > Regulation of Insurance > Insurance Company Operations*

[HN3]See Fla. Stat. Ann. § 626.988(2) (Supp. 1996).

*Insurance Law > Regulation of Insurance > Insurance Company Operations*

[HN4]The term "financial institution" includes any bank except for a bank which is not a subsidiary or affiliate of a bank holding company and is located in a

517 U.S. 25; 116 S. Ct. 1103; 134 L. Ed. 2d 237; 1996 U.S. LEXIS 2161; 64 U.S.L.W. 4161; 96 Fulton County D. Rep. 1197; 96 Cal. Daily Op. Service 2000; 9 Fla. L. Weekly Fed. S 451

city having a population of less than 5,000. Fla. Stat. Ann. § 626.988(1)(a).

*Insurance Law > Regulation of Insurance > Insurance Company Operations*

[HN5]Fla. Stat. Ann. § 626.988(2) (Supp.1996) says, in essence, that banks cannot sell insurance in Florida -- except that an unaffiliated small town bank (i. e., a bank that is not affiliated with a bank holding company) may sell insurance in a small town.

*Insurance Law > Regulation of Insurance > Limitations on Federal Regulation*

[HN6]No act of Congress shall be construed to invalidate, impair, or supersede any law enacted by any state for the purpose of regulating the business of insurance, or which imposes a fee or tax upon such business, unless such act specifically relates to the business of insurance. 15 U.S.C.S. § 1012(b).

*Constitutional Law > Supremacy Clause*

[HN7]The Supremacy Clause requires courts to follow federal, not state, law. U.S. Const. art. VI, cl. 2.

*Constitutional Law > Supremacy Clause*

[HN8]If explicit preemption language does not appear in a federal statute, or does not directly answer the question, courts must consider whether the federal statute's "structure and purpose," or nonspecific statutory language, nonetheless reveal a clear, but implicit, pre-emptive intent. A federal statute, for example, may create a scheme of federal regulation so pervasive as to make reasonable the inference that Congress left no room for the states to supplement it. Alternatively, federal law may be in irreconcilable conflict with state law. Compliance with both statutes, for example, may be a "physical impossibility;" or, the state law may stand as an obstacle to the accomplishment and execution of the full purposes and objectives of Congress.

*Banking Law > National Banks > Insurance Brokerage*

[HN9]National banks may act as the agent for insurance sales. 12 U.S.C.S. § 92.

*Constitutional Law > Supremacy Clause*

[HN10]Where there exists a concurrent right of legislation in the states and in Congress, and the latter has exercised its power, there remains in the states no authority to legislate on the same matter.

*Insurance Law > Regulation of Insurance > Limitations on Federal Regulation*

[HN11]Where Congress has not expressly conditioned the grant of "power" upon a grant of state permission, ordinarily no such condition applies.

*Insurance Law > Regulation of Insurance > Limitations on Federal Regulation*

[HN12]The McCarran-Ferguson Act does not apply when the conflicting federal statute "specifically relates to the business of insurance."

*Insurance Law > Regulation of Insurance > Limitations on Federal Regulation*

[HN13]The word "relates" is highly general, and it is interpreted broadly.

*Insurance Law > Regulation of Insurance > Limitations on Federal Regulation*

[HN14]"Specifically" can mean "explicitly, particularly, [or] definitely," Black's Law Dictionary 1398 (6th ed. 1990), thereby contrasting a specific reference with an implicit reference made by more general language to a broader topic. The general words "business activity," for example, will sometimes include, and thereby implicitly refer, to insurance; the particular words "finance, banking, and insurance" make that reference explicitly and specifically.

*Insurance Law > Regulation of Insurance > Limitations on Federal Regulation*

*Banking Law > National Banks > Insurance Brokerage*

[HN15]The McCarran-Ferguson Act explicitly grants national banks permission to act as the agent for any fire, life, or other insurance company, to solicit and sell insurance, to collect premiums, and to receive for services so rendered fees or commissions subject to regulation. 12 U.S.C.S. § 92. It also sets forth certain specific rules prohibiting banks from guaranteeing the payment of any premium on insurance policies issued through its agency and the truth of any statement made by an assured in filing his application for insurance.

*Insurance Law > Regulation of Insurance > Limitations on Federal Regulation*

[HN16]The McCarran-Ferguson Act sets forth two mutually reinforcing purposes in its first section, namely, that continued regulation and taxation by the several states of the business of insurance is in the public interest, and that silence on the part of the Congress shall not be construed to impose any barrier to the regulation or taxation of such business by the several states. 15 U.S.C.S. § 1011.

*Insurance Law > Regulation of Insurance > Limitations on Federal Regulation*

517 U.S. 25; 116 S. Ct. 1103; 134 L. Ed. 2d 237; 1996 U.S. LEXIS 2161; 64 U.S.L.W. 4161; 96 Fulton County D. Rep. 1197; 96 Cal. Daily Op. Service 2000; 9 Fla. L. Weekly Fed. S 451

[HN17]The McCarran-Ferguson Act does not seek to insulate state insurance regulation from the reach of all federal law. Rather, it seeks to protect state regulation primarily against inadvertent federal intrusion.

*Insurance Law > Regulation of Insurance > Limitations on Federal Regulation*

*Governments > Legislation > Interpretation*

[HN18]A statute may specifically relate to more than one thing.

**DECISION:** Federal statute (12 USCS 92) authorizing national banks to sell insurance in small towns held to (1) pre-empt Florida statute restricting bank insurance sales, and (2) specifically relate to business of insurance within meaning of McCarran-Ferguson Act.

**SUMMARY:** It is provided in 12 USCS 92, which was enacted in 1916, that any national bank located and doing business in any place with a population of not more than 5,000 may act as the agent for any insurance company authorized by the state to sell insurance. Under 2(b) of the McCarran-Ferguson Act (15 USCS 1012(b)), which was enacted in 1945, an act of Congress may not be construed to invalidate, impair, or supersede any state law enacted for the purpose of regulating the business of insurance unless the congressional act "specifically relates to the business of insurance." In 1974, the state of Florida enacted a statute which prohibited the selling of most kinds of insurance in Florida by all banks except those which were located in a city having a population of less than 5,000 and which were not a subsidiary or an affiliate of a bank holding company. In 1993, an affiliated national bank which did business through a branch in a Florida town with a population of less than 5,000 bought a Florida-licensed insurance agency. On the day of the purchase, the bank filed an action in the United States District Court for the Middle District of Florida against the Florida insurance commissioner for permanent injunctive and declaratory relief, on the grounds that 92 pre-empted the Florida statute. Four days later, the commissioner ordered the agency to stop selling the prohibited kinds of insurance. Thereafter, the bank moved in District Court for a preliminary injunction against the commissioner. The District Court, denying both preliminary and permanent relief, ruled that 92 did not pre-empt the Florida statute, as (1) the Florida statute was a law enacted for the purpose of regulating the business of insurance within the meaning of 2(b), and (2) 92 did not fall within 2(b)'s anti-pre-emption rule because 92 did not specifically relate to the business of insurance (839 F Supp 835). On appeal, the United States Court

of Appeals for the Eleventh Circuit affirmed for similar reasons (43 F3d 631).

On certiorari, the United States Supreme Court reversed. In an opinion by Breyer, J., expressing the unanimous view of the court, it was held that 92 pre-empted the Florida statute, because (1) under ordinary legal principles of federal pre-emption, the intent of 92 was to grant authority to small town national banks to sell insurance regardless of whether a state granted its own state banks or national banks similar approval; and (2) 92 specifically related to the business of insurance within the meaning of 2(b).

**LAWYERS' EDITION HEADNOTES:**

[***LEdHN1]
BANKS §59
COMMERCE §104
Headnote:[1A][1B][1C][1D]
12 USCS 92--which was enacted in 1916 and provides that, in addition to the powers vested by law in national banks, any such bank located and doing business in any place with a population of not more than 5,000 may act as the agent for any insurance company authorized by the state to sell insurance, under such rules and regulations as the Comptroller of the Currency may prescribe--pre-empts a state statute which prohibits the selling of most kinds of insurance in the state by all banks except those which are located in a city having a population of less than 5,000 and which are not a subsidiary or an affiliate of a bank holding company, because (1) under ordinary legal principles of federal pre-emption, the intent of 92 is to grant authority to small town national banks to sell insurance regardless of whether a state grants its own state banks or national banks similar approval, in that (a) the language of 92 suggests that 92 grants national banks a broad permission to sell insurance which is not conditioned upon state permission, (b) there is a history in the United States Supreme Court of interpreting grants of both enumerated and incidental powers to national banks as grants of authority not normally limited by, but ordinarily pre-empting, contrary state law, (c) nothing in the background or history of 92 significantly supports the argument that special circumstances surrounding the enactment of 92 demonstrate Congress' intent to grant national banks only a limited permission to sell insurance subject to state approval, and (d) the Comptroller's subsequent interpretation of 92 does not suggest that 92 provides national banks with only a limited authority to sell insurance subject to similar state approval; and (2) 92 "specifically relates to the business of insurance" within the meaning of 2(b) of the McCarran-Ferguson

517 U.S. 25; 116 S. Ct. 1103; 134 L. Ed. 2d 237; 1996 U.S. LEXIS 2161; 64 U.S.L.W. 4161; 96 Fulton County D. Rep. 1197; 96 Cal. Daily Op. Service 2000; 9 Fla. L. Weekly Fed. S 451

Act (15 USCS 1012(b))--which provides that an act of Congress may not be construed to invalidate, impair, or supersede any state law enacted for the purpose of regulating the business of insurance unless the congressional act specifically relates to the business of insurance--and thus 2(b)'s special anti-pre-emption rule does not apply, in that (a) in ordinary English, 92 "specifically" "relates" to the "business of insurance," and in setting forth certain specific rules for banks, 92 not only focuses directly upon industry-specific selling practices but also affects the relation of insured to insurer and the spreading of risk, and (b) a purpose of the McCarran-Ferguson Act (15 USCS 1011-1015) as set forth in 15 USCS 1011, namely that silence on the part of Congress shall not be construed to impose any barrier to the regulation or taxation of the business of insurance by the several states, indicates--as the circumstances surrounding enactment of the McCarran-Ferguson Act also suggest--that the McCarran-Ferguson Act seeks to protect state regulation primarily against inadvertent federal intrusion, such as by enactment of a federal statute that describes an affected activity in broad, general terms, of which the insurance business happens to comprise one part.

[***LEdHN2]
STATES, TERRITORIES, AND POSSESSIONS §22
 federal pre-emption -- intent -- tests --
Headnote:[2]
If Congress, in enacting a federal statute, intends to exercise its constitutionally delegated authority to set aside the laws of a state, then the Federal Constitution's supremacy clause (Art VI, cl 2) requires courts to follow federal law, not state law; where explicit pre-emption language does not appear, or does not directly answer the question of whether the federal statute pre-empts state law, courts must consider whether the federal statute's structure and purpose, or nonspecific statutory language, nonetheless reveal a clear but implicit pre-emptive intent--as, for example, where (1) a federal statute creates a scheme of federal regulation so pervasive as to make reasonable the inference that Congress left no room for the states to supplement it, (2) federal law is in irreconcilable conflict with state law, (3) compliance with both the federal statute and the state statute is a physical impossibility, or (4) the state law stands as an obstacle to the accomplishment and execution of the full purposes and objectives of Congress.

[***LEdHN3]
BANKS §59
 national banks -- power of state --
Headnote:[3]

States have the power to regulate national banks where doing so does not prevent or significantly interfere with a national bank's exercise of its powers.

[***LEdHN4]
MUNICIPAL CORPORATIONS §34.5
STATUTES §178
 term "specifically relates" -- ordinance --
Headnote:[4]
For purposes of construing the statutory term "specifically relates", a statute may specifically relate to more than one thing; just as an ordinance forbidding dogs in city parks specifically relates to dogs and to parks, so a statute permitting banks to sell insurance can specifically relate to banks and to insurance.

[***LEdHN5]
COMMERCE §104
Headnote:[5]
Neither the language nor the purpose of 2(b) of the McCarran-Ferguson Act (15 USCS 1012(b))--which provides that an act of Congress may not be construed to invalidate, impair, or supersede any state law enacted for the purpose of regulating the business of insurance unless the congressional act specifically relates to the business of insurance--requires that a federal statute relate predominantly to insurance in order to pre-empt state law.

[***LEdHN6]
BANKRUPTCY §15
COMMERCE §104
Headnote:[6]
The anti-pre-emption rule enunciated by 2(b) of the McCarran-Ferguson Act (15 USCS 1012(b))--which provides that an act of Congress may not be construed to invalidate, impair, or supersede any state law enacted for the purpose of regulating the business of insurance unless the congressional act specifically relates to the business of insurance--applies where federal statutes with a potential pre-emptive effect upon state law, such as the bankruptcy statutes, (1) use general language that does not appear to specifically relate to insurance, and (2) conflict with state law that was enacted for the purpose of regulating the business of insurance.

SYLLABUS: A 1916 federal law (Federal Statute) permits national banks to sell insurance in small towns, but a Florida law (State Statute) prohibits such banks from selling most types of insurance. When petitioner Barnett Bank, a national bank doing business in a small Florida town, bought a state licensed insurance agency, respondent State Insurance Commissioner ordered the agency to stop selling the prohibited forms

517 U.S. 25; 116 S. Ct. 1103; 134 L. Ed. 2d 237; 1996 U.S. LEXIS 2161; 64 U.S.L.W. 4161; 96 Fulton County D. Rep. 1197; 96 Cal. Daily Op. Service 2000; 9 Fla. L. Weekly Fed. S 451

of insurance. In this action for declaratory and injunctive relief, the District Court held that the State Statute was not pre-empted, but only because of the McCarran-Ferguson Act's special insurance-related anti-pre-emption rule. That rule [****2] provides that a federal law will *not* pre-empt a state law enacted "for the purpose of regulating the business of insurance" -- *unless* the federal statute "*specifically relates to the business of insurance.*" 15 U.S.C. § 1012(b) (emphasis added). The Court of Appeals affirmed.

*Held:* The Federal Statute pre-empts the State Statute. Pp. 30-43.

(a) Under ordinary pre-emption principles, the State Statute would be pre-empted, for it is clear that Congress, in enacting the Federal Statute, intended to exercise its constitutionally delegated authority to override contrary state law. The Federal and State Statutes are in "irreconcilable conflict," *Rice* v. *Norman Williams Co.*, 458 U.S. 654, 659, 73 L. Ed. 2d 1042, 102 S. Ct. 3294, since the Federal Statute authorizes national banks to engage in activities that the State Statute expressly forbids. Thus, the State's prohibition would seem to "stand as an obstacle" to the accomplishment" of one of the Federal Statute's purposes, *Hines* v. *Davidowitz*, 312 U.S. 52, 67, 85 L. Ed. 581, 61 S. Ct. 399, unless, as the State contends, Congress intended to limit federal [****3] permission to sell insurance to those circumstances permitted by state law. However, by providing, without relevant qualification, that national banks "may . . . act as the agent" for insurance sales, 12 U.S.C. § 92, the Federal Statute's language suggests a broad, not a limited, permission. That this authority is granted in "addition to the *powers* now vested . . . in national [banks]," *ibid.* (emphasis added), is also significant. Legislative grants of both enumerated and incidental "powers" to national banks historically have been interpreted as grants of authority not normally limited by, but rather ordinarily pre-empting, contrary state law. See, e. g., *First Nat. Bank of San Jose* v. *California*, 262 U.S. 366, 368-369, 67 L. Ed. 1030, 43 S. Ct. 602. Where, as here, Congress has not expressly conditioned the grant of power upon a grant of state permission, this Court has ordinarily found that no such condition applies. See *Franklin Nat. Bank of Franklin Square* v. *New York*, 347 U.S. 373, 98 L. Ed. 767, 74 S. Ct. 550. The State's argument that special circumstances surrounding the Federal Statute's enactment [****4] demonstrate Congress' intent to grant only a limited permission is unpersuasive. Pp. 30-37.

(b) The McCarran-Ferguson Act's anti-pre-emption rule does not govern this case, because the Federal Statute "specifically relates to the business of insurance." This conclusion rests upon the Act's language and purposes, taken together. The word "relates" is highly general; and in ordinary English, the Federal Statute -- which focuses directly upon industry-specific selling practices and affects the relation of insured to insurer and the spreading of risk -- "specifically" relates to the insurance business. The Act's mutually reinforcing purposes -- that state regulation and taxation of the insurance business is in the public interest, and that Congress' "silence . . . shall not be construed to impose any barrier to [such] regulation or taxation," 15 U.S.C. § 1011 (emphasis added) -- also support this view. This phrase, especially the word "silence," indicates that the Act seeks to protect state regulation primarily against inadvertent federal intrusion, not to insulate state insurance regulation from the reach of all federal law. The circumstances surrounding [****5] the Act's enactment also suggest that the Act was passed to ensure that generally phrased congressional statutes, which do not mention insurance, are not applied to the issuance of insurance policies, thereby interfering with state regulation in unanticipated ways. The parties' remaining arguments to the contrary are unconvincing. Pp. 37-43.

**COUNSEL:** Nathan Lewin argued the cause and filed briefs for petitioner. With him on the briefs were Scott L. Nelson, James R. Heavner, Jr., and Richard E. Swartley.

Richard P. Bress argued the cause for the United States et al. as amici curiae urging reversal. With him on the brief were Solicitor General Days, Assistant Attorney General Hunger, Deputy Solicitor General Bender, Edward C. DuMont, Anthony J. Steinmeyer, Jacob M. Lewis, Julie L. Williams, L. Robert Griffin, Ernest C. Barrett III, and Joan M. Bernott.

Daniel Y. Sumner argued the cause and filed a brief for respondents Bill Nelson et al. With him on the brief were David J. Busch, Dennis Silverman, and Karen Asher-Cohen. Ann M. Kappler argued the cause and filed a brief for respondents Florida Association of Life Underwriters et al. With her on the brief were Scott A. Sinder, Sam Hirsch, [****6] Bruce J. Ennis, Jr., Paul M. Smith, and Donald B. Verrilli, Jr. *

- - - - - - - - - - - - - - - Footnotes - - - - - - - - - - - - - - - -

* Briefs of amici curiae urging reversal were filed for the American Bankers Association et al. by John J. Gill III, Michael F. Crotty, Mathew H. Street, Richard M. Whiting, Leonard J. Rubin, M.

517 U.S. 25; 116 S. Ct. 1103; 134 L. Ed. 2d 237; 1996 U.S. LEXIS 2161; 64 U.S.L.W. 4161; 96 Fulton County D. Rep. 1197; 96 Cal. Daily Op. Service 2000; 9 Fla. L. Weekly Fed. S 451

Thurman Senn, and David L. Glass; for American Deposit Corp. et al. by Thaddeus Holt and Dennis M. Gingold; for the Consumer Bankers Association et al. by David W. Roderer, Eric L. Hirschhorn, Donn C. Meindertsma, John W. Anderson, and Jeffrey D. Quayle; for the Florida Bankers Association by J. Thomas Cardwell and Virginia B. Townes; and for the New York Clearing House Association by Bruce E. Clark, Michael M. Wiseman, and Norman R. Nelson.

Briefs of amici curiae urging affirmance were filed for the American Council of Life Insurance by David Overlock Stewart, James M. Lichtman, Gary E. Hughes, and Phillip E. Stano; for the Council of Insurance Agents and Brokers by Mark E. Herlihy; for the National Association of Insurance Commissioners by Ellen Dollase Wilcox; for the National Conference of State Legislatures et al. by Richard Ruda, Lee Fennell, and Arthur E. Wilmarth, Jr.; and for Don W. Stephens et al. by Stephen B. Cox, Suetta W. Dickinson, Julie A. Fuselier, Richard Blumenthal, Attorney General of Connecticut, and John G. Haines, Assistant Attorney General.

- - - - - - - - - - - - End Footnotes- - - - - - - - 
- - - - - -

[****7]

JUDGES: BREYER, J., delivered the opinion for a unanimous Court.

OPINIONBY: BREYER

OPINION: [*27]  [**1106]  [***242] JUSTICE BREYER delivered the opinion of the Court.

[***LEdHR1A]  [1A]The question in this case is whether a federal statute that permits national banks to sell insurance in small towns pre-empts a state statute that forbids them to do so. To answer this question, we must consider both ordinary pre-emption principles, and also a special federal anti-pre-emption rule, which provides that [HN1]a federal statute will *not* pre-empt a [*28] state statute enacted "for the purpose of regulating the business of insurance" -- *unless the federal statute "specifically relates to the business of insurance."* McCarran-Ferguson Act, 15 U.S.C. § 1012(b) (emphasis added). We decide that the McCarran-Ferguson Act's special anti-pre-emption rule does not govern this case, because the federal statute in

question "specifically relates to the business of insurance." We conclude that, under ordinary pre-emption principles, the federal statute pre-empts the state statute, thereby [****8] prohibiting application of the state statute to prevent a national bank from selling insurance in a small town.

I

In 1916 Congress enacted a federal statute that says that certain national banks "may" sell insurance in small towns. It provides in relevant part:

[HN2]"In addition to the powers now vested by law in national [banks] organized under the laws of the United States *any such [bank]* located and doing business in any place [with a population] . . . [of not more than] five thousand . . . *may*, under such rules and regulations as may be prescribed by the Comptroller of the Currency, *act as the agent for any fire, life, or other insurance company* authorized by the authorities of the State . . . to do business [there], . . . by soliciting and selling insurance . . . Provided, however, That no such bank shall . . . guarantee the payment of any premium . . . And provided further, That the bank shall not guarantee the truth of any statement made by an assured [when applying] . . . for insurance." Act of Sept. 7, 1916 (Federal Statute), 39 Stat. 753, as [**1107] amended, 12 U.S.C. § 92 (emphases changed).

In 1974 Florida enacted [****9] a statute that prohibits certain banks from selling most kinds of insurance. It says:

[*29] [HN3]"No [Florida licensed] insurance agent . . . who is associated with, . . . owned or controlled by . . . a financial institution shall engage in insurance agency activities . . . ." Fla. Stat. § 626.988(2) (Supp. 1996) (State Statute).

The term "financial institution" includes[HN4]"any bank . . . [except for a] bank which is not a subsidiary or affiliate of a bank holding company and is located in a city having a population [***243] of less than 5,000 . . . ." § 626.988(1)(a).Thus, the State Statute [HN5]says, in essence, that banks cannot sell insurance in Florida -- except that an *unaffiliated* small town bank (i. e., a bank that is not affiliated with a bank holding company) may sell insurance in a small town. *Ibid.*

In October 1993 petitioner Barnett Bank, an "affiliated" national bank which does business through a branch in a small Florida town, bought a Florida licensed insurance agency. The Florida State Insurance Commissioner, pointing to the State Statute (and noting that the unaffiliated small town bank exception

517 U.S. 25; 116 S. Ct. 1103; 134 L. Ed. 2d 237; 1996 U.S. LEXIS 2161; 64 U.S.L.W. 4161; 96 Fulton County D. Rep. 1197; 96 Cal. Daily Op. Service 2000; 9 Fla. L. Weekly Fed. S 451

did not apply), ordered Barnett's [****10] insurance agency to stop selling the prohibited forms of insurance. Barnett, claiming that the Federal Statute pre-empted the State Statute, then filed this action for declaratory and injunctive relief in federal court.

The District Court held that the Federal Statute did not pre-empt the State Statute, but only because of the special insurance-related federal anti-pre-emption rule. The McCarran-Ferguson Act, which creates that rule, says:

[HN6]"No act of Congress shall be construed to invalidate, impair, or supersede any law enacted by any State for the purpose of regulating the business of insurance, or which imposes a fee or tax upon such business, unless such Act specifically relates to the business of insurance . . . ." McCarran-Ferguson Act, § 2(b), 59 Stat. 34, 15 U.S.C. § 1012(b).

[*30] The District Court decided both (1) that the Federal Statute did not fall within the McCarran-Ferguson Act's exception because it did not "specifically relat[e] to the business of insurance"; and (2) that the State Statute was a "law enacted . . . for the purpose of regulating the business of insurance." *Barnett Banks of Marion County, N. A. v. Gallagher*, 839 F. Supp. 835, 840-841, 843 (MD Fla. 1993) [****11] (internal quotation marks omitted). Consequently, the McCarran-Ferguson Act, in the District Court's view, instructs courts not to "constru[e]" the Federal Statute "to invalidate" the State Statute. 15 U.S.C. § 1012(b). The Eleventh Circuit Court of Appeals, for similar reasons, agreed that the Federal Statute did not pre-empt the State Statute. *Barnett Bank of Marion County, N. A. v. Gallagher*, 43 F.3d 631, 634-637 (1995).

We granted certiorari due to uncertainty among lower courts about the pre-emptive effect of this Federal Statute. See *Owensboro Nat. Bank v. Stephens*, 44 F.3d 388 (CA6 1994) (pre-emption of Kentucky statute that prevents national banks from selling insurance in small towns); *First Advantage Ins., Inc. v. Green*, 652 So. 2d 562 (La. Ct. App.), cert. and review denied, 654 So. 2d 331 (1995) (no pre-emption). We now reverse the Eleventh Circuit.

II

[***LEdHR2] [2]We shall put the McCarran-Ferguson Act's special anti-pre-emption rule to the side for the moment, and begin by asking whether, in the [****12] absence of that rule, we should construe the Federal Statute to pre-empt the State Statute. This question is basically one of congressional intent. Did Congress, in enacting the Federal Statute, intend to

exercise its constitutionally delegated authority to set aside the laws of a State? If [***244] so, [HN7]the Supremacy Clause requires courts to follow federal, not state, law. U.S. Const., Art. VI, cl. 2; see *California Fed. Sav. & Loan Assn. v. Guerra*, 479 U.S. 272, 280-281, 93 L. Ed. 2d 613, 107 S. Ct. 683 (1987) (reviewing pre-emption doctrine).

[*31] Sometimes courts, when facing the pre-emption question, find language in the [**1108] federal statute that reveals an explicit congressional intent to pre-empt state law. *E. g., Jones v. Rath Packing Co.*, 430 U.S. 519, 525, 530-531, 51 L. Ed. 2d 604, 97 S. Ct. 1305 (1977). More often, explicit pre-emption language does not appear, or does not directly answer the question. In that event, [HN8]courts must consider whether the federal statute's "structure and purpose," or nonspecific statutory language, nonetheless reveal a clear, but implicit, pre-emptive intent. *Id., at 525;* [***13] *Fidelity Fed. Sav. & Loan Assn. v. De la Cuesta*, 458 U.S. 141, 152-153, 73 L. Ed. 2d 664, 102 S. Ct. 3014 (1982). A federal statute, for example, may create a scheme of federal regulation "so pervasive as to make reasonable the inference that Congress left no room for the States to supplement it." *Rice v. Santa Fe Elevator Corp.*, 331 U.S. 218, 230, 91 L. Ed. 1447, 67 S. Ct. 1146 (1947). Alternatively, federal law may be in "irreconcilable conflict" with state law. *Rice v. Norman Williams Co.*, 458 U.S. 654, 659, 73 L. Ed. 2d 1042, 102 S. Ct. 3294 (1982). Compliance with both statutes, for example, may be a "physical impossibility," *Florida Lime & Avocado Growers, Inc. v. Paul*, 373 U.S. 132, 142-143, 10 L. Ed. 2d 248, 83 S. Ct. 1210 (1963); or, the state law may "stand as an obstacle to the accomplishment and execution of the full purposes and objectives of Congress." *Hines v. Davidowitz*, 312 U.S. 52, 67, 85 L. Ed. 581, 61 S. Ct. 399 (1941).

In this case we must ask whether or not the Federal and State Statutes are in "irreconcilable conflict." The two statutes do not impose [****14] directly conflicting duties on national banks -- as they would, for example, if the federal law said, "you must sell insurance," while the state law said, "you may not." Nonetheless, the Federal Statute authorizes national banks to engage in activities that the State Statute expressly forbids. Thus, the State's prohibition of those activities would seem to "stand as an obstacle to the accomplishment" of one of the Federal Statute's purposes -- unless, of course, that federal purpose is to grant the bank only a very *limited* permission, that is, permission to sell insurance *to the extent that state law also grants permission to do so*.

[*32] That is what the State of Florida and its supporting *amici* argue. They say that the Federal

517 U.S. 25; 116 S. Ct. 1103; 134 L. Ed. 2d 237; 1996 U.S. LEXIS 2161; 64 U.S.L.W. 4161; 96 Fulton County D. Rep. 1197; 96 Cal. Daily Op. Service 2000; 9 Fla. L. Weekly Fed. S 451

Statute grants national banks a permission that is limited to circumstances where state law is not to the contrary. In their view, the Federal Statute removes only federal legal obstacles, not state legal obstacles, to the sale of insurance by national banks. But we do not find this, or the State's related, ordinary pre-emption arguments, convincing.

[***LEdHR1B] [1B]For one [****15] thing, the Federal Statute's language suggests a broad, not a limited, permission. That language says, without relevant qualification, that [HN9]national banks "may . . . act as the agent" for insurance sales. 12 U.S.C. § 92. It specifically refers to "rules and regulations" that will govern such sales, while citing as their source not state law, but the federal Comptroller of the Currency. Ibid. It also specifically refers to state regulation, while limiting that reference to licensing -- not [***245] of banks or insurance agents, but of the insurance companies whose policies the bank, as insurance agent, will sell. Ibid.

For another thing, the Federal Statute says that its grant of authority to sell insurance is in "addition to the powers now vested by law in national [banks]." Ibid. (emphasis added). In using the word "powers," the statute chooses a legal concept that, in the context of national bank legislation, has a history. That history is one of interpreting grants of both enumerated and incidental "powers" to national banks as grants of authority not normally limited by, but rather ordinarily pre-empting, contrary state law. See, [****16] e. g., First Nat. Bank of San Jose v. California, 262 U.S. 366, 368-369, 67 L. Ed. 1030, 43 S. Ct. 602 (1923) (national banks' "power" to receive deposits pre-empts contrary state escheat law); Easton v. Iowa, 188 U.S. 220, 229-230, 47 L. Ed. 452, 23 S. Ct. 288 (1903) (national banking system normally "independent, so far as powers conferred are concerned, of state legislation"); cf. Waite v. Dowley, 94 U.S. 527, 533, 24 L. Ed. 181 (1877) ([HN10]"Where there exists a concurrent right of legislation in the States and in Congress, and the latter has exercised [**1109] its [*33] power, there remains in the States no authority to legislate on the same matter").

Thus, this Court, in a case quite similar to this one, held that a federal statute permitting, but not requiring, national banks to receive savings deposits pre-empts a state statute prohibiting certain state and national banks from using the word "savings" in their advertising. Franklin Nat. Bank of Franklin Square v. New York, 347 U.S. 373, 375-379, 98 L. Ed. 767, 74 S. Ct. 550 (1954) (Federal Reserve Act provision that national banks [****17] "may continue . . . to receive . . .

savings deposits" read as "declaratory of the right of a national bank to enter into or remain in that type of business"). See also De la Cuesta, supra, at 154-159 (federal regulation permitting, but not requiring, national banks to include in mortgage contracts a debt accelerating "due on sale" clause pre-empts a state law forbidding the use of such a clause); cf. Lawrence County v. Lead-Deadwood School Dist. No. 40-1, 469 U.S. 256, 105 S. Ct. 695, 83 L. Ed. 2d 635 (1985) (federal statute providing that local government units "may" expend federal funds for any governmental purpose pre-empts state law restricting their expenditure).

[***LEdHR3] [3]In defining the pre-emptive scope of statutes and regulations granting a power to national banks, these cases take the view that normally Congress would not want States to forbid, or to impair significantly, the exercise of a power that Congress explicitly granted. To say this is not to deprive States of the power to regulate national banks, where (unlike here) doing so does not prevent or significantly [****18] interfere with the national bank's exercise of its powers. See, e. g., Anderson Nat. Bank v. Luckett, 321 U.S. 233, 247-252, 88 L. Ed. 692, 64 S. Ct. 599 (1944) (state statute administering abandoned deposit accounts did not "unlawful[ly] encroac[h] on the rights and privileges of national banks"); McClellan v. Chipman, 164 U.S. 347, 358, 41 L. Ed. 461, 17 S. Ct. 85 (1896) (application to national banks of state statute forbidding certain real estate transfers by insolvent transferees would not "destro[y] or hampe[r]" national banks' functions); National Bank v. Commonwealth, 76 U.S. 353, 9 Wall. 353, 362, 19 L. Ed. 701 (1870) [*34] (national banks subject to state law [***246] that does not "interfere with, or impair [national banks'] efficiency in performing the functions by which they are designed to serve [the Federal] Government").

Nor do these cases control the interpretation of federal banking statutes that accompany a grant of an explicit power with an explicit statement that the exercise of that power is subject to state law. See, e. g., 12 U.S.C. § 36(c) (McFadden [****19] Act) (authorizing national banks to operate branches, but only where state law authorizes state banks to do so); § 92a(a) (Comptroller of Currency may grant fiduciary powers "by special permit to national banks applying therefor, when not in contravention of State or local law"). Not surprisingly, this Court has interpreted those explicit provisions to mean what they say. See, e. g., First Nat. Bank in Plant City v. Dickinson, 396 U.S. 122, 131, 24 L. Ed. 2d 312, 90 S. Ct. 337 (1969) (under McFadden Act, state branching restrictions apply to national

517 U.S. 25; 116 S. Ct. 1103; 134 L. Ed. 2d 237; 1996 U.S. LEXIS 2161; 64 U.S.L.W. 4161; 96 Fulton County D. Rep. 1197; 96 Cal. Daily Op. Service 2000; 9 Fla. L. Weekly Fed. S 451

banks); *First Nat. Bank of Logan* v. *Walker Bank & Trust Co.*, 385 U.S. 252, 260-261, 17 L. Ed. 2d 343, 87 S. Ct. 492 (1966) (same); see also *Van Allen* v. *Assessors*, 70 U.S. 573, 3 Wall. 573, 586, 18 L. Ed. 229 (1866) (enforcing 1864 amendments to National Bank Act expressly authorizing state taxation of national bank shares).

But, as we pointed out, *supra*, at 32-33, [HN11]where Congress has not expressly conditioned the grant of "power" upon a grant of state permission, the Court has ordinarily found that no such condition applies. In *Franklin Nat. Bank*, the Court made [****20] this point explicit. It held that Congress did not intend to subject national banks' power to local restrictions, because the federal power-granting statute there in question contained "no indication that Congress [so] intended . . . as it has done *by express language* in several other instances." 347 U.S. at 378, and n. 7 (emphasis added) (collecting examples).

[***LEdHR1C] [1C]The Federal Statute before us, as in *Franklin Nat. Bank*, explicitly grants a national bank an authorization, permission, or power. And, as in *Franklin Nat. Bank*, it [**1110] contains [*35] no "indication" that Congress intended to subject that power to local restriction. Thus, the Court's discussion in *Franklin Nat. Bank*, the holding of that case, and the other precedent we have cited above, strongly argue for a similar interpretation here -- a broad interpretation of the word "may" that does not condition federal permission upon that of the State.

Finally, Florida and its supporters challenge this interpretation by arguing that special circumstances surrounding the enactment of the Federal Statute nonetheless [****21] demonstrate Congress' intent to grant only a limited permission (subject to state approval). They point to a letter to Congress written by the Comptroller of the Currency in 1916. The Comptroller attached a draft of what became the Federal Statute, and the letter explains to Congress why the Comptroller wants Congress to enact his proposal. The letter says that, since 1900, many small town national banks had failed; that some States had authorized small town state banks to sell insurance; that providing small town national banks with authority to sell insurance would help them financially; and that doing so would also improve their competitive position vis-a-vis state banks. The relevant language in the letter (somewhat abridged) reads as follows:

[***247] "[Since 1900, of 3,084 small national banks, 438] have either failed or gone into liquidation. . . .

There are many banks located in [small towns] . . . where the small deposits which the banks receive may make it somewhat difficult [to earn] . . . a satisfactory return . . . .

"For some time I have been giving careful consideration to the question as to how the powers of these small national banks might be enlarged [****22] so as to provide them with additional sources of revenue and place them in a position where they could better compete with local State banks and trust companies which are sometimes [*36] authorized under the law to do a class of business not strictly that of commercial banking. . . .

"[The federal banking laws, while granting national banks certain "incidental powers," do not give them] either expressly nor by necessary implication the power to act as agents for insurance companies. . . .

. . . .

"My investigations lead me respectfully to recommend to Congress an amendment to the national-bank act by which national banks located in [small towns] . . . may be permitted to act as agents for insurance companies . . .

"It seems desirable from the standpoint of public policy and banking efficiency that this authority should be limited to banks in small communities. This additional income will strengthen them and increase their ability to make a fair return . . . .

"I think it would be unwise and therefore undesirable to confer this privilege generally upon banks in large cities where the legitimate business of banking affords ample scope for the energies of trained and [****23] expert bankers . . . .

"I inclose . . . a draft . . . designed to empower national banks located in [small] towns . . . under such regulations and restrictions as may from time to time be approved and promulgated by the Comptroller of the Currency, to act as agents for the placing of insurance policies . . . ." 53 Cong. Rec. 11001 (1916) (letter from Comptroller Williams to the Chairman of the Senate Bank and Currency Committee).

Assuming for argument's sake that this letter is relevant, and in response to the arguments of Florida and its supporters, we point out that the letter does not significantly advance their cause. Although the letter mentions that enlarging the powers of small national banks will help them "better compete with local State banks," it primarily focuses upon small town national banks' need for added revenue -- [*37] an objective met by a broad insurance-selling authority that is not limited by state law. The letter refers to limitations that

517 U.S. 25; 116 S. Ct. 1103; 134 L. Ed. 2d 237; 1996 U.S. LEXIS 2161; 64 U.S.L.W. 4161; 96 Fulton County D. Rep. 1197; 96 Cal. Daily Op. Service 2000; 9 Fla. L. Weekly Fed. S 451

*federal* regulation might impose, but it says nothing about limitations imposed by *state* regulation or *state* law. The letter makes clear that authority to sell insurance in small towns is an added "incidental [****24] power" of a national bank -- a term that, in light of this Court's then-existing [**1111] cases, suggested freedom from conflicting state regulation. See *Easton*, 188 U.S. at 229-230; *First Nat. Bank of San Jose*, 262 U.S. at 368-369. [***248] The letter sets forth as potential objections to the proposal (or to its extension to larger national banks) concerns about distracting banking management or inhibiting the development of banking expertise -- not concerns related to state regulatory control.

We have found nothing elsewhere in the Federal Statute's background or history that significantly supports the State's arguments. And as far as we are aware, the Comptroller's subsequent interpretation of the Federal Statute does not suggest that the statute provides only a limited authority subject to similar state approval. Cf. 12 CFR § 7.7100 (1995); OCC Interpretive Letter No. 366, CCH Fed. Banking L. Rep. P85,536, p. 77,833 (1986).

In light of these considerations, we conclude that the Federal Statute means to grant small town national banks authority to sell insurance, whether or not a State grants its own state banks or national banks similar [****25] approval. Were we to apply ordinary legal principles of pre-emption, the federal law would pre-empt that of the State.

III

[***LEdHR1D] [1D]We now must decide whether ordinary legal principles of pre-emption, or the special McCarran-Ferguson Act anti-pre-emption rule, governs this case. The lower courts held that the McCarran-Ferguson Act's special anti-pre-emption rule applies, and instructs courts not to "construe" the Federal Statute to "invalidate, impair, or supersede" that of the [*38] State. 15 U.S.C. § 1012(b). By its terms, however, [HN12]the Act does not apply when the conflicting federal statute *"specifically relates to the business of insurance."* Ibid. (emphasis added). In our view, the Federal Statute in this case "specifically relates to the business of insurance" -- therefore the McCarran-Ferguson Act's special anti-pre-emption rule does not apply.

Our conclusion rests upon the McCarran-Ferguson Act's language and purpose, taken together. Consider the language -- "specifically relates to the business of insurance." In ordinary English, a statute that says that banks may [****26] act as insurance agents, and that

the Comptroller of the Currency may regulate their insurance-related activities, "*relates*" to the insurance business. [HN13]The word "relates" is highly general, and this Court has interpreted it broadly in other pre-emption contexts. See, e. g., *Pilot Life Ins. Co.* v. *Dedeaux*, 481 U.S. 41, 47, 95 L. Ed. 2d 39, 107 S. Ct. 1549 (1987) (words "'relate to'" have "'broad common-sense meaning, such that a state law 'relate[s] to' a benefit plan ". . . if it has a connection with or reference to such a plan'"") (quoting *Metropolitan Life Ins. Co.* v. *Massachusetts*, 471 U.S. 724, 739, 85 L. Ed. 2d 728, 105 S. Ct. 2380 (1985), in turn quoting *Shaw* v. *Delta Air Lines, Inc.*, 463 U.S. 85, 97, 77 L. Ed. 2d 490, 103 S. Ct. 2890 (1983)); *Morales* v. *Trans World Airlines, Inc.*, 504 U.S. 374, 383-384, 119 L. Ed. 2d 157, 112 S. Ct. 2031 (1992) (interpreting similarly the words "'relating to'" in the Airline Deregulation Act of 1978).

More importantly, in ordinary English, this statute *"specifically"* relates to the insurance business. [HN14]"Specifically" can mean "explicitly, [****27] particularly, [or] definitely," Black's Law Dictionary 1398 (6th ed. 1990), thereby contrasting a *specific* reference with an *implicit* reference made by more general language to a broader topic. The general words "business activity," for example, will [***249] sometimes include, and thereby implicitly refer, to insurance; the particular words "finance, banking, and insurance" make that reference explicitly *and specifically*.

[*39] Finally, using ordinary English, one would say that this statute specifically relates to the *"business of insurance."* The statute [HN15]explicitly grants national banks permission to "act as the agent for any fire, life, or other insurance company," to "solici[t] and sel[l] insurance," to "collec[t] premiums," and to "receive for services so rendered . . . fees or commissions," subject to Comptroller regulation. 12 U.S.C. § 92. It also sets forth certain specific rules prohibiting banks from guaranteeing the "payment of any premium on insurance policies issued through its agency [**1112] . . ." and the "truth of any statement made by an assured in filing his application for insurance." Ibid. The statute [****28] thereby not only focuses directly upon industry-specific selling practices, but also affects the relation of insured to insurer and the spreading of risk -- matters that this Court, in other contexts, has placed at the core of the McCarran-Ferguson Act's concern. See *Union Labor Life Ins. Co.* v. *Pireno*, 458 U.S. 119, 129, 73 L. Ed. 2d 647, 102 S. Ct. 3002 (1982) (citing *Group Life & Health Ins. Co.* v. *Royal Drug Co.*, 440 U.S. 205, 59 L. Ed. 2d 261, 99 S. Ct. 1067 (1979); see also

517 U.S. 25; 116 S. Ct. 1103; 134 L. Ed. 2d 237; 1996 U.S. LEXIS 2161; 64 U.S.L.W. 4161; 96 Fulton County D. Rep. 1197; 96 Cal. Daily Op. Service 2000; 9 Fla. L. Weekly Fed. S 451

*Department of Treasury v. Fabe, 508 U.S. 491, 502-504, 124 L. Ed. 2d 449, 113 S. Ct. 2202 (1993).*

Consider, too, the McCarran-Ferguson Act's basic purposes. [HN16]The Act sets forth two mutually reinforcing purposes in its first section, namely, that "continued regulation and taxation by the several States of the business of insurance is in the public interest," and that "*silence* on the part of the Congress shall not be construed to impose any barrier to the regulation or taxation of such business by the several States." 15 U.S.C. § 1011 (emphasis added). The latter phrase, particularly the word "silence," indicates that [****29] [HN17]the Act does not seek to insulate state insurance regulation from the reach of all federal law. Rather, it seeks to protect state regulation primarily against *inadvertent* federal intrusion -- say, through enactment of a federal statute that describes an affected activity in broad, general terms, of which the insurance business happens to constitute one part.

[*40] The circumstances surrounding enactment of the McCarran-Ferguson Act suggest the same. Just prior to the law's enactment, this Court, in *United States v. South-Eastern Underwriters Assn., 322 U.S. 533, 88 L. Ed. 1440, 64 S. Ct. 1162 (1944),* held that a federal antitrust law, the Sherman Act, applied to the business of insurance. The Sherman Act's highly general language said nothing specifically about insurance. See 15 U.S.C. § 1 (forbidding every "contract, combination . . . or conspiracy, in restraint of trade or commerce among the several States"). The Sherman Act applied only to activities in or affecting interstate commerce. *Hopkins v. United States, 171 U.S. 578, 586, 43 L. Ed. 290, 19 S. Ct. 40 (1898).* Many lawyers and insurance professionals [****30] had previously thought (relying, in part, on this Court's opinion in *Paul v. Virginia, 75 U.S. 168, 8 Wall. 168, 183, 19 L. Ed. 357 (1869),* and other cases) that the issuance of an insurance policy was not a "transaction of commerce," and therefore fell outside the Sherman Act's scope. *South-Eastern Underwriters* told those professionals that they were wrong about interstate commerce, and that the Sherman [***250] Act did apply. And *South-Eastern Underwriters'* principle meant, consequently, that other generally phrased congressional statutes might also apply to the issuance of insurance policies, thereby interfering with state regulation of insurance in similarly unanticipated ways.

In reaction to *South-Eastern Underwriters*, Congress "moved quickly," enacting the McCarran-Ferguson Act "to restore the supremacy of the States in the realm of insurance regulation." *Fabe, supra, at 500.* But the circumstances we have just described mean that

"restor[ation]" of "supremacy" basically required setting aside the unanticipated effects of *South-Eastern Underwriters*, and cautiously avoiding similar unanticipated interference with [****31] state regulation in the future. It did not require avoiding federal pre-emption by future federal statutes that indicate, through their "specific relat[ion]" to insurance, that Congress had focused upon the insurance industry, and therefore, in all [*41] likelihood, consciously intended to exert upon the insurance industry whatever pre-emptive force accompanied its law. See also, *e. g.,* insofar as relevant, 91 Cong. Rec. 483 (1945) (statement of Sen. O'Mahoney, floor manager of the Act, that the Act was intended to be "a sort of catch-all provision to take into consideration other acts of Congress which might affect the insurance industry, but of which we did not have knowledge at the time"); *ibid.* (similar statement of Sen. Ferguson).

The language of the Federal Statute before us is not general. It refers specifically to insurance. Its state regulatory implications are not surprising, nor do we believe them inadvertent. See Part II, *supra.* Consequently, [**1113] considerations of purpose, as well as of language, indicate that the Federal Statute falls within the scope of the McCarran-Ferguson Act's "specifically relates" exception to its anti-pre-emption rule. [****32] Cf. *John Hancock Mut. Life Ins. Co. v. Harris Trust and Sav. Bank, 510 U.S. 86, 98, 126 L. Ed. 2d 524, 114 S. Ct. 517 (1993)* (adopting the United States' view that language in the Employee Retirement Income Security Act of 1974 defining a "guaranteed benefit policy" as a certain kind of "insurance" policy "obviously and specifically relates to the business of insurance") (internal quotation marks omitted).

[***LEdHR4] [4] [***LEdHR5] [5]We shall mention briefly why we are not convinced by several of the parties' remaining arguments. Florida says that the Federal Statute "specifically relates" to banking, not to insurance. But [HN18]a statute may specifically relate to more than one thing. Just as an ordinance forbidding dogs in city parks specifically relates to dogs and to parks, so a statute permitting banks to sell insurance can specifically relate to banks and to insurance. Neither the McCarran-Ferguson Act's language, nor its purpose, requires the Federal Statute to relate *predominantly* to insurance. To the contrary, specific detailed [****33] references to the insurance industry in proposed legislation normally will achieve the McCarran-Ferguson Act's objectives, for they will call the proposed legislation [*42] to the attention of interested parties, and thereby normally guarantee,

517 U.S. 25; 116 S. Ct. 1103; 134 L. Ed. 2d 237; 1996 U.S. LEXIS 2161; 64 U.S.L.W. 4161; 96 Fulton County D. Rep. 1197; 96 Cal. Daily Op. Service 2000; 9 Fla. L. Weekly Fed. S 451

should the proposal become law, that Congress will have focused upon its insurance-related effects.

[***LEdHR6]    [6]An *amicus* argues that our interpretation would give the Act "little meaning," because "whenever a state statute 'regulates' the business of insurance, any conflicting  [***251] federal statute necessarily will 'specifically relate' to the insurance business." Brief for American Council of Life Insurance as *Amicus Curiae* 4. We disagree. Many federal statutes with potentially pre-emptive effect, such as the bankruptcy statutes, use general language that does not appear to "specifically relate" to insurance; and where those statutes conflict with state law that was enacted "for the purpose of regulating the business of insurance," the McCarran-Ferguson Act's anti-pre-emption rule will apply. See generally *Fabe, supra, at 501* (noting [****34] the parties' agreement that federal bankruptcy priority rules, although conflicting with state law, do not "specifically relate" to the business of insurance).

The lower courts argued that the Federal Statute's 1916 date of enactment was significant, because Congress would have then believed that state insurance regulation was beyond its "Commerce Clause" power to affect. The lower courts apparently thought that Congress therefore could not have intended the Federal Statute to pre-empt contrary state law. The short answer to this claim is that there is no reason to think that Congress believed state insurance regulation beyond its constitutional powers to affect -- insofar as Congress exercised those powers to create, to empower, or to regulate national banks. See *McCulloch v. Maryland, 17 U.S. 316, 4 Wheat. 316, 4 L. Ed. 579 (1819); Farmers' and Mechanics' Nat. Bank v. Dearing, 91 U.S. 29, 33, 23 L. Ed. 196 (1875);* see also, *e. g., Easton v. Iowa, 188 U.S. at 238.* We have explained, see Part II, *supra,* why we conclude that Congress indeed *did* intend the Federal Statute to pre-empt conflicting state law. [****35]

[*43]  Finally, Florida points to language in *Fabe,* which states that the McCarran-Ferguson Act "imposes what is, in effect, a clear-statement rule" that forbids pre-emption "unless a federal statute specifically requires otherwise." *508 U.S. at 507.* Florida believes that this statement in *Fabe* means that the Federal Statute would have to use the words "state law is pre-empted," or the like, in order to fall within the McCarran-Ferguson Act exception. We do not believe, however, that *Fabe* imposes any such requirement. Rather, the quoted language in *Fabe* was a general description of the Act's effect. It simply pointed to the existence of the clause at issue here -- the exception for federal statutes that "specifically relat[e] to the

business of insurance." But it did not purport authoritatively to interpret the "specifically relates" clause. That matter was not at issue in *Fabe.* We [**1114] therefore believe that *Fabe* does not require us to reach a different result here.

For these reasons, the judgment of the Court of Appeals is reversed.

*It is so ordered.*

**REFERENCES:**
Return To Full Text Opinion

[****36]    Go to Supreme Court Brief(s)
        Go to Oral Argument Transcript

10 Am Jur 2d, Banks 303; 43 Am Jur 2d, Insurance 37, 38

12 USCS 92; 15 USCS 1012(b)

L Ed Digest, Banks 59; Commerce 103(1)

L Ed Index, Banks; McCarran-Ferguson Act

ALR Index, Banks and Banking; Insurance Agents and Brokers; McCarran-Ferguson Act; National Banks

Annotation References:

Supreme Court's views as to validity, construction, and application of McCarran-Ferguson Act (15 USCS 1011-1015), concerning regulation of business of insurance by state or federal law. 125 L Ed 2d 879.

Public regulation or control of insurance agents or brokers. 10 ALR2d 950.

195 B.R. 558; 1996 Bankr. LEXIS 544

In re: DOROTHY BOTELHO, Debtor; DOROTHY BOTELHO, Plaintiff v. CITICORP MORTGAGE, INC., Defendant

Chapter 13, Case No. 95-13744-JNF, Adversary Proceeding No. 95-1468

UNITED STATES BANKRUPTCY COURT FOR THE DISTRICT OF MASSACHUSETTS

195 B.R. 558; 1996 Bankr. LEXIS 544

May 21, 1996, Decided
May 21, 1996, Opinion Filed

**DISPOSITION:** [**1] Defendant's Motion to Dismiss Adversary Complaint denied, which the Court has treated as a motion for summary judgment.

## CASE SUMMARY

**PROCEDURAL POSTURE:** Defendant creditor filed a motion to dismiss plaintiff's adversary complaint under Fed. R. Civ. P. 12(b)(1) and Fed. R. Civ. P. 12(b)(6) for lack of subject matter jurisdiction and failure to state a claim in plaintiff debtor's Chapter 13 bankruptcy proceedings. The court treated the motion as motion for summary judgment.

**OVERVIEW:** Plaintiff and third-party entered into a rapid equity mortgage with defendant, granting a security interest in the mortgaged property. On May 25, 1995, plaintiff's counsel sent a letter to defendant rescinding the transaction pursuant to the federal Truth-in-Lending Act, 15 U.S.C.S. §§ 1601-1667(e), and the Massachusetts Consumer Creditor Cost Disclosure Act, Mass. Gen. Laws ch. 140D, §§ 1-34. Six days later, plaintiff filed a Chapter 13 bankruptcy proceeding, listing the property as unsecured. Defendant filed a proof of claim. Plaintiff then commenced this adversary proceeding, and defendant moved to dismiss pursuant to Fed. R. Civ. P. 12(b)(1) and Fed. R. Civ. P. 12(b)(6). The court treated the motion to dismiss as a motion for summary judgment. The court held that it had subject matter jurisdiction to hear plaintiff's adversary complaint and that plaintiff's amended and second amended complaints contained sufficient allegations to state a cause of action against defendant. Accordingly, the court denied defendant's motion.

**OUTCOME:** The court denied defendant's motion because plaintiff's recission claim was available by recoupment based on the court's finding that recoupment counterclaims were exempt from limitations periods when compulsory and the parties' claims arose out of the same transaction. The court held that the contention that it lacked subject matter jurisdiction was without merit.

**CORE TERMS:** recoupment, rescission, consumer, statute of limitations, obligor, right to rescind, notice, lending, counterclaim, regulation, mortgage, cancel, disclosure, foreclosure, exempt, adversary proceeding, deed of trust, refinancing, disclose, security interest, stale, proof of claim, subject matter jurisdiction, consummation, rescind, occurrence, exemption, asserting, lawsuit, summary judgment

**LexisNexis(TM) Headnotes**

*Civil Procedure > State & Federal Interrelationships > Federal Common Law*

*Contracts Law > Consideration > Mutual Obligation*

*Civil Procedure > Pleading & Practice > Defenses, Objections & Demurrers > Affirmative Defenses*

[HN1]The common law doctrine of recoupment permits the crediting of reciprocal rights against each other where those rights arose under the same transaction, typically the same contract.

*Civil Procedure > Pleading & Practice > Defenses, Objections & Demurrers > Affirmative Defenses*

[HN2]Recoupment is in the nature of a defense and is intended to permit judgment to be rendered that does justice in view of the one transaction as a whole.

*Civil Procedure > State & Federal Interrelationships > Federal Common Law*

*Civil Procedure > Pleading & Practice > Defenses, Objections & Demurrers > Affirmative Defenses*

*Civil Procedure > Pleading & Practice > Pleadings > Counterclaims & Cross-Claims*

[HN3]Recoupment has been incorporated into the counterclaim in modern practice and procedure. However, common law recoupment is still recognized by courts as a valid defense.

*Governments > Legislation > Statutes of Limitations > Statutes of Limitations Generally*

195 B.R. 558; 1996 Bankr. LEXIS 544

*Civil Procedure > Pleading & Practice > Defenses, Objections & Demurrers > Affirmative Defenses*

[HN4]Recoupment is in the nature of a defense arising out of some feature of the transaction upon which the plaintiff's action is grounded. Such a defense is never barred by the statute of limitations so long as the main action itself is timely.

*Governments > Legislation > Statutes of Limitations > Statutes of Limitations Generally*

[HN5]Statutes of limitations are aimed at lawsuits, not at the consideration of particular issues in lawsuits. To use the statute of limitations to cut off the consideration of a particular defense in the case is quite foreign to the policy of preventing the commencement of stale litigation. It would be incongruous to hold that once a lawsuit is properly before the court, decision must be made without consideration of all the issues in the case and without the benefit of all the applicable law. If the litigation is not stale, then no issue in it can be deemed stale.

*Banking Law > Bank Activities > Consumer Protection > Truth in Lending*

[HN6]In order to raise Truth-in-Lending Act (TILA), 15 U.S.C.S. §§ 1601-1667(e), claims by way of recoupment, the debtor must satisfy a three-pronged test. She must show that (1) the TILA violation and the creditor's debt claim arose from the same transaction, (2) she is asserting her claim as a defense, and (3) the "main action" is timely.

*Banking Law > Bank Activities > Consumer Protection > Truth in Lending*

[HN7]Pursuant to 15 U.S.C.S. § 1604 of the Truth-in-Lending Act (TILA), 15 U.S.C.S. §§ 1601-1667(e), the Board of Governors of the Federal Reserve System has promulgated Regulation Z, 12 C.F.R. § 226 (Regulation Z), and has published model disclosure forms. TILA and Regulation Z require creditors to clearly and conspicuously disclose certain credit-related information.

*Governments > Legislation > Statutory Remedies & Rights*

*Banking Law > Bank Activities > Consumer Protection > Truth in Lending*

[HN8]The Truth-in-Lending Act, 15 U.S.C.S. §§ 1601-1667(e), provides consumers with remedies in the forms of both a right of rescission and a right to damages. 15 U.S.C.S. §§ 1635, 1640.

*Banking Law > Bank Activities > Consumer Protection > Truth in Lending*

[HN9]See 15 U.S.C.S. § 1635.

*Governments > Legislation > Statutes of Limitations > Statutes of Limitations Generally*

*Banking Law > Bank Activities > Consumer Protection > Truth in Lending*

[HN10]Affirmative claims for rescission are subject to the three-year limitation provided by 15 U.S.C.S. § 1635(f) and 12 C.F.R. § 226.23(a)(3), If the required notice or material disclosures are not delivered, the right to rescind shall expire three years after consummation.

*Banking Law > Bank Activities > Consumer Protection > Truth in Lending*

[HN11]See 15 U.S.C.S. § 1640.

*Governments > Legislation > Interpretation*

*Banking Law > Bank Activities > Consumer Protection > Truth in Lending*

[HN12]Massachusetts Consumer Creditor Cost Disclosure Act, Mass. Gen. Laws ch. 140D, §§ 1-34, and the regulations promulgated by the Massachusetts Division of Banks and Loan Agencies, 209 C.M.R. § 32.00 et seq., essentially mirror the provisions of the Truth-in-Lending Act, 15 U.S.C.S. §§ 1601-1667(e) and Regulation Z, 12 C.F.R. § 226.

*Governments > Legislation > Statutes of Limitations > Statutes of Limitations Generally*

*Banking Law > Bank Activities > Consumer Protection > Truth in Lending*

[HN13]The major difference between the federal Truth-in-Lending Act, 15 U.S.C.S. §§ 1601-1667(e) and Massachusetts Consumer Credit Cost Disclosure Act, Mass. Gen. Laws ch. 140D, §§ 1-34 (CCCDA) is the period of limitations for rescission and damages claims. Under CCCDA, a consumer's affirmative right to rescind a transaction is extended to four years.

*Governments > Legislation > Statutes of Limitations > Statutes of Limitations Generally*

*Banking Law > Bank Activities > Consumer Protection*

[HN14]See Mass. Gen. Laws ch.260, § 5A.

*Banking Law > Bank Activities > Consumer Protection > Truth in Lending*

[HN15]See Mass. Gen. Laws ch. 140D, § 32(g).

*Banking Law > Bank Activities > Consumer Protection > Truth in Lending*

[HN16]Because the provisions of the federal Truth-in-Lending Act, 15 U.S.C.S. §§ 1601-1667(e) (TILA), and Massachusetts Consumer Credit Cost Disclosure

195 B.R. 558; 1996 Bankr. LEXIS 544

Act, Mass. Gen. Laws. ch. 140D, §§ 1-34 (CCCDA), are "substantially similar," 15 U.S.C.S. § 1633 exempts from chapters two and four of TILA credit transactions that are subject to CCCDA. Both 15 U.S.C.S. § 1635 and 15 U.S.C.S. § 1640 are included in chapter two of TILA. The exemption is limited, however, because Regulation Z, 12 C.F.R. § 226.29(B)(1) provides that no exemptions granted under this section shall extend to the civil liability provisions of TILA.

*Governments > Legislation > Interpretation*

*Banking Law > Bank Activities > Consumer Protection > Truth in Lending*

[HN17]Because the provisions of the Massachusetts Consumer Credit Cost Disclosure Act, Mass. Gen. Laws ch. 140D, §§ 1-34 (CCCDA), parallel those of the federal Truth-in-Lending Act, 15 U.S.C.S. §§ 1601-1667(e) (TILA), CCCDA should be construed in accordance with federal law. Thus, a court may look to federal case law to determine if relief is available to a debtor by way of recoupment for both rescission and damages.

*Governments > Legislation > Statutes of Limitations > Time Limitations*

*Banking Law > Bank Activities > Consumer Protection > Truth in Lending*

[HN18]The language of 15 U.S.C.S. § 1640(e) explicitly exempts recoupment claims from the one-year statute of limitations.

*Civil Procedure > Pleading & Practice > Defenses, Objections & Demurrers > Affirmative Defenses*

*Banking Law > Bank Activities > Consumer Protection > Truth in Lending*

[HN19]The statute of limitations does not bar the assertion of a recoupment claim pursuant to the federal Truth-in-Lending Act, 15 U.S.C.S. §§ 1601-1667(e), defensively.

*Governments > Legislation > Statutes of Limitations > Statutes of Limitations Generally*

*Governments > Legislation > Interpretation*

*Banking Law > Bank Activities > Consumer Protection > Truth in Lending*

[HN20]The presence of recoupment language in 15 U.S.C.S. § 1640(e) and its absence in 15 U.S.C.S. § 1635(f) amounts to a distinction without a difference, in view of the fact that recoupment claims are generally not subject to statutes of limitations.

*Banking Law > Bank Activities > Consumer Protection > Truth in Lending*

[HN21]See 15 U.S.C.S. § 1635(i).

*Governments > Legislation > Effect & Operation > Prospective & Retrospective Operation*

*Civil Procedure > State & Federal Interrelationships > Application of State Law*

*Banking Law > Bank Activities > Consumer Protection > Truth in Lending*

[HN22]According to 15 U.S.C.S. § 1635(i), which applies retroactively, state law determines whether rescission is available by way of recoupment after the expiration of the statute of limitations. Therefore, the court must look to state law to determine if recoupment is available.

*Governments > Legislation > Statutes of Limitations > Statutes of Limitations Generally*

*Civil Procedure > Pleading & Practice > Pleadings > Counterclaims & Cross-Claims*

[HN23]See Mass. Gen. Laws ch. 260, § 36.

*Governments > Legislation > Statutes of Limitations > Statutes of Limitations Generally*

*Civil Procedure > Pleading & Practice > Pleadings > Counterclaims & Cross-Claims*

[HN24]The First Circuit Court of Appeals has recognized that counterclaims are exempt from statutory limitation periods if they are compulsory, that is, if they arise out of the same transaction.

*Governments > Legislation > Statutes of Limitations > Statutes of Limitations Generally*

*Civil Procedure > Pleading & Practice > Pleadings*

*Civil Procedure > State & Federal Interrelationships > Federal Common Law*

[HN25]The common law concept of recoupment is generally, if not always, timely, no matter when actually pleaded in the action, if the plaintiff's original claim was timely.

**COUNSEL:** Sara M. Quinn, Esq., Richard McMahon, Southeastern Mass. Legal Assistance Corp., New Bedford, MA, for Debtor.

Donald H. Carvin, Esq., Braintree, MA, for Citicorp Mortgage, Inc.

Chapter 13 Trustee.

**JUDGES:** Joan N. Feeney, United States Bankruptcy Judge

**OPINIONBY:** Joan N. Feeney

195 B.R. 558; 1996 Bankr. LEXIS 544

## OPINION: [*560] MEMORANDUM

## I. INTRODUCTION

The matter before the Court in this adversary proceeding is the defendant's Motion to Dismiss Adversary Complaint pursuant to Fed. R. Civ. P. 12(b)(1) and (6) for lack of subject matter jurisdiction and for failure to state a claim upon which relief can be granted. The plaintiff filed an objection to the motion, and the Court held a hearing in this matter on January 22, 1996. At the conclusion of the hearing, the Court ordered that supplemental briefs be filed by March 15, 1996. The defendant filed a supplemental brief on March 15, 1996, and the plaintiff filed a response on April 5, 1996. On April 9, 1996, the defendant moved for additional time to file a reply brief to the plaintiff's response brief and also sought an order that no further [**2] briefs be filed without order of the Court. The Court allowed the motion on April 10, 1996, and ordered the defendant to file its reply brief by April 19, 1996.

The Court will treat the Motion to Dismiss as a Motion for Summary Judgment. The material facts necessary to decide this matter, which the Court has gleaned from the pleadings and exhibits as well as the Debtor's petition and schedules, are not in dispute.

## II. FINDINGS OF FACT

Dorothy Botelho (the "Debtor") resides at 63 Adirondack Road, Westport, Massachusetts (the "property"). The Debtor, Barbie Jo Botelho ("Ms. Botelho") and Nazih B. Elkallassi ("Mr. Elkallassi") own the property as joint tenants with rights of survivorship. However, neither Ms. Botelho nor Mr. Elkallassi occupies the property. On December 11, 1989, the Debtor, Ms. Botelho and Mr. Elkallassi entered into a "Rapid Equity Mortgage Note" with Citicorp Mortgage, Inc. ("Citicorp") in which they promised to repay $ 59,150.00 at an annual rate of 10.25% (the "1989 transaction"). As security for the loan, they granted Citicorp a mortgage on the property, which mortgage was properly recorded on December 15, 1989.

Also on December 11, 1989, the Debtor [**3] signed a receipt in which she acknowledged that she received two copies of Citicorp's Notice of Right to Cancel. Although there is no evidence that the Debtor and her co-debtors had borrowed money from Citicorp prior to December 11, 1989, Citicorp provided a notice which stated in relevant part the following:**Your Right To Cancel**

You are entering into a new transaction to increase the amount of credit provided to you. We acquired a mortgage/deed of trust on your home under the original transaction and will retain that mortgage/deed of trust in the new transaction. You have a legal right under federal law to cancel the new transaction, without cost, within three business days from whichever of the following events occurs last:(1) the date of the new transaction, which is December 11, 1989; or

(2) the date you received your new Truth-in-Lending disclosures; or

(3) the date you received this notice of your right to cancel.If you cancel the new transaction, your cancellation will apply only to the increase in the amount of credit. It will not affect the amount that you presently owe on the mortgage/deed of trust we already have on your home. If [**4] you cancel, the mortgage/deed of trust as it applies to the increased amount is also cancelled. Within 20 calendar days after we receive your notice of cancellation of the new transaction, we must take the steps necessary to reflect the fact that our mortgage/deed of trust on your home no longer applies to the increase of credit. We must also return [*561] any money you have given to us or anyone else in connection with the new transaction...Neither Ms. Botelho nor Mr. Elkallassi signed the receipt.

On May 25, 1995, the Debtor's counsel sent a letter to Citicorp in which she indicated that the Debtor was rescinding the 1989 transaction pursuant to the federal Truth-in-Lending Act, 15 U.S.C. §§ 1601-1667e (West 1982 & Supp. 1996) ("TILA"), and the Massachusetts Consumer Credit Cost Disclosure Act, M.G.L. c. 140D, §§ 1-34 (West 1991 & Supp. 1996)("CCCDA"), as well as the regulations promulgated in accordance with each statute. The letter demanded that Citicorp return all monies paid by the Debtor and take all steps necessary to terminate its security interest in the property. To date, Citicorp has refused the Debtor's demands.

On May 31, 1995, the Debtor filed a voluntary petition [**5] under Chapter 13 of the Bankruptcy Code. On Schedule A--Real Property, she listed the property, which she valued at $ 35,000.00, and noted that "the interest of each debtor, which cannot be sold or assigned without the other's consent is worth considerably less than one-third this amount." On her Statement of Financial Affairs, she indicated that she received a notice of foreclosure from Citicorp on March 31, 1995. n1

195 B.R. 558; 1996 Bankr. LEXIS 544

- - - - - - - - - - - - - - Footnotes - - - - - - - - -
- - - - - -

n1 The Debtor has not submitted a copy of the notice of foreclosure sale or other evidence of the foreclosure. However, since Citicorp has not denied the allegation that it commenced foreclosure of the mortgage, the Court will accept it as being true for purposes of deciding the motion to dismiss.

- - - - - - - - - - - End Footnotes- - - - - - -
- - - - - -

On Schedule D--Creditors Holding Secured Claims, the Debtor listed no secured creditors. On Schedule F--Creditors Holding Unsecured Nonpriority Claims, the Debtor listed Citicorp with a claim in an estimated amount of $ 22,729.17. She described the debt owed to Citicorp as a second mortgage which she [**6] had rescinded. n2 The Debtor calculated Citicorp's claim based upon the amount financed, ($ 57,593.13), n3 less the amount she paid to Citicorp from February 1, 1990 through November 1, 1994 ($ 32,863.96), less statutory damages pursuant to TILA ($ 2,000). However, on August 17, 1995, Citicorp filed a Proof of Claim in the amount of $ 64,108.27.

- - - - - - - - - - - - - - Footnotes - - - - - - - - -
- - - - - -

n2 Because there are no secured creditors listed on Schedule D and because Citicorp has not alleged that the 1989 transaction constituted either a refinancing or a second loan to the Debtor, the reason for the Debtor's characterization of Citicorp's claim as a second mortgage is unclear. Since the reference to a second mortgage does not appear elsewhere in the schedules, pleadings or exhibits, the Court assumes for the purpose of deciding Citicorp's motion that Citicorp held a first mortgage on the property.

n3 The Note states that the principal amount of the loan was $ 59,150.00.

- - - - - - - - - - - End Footnotes- - - - - - -
- - - - - -

The Debtor filed her initial Chapter 13 plan on June 15, 1995. n4 Through her plan, [**7] she proposed to treat the debt owed to Citicorp as an unsecured claim by virtue of her attorney's May 25, 1995 letter to Citicorp rescinding the transaction. On July 7, 1995, the Debtor filed a First Amended Chapter 13 Plan,

which provided for a dividend to unsecured creditors in an indeterminate amount. Citicorp objected to the First Amended Plan on grounds that the Debtor's federal and state truth in lending claims were barred by the respective three and four-year statutes of limitations. The Debtor filed a response to Citicorp's objection, in which she argued that her truth in lending claims were not time-barred because she had raised them in defense to Citicorp's foreclosure action.

- - - - - - - - - - - - - - Footnotes - - - - - - - - -
- - - - - -

n4 The Debtor's plan does not conform to the model form attached to and required by the Court's Joint Procedural Order dated September 1, 1994.

- - - - - - - - - - - End Footnotes- - - - - - -
- - - - - -

The Debtor commenced this adversary proceeding on August 8, 1995. In her Second Amended Complaint, which was filed on January 16, 1996, n5 she alleged that Citicorp "furnished incorrect [**8] rescission forms" to her in connection with the 1989 transaction. Specifically, the Debtor claimed that the Notice [*562] of Right to Cancel given to her by Citicorp was based upon Rescission Model Form H-9, issued by the Board of Governors of the Federal Reserve System (the "Board") and applicable only to refinancing transactions, rather than Rescission Model Form H-8, applicable generally. Additionally, the Debtor alleged that Citicorp failed to accurately disclose the amount financed, in violation of both TILA and CCCDA, by failing to disclose that a portion of the loan proceeds were being held in escrow for future advances. Through her Second Amended Complaint, the Debtor seeks the following relief: (1) a declaration that she validly rescinded the 1989 transaction; (2) a determination that Citicorp's claim is unsecured and an adjustment of its proof of claim; (3) dismissal of Citicorp's objection to the plan; (4) statutory damages under TILA and CCCDA in the amount of $ 2,000.00; and (5) attorneys' fees and costs under TILA and CCCDA.

- - - - - - - - - - - - - - Footnotes - - - - - - - - -
- - - - - -

n5 After the January 22, 1996 hearing in this matter, Citicorp opposed the Debtor's motion to file a Second Amended Complaint. As the matter had already been taken under advisement, the Court did not act upon either motion. However, like her Second Amended Complaint, the Debtor's Amended Complaint alleged that Citicorp

195 B.R. 558; 1996 Bankr. LEXIS 544

failed to provide her with the proper notice
of her right to rescind.

- - - - - - - - - - - End Footnotes- - - - - - - -
- - - - - -

**[**9]**

On November 15, 1995, Citicorp moved to dismiss the
Debtor's amended complaint on grounds that both her
federal and state truth in lending claims are barred by
the respective three and four-year statutes of
limitations. On January 16, 1996, the Debtor objected
to Citicorp's Motion to Dismiss.

### III. POSITIONS OF THE PARTIES

A. Citicorp

Citicorp first contends that the respective three and
four-year statutes of limitations governing rescission
under TILA and CCCDA constitute an "absolute" bar
to the Debtor's action. Alternatively, citing
McGuinness v. Cotter, 412 Mass. 617, 591 N.E.2d 659
(1992), and Nissan Motor Corporation in U.S.A. v.
Commissioner of Revenue, 407 Mass. 153 (1990),
Citicorp argues that the limitations provisions
contained in both TILA and CCCDA are statutes of
repose and not statutes of limitations. Therefore, in
Citicorp's view, the statutes create an "insurmountable
bar" to the Debtor's action and, as a result, this Court
lacks subject matter jurisdiction over the adversary
proceeding.

Initially, Citicorp failed to distinguish between
affirmative and defensive use of TILA and relied upon
cases in which affirmative claims were determined
**[**10]** to be time-barred. Alternatively, Citicorp
concedes that TILA expressly allows claims for
damages to be asserted via recoupment after the
expiration of the statute of limitations. However, it
argues that the lack of such statutory language in the
section governing rescission indicates that recoupment
is not available.

Finally, Citicorp contends that the Debtor's Amended
Complaint fails to allege sufficient facts to establish
violations of TILA and CCCDA. It claims that the
Notice of Right to Cancel contains all disclosures
required by federal and state law. Citicorp urges the
Court to "balance the equities" in its favor because, in
a bankruptcy case, "the secured creditor stands to lose
both its security and any hope of collecting on the
underlying debt."

B. The Debtor

The Debtor argues that Citicorp's motion to dismiss
should be denied because the TILA and CCCDA

limitations periods are not applicable to claims that are
raised in defense to a foreclosure proceeding. She cites
cases from other jurisdictions in which various courts
have held that truth in lending claims may be asserted
under a recoupment theory after the expiration of the
statute of limitations. The Debtor argues **[**11]** that
Congress "sanctioned" these holdings when it amended
TILA in 1995 and provided that a consumer may
rescind a transaction by way of recoupment to the
extent allowed by state law. According to the Debtor,
although there is no Massachusetts caselaw on point,
M.G.L. c. 260, § 36 allows time-barred claims to be
raised as defenses to actions.

In her response to Citicorp's motion, the Debtor
contends that it is premature to consider the equities of
the case, as Citicorp suggests. Alternatively, citing
Bizier v. Globe Financial Services, Inc., 654 F.2d 1
(1981), she asserts that TILA imposes strict liability
upon lenders for truth in lending violations.

### IV. DISCUSSION

The issue for determination is whether the Debtor may
assert claims for both rescission **[*563]** and damages
based upon TILA and CCCDA in defense to Citicorp's
foreclosure action even though such claims would be
barred by the relevant statutes of limitations if raised
affirmatively. The issue appears to be one of first
impression in the First Circuit. The Court must first
determine if the Debtor's claim is in the nature of
recoupment. If so, then the Court will consider whether
the statute of limitations bars the **[**12]** Debtor's
action.

[HN1]The common law doctrine of recoupment
"permits the crediting of reciprocal rights against each
other where those rights arose under the same
transaction, typically the same contract." Mohawk
Industries, Inc. v. United States of America (In re
Mohawk Industries, Inc.), 82 Bankr. 174, 176 (Bankr.
D. Mass. 1987). See also United Structures of
America, Inc. v. G.R.G. Engineering, S.E., 9 F.3d 996,
999 (1st Cir. 1993) (recoupment [HN2]"is 'in the
nature of a defense' and is intended to 'permit ...
judgment to be rendered that does justice in view of
the one transaction as a whole.'") (citation omitted);
Bob Brest Buick, Inc. v. Nissan Motor Corporation in
U.S.A. (In re Bob Brest Buick, Inc.), 136 Bankr. 322
(Bankr. D. Mass. 1991). [HN3]Recoupment has been
incorporated into the counterclaim in modern practice
and procedure. However, common law recoupment is
still recognized by courts as a valid defense. See
generally Comment, *Truth in Lending and the Statute
of Limitations*, 21 Vill.L.Rev. 904, 905-909 (1975).

195 B.R. 558; 1996 Bankr. LEXIS 544

In Bull v. United States, 295 U.S. 247, 79 L. Ed. 1421, 55 S. Ct. 695 (1935), the Supreme Court of the United States recognized the defense of recoupment [**13] in a tax case. The Court held that "... [HN4]recoupment is in the nature of a defense arising out of some feature of the transaction upon which the plaintiff's action is grounded. Such a defense is never barred by the statute of limitations so long as the main action itself is timely." Id. at 262. The Court allowed an overpayment of an estate tax, which could not be recovered by the estate since the statute had run, to be credited against the estate's income tax deficiency. Id. at 263.

In U.S. v. Western Pac. R. Co., 352 U.S. 59, 1 L. Ed. 2d 126, 77 S. Ct. 161 (1956), the Supreme Court further stated that

The purpose of [statutes of limitations] is to keep stale litigation out of the courts. [HN5]They are aimed at lawsuits, not at the consideration of particular issues in lawsuits... To use the statute of limitations to cut off the consideration of a particular defense in the case is quite foreign to the policy of preventing the commencement of stale litigation. We think it would be incongruous to hold that once a lawsuit is properly before the court, decision must be made without consideration of all the issues in the case and without the benefit of all the applicable [**14] law. If [the] litigation is not stale, then no issue in it can be deemed stale.

352 U.S. at 72.

[HN6]In order to raise her TILA claims by way of recoupment, the Debtor must satisfy a three-pronged test. She "must show that (1) the TILA violation and the creditor's debt claim arose from the same transaction, (2) she is asserting her claim as a *defense*, and (3) the 'main action' is timely." Smith v. American Financial Systems, Inc. (In re Smith), 737 F.2d 1549, 1553 (11th Cir. 1984) (emphasis in original). See also Coxson v. Commonwealth Mortgage Co. of America, L.P. (Matter of Coxson), 43 F.3d 189, 193 (5th Cir. 1995); Shaw v. Federal Mortgage & Investment Corp. (In re Shaw), 178 Bankr. 380, 386 (Bankr. D. N.J. 1994). The Court has little trouble finding that all three requirements have been met in the instant case. Both the alleged TILA violations and Citicorp's claim arose from the 1989 transaction. It is undisputed that the Debtor asserted her right to rescind the transaction in defense to Citicorp's foreclosure. The fact that the Debtor is the plaintiff in this adversary proceeding does not preclude the Court from finding that she raised her TILA claims defensively. [**15] Coxson, 43 F.3d at 194. Additionally, the foreclosure proceeding and Citicorp's filing of its proof of claim were timely. Therefore, the Debtor's adversary proceeding is an action for recoupment.

[*564] A. Truth in Lending

TILA was enacted to "assure a meaningful disclosure of credit terms so that the consumer will be able to compare more readily the various credit terms available to him and avoid the uninformed use of credit...." 15 U.S.C. § 1601(a). [HN7]Pursuant to section 1604 of TILA, the Board promulgated Regulation Z, 12 C.F.R. § 226, and published model disclosure forms. TILA and Regulation Z require creditors to clearly and conspicuously disclose certain credit-related information. 15 U.S.C. § 1632; 12 C.F.R. § 226.6. [HN8]TILA provides consumers with remedies in the forms of both a right of rescission and a right to damages. 15 U.S.C. §§ 1635, 1640.

Section 1635 of TILA governs rescission and provides, in relevant part, the following:[HN9](a) Except as otherwise provided in this section, in the case of any consumer credit transaction ... in which a security interest ... is or will be retained or acquired in any property which is used as the principal dwelling of the person [**16] to whom credit is extended, the obligor shall have the right to rescind the transaction until midnight of the third business day following the consummation of the transaction or the delivery of the information and rescission forms required under this section together with a statement containing the material disclosures required under this subchapter, whichever is later, by notifying the creditor... The creditor shall clearly and conspicuously disclose, in accordance with regulations of the Board, to any obligor in a transaction subject to this section the rights of the obligor under this section. The creditor shall also provide, in accordance with the regulations of the Board, appropriate forms for the obligor to exercise his right to rescind any transaction subject to this section.

(b) When an obligor exercises his right to rescind under subsection (a) of this section, he is not liable for any finance or other charge, and any security interest given by the obligor ... becomes void upon such a rescission. Within 20 days after receipt of a notice of rescission, the creditor shall return to the obligor any money or property given as earnest money, downpayment, or otherwise, and [**17] shall take any action necessary or appropriate to reflect the termination of any security interest created under the transaction. If the creditor has delivered any property to the obligor, the obligor may retain possession of it. Upon the performance of the creditor's obligations under this section, the obligor shall tender the property to the creditor...

195 B.R. 558; 1996 Bankr. LEXIS 544

(f) An obligor's right of rescission shall expire three years after the date of consummation of the transaction ... notwithstanding the fact that the information and forms required under this section or any other disclosures required under this part have not been delivered to the obligor...15 U.S.C. § 1635. [HN10]Affirmative claims for rescission are subject to the three-year limitation provided by section 1635(f). See also 12 C.F.R. § 226.23(a)(3) ("If the required notice or material disclosures are not delivered, the right to rescind shall expire three years after consummation....").

Civil liability under TILA is governed by section 1640, which provides, in relevant part, the following:(a) Except as otherwise provided in this section, any creditor who fails to comply with any requirement imposed under this [**18] part, including any requirement under section 1635 of this title ... with respect to any person is liable to such person in an amount equal to the sum of --[HN11](1) any actual damage sustained by such person as a result of the failure;

(2)(A)(i) in the case of an individual action twice the amount of any finance charge in connection with the transaction, ... or (iii) in the case of an individual action relating to a credit transaction not under an open end credit plan that is secured by real property or a dwelling, not less than $ 200 or greater than $ 2,000;...

(3) in the case of any successful action to enforce the foregoing liability or in any action in which a person is determined to have a right of rescission under section 1635 of this title, the costs of the [*565] action, together with a reasonable attorney's fee as determined by the court...

***

(e) Any action under this section may be brought ... within one year from the date of the occurrence of the violation.*This subsection does not bar a person from asserting a violation of this subchapter in an action to collect the debt which was brought more than one year from the date of the occurrence of the violation* [**19] *as a matter of defense by recoupment or set-off in such action, except as otherwise provided by State law...*15 U.S.C. § 1640 (emphasis added).

[HN12]CCCDA and the regulations promulgated by the Massachusetts Division of Banks and Loan Agencies, 209 C.M.R. § 32.00 *et seq.,* essentially mirror the provisions of TILA and Regulation Z. Whitley v. Rhodes Financial Services, Inc. (In re Whitley), 177 Bankr. 142, 147 (Bankr. D. Mass. 1995)

(citation omitted); Lynch v. Signal Finance Co. of Quincy, 367 Mass. 503, 505, 327 N.E.2d 732 (1975). [HN13]The major difference between TILA and CCCDA is the period of limitations for rescission and damages claims. Under CCCDA, a consumer's affirmative right to rescind a transaction is extended to four years. G.L. c. 140D, § 10(f); 209 C.M.R. § 32.15(1)(c). Additionally, G.L. c. 260, § 5A, which governs limitations of consumer protection actions, provides that:[HN14]actions arising on account of violations of any law intended for the protection of consumers, including but not limited to ... chapter one hundred and forty D ... whether for damages, penalties *or other relief ... shall be commenced only within four years next after* [**20] *the cause of action accrues.*G.L. c. 260, § 5A (emphasis supplied). Like its federal counterpart, CCCDA has a separate section for civil liability, which provides that:[HN15]This subsection shall not bar a consumer then in default on the obligation from asserting a violation of this chapter, or any rule or regulation issued thereunder, as an original action, or *as a defense or counterclaim to an action to collect amounts owed by the consumer* brought by a person liable under this chapter, or any rule or regulation issued thereunder.G.L. c. 140D, § 32(g) (emphasis added).

[HN16]Because the provisions of TILA and CCCDA are "substantially similar," the Board, in accordance with 15 U.S.C. § 1633, n6 exempted from chapters two and four of TILA credit transactions that are subject to CCCDA. See 48 Fed.Reg. 14882, 14890 (April 6, 1983); Whitley, 177 Bankr. at 148; Myers v. Federal Home Loan Mortgage Co. (In re Myers), 175 Bankr. 122, 125-6 (Bankr. D. Mass. 1994). Both section 1635 and section 1640 are included in chapter two of TILA. The exemption is limited, however, because Regulation Z provides that "no exemptions granted under this section shall extend [**21] to the civil liability provisions of ... [TILA]." 12 C.F.R. § 226.29(b)(1). The Board explained that "the provision that an exemption may not extend to [the civil liability provisions of TILA] assures that consumers retain access to both federal and state courts in seeking damages or civil penalties for violations, while creditors retain the defenses specified in [TILA]." Official Staff Commentary § 226.29(b)-1.

- - - - - - - - - - - - - - Footnotes - - - - - - - - - - -
- - - - - -

n6 "The Board shall by regulation exempt from the requirements of this part any class of credit transactions within any State if it determines that under the law of that State that class of transactions is subject to requirements substantially similar to those

195 B.R. 558; 1996 Bankr. LEXIS 544

imposed under this part, and that there is adequate provision for enforcement." 15 U.S.C. § 1633.

- - - - - - - - - - - End Footnotes - - - - - - - - - - - -

[HN17]Because the provisions of CCCDA parallel those of TILA, CCCDA "should be construed in accordance with federal law." Mayo v. Key Financial Services, Inc., No. 92-6441-D, slip op. at 3 (Superior Court June 22, 1994). Thus, the Court may [**22] look to federal case law to determine if relief is available to the Debtor by way of recoupment for both rescission and damages.

[HN18]The language of 15 U.S.C. § 1640(e) explicitly exempts recoupment claims from the one-year statute of limitations. A majority of courts has allowed debtors to raise TILA claims for damages under section 1640(e) by way of recoupment beyond the statutory one-year [*566] period. In Coxson, the Fifth Circuit Court of Appeals held that the creditor's filing of a proof of claim constituted "an action to collect the debt" pursuant to section 1640(e) and, therefore, the debtor's TILA claim was not barred by the statute of limitations. 43 F.3d at 194. See also Jones v. Progressive-Home Federal Savings & Loan Assoc. (In re Jones), 122 Bankr. 246, 250 (W.D. Pa. 1990); Werts v. Federal Nat. Mortgage Ass'n (In re Werts), 48 Bankr. 980, 983 (E.D. Pa. 1985); Kenderdine v. Polonia Federal Savings & Loan Association (In re Kenderdine), 118 Bankr. 258, 263 (Bankr. E.D. Pa. 1990); Joyce v. Fidelity Consumer Discount Co. (In re Joyce), 41 Bankr. 249, 251 (Bankr. E.D. Pa. 1984); Galea'i v. Associates Financial Services Co. of Hawaii, Inc. (In re Galea'i), 31 [**23] Bankr. 629, 634 (Bankr. D. Haw. 1981). Additionally, some courts, relying upon Bull, allowed consumers to counterclaim for damages under TILA even before section 1640(e) was amended to specifically exempt recoupment claims from the one year statute of limitations. See Household Consumer Discount Co. v. Vespaziani, 490 Pa. 209, 415 A.2d 689 (1980); Household Finance Corp. v. Pugh, 288 N.W.2d 701 (1980) ("utilization of the 'recoupment doctrine' would enhance the general policy of TILA").

Prior to September 30, 1995, the language of section 1635, unlike section 1640(e), did not expressly exempt recoupment claims with respect to the right of rescission from its statute of limitations. Nevertheless, beginning with the Supreme Court of Colorado's decision in Dawe v. Merchants Mortg. & Trust Corp., 683 P.2d 796 (Colo. 1984), many courts held that section 1635's three-year statute of limitations was not applicable to rescission claims that were in the nature

of recoupment. See Shaw, 178 Bankr. at 386; Federal Deposit Insurance Corp. v. Ablin, 177 Ill. App. 3d 390, 126 Ill. Dec. 694, 532 N.E.2d 379 (Ill. 1988); Community Nat. Bank & Trust Co. of New York v. McClammy, [**24] 138 A.D.2d 339, 525 N.Y.S.2d 629 (1988). The cases cited by Citicorp are inapposite since they were not decided on recoupment grounds. See Jamerson v. Miles, 421 F. Supp. 107 (N.D. Tex. 1976) (court lacked subject matter jurisdiction to hear consumer's *affirmative* TILA action brought more than three years after consummation of the transaction); In re Cox, 162 Bankr. 191 (Bankr. C.D. Ill. 1993) (debtors attempted to rescind transaction in response to foreclosure, but recoupment not considered by court).

In Dawe, the court cited the Supreme Court's opinion in Bull and held that [HN19]the statute of limitations does not bar the assertion of a claim defensively. 683 P.2d at 800. The court observed that "if recoupment claims were barred by the relevant statute of limitations, lenders could avoid the penalties of [TILA] by waiting ... three years or more to sue on the borrower's default, and thereby frustrate the fundamental policy of TILA." Id. at 801. See also Ablin, 177 Ill. App. 3d at 395. n7 The Dawe court also opined that many consumers are ignorant of TILA "until they consult an attorney after the statute of limitations has run. Allowing creditors to profit [**25] from a violation of TILA simply because three years has passed would not further the purposes of the Act." 683 P.2d at 801.

- - - - - - - - - - - - - Footnotes - - - - - - - - - - - - -

n7 This Court is not unmindful of the fact that debtors may also have an incentive to play a waiting game. In General Motors Acceptance Corp. v. Audino (In re Audino), 10 Bankr. 135 (Bankr. D. R.I. 1981), Bankruptcy Judge Votolato opined that "... to allow a debtor to revive a TILA cause of action merely by not paying the debt, waiting to be sued, and then raising the action as a counterclaim would defeat the very purpose of a statute of limitations." 10 Bankr. at 137. However, this Court is not persuaded by the holding in Audino, which is distinguishable because it was decided prior to the 1980 TILA amendment that added the recoupment language to section 1640(e).

- - - - - - - - - - - End Footnotes - - - - - - - - - - - -

195 B.R. 558; 1996 Bankr. LEXIS 544

In Ablin, the Federal Deposit Insurance Corporation ("FDIC"), in its capacity as receiver of a failed bank, brought a foreclosure action against mortgagors who, in turn, counterclaimed and sought rescission of the [**26] transaction on grounds that the bank failed to inform them of their right to rescind under TILA. The mortgagors contended that the statute of limitations, which had expired, did not bar their counterclaim. Like Citicorp in the instant case, the FDIC argued in Ablin that the absence in section 1635 of a provision similar to section 1640(e)'s recoupment provision indicated that the recoupment defense [*567] was not available to lengthen the limitations period for rights of rescission. The Ablin court flatly rejected that argument and, following Dawe, held that section 1635's three-year limitation does not bar a counterclaim. 177 Ill. App. 3d at 395.

This Court agrees with the pre-1995 decisions and holds that [HN20]the presence of recoupment language in section 1640(e) and its absence in section 1635(f) amounts to a distinction without a difference, in view of the fact that recoupment claims are generally not subject to statutes of limitations. Dawe, 683 P.2d at 800; Shaw, 178 Bankr. at 387.

Alternatively, Citicorp's argument lacks merit as a result of the 1995 amendments to TILA, n8 in which Congress added subsection (i) to section 1635, which provides the following: [**27] [HN21](i) Rescission rights in foreclosure(1) In general

Notwithstanding section 1649 of this title, and subject to the time period provided in subsection (f) of this section, *in addition to any other right of rescission available under this section for a transaction, after the initiation of any judicial or nonjudicial foreclosure process on the primary dwelling of an obligor securing an extension of credit, the obligor shall have a right to rescind the transaction equivalent to other rescission rights provided by this section, if-- ...*

*(B) the form of notice of rescission for the transaction is not the appropriate form of written notice* published and adopted by the Board or a comparable written notice, and otherwise complied with all the requirements of this section regarding notice.

\*\*\*

(3) Right of recoupment under State law

*Nothing in this subsection affects a consumer's right of rescission in recoupment under State law.*

(4) Applicability

This subsection shall apply to all consumer credit transactions in existence or consummated on or after September 30, 1995.
15 U.S.C. § 1635(i) (emphasis supplied). [**28] n9



- - - - - - - - - - - - - - Footnotes - - - - - - - - - - - - - - - -

n8 Pub. L. No. 104-29 (September 30, 1995).

n9 The Board has not yet promulgated regulations in response to the 1995 TILA amendments.

- - - - - - - - - - - - End Footnotes- - - - - - - - - - - - -

The Debtor claims that this section essentially codifies the Dawe line of cases. In one of its briefs, Citicorp referred to section 1635(i) in passing and concluded that rescission "is clearly not available in recoupment." Citicorp's reading of the statute cannot be reconciled with the plain language of section 1635(i)(3).

[HN22]According to section 1635(i), which applies retroactively and thus governs the instant proceeding, state law determines whether rescission is available by way of recoupment after the expiration of the statute of limitations. See National Consumer Law Center, *Truth in Lending,* § 6.6.3.3.1. (3d ed. 1995). Therefore, the Court must look to Massachusetts law to determine if recoupment is available.

M.G.L. c. 260, which governs limitations of actions, provides, in relevant part, the following:

... [HN23]a counterclaim arising out of the [**29] same transaction or occurrence that is the subject matter of the plaintiff's claim, to the extent of the plaintiff's claim, may be asserted without regard to the provisions of law relative to limitations of actions.

M.G.L. c. 260, § 36. Because a "section 36 counterclaim [goes] only 'to the extent of the plaintiff's claim,' it corresponds to 'recoupment' in the pre-Rules practice." Bernstein v. Gramercy Mills, Inc., 16 Mass. App. Ct. 403, 409, 452 N.E.2d 231 (1983); Howell v. Birnberg, 1994 WL 879659 *4 (Mass. Super. Ct. No. 92-2842A). n10

- - - - - - - - - - - - - - Footnotes - - - - - - - - - - - - - - - -

n10 In fact, in its Reply Memorandum, Citicorp concedes that section 36 is a "codification of the old common-law doctrine of recoupment."

195 B.R. 558; 1996 Bankr. LEXIS 544

- - - - - - - - - - - End Footnotes- - - - - - - -
- - - - - -

[HN24]The First Circuit Court of Appeals has recognized that counterclaims are [*568] exempt from statutory limitation periods if they are compulsory, that is, if they arise out of the same transaction. Pahlavi v. Palandjian, 809 F.2d 938, 943 (1st Cir. 1987). The Court has already found that the claims of both Citicorp and the [**30] Debtor arose from the 1989 transaction. In Bose Corp. v. Consumers Union of U.S., Inc., 367 Mass. 424, 326 N.E.2d 8 (1975), the Supreme Judicial Court held that [HN25]the common law concept of recoupment "was generally if not always timely, no matter when actually pleaded in the action, if the plaintiff's claim was timely...." 367 Mass. at 427. Therefore, the Debtor's rescission claim is available by way of recoupment and Citicorp's contention that this Court lacks subject matter jurisdiction over the instant dispute is without merit. n11

- - - - - - - - - - - - - - Footnotes - - - - - - - - -
- - - - - -

n11 The Court holds that Citicorp's distinction between statutes of limitations and statutes of repose, and its contention that TILA and CCCDA fall into the latter category, are irrelevant. The Court agrees with Citicorp that "it has long been the law of [Massachusetts] that, when a remedy is created by statute, and the time within which it may be availed of is one of the prescribed conditions for relief, failure to meet that time limit deprives a ... court ... of jurisdiction to hear the case." Nissan, 407 Mass. at 157 (citation omitted). However, both M.G.L. c. 260, § 36 and the cases cited herein explicitly allow the Debtor's claims to be raised in recoupment beyond the limitations period.

- - - - - - - - - - - End Footnotes- - - - - - - -
- - - - - -

[**31]
B. Rule 12(b)(6)

The Court rejects Citicorp's contention, based upon Fed. R. Civ. P. 12(b)(6), that the Amended Complaint fails to state a claim upon which relief can be granted. See Fed. R. Bankr. P. 7012(b). Citicorp argues that the Debtor fails to allege sufficient facts to support her truth in lending claims. The Debtor's Second Amended Complaint supersedes her Amended Complaint. Two of Citicorp's briefs were filed after the Debtor filed her

Second Amended Complaint, but Citicorp continues to refer to the Amended Complaint, which is no longer operative in this proceeding. However, the Court finds that bath the Amended Complaint and the Second Amended Complaint contain sufficient allegations to state a cause of action.

The Debtor first alleged that Citicorp "furnished incorrect rescission forms" to her. The Board's Model Form H-9 applies to refinancing transactions, in which a consumer's right of rescission extends only to the amount of new credit extended in the transaction. Model Form H-8, on the other hand, applies generally to new loans. Citicorp's contention that its Notice of Right to Cancel disclosed all of the information required to be disclosed under 12 C.F.R. [**32] § 226.23(b) is erroneous. Because the 1989 transaction was a home equity loan and not a refinancing, and the Debtor was entitled to rescind the entire transaction rather than only "new credit," the notice did not accurately disclose the "effects of rescission" in accordance with 12 C.F.R. § 226.23(b)(4). The Court finds, as a matter of law, that Citicorp's notice of the Debtor's right to cancel was defective on its face and, therefore, the notice violated TILA and CCCDA. In re Porter, 961 F.2d 1066 (3rd Cir. 1992) (in a transaction that was partially a refinancing, use of Form H-8 violated TILA). See also Mayfield v. Vanguard Sav. & Loan Ass'n, 710 F. Supp. 143, 145 (E.D. Pa. 1989) (bank "failed to properly complete the rescission notices and to provide plaintiff with accurate disclosures").

The Debtor also alleged that Citicorp failed to accurately disclose the amount financed which, if proven, would also constitute a violation of TILA and CCCDA. n12 However, the Debtor need allege and prove only one violation in order to be able to rescind the 1989 transaction and recover damages. Thus, the Court rejects Citicorp's argument that the Debtor's Second Amended [*569] Complaint fails [**33] to state a claim upon which relief can be granted.

- - - - - - - - - - - - - - Footnotes - - - - - - - - -
- - - - - -

n12 Additionally, the Court notes that Ms. Botelho and Mr. Elkallassi may not have received two copies of the Notice of Right to Cancel since only the Debtor signed the receipt. If true, this would constitute a violation of Regulation Z and the Massachusetts regulations, both of which require that a creditor provide each consumer with two copies of the notice of the right to rescind the transaction. 12 C.F.R. § 226.23(b); 209 C.M.R. § 32.15(2). However, the fact that the Debtor

195 B.R. 558; 1996 Bankr. LEXIS 544

alone sent a rescission letter to Citicorp does not render the rescission invalid. See 12 C.F.R. § 226.23(a)(4)("when more than one consumer in a transaction has the right to rescind, the exercise of the right by one consumer shall be effective as to all consumers"); 209 C.M.R. §§ 32.15(1)(d), 32.23(1)(d).

- - - - - - - - - - - - End Footnotes- - - - - - - - - - - - - -

The Court need not reach Citicorp's equitable arguments, which are not dispositive of the Motion presently before the Court.

## V. CONCLUSION

For the foregoing reasons, [**34] the Court denies the defendant's Motion to Dismiss Adversary Complaint, which the Court has treated as a motion for summary judgment.

By the Court,

Joan N. Feeney

United States Bankruptcy Judge

Dated: May 21, 1996

## ORDER

In accordance with the Memorandum dated May 21, 1996, the Court denies the defendant's Motion to Dismiss Adversary Complaint, which the Court has treated as a motion for summary judgment. The defendant is hereby ordered to file an answer within 20 days of the date of this Order. The Debtor is ordered to file a Chapter 13 plan in the form required by the Court's September 1, 1994 Joint Procedural Order by June 28, 1996.

By the Court,

Joan N. Feeney

United States Bankruptcy Judge

Dated: May 21, 1996

323 F. Supp. 2d 350; 2004 U.S. Dist. LEXIS 12332

JEAN A. BOURSIQUOT AND LEONE BOURSIQUOT, Plaintiffs, v. CITIBANK F.S.B., Defendant.

CIVIL ACTION NO. 3:03cv1914 (SRU)

UNITED STATES DISTRICT COURT FOR THE DISTRICT OF CONNECTICUT

323 F. Supp. 2d 350; 2004 U.S. Dist. LEXIS 12332

July 1, 2004, Decided

**DISPOSITION:** Defendant's motion to dismiss granted.

## CASE SUMMARY

**PROCEDURAL POSTURE:** Defendant lender, a federal savings association, filed a motion pursuant to Fed. R. Civ. P. 12(b)(6) to dismiss plaintiff borrowers' action, which alleged violations of the Truth in Lending Act (TILA), 15 U.S.C.S. § 1601 et seq., and the Connecticut Unfair Trade Practices Act (CUTPA), Conn. Gen. Stat. § 42-110a et seq., arising out of a consumer loan transaction.

**OVERVIEW:** The lender loaned the borrowers money secured by a mortgage on the borrowers' primary residence. A disclosure statement was created for the transaction and signed contemporaneously with the note and mortgage. Seven years later, the borrowers refinanced the loan on their residence with a new lender. The borrowers objected to the fact that the lender held excess interest and funds from the borrowers' escrow account for almost 20 days, did not prorate the monthly private mortgage insurance premium, and charged an undisclosed fax/statement fee. In granting the lender's motion to dismiss, the court held that the TILA claim was time barred because it was not brought within one year of when the borrowers entered into the loan agreement. The court held that the statute of limitations would not be tolled even though the borrowers could not have discovered the alleged nondisclosures when they closed on the loan. The court also held that, because the effects of CUTPA were not merely incidental, but had a direct bearing on the lending operations of the lender, the borrowers' CUTPA claims were preempted by the Home Owners' Loan Act, 12 U.S.C.S. § 1461 et seq.

**OUTCOME:** The court granted the lender's motion to dismiss.

**CORE TERMS:** statute of limitations, federal savings, preempted, lending, regulation, payoff, nondisclosure, disclosure, motion to dismiss, fraudulent concealment, mortgage, federal preemption, occurrence, thereunder, consumer, tolled, occupy, regulations promulgated, statute of limitation,

disclosure statement, state regulation, finance charge, entire field, federal law, state law, premium, fax, undisclosed, time-barred, calculated

**LexisNexis(TM) Headnotes**

*Civil Procedure > Pleading & Practice > Defenses, Objections & Demurrers > Failure to State a Cause of Action*

[HN1]The trial court should grant a motion to dismiss for failure to state a claim pursuant to Fed. R. Civ. P. 12(b)(6) only if it is clear that no relief could be granted under any set of facts that could be proved consistent with the allegations. The function of a motion to dismiss is merely to assess the legal feasibility of the complaint, not to assay the weight of the evidence which might be offered in support thereof. The court must therefore accept the material facts alleged in the complaint as true, and all reasonable inferences are drawn and viewed in a light most favorable to plaintiff. Despite the liberality of this standard, only the "well pleaded" factual allegations of the complaint will be taken as true. Conclusory statements that fail to give notice of the basic events about which the plaintiff complains need not be credited by the court.

*Governments > Legislation > Statutes of Limitations > Time Limitations*

*Banking Law > Bank Activities > Consumer Protection > Truth in Lending*

[HN2]The language of 15 U.S.C.S. § 1640(e) is unambiguous in setting a one-year statute of limitation for any action brought thereunder.

*Governments > Legislation > Statutes of Limitations > Time Limitations*

*Banking Law > Bank Activities > Consumer Protection > Truth in Lending*

[HN3]See 15 U.S.C.S. § 1640(e).

*Governments > Legislation > Statutes of Limitations > Time Limitations*

**3**

Case 1:04-cv-11954-RCL     Document 13-3     Filed 03/24/2005     Page 29 of 92

323 F. Supp. 2d 350; 2004 U.S. Dist. LEXIS 12332

*Banking Law > Bank Activities > Consumer Protection > Truth in Lending*

[HN4]The "occurrence of the violation" in 15 U.S.C.S. § 1640(e) means the date the borrower enters into the loan agreement or, in the alternative, when the lender performs by transmitting the loan funds to the borrower.

*Governments > Legislation > Statutes of Limitations > Tolling*

*Banking Law > Bank Activities > Consumer Protection > Truth in Lending*

[HN5]Mere nondisclosures provide insufficient grounds for tolling the statute of limitations, regardless of when plaintiffs should have discovered the nondisclosure. To bring an affirmative action against a creditor for statutory damages, the debtor must bring the action within one year from the date of the occurrence of the violation. The violation occurs when the transaction is consummated. Nondisclosure is not a continuing violation for purposes of the statute of limitations. The required disclosures under the Truth in Lending Act, 15 U.S.C.S. § 1601 et seq., are to be made as of the time that credit is extended, and it is as of that time that the adequacy and accuracy of the disclosures are to be measured.

*Constitutional Law > Supremacy Clause*

[HN6]The Supremacy Clause of the United States Constitution provides the basis for federal preemption of state laws. State law is preempted explicitly where Congress states an intent to occupy the field and to exclude state regulation. State law is preempted implicitly where the federal interest in the subject matter regulated is so pervasive that no room remains for state action, indicating an implicit intent to occupy the field, or where the state regulation at issue conflicts with federal law or stands as an obstacle to the accomplishment of its objectives.

*Constitutional Law > Supremacy Clause*

*Banking Law > Federal Acts > Home Owners' Loan Act*

[HN7]The Home Owners' Loan Act (HOLA), 12 U.S.C.S. § 1461 et seq., states that the Office of Thrift Supervision (OTS) may promulgate such regulations and issue such orders as the director may determine to be necessary for carrying out the act and all other laws within the director's jurisdiction. 12 U.S.C.S. § 1462a(b)(2). Additionally, 12 U.S.C.S. § 1463 provides for the OTS to do so in the specific context of federal savings associations. 12 U.S.C.S. § 1463(a)(2). Under the authority provided by HOLA, OTS promulgated 12 C.F.R. § 560.2(a) with the specific

intention of occupying the entire field of lending regulation for federal savings associations.

*Constitutional Law > Supremacy Clause*

*Banking Law > Federal Acts > Home Owners' Loan Act*

[HN8]See 12 C.F.R. § 560.2(a).

*Constitutional Law > Supremacy Clause*

*Banking Law > Federal Acts > Home Owners' Loan Act*

[HN9]The language of 12 C.F.R. § 560.2(a) is unequivocal in its intent to preempt all state laws affecting lending regulation for federal savings associations.

*Constitutional Law > Supremacy Clause*

*Banking Law > Federal Acts > Home Owners' Loan Act*

[HN10]See 12 C.F.R. § 560.2(b).

*Constitutional Law > Supremacy Clause*

*Banking Law > Federal Acts > Home Owners' Loan Act*

[HN11]Although 12 C.F.R. § 560.2(c) does create an exception for some state commercial laws, it goes on to provide that state commercial laws are not preempted to the extent that they only incidentally affect the lending operations of federal savings associations.

COUNSEL: [**1] For Leone Boursiquot, Jean A. Boursiquot, Plaintiffs: Edward F. Kunin, Law Offices Of Edward F. Kunin, Fairfield, CT.

For Citibank F.S.B., Defendant: Donald E. Frechette, Edwards & Angell, Hartford, CT. William E. Murray, Edwards & Angell, Hartford, CT.

JUDGES: Stefan R. Underhill, United States District Judge.

OPINIONBY: Stefan R. Underhill

OPINION: [*351] RULING ON MOTION TO DISMISS

Jean and Leone Boursiquot ("the Boursiquots") allege violations of the Truth in [*352] Lending Act ("TILA"), 15 U.S.C. § 1601 et seq., and the Connecticut Unfair Trade Practices Act ("CUTPA"), Conn. Gen. Stat. § 42-110a et seq., arising out of a consumer loan transaction with the defendant, Citibank. Citibank now moves to dismiss the Boursiquots' claims based on the expiration of the statute of limitation on the TILA claims, and federal

323 F. Supp. 2d 350; 2004 U.S. Dist. LEXIS 12332

preemption of the CUTPA claims. For the following reasons the motion to dismiss is granted.

## I. FACTS

For purposes of this motion, the following facts alleged in the complaint are assumed to be true. On October 29, 1996, the Boursiquots borrowed $ 97,800.00 from Citibank. The note was secured by a mortgage on the Boursiquots' **[**2]** primary residence in Bridgeport, Connecticut. The transaction was considered a "consumer transaction" for the purposes of TILA, which requires certain disclosures prior to concluding a consumer transaction. 15 U.S.C. § 1601 et seq. A disclosure statement was created for the transaction in question and signed contemporaneously with the note and mortgage. The disclosure statement provided that, if the Boursiquots paid off any portion of the loan ahead of schedule, they would not be subject to any penalty.

In March 2003, the Boursiquots refinanced the loan on their residence with a new lender. The new note and mortgage were approved on April 10, 2003. Because the new loan was to be secured by a first mortgage on their residence in Bridgeport, the new lender required that the Boursiquots pay off the existing loan with Citibank and obtain a release of the mortgage. Subsequently, Citibank provided the Boursiquots with a payoff figure as of April 8, 2003, which calculated the total principal and interest due through May 1, 2003. The payoff statement contained language indicating that it was good through May 1, 2003 and that the total due was calculated through that **[**3]** date to avoid any interest shortfall. The total due was $ 93,622.19, broken down as follows: (1) "PRINCIPAL BALANCE AS OF 03/01/03" in the amount of $ 92,040.42; (2) "INTEREST FROM 03/01/03 TO 05/01/03 AT 8.750%" in the amount of $ 1,364.63; (3) a "PMI [private mortgage insurance] PREMIUM" of $ 127.14; and (4) a "FAX/STATEMENT FEE" of $ 90.00. The payoff statement also noted that "[a] refund will be sent to the customer's address, within 20 calendar days after payoff, for any remaining escrow funds and/or any additional payoff amount."

The entire balance of $ 93,622.19 was paid on April 16, 2003. At some point within the twenty days provided in the payoff statement, Citibank returned all of the excess funds.

The Boursiquots allege that Citibank committed several TILA and CUTPA violations in connection with the home loan. First, they allege that Citibank held excess interest and funds from the Boursiquots' escrow account for almost twenty days, depriving the Boursiquots of their funds, and permitting Citibank to profit by "floating" the money in violation of 15 U.S.C. § 1640 et seq. and Conn. Gen. Stat. § 42-110a **[**4]** et seq. Second, Citibank wrongfully kept $ 31.79, representing the amount due on the PMI from April 16, 2003 to April 30, 2003, and that keeping that money represents an undisclosed finance charge, in violation of 15 U.S.C. § 1640 et seq. and Conn. Gen. Stat. § 42-110a et seq. Finally, the Boursiquots contend that the $ 90.00 charged as a "fax/statement fee" is both unreasonable and an undisclosed finance **[**353]** charge in violation of 15 U.S.C. § 1640 et seq. and Conn. Gen. Stat. § 42-110a et seq.

Citibank filed a motion to dismiss the complaint pursuant to Federal Rule of Civil Procedure 12 (b)(6).

## II. STANDARD OF REVIEW

[HN1]The court should grant a motion to dismiss for failure to state a claim pursuant to Rule 12(b)(6) only if "it is clear that no relief could be granted under any set of facts that could be proved consistent with the allegations." Hishon v. Spalding, 467 U.S. 69, 73, 81 L. Ed. 2d 59, 104 S. Ct. 2229 (1984) (citation omitted); see also Cohen v. Koenig, 25 F.3d 1168, 1172 (2d Cir. 1994). The function of a motion **[**5]** to dismiss is "merely to assess the legal feasibility of the complaint, not to assay the weight of the evidence which might be offered in support thereof." Ryder Energy Distribution Corp. v. Merrill Lynch Commodities, Inc., 748 F.2d 774, 779 (2d Cir. 1984) (quoting Geisler v. Petrocelli, 616 F.2d 636, 639 (2d Cir. 1980)). The court must therefore accept the material facts alleged in the complaint as true, and all reasonable inferences are drawn and viewed in a light most favorable to the plaintiff. See Leeds v. Meltz, 85 F.3d 51, 53 (2d Cir. 1996); Staron v. McDonald's Corp., 51 F.3d 353, 355 (2d Cir. 1995); Skeete v. IVF America, Inc., 972 F. Supp. 206, 207 (S.D.N.Y. 1997).

Despite the liberality of this standard, only the "well pleaded" factual allegations of the complaint will be taken as true. Papasan v. Allain, 478 U.S. 265, 283, 92 L. Ed. 2d 209, 106 S. Ct. 2932 (1986). Conclusory statements that fail to give notice of the basic events about which the plaintiff complains need not be credited by the court. Haviland v. J. Aron & Co., 796 F. Supp. 95, 97 (S.D.N.Y.), **[**6]** aff'd, 986 F.2d 499 (2d Cir.1992), cert. denied, 507 U.S. 1051, 123 L. Ed. 2d 650, 113 S. Ct. 1945 (1993).

## III. DISCUSSION

Citibank raises several arguments in its motion to dismiss. Only two are essential to the holding in this case: (1) the Boursiquots' TILA claims are time-barred under 15 U.S.C. § 1640(e); and (2) the Boursiquots'

323 F. Supp. 2d 350; 2004 U.S. Dist. LEXIS 12332

CUTPA claims are expressly preempted by the federal Home Owners' Loan Act ("HOLA") 12 U.S.C. § 1461 et seq., and the regulations promulgated thereunder by the Office of Thrift Supervision ("OTS"), specifically 12 C.F.R. §§ 560.2(a) and (b).

A. The Statute of Limitations

[HN2]The language of 15 U.S.C. § 1640(e) is unambiguous in setting a one-year statute of limitation for any action brought thereunder. "[HN3]Any action under this section may be brought in any United States district court, or in any other court of competent jurisdiction, within one year from the date of the occurrence of the violation." 15 U.S.C. § 1640(e). It is well settled that [HN4]the "occurrence of the violation" means the date the plaintiff enters the loan [**7] agreement or, in the alternative, when the defendant performs by transmitting the loan funds to the plaintiffs. Cardiello v. Money Store, Inc., 2001 U.S. Dist. LEXIS 7107 (S.D.N.Y. June 1, 2001). Because the loan in question closed in October 1996, any violation in connection therewith occurred more than seven years before the complaint was filed. Thus, the Boursiquots' complaint is untimely unless the statute of limitations has been equitably tolled.

The Boursiquots argue that equitable tolling applies because, at the time of the transaction, they could not have discovered that the PMI premiums would [*354] not be prorated upon full payment. n1 This assertion fails because it is generally established that [HN5]mere nondisclosures provide insufficient grounds for tolling the statute of limitations, regardless of when the plaintiffs should have discovered the nondisclosure. In re Smith, 737 F.2d 1549, 1552 (11th Cir. 1984) ("to bring an affirmative action against a creditor for statutory damages, the debtor must bring the action 'within one year from the date of the occurrence of the violation' . . . . The violation 'occurs' when the transaction is consummated. [**8] Nondisclosure is not a continuing violation for purposes of the statute of limitations."); Bartholomew v. Northampton National Bank, 584 F.2d 1288, 1296 (3d Cir. 1978) ("the required disclosures under TILA are to be made as of the time that credit is extended, [] and it is as of that time that the adequacy and accuracy of the disclosures are to be measured."); Chevalier v. Baird Savings Association, 371 F. Supp. 1282, 1284 (E.D. Pa. 1974) ("Since Truth-in-Lending creates a 'duty to disclose,' the Plaintiffs argue, the failure to so disclose automatically tolls the statute of limitations. We cannot accept this argument, facially appealing though it may be. To apply the doctrine of fraudulent concealment in such a way would be to nullify the statute of limitations established in § 1640(e). Either that provision would be meaningless, or else plaintiffs

would have us believe that a 'violation' occurs only when the requisite disclosures are eventually made, or discovered. This certainly would square with no common understanding of the word 'violation.'").

Although the Second Circuit has yet to rule on the matter, the overwhelming authority from other [**9] jurisdictions suggests that the inability to discover a nondisclosure is not enough, by itself, to toll the statute. I see no reason to depart from the reasoning of the aforementioned line of cases. To hold otherwise would circumvent the Congress' intent and open the door to a legion of stale claims. Accordingly, the statute of limitations will not be tolled even though the Boursiquots could not have discovered the nondisclosure when they closed the loan.

- - - - - - - - - - - - - - Footnotes - - - - - - - - - - - - - - - -

n1 In their opposition brief, the Boursiquots argue that the statute of limitations should be tolled as a result of fraudulent concealment. Because the Boursiquots admitted at oral argument that the facts of this case do not involve any fraudulent concealment on the part of Citibank, fraudulent concealment does not provide a basis for tolling the statute of limitations in this case.

- - - - - - - - - - - - - End Footnotes- - - - - - - - - - - - - -

Because the Boursiquots' TILA claims were first brought long after the passing of the statute of limitations and because that statute cannot be tolled on the facts of the case, the [**10] first count of the amended complaint is dismissed as time-barred.

B. Federal Preemption

Citibank moves to dismiss the Boursiquots' CUTPA claims on the ground that those claims are preempted by HOLA, 12 U.S.C. § 1461 et seq., and the regulations promulgated thereunder by the OTS. The Supremacy Clause of the United States Constitution [HN6]provides the basis for federal preemption of state laws. See Fidelity Federal Savings & Loan Association v. de la Cuesta, 458 U.S. 141, 152, 73 L. Ed. 2d 664, 102 S. Ct. 3014 (1982). As the Second Circuit has noted:

State law is preempted explicitly where Congress states an intent to occupy the field and to exclude state regulation. State law is preempted implicitly where the federal interest in the subject matter regulated is so pervasive that no room remains for state action,

indicating an implicit intent to occupy the field, or [*355] where the state regulation at issue conflicts with federal law or stands as an obstacle to the accomplishment of its objectives.

Rondout Elec., Inc. v. N.Y. State DOL, 335 F.3d 162 (2d Cir. 2003) (*citing* Pacific Gas & Electric Co. v. State Energy Resources Conservation & Development Commission, 461 U.S. 190, 203-04, 75 L. Ed. 2d 752, 103 S. Ct. 1713 (1983); [**11] Fidelity Federal Savings & Loan Association v. de la Cuesta, 458 U.S. 141, 153, 73 L. Ed. 2d 664, 102 S. Ct. 3014, (1982); Sprint Spectrum L.P. v. Mills, 283 F.3d 404, 414-15 (2d Cir. 2002)).

HOLA [HN7]states that OTS may promulgate "such regulations and issue such orders as the Director may determine to be necessary for carrying out [the] act and all other laws within the Director's jurisdiction." 12 U.S.C. § 1462(a)(2). Additionally, section 1463 provides for OTS to do so in the specific context of federal savings associations. 12 U.S.C. § 1463(a)(2).

Under the authority provided by HOLA, OTS promulgated 12 C.F.R. § 560.2(a) with the specific intention of occupying "the entire field of lending regulation for federal savings associations." n2(a) [HN8]Occupation of field. Pursuant to sections 4(a) and 5(a) of the HOLA, 12 U.S.C. 1463(a), 1464(a), OTS is authorized to promulgate regulations that preempt state laws affecting the operations of federal savings associations . . . . *OTS hereby occupies the entire field of lending regulation for federal savings associations* [**12] . . . . For purposes of this section, "state law" includes any state statute, regulation, ruling, order or judicial decision.12 C.F.R. § 560.2(a) (emphasis added).

- - - - - - - - - - - - - - Footnotes - - - - - - - - - - - - - - -

n2 Citibank is a federal savings association.

- - - - - - - - - - - - End Footnotes- - - - - - - - - - - - - -

[HN9]The language of section 560.2(a) is unequivocal in its intent to preempt all state laws affecting lending regulation for federal savings associations. Furthermore, 12 C.F.R. § 560.2(b) gives an extensive list of the type of state laws preempted by section 560.2(a) n3. The list includes laws that affect:[HN10](4) The terms of credit, including amortization of loans and the deferral and capitalization of interest and adjustments to the interest rate, balance, payments due, or term to maturity of the loan, including the circumstances under which a loan

may be called due and payable upon the passage of time or a specified event external to the loan;

(5) Loan-related fees, including without limitation, initial charges, late charges, prepayment penalties, servicing [**13] fees, and overlimit fees;

* * * *

(9) Disclosure and advertising, including laws requiring specific statements, information, or other content to be included in credit application forms, credit solicitations, billing statements, credit contracts, or other credit-related documents and laws requiring creditors to supply copies of credit reports to borrowers or applicants;

* * * *

(11) Disbursements and repayments; . . . .Id.

- - - - - - - - - - - - - - Footnotes - - - - - - - - - - - - - - -

n3 A working example of the types of laws OTS intended to preempt comes from CUTPA's California analog, the Unfair Competition Act ("UCA"), Cal Bus. & Prof. Code §§ 17200 et seq. In an opinion letter OTS stated that UCA is preempted by HOLA where it attempts to regulate loan-related fees *including statement fees and facsimile charges*. OTS Opinion Letter P-99-3, Mar. 10, 1999, at 16 (emphasis added).

- - - - - - - - - - - - End Footnotes- - - - - - - - - - - - - -

The Boursiquots' CUTPA claims fall squarely within the fields of state law [*356] set forth above. Regardless, the Boursiquots argue that [**14] their CUTPA claims are excepted under 12 C.F.R. § 560.2(c), because CUTPA falls under the heading of "commercial law." [HN11]Although Section 560.2(c) does create an exception for some state commercial laws, it goes on to provide that state commercial laws "are not preempted to the extent that they only incidentally affect the lending operations of Federal savings associations . . . ." 12 C.F.R. § 560.2(c). CUTPA's effects are not merely incidental, they have a direct bearing the lending operations of federal savings associations.

Because the Boursiquots' CUTPA claims are preempted by federal law, the second count of the amended complaint is dismissed.

323 F. Supp. 2d 350; 2004 U.S. Dist. LEXIS 12332

## IV. CONCLUSION

For the aforementioned reasons, Citibank's Motion to Dismiss (doc. # 13) is GRANTED. The clerk shall close this file.

It is so ordered.

Dated at Bridgeport, Connecticut, this 1st day of July 2004.

/s/ Stefan R. Underhill

Stefan R. Underhill

United States District Judge

2005 U.S. Dist. LEXIS 3484

LYNNE CHRISTENSEN, Plaintiff, v. KINGSTON SCHOOL COMMITTEE; GORDON L. NOSEWORTHY, In His Professional Capacity as Superintendent of Kingston Schools, Defendants.

CIVIL ACTION NO. 04-11773-WGY

UNITED STATES DISTRICT COURT FOR THE DISTRICT OF MASSACHUSETTS

2005 U.S. Dist. LEXIS 3484

March 8, 2005, Decided

**DISPOSITION:** Defendant Kingston School Committee's motions to dismiss granted in part and denied in part. Claim remanded to state court.

## CASE SUMMARY

**PROCEDURAL POSTURE:** Plaintiff former school principal sued defendants school committee and school superintendant for violations of (1) her federal procedural and substantive due process rights, (2) her state procedural and substantive due process rights, and (3) 42 U.S.C.S. § 1983, as well as for breaches of (4) contract and (5) the implied covenant of good faith and fair dealing. The committee moved to dismiss.

**OVERVIEW:** Although her three-year contract period was not yet up, the committee eliminated the principal's position and terminated her employment. The court held that Mass. Gen. Laws ch. 71, § 41 did not create a property right; nor did the claimed interests resemble those interests previously viewed as fundamental by the Constitution. Because the principal did not have a protected property interest in her position, her federal and state procedural and substantive due process and 42 U.S.C.S. § 1983 claims were without merit. However, Mass. Gen. Laws ch. 71, § 41 explicitly provided that individual contracts up to three years in duration were allowed, so the school committee's attempts to conjure up a public policy to nullify the contract was unavailing. A valid contract apparently existed and the breach of contract claim warranted further review. As the principal had not alleged that the committee fired her in bad faith or for any reason other than the budgetary and fiscal constraints stated by it, that the committee had an improper motive, or that she was due compensation for past services, the breach of the covenant of good faith and fair dealing claim failed.

**OUTCOME:** The court dismissed all claims except the breach of contract claims.

**CORE TERMS:** fair dealing, property interest, implied covenant, good cause, breach of contract, superintendent, consecutive, motion to dismiss, termination, arbitration, managerial, continued employment, property right, covenant, state law, contractual, terminate, employment contract, at-will, fiscal, collective bargaining, summary judgment, written notice, public schools, protectable, resemblance, safeguard, duration, redress, teacher

## LexisNexis(TM) Headnotes

*Civil Procedure > Pleading & Practice > Defenses, Objections & Demurrers > Failure to State a Cause of Action*

[HN1]A court assumes all factual allegations in a plaintiff's complaint to be true and grants all inferences to the plaintiff when considering a defendant's motion to dismiss. The averments of the complaint, as well as the proper inferences arising from them, are liberally construed in favor of the plaintiff. A complaint should not be dismissed for failure to state a claim unless it appears beyond doubt that the plaintiff can prove no set of facts in support of her claim which would entitle her to relief. Fed. R. Civ. P. 12(b)(6). The plaintiff must put forth factual allegations, either direct or inferential, respecting each material element necessary to sustain recovery under some actionable legal theory.

*Civil Procedure > Pleading & Practice > Defenses, Objections & Demurrers > Failure to State a Cause of Action*

[HN2]When a plaintiff fails to introduce a pertinent document as part of his pleading, a defendant may introduce the exhibit as part of his motion attacking the pleading.

*Constitutional Law > Procedural Due Process > Scope of Protection*

[HN3]The federal and Massachusetts standards for a procedural due process analysis are identical.

*Constitutional Law > Procedural Due Process > Scope of Protection*

*Constitutional Law > Substantive Due Process > Scope of Protection*

[HN4]A plaintiff must demonstrate a violation of an identified liberty or property interest protected by the due process clause to find a violation of due process.

*Constitutional Law > Procedural Due Process > Scope of Protection*

*Constitutional Law > Substantive Due Process > Scope of Protection*

[HN5]For an interest in a statutorily created benefit to become a protected property interest under the Fourteenth Amendment, a person must have more than a unilateral expectation of it. He must, instead, have a legitimate claim of entitlement to it.

*Constitutional Law > Procedural Due Process > Scope of Protection*

*Constitutional Law > Substantive Due Process > Scope of Protection*

[HN6]The decisions of the United States Court of Appeals for the First Circuit do not rule out the possibility of a regulatory scheme creating a legitimate claim of entitlement to a promotion.

*Constitutional Law > Procedural Due Process > Scope of Protection*

*Constitutional Law > Substantive Due Process > Scope of Protection*

[HN7]For the purposes of a due process analysis, property interests are created by existing rules that stem from an independent source such as state law.

*Constitutional Law > Procedural Due Process > Scope of Protection*

*Constitutional Law > Substantive Due Process > Scope of Protection*

[HN8]For the purposes of a due process analysis, the significance of the private interest in retaining employment cannot be gainsaid. Depriving a person of the means of livelihood is "severe."

*Education Law > Faculty & Staff > Discipline & Dismissal > Administrative Proceedings > Due Process*

*Education Law > Faculty & Staff > Employment Contracts*

[HN9]A principal serving under contract does not have a constitutionally protected property interest in his employment.

*Constitutional Law > Procedural Due Process > Scope of Protection*

*Constitutional Law > Substantive Due Process > Scope of Protection*

[HN10]Property interests are protected by procedural due process, which interest is derived from state law.

*Constitutional Law > Procedural Due Process > Scope of Protection*

*Education Law > Faculty & Staff > Discipline & Dismissal > Administrative Proceedings > Due Process*

*Education Law > Faculty & Staff > Discipline & Dismissal > Causes*

[HN11]Though certain language of Mass. Gen. Laws ch. 71, § 41 may, arguably, be tenebrous, the statute explicitly provides that only those principals who have worked for a district for three consecutive years are afforded statutory "good cause" protection.

*Constitutional Law > Procedural Due Process > Scope of Protection*

*Education Law > Faculty & Staff > Discipline & Dismissal > Administrative Proceedings > Due Process*

[HN12]Mass. Gen. Laws ch. 71, § 41 does not create a property for purposes of a due process analysis.

*Constitutional Law > Procedural Due Process > Scope of Protection*

*Constitutional Law > Substantive Due Process > Scope of Protection*

[HN13]Plaintiffs claiming violations of procedural due process rights must show first that the property interest that they claim was one to which they had an entitlement. Only if the plaintiffs make such a showing does the court need to consider whether the procedures used meet the requirements of due process.

*Education Law > Faculty & Staff > Discipline & Dismissal > Administrative Proceedings > Due Process*

*Education Law > Faculty & Staff > Employment Contracts*

[HN14]See Mass. Gen. Laws ch. 71, § 41, para. 2.

*Contracts Law > Contract Interpretation > Good Faith & Fair Dealing*

[HN15]The implied covenant of good faith and fair dealing is viewed by some an indispensable measure of contractual morality, and by others as a "chameleon." Courts have often applied this rule to prevent overreaching by employers and the forfeiture by employees of benefits almost earned by the rendering of substantial services.

*Contracts Law > Contract Interpretation > Good Faith & Fair Dealing*

[HN16]In Massachusetts, in order to demonstrate a claim for the breach of the covenant of good faith and fair dealing, the plaintiff must show that there existed an enforceable contract between the two parties.

*Contracts Law > Contract Interpretation > Good Faith & Fair Dealing*

[HN17]Though applicable to at-will employment relationships, in Massachusetts, the covenant of good faith and fair dealing arises naturally out of formal contractual relationships. Every contract is subject to an implied covenant of good faith and fair dealing. The obligation is to preserve the spirit of the bargain rather than the form, and it is moreover a group of specific rules which evolved to insure that the basic purpose of contract law is carried out, the protection of reasonable expectations of parties induced by promise.

*Contracts Law > Contract Interpretation > Good Faith & Fair Dealing*

[HN18]While every breach of contract has the effect of destroying or injuring the rights of the other party to receive its fruits, not every breach of contract is a breach of the implied covenant of good faith and fair dealing. As the law has developed, recovery under the latter theory requires conduct taken in bad faith either to deprive a party of the fruits of labor already substantially earned or unfair leveraging of the contract terms to secure undue economic advantage.

*Contracts Law > Contract Interpretation > Good Faith & Fair Dealing*

[HN19]Courts have agreed that the question of breach is a matter of degree. Harms suffered in a breach of the implied covenant of good faith and fair dealing generally involve deceit or "unfair subterfuge" and usually are compounded by deceptive or unfair behavior that prevented -- or at a minimum diverted -- the injured parties from seeking immediate redress.

*Contracts Law > Contract Interpretation > Good Faith & Fair Dealing*

*Labor & Employment Law > Wrongful Termination > Breach of Contract*

*Labor & Employment Law > Wrongful Termination > Public Policy*

[HN20]In Massachusetts, a mere finding that there was no good reason for an employment termination in the absence of other indicia of lack of honesty or taking unfair advantage, or bad faith, is insufficient to support a claim for breach of the covenant of good faith and fair dealing. The absence of good cause is not the equivalent of absence of good faith.

*Contracts Law > Remedies > Compensatory Damages*

[HN21]Contract damages are ordinarily based on the injured party's expectation interest and are intended to give him the benefit of his bargain by awarding him a sum of money that will, to the extent possible, put him in as good a position as he would have been in had the contract been performed. The fundamental principle of law upon which damages for breach of contract are assessed is that the injured party shall be placed in the same position he would have been in, if the contract had been performed, so far as loss can be ascertained to have followed as a natural consequence and to have been within the contemplation of reasonable men as a probable result of the breach, and so far as compensation therefor in money can be computed by rational methods upon a firm basis of facts. Full contract damages are not, however, necessarily the measure of damages for breach of the implied covenant of good faith and fair dealing concerned with the employer's duty of good faith and fair dealing in carrying out the terms of its agreement regarding past services.

*Contracts Law > Breach > Causes of Action*

*Contracts Law > Contract Interpretation > Good Faith & Fair Dealing*

[HN22]Courts should not view the covenant of good faith and fair dealing as an unwarranted invitation to impermissibly intrude into freedom of contract. Nor should claims of a breach of the implied covenant of good faith and fair dealing become automatic bedfellows of breach of contract claims. Conceptually, claims for breach of the implied covenant of good faith and fair dealing are distinct from simple breach of contract claims and require additional factual allegations of unfairly leveraging the contract terms for undue economic advantage.

*Contracts Law > Breach > Causes of Action*

*Contracts Law > Contract Interpretation > Good Faith & Fair Dealing*

[HN23]Parties to a contract in Massachusetts still have the traditional choice: perform on the contract in good faith or withhold performance and become liable to the other for contract damages. Parties to an arm's length transaction can act in their own self-interest so long as they honor their contractual obligations. Such redress is appropriate in a breach of contract claim. No claim for breaching an implied covenant of good faith and fair dealing need be pled unless the factual circumstances actually warrant the additional claim.

*Civil Procedure > Appeals > Standards of Review > De Novo Review*

*Civil Procedure > State & Federal Interrelationships > Application of State Law*

2005 U.S. Dist. LEXIS 3484

[HN24]Federal courts of appeals should review de novo a district court's determination of state law.

**COUNSEL:** **[*1]** For Kingston School Committee, Defendant: Fernand J. Dupere, Jr., Southampton, MA; Gordon Noseworthy, Jennifer L. Markowski, Peabody & Arnold LLP, Boston, MA; Terence P. Noonan, Law Office of Kathryn M. Noonan, Newton, MA.

For Lynne Christensen, Plaintiff: Rebecca J. Wilson, Peabody & Arnold LLP, Boston, MA.

**JUDGES:** WILLIAM G. YOUNG, CHIEF JUDGE.

**OPINIONBY:** WILLIAM G. YOUNG

**OPINION:** MEMORANDUM AND ORDER

YOUNG, C.J.

## I. INTRODUCTION

The plaintiff Lynne Christensen ("Christensen") filed a complaint on August 13, 2004, against the defendants Kingston School Committee ("the Committee") and Gordon L. Noseworthy ("Noseworthy"), in his Professional Capacity as the Superintendent of the Kingston Schools (the Committee and Noseworthy, together, "Kingston"). Christensen is seeking damages and equitable, declaratory, and injunctive relief for violations of (1) her federal procedural and substantive due process rights, (2) her state procedural and substantive due process rights, and (3) 42 U.S.C. section 1983, as well as for breaches of (4) contract and (5) the implied covenant of good faith and fair dealing. Kingston moved to dismiss. The Court heard the parties' **[*2]** oral arguments on November 16, 2004, and took the matter under advisement.

## II. Facts

There are no real factual disputes in this case. In August 2002, Christensen and Kingston entered into a three-year contract, signed by Noseworthy on behalf of the Committee, that employed Christensen as a school principal. Compl. of Lynne Christensen [Doc. No. 1] ("Pl.'s Compl.") at 1, 3. The term of the contract ran from August 12, 2002, through June 30, 2005. Pl.'s Compl. at 1, 3 P 10. The contract provided that Christensen would receive a salary of $ 77,000 for the first year, $ 80,080 for the second year, and $ 83,283 for the third and final year of the contract. Pl.'s Compl. at 3 P 11. She was also entitled other benefits, namely "health insurance, life insurance, sick leave, bereavement leave, personal business, workers compensation coverage, course reimbursement, vacation, and retirement benefits." Pl.'s Compl. at 3 P

12. The precise terms of the contract's termination provisions are not clear on the record before this Court on this motion to dismiss.

Christensen was informed, both verbally and in a letter dated May 14, 2004, that Noseworthy **[*3]** had eliminated her principal position, one of two existing principal positions in the district, and that, as a result, she would be terminated effective June 30, 2004. Pl.'s Compl. at 1, 3 PP 14-15, 4 P 18; Defs.' Mem. in Supp. of Mot. to Dismiss [Doc. No. 7] ("Defs.' Mem.") at 2 P 5. Noseworthy stated that the elimination of the position was "due to fiscal constraints and reorganization of administration of the elementary schools in Kingston." Pl.'s Compl. at 3 P 16. Christensen has not challenged Noseworthy's reasons for terminating the position and dismissing her. Kingston correctly indicates that "Ms. Christensen's Complaint does not allege that her position was eliminated for any reason other than what was stated in the May 14, 2004, letter" nor does she "allege that she requested a hearing to address the elimination of her position." Defs.' Mem. at 2 PP 7-8. Christensen accepts these reasons for her termination, it appears, when she states in her complaint that her contract did not allow Kingston to terminate her due to "fiscal constraints and reorganization of administration of the elementary schools in Kingston." Pl.'s Compl. at 3 P 16, **[*4]** 4 PP 20-21.

## III. DISCUSSION

### A. Standard of Review

#### 1. Motion to Dismiss

This Court has jurisdiction pursuant to the United States Constitution, 42 U.S.C. section 1983, and 28 U.S.C. sections 1331, 1343, and 1367. [HN1]This Court assumes all factual allegations in Christensen's Complaint to be true and grants all inferences to Christensen when considering Kingston's Motion to Dismiss. Coyne v. City of Somerville, 770 F. Supp. 740, 743 (D. Mass. 1991) (Cohen, M.J.), aff'd 972 F.2d 440 (1st Cir. 1992) ("The averments of the complaint, as well as the proper inferences arising from them, [are] liberally construed in favor of the plaintiff."). "[A] complaint should not be dismissed for failure to state a claim unless it appears beyond doubt that [Christensen] can prove no set of facts in support of [her] claim which would entitle [her] to relief." Conley v. Gibson, 355 U.S. 41, 45-46, 2 L. Ed. 2d 80, 78 S. Ct. 99 (1957) (original alterations omitted) (alterations added); Fed. R. Civ. P. 12(b) (6). Christensen must put forth "factual allegations, either **[*5]** direct or inferential, respecting each material element necessary to sustain recovery under some actionable legal

2005 U.S. Dist. LEXIS 3484

theory." Gooley v. Mobil Oil Corp., 851 F.2d 513, 515 (1st Cir. 1988).

**2. Inclusion of Exhibit to the Motion to Dismiss**
Kingston defends its inclusion of the notice of termination as an exhibit to its motion to dismiss and contends that this Court, in making its decision, may consider "an undisputedly authentic document that [Kingston] attaches as an exhibit to a motion to dismiss if [Christensen's] claims are based on the document." Pension Benefit Guar. Corp. v. White Consol. Indus., 998 F.2d 1192, 1196 (3d Cir. 1993). Kingston contends that the dismissal letter attached to the motion may be considered by this Court "without converting the instant motion into one for summary judgment" because the letter is "authentic" and Christensen specifically relies on statements from the letter in her complaint. Defs.' Mem. at 3-4.

This Court agrees. In re Computervision Corp. Sec. Litig., 869 F. Supp. 56, 59-60 (D. Mass. 1994) (quoting Romani v. Shearson Lehman Hutton, 929 F.2d 875, 879 n.3 (1st Cir. 1991) [*6] ("Although plaintiff did not attach a copy of the offering materials to his complaint, defendants submitted the documents with their motion[] to dismiss. This step was proper and did not convert the motion to dismiss into a motion for summary judgment.")); Fudge v. Penthouse Int'l, Ltd., 840 F.2d 1012, 1015 (1st Cir. 1988) (stating that [HN2]"when [a] plaintiff fails to introduce a pertinent document as part of his pleading, [a] defendant may introduce the exhibit as part of his motion attacking the pleading.") (citations and internal quotation marks omitted); LoCicero v. Leslie, 948 F. Supp. 10, 12 (D. Mass. 1996) (explaining, when considering the inclusion of a public transcript, that "despite the parties' arguments, it is not necessary for this Court to convert the motion to dismiss to a motion for summary judgment"); Branch v. FDIC, 825 F. Supp. 384, 398 n.8 (D. Mass. 1993) (explaining that "it is well established that a district court may take judicial notice of . . . indisputably authentic documents on a 12(b) motion without converting even a 12(b)(6) motion into one for summary judgment.").

**B. Christensen's [*7]   Federal and State Due Process n1 and 42 U.S.C. § 1983 Claims**

- - - - - - - - - - - - - - Footnotes - - - - - - - - - - - - - - -

n1 It should be observed at the outset that, as a general proposition, [HN3]the federal and Massachusetts standards for a procedural due process analysis are identical. Liability Investigative Fund Effort, Inc. v. Massachusetts Med. Prof. Ins. Ass'n, 418 Mass. 436, 443, 636 N.E.2d

1317 (1994) ("We observe preliminarily that we have treated the procedural due process protections of the Massachusetts and United States Constitutions identically."); School Comm. of Hatfield v. Board of Educ., 372 Mass. 513, 515 n.2, 363 N.E.2d 237 (1977) ("The protection afforded property interests by both [federal and Massachusetts due process] provisions is subject to the same analysis."); Doyle v. Dep't of Indus. Accidents, 50 Mass. App. Ct. 42, 45, 734 N.E.2d 1187 (2000) (noting, in a due process context, that "the procedural protections" of the federal constitution and the Massachusetts Declaration of Rights "are co-extensive"). Cf. Dickerson v. Attorney Gen., 396 Mass. 740, 743, 488 N.E.2d 757 (1986) (noting in equal protection context that the "standard of review under the cognate provisions of the Massachusetts Declaration of Rights is the same as under the Fourteenth Amendment to the Federal Constitution."). Accordingly, in evaluating Christensen's federal procedural due process claims, this Court inherently reviews her state procedural due process claims.

In the context of substantive due process, the Massachusetts Declaration of Rights at times provides greater substantive due process protections. Macone v. Town of Wakefield, 2003 Mass. Super. LEXIS 219, 16 Mass. L. Rep. 506, 2003 WL 21960670, *3 (Mass. Super. Ct. Jul 16, 2003) (Houston, J.) ("There are situations where Massachusetts courts have found that the Massachusetts Declaration of Rights provides greater substantive due process protections. . . ."). As in Macone, Christensen has not argued "that the Massachusetts Declaration of Rights provides greater substantive due process protections in this context." Id. Accordingly, this Court treats the federal and state claims identically.

- - - - - - - - - - - - End Footnotes- - - - - - - - - - - - - -

[*8]

**1. Does Christensen have a Protectable Property Interest such as would Warrant Constitutional Due Process Protections and Rights under 42 U.S.C. § 1983?**

[HN4]"[A] plaintiff must demonstrate a violation of an identified liberty or property interest protected by the due process clause" to find a violation of due process. Coyne, 770 F. Supp. at 746 n.13 (emphasis added). See Cleveland Bd. of Educ. v. Loudermill, 470 U.S. 532, 538, 84 L. Ed. 2d 494, 105 S. Ct. 1487 (1985) (noting that a "federal constitutional claim" depended on the existence of "a property right in continued employment"); Pittsley v. Warish, 927 F.2d 3, 6 (1st Cir. 1991) (summarizing the two theories of due process in a case involving section 1983 and due process claims against police officer for events transpiring during an arrest). In order for Christensen's due process claims and, in turn, her section 1983 claim to survive, this Court must determine that she had the requisite "protectable property interest."

[HN5]"For an interest in a statutorily created benefit to become a protected property interest under the Fourteenth Amendment, a person must have more than a unilateral [*9] expectation of it. He must, instead, have a legitimate claim of entitlement to it.'" Coyne v. City of Somerville, 972 F.2d 440, 443 (1st Cir. 1992) (quoting Board of Regents v. Roth, 408 U.S. 564, 577, 33 L. Ed. 2d 548, 92 S. Ct. 2701 (1972)); Hoffman v. City of Warwick, 909 F.2d 608, 619 (1st Cir. 1990) (same); Smith v. Comm'r of Mental Retardation, 409 Mass. 545, 548-49, 567 N.E.2d 924 (1991) (quoting Roth, 408 U.S. at 576-77, and noting that "a person clearly must have more than an abstract need or desire" for rights to arise).

The First Circuit did state in Coyne that [HN6]the decisions of the circuit do "not rule out the possibility of a regulatory scheme creating a legitimate claim of entitlement'" to, in that case, a promotion. Coyne, 972 F.2d at 443. Comparably, Christensen argues that she "had a reasonable expectation that her employment with her public employer would continue throughout the contractually agreed to term" and concludes "she had a protected property interest in her continued employment with her public employer." Pl.'s Opp'n to Defs.' Mot. to Dismiss [Doc. No. 9] ("Pl.'s Opp'n") at 4. Christensen also [*10] relies on the decision of the Supreme Court in Cleveland Bd. of Educ. v. Loudermill, 470 U.S. 532, 84 L. Ed. 2d 494, 105 S. Ct. 1487 (1985), where the Supreme Court, quoting its decision in Roth, 408 U.S. at 577, again explained that [HN7]property interests "are created . . . by existing rules that stem from an independent source such as state law." 470 U.S. at 538.

The Supreme Court in Loudermill emphasized important, august truths which unquestionably resonate with this Court: [HN8]"the significance of the private interest in retaining employment cannot be gainsaid," 470 U.S. at 543, "depriving a person of the means of livelihood," is "severe," id., "[a] governmental employer . . . has an interest in keeping citizens usefully employed rather than . . . forcing its employees onto the welfare rolls," id. at 544, and the disruption caused by a loss of wages may be . . . devastating to an employee . . . Absent an interim source of wages, the employee might be unable to meet his basic, fixed costs, such as food, rent or mortgage payments. . . . A child's education may be interrupted, a family's home lost, a person's relationship with his friends or even his family [*11] may be irrevocably affected.Id. at 549-550 (Marshall, J. concurring) (contemplating in that case the potential consequences of the passage of a considerable amount of time between the termination of employment and a post-termination hearing and decision).

The Supreme Court held that a protected property right existed in Loudermill. Yet, Loudermill is readily distinguishable from this matter. The Ohio Statute n2 specifically provided that civil servants like Loudermill and Donnelly, n3 could not be removed from employment except for cause. As such, as per the statute, Loudermill and Donnelly, civil servants who could only be fired for cause, possessed property rights. Loudermill, 470 U.S. at 539 (explaining that the Ohio statute "plainly supports the conclusion" that the civil service employees "possessed property rights in continued employment" and noting that the question of the existence of a property right was not raised in the district or circuit courts). Here, Christensen had only been employed for two years and was not protected by the statutory "for good cause" safeguard of the Massachusetts statute. Mass. Gen. Laws ch. 71, § 41 [*12] . Further, in Loudermill, the civil service employees, unlike Christensen, took advantage of the administrative appeals process afforded by law. 470 U.S. at 535.

- - - - - - - - - - - - - - Footnotes - - - - - - - - - - - - - - - -

n2 The Ohio statute considered in Loudermill provided that a civil service employee could only be dismissed due to a transfer or reassignment, or "for incompetency, inefficiency, dishonesty, drunkenness, immoral conduct, insubordination, discourteous treatment of the public, neglect of duty, violation of such sections or the rules of the director of administrative services or the commission, or any other failure of good behavior, or any other acts of misfeasance, malfeasance, or nonfeasance in office, or conviction of a felony." Ohio Rev. Code

Ann. § 124.34 (cited in part in Loudermill. 470 U.S. at 538-539 n.4).

n3 Donnelly originally filed a separate action in district court. The cases were consolidated for appeal before the Court of Appeals for the Sixth Circuit, which reversed in part and remanded the decision of the District Court. The Supreme Court affirmed the decision of the Sixth Circuit. See Loudermill, 470 U.S. at 537.


- - - - - - - - - - - - End Footnotes- - - - - - - -
- - - - - -

[*13]

Most on point is the decision of the Appeals Court of Massachusetts in Downing v. City of Lowell, where the court specifically decided that the due process claims of a principal who has served for more than three consecutive years were without merit as [HN9]"a principal serving under contract does not have a constitutionally protected property interest in his employment." 50 Mass. App. Ct. 779, 785, 741 N.E.2d 469 (2001) (emphasis added) (involving a principal who, unlike Christensen, was tenured, and examining the difference between a dismissal and a failure to renew an employment contract). See Fontana v. Comm'r of the Metro. Dist. Comm'n, 34 Mass. App. Ct. 63, 69, 606 N.E.2d 1343 (1993) (holding that a probationary employee does not have a protected property interest); Smith, 409 Mass. at 549 (concluding that, in a case involving a temporary supervisor, that no protected property interest existed).

Christensen attempts to use language in Downing to receive protections because Noseworthy attempted to "terminate the employment relationship prior to the expiration of the contractual period." Pl.'s Opp'n at 6 (quoting Downing, 50 Mass. App. Ct. at 782). [*14] Christensen argues that in Downing the Massachusetts Appeals Court stated that "a principal under a one-year, or even a three-year, contract is guaranteed protection in the event of dismissal only when a superintendent seeks to terminate the employment relationship prior to the expiration of the contractual period." Downing. 50 Mass. App. Ct at 782. This analysis is incomplete.

Downing is entirely distinguishable. It is true that Downing distinguishes between the dismissal of a principal and the failure to renew a principal's contract. The court differentiated the two, stating that a school system only needs to have good cause when dismissing a principal and not when deciding whether to renew a principal's contract. "To hold otherwise would grant principals de facto tenure. . ." Downing, 50 Mass. App.

Ct. at 782. The section 41 statutory "safeguards" granting school principals "insulation against dismissal except for good cause' . . . do not apply should a contract simply expire." Downing, 50 Mass. App. Ct. at 782.

Downing began as a teacher, was later granted tenure, and subsequently became a principal. Id. at 780. [*15] "By the end of the school year in June, 1995, Mr. Downing had served for more than three years as the school's principal." Downing v. City of Lowell, 1996 Mass. Super. LEXIS 729, No. 95-3812, 1996 WL 775399, at *1 (Mass. Super. Ct. Nov. 20, 1996) (Hely, J.), aff'd 50 Mass. App. Ct. 779, 741 N.E.2d 469 (2001). As Downing had served for more than three years, he was entitled the safeguards insulating school principals against dismissal except for good cause that are afforded him by section 41 of the Massachusetts statute. See id. at 782. Christensen is not so entitled. Her argument is without merit.

Christensen correctly cites Justice Powell's concurring opinion in Regents of Univ. of Michigan v. Ewing, in which he wrote that [HN10]"property interests are protected by procedural due process," which "interest is derived from state law." 474 U.S. 214, 229, 88 L. Ed. 2d 523, 106 S. Ct. 507 (1985) (Powell, J. concurring). Unlike the statute in Loudermill, the Massachusetts statute, Mass. Gen. Laws ch. 71, sections 41-42, does not grant Christensen good cause protection nor does it create such a property interest. [HN11]Though certain language of the Massachusetts statute may, arguably, be tenebrous, the statute [*16] explicitly provides that only those principals who have worked for a district for three consecutive years are afforded statutory "good cause" protection. See Loudermill, 470 U.S. at 548 (Marshall, J. concurring) (noting that "public employees who may be discharged only for cause are entitled" due process protections and explaining the importance of affording such employees the opportunity to present and challenge evidence and witnesses when evidentiary questions exist) (emphasis added).

Further, the courts in Downing and Smith have established that even a principal with both good cause protection and "serving under contract does not have a constitutionally protected property right in his employment." Downing, 50 Mass. App. Ct. at 784-785 (citing Smith, 409 Mass. at 549). n4 If this is so for a principal under contract who has served for three consecutive years, as in Downing, it is indubitably so for a principal who has served less than three years. Though Christensen claims it is "pellucidly clear" that she "has pled a protectable property interest in her continued employment," this Court disagrees.

- - - - - - - - - - - - - Footnotes - - - - - - - - -
- - - - - -

n4 Though Christensen had a binding employment contract, absent statutory "good cause" protections it is this Court's view that this matter falls somewhere between Fontana, 34 Mass. App. Ct. at 65 ("[A] provisional employee does not have a statutory basis for claiming a property interest in continued employment. . ."), and Downing (holding a tenured principal did not have a property interest). The courts in Fontana and Downing both held, respectively, that no protectable property interest existed. This Court is likewise convinced that Christensen, who falls somewhere in the middle of the Fontana-Downing continuum, does not possess a protectable property interest.

Though Christensen has an employment contract with Kingston, because she is not afforded statutory "good cause" protection her status bears greater resemblance to that of an at-will employee than that of a tenured principal. For a kindred viewpoint, see Marlborough Sch. Comm. v. Morley, 1996 Mass. Super. LEXIS 304, No. 95-6633, 1996 WL 1186877 (Mass. Super. Ct. Oct 11, 1996) (McHugh, J.) (unpublished opinion), where the court stated:Here, the Legislature's manifest objective was [the] creation of a managerial system designed to produce public schools capable of delivering high quality education to all who attend. An important component of any effective managerial system is the power to control direct subordinates. It would be completely inconsistent with that kind of a management plan for the Legislature to have inserted in a key supervisory role people who had broad responsibility for policy but who could be removed only for "misconduct which adversely affects the public interest by impairing the efficiency of the public service." Far more consistent is a management scheme under which principals are the equivalent of at-will employees for the first three years of their employment and thereafter are protected against discharge for arbitrary or irrational reasons. That kind of plan is one that protects key employees from irrational whimsy but gives their superiors the flexibility they need to manage in a way

for which they can be held responsible. That, in my opinion, is the plan the Legislature in fact created when it inserted the "good cause" standard in [section] 41.1996 Mass. Super. LEXIS 304, *20-21 [WL] at *7 (emphasis added). This explanation by Justice McHugh of the Massachusetts Superior Court is in harmony with this Court's reading of the statute.

- - - - - - - - - - - End Footnotes- - - - - - - -
- - - - - -

[*17]

Here, [HN12]the statute does not create a property right, nor does the situation "possess a significant resemblance to those interests previously viewed as fundamental by the Constitution." Coyne, 770 F. Supp. at 747; see also, Michael H. v. Gerald D., 491 U.S. 110, 105 L. Ed. 2d 91, 109 S. Ct. 2333 (1989) (enunciating that a "'liberty' interest is one so deeply imbedded within society's traditions as to be a fundamental right"). Though this Court certainly concurs with the Supreme Court's articulation of the indispensable importance of security in employment, it is the holding of this Court that Christensen does not have a protected property interest. For this reason, this Court holds that Christensen's federal, and likewise state, procedural and substantive due process and 42 U.S.C. section 1983 claims are without merit and grants Kingston's Motion to Dismiss these claims.

## 2. Alternative Analysis of Federal and State Claims

Christensen's "federal constitutional claim[s] depend . . . on [Christensen] having had a property right in continued employment," Loudermill, 470 U.S. at 538, and, to reiterate, it is the holding of this Court that [*18] Christensen does not have such a protected property interest in her position. As an alternative ground of decision, however, this Court' will review the merits of Christensen's federal claims. See Liability Investigative Fund Effort, Inc. v. Massachusetts Med. Prof. Ins. Assoc., 418 Mass. 436, 443-444, 636 N.E.2d 1317 (noting that [HN13]plaintiffs claiming violations of procedural due process rights "must show first that the property interest that they claim was one to which they had an entitlement. Only if the plaintiffs make such a showing do we need to consider whether the procedures used meet the requirements of due process." (citations omitted)). This Court rules that even if Christensen had a property interest, her procedural and substantive due process claims and her 42 U.S.C. section 1983 claim nevertheless fail.

## a. Federal and State Procedural Due Process Claims

Christensen argues that both the termination and the absence of an adequate hearing violated her due process rights. Pl.'s Compl. at 4 PP 23-26, 5 P 27. She disputes whether she was given adequate notice and contends she should have been granted pre and post-termination hearings. **[*19]** Pl.'s Opp'n at 5; Pl.'s Compl. at PP 14, 23, 24, 26, 27. She asserts that, given the Supreme Court's decision in Vitek v. Jones, 445 U.S. 480, 63 L. Ed. 2d 552, 100 S. Ct. 1254 (1980), one determines "the adequacy of procedures by balancing the government's interest against the private interest affected by the action, the risk of erroneous deprivation, and the value of additional safeguards." Pl.'s Opp'n at 5 (citing Vitek, 445 U.S. at 491). Christensen further claims that the Supreme Court in Loudermill put "great emphasis on a state depriving an individual of her livelihood." Pl.'s Opp'n at 5 (citing Loudermill, 470 U.S. 532, 84 L. Ed. 2d 494, 105 S. Ct. 1487).

Central to the determination of Christensen's procedural due process claims is section 41 of Chapter 71 of the Massachusetts General Laws, which provides in pertinent part that:School principals, by whatever title their position may be known, shall not be represented in collective bargaining, but every principal shall have the opportunity to meet and discuss individually the terms and conditions of his employment in his school district with such district's superintendent and may be represented by an attorney or other representative, **[*20]** and shall be employed under written contracts of employment. Such contracts shall be for terms of up to three years in length . . .

A principal . . . who has served in that position in the public schools of the district for three consecutive years shall not be dismissed or demoted except for good cause. Only a superintendent may dismiss a principal. A principal . . . shall not be dismissed unless he has been furnished with a written notice of intent to dismiss with an explanation of the grounds for the dismissal, and, if he so requests, has been given a reasonable opportunity within fifteen days after receiving such notice to review the decision with the superintendent at which meeting such employee may be represented by an attorney or other representative to present information pertaining to the bases for the decision and to such employee's status. A principal . . . may seek review of a dismissal or demotion decision by filing a petition with the commissioner for arbitration.Mass. Gen. Laws ch. 71, § 41 (emphasis added).

The outcome here turns in large part on the meaning of the "three consecutive years" **[*21]** language found only in the first sentence of the second quoted paragraph of section 41 of the statute. Mass. Gen. Laws. ch. 71, § 41, i.e., "A principal, assistant principal, department head or other supervisor who has served in that position in the public schools of the district for three consecutive years shall not be dismissed or demoted except for good cause." (emphasis added). Relatively few courts have interpreted section 41. Downing, 50 Mass. App. Ct. at 779 (examining whether the hearing and arbitration provisions of section 41 apply when a school district fails to renew a principal's contract); Apostolides v. Buckley, 1997 Mass. Super. LEXIS 314, 7 Mass. L. Rep. 58, No. 95-2398, 1997 WL 338932 (Mass. Super. Ct. June 12, 1997) (Welch, J.) (examining the collective bargaining provisions, but not the hearing and arbitration provisions, of section 41). Courts have not yet had occasion to address the applicability of the arbitration and hearing provisions of section 41 to a principal who has served for less than "three consecutive years."

Christensen argues that the "three consecutive years" language applies to the entire quoted paragraph of section **[*22]** 41. Therefore, Christensen argues that the hearing and arbitration provisions of section 41 do not apply to her as she had not been employed by Kingston for three consecutive years at the time of termination, and are, in consequence, procedurally defective. Pl.'s Opp'n at 4. Kingston retorts -- somewhat anomalously in view of its argument that Christensen has no property interest in continued employment -- that the "three consecutive years" language applies only to that sentence in which those words appear and that the remainder of the third paragraph applies generally to the termination of all principals. Defs.' Reply to Pl.'s Opp'n to Defs.' Mot. to Dismiss [Doc. No. 10] ("Def.'s Reply") at 1, 5.

During oral arguments, Christensen's attorney asserted that counsel had "appealed to the [Massachusetts Department of Education] consistently on behalf of principals" and that the Massachusetts Department of Education has repeatedly taken the position that the "three consecutive years" language applies to the entire third paragraph of section 41. Tr. of Mot. Hr'g of Nov. 16, 2004 ("Tr.") at 3 (asserting "they send us letters like the one I have in front of me that says if you don't have **[*23]** three years . . . [the hearing and arbitration provisions of the paragraph] are inapplicable to you."). In response to this Court's Order of November 24, 2004 [Doc. No. 11] requesting that Christensen provide this Court copies of the letters to which reference was made during oral argument, Christensen's counsel produced two letters in two

unrelated matters written by the Commonwealth of Massachusetts Department of Education.

In the first letter, dated September 23, 1996, Robert V. Antonucci, the then Commissioner of Education ("Antonucci"), indicated the view of the Massachusetts Department of Education by stating, "my interpretation of that paragraph is that the phrase three consecutive years' of service in the position applies throughout the paragraph." In the second letter, dated June 10, 2002 (only the first page was submitted to this Court), David P. Driscoll, Commissioner of Education ("Driscoll"), again indicates that because the principal "had not served in the position of principal . . . for three consecutive years, he is. not eligible for statutory arbitration."

It is clear that the Massachusetts Commissioner of Education is charged with interpreting chapter 41. [*24]  See, e.g. the Commissioner's Update dated November 16, 1994, to which Commissioner Antonucci attached an "Advisory on School Governance" including a section entitled "Discipline and Dismissal;" Charter Schools Technical Advisory 03-1: Horace Mann Charter Schools, available at http://www.doe.mass.edu/charter/tech_advisory/03_1.h tml ("Advisory 03-1") at 6 (answering the questions "who employs the . . . principal . . . of a Horace Mann charter school?" and "who has authority over . . . dismissal of staff at a Horace Mann charter school?," Commissioner Driscoll, including Technical Advisory 98-2 in Advisory 03-1, by responding that "the charter school statute . . . provides that [chapter] 71, [sections] 41 and 42 will apply to Horace Mann charter schools. . . . With respect to dismissal, [section] 41 states, only a superintendent may dismiss a principal.'"). The Commissioner's interpretation is, therefore, entitled to some deference from this Court.n5  Franklin W. Olin College of Eng'g v. Dep't of Telecomms. & Energy. 439 Mass. 857, 862, 792 N.E.2d 980 (2003) ("We afford substantial deference to an agency's interpretation of a statute that it is charged with administering.  [*25] "); Leopoldstadt, Inc. v. Comm'r of the Div. of Health Care Fin. & Policy, 436 Mass. 80, 91, 762 N.E.2d 824 (2002) ("In general, we grant substantial deference to an interpretation of a statute by the administrative agency charged with its administration."); Amherst-Pelham Reg'l Sch. Comm. v. Dep't of Educ., 376 Mass. 480, 491, 381 N.E.2d 922 (1978) ("While an administrative or executive interpretation cannot bind the courts, weight should be given to any reasonable construction of a regulatory statute adopted by the agency charged with . . . (its) enforcement.'" (citing Sch. Comm. of Springfield v. Bd. of Educ., 362 Mass. 417, 441 n.22, 287 N.E.2d 438 (1972))).

- - - - - - - - - - - - - - - Footnotes - - - - - - - - -
- - - - - -

n5 See Morley, 1996 Mass. Super. LEXIS 304, 1996 WL 1186877 (unpublished opinion) (involving a high school principal who served in that position for approximately twelve years). The court in Morley held:Only a superintendent is permitted to dismiss or to demote a principal. As a prerequisite to dismissal, however, the superintendent must furnish the principal with a written notice of intent to dismiss with an explanation of the grounds for the dismissal, and, if [the principal] so requests . . . a reasonable opportunity . . . to review the [dismissal] decision with the superintendent. . . . The amended statute also provides that a principal . . . who has served in that position in the public schools of the district for three consecutive years shall not be dismissed or demoted except for good cause.1996 Mass. Super. LEXIS 304, *12 [WL] at *4 (alterations in original) (emphasis added).

- - - - - - - - - - - - End Footnotes- - - - - - - -
- - - - - -

[*26]

Christensen argues that in a determination of due process, this Court should consider "what process was due and whether, if given, it was constitutionally adequate." Pl.'s Opp'n at 4. "The fundamental requisite of due process is an opportunity to be heard at a meaningful time and in a meaningful manner." Matter of Kenney, 399 Mass. 431, 435, 504 N.E.2d 652 (1987). Even if Christensen, as a principal for less than three years, did not have a statutory right to hearing and arbitration -- a point this Court need not definitively decide -- Christensen's recourse here is grounded in the statutorily provided right to contract with Kingston. Christensen had "the opportunity to meet and discuss individually" her contract terms, was "employed under written contract," and the contract was for a term "up to three years in length." Further, in compliance with the statute, Kingston provided Christensen adequate written notice in mid-May of the intent to dismiss effective the end of June. The statute explicitly provides that, upon receiving such notice, "if [the principal] so requests" the principal is entitled to a review of such request with the superintendent accompanied by an attorney  [*27]  or others. Loudermill, 470 U.S. at 533 (holding that the "essential requirements of due process are notice and

an opportunity to respond"); Mass. Gen. Laws ch. 71, § 41 P 3 (emphasis added).

Though this Court understands the adverse effect of Christensen's misreading of the statute, Christensen cannot now claim a violation of procedural due process when she did not avail herself of the statutory protections it provides. Roslindale Coop. Bank v. Greenwald, 638 F.2d 258, 261 (1st Cir. 1981) ("We cannot be sympathetic to a party who elects to forego the hearing provided him, and then complains he received none. . . . Since a sufficiently timely [review] was available . . . [appellants] cannot bootstrap themselves into the federal court by failing to seek it."). Christensen's procedural due process claim is without merit.

**b. Federal and State Substantive Due Process Claims**

Again, even were this Court to assume that Christensen has a protected property interest, not all property interests are afforded substantive due process protections. n6 Coyne, 770 F. Supp. at 746-47 (quoting Roth, 408 U.S. at 577, [*28] for the proposition that "even if one assumes the existence of a property right . . . not every such right is entitled to the protection of substantive due process."). "While property interests are protected by procedural due process even though the interest is derived from state law rather than the Constitution, . . . substantive due process rights are created only by the Constitution." Ewing, 474 U.S. at 229 (Powell, J. concurring).

- - - - - - - - - - - - - - Footnotes - - - - - - - - -
- - - - - -

n6 "The Supreme Court has enunciated two alternative tests by which substantive due process is examined. Under the first theory, it is not required that the plaintiffs prove a violation of a specific liberty or property interest; however, the state's conduct must be such that it shocks the conscience.'" Coyne, 770 F. Supp. at 746 n.13 and, Pittsley v. Warish, 927 F.2d 3, 6 (1st Cir. 1991) (quoting Rochin v. California, 342 U.S. 165, 172, 173, 96 L. Ed. 183, 72 S. Ct. 205 (1952) and indicating that "the activities complained of must do more than offend some fastidious squeamishness or private sentimentalism"). Kingston's actions do not rise to this level.

"To succeed under the second theory, a plaintiff must demonstrate a violation of an identified liberty or property interest protected by the due process clause."

Coyne, 770 F. Supp. at 746 n.13 and Pittsley, 927 F.2d at 6 (citing Meyer v. Nebraska, 262 U.S. 390, 399, 67 L. Ed. 1042, 43 S. Ct. 625 (1923)). This is the theory presently before this Court.

- - - - - - - - - - - - End Footnotes- - - - - - - -
- - - - - -

**[*29]**

Further, only fundamental liberties traditionally protected by society are safeguarded by the substantive due process clause. Michael H., 491 U.S. at 122 (noting that due process only protects those liberties that are "so rooted in the traditions and conscience of our people as to be ranked as fundamental"); Harrah Indep. Sch. Dist. v. Martin, 440 U.S. 194, 198, 59 L. Ed. 2d 248, 99 S. Ct. 1062 (1979) (noting the "Fourteenth Amendment's protection of the substantive aspects' of life, liberty, and property'"); Coyne, 770 F. Supp. at 747-748 (holding an interest in a promotion did "not possess a significant resemblance to those interests previously viewed as fundamental by the Constitution").

As Magistrate Judge Cohen stated in Coyne, "violations of state statutes and contracts do[] not offend substantive due process." Coyne, 770 F. Supp. at 749. The First Circuit confirmed this conclusion, stating that "it is bedrock law in this circuit . . . that violations of state law -- even where arbitrary, capricious, or undertaken in bad faith -- do not, without more, give rise to a denial of substantive due process under the U.S. Constitution." Coyne, 972 F.2d at 444. [*30] The First Circuit has also stated in Jimenez v. Almodovar, in the substantive due process context, that a "mere breach of contractual right is not a deprivation of property without constitutional due process of law. Otherwise, virtually every controversy involving an alleged breach of contract by a government or governmental institution or agency or instrumentality would be a constitutional case." 650 F.2d 363, 370 (1st Cir. 1981) (internal citation and footnote omitted).

"To state a cause of action under the substantive due process component of the Fourteenth Amendment, one must show either that a specific liberty or property interest protected by the federal due process clause has been violated or that the state's conduct shocks the conscience.'" Coyne, 972 F.2d at 443 (citations omitted); Meyer v. Nebraska, 262 U.S. 390, 399, 67 L. Ed. 1042, 43 S. Ct. 625 (1923). Any "property interest asserted by [Christensen] . . . is, at bottom, a right weaved from the cloth of state law. It does not possess a significant resemblance to those interests previously viewed as fundamental by the Constitution." Coyne, 770 F. Supp. at 747. Christensen's claim [*31] of a

2005 U.S. Dist. LEXIS 3484

violation of her rights of substantive due process is without merit.

### 3. Christensen's Claim Under 42 U.S.C. § 1983

The section 1983 claim n7 appears ancillary to the other claims and is not addressed at great length by either party. In Pittsley, the First Circuit stated that "to prevail in an action brought under 42 U.S.C. [section] 1983, a plaintiff must show that he or she was deprived of a right, immunity, or privilege secured by the constitution or laws of the United States by a person acting under color of state law." 927 F.2d at 6 (citing Parratt v. Taylor, 451 U.S. 527, 535, 68 L. Ed. 2d 420, 101 S. Ct. 1908 (1981)); 42 U.S.C. § 1983. Christensen contends that Kingston has "not merely breached the contract" but has "eschewed the bare minimum requirements of due process." Pl.'s Opp'n at 7. This claim lacks merit. Christensen did not have a protected property interest, Pittsley, 927 F.2d at 6, and since Kingston did not violate her procedural or substantive due process rights, Christensen's section 1983 claim fails.

- - - - - - - - - - - - - - Footnotes - - - - - - - - - - - - - - -

n7 Section 1983 provides that:every person who, under color of any statute, ordinance, regulation, custom, or usage, of any State or Territory or the District of Columbia, subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law, suit in equity, or other proper proceeding for redress. . . .42 U.S.C. § 1983 (emphasis added)

- - - - - - - - - - - End Footnotes- - - - - - - - - - - - -

[*32]

### C. Christensen's Breach of Contract Claim

Christensen argues that the parties had entered a binding agreement which Kingston breached because the contract did not provide that Kingston could terminate Christensen "due to reorganization" or "due to fiscal constraints." Pl.'s Compl. at 4 PP 20-21, 5 P 28. Kingston counters that the contract is unenforceable for reasons of public policy. Kingston asserts that the reasoning of Boston Teachers Union, Local 66 v. School Comm. of Boston, 386 Mass. 197, 434 N.E.2d 1258 (1982) (involving a collective

bargaining agreement with teachers and nurses in the public education setting), applies here.

In Boston Teachers, the Supreme Judicial Court of Massachusetts decided that a job security clause binding a committee to employ a teacher for a period of time greater than one year was unenforceable due to the limitations it places on the committee's ability to make managerial decisions. 386 Mass. at 213; Defs.' Mem. at 10. The court held that "in the context of public education . . . specific appointment determinations, and decisions to abolish positions are within the exclusive managerial prerogative of a school [*33] committee." Boston Teachers 386 Mass. at 211.

Boston Teachers, however, is readily distinguishable. Boston Teachers involved teachers and nurses who were afforded the right to collective bargaining. In the case of principals, however, section 41 of the statute explicitly provides that,[HN14]school principals . . . shall not be represented in collective bargaining, but every principal shall have the opportunity to meet and discuss individually the terms and conditions of his employment in his school district with such districts's superintendent and may be represented by an attorney or other representative, and shall be employed under written contracts of employment. Such contracts shall be for terms of up to three years in length.Mass. Gen. Laws ch. 71, § 41, P 2 (emphasis added).

Here, the Massachusetts statute explicitly provides that, unlike in Boston Teachers which involved managerial decisions in the context of collective bargaining, individual contracts up to three years in duration n8 are allowed. Kingston's attempts to conjure up a public policy to nullify the contract are unavailing. Here, a [*34] valid contract apparently existed and Christensen's breach of contract claim survives Kingston's Motion to Dismiss.

- - - - - - - - - - - - - - Footnotes - - - - - - - - - - - - - - -

n8 Kingston argues that to allow contracts up to three years in duration takes away the explicit statutory authority of a superintendent to dismiss a principal. Kingston asserts that "if . . . the superintendent has the authority to dismiss a principal [under section 41], then the contract entered between the principal and the School Committee cannot be construed to effectively abrogate that authority." Defs.' Reply, at 11.

This argument is puzzling. First, the statute explicitly contemplates and allows such a contract. Second, and even more perplexing, Kingston knowingly entered



into a three-year contract with Christensen when it was free to enter into a contract of lesser duration. Defs.' Reply, at 11. Finally, the statute makes explicitly clear that a superintendent can fire a principal for good cause at any time (although a principal with more than three years tenure has the added procedural protection of review by way of arbitration). Mass. Gen. Laws ch. 71, § 41 P 2.

- - - - - - - - - - - - End Footnotes- - - - - - - - - - - -

[*35]

Just as Christensen could have bargained for contractual provisions to protect her interests, nothing precluded Kingston from negotiating a contract for a shorter term or from including provisions to protect and retain its managerial authority to make fiscal and other decisions. Were Kingston free simply to void the contract and terminate Christensen's employment, it would effectively circumvent the express language of the statute, Mass. Gen. Laws ch. 71, § 41 P 2 (allowing principals to negotiate individual contracts and allowing contracts up to three years in duration), and render Christensen an employee-at-will. Kingston was free to negotiate the length of the agreement and terms sufficient to retain its managerial authority. It must bear the consequences of its failure to do so.

Since Christensen's employment contract is not on the record before this Court in this motion to dismiss, it does no more than rule that Christensen's breach of contract claim is sufficient to withstand Kingston's Motion to Dismiss, thus warranting further review of the employment contract, its termination provisions, and the intent of the contracting parties.

**D. Christensen's [*36]    Claim for a Breach of the Implied Covenant of Good Faith and Fair Dealing**

[HN15]The implied covenant of good faith and fair dealing is viewed by some "an indispensable measure of contractual morality," Tory A. Weigand, The Duty of Good Faith and Fair Dealing in Commercial Contracts in Massachusetts, 88 Mass. L. Rev. 174 (2004) (internal quotations and citations omitted), and by others as a "chameleon." Id. (quoting Empire Gas Corp. v. American Bakeries Co., 840 F.2d 1333, 1339 (7th Cir. 1988)). n9 "Courts have often applied this rule to prevent overreaching by employers and the forfeiture by employees of benefits almost earned by the rendering of substantial services." Fortune v. National Cash Register Co., 373 Mass. 96, 105, 364 N.E.2d 1251 (1977).

- - - - - - - - - - - - - - Footnotes - - - - - - - - - - - -

n9 For a comprehensive historical and legal overview of the implied covenant of good faith and fair dealing in Massachusetts, see Weigand, 88 Mass. L. Rev. at 174-196.

- - - - - - - - - - - - End Footnotes- - - - - - - - - - - -

[HN16]In order to demonstrate a claim for the breach [*37] of the covenant of good faith and fair dealing, "the plaintiff must show that there existed an enforceable contract between the two parties." Learning Express, Inc. v. Ray-Matt Enters., Inc., 74 F. Supp. 2d 79, 84 (1999) (quoting Laser Labs, Inc., v. ETL Testing Lab., Inc., 29 F. Supp. 2d 21, 24 (D. Mass. 1998) (O'Toole, J.)); Moore v. Marty Gilman, Inc., 965 F. Supp. 203, 222 n.16 (D. Mass. 1996) (Karol, M.J.) ("A contract is a necessary element of . . . a claim of a breach of the implied covenant of good faith and fair dealing." (citation omitted)).

[HN17]Though applicable to at-will employment relationships, Fortune, 373 Mass. at 104, the covenant arises naturally out of formal contractual relationships as well. "Every contract is subject to an implied covenant of good faith and fair dealing." Anthony's Pier Four, Inc. v. HBC Assocs., 411 Mass. 451, 473, 583 N.E.2d 806 (1991) (noting that the "rule is clear in Massachusetts"); Pl.'s Opp'n at 12. "The obligation [is] to preserve the spirit of the bargain rather than the form," and "it is moreover a group of specific rules which evolved to insure that the basic [*38] purpose of contract law is carried out, the protection of reasonable expectations of parties induced by promise." See Corbin on Contracts, § 654A(A), Kaufman supp. (1984). Here, Christensen argues that the implied covenant of good faith and fair dealing provides that "neither party shall do anything that will have the effect of destroying or injuring the right of the other party to receive the fruits of the contract." Uproar Co. v. National Broad. Co., 81 F.2d 373, 377 (1st Cir. 1936) (noting "that in every contract there exists an implied covenant of good faith and fair dealing"); Anthony's Pier Four, 411 Mass. at 471, 473 (same); Pl.'s Opp'n at 12.

It is important not to read too much into the words just quoted, however, since, [HN18]while every breach of contract has the "effect of destroying or injuring the rights of the other party to receive [its] fruits," not every breach of contract is a breach of the implied covenant of good faith and fair dealing. As the law has developed, recovery under the latter theory requires

conduct taken in bad faith either to deprive a party of the fruits of labor already substantially earned or unfair leveraging [*39] of the contract terms to secure undue economic advantage. Id. at 471.

Anthony's Pier Four developed the second approach to the implied covenant. Anthony's was attempting to get out of a "lousy deal" and wanted more money. 411 Mass. at 472. Anthony's withheld needed approvals to apply pressure on the other party to the contract. Id. [HN19]Courts have agreed that the question of breach is a matter of degree. Harms suffered in a breach of the implied covenant of good faith and fair dealing generally involve deceit or "unfair subterfuge" and usually are "compounded by deceptive or unfair behavior that prevented -- or at a minimum diverted -- the injured parties from seeking immediate redress." Boston Pilots v. Motor Vessel Midnight Gambler and E. Coast Excursions, Inc., 357 F.3d 129, 135 (1st Cir. 2004).

In this instance, Christensen has not alleged that Kingston fired her in bad faith or for any reason other than the budgetary and fiscal constraints stated by it. Piantes v. Pepperidge Farm, Inc., 875 F. Supp. 929, 938 (D. Mass. 1995) (Gertner, J.) [HN20]("A mere finding that there was no good' reason for the termination in [*40] the absence of other indicia of lack of honesty or taking unfair advantage; or bad faith, is insufficient to support a claim. . . . The absence of good cause is not the equivalent of absence of good faith."); Equipment & Sys. for Indus., Inc. v. Northmeadows Constr. Co., Inc., 59 Mass. App. Ct. 931, 932, 798 N.E.2d 571 (2003) ("There is nothing in the complaint from which one might draw the reasonable inference that . . . [Kingston's actions were] done in bad faith . . . [nor to] permit an inference of a breach of an implied contract of good faith and fair dealing, implicating a dishonest purpose, consciousness of wrong, or ill will. . .").

Nor has Christensen alleged that Kingston had an "improper motive," Fortune, 373 Mass. at 101 (explaining, in an at-will employment context, that "it is clear that the contract itself reserved to the parties an explicit power to terminate the contract without cause on written notice . . . [Yet a] written contract contains an implied covenant of good faith and fair dealing, and a termination not made in good faith constitutes a breach of the contract."); Gram v. Liberty Mut. Ins. Co., 384 Mass. 659, 429 N.E.2d 21 (1981) [*41] ("Gram I"), or that its behavior was "pretextual or coercive." Christensen simply has not alleged "that [Kingston]'s actions were motivated by a desire to destroy or injure [Christensen]'s right to receive the fruits of the . . . agreement." Piantes, 875 F. Supp. at 938 (citing Anthony's Pier Four, 411 Mass. at 471-472).

The parties refer to Fortune, which involved a commercial, at -- will situation n10 in which it was held that an employer was accountable to a terminated employee for already-earned, unpaid compensation if such employee was terminated in bad faith and the compensation was connected to work already performed. 373 Mass. 96, 364 N.E.2d 1251. The implied covenant of good faith and fair dealing there was applied to address compensation for past services. Devlin v. WSI Corp., 833 F. Supp. 69, 77 (D. Mass. 1993) (articulating, in an at -- will employee context, that "the holding in Fortune . . . requires something more than bad faith. The employer must seek to deprive the . . . employee of money fairly earned and legitimately expected.'") (citations omitted); Fortune, 373 Mass. at 105 ("Courts [*42] have often applied this rule to prevent overreaching by employers and the forfeiture by employees of benefits almost earned by the rendering of substantial services."). Further, in Gram I, 384 Mass. at 671, an employer was held liable by the Supreme Judicial Court for breach of the implied covenant of good faith and fair dealing where it did not pay employee commissions the employee had earned prior to termination but which were not yet due.

- - - - - - - - - - - - - - Footnotes - - - - - - - - - -
- - - - - -

n10 For this Court's explanation of why parallels may be drawn between Christensen and an at-will employee, see supra n.4.

- - - - - - - - - - - - End Footnotes- - - - - - - -
- - - - - -

Christensen, however, does not allege that she is due compensation for past services. Def.'s Mem. at 3 P 9. Rather, Christensen seeks redress for the remainder of the contract. [HN21]"Contract damages are ordinarily based on the injured party's expectation interest and are intended to give him the benefit of his bargain by awarding him a sum of money that will, to the extent possible, put him in as good a position as he [*43] would have been in had the contract been performed." Restatement (Second) of Contracts § 347 cmt. a; VMark Software v. EMC Corp., 37 Mass. App. Ct. 610, 611 n.2, 625, 642 N.E.2d 587 (1994) (noting "that the wronged party should . . . be placed in the same position as if the contract had been performed.") (citing John Hetherington & Sons, Ltd. v. William Firth Co., 210 Mass. 8, 21, 95 N.E. 961 (1911) ("The fundamental principle of law upon which damages for

breach of contract are assessed is that the injured party shall be placed in the same position he would have been in, if the contract had been performed, so far as loss can be ascertained to have followed as a natural consequence and to have been within the contemplation of reasonable men as a probable result of the breach, and so far as compensation therefor in money can be computed by rational methods upon a firm basis of facts.")).

Full contract damages are not, however, necessarily the measure of damages for breach of the implied covenant of good faith and fair dealing, concerned as it is with Kingston's "duty of good faith and fair dealing in carrying out the terms of its agreement [*44] regarding" past services. Devlin, 833 F. Supp. at 78 (noting, in a matter involving a claim of wrongful discharge, that a termination "that is contrived to despoil an employee of earned commissions or similar compensation due for past services will qualify under Fortune."); Gram v. Liberty Mut. Ins. Co., 391 Mass. 333, 338, 461 N.E.2d 796 (1984) ("Gram II") (emphasizing its holding in Gram I, 384 Mass. at 672, that "the obligation of good faith and fair dealing imposed on an employer requires that the employer be liable for the loss of compensation that is so clearly related to an employee[at will]'s past service, when the employee is discharged without good cause"); Tufankjian v. Rockland Trust Co., 57 Mass. App. Ct. 173, 177, 782 N.E.2d 1 (2003) (holding that the bank's attempts to "sweeten the deal" and to recapture forgone contract opportunities justified a finding of a breach of the covenant).

Christensen here seeks compensation for the remainder of the contract. In Gram I, the plaintiff "was entitled to recover identifiable, reasonably anticipated future compensation, based on his past services, that he lost because of his [*45] discharge without cause." Gram II, 391 Mass. at 333 (emphasis added) (reiterating its holding in Gram I, 384 Mass. 659, 429 N.E.2d 21 (1981)). In this instance, the damages Christensen seeks are based not on past services but on the remaining term of the contract. Cf. Showstead v. Holzman, 2004 Mass. Super. LEXIS 149, No. 031561, 2004 WL 1109820, at *2 (Mass. Super. Ct. April 7, 2004) (Hely, J.) ("In this case, the facts pleaded by [Christensen] show [, if anything,] a straightforward breach of contract action based on a default by the [Committee and Noseworthy] on or before the [contract termination] date. . . . [Christensen] cannot circumvent this by calling his breach of contract action by a different name."). Kingston made a managerial decision when it eliminated Christensen's position and, while her termination may amount to a breach of its contract with her, it does not amount to a breach of the implied covenant of good faith and fair dealing.

[HN22]Courts should not view the covenant as "an unwarranted invitation . . . to impermissibly intrude into freedom of contract." Weigand at 174-175 (quoting E. Allan Farnsworth, Good Faith Performance and Commercial Reasonableness [*46] Under the Uniform Commercial Code, 30 U. Chi. L. Rev. 666, 669-670 (1962)). Nor should claims of a breach of the implied covenant of good faith and fair dealing become automatic bedfellows of breach of contract claims. It has become common practice by plaintiffs bringing breach of contact claims automatically to pursue claims for breach of the covenant of good faith and fair dealing. Often, these claims are frivolous, baseless, and perfunctory, and become unjustifiably entangled in legitimate breach of contract claims. Conceptually, claims for breach of the implied covenant of good faith and fair dealing are distinct from simple breach of contract claims and require additional factual allegations of unfairly leveraging the contract terms for undue economic advantage.

[HN23]Parties to a contract in Massachusetts still have the traditional choice: perform on the contract in good faith or withhold performance and become liable to the other for contract damages. See Weigand at 184 (noting that "parties to an arm's length . . . transaction can act in their own self-interest so long as they honor their contractual obligations"). Such redress is appropriate in a breach of contract [*47] claim. No claim for breaching an implied covenant of good faith and fair dealing need be pled unless the factual circumstances actually warrant the additional claim. n11

- - - - - - - - - - - - - - Footnotes - - - - - - - - - - - - - - - -

n11 The Court has thoroughly analyzed the similarities and differences under the law of Massachusetts between a contract claim and a claim for the breach of the covenant of good faith and fair dealing. Notwithstanding Salve Regina Coll. v. Russell, 499 U.S. 225, 231-32, 239-40, 113 L. Ed. 2d 190, 111 S. Ct. 1217 (1991) (holding that [HN24]courts of appeals "should review de novo a district court's determination of state law" explaining that this fosters judicial economy and accuracy because while district courts focus time, energy and resources on trial, appellate courts are "structurally suited to the collaborative juridical process that promotes decisional accuracy" by virtue of their primarily focus on questions of law and the benefit of multi-judge panels), recent scholarship suggests this analysis is

2005 U.S. Dist. LEXIS 3484

worth some deference. Jonathan Remy Nash, Resuscitating Deference to Lower Federal Court Judges' Interpretations of State Law, 77 So. Cal. L. Rev. 975 (2004).

- - - - - - - - - - - - End Footnotes- - - - - - - - - - - -

[*48]

## III. CONCLUSION

For the foregoing reasons, this Court rules that (1) Kingston's motion to dismiss [Doc. No. 6] Christensen's claim for a violation of federal procedural due process is ALLOWED, (2) Kingston's motion to dismiss Christensen's claim for a violation of federal substantive due process is ALLOWED, (3) Kingston's motion to dismiss Christensen's claim for a violation of 42 U.S.C. section 1983 is ALLOWED, (4) Kingston's motion to dismiss Christensen's state procedural due process claims is ALLOWED, (5) Kingston's motion to dismiss Christensen's state substantive due process claims is ALLOWED, (6) Kingston's motion to dismiss Christensen's claim for a violation of the covenant of good faith and fair dealing is ALLOWED, and (7) Kingston's motion to dismiss Christensen's breach of contract claim is DENIED.

Having gone about as far as it can go, and having dismissed all of the federal and many of the state claims, this Court remands Christensen's breach of contract claim to the Massachusetts Superior Court sitting in and for the County of Plymouth.

SO ORDERED.

WILLIAM G. YOUNG

CHIEF JUDGE

228 U.S. App. D.C. 367; 710 F.2d 878; 1983 U.S. App. LEXIS 26257

CONFERENCE OF STATE BANK SUPERVISORS, APPELLANT v. C. TODD CONOVER, COMPTROLLER
OF THE CURRENCY OF THE UNITED STATES

No. 82-1303

UNITED STATES COURT OF APPEALS FOR THE DISTRICT OF COLUMBIA CIRCUIT

228 U.S. App. D.C. 367; 710 F.2d 878; 1983 U.S. App. LEXIS 26257

December 9, 1982, Argued
June 30, 1983, Decided

**PRIOR HISTORY:** [***1]

Appeal from the United States District Court for the District of Columbia.

## CASE SUMMARY

**PROCEDURAL POSTURE:** Appellant banking association sought review of a judgment of the United States District Court for the District of Columbia, which granted summary judgment to appellee, the Comptroller of the Currency of the United States (Comptroller). The banking association had sought a declaratory judgment that the Comptroller's regulations concerning adjustable-rate mortgages (ARMs) were invalid to the extent they purport to preempt inconsistent state laws.

**OVERVIEW:** The Comptroller promulgated regulations establishing the terms on which national banks could offer or purchase ARMs. The banking association sought a declaratory judgment that the regulations were invalid because they preempted state laws restricting ARMs. The district court granted the Comptroller's motion for summary judgment. On appeal, the court affirmed. The banking association did not contest the reasonableness of the regulations. Thus, there was no need for a finding that Congress specifically intended, either explicitly or implicitly, to bestow preemptive authority. Also, the court could not disturb the Comptroller's reasonable accommodation of the conflicting policies because it appeared that Congress would have sanctioned it. Further, the Comptroller had the requisite authority to issue the regulations under 12 U.S.C.S. § 371 and 12 U.S.C.S. § 93a because national banks were permitted to offer ARMs before the regulations were promulgated. The congressional decision to upgrade the powers of national banks did not entail the altogether different proposition that Congress intended to compel national banks to be consistent with state banks.

**OUTCOME:** The court affirmed the grant of summary judgment to the Comptroller in the banking association's declaratory judgment action concerning the validity of federal adjustable-rate mortgages, which purportedly preempted inconsistent state laws.

**CORE TERMS:** regulation, state law, preemptive, mortgage, preempt, lending, preemption, legislative history, real estate, authorize, congressional intent, authority to issue, adjustable-rate, promulgate, reasonable accommodation, persuasive evidence, national banking, federal law, due-on-sale, sanctioned, requisite, preemptive effect, impermissible, confer, bestow, supremacy clause, rulemaking authority, intent to supersede, anti-redlining, accommodation

**LexisNexis(TM) Headnotes**

*Constitutional Law > Supremacy Clause*

[HN1]The preemption doctrine requires the court to examine congressional intent, which may be express or implied. The Supremacy Clause is triggered whether Congress's command is explicitly stated in the statute's language or implicitly contained in its structure and purpose.

*Constitutional Law > Supremacy Clause*

*Governments > Legislation > Interpretation*

[HN2]Courts indulge a rule of construction (not a presumption) which avoids finding a conflict between state and federal laws if at all possible.

*Administrative Law > Agency Rulemaking > Rule Application & Interpretation*

*Administrative Law > Judicial Review > Standards of Review > Arbitrary & Capricious Review*

[HN3]Federal regulations have no less pre-emptive effect than federal statutes. Where Congress has directed an administrator to exercise his discretion, his judgments are subject to judicial review only to determine whether he has exceeded his authority or acted arbitrarily. When the administrator promulgates regulations intended to pre-empt state law, the court's inquiry is similarly limited: If his choice represents a reasonable accommodation of conflicting policies that

Page 1

**5**

were committed to the agency's care by the statute, the court should not disturb it unless it appears from the statute or its legislative history that the accommodation is not one that Congress would have sanctioned.

### Banking Law > Federal Acts > Garn-St. Germain Depository Institutions Act

[HN4]Title VIII of the Garn-St. Germain Depository Institutions Act of 1982 (Act) authorizes state lenders to issue mortgages in accordance with federal regulations, and it expressly proposes thereby to eliminate the discriminatory impact on state lenders of the adjustable-rate mortgage regulations. Section 802(a)(3), (b) of the Garn-ST. Germain Depository Institutions Act of 1982.

**COUNSEL:** Arthur E. Wilmarth, Jr., James F. Bell, John A. Buchman, for Appellant.

Dina R. Lassow, U.S. Department of Justice, Stanley S. Harris, United States Attorney, Anthony J. Steinmeyer, U.S. Department of Justice, Ronald R. Glancz, L. Robert Griffin, Office of the Comptroller of the Currency, for Appellee.

Arnold M. Lerman, David R. Johnson, Daniel M. Drory, for American National Trust and Savings Association, et al., Amici Curiae urging affirmance.

**JUDGES:** Robinson, Chief Judge; Wilkey, Circuit Judge; and MacKinnon, Senior Circuit Judge.

**OPINIONBY:** PER CURIAM

**OPINION:**  [**880]  Opinion for the Court PER CURIAM.

Appellant Conference of State Bank Supervisors (the Conference) sought a declaratory judgment that regulations promulgated by the Comptroller of the Currency (the Comptroller) establishing the terms on which national banks may offer or purchase adjustable-rate mortgages (ARMs) are invalid to the extent they purport to preempt inconsistent state laws. The district court granted the Comptroller's motion for summary judgment on the ground that the challenged regulations fall within the scope [***2] of powers granted by Congress under two different acts. The Conference appeals and we affirm.

I.

The essential feature of an adjustable-rate mortgage is that the interest rate may be adjusted periodically to reflect changes in prevailing rates. The Comptroller's regulations at issue here provide that all *national* banks may offer or purchase ARMs subject to various conditions relating to the permissible amount of each increase in interest, the frequency of increases, the maximum overall interest increase, and other matters.

Adjustable-Rate Mortgages, 46 Fed. Reg. 18,932 (1981) (to be codified at 12 C.F.R. pt. 29) (JA 37-39). n1 The Comptroller described the regulations as intended to "encourage national bank participation in the residential mortgage market by facilitating the development of new mortgage instruments . . . ." *Id.* at 18,934, col. 1 (JA 28).

- - - - - - - - - - - - - - Footnotes - - - - - - - - - - - - - - - -

n1 Citations to the Joint Appendix are designated by "JA."

- - - - - - - - - - - - End Footnotes- - - - - - - - - - - - - - -

A number of states, however, have established restrictions [***3] on ARMs that conflict with the Comptroller's regulations in various respects. Believing that these state restrictions have the effect of discouraging national banks from offering ARMs, the Comptroller determined that his regulations should override inconsistent state law. *Id.* at 18,942, col. 2 (JA 36). The regulations provide generally that national banks may offer ARMs without regard to any limitations imposed by state law. In addition, the regulations preempt state laws that prohibit the charging of interest on interest and prepayment fees and that impair the enforceability of due-on-sale clauses. n2

- - - - - - - - - - - - - - Footnotes - - - - - - - - - - - - - - - -

n2 12 C.F.R. Ch. I was amended by adding a new Part 29, which provides:National banks may make or purchase adjustable-rate mortgage loans pursuant to this Part without regard to any limitations that otherwise would be imposed on adjustable-rate mortgage lending by the laws of any State, the District of Columbia, Puerto Rico, the Virgin Islands, American Samoa, or Guam, which limitations are hereby expressly preempted.

46 Fed. Rg. at 18,943, col. 1-2 (to be codified at 12 C.F.R. § 29.3) (JA 37). Specific provisions preempting state laws are embodied in other subsections of the final rule. *See id.* at 18,944, col. 1 (to be codified at 12 C.F.R. § 29.5(d)(1)) (JA 38); *id.* (to be codified at 12 C.F.R. § 29.6) (JA 38); *id.*, col. 1-2 (to be codified at 12 C.F.R. § 29.7) (JA 38).

228 U.S. App. D.C. 367; 710 F.2d 878; 1983 U.S. App. LEXIS 26257

- - - - - - - - - - - - End Footnotes- - - - - - - -
- - - - - -

[***4]

The Conference is an association composed of state government officials who are responsible for regulating *state* banks. It brought a prompt declaratory judgment action challenging the Comptroller's authority to preempt inconsistent state laws. Since it was undisputed that the banking laws conflict with the Comptroller's regulations, the only question upon which issue was joined was "whether these regulations are within the scope of the Comptroller's powers granted by Congress." n3 *Conference* [**881] *of State Bank Supervisors v. Lord, 532 F. Supp 694, 696 (D.D.C. 1982)* (JA 58). The court considered the question on cross-motions for summary judgment and the parties' written oppositions thereto.

- - - - - - - - - - - - - - Footnotes - - - - - - - - - -
- - - - - -

n3 The Comptroller also raised the threshold issue of whether the Conference has standing, but the court ruled that it did. *Id.* at 695-96 (JA 57-58). We agree that appellant has standing under *Nuesse v. Camp, 128 U.S. App. D.C. 172, 385 F.2d 694 (D.C. Cir. 1967).*

- - - - - - - - - - - - End Footnotes- - - - - - - -
- - - - - -

[***5]

The court accepted both alternative bases offered by the Comptroller as conferring the requisite rulemaking authority. First, the Comptroller relied on the rule-making power conferred by 12 U.S.C. § 371 (g), which was enacted as part of the Housing and Community Development Act of 1974, Pub. L. No. 93-383, 88 Stat. 633 (1974). Section 371 (g) provided:Loans made pursuant to this section shall be subject to such conditions and limitations as the Comptroller of the Currency may prescribe by rule or regulation. n4

Viewing the purpose of the Act as the authorization of wider real estate lending powers for national banks, *see* H.R. Rep. No. 1114, 93d Cong., 2d Sess. 44 (1974), the court reasoned that since ARMs are "real estate" loans within the meaning of 12 U.S.C. § 371(a), and the challenged regulations establish "conditions and limitations" on such loans, the Comptroller was authorized to issue the regulations under section 371(g).

- - - - - - - - - - - - - - Footnotes - - - - - - - - - -
- - - - - -

n4 This statute was superseded by the Garn-St. Germain Depository Institutions Act of 1982, Pub. L. No. 97-320, 96 Stat. 1469 (1982) (to be effective April 14, 1983). This opinion is relevant only to the period prior to passage of the Garn-St. Germain Act and covers transactions made prior thereto. The parties concede, and we agree, that this action has not been mooted by passage of the Garn-St. Germain Act.

- - - - - - - - - - - - End Footnotes- - - - - - - -
- - - - - -

[***6]

Second, the court held that the Comptroller had an independent statutory basis for issuing the regulations under 12 U.S.C. § 93a, which was enacted as section 708 of the Depository Institutions Deregulation and Monetary Control Act of 1980 (DIDMCA), Pub. L. No. 96-221, 94 Stat. 132 (1980). Section 93a provides:Except to the extent that authority to issue such rules and regulations has been expressly and exclusively granted to another regulatory agency, the Comptroller of the Currency is authorized to prescribe rules and regulations to carry out the responsibilities of the office, except that the authority conferred by this section does not apply to section 36 of this title [*i.e.*, the McFadden Act, which makes the power of national banks to branch subject to *state* law] or to securities activities of the National Banks under the Act commonly known as the "Glass-Steagall Act."

The court reasoned that the Comptroller's responsibility to ensure the safety and soundness of the national banking system under 12 U.S.C. § 481, and to carry out those provisions of federal banking law that authorize national banks [***7] to offer real estate loans, provided him with the broad authority to issue the challenged regulations.

II.

Not surprisingly, the Conference challenges both alleged bases of the Comptroller's authority. Before reaching these questions of statutory intent, however, we consider the effect of the Supreme Court's recent decision in *Fidelity Federal Savings & Loan Association v. de la Cuesta, 458 U.S. 141, 102 S. Ct. 3014, 73 L. Ed. 2d 664 (1982).* Our conclusion follows inexorably from the reasoning of the majority in *Fidelity.*

*Fidelity* upheld the preemptive effect of a Federal Home Loan Bank Board regulation which permitted federal savings and loan associations to enforce due-on-sale clauses of mortgages notwithstanding inconsistent state laws. Although *Fidelity* is factually

228 U.S. App. D.C. 367; 710 F.2d 878; 1983 U.S. App. LEXIS 26257

similar to the instant appeal, appellant seeks to distinguish the case on two grounds: (1) that the decision does not dispose of appellant's contention that courts must apply "strict scrutiny" when reviewing preemption claims, and (2) that *Fidelity* is inapposite because of the dual nature of the American banking system.

### A. The Standard of Review.

[HN1]The preemption doctrine [***8] requires us to examine congressional intent, which may be express or implied. The Supremacy [**882] Clause is triggered " 'whether Congress ' command is explicitly stated in the statute's language or implicitly contained in its structure and purpose. " *Id.* at 3022 (quoting *Jones v. Rath Packing Co.*, 430 U.S. 519, 525, 51 L. Ed. 2d 604, 97 S. Ct. 1305 (1977)). Neither party disputes these fundamental principles, but appellant insists that a "presumption against federal *administrative* preemption of state law" should apply. Brief for Appellant at 1 (emphasis added). The Conference describes this putative "presumption" as entailing the application of "*a strict standard of scrutiny* which requires *persuasive evidence* of an express or implied congressional intent contemplating preemption of state law." Appellant's Reply Brief at 14 (emphasis added). Appellant's argument is voiced sometimes as a "presumption" that can only be overcome by more "persuasive evidence," and other times as a requirement that the statute conferring rulemaking power must contain a *specific* grant of "preemptive authority." *See* Brief for Appellant at 12-13, 27-33, 49. [***9] Neither is convincing.

Appellant's assertion that a presumption runs against preemption cannot be supported, even in cases where preemption is accomplished through regulation. As *amici* have demonstrated, *see* Brief for Amici Curiae at 12-14, the authorities upon which appellant relies to support this proposition are cases that *construe* the relevant state and federal laws to determine whether there actually is a conflict between them. *See, e.g.,* *Chicago & North Western Transportation Co. v. Kalo Brick & Tile Co.*, 450 U.S. 311, 67 L. Ed. 2d 258, 101 S. Ct. 1124 (1981); *Ray v. Atlantic Richfield Co.*, 435 U.S. 151, 55 L. Ed. 2d 179, 98 S. Ct. 988 (1978). In the construction of such laws, [HN2]courts indulge a rule of construction (not a presumption) which avoids finding a conflict if at all possible. But here the conflict is undisputed. *See* Brief for Appellant at 6 ("The challenged regulations conflict with the applicable laws of a number of states . . . ."). Consequently, the "presumption" inquiry is not relevant here, for the only question before us is whether admittedly conflicting regulations are valid.

Appellant at times also [***10] contends that a regulation -- however valid in other respects -- cannot preempt state law unless there is "persuasive evidence" that Congress specifically intended to grant regulatory authority to preempt. But the Supreme Court ruled adversely upon the requirement for a special inquiry in *Fidelity*. In upholding the Federal Home Loan Bank Board's preemptive regulation, the Court considered the showing of congressional intent that must be made in order to find preemptive effect in a federal statute or regulation. The California Court of Appeals determined that Congress had not expressed an intent to preempt state due-on-sale laws, and that court refused to " 'equate the *Board's* expression of intent with the requisite *congressional* intent. '" 102 S. Ct. at 3020 (quoting 121 Cal. App. 3d 328, 175 Cal. Rptr. 467, 474 (1981) (emphasis in original)). The Supreme Court rejected as "misdirected" this "narrow focus on Congress' intent to supersede state law." n5 102 S. Ct. at 3023. Rather, the Court reasoned,

[HN3]
federal regulations have no less pre-emptive effect than federal statutes. Where Congress has directed an administrator [***11] to exercise his discretion, his judgments are subject to judicial review *only to determine whether he has exceeded his authority or acted arbitrarily. United States v. Shimer*, 367 U.S. 374, 381-382, 6 L. Ed. 2d 908, 81 S. Ct. 1554 (1961). When the administrator promulgates [**883] regulations intended to pre-empt state law, the court's inquiry is similarly limited:

"If his choice represents a reasonable accommodation of conflicting policies that were committed to the agency's care by the statute, we should not disturb it unless it appears from the statute or its legislative history that the accommodation is not one that Congress would have sanctioned." *Id.,* at 383 . . . .

*Id.* at 3022 (emphasis added). Clearly, the Court ruled that no further inquiry into intent to bestow preemptive authority is required. The preemption analysis need ask only two questions: (1) was the Comptroller's choice a "reasonable accommodation of conflicting policies" committed to his care, and (2) were the regulations within his statutory authority. The Conference does not contest the reasonableness of the regulations. As to the second [***12] question, if the regulations would *otherwise* be valid, their preemptive effect does not invalidate them *unless* Congress has expressed, either explicitly or implicitly, an intent that preemption is *not* within the Comptroller's power.

- - - - - - - - - - - - - - Footnotes - - - - - - - - -
- - - - - -

228 U.S. App. D.C. 367; 710 F.2d 878; 1983 U.S. App. LEXIS 26257

n5 Appellant attempts to minimize the Court's decision to eschew a "narrow focus on . . . intent to supersede state law" by maintaining that the Court was rejecting a requirement by the California court that "preemptive authority" be *expressly* authorized. Appellant's Reply Brief at 12 n.9. This contention cannot be supported. A reading of the California court's opinion clearly indicates, as the language of the Supreme Court's opinion suggests, that the lower court did not insist on express bestowal of preemptive authority; implied bestowal would have sufficed. *See* 121 Cal. App. 3d at 335-336, 175 Cal. Rptr. at 470-71. Therefore, the Supreme Court must have been rejecting the narrow focus of an inquiry directed at intent to bestow preemptive authority.

- - - - - - - - - - - - End Footnotes- - - - - - - - - - - -

**[***13]**

The Conference points out, however, that the *Fidelity* Court found that Congress "plainly indicated that the Board need not feel bound by existing state law." *Id.* at 3027. On the strength of this finding, appellant maintains that "nothing in the Court's decision suggests that *no* evidence of congressional intent is needed to authorize a preemptive regulation." Appellant's Reply Brief at 12 n.9 (emphasis in original). This conclusion is unsupportable. In seeking evidence that the Board had not exceeded its authority, the Court did find evidence that Congress had also contemplated and approved the possibility that the Board might promulgate regulations that would preempt state laws. But at most that finding reduces to dicta Part II of the Court's opinion, which commanded the votes of six Justices. n6 It does not permit this court to ignore the dictum, if such it be.

- - - - - - - - - - - - Footnotes - - - - - - - - - - - -

n6 Justice Powell did not participate in the consideration or decision in the case. 102 S. Ct. at 3031.

- - - - - - - - - - - - End Footnotes- - - - - - - - - - - -

There need be **[***14]** no finding, therefore, that Congress specifically intended -- either explicitly or implicitly -- to bestow preemptive authority.

B. *The Dual Nature of the Banking System* .

Appellant contends that unlike *Fidelity*, which concerned *savings and loan institutions*, the present case involves national *banks*, to which federal courts have consistently held that state laws are applicable insofar as their real estate lending activities are concerned. Appellant's Reply Brief at 16-22. But all of the cases cited by appellant involved the application of state law in the *absence* of federal regulation, where the supremacy clause had not been triggered. For example, in  *National State Bank v. Long*, 630 F.2d 981 (3d Cir. 1980), upon which appellant places much reliance to buttress its "dual-nature" argument, the court found that a state anti-redlining law was applicable to national banks because it did not conflict with federal law and would promote non-discriminatory lending, a goal already supported by Congress. The result in *Long* -- particularly after *Fidelity* -- would not have been the same had the Comptroller not acquiesced in the anti-redlining **[***15]** law by failing to promulgate a regulation preempting such laws. The line of cases appellant strings together to support its position stand only for the much narrower proposition that state laws are generally applicable to national banks only to the extent they do not conflict with federal law, whether statutory or administrative.

Therefore, *Fidelity* does apply to the present case, and the reviewing court may not disturb the Comptroller's " 'reasonable accommodation of conflicting policies . . . unless it appears from the statute or its legislative history that the accommodation is not one that Congress would have sanctioned.' " 102 S. Ct. at 3022 (quoting *United States v. Shimer*, 367 U.S. 374, 383, 6 L. Ed. 2d 908, 81 S. Ct. 1554 (1961)).

**[**884]** III.

A. *Section 371(g).*

As noted above, after this appeal was filed, section 371 was amended by section 403 of the Garn-St. Germain Depository Institutions Act of 1982. *See* note 4 *supra*. The amendment strikes the terms of section 371 and replaces them with a provision enabling national banks to make real estate loans "subject to such terms, conditions, and limitations as may be **[***16]** prescribed by the Comptroller of the Currency by order, rule or regulations." *Id.* § 403(a). This language is not substantially different from that in section 371(g), although the legislative history and the statutory setting differ. As appellant concedes, Appellant's Reply Brief at 23-24 & n.23; Appellant's Letter to the Clerk (Oct. 18, 1982), section 403 indisputably grants the Comptroller, as of April 14, 1983, the substantive rulemaking authority he claimed in promulgating the regulations at issue in this appeal. Moreover, [HN4]Title VIII of the new Act authorizes

*state* lenders to issue mortgages in accordance with federal regulations, and it expressly proposes thereby to "eliminate the discriminatory impact" on state lenders of, *inter alia*, the regulations here in dispute. *See* section 802(a)(3) and (b). Consequently, this entire appeal is moot except to the extent it affects lending activities of national banks after promulgation of the regulations (March 27, 1981) and before the effective date of the new Act (April 14, 1983).

At the same time, the old maxim that the views of one Congress ordinarily have no legal bearing on the legislative intent of another should [***17] not be ignored. It is undetermined whether section 403 was enacted in order to grant *new* authority or to clarify beyond cavil *preexisting* authority to issue the challenged regulations. In any event, we are convinced that the Comptroller had the requisite authority to issue the regulations before section 371 was amended.

Appellant offers two main arguments in support of its contention that the unamended version of section 371 does not authorize the Comptroller's preemptive regulations. First, the Conference maintains that the language and legislative history of section 371 indicate the Comptroller is permitted only to impose "*conditions and limitations*" on the lending powers of national banks, not to issue rules that would *expand* those powers. The short answer to this argument, as the Comptroller notes, is that permitting national banks to offer ARMs is not a *new* power at all. Brief for Appellee at 24-27. National banks could offer ARMs before the promulgation of these regulations. Appellant confuses the banks' preexisting power to offer new lending instruments with the Comptroller's power to preempt state laws where he concludes that they conflict with his [***18] duty to assure that national banks play an active role in extending credit to home-buyers. It is significant that, in its selective recapitulation of the legislative history of section 371, appellant omits the following sentence from the report by the House Committee on Banking and Currency:The primary purpose of this provision is to improve and update the mortgage investment tools of national banks to assist them in their efforts to respond to the demands of the real estate industry.

H.R. Rep. No. 93-1114, 93d Cong., 2d Sess. 44 (1974). This clearly authorizes the Comptroller to regulate the terms and conditions of mortgages.

Second, appellant contends that Congress adopted section 371 in order to preserve "competitive equality" between the state and national banking systems. Since these regulations place state banks at a disadvantage vis a vis national banks in those states that regulate ARMs more restrictively than do the new federal regulations, the regulations will frustrate the congressional goal of achieving "parity." But this argument never gets beyond its faulty premise.

Appellant quotes the same House Committee report (and omits the sentence quoted [***19] above, notwithstanding that it immediately precedes the passage appellant relies on), which explains that "the addition of these provisions would place national banks [**885] on a par with state chartered commercial banks *and other financial institutions.*" *Id.* (emphasis added). But the argument is a non sequitur; a congressional decision to upgrade the powers of national banks because they were at a competitive disadvantage does not entail the altogether different proposition that Congress intended to compel national banks to move in lockstep with state banks. Moreover, as the Comptroller notes, the very fact that congressional action was necessary "to place national banks on a par" with state institutions shows that equality is not contemplated by section 371. If national banks had been governed by state law before section 371 was enacted, the scope of their lending activities would have *matched* those of state institutions and no federal legislation would have been required.

Finally, the inclusion of "other financial institutions" in the quoted passage compels the conclusion that Congress did not intend to codify the rigid "parity" appellant suggests, for this phrase [***20] also embraces savings and loan associations, whose governance by preemptive federal regulations the Supreme Court has already sanctioned in *Fidelity*. Appellant's position, therefore, squarely contradicts the decision in *Fidelity*.

We conclude that section 371(g) confers authority to promulgate these regulations.

*B. Section 93a.*

This section also provides statutory authority for issuing the ARM regulations. Appellant denigrates this provision as a grant of authority to issue only "housekeeping" procedural regulations, but this argument is unconvincing. Appellant quotes a remark by Senator Proxmire (who was floor manager of the bill that added this provision) in which he assured the Senate that section 93a "carries with it no new authority to confer on national banks powers which they do not have under existing law." Brief for Appellant at 50-51 (quoting 126 Cong. Rec. S. 3172 (daily ed. March 27, 1980)). But as we have already noted, these regulations do *not* confer any new powers on national banks, since the Act imposed no restrictions on ARMs. Rather, the regulations control the terms under which banks may offer ARMs. That the Comptroller also saw fit to [***21] preempt those

228 U.S. App. D.C. 367; 710 F.2d 878; 1983 U.S. App. LEXIS 26257

state laws that conflict with his responsibility to ensure the safety and soundness of the national banking system, *see* 12 U.S.C. § 481, does not constitute an expansion of the powers of national *banks* .

Similarly, appellant's recitation of other scattered bits of legislative history does not support the proposition that section 93a can form no basis for the challenged regulations. In every instance, the proffered legislative materials contain statements that the section grants no new substantive powers to *banks*. For example, appellant quotes from the conference report on DIDMCA, which stated that section 93a "carries no authority [enabling the Comptroller] to permit otherwise impermissible activities *of national banks* with specific reference to the provisions of the McFadden Act and the Glass-Steagall Act." H.R. Rep. No. 842, 96th Cong., 2d Sess. 83 (1980) (emphasis added) (quoted in Appellant's Reply Brief at 33 n.40). Furthermore, as the "specific reference" to the McFadden and Glass-Steagall Acts indicates, the "impermissible activities" which the Comptroller is not empowered to permit are activities that are impermissible [***22] under federal, not state law. It bears repeating that the entire legislative scheme is one that contemplates the operation of state law only in the absence of federal law and where such state law does not conflict with the policies of the National Banking Act. So long as he does not authorize activities that run afoul of federal laws governing the activities of the national banks, therefore, the Comptroller has the power to preempt inconsistent state law.

IV.

For the foregoing reasons the decision of the district court is affirmed.

*Judgment accordingly.*

161 U.S. 275; 16 S. Ct. 502; 40 L. Ed. 700; 1896 U.S. LEXIS 2162

## DAVIS v. ELMIRA SAVINGS BANK.

### No. 415.

### SUPREME COURT OF THE UNITED STATES

161 U.S. 275; 16 S. Ct. 502; 40 L. Ed. 700; 1896 U.S. LEXIS 2162

Argued January 13, 14, 1896.
March 2, 1896, Decided

**PRIOR HISTORY:** [****1]

ERROR TO THE COURT OF APPEALS OF THE STATE OF NEW YORK.

IN March, 1893, the Elmira National Bank, a banking association organized under the laws of the United States, and doing business in the State of New York, suspended payment, and the Comptroller of the Currency of the United States appointed Charles Davis, plaintiff in error, the receiver thereof.The Elmira Savings Bank, which was incorporated under the laws of the State of New York, from November, 1890, kept a deposit account with the Elmira National Bank, and at the time of the appointment of the receiver of the latter corporation there was to the credit of this account of the Savings Bank the sum of $42,704.67. The opening of the deposit account by the Savings Bank was sanctioned by the general banking laws of the State of New York, as expressed in sections 118 and 119 of chapter 689 of the laws of 1892, which were as follows:

2 Laws of 1892, p. 1898, c. 689.   "§ 118. AVAILABLE FUND FOR CURRENT EXPENSES, HOW LOANED. -- The trustees of every such corporation shall as soon as practicable invest the moneys deposited with them in the securities authorized by this article; but for the purpose of meeting current payments [****2] and expenses in excess of the receipts, there may be kept an available fund not exceeding ten per centum of the whole amount of deposits with such corporation, on hand or deposit in any bank in this State organized under any law of this State or of the United States, or with any trust company incorporated by any law of the State; but the sum so deposited in any one bank or trust company shall not exceed twenty-five per centum of the paidup capital and surplus of any such bank or company. . . ."

Id. "§ 119. TEMPORARY DEPOSITS. -- Every such corporation may also deposit temporarily in the banks or trust companies specified in the last section the excess of current daily receipts over the payments,

until such time as the same can be judiciously invested in the securities required by this article. . . ."

In the process of liquidating the affairs and realizing the assets of the National Bank all its circulating notes were provided for, and the receiver had on hand in cash for distribution among its creditors a sum exceeding the amount due as aforesaid to the Savings Bank. Thereupon the latter demanded of the receiver payment of the sum to the credit of its deposit account in preference [****3] to the other creditors of the National Bank, basing its demand on a provision of the general banking law of the State of New York, which is as follows:

Id. 1903.  "§ 130. DEBTS DUE SAVINGS BANKS FROM INSOLVENT BANKS PREFERRED. -- All the property of any bank or trust company which shall become insolvent shall, after providing for the payment of its circulating notes, if it has any, be applied by the trustees, assignees or receiver thereof, in the first place, to the payment in full of any sum or sums of money deposited therewith by any savings bank, but not to an amount exceeding that authorized to be so deposited by the provisions of this chapter, and subject to any other preference provided for in the charter of any such trust company."

The receiver, under the authority of the Comptroller of the Currency of the United States, declined to accede to this demand, predicating his refusal on the provisions of sections 5236 and 5242 of the Revised Statutes of the United States, which are as follows:

"§ 5236. From time to time, after full provision has been first made for refunding to the United States any deficiency in redeeming the notes of such association, the Comptroller shall [****4] make a ratable dividend of the money so paid over to him by such receiver on all such claims as may have been proved to his satisfaction or adjudicated in a court of competent jurisdiction, and, as the proceeds of the assets of such association are paid over to him, shall make further dividends on all claims previously proved or adjudicated; and the remainder of the proceeds, if any, shall be paid over to the shareholders of such

association, or their legal representatives, in proportion to the stock by them respectively held."

"§ 5242. All transfers of the notes, bonds, bills of exchange or other evidences of debt owing to any national banking association, or of deposits to its credit; all assignments of mortgages, sureties on real estate, or of judgments or decrees in its favor; all deposits of money, bullion or other valuable thing for its use or for the use of any of its shareholders or creditors; and all payments of money to either, made after the commission of an act of insolvency, or in contemplation thereof, made with a view to prevent the application of its assets in the manner prescribed by this chapter, or with a view to the preference of one creditor to another, except [****5] in payment of its circulating notes, shall be utterly null and void. . . ."

In consequence of this refusal the Savings Bank brought an action in the Supreme Court of the State of New York to enforce the payment by preference, which action was resisted by the receiver. Ultimately the case was taken to the Court of Appeals of the State of New York, where the claim of preference, asserted by the Savings Bank, was maintained. The case is reported in 142 N.Y. 590. To that judgment the present writ of error is prosecuted.

## CASE SUMMARY

**PROCEDURAL POSTURE:** Plaintiff in error, a receiver for an insolvent national bank, appealed from order of the Court of Appeals of the State of New York, which maintained a claim of preference made by defendant in error savings bank.

**OVERVIEW:** A savings bank incorporated in New York kept a deposit account with a national bank organized under federal law. The national bank became insolvent. Savings bank demanded the receiver pay them in preference to other creditors based on the law of New York. The receiver refused based on the United States Revised Statutes § 5236 and § 5242 which required a ratable dividend of the money paid on all claims. Although the lower courts maintained the claims, the Court held that the prohibition of the constitution against state laws impairing the obligation of contracts applied to implied and express contracts. Court found that these two statutes conflicted and that the law of New York was void. Court found that the ratable distribution provided by Congress was to provide for equal distribution of the assets among all unsecured creditors in the event of insolvency. The savings bank was an ordinary creditor asserting rights to preference based on state law. The claim which existed unsecured at the time of the insolvency was not converted after the insolvency into a preferred claim to

be paid by preference over other creditors because conversion would defeat the act of Congress.

**OUTCOME:** The court reversed the judgment and remanded the case with directions to dismiss the action because the state statute which provided a greater preference at the time of insolvency conflicted with the federal statute, and the state statute became void.

**CORE TERMS:** insolvency, ratable distribution, national bank, deposit, state statute, insolvent, belong, savings bank, ratable, duty, insolvent bank, state law, insolvent national bank, distributed, sanctioned, directing, dividend, receiver, particular contract, legal relation, deprived, speaking, set-off, general creditors, manner prescribed, act of insolvency, public policy, first place, money paid, subject-matter

## LexisNexis(TM) Headnotes

*Banking Law > National Banks > Bank Powers*

[HN1]National banks are instrumentalities of the Federal government, created for a public purpose, and as such necessarily subject to the paramount authority of the United States.

*Banking Law > National Banks > Bank Powers*

[HN2]An attempt by a State to define a national bank's duties or control the conduct of a national bank's affairs is absolutely void, wherever such attempted exercise of authority expressly conflicts with the laws of the United States, and either frustrates the purpose of the national legislation or impairs the efficiency of these agencies of the Federal government to discharge the duties, for the performance of which they were created.

*Banking Law > Federal Acts > National Bank Act*

[HN3]One of the objects of the national bank system was to secure, in the event of insolvency, a just and equal distribution of the assets of national banks among all unsecured creditors, and to prevent such banks from creating preferences in contemplation of insolvency.

*Banking Law > Bank Activities > Bank Accounts > Deposit Accounts*

[HN4]The deposit of money by a customer with his banker is one of loan, with a superadded obligation that the money is to be paid when demanded by a check.

*Banking Law > National Banks > Capitalization & Dividends*

[HN5]The requirement as to ratable dividends is to make them from what belongs to the bank, and that

which at the time of the insolvency belongs of right to the debtor, does not belong to the bank.

*Banking Law > National Banks > Capitalization & Dividends*

[HN6]Funds received by a national bank, which the party depositing had no authority of law to deposit, were not part of the assets to be ratably distributed, but must be returned in full to the rightful owner.

*Banking Law > National Banks > Bank Powers*

*Constitutional Law > Supremacy Clause*

[HN7]Nothing is intended to deny the operation of general and undiscriminating state laws on the contracts of national banks, so long as such laws do not conflict with the letter or the general objects and purposes of Congressional legislation.

**LAWYERS' EDITION HEADNOTES:**
Preference by insolvent national bank. --

Headnote:
A preference, under the New York law, of the debt of an insolvent national bank for a deposit by a savings bank, is invalid under U. S. Rev. Stat. 5236, 5342, which require a ratable distribution of the assets of insolvent national banks, and prohibit preferences made in contemplation of or after committing an act of insolvency.

**SYLLABUS:** Section 130 of chapter 689 of the laws of New York of 1892, providing for the payment by the receiver of an insolvent bank, in the first place, of deposits in the bank by savings banks, when applied to an insolvent national bank, is in conflict with § 5236 of the Revised Statutes of the United States, directing the Comptroller of the Currency to make ratable dividends of the money paid over to him by such receiver, on all claims proved to his satisfaction, or adjudicated in a court of competent jurisdiction, and is therefore void when attempted to be applied to a national bank.

**COUNSEL:** Mr. Edward Winslow Paige for plaintiff in error.

Mr. Augustus S. Hutchins [****6] filed a brief on behalf of the Metropolitan Savings Bank.

Mr. James C. Carter and Mr. Edward G. Herendeen for defendant in error.

The Court of Appeals of New York held in this case that the New York statute applies to national as well as to state banks. This construction is, of course, binding on this court. Christy v. Pridgeon, 4 Wall. 196; People v. Weaver, 100 U.S. 539.

Clearly the legislature intended that national banks should be on the same footing as state banks as to right to receive deposits of savings banks. But this intention would wholly fail of purpose, if such deposits were preferred when held by insolvent state banks and were not preferred when held by insolvent national banks.

That act is within the proper sphere of state legislation. The theory upon which the constitutionality of national bank legislation was finally upheld, is a narrow one, necessarily involving sharp and closely confined limitations. Of the cases on this subject, the leading one is National Bank v. Commonwealth, 9 Wall. 353. From the opinion in that case, the United States Supreme Court, in so recent a case as Western Union Tel. Co. v. Massachusetts, 125 U.S. 530, 551, referring to such [****7] limitation, quotes approvingly as follows: "That limitation is that the agencies of the Federal government are only exempted from state legislation, so far as that legislation may interfere with or impair their efficiency in performing the functions by which they are designed to serve that government. Any other rule would convert a principle founded alone on the necessity of securing to the government of the United States the means of exercising its legitimate powers, into an unauthorized and unjustifiable invasion of the rights of the States. . . . So of the banks. They are subject to the laws of the State, and are governed in their daily course of business far more by the laws of the State than of the nation. All their contracts are governed and construed by state laws. Their acquisition and transfer of property, their right to collect their debts, and their liability to be sued for debts, are all based on state law. It is only when the state law incapacitates the banks from discharging their duties to the government that it becomes unconstitutional." See also Waite v. Dowley, 94 U.S. 527.

The contract which the state statute compelled the bank to make with the defendant [****8] in error in this case is one made in respect to an ordinary transaction between the bank and a depositor. Such a contract in no respect impairs the utility of the national bank as an agent of the United States, and is to be considered as made with reference to the law of the State, and as subject to its provisions. Odgen v. Saunders, 12 Wheat. 213; Baldwin v. Hale, 1 Wall. 223; Von Hoffman v. Quincy, 4 Wall. 535, 550. The highest court of the State has decided that it gave to the defendant in error an equitable lien which operated as an equitable assignment of the assets of the national bank upon insolvency for the purpose of securing the payment of the deposit in full, and that construction is binding on this court. Louisiana v. Pillsbury, 105 U.S. 278; Morley v. Lake Shore & Michigan Southern Railway, 146 U.S. 162, 166.

161 U.S. 275; 16 S. Ct. 502; 40 L. Ed. 700; 1896 U.S. LEXIS 2162

It is not material that the fund so assigned should be in existence. Peugh v. Porter, 112 U.S. 737, 742. According to the general doctrine of equity, established beyond any doubt by the highest judicial authority, the equitable assignment or the equitable lien upon property to be acquired in the future, is valid and enforceable not only against the contracting [****9] party himself, but also against subsequent judgment creditors, assignees in bankruptcy, and all other volunteers claiming or holding under him and against subsequent purchasers from him with notice of the assignment or lien. When chattels are sold or exchanged, the lien will attach to those substituted. 3 Pom. Eq. Jur. § 1291.

Assignees in bankruptcy take only such rights as the bankrupt had, and are affected with all the equities which would affect the bankrupt himself. Courts of equity support assignments of choses in action, interests and expectations not only, but also of things which have no present actual potential existence but rest in mere possibility only.

An agreement to charge, or to assign, or to give security upon, or to affect property not yet in existence, or in the ownership of the party making the contract, or property to be acquired by him in the future . . . constitutes an equitable lien upon the property so existing or acquired at a subsequent time, which is enforced in the same manner and against the same parties as a lien upon specific things existing and owned by the contracting party at the date of contract. 3 Pom. Eq. Jur. §§ 1236, 1237.

This equitable [****10] assignment only differs from a pledge in that the fund is not yet definitely fixed. Such a pledge or mortgage is permitted when made for present consideration, though it may operate to give a preference. So the present assignment of a fund to be thereafter definitely ascertained, must be permitted, though it operate as a preference.

This constitutes a present right of property which the legislature cannot constitutionally impair. Mather v. Bush, 16 Johns. 233, 252; Roosevelt v. Cebra, 17 Johns. 108; Sturges v. Crowninshield, 4 Wheat. 122, 198.

Any statute is unconstitutional as impairing the obligation of contracts which introduces a change into the express terms of the contract, its legal construction, its validity, its discharge, or (within certain limits) its enforcement.

The prohibition of the Constitution against state laws impairing the obligation of contracts, applies to implied as well as to express contracts. Fisk v. Jefferson Police Jury, 116 U.S. 131.

In any case the lawful repeal of a statute cannot constitutionally be made so as to destroy contracts which have been entered into under it, or to affect substantially the rights obtained by virtue of the statute. [****11] Cooley's Const. Lim., 3d ed., pp. 289, 290, 291, and 292.

The right of the Savings Bank to deposit in the National Bank only existed by permission of the statute. That permission is conditioned on an equitable assignment, as collateral security for the deposit, of the assets of the National Bank on hand at the time of its insolvency.

The contract made by the operation of the state statute between the Savings Bank and the National Bank at the time the deposit was made, constituting an equitable lien or equitable assignment, is not in conflict with the national bank act, or with any provision of any Federal statute. The Federal statute has been construed to recognize all prior equitable and legal liens. Scott v. Armstrong, 146 U.S. 499.

It has been uniformly held that the receiver is a statutory assignee of the bank, and gets no better title than the bank had, and takes the funds in the plight in which they were held by the bank immediately prior to his appointment, and must turn them over accordingly unaffected by the provisions of the national bank act, as to ratable distribution. He takes the property cum onere.

In Scott v. Armstrong, this court held that the receiver [****12] of a national bank took the assets as a mere trustee and not as a purchaser for value; and that in the absence of a statute to the contrary, demands and choses in action which belonged to the bank were in his hands subject to all claims and advances that might have been interposed as against the bank before the liens of the United States and general creditors attached.

Even under the stringent provisions of non-preferential bankrupt laws, it has been uniformly held that collateral given at the time of the passing of a present sufficient consideration, even though the possibility, or even probability, of future insolvency was in the minds of the parties at the time, will be sustained, and contractual rights or equities existing at such a time will be afterward upheld when insolvency occurs.

The contract in question was not made in contemplation of insolvency. The lien created by it was not a secret lien.It worked no harm to other depositors. Without it the bank could not have obtained the deposit. The National Bank might have refused to accept the deposit under these terms, but the Savings Bank had no discretion. It could only deposit upon the conditions of this statutory contract.

[****13] The use of that deposit was to the advantage of all of the depositors of the depository bank. The assets of the bank were thus increased by every dollar for which the lien is claimed, and no harm could possibly result by this transaction to the other creditors of the bank.

It is no answer to the contention of the defendant in error in this case to say that such a contract could be made with every one and proportionate distribution thereby defeated. We are dealing with a right given by the State of New York to one class of creditors only; a right founded in the highest conception of public policy, and in line with the theory of all savings bank legislation, which is to surround the funds of savings banks with every possible protection. The Savings Bank is limited in its powers. It is not permitted to make any other contract of deposit with the National Bank. If this case should be held to be an exception to a general rule it would work no harm, for it would be an exception founded upon the broad principles of public policy and justice.

OPINIONBY: WHITE

OPINION: [*283] [**503] [***701] MR. JUSTICE WHITE, after stating the case, delivered the opinion of the court.

[HN1]National [****14] banks are instrumentalities of the Federal government, created for a public purpose, and as such necessarily sugject to the paramount authority of the United States. [HN2]It follows that an attempt, by a State, to define their duties or control the conduct of their affairs is absolutely void, wherever such attempted exercise of authority expressly conflicts with the laws of the United States, and either frustrates the purpose of the national legislation or impairs the efficiency of these agencies of the Federal government to discharge the duties, for the performance of which they were created. These principles are axiomatic, and are sanctioned by the repeated adjudications of this court.

The question which the record presents is, does the law of the State of New York on which the Savings Bank relies conflict with the law of the United States upon which the [**504] Comptroller of the Currency rests to sustain his refusal? If there be no conflict, the two laws can coexist and be harmoniously enforced, but if the conflict arises, the law of New York is from the nature of things inoperative and void as against the dominant authority of the Federal statute. In examining the question [****15] it is well to put in juxtaposition a summary statement of the Federal and state statutes. The first directs the Comptroller "from time to time, after full provision has been made for the refunding to the United States of any deficiency in

redeeming the notes of such association, . . . to make a ratable dividend of the money paid over to him . . . on all such claims as may have been proved." The second, the state law, directs "the trustee, assignee or receiver" of "any bank or trust company which shall become insolvent" to apply the assets received by him, "in the first place to the payment in full of any sum or sums of money deposited therewith by any savings bank, but not to an amount exceeding that authorized" by law.

It is clear that these two statutes cover exactly the same subject-matter. Both relate to insolvent banks; both ordain [*284] that the right of preference on the one side and the duty of ratable distribution on the other shall only result from insolvency; both cover the assets of such banks coming, after insolvency, into the hands of the officer or person authorized to administer them. It is equally certain that both statutes relate to the same duty on the [****16] part of the officer of the insolvent bank; the one directs the representative to make a ratable distribution; the other requires, if necessary, the application of the entire assets to payment in full, by preference and priority over all others of a particular and selected class of creditors therein named. We have, therefore, on the one hand, the statute of the United States, directing that the assets of an insolvent national bank shall be distributed by the Comptroller of the Currency in the manner therein pointed out, that is, ratably among the creditors.We have on the other hand, the statute of the State of New York giving a contrary command. To hold that the state statute is operative is to decide that it overrides the plain text of the act of Congress. This results, not only from the fact that the two statutes, as we have said, cover the same subject-matter, and relate to the same duty, but also because there is an absolute repugnancy between their provisions, that is, between the ratable distribution, commanded by Congress, and the preferential distribution directed by the law of the State of New York.

The conflict between the spirit and purpose of the two statutes is as [****17] pronounced as that which exists between their unambiguous [HN3]letter. It cannot be doubted that one of the objects of the national bank system was to secure, in the event of insolvency, a just and equal distribution of the assets of national banks among all unsecured creditors, and to prevent such banks from creating preferences in contemplation of insolvency. This public aim in favor of all the citizens of every State of the Union is manifested by the entire context of the national bank act.

In Cook County National Bank v. United States, 107 U.S. 445, 448, speaking through Mr. Justice Field, the court said: "We consider that act as constituting by itself a complete system for the establishment and

government of national [*285] banks. . . . Everything essential to the formation of the banks, the issue, security and redemption of their notes, the winding up of the institutions, and the distribution of their assets, are fully provided for."

In National Bank v. Colby, 21 Wall. 609, 613, 614, the court said:

"As to the general creditors, the act evidently intends to secure equality among them in the division of the proceeds of the property of the bank. . . .

"The fifty-second [****18] section, further to secure this equality, declares that all transfers by an insolvent bank of its property of every kind, and all payments of money made after the commission of an act of insolvency, or in contemplation thereof, with a view to prevent the application of its assets in the manner prescribed by the act, or 'with the view to the preference of one creditor over another, except in the payment of its circulating notes,' shall be utterly null and void.

"There is in these provisions a clear manifestation of a design on the part of Congress: 1st, [***702] to secure the government for the payment of the notes, not only by requiring, in advance of their issue, a deposit of bonds of the United States, and by giving to the government a first lien for any deficiency that may arise on all the assets subsequently acquired by the insolvent bank; and, 2d, to secure the assets of the bank for ratable distribution among its general creditors.

"This design would be defeated if a preference in the application of the assets could be obtained by adversary proceedings."

Nearly twenty-five years ago (in September, 1871) the Secretary of the Treasury submitted to the Attorney General [****19] of the United States the question of whether the ratable division provided for in the act of Congress deprived the United States, as a creditor of an insolvent national bank, of the power to avail of the preference given by the statute, which provides that the United States shall be preferred out of the effects of an insolvent debtor. (Act of March 3, 1797, c. 20, § 5, 1 Stat. 515.) The opinion of the Attorney General was that the ratable distribution required, when read in connection with other [*286] sections of the national bank law, deprived the United States of all preference, except that given for the payment of the notes issued by such banks. 13 Opinions, 528.

This construction has been the rule administered by the Comptrollers of the Currency in the liquidation of national banks, from that [**505] date, and was directly sustained in Cook County National Bank v.

United States, ubi supra, where Mr. Justice Field, as the organ of the court, said: "The sections directing ratable distribution provide for the distribution of the entire assets of the bank, giving no preference to any claim, except for moneys to reimburse the United States for advances in redeeming the [****20] notes." After holding that the United States could not exercise as a creditor the preference in its favor created by a general law of the United States, the conclusion is thus summed up: "These provisions could not be carried out if the United States were entitled to priority in the payment of a demand not arising from advances to redeem the circulating notes. The balance, after reimbursement of the advances, could not be distributed as directed by ratable dividends to all holders of claims, that is, to all creditors." Thus, although for many years in the administration of the act, under a construction given by the Attorney General of the United States, sanctioned by the decisions of this court, the ratable distribution provided by the act of Congress has been deemed so important as to repeal, in so far as it prevented ratable distribution, the general preference given the United States by its own statute, the contention now advanced maintains that this ratable distribution is of so little consequence that it can be overthrown and rendered nothing worth, by the provisions of a general insolvent statute of the State of New York. In other words, that the statute of the State of New [****21] York operating upon the national bank law is more efficacious than would be a statute of the United States.

Nor is it an answer to say that the ratio decidendi of the ruling in Cook County National Bank v. United States was the fact that the statute provided that the United States should take security for the debts to become due them by a national bank. In the case presented by the Secretary of the [*287] Treasury to the Attorney General for consideration the security in favor of the United States was inadequate, and therefore the question which arose was the right of the United States to collect an unsecured claim in disregard of the rule of ratable division. And such was the state of facts contemplated by the opinion of this court in the Cook County case. This makes it evident that the controlling thought which gave rise to the interpretation sanctioned by this court was the fact that to have allowed the preference in favor of the United States ordained by one of its statutes would have destroyed the rule of ratable distribution established as a protection to and for the benefit of all the creditors of a national bank.

It is certain, that in so far as not repugnant to [****22] acts of Congress, the contracts and dealings of national banks are left subject to the state law, and upon this

undoubted premise, which nothing in this opinion gainsays, the proposition is advanced that the deposit here considered of the Savings Bank with a national bank imported a contract to pay the claim of the former with the preference allowed by the New York statute. But this overlooks the plain terms of the New York law. That statute does not profess to deal with the bank and its relations as a going concern; it wholly and exclusively undertakes to regulate the distribution of the assets after insolvency. Insolvency, and insolvency alone, is made the criterion from which the preference is to arise. Indeed, the statute, in terms, directs its mandate to discharge the claim with preference, not to the bank eo nomine, but to the assignee, trustee or agent, charged with administering its effects after insolvency has become flagrant. The claim of contract, therefore, conflicts with the very terms of the statute upn which it is based, and there is, therefore, no room for implying a contract. If such implication, however, could be invoked it must rest on the contention that inasmuch [****23] as the state statute gave a savings bank making a deposit the right to be preferred in case of insolvency, therefore the general state law must be presumed to have entered into the contract of the parties, and hence also engender the presumption that [*288] in case of insolvency such deposit should be preferred. If the law of the State is to be read into the contract, then, of course, the law of Congress should also be read into it. We should thus have to consider all the deposits as made with an implication that they were subject to the Federal law, and hence the conflict between the two laws would become evident, and the Federal law, being paramount, would prevail.

The New York statute does not profess, however, to change the legal relation which results from a deposit made in a bank. [HN4]The deposit of money by a customer with his banker is one of loan, with a superadded obligation that the money is to be paid when demanded by a check. Scammon v. Kimball, 92 U.S. 362; Marine Bank v. Fulton Bank, 2 Wall. 252. The argument, therefore, of implied contract, not only is contrary to the letter of the New York statute, but also destroys the very [***703] essence of the legal [****24] relation resulting from the dealings between the parties. Nor is the repugnancy between the state statute and the act of Congress removed by the contention that inasmuch as ratable distribution applies only to that which belongs to the bank, therefore there is no conflict between the state statute and the act of Congress. This argument can only mean that the effect of the state statute is to make the Savings Bank, in the event of insolvency of the National Bank, the owner of a sum equivalent in amount to the sum of money which was by it deposited. But to say this aggravates

the conflict between the state law and the act of Congress. If the state statute is to be read as saying that whenever the persons named therein deposit money with a national bank they shall be treated as the owners of an equal sum of the assets of the bank when it becomes insolvent, then the state statute precludes, [**506] in a most flagrant way, the possibility of the ratable distribution ordered by the act of Congress. True it is that where, by state law, a lien is made to result from a particular contract, that lien, when its existence is not incompatible with the act of Congress, will be enforced. True, [****25] also, where a particular contract is made by a national bank which from its nature gives rise at the time of the contract to a claim on a specific fund, such claim, if not violative [*289] of the act of Congress will be allowed. To that effect are the authorities relied on.

Thus it was said by this court in Scott v. Armstrong, 146 U.S. 499, when dealing with the question of set-off: "[HN5]The requirement as to ratable dividends is to make them from what belongs to the bank, and that which at the time of the insolvency belongs of right to the debtor, does not belong to the bank." So in the case of San Diego County v. California Nat. Bank, 52 Fed. Rep. 59, it was decided that the [HN6]funds received by a national bank, which the party depositing had no authority of law to deposit, were not part of the assets to be "ratably distributed," but must be returned in full to the rightful owner. And, again in Massey v. Fisher, 62 Fed. Rep. 958, which was a case where an endorser paid the amount of a note to a bank and took a receipt, but before he took the note from the bank the bank failed, the substance of the decision was, that the money did not belong to the bank, but was held by it in trust; [****26] and, of course, in that case, it was not part of its assets.

None of these cases are apposite here. On the contrary, by an affirmative, pregnant with a negative, they deny the preference which is now advanced. This clearly results from the context of the opinions in these cases. They all reason to demonstrate that from the particular facts stated the relation was not that of an ordinary creditor, but was one giving rise to a specific lien or right resulting from the contract, and which was in being before the insolvency took place. Here there is no such condition; there is simply an ordinary creditor asserting the right to a preference arising from an insolvent law. This distinction is well illustrated by Scott v. Armstrong, supra, cited and relied on in the opinion of the court below. In that case the facts as to the set-off, which was allowed, are thus stated: "The credits between the banks were reciprocal and were parts of the same transaction, in which each gave credit to the other on the faith of the simultaneous credit, and the principle applicable to mutual credits applied."

161 U.S. 275; 16 S. Ct. 502; 40 L. Ed. 700; 1896 U.S. LEXIS 2162

The difference between Scott v. Armstrong and the present [*290] case is this: There this [****27] court was called on to determine whether a claim which had been extinguished, by operation of law, prior to the insolvency was still due after the insolvency, but here the question is whether a claim existing at the time of the insolvency and up to that date unsecured shall, by the operation of an insolvent statute, be converted after the insolvency into a preferred claim to be paid by preference over all other creditors. This distinction between the two questions was clearly stated in Scott v. Armstrong, where, speaking through Mr. Chief Justice Fuller, this court said: "The state of case where the claim sought to be off-set is acquired after the act of insolvency, is far otherwise for the rights of the parties become fixed as of that time, and to sustain such a transfer would defeat the objects of these provisions (the act of Congress). The transaction must necessarily be held to have been entered into with the intention to produce its natural result, the preventing of the application of the insolvent assets in the manner prescribed. Venango National Bank v. Taylor, 56 Penn. St. 14; Colt v. Brown, 12 Gray, 233."

[HN7]Nothing of course, in this opinion is intended to deny the operation [****28] of general and undiscriminating state laws on the contracts of national banks, so long as such laws do not conflict with the letter or the general objects and purposes of Congressional legislation. Much was said in argument as to the public policy embodied in the law of the State of New York and the wisdom of upholding it. Our function is judicial and not legislative. Did we, however, consider motives of public policy, we should not be unmindful of the wise safeguard, in favor of all the people of the United States, resulting from the provision which secures to every one dealing with a national bank a ratable distribution of the assets thereof, thereby stimulating confidence and uniformity of treatment.

Judgment reversed and case remanded to the Court of Appeals of the State of New York with instructions to remit the cause to the court in which it originated with directions to dismiss the action.

212 B.R. 716; 1997 Bankr. LEXIS 1513

In re: MICHAEL D. DESROSIERS and ROSE A. DESROSIERS, Debtors; MICHAEL D. DESROSIERS and ROSE A. DESROSIERS, Plaintiffs, v. TRANSAMERICA FINANCIAL CORPORATION, Defendant

Chapter 13, Case No. 96-46084-HJB, Adversary Proceeding No. 97-4026

UNITED STATES BANKRUPTCY COURT FOR THE DISTRICT OF MASSACHUSETTS

212 B.R. 716; 1997 Bankr. LEXIS 1513

September 24, 1997, Decided

**DISPOSITION:** [**1] Transamerica's AP Dismissal Motion granted, and its Plan Objection sustained. Transamerica's Case Dismissal Motion denied without prejudice.

**CORE TERMS:** nonparty, adversary proceeding, consumer, res judicata, rescission, judicata, mortgage, spouse, annual percentage rate, finance charge, secured claim, counterclaim, privity, notice, virtual representation, right to rescind, summary judgment, motion to dismiss, disclosure, regulation, recision, statute of limitations, cause of action, virtual, second mortgage, class action, financed, Federal Rule of Civil Procedure, causes of action, claim preclusion

**COUNSEL:** David W. Ostrander, Esq., for Debtors.

Nicholas J. Psyhogeos, Esq., for Transamerica.

Denise M. Papalardo, Esq., Chapter 13 Trustee.

U.S. Trustee.

**JUDGES:** Henry J. Boroff, U.S. Bankruptcy Judge.

**OPINIONBY:** Henry J. Boroff

**OPINION:** [*718] **MEMORANDUM OF DECISION**

Before the Court for determination are (1) a "Motion to Dismiss" the Chapter 13 case of Michael D. and Rose A. Desrosiers (individually "Mr." and "Mrs. Desrosiers," and jointly the "Debtors") (the "Case Dismissal Motion"); (2) an "Objection to Confirmation of Debtors' Chapter 13 Plan" (the "Plan Objection"); and (3) a "Motion to Dismiss [the] Adversary Proceeding" (the "AP Dismissal Motion"), all filed by creditor and defendant Transamerica Financial Corporation ("Transamerica" or the "Defendant").

In the adversary proceeding, the Debtors seek a determination that Transamerica does not have a valid claim against them. They argue that, pursuant to the Federal Truth in Lending Act ("TILA") and the Massachusetts Consumer Credit Cost Disclosure Act ("CCCDA"), they properly rescinded [**2] their mortgage with Aetna Finance Company, doing business as ITT Financial Services ("ITT") (Transamerica's predecessor in interest). The Debtors also request statutory damages, costs, and attorney fees. In the AP Dismissal Motion, Transamerica argues that the Debtor's claims are barred by the doctrine of res judicata. Transamerica contends that those claims were the subject of a previous case before the U.S. District Court for the District of Massachusetts that culminated in a final adjudication on the merits in Transamerica's favor. n1 [*719] Transamerica's Case Dismissal Motion and Plan Objection are based on the Debtors' failure to treat Transamerica's secured claim in their Chapter 13 Plan.

- - - - - - - - - - - - - - Footnotes - - - - - - - - - - - - - - - -

n1 Transamerica based its Motion to Dismiss the Adversary Proceeding on Federal Rule of Civil Procedure 12(b)(1), made applicable here by Federal Rule of Bankruptcy Procedure 7012. Rule 12(b)(1) relates to the lack of subject matter jurisdiction. However, as detailed below, Transamerica argues only that the causes of action raised in this adversary proceeding are barred by the doctrine of res judicata. Thus, the applicable ground for dismissal is the Complaint's failure to state a claim upon which relief can be granted. See Fed. R. Civ. P. 12(b)(6); see, e.g., Mullens v. United States, 785 F. Supp. 216, 222 (D. Me. 1992) (dismissing a cause of action barred by res judicata under Fed. R. Civ. P. 12(b)(6)). Further, because Transamerica relies on matters outside the pleadings, the Court must treat the motion as one for summary judgment under Federal Rule of Bankruptcy Procedure 7056, incorporating Federal Rule of Civil Procedure 56. See Fed. R. Civ. P. 12(b) ("If, on a motion asserting the defense numbered (6) to dismiss . . ., matters outside the pleading are presented

**7**

Case 1:04-cv-11954-RCL    Document 13-3    Filed 03/24/2005    Page 66 of 92

212 B.R. 716; 1997 Bankr. LEXIS 1513

to and not excluded by the court, the motion shall be treated as one for summary judgment and disposed of as provided in Rule 56"). The Court notes that Rule 12(b) requires that all parties "be given reasonable opportunity to present all material made pertinent to such a motion by Rule 56," and finds that requirement met here.

- - - - - - - - - - - End Footnotes- - - - - - - - - - - -

[**3]

I. Facts

The facts material to the resolution of the res judicata issue are without dispute.

In March 1986, the Debtors contacted Bentley-Royce, Inc., a Massachusetts-based loan broker, in their attempt to obtain a loan secured by a second mortgage on their residence in West Springfield, Massachusetts (the "West Springfield Property"). The broker referred the Debtors to the Money Tree, another loan broker. After the Debtors completed a loan application, a Money Tree employee drove the Debtors to ITT's Rhode Island office. ITT agreed to loan the Debtors the sum of $ 14,033.66, with interest payable at an annual percentage rate of 18%, and secured by a second mortgage on the West Springfield Property.

The Debtors rewrote this loan with ITT on three occasions. In April 1988, they refinanced, increasing the loan to the sum of $ 21,185.07, with interest payable at an annual percentage rate of 15%; in June 1989, they refinanced, increasing the loan to the sum of $ 38,796.72, with interest payable at an annual percentage rate of 16% interest; and on December 5, 1990, they refinanced, increasing the loan to the sum of $ 43,640.36, with interest payable at an annual percentage rate [**4] of 15%. Each refinancing was accompanied by a new second mortgage on the West Springfield Property.

On April 13, 1993, then-counsel for the Debtors, Edward O'Brien, sent to ITT a notice of recision of the second mortgage loan, pursuant to Mass. Gen. Laws ch. 140D, § 10 (1997). The notice, sent only on behalf of Mr. Desrosiers, alleged violations of CCCDA and the regulations promulgated thereunder. Pursuant to the statute and applicable state regulations, Attorney O'Brien made demand, inter alia, that "ITT return and refund to [Mr. Desrosiers] all money paid by [him] to ITT in connection with the loan transaction being . . . rescinded."

Mr. Desrosiers' demand was not the first of its type received by ITT. In response to earlier notices, ITT had previously filed suit in the United States District Court for the District of Rhode Island against certain of the rescinding mortgagors, seeking a declaratory judgment as to the validity of the rescission claims (the "ITT Suit"). That action was subsequently transferred to the United States District Court for the District of Massachusetts (the "District Court"), and the complaint was amended on multiple occasions to include borrowers who [**5] filed notices of rescission after the ITT Suit was commenced. After Attorney O'Brien sent the notice of rescission on behalf of Mr. Desrosiers, ITT added him to the ITT Suit as a defendant.

In February 1995, Attorney O'Brien filed a counterclaim on behalf of Mr. Desrosiers and others. The counterclaim raised counts in which it was alleged that ITT (1) violated CCCDA; (2) conspired with and induced the loan brokers to breach the fiduciary duties they owed to the borrowers; (3) committed fraud; (4) violated the Rhode Island Secondary Mortgage Loan Act, R.I. Gen. Laws 19-25.2-24 (1995) (which was repealed effective July 1, 1995, see 1995 R.I. Pub. Laws ch. 82, § 30); (5) collected point overcharges prohibited by Mass. Gen. Laws ch. 183, § 63; and (6) violated section 9 of Mass. Gen. Laws ch. 93A. The alleged violations of CCCDA raised [*720] in the counterclaim related to unlawful finance charges and nondisclosure of finance charges, overcharges for filing and recording the mortgages and other documents, and inflated attorney fee charges. Attorney O'Brien also sought to have the claims of the plaintiffs-in-counterclaim consolidated as a class action against ITT. However, for reasons not [**6] relevant here, the District Court declined to certify the plaintiffs-in-counterclaim as a class. Settlement discussions then ensued.

In October, 1995, Attorney O'Brien and counsel for ITT agreed to a proposed overall settlement of the claims held by Attorney O'Brien's clients, and filed a "Stipulation of Dismissal" with respect to Attorney O'Brien's clients, excepting only Mr. Desrosiers. Mr. Desrosiers had refused to agree to the settlement, and his claims against ITT were excluded therefrom. Attorney O'Brien thereafter filed an "assented to" motion to withdraw as counsel for Mr. Desrosiers, stating therein:

This motion is made on the grounds that counsel has advised Mr. Desrosiers to settle this case upon the same terms as dozens of co-plaintiffs'/defendants-in-counterclaim have already settled this case, the settlement being, in the opinion of counsel, fair and reasonable. It is not economically feasible for counsel

Case 1:04-cv-11954-RCL     Document 13-3     Filed 03/24/2005     Page 67 of 92

212 B.R. 716; 1997 Bankr. LEXIS 1513

to continue pressing this consolidated case against ITT . . . on behalf of just one person (this Court having already denied plaintiffs' class motion).

Attorney O'Brien also requested a continuance of court proceedings relative to Mr. Desrosiers until December [**7] 1, 1995, so that if Attorney O'Brien were granted leave to withdraw, there would be time both for Mr. Desrosiers to obtain substitute counsel, and for that substitute counsel to prepare its representation. On October 10, 1995, the District Court allowed both the stipulation of dismissal and Attorney O'Brien's withdrawal motion. n2

- - - - - - - - - - - - - - Footnotes - - - - - - - - - - - - - - - - -

n2 Although Attorney O'Brien's motion was captioned as being "Assented to," he did not indicate who had assented to it. The implication was that Mr. Desrosiers was the assenting party, but Mr. Desrosiers and his wife indicated in a October 18, 1995 letter addressed to a District Court employee that they did not assent to the withdrawal. A copy of this letter is attached to the Debtors' Complaint, although there is no clear indication that it was ever sent to or received by the District Court.

- - - - - - - - - - - - End Footnotes- - - - - - - - - - - - - -

Mr. Desrosiers failed to obtain successor counsel by December 1, 1995, prompting ITT to file a motion to dismiss the case against him. That motion was allowed by the District Court on March 1, [**8] 1996. ITT then filed an additional motion to dismiss, pursuant to Rule 41(b) of the Federal Rules of Civil Procedure, with respect to the counterclaims asserted by Mr. Desrosiers. ITT alleged that Mr. Desrosiers had not appeared pro se and no attorney had filed an appearance on his behalf, and "had not communicated with counsel [to ITT] or the Court, had done nothing to indicate that he had any interest in prosecuting his counterclaim, and had ignored the Court's directive that substitute counsel should appear and be ready to proceed after December [1], 1995." This second motion was allowed by the District Court on March 4, 1996.

Approximately 6 months later, Mr. Desrosiers filed a motion for relief from the March 4, 1996 District Court judgment, pursuant to Rule 60(b) of the Federal Rules of Civil Procedure. On October 28, 1996, that motion was denied by the District Court. In the interim, ITT had assigned its note and mortgage to Transamerica,

and Transamerica had initiated state court foreclosure proceedings.

On November 1, 1996, the Debtors filed a petition in this Court under Chapter 13 of the Bankruptcy Code. In their Chapter 13 Plan, the Debtors stated in a section entitled [**9] "Other Provisions" that they possessed a cause of action against Transamerica relating to violations of TILA and CCCDA. They further stated their intention to pursue that cause of action in an adversary proceeding, but that if they failed to prevail, the Plan would be amended to pay the arrears owed to Transamerica. In the event that they prevailed in the cause of action and their mortgage with Transamerica was deemed rescinded, the Debtors proposed to amend their Plan to treat the claim of Transamerica as unsecured. Accordingly, the Chapter 13 [*721] Plan did not provide any treatment of Transamerica's claim.

Back in the District Court, Mr. Desrosiers filed a motion for reconsideration of that court's denial of his motion for relief from the March 4, 1996 judgment. The District Court denied the reconsideration motion on January 13, 1997.

On January 7, 1997, Transamerica filed its combined Case Dismissal Motion and Plan Objection. Transamerica contended that the Debtors' Plan did not comply with 11 U.S.C. § 1325(a)(3) and (a)(5), n3 largely because its secured claim was not properly treated. Transamerica further argued that, because the Debtors' income was insufficient to pay both the [**10] prepetition arrearage n4 and the mortgage payments, the proposed plan was not feasible. See 11 U.S.C. § 1325(a)(6).

- - - - - - - - - - - - - - Footnotes - - - - - - - - - - - - - - - - -

n3 Section 1325(a) lists the conditions which must be met in order for a Chapter 13 plan to be confirmed. Under subsection (a)(3), the plan must have "been proposed in good faith and not by any means forbidden by law." Under subsection (a)(5), one of three sub-conditions must be met with respect to each secured claim provided for in the plan: (i) the secured claim holder accepts the plan; (ii) the plan allows the secured claim holder to retain his or her lien on the property, provided that "the value, as of the effective date of the plan, of property to be distributed under the plan on account of such claim is not less than the allowed amount of such claim"; or (iii) the debtor surrenders the subject property to the secured claim holder.

Case 1:04-cv-11954-RCL    Document 13-3    Filed 03/24/2005    Page 68 of 92

212 B.R. 716; 1997 Bankr. LEXIS 1513

n4 According to Transamerica, the Debtors owe a prepetition arrearage to the company of more than $ 30,000. Obj. To Confirm. of Debtors' Chapter 13 Plan and Mot. To Dismiss at 2.

- - - - - - - - - - - - End Footnotes- - - - - - - - - - - - - -

[**11]

On February 3, 1997, the Debtors, acting pro se, filed an Adversary Proceeding against Transamerica, seeking, pursuant to TILA and CCCDA, a recision of the mortgage and a recovery of the money they paid to Transamerica. In their Complaint, the Debtors alleged that ITT overcharged them for recording fees and attorney fees without listing the excessive costs as "finance charges."

On February 12, 1997, the Court conducted a hearing on the Case Dismissal Motion and the Plan Objection. Subsequently, after the AP Dismissal Motion was filed, the Court consolidated the Case Dismissal Motion and Plan Objection with the adversary proceeding and took all of the outstanding matters under advisement, extending the briefing schedule to May 1, 1997.

II. Positions of the Parties

Transamerica argues that the adversary proceeding should be dismissed because any claim that the Debtors may have under TILA or CCCDA is barred by res judicata, based on the judgment against Mr. Desrosiers in the ITT Suit. Transamerica points to Federal Rule of Civil Procedure 41(b), the rule governing involuntary dismissals, which provides that a dismissal for failure to prosecute "operates as an adjudication [**12] upon the merits" unless the court specifically states otherwise. Therefore, Transamerica contends that its mortgage is immune from attack by the Debtors, and that the failure of the Debtors' proposed Chapter 13 Plan to treat its secured claim renders the Chapter 13 Plan unconfirmable and constitutes grounds for dismissal of the case.

The Debtors counter that res judicata should not apply on these facts. They remind the Court that the counterclaim in the ITT Suit was brought only on behalf of Mr. Desrosiers, and that Mrs. Desrosiers has a valid, independent right of recision under the federal and state statutes. Attached to their Opposition was an affidavit of Mrs. Desrosiers, in which she stated that she did not "substantially [sic] control, actively participate in, or otherwise have an impact on the abrogated class action brought in the [District Court] in which my husband . . . was a party. . . . My husband

Michael handled all of the paperwork, communications and other activity connected with that case." The Debtors also argue that a case should be dismissed "with prejudice" under Fed. R. Civ. P. 41(b) "only in 'extreme situations', in which there is compelling evidence of 'willful [**13] default.'" Debtors' Opp'n at 15 (quoting 8 Charles Alan Wright & Arthur R. Miller, Federal Practice and Procedure § 2369 (2d ed. 1987)). In its Reply Brief, Transamerica argues that Mrs. Desrosiers was in privity with her husband regarding the ITT Suit, and states that the dismissal under Fed. R. Civ. P. [*722] 41(b) did involve violation of a court order, namely the District Court order continuing the case until December 1, 1995 so that Mr. Desrosiers could obtain successor counsel.

III. Analysis

Summary judgment should be granted where "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed. R. Bankr. P. 7056; Fed. R. Civ. P. 56(c); Brzys v. Lubanski (In re Lubanski), 186 B.R. 160, 163-64 (Bankr. D. Mass. 1995). "The burden of proof is upon the moving party in the first instance. . . . To defeat the motion, the opposing party must produce substantial evidence of a genuine dispute as to a material fact." Fidler v. Central Coop. Bank (In re Fidler), 210 B.R. 411, 418 (Bankr. [**14] D. Mass. 1997). The Court must resolve any disputed facts and inferences in favor of the party opposing summary judgment, "and must indulge all inferences favorable to that party." Id.; see also Fleet Nat'l Bank v. H&D Entertainment, Inc., 96 F.3d 532, 537 (1st Cir. 1996).

A. Relevant TILA and CCCDA Background

Both TILA and CCCDA were enacted "to assure a meaningful disclosure of credit terms so that . . . consumer[s] would be able to compare more readily the various credit terms available to [them] and avoid the uninformed use of credit, and to protect . . . consumer[s] against inaccurate and unfair credit card practices." 15 U.S.C. § 1601(a). "TILA [and CCCDA] provide[] consumers with remedies in the forms of both a right of rescission and a right to damages." In re Botelho, 195 B.R. 558, 564 (Bankr. D. Mass. 1996); see 15 U.S.C. § 1635(a) (right to rescission under TILA); 15 U.S.C. § 1640 (right to damages under TILA); Mass. Gen. Laws ch. 140D, § 10(a) (right to rescission under CCCDA); Mass. Gen. Laws ch. 140D, § 32 (right to damages under CCCDA).

Case 1:04-cv-11954-RCL    Document 13-3    Filed 03/24/2005    Page 69 of 92

212 B.R. 716; 1997 Bankr. LEXIS 1513

The two statutes are substantially the same, except that TILA contains a [**15] one-year statute of limitations for a damage claim, § 1640(e), and a three-year statute of limitations for a rescission claim, § 1635(f), while the limitation period for both remedies under CCCDA is four years, Mass. Gen. Laws ch. 140D, § 10(f) (statute of limitations regarding right of rescission), Mass. Gen. Laws ch. 260, 5A (1997) (statute of limitations regarding right to damages). "Because the provisions of CCCDA parallel those of TILA, CCCDA 'should be construed in accordance with federal law.'" Botelho, 195 B.R. at 565 (quoting Mayo v. Key Fin. Servs., Inc., No. 92-6441-D, slip op. at 3, 1994 WL 879676 (Mass. Super. Ct. June 22, 1994)); see also Mass. Regs. Code tit. 209, § 32.27 (1997) ("Compliance with any provisions of [TILA], the Board's Regulation Z, and the Official Staff Commentary, which does not conflict with [CCCDA], [the regulations thereunder,] or an advisory ruling of the Commissioner, shall be deemed to be in compliance with [CCCDA]."). n5 Accordingly, the Court will follow the Botelho Court's lead and refer only to TILA and provisions of Regulation Z. n6

- - - - - - - - - - - - - - Footnotes - - - - - - - - - - - - - - - -

n5 "Regulation Z" is the name of the body of regulations enacted by the Board of Governors of the Federal Reserve System (the "Board") interpreting TILA, pursuant to authority granted them in the statute.

[**16]

n6 The Court notes that the Board exempted credit transactions subject to CCCDA "from chapters 2 and 4 of the Federal act," pursuant to authority granted it in 15 U.S.C. § 1633. See 48 Fed. Reg. 14882, 14890 (1983). Chapter 2 of the statute includes §§ 1631 through 1646. However, the Board enacted a regulation providing that "no exemptions granted under this section shall extend to the civil liability provisions of section [1640] and [1641] of the act." Regulation Z, 12 C.F.R. § 226.29(b)(1) (1997). Accordingly, a Massachusetts resident can bring a claim for damages under § 1640 of TILA, but cannot rescind a credit transaction under § 1635 of that statute; he or she can pursue that remedy only under CCCDA. See Botelho, 195 B.R. at 565; Myers v. Federal Home Loan Mortgage Co. (In re Myers), 175 B.R. 122, 125-26 (Bankr. D. Mass. 1994). Nevertheless, it is still appropriate to refer to the provisions of the federal statute and regulations at issue here because they do not differ from their Massachusetts counterparts in any material way.

- - - - - - - - - - - End Footnotes- - - - - - - - - - - - - -

[*723] The provision of Regulation Z relating [**17] to closed-end credit transactions provides in pertinent part: "In a credit transaction in which a security interest is or will be retained or acquired in a consumer's principal dwelling, each consumer whose ownership interest is or will be subject to the security interest shall have the right to rescind the transaction." 12 C.F.R. § 226.23(a)(1) (1997); see also 15 U.S.C. § 1635. The regulation further provides: The consumer may exercise the right to rescind until midnight of the third business day following consummation, delivery of the notice [of the right to rescind] . . ., or delivery of all material disclosures, whichever occurs last. If the required notice or material disclosures are not delivered, the right to rescind shall expire 3 years after consummation, upon transfer of all of the consumer's interest in the property, [or] upon sale of the property, whichever occurs first. Id. § 226.23(a)(3) (footnote omitted); see § 1635(a)(f); Mass. Gen. Laws ch 140D, § 10(f) (as noted above, four year statute of limitations). The term "material disclosures" includes "the required disclosures of the annual percentage rate, the finance charge, the amount [**18] financed, the total payments, and the payment schedule." Id. § 226.23(a)(3) n.48. Thus, if the lender does not provide the consumer with those material disclosures required by law, the consumer has three years to rescind the transaction under TILA, and four years under CCCDA.

The "finance charge" is defined as "the cost of consumer credit as a dollar amount" and includes "any charge payable directly or indirectly by the consumer and imposed directly or indirectly by the creditor as an incident to or a condition of the extension of credit." 12 C.F.R. § 226.4(a) (1997). The regulations provide that the "amount financed" equals the principal loan amount plus "any other amounts that are financed by the creditor and are not part of the finance charge . . . [minus] any prepaid finance charge." 12 C.F.R. § 226.18(b) (1997). The "annual percentage rate" is the rate "which will yield a sum equal to the amount of the finance charge when it is applied to the unpaid balances of the amount financed." 15 U.S.C. § 1606(a)(1)(A). "Thus, characterizing a portion of a loan as part of the 'finance charge' instead of the 'amount financed' will alter not only the amount of the finance charge [**19] but the annual percentage rate as well." Therrien v. Resource Fin. Group, Inc., 704 F.

Case 1:04-cv-11954-RCL    Document 13-3    Filed 03/24/2005    Page 70 of 92

212 B.R. 716; 1997 Bankr. LEXIS 1513

Supp. 322, 325 (D.N.H. 1989). Accordingly, the critical issue in many TILA and CCCDA actions (including this one, should it proceed) is whether or not a particular charge to a consumer was a "finance charge" and should have been but was not included in the calculation of the annual percentage rate. See, e.g., Therrien, 704 F. Supp. 322; Whitley v. Rhodes Fin. Servs., Inc. (In re Whitley), 177 B.R. 142 (Bankr. D. Mass. 1995).

Finally, Regulation Z provides that "when more than one consumer in a transaction has the right to rescind, the exercise of the right by one consumer shall be effective as to all consumers." Regulation Z, 12 C.F.R. § 226.23(a)(4) (1997). The "Official Staff Interpretation" of Regulation Z provides the following example, after restating the regulation: "If both husband and wife have the right to rescind a transaction, either spouse acting alone may exercise the right and both are bound by the rescission." 12 C.F.R. pt. 226, Supp. I (1997).

### B. Dismissals under Rule 41(b)

Federal Rule of Civil Procedure 41(b) provides as follows:

For failure of [**20] the plaintiff to prosecute or to comply with these rules or any order of court, a defendant may move for dismissal of an action or of any claim against the defendant. Unless the court in its order for dismissal otherwise specifies, a dismissal under this subdivision . . . operates as an adjudication upon the merits.

The rule is plain on its face, and it is clear that an order granting a motion to dismiss under Rule 41(b) constitutes an adjudication upon the merits "both when the court expressly provides that dismissal is with prejudice and when it is silent on the matter." 9 Wright & Miller, Federal Practice and Procedure § 2373 (footnotes omitted); see LeBeau v. Taco Bell, [*724] Inc., 892 F.2d 605, 607 (7th Cir. 1989) ("Because the judgment did not otherwise state, the dismissal was on the merits--with prejudice."); see also Proctor v. Millar Elevator Serv. Co., 303 U.S. App. D.C. 420, 8 F.3d 824, 824-26 (D.C. Cir. 1993); Kern v. Hettinger, 303 F.2d 333, 339-40 (2d Cir. 1962). Thus, the dismissal of the ITT Suit was with prejudice.

The Debtors argue that the District Court's order allowing the motion to dismiss their counterclaims in the ITT Suit should not have [**21] preclusive effect because there was no disobedience of a court order; no prior warning of a prejudicial dismissal was given; an "unreasonable" amount of time had not passed; ITT

was not prejudiced by Mr. Desrosiers' delay in acting; and judicial economy was not advanced by a prejudicial dismissal of the case. Debtors' Opp'n at 17-18. The Debtors also state:In this circumstance, the District Court's dismissal should be interpreted as a dismissal without prejudice. Such an interpretation is consistent with the appellate courts' view of the type of situation which justifies a dismissal with prejudice. . . . Were the District Court's dismissal interpreted as a dismissal with prejudice, it would clearly be one which demonstrated a reversible abuse of discretion. It is very unlikely that the District Court would have intended an effect to a dismissal order which would demonstrate such an abuse of discretion.

Id. at 16-17. The Debtors support their contention that a dismissal of the ITT Suit on the merits would have been an abuse of discretion by citing case law from the U.S. Courts of Appeals for the First and Second Circuits, where those courts analyzed whether a dismissal [**22] with prejudice under Rule 41(b) was an abuse of the trial court's discretion. Id. at 17; see Jackson v. City of New York, 22 F.3d 71 (2d Cir. 1994); Schenck v. Bear, Stearns & Co., 583 F.2d 58 (2d Cir. 1978); Richman v. General Motors Corp., 437 F.2d 196 (1st Cir. 1971).

The Debtors' suggestion that this Court interpret the District Court's dismissal order as a dismissal without prejudice defies the plain meaning of Rule 41(b). The District Court's omission of a designation such as "without prejudice" is the end of the matter. There was a proper forum for Mr. Desrosiers to present such arguments--the United States Court of Appeals for the First Circuit. However, he failed to file a timely appeal of the District Court's dismissal order. In reality, the Debtors' arguments amount to a thinly-veiled attempt to obtain appellate-type review of the District Court's dismissal order. They have forgotten who reviews whom. The District Court's order dismissing the action before it under Rule 41(b) was with prejudice, that is, on the merits, and as no timely appeal was filed, the District Court's decision is final.

### C. Res Judicata

"The accepted formulation of res [**23] jud icata for federal court use teaches that 'a final judgment on the merits of an action precludes the parties or their privies from relitigating issues that were or could have been raised in that action.'" Gonzalez v. Banco Central Corp., 27 F.3d 751, 755 (1st Cir. 1994) (quoting Allen v. McCurry, 449 U.S. 90, 94, 101 S. Ct. 411, 414, 66 L. Ed. 2d 308 (1980)). n7 As the U.S. Court of Appeals for the First Circuit has explained:

Case 1:04-cv-11954-RCL    Document 13-3    Filed 03/24/2005    Page 71 of 92

212 B.R. 716; 1997 Bankr. LEXIS 1513

The policy rationale behind res judicata is to "relieve parties of the cost and vexation of multiple lawsuits, conserve judicial resources, and by preventing inconsistent decisions, encourage reliance on adjudication." Res judicata, therefore, prevents plaintiffs from splitting their claims by providing a strong incentive for them to plead all factually related allegations and [*725] attendant legal theories for recovery the first time they bring suit.

Apparel Art Int'l, Inc. v. Amertex Enter. Ltd., 48 F.3d 576, 583 (1st Cir. 1995) (quoting Allen, 449 U.S. at 94, 101 S. Ct. at 415) (citation omitted).

- - - - - - - - - - - - - - Footnotes - - - - - - - - - - -

n7 The term "res judicata" actually encompasses two separate concepts, claim preclusion and issue preclusion (which is also referred to as "collateral estoppel"). See DiBerto v. Meadows at Madbury (In re DiBerto), 171 B.R. 461, 470 (Bankr. D.N.H. 1994); 18 Charles A. Wright & Arthur R. Miller, Federal Practice and Procedure § 4402 (2d ed. 1987) ("Although the time has not yet come when courts can be forced into a single vocabulary, substantial progress has been made toward a convention that the broad 'res judicata' phrase refers to the distinctive effects of a judgment separately characterized as 'claim preclusion' and 'issue preclusion.'"). However, "res judicata" is commonly used to refer to only claim preclusion, DiBerto, 171 B.R. at 470, and the Court is using the term in that narrower sense.

- - - - - - - - - - - - End Footnotes- - - - - - - - - - - - -

[**24]

"The elements of res judicata are (1) a final judgment on the merits in an earlier suit, (2) sufficient identicality between the causes of action asserted in the earlier and later suits, and (3) sufficient identicality between the parties in the two suits." Gonzalez, 27 F.3d at 755. As established above, the first element has been met. The District Court's ruling was on the merits. See Potts v. United Techs. Corp., 879 F. Supp. 1196, 1200 (N.D. Ga. 1994) (where court's prior Rule 41(b) dismissal "was on the merits, the plaintiffs are barred from further prosecuting [the] action under the doctrine of res judicata"); Dougherty v. Nynex Corp., 835 F. Supp. 22, 23 (D. Me. 1993) (dismissal of

previous lawsuit under Rule 41(b) for failure to respond to a motion to dismiss precluded litigation of claims raised therein; court noted in footnote that same result would have obtained had the dismissal been for failure to prosecute).

With respect to the identicality of the causes of action, the Court is satisfied that the claims raised in this adversary proceeding are virtually identical to those raised in Count 1 of the First Amended Counterclaim in the ITT Suit. At the February [**25] 12, 1997 hearing on Transamerica's Case Dismissal Motion, proposed special counsel for the Debtors argued that the claim relating to ITT's overcharging for attorneys' fees had not been addressed in the ITT Suit, and that the causes of action were therefore dissimilar. However, as pointed out by Transamerica, that statement proved to be inaccurate. See Transamerica's Memo. Sup. Mot. To Dismiss Adversary Proceeding at 13-14 (citing to sections of the "First Amended Counterclaim to Plaintiff's Fifth Amended Complaint" from the ITT Suit, and revealing that claims relating to excessive attorneys' fees were raised). However, even had such claims not been raised before the District Court, res judicata would still bar them from being raised here because "[a] final judgment on the merits of an action precludes the parties or their privies from relitigating issues that were or could have been raised in that action." Federated Dep't Stores, Inc. v. Moitie, 452 U.S. 394, 398, 101 S. Ct. 2424, 2428, 69 L. Ed. 2d 103 (1981) (emphasis added); see also Turbocare Div. Of Demag Delaval Turbomachinery Corp. v. General Elec. Corp., 938 F. Supp. 83, 84 (D. Mass. 1996). The Debtors contend [**26] that the attorneys' fees-overcharge claim could not have been raised in the ITT Suit because that was a quasi-class action and it was unclear whether a large number of the borrowers besides the Debtors were overcharged for attorneys' fees. However, the ITT Suit was never a class action, and nothing precluded Mr. Desrosiers from raising the issue after the District Court declined to certify the class. In any event, once all of the other plaintiffs-in counterclaim were removed from the suit, there was absolutely no barrier to bringing the claim.

The third element of res judicata is the most difficult hurdle in this analysis, but it is also overcome. Res judicata will generally bar the litigation of claims which were previously raised in a lawsuit against only those parties who participated in the original cause of action, based on "the bedrock principle that, for claim preclusion [i.e., res judicata] to apply, a litigant first must have had a full and fair opportunity to litigate his claim." Gonzalez, 27 F.3d at 758. However, where a nonparty has such a significant relationship with a party to the previous action that it can be said that the former is a "privy" of the latter, [**27] res judicata

will apply to the nonparty as well. Id. at 757-58. There are two relevant types of relationships on which the First Circuit has based a finding of privity for res judicata purposes. They are where (1) the "nonparty . . . substantially controlled a party's involvement in the initial litigation," or (2) the nonparty "permitted a party to the initial litigation to function as his de facto [(or virtual)] representative." Id. at 758. n8

- - - - - - - - - - - - - Footnotes - - - - - - - - - - - - - - -

n8 There is also a third type of privity, where the nonparty is a successor in interest to a party in the previous cause of action. See Casa Marie, Inc. v. Superior Court of Puerto Rico, 988 F.2d 252, 265 n.13 (1st Cir. 1993). Thus, there is clearly privity between ITT and Transamerica.

- - - - - - - - - - - - End Footnotes- - - - - - - - - - - - -

[*726]     Substantial control amounts to "the availability of a significant degree of effective control in the prosecution or defense of the case--what one might term, in the vernacular, the power--whether exercised or not--to call the shots." Id. Thus, where "substantial control" [**28] exists, the nonparty will generally be in a position of power over the party to the litigation. See, e.g., Kreager v. General Elec. Co., 497 F.2d 468, 471-72 (2d Cir. 1974) (owner of a close corporation was in privity with the close corporation); Iacopini v. New Amsterdam Cas. Co., 379 F.2d 311, 312 (3d Cir. 1967) (liability insurer was in privity with the insured party, where insurer had assumed insured's defense). Here, there is insufficient evidence of substantial control for summary judgment purposes. In her affidavit, Mrs. Desrosiers says that she did not exercise such control over the ITT Suit, raising a genuine issue of material fact and precluding summary judgment, if substantial control were the only test of privity. A spousal relationship alone is not determinative of substantial control.

Virtual representation, on the other hand, connotes a relationship where the parties have an identity of interests in the initial cause of action. See Gonzalez, 27 F.3d at 760-61. "A non-party . . . is adequately represented where a party in the prior suit is so closely aligned to her interests as to be her virtual representative." Eubanks v. Federal Deposit Ins. Corp., [**29] 977 F.2d 166, 170 (5th Cir. 1992). However, even an alignment of interests by itself is not enough. See, e.g., Gonzalez, 27 F.3d at 760; Eubanks, 977 F.2d at 170. Determining whether the party to the first litigation was the virtual representative of a nonparty is

"a weighing process that balances the nonparty's claim to a day in court against the factors that may suggest that representation has afforded a 'vicarious day in court' and that may establish the special importance of avoiding inconsistent results." 18 Wright & Miller, Federal Practice and Procedure § 4457.

In accordance with these principles, the First Circuit has been careful not to apply a strict definition to the term "virtual representation." See Gonzalez, 27 F.3d at 761 ("There is no black letter rule. . . . In the end, virtual representation is best understood as an equitable theory rather than as a crisp rule with sharp corners and clear factual predicates."). Yet, the Gonzalez court provided the following guidance:

Although the need for individualized analysis persists, a common thread binds these variegated cases together: virtual representation has a pronounced equitable dimension. Thus, [**30] notwithstanding identity of interests, virtual representation will not serve to bar a nonparty's claim unless the nonparty has had actual or constructive notice of the earlier litigation, and the balance of the relevant equities tips in favor of preclusion. For example, courts have applied the doctrine in situations in which a nonparty has given actual or implied consent to be bound by the results in a prior action, . . . or in which certain types of familial relationships link parties and nonparties, . . . or in which courts have detected tactical maneuvering designed unfairly to exploit technical nonparty status in order to obtain multiple bites of the litigatory apple . . . . Implicit in all these scenarios is the existence of actual or constructive notice.

We have considered, and rejected, another possible common characteristic. Some courts have suggested that adequacy of representation is also a condition precedent to nonparty preclusion grounded upon virtual representation. . . . Properly viewed, however, adequacy of representation is not itself a separate and inflexible requirement for engaging principles of virtual representation, although it is one of the factors that [**31] an inquiring court should weigh in attempting to balance the equities.

Id. at 761-62 (footnotes and citations omitted) (emphasis added).

Both of the two primary factors noted by the Gonzalez court, an identity of interests and notice of the initial litigation, are present here. As co-owners of the West Springfield Property and co-obligors under the notes and [*727] mortgages with ITT, Mr. and Mrs. Desrosiers certainly had the same interests with respect to the claims in the ITT Suit. A review of the pleadings filed before the Court establishes that Mrs. Desrosiers

was fully aware of the ITT Suit. See, e.g., Transamerica's Reply to Debtor's Memo. In Opp'n To Mot. To Dismiss Adversary Proceeding, exhibit A (letter from both Debtors to District Court employee, stating that they received ITT's motion to dismiss that action and further stating: "We do not agree to this dismissal [sic], we did not out of hundreds involved in this case sign off or . . . accept a settlement offer from ITT . . . . We do intend however in the near future on proceeding with this case to prove all wrong doings by ITT. . . .") (emphasis added). Further, the Debtors have repeatedly made [**32] reference to the fact that both of them were involved in the ITT Suit. As noted by Transamerica:In the Adversary Proceeding Complaint, [the Debtors] state that [their] principal claim for rescission of the Mortgage loan pursuant to [TILA] "arose out of a class action case, which was settled or dismissed as to all parties except the Desrosiers." . . . Further, in their Chapter 13 Plan, Debtors state: "over approximately the past four years, the Debtors have been involved in litigation with Transamerica . . ., or its predecessor in interest, which holds a second mortgage on the Debtor's residence.". . . Also, in their Opposition to Transamerica's Motion to Dismiss case, Debtors state: "the litigation in the U.S. District Court cannot be explained in just a few sentence [sic], but the Debtors were members of a class action in which they elected to opt out of a proposed settlement."Transamerica's Memo. Supp. Mot. To Dismiss Adversary Proceeding at 19.

Balancing the relevant equities here, the Court finds that the scale tips in favor of applying the doctrine of res judicata and dismissing the adversary proceeding. To allow this adversary proceeding [**33] to continue would be to ignore the long-standing policies behind res judicata; namely, of "protecting litigants from the burden of relitigating an identical issue with the same party or his privy and of promoting judicial economy by preventing needless litigation." Parklane Hosiery Co. v. Shore, 439 U.S. 322, 326, 99 S. Ct. 645, 649, 58 L. Ed. 2d 552 (1979). It would also encourage spouses to bring TILA and CCCDA actions in only one of their names, in order to potentially obtain a "second bite at the apple."

It is true that both TILA and CCCDA provide each spouse with a right of rescission. However, the existence of a recision right for each spouse does not justify a policy which would allow one spouse to bring an action after the other spouse had already done so and failed. And since Regulation Z provides that a recision by one spouse is binding on the other, it would be quite anomalous if the law permitted the non-party spouse to benefit from the party-spouse's success, but not share in the consequences of its failure, notwithstanding the non-party spouse's acquiescence in

the recision action. See Regulation Z, 12 C.F.R. § 226.23(a)(4); Official Staff Interpretation, [**34] 12 C.F.R. pt. 226, Supp. I. While "concurrent property interests [generally] do not justify nonparty preclusion," where there is "general authority to represent concurrent interests," res judicata should apply. 18 Wright & Miller, Federal Practice and Procedure § 4461.

Accordingly, the Court holds that Mr. Desrosiers acted as Mrs. Desrosiers' virtual representative in the ITT Suit, and that the Debtors are now barred from bringing TILA and/or CCCDA claims against Transamerica. As all of the allegations raised in this adversary proceeding relate to the loan transactions between ITT and the Debtors, the AP Dismissal Motion, construed as a motion for summary judgment, must be granted.

Further, as the Chapter 13 plan proposed by the Debtors proposes no treatment for Transamerica's secured claim, the Court sustains Transamerica's Plan Objection, pursuant to 11 U.S.C. § 1325(a)(5). However, the Court determines that Transamerica's Case Dismissal Motion is not yet ripe for determination. Some time has passed and the Debtors' income and expenses may have changed from that originally presented at the commencement of their case. Therefore, the [*728] Court will order the Debtors to file updated [**35] schedules I and J and give them an opportunity to amend their chapter 13 plan in order to properly provide for Transamerica's claim.

IV. Conclusion

For the reasons stated above, Transamerica's AP Dismissal Motion is granted, and its Plan Objection is sustained. Transamerica's Case Dismissal Motion is denied without prejudice. The Debtor is ordered to file, on or before October 16, 1997, updated schedules I and J, an amended Chapter 13 plan and a motion to approve the amended Chapter 13 plan. Separate orders and a judgment shall enter in conformity herewith.

Dated: September 24, 1997

By the Court,

Henry J. Boroff

U.S. Bankruptcy Judge

ORDER

For the reasons provided in the Memorandum of Decision of even date, Transamerica Financial Corporation's "Motion to Dismiss" the Chapter 13 case

of Michael D. and Rose A. Desrosiers is denied without prejudice.

Dated: September 24, 1997

By the Court,

Henry J. Boroff

U.S. Bankruptcy Judge

**ORDER**

For the reasons provided in the Memorandum of Decision of even date, the "Objection to Confirmation of Debtors' Chapter 13 Plan" filed by creditor and defendant Transamerica Financial Corporation is sustained. **[**36]** The Debtors, Michael D. and Rose A. Desrosiers, are ordered to file (1) updated schedules I and J, (2) an amended Chapter 13 plan, and (3) a motion to approve such plan, on or before October 16, 1997.

Dated: September 24, 1997

By the Court,

Henry J. Boroff

U.S. Bankruptcy Judge

**JUDGMENT**

For the reasons provided in the Memorandum of Decision of even date, the "Motion to Dismiss [the] Adversary Proceeding" filed by creditor and defendant Transamerica Financial Corporation is granted and this Adversary Proceeding is dismissed.

Dated: September 24, 1997

By the Court,

Henry J. Boroff

U.S. Bankruptcy Judge

226 B.R. 734; 1998 Bankr. LEXIS 1371

IN RE: JOHN W. FIDLER and HELEN M. FIDLER, Debtors; JOHN W. FIDLER and HELEN M. FIDLER, Plaintiffs v. CENTRAL COOPERATIVE BANK, Defendant

Chapter 13, Case No. 96-10678-WCH, Adversary Proceeding No. 96-1270

UNITED STATES BANKRUPTCY COURT FOR THE DISTRICT OF MASSACHUSETTS, EASTERN DIVISION

226 B.R. 734; 1998 Bankr. LEXIS 1371

October 26, 1998, Decided
October 27, 1998, Entered on Docket

**DISPOSITION:** [**1] Treating Central's motion as a motion to vacate the previously granted summary judgment in favor of the Fidlers as to all TILA claims in Count 1 motion granted. Central's Motion to Dismiss granted in part and denied in part.

## CASE SUMMARY

**PROCEDURAL POSTURE:** Plaintiff debtors filed an adversary proceeding seeking a declaration that defendant creditor's claim had lawfully been rescinded and was void and unenforceable. The debtors alleged that the creditor had violated both the federal Truth-in-Lending Act (TILA), 15 U.S.C.S. § 1601 et seq., and the Massachusetts Consumer Cost Disclosure Act (CCCDA), Mass. Gen. Laws ch. 140D, § 1 et seq., which entitled the debtors to rescind the loan transaction.

**OVERVIEW:** In a prior opinion the court had denied the creditor's motion for summary judgment. The creditor had argued that the TILA and CCCDA recission claims were time-barred. Critical to the denial of summary judgment were the holdings that the debtors' recission claims were not affirmative claims but defensive claims of recoupment, and that recission claims brought as claims of recoupment under TILA and CCCDA were not subject to the respective limitation periods in those statutes. Subsequent to that decision by the court, the United States Supreme Court held in Beach v. Ocwen Federal Bank that TILA's three-year limitation period applies to a borrower's right of recission brought as a claim of recoupment. Based on this holding, the court vacated its prior summary judgment motion in favor of the debtors and held that the debtors' TILA claims were barred by the three-year limitations period of 15 U.S.C.S. § 1635(f). However, because the debtors' CCDA claims brought as claims of recoupment were not subject to the limitations period of Mass. Gen. Laws ch. 140D, § 10(f), the court denied the creditor's motion to dismiss the comparable CCCDA claims.

**OUTCOME:** The court granted the creditor's motion to dismiss the TILA claims as time-barred, treating it as a motion to vacate the court's prior summary judgment motion in favor of the debtors. The court denied the creditor's motion to dismiss the CCCDA claims as time-barred.

**CORE TERMS:** recoupment, recission, summary judgment, disclosure, loan transaction, consumer, defensive, time barred, et seq, borrower, statute of limitations, limitations period, right to rescind, consummation, dwelling, obligor, expire, limitation period, motion to vacate, secured claim, main action, non-numerical, defensively, three-year, construing, asserting, reaffirm, rescind, adversary proceeding, first mortgage

**LexisNexis(TM) Headnotes**

*Banking Law > Bank Activities > Consumer Protection > Truth in Lending*

[HN1]15 U.S.C.S. § 1635(a) of the federal Truth-in-Lending Act and Mass. Gen. Laws ch. 140D, § 10(a) of the Massachusetts Consumer Cost Disclosure Act are virtually identical and provide in part that except as otherwise provided in the section, in the case of any consumer credit transaction in which a security interest is or will be retained or acquired in any property which is used as the principal dwelling of the person to whom credit is extended, the obligor shall have the right to rescind the transaction until midnight of the third business day following the delivery of the information and recission forms required under this section together with a statement containing the material disclosures required under this subchapter by notifying the creditor of his intention to do so.

*Banking Law > Bank Activities > Consumer Protection > Truth in Lending*

[HN2]The federal Truth-in-Lending Act's three-year limitation period in 15 U.S.C.S. § 1635(f) apples to a

**8**

borrower's right of recission brought as a claim of recoupment.

*Civil Procedure > Pleading & Practice > Defenses, Objections & Demurrers > Motions to Dismiss*

[HN3]The standard for ruling on a motion to dismiss under Fed. R. Civ. P. 12(b)(6) requires the court to accept the factual averments contained in the complaint as true, indulging every reasonable inference helpful to the plaintiff's cause. The court may grant such a motion only if it clearly appears, according to the facts alleged, that the plaintiff cannot recover on any viable theory.

*Banking Law > Bank Activities > Consumer Protection > Truth in Lending*

[HN4]The federal Truth-in-Lending Act and the Massachusetts Consumer Cost Disclosure Act both provide that a borrower whose loan is secured by his principal dwelling and who has been denied the requisite disclosures may rescind the loan transaction.

*Banking Law > Bank Activities > Consumer Protection > Truth in Lending*

[HN5]15 U.S.C.S. § 1635(f), as interpreted by the Supreme Court, is more than a typical statute of limitations. It provides that an obligor's right of rescission shall expire three years after the date of consummation of the transaction or upon the sale of the property, whichever occurs first. Because it provides in such absolute terms that the right of recission shall expire after three years, § 1635 bars not just the bringing of a suit for recission, it extinguishes completely the right to rescind. Thus, no right of recission under § 1635 exists after three years, whether asserted offensively or defensively.

*Banking Law > Bank Activities > Consumer Protection > Truth in Lending*

[HN6]To demonstrate that a claim is being asserted in recoupment, the following elements must be satisfied: (1) the TILA violation and the creditor's debt arose from the same transaction, (2) the claimant is asserting her claim as a defense, and (3) the main action is timely.

**COUNSEL:** For Debtor: John F. Cullen, Cullen & Cullen, P.A., Boston, MA.


For Central Cooperative Bank: Paul D. Gallese, Zuroff, Rosen, Baumberg & Gallese, Wellesley, MA.

**JUDGES:** William C. Hillman, United States Bankruptcy Judge.

**OPINIONBY:** William C. Hillman

**OPINION:** [*735] DECISION ON DEFENDANT'S MOTION TO DISMISS


I. Factual Background n1

- - - - - - - - - - - - - - - Footnotes - - - - - - - - - - - - - - - -

n1 *See Fidler v. Central Cooperative Bank (In re Fidler), 210 B.R. 411, 414-417 (Bankr. D. Mass. 1997)*, for a more complete recitation of the facts.


- - - - - - - - - - - - End Footnotes- - - - - - - - - - - - - -

On January 24, 1980, the plaintiffs in this adversary proceeding, John W. Fidler and Helen M. Fidler (the "Fidlers"), purchased real property located at 6 Cross Street, Charlestown, Massachusetts (the "Property"). n2 It is their primary dwelling. In December 1983, they refinanced the Property, borrowing $ 32,500 from [**2] the Defendant, Central Cooperative Bank ("Central"), secured by a first mortgage. In May 1986, the Fidlers refinanced the 1983 loan, borrowing $ 42,000 from Central secured by a replacement mortgage in that amount. In March 1987, the Fidlers obtained an additional loan of $ 35,500 from Bedford Mortgage Corporation secured by a second mortgage on the Property.

- - - - - - - - - - - - - - Footnotes - - - - - - - - - - - - - - - -

n2 Mrs. Helen M. Fidler has since passed away.


- - - - - - - - - - - - End Footnotes- - - - - - - - - - - - - -

In August 1987, the Fidlers entered into negotiations with Central to refinance the mortgages on the Property. On October 21, 1987, the Fidlers executed an Indexed Adjustable Rate Mortgage Note ("Note") in the principal amount of $ 80,000 and granted Central a first mortgage on the Property. The Fidlers subsequently defaulted on a number of payments under the Note and on September 5, 1995, counsel for Central sent the Fidlers a Notice of Intent to Foreclose.

On January 31, 1996, the Fidlers filed a petition under Chapter 13 of the Bankruptcy Code, 11 U.S.C. § 101 et seq. On March 14, 1996, Central filed [**3] an Amended Proof of Claim, asserting a secured claim in the amount of $ 89,633.08. On June 4, 1996, the Fidlers commenced their present adversary proceeding, seeking, *inter alia*, a declaration that the 1987 transaction had lawfully been rescinded and that the

226 B.R. 734; 1998 Bankr. LEXIS 1371

secured claim asserted by Central is void and unenforceable. The Fidlers' complaint alleges that Central, in conducting the loan transaction, violated both the federal Truth-in-Lending Act, 15 U.S.C. § 1601 *et seq.* ("TILA"), and the Massachusetts Consumer Cost Disclosure Act, Mass. Gen. Laws ch. 140D, § 1 *et seq.* ("CCCDA"). A lender's violation of certain provisions of TILA or CCCDA entitles the borrower to rescind the loan transaction. *See* § 1635(a); ch. 140D, § 10(a). n3

- - - - - - - - - - - - - - Footnotes - - - - - - - - - - - - - - - - -

n3 [HN1]Section 1635(a) and ch. 140D, § 10(a) are virtually identical and provide, in relevant part:Except as otherwise provided in this section, in the case of any consumer credit transaction . . . in which a security interest . . . is or will be retained or acquired in any property which is used as the principal dwelling of the person to whom credit is extended, the obligor shall have the right to rescind the transaction until midnight of the third business day following . . . the delivery of the information and recission forms required under this section together with a statement containing the material disclosures required under this subchapter . . . by notifying the creditor . . . of his intention to do so.

- - - - - - - - - - - - - End Footnotes- - - - - - - - - - - - - -

[**4]

Central responded to the Fidlers' complaint by filing a Motion for Summary Judgment in which it argued, *inter alia*, that the Fidler's TILA and CCCDA recission claims are time barred. *See* § 1635(f); ch. 140D, § 10(f). n4 On June 30, 1997, I issued an order and decision granting in part and denying in part Central's Motion for Summary Judgment and granting summary judgment in favor of the Fidlers on Count 1 of their complaint. *See Fidler v. Central Cooperative Bank (In re Fidler), 210 B.R. 411 (Bankr. D. Mass. 1997)* ("*Fidler I*"). Critical to the denial of summary judgment on several counts in the complaint were my holdings (1) that the Fidlers' TILA and CCCDA recission claims were not affirmative claims but rather, [*736] were defensive claims of recoupment, and (2) that recission claims brought as claims of recoupment under TILA and CCCDA are not subject to the respective limitation periods in those statutes. *See id.* at 419, 420.

- - - - - - - - - - - - - Footnotes - - - - - - - - - - - - - - - - -

n4 Section 1635(f) provides, in relevant part: "An obligor's right of recission shall expire three years after the date of consummation of the transaction . . . ." Section 10(f) is identical except that it provides a 4-year limitations period.

It is undisputed that the Fidlers' notice of recission on November 30, 1995 occurred more than 4 years after the consummation of the loan transaction on October 21, 1987.

- - - - - - - - - - - End Footnotes- - - - - - - - - - - - - - -

[**5]

Subsequent to my decision in *Fidler I*, the United States Supreme Court issued its decision in *Beach v. Ocwen Federal Bank*, holding that [HN2]TILA's three-year limitation period in § 1635(f) does apply to a borrower's right of recission brought as a claim of recoupment. 523 U.S. 410, 118 S. Ct. 1408, 140 L. Ed. 2d 566 (1997). In reliance on *Beach*, Central now moves for dismissal of all counts in the Fidlers' complaint pertaining to TILA and CCCDA. Because I also granted summary judgment in favor of the Fidlers on Count 1 of their complaint "on the issue of whether Central's non-numerical disclosures in the September TILA Statement violated TILA," *see Fidler I, 210 B.R. at 427,* I will treat Central's Motion to Dismiss Count 1 as a motion to vacate the granting of summary judgment as well. For the following reasons, Central's motion is granted in part and denied in part.

II. Discussion

A. Motion to Dismiss Standard

[HN3]The standard for ruling on a motion to dismiss under FED. R. CIV. P. 12(b)(6) requires me to accept the "factual averments contained in the complaint as true, indulging every reasonable inference helpful to the plaintiff's cause." *Garita Hotel Ltd.* [**6] *Partnership v. Ponce Fed. Bank, 958 F.2d 15, 17 (1st Cir. 1992).* I may grant such a motion "only if it clearly appears, according to the facts alleged, that the plaintiff cannot recover on any viable theory." *Id.* (quoting *Correa-Martinez v. Arrillaga-Belendez, 903 F.2d 49, 52 (1st Cir. 1990)).* The issue for determination is whether the Fidlers' TILA and CCCDA claims are time barred. If I determine that the Fidlers' claims are barred by an applicable limitations period, dismissal will be appropriate.

B. TILA and CCCDA

Both TILA and CCCDA were enacted "to assure a meaningful disclosure of credit terms so that the consumer will be able to compare more readily the various credit terms available to him and avoid the uninformed use of credit, and to protect the consumer against inaccurate and unfair credit billing and credit card practices." § 1601(a); *see Beach*, 118 S. Ct. at 1409-10. [HN4]Both acts provide that a borrower whose loan is secured by his principal dwelling and who has been denied the requisite disclosures may rescind the loan transaction. § 1635; ch. 140D, § 10; *see Beach, 118 S. Ct. at 1410*. The recission provision of TILA, however, is not the law in Massachusetts. [**7] Acting pursuant to its powers under § 1633, the Board of Governors of the Federal Reserve System has exempted credit transactions within Massachusetts subject to CCCDA from chapters two and four of TILA. *See 48 Fed. Reg. 14882, 14890* (April 6, 1983); *Desrosiers v. Transamerica Fin. Corp. (In re Desrosiers)*, 212 B.R. 716, 722 n.6 (Bankr. D. Mass. 1997). n5 Chapter two of TILA includes §§ 1631 through 1646. Thus, the transaction at issue here is governed not by TILA but by CCCDA. n6

- - - - - - - - - - - - - - Footnotes - - - - - - - - -
- - - - - -

n5 Section 1633 provides:The Board shall by regulation exempt from the requirements of this part any class of credit transactions within any State if it determines that under the law of that State that class of transactions is subject to requirements substantially similar to those imposed under this part, and that there is adequate provision for enforcement.

n6 Even if this case were governed by TILA, § 1635(i)(3), which provides that "nothing in this subsection affects a consumer's right of recission in recoupment under State law," would direct my inquiry to CCCDA and other Massachusetts law concerning recoupment.

- - - - - - - - - - - - End Footnotes- - - - - - - -
- - - - - -

[**8]

Though it does not govern this case, TILA nevertheless remains relevant to this inquiry. Because TILA was the model on which CCCDA was based, federal court decisions construing TILA are instructive in construing parallel provisions of CCCDA. *See Mayo v. Key Fin. Serv., Inc.*, 424 Mass. 862, 864, 678 N.E.2d 1311 (1997); *Desrosiers*, 212 B.R. at 722.

[*737] C. Statute of Limitations

Central relies on the Supreme Court's recent decision in *Beach* for its proposition that the Fidlers' recission claims are time barred under § 1635(f) and ch. 140D, § 10(f). n7 The Fidlers answer that because their recission claims are in recoupment, they are exempt from those limitations periods. "Recoupment is a purely defensive matter growing out of [a] transaction constituting plaintiff's cause of action and is available only to reduce or satisfy plaintiff's claim and permits of no affirmative judgment." BLACK'S LAW DICTIONARY 1275 (6th ed. 1990) (*citing Schroeder v. Prince Charles, Inc., 427 S.W.2d 414, 419 (Mo. 1968)); see also United Structures of America, Inc. v. G.R.G. Eng., S.E.*, 9 F.3d 996, 998 (1st Cir. 1993). As statutes of limitations merely bar the *bringing* of a suit [**9] after a certain period of time, they normally do not bar claims of recoupment because such claims are defensive in nature. *See Bull v. United States, 295 U.S. 247, 262, 79 L. Ed. 1421, 55 S. Ct. 695 (1935)* (holding that defense of recoupment "is never barred by the statute of limitations so long as the main action itself is timely.").

- - - - - - - - - - - - - Footnotes - - - - - - - - -
- - - - - -

n7 Although the events giving rise to this litigation predated the Supreme Court's decision in *Beach*, that decision has full retroactive effect in this case because it is still an open case subject to direct review. *See Harper v. Virginia Dept. of Taxation, 509 U.S. 86, 97, 125 L. Ed. 2d 74, 113 S. Ct. 2510 (1993)*.

- - - - - - - - - - - - End Footnotes- - - - - - -
- - - - - -

[HN5]Section 1635(f), however, as interpreted by the Supreme Court, is more than a typical statute of limitations. *See Beach, 118 S. Ct. at 1412*. It provides that "an obligor's right of rescission shall expire three years after the date of consummation of the transaction or upon the sale of the property, whichever occurs first." 15 U.S.C. § 1635(f). Because [**10] it provides in such absolute terms that the *right of recission shall expire* after three years, § 1635 bars not just the *bringing* of a suit for recission, it extinguishes *completely* the right to rescind. *See Beach, 118 S. Ct. at 1412*. Thus, no right of recission under § 1635 exists after three years, whether asserted offensively or defensively.

As stated above, however, this case is governed not by TILA but by CCCDA. While the Supreme Court's opinion in *Beach* settles the law with respect to TILA,

226 B.R. 734; 1998 Bankr. LEXIS 1371

it says nothing of state Truth-in-Lending acts such as CCCDA. The Court itself noted: "Since there is no claim before us that Florida law purports to provide any right to rescind defensively on the grounds relevant under the Act, we have no occasion to explore how state recoupment law might work when raised in a foreclosure proceeding outside the 3-year period." *See* 118 S. Ct. at 1413, n.6.

While CCCDA § 10 closely parallels its federal counterpart, § 1635, including the limitation period provision, the two sections are not identical. A 1996 amendment to CCCDA, ch. 140D, § 10(i)(3) provides: "Nothing in this section shall be construed so as to affect a consumer's [**11] right of recoupment under the laws of the commonwealth." By inserting this provision, the Massachusetts Legislature has essentially ended any debate over the meaning of the limitations period in ch. 140D, § 10(f). However else it may be construed, one thing is for certain: ch. 140D, § 10(f) does not affect the Fidlers' right of recoupment.

### D. The Fidlers' Right of Recoupment

The common law doctrine of recoupment is a well-established method of reducing "part of the plaintiff's claim because of a right in the defendant arising out of the same transaction." *United Structures of America, Inc.*, 9 F.3d at 998; *see also Mohawk Industries v. United States (In re Mohawk Industries)*, 82 B.R. 174, 176 (Bankr. D. Mass. 1987). [HN6]To demonstrate that a claim is being asserted in recoupment, the following elements must be satisfied: "(1) the TILA violation and the creditor's debt arose from the same transaction, (2) [The claimant] is asserting her claim as a defense, and (3) the 'main action' is timely." *Smith v. American Financial Systems, Inc. (In re Smith)*, 737 F.2d 1549, 1553 (11th Cir. 1984); *see also Coxson v. Commonwealth Mortgage Co. of America (Matter of Coxson)*, [**12] 43 F.3d 189, 193 (5th Cir. 1995). I held in *Fidler I*, and now reaffirm, that the Fidlers satisfied these [*738] elements and that their claims under TILA and CCCDA were asserted as defensive claims of recoupment. *See* 210 B.R. at 420.

### III. Conclusion

In accordance with the Supreme Court's recent pronouncement in *Beach*, I now hold that the Fidler's TILA claims are barred by the three-year limitations period of § 1635(f). Accordingly, treating Central's motion as a motion to vacate the previously granted summary judgment in favor of the Fidlers as to all TILA claims in Count 1, I grant the motion. I also grant Central's Motion to Dismiss as to all TILA claims in Counts 1, 2, 4, 11, and 12. The Fidler's CCCDA claims brought as claims of recoupment are not subject to the limitations period of ch. 140D, § 10(f) and thus, Central's Motion to Dismiss is denied as to all CCCDA claims in Counts 1, 2, 4, 11, and 12. I reaffirm the grant of summary judgment in favor of the Fidlers on Count 1 "on the issue of whether Central's non-numerical disclosures in the September TILA Statement violated [CCCDA]." *See Fidler I*, 210 B.R. at 427.

William C. Hillman

United States Bankruptcy [**13] Judge

Dated: 10/26/98

444 U.S. 555; 100 S. Ct. 790; 63 L. Ed. 2d 22; 1980 U.S. LEXIS 60

FORD MOTOR CREDIT CO. ET AL. v. MILHOLLIN * ET AL.

* Although respondents spell their name "Millhollin," throughout this litigation their name has been misspelled as "Milhollin." Because legal research catalogs and computers are governed by the principle of consistency, not correctness, we feel constrained to adhere to the erroneous spelling.

No. 78-1487

SUPREME COURT OF THE UNITED STATES

444 U.S. 555; 100 S. Ct. 790; 63 L. Ed. 2d 22; 1980 U.S. LEXIS 60

December 4, 1979, Argued
February 20, 1980, Decided

**PRIOR HISTORY: [****1]**

CERTIORARI TO THE UNITED STATES COURT OF APPEALS FOR THE NINTH CIRCUIT.

**DISPOSITION:** 588 F.2d 753, reversed and remanded.

## CASE SUMMARY

**PROCEDURAL POSTURE:** Petitioner credit company sought review of decision, by United States Court of Appeals for Ninth Circuit, holding that Truth in Lending Act, 15 U.S.C.S. § 1601 et seq., imposed a general acceleration clause disclosure requirement and that under Regulation Z, 12 C.F.R. pt. 226 (1979), a creditor must disclose whether a rebate of unearned interest would be made upon acceleration and disclose method by which amount of interest would be computed.

**OVERVIEW:** Petitioner credit company sought review of a decision holding that the Truth in Lending Act (TIL), 15 U.S.C.S. § 1601 et seq., imposed a general acceleration clause disclosure requirement and that, under Regulation Z, 12 C.F.R. pt. 226 (1979), a creditor had to disclose whether a rebate of unearned interest would have been made upon acceleration and that creditor had to disclose the method by which the amount of interest was to be computed. The Court that held an acceleration clause could not be equated with default, delinquency, or similar charge, subject to disclosure under TIL, U.S.C.S. §§ 1638(a)(9), 1639(a)(7), and Regulation Z, 12 C.F.R. § 226.8 (b)(4). Considerable respect was due an interpretation of statute by Federal Reserve Board charged with administration of TIL. Unless demonstrably irrational, Federal Reserve Board staff opinions construing TIL or Regulation Z were dispositive. The Federal Reserve Board staff could reasonably have concluded consumers would have been more concerned about differing financial consequences of acceleration and that separate disclosure of voluntary prepayments and acceleration rebate practices was not warranted under TIL and Regulation Z.

**OUTCOME:** The Court reversed and remanded. The Court held that an acceleration clause could not be equated with a default, delinquency, or similar charge, subject to disclosure under Truth in Lending (TIL) and Regulation Z. Further, unless demonstrably irrational, Federal Reserve Board decision construing TIL as not requiring disclosure of acceleration rebate practices, was both an interpretation due considerable deference and dispositive of issue.

**CORE TERMS:** acceleration, rebate, disclosure, staff, prepayment, default, unearned, regulation, delinquency, finance, disclose, Lending Act, finance charge, installment, accelerate, consumer, precomputed, buyer, deference, separately, computed, front, acceleration clause, customer, disclosure requirement, acceleration-clause, contradiction, accelerated, computing, lawmaking

**LexisNexis(TM) Headnotes**

*Banking Law > Bank Activities > Consumer Protection > Truth in Lending*

[HN1]The Truth in Lending Act has the broad purpose of promoting the informed use of credit by assuring meaningful disclosure of credit terms to consumers. Truth in Lending Act, 15 U.S.C.S. § 1601.

*Banking Law > Bank Activities > Consumer Protection > Truth in Lending*

[HN2]Congress delegated expansive authority to the Federal Reserve Board to elaborate and expand the legal framework governing commerce in credit. Truth in Lending Act, 15 U.S.C.S. § 1604.

*Governments > Legislation > Interpretation*

*Banking Law > Bank Activities > Consumer Protection > Truth in Lending*

**9**                                        Page 1

444 U.S. 555; 100 S. Ct. 790; 63 L. Ed. 2d 22; 1980 U.S. LEXIS 60

[HN3]Interpretation of Truth in Lending Act, 15 U.S.C.S. §§ 1601 et seq., and Regulation Z, 12 C.F.R. pt. 226 (1979), demands an examination of their express language; absent a clear expression, it becomes necessary to consider the implicit character of the statutory scheme.

***Banking Law > Bank Activities > Consumer Protection > Truth in Lending***

[HN4]The issue of acceleration disclosure is not governed by clear expression in the Truth in Lending Act, 15 U.S.C.S. § 1601 et seq., or Regulation Z, 12 C.F.R. pt. 226 (1979), and it is appropriate to defer to the Federal Reserve Board and staff in determining what resolution of that issue is implied by the truth-in-lending enactments.

***Banking Law > Bank Activities > Consumer Protection > Truth in Lending***

[HN5]See 12 C.F.R. § 226.8(b)(7).

***Banking Law > Bank Activities > Consumer Protection > Truth in Lending***

[HN6]An acceleration clause cannot be equated with a default, delinquency, or similar charge, subject to disclosure under Truth in Lending Act, U.S.C.S. §§ 1638(a)(9), 1639(a)(7), and Regulation Z, 12 CFR § 226.8 (b)(4).

***Banking Law > Bank Activities > Consumer Protection > Truth in Lending***

[HN7]The prerogative of acceleration affords the creditor a mechanism for collecting the outstanding portion of a debt on which there has been a partial default. In itself, acceleration entails no monetary penalty, although a creditor may independently impose such a penalty, for example, by failing to rebate unearned finance charges.

***Banking Law > Bank Activities > Consumer Protection > Truth in Lending***

[HN8]A default, delinquency, or similar charge, on the other hand, self-evidently refers to a specific assessable sum. Thus, within the trade, delinquency charges are understood to be the compensation a creditor receives on a precomputed contract for the debtor's delay in making timely installment payments.

***Banking Law > Bank Activities > Consumer Protection > Truth in Lending***

[HN9]12 C.F.R. § 226.8 (b)(7) squares with the position of the Federal Reserve Board staff that specific disclosure of acceleration rebate policy is only necessary when that policy varies from the custom with respect to voluntary prepayment rebates.

***Governments > Legislation > Interpretation***

[HN10]It is a commonplace that courts will further legislative goals by filling the interstitial silences within a statute or a regulation. Because legislators cannot foresee all eventualities, judges must decide unanticipated cases by extrapolating from related statutes or administrative provisions.

***Governments > Legislation > Interpretation***

[HN11]Legislative silence is not always the result of a lack of prescience; it may instead betoken permission or, perhaps, considered abstention from regulation. In that event, judges are not accredited to supersede Congress or the appropriate agency by embellishing upon the regulatory scheme.

***Governments > Legislation > Interpretation***

***Banking Law > Bank Activities > Consumer Protection > Truth in Lending***

[HN12]Deference is especially appropriate in the process of interpreting the Truth in Lending Act (TIL), 15 U.S.C.S. § 1601 et seq., and Regulation Z, 12 C.F.R. pt. 226 (1979). Unless demonstrably irrational, Federal Reserve Board staff opinions construing the TIL or Regulation Z should be dispositive.

***Governments > Legislation > Interpretation***

[HN13]Considerable respect is due the interpretation given a statute by the officers or agency charged with its administration. An agency's construction of its own regulations is regarded as especially due that respect.

***Banking Law > Bank Activities > Consumer Protection > Truth in Lending***

[HN14]Traditional acquiescence in administrative expertise is particularly apt under Truth in Lending Act, 15 U.S.C.S. § 1601 et seq., because the Federal Reserve Board has played a pivotal role in setting the statutory machinery in motion.

***Banking Law > Regulatory Agencies > Federal Reserve Board***

***Banking Law > Bank Activities > Consumer Protection > Truth in Lending***

[HN15]Congress has specifically designated the Federal Reserve Board and staff as the primary source for interpretation and application of truth-in-lending law.

***Banking Law > Bank Activities > Consumer Protection > Truth in Lending***

[HN16]Acceleration rebate practices need be disclosed only when they diverge from other prepayment rebate practices.

444 U.S. 555; 100 S. Ct. 790; 63 L. Ed. 2d 22; 1980 U.S. LEXIS 60

**DECISION:** General rule of disclosure of existence of acceleration clause on front of retail installment contract, held not mandated by Truth in Lending Act (15 USCS 1601 et seq.).

**SUMMARY:** Several persons purchased automobiles from various dealers, financing their purchases through standard retail installment contracts that were assigned to a finance company. As required by the Truth in Lending Act (15 USCS 1601 et seq.) and implementing Regulation Z of the Federal Reserve Board (12 CFR Part 226), the front page of each contract disclosed and explained certain features of the agreement, but no mention was made on the disclosure page that a clause in the body of the contract gave the creditor a right to accelerate payment of the entire debt upon the buyer's default. The buyers then commenced four separate suits against the finance company in the United States District Court for the District of Oregon, alleging, among other things, that the finance company had violated the Act and Regulation Z by failing to disclose on the front page of the contract that the creditor retained the right to accelerate payment of the debt. In two of the suits, the District Court held that facial disclosure of the acceleration clauses was mandated by the provision of the Act compelling publication of "default, delinquency, or similar charges payable in the event of late payments" (15 USCS 1638(a)(9) and 1639(a)(7)). On a consolidated appeal of such two cases and the two other suits in which buyers prevailed on other grounds, the United States Court of Appeals for the Ninth Circuit agreed with the District Court that the Act imposed a general acceleration clause disclosure requirement, basing its decision on the principle that under Regulation Z the creditor must disclose whether a rebate of unearned interest will be made upon acceleration and also disclose the method by which the amount of unearned interest will be computed if the debt is accelerated, the Court implicitly rejecting the contrary administrative interpretation of the pertinent statutory and regulatory provisions (588 F2d 753).

On certiorari, the United States Supreme Court reversed and remanded. In an opinion by Brennan, J., expressing the unanimous view of the court, it was held that the Truth in Lending Act does not mandate a general rule that the existence of an acceleration clause always be disclosed on the face of a credit agreement, since, in view of the fact that the issue of acceleration disclosure was not governed by clear expression in the Act or the Federal Reserve Board's Regulation Z, a high degree of deference to the judgment to the Board and its staff that the Act and Regulation impose no such uniform requirement and that acceleration rebate practices need be disclosed only when they diverge from other prepayment rebate practices was mandated.

Blackmun, J., joined by Burger, Ch. J., concurred, agreeing that the Federal Reserve Board's approach to the disclosure of acceleration rebates was reasonable, but expressing the view that requiring disclosure of the creditor's right to retain finance charges upon acceleration when it differed from the right to such charges upon prepayment could prove to be a sounder and more durable application of the statute than the position adopted by the Board.

**LAWYERS' EDITION HEADNOTES:**

**[***LEdHN1]**
LENDERS §1
STATUTES §158.8
Truth in Lending Act -- retail installment contracts -- front page disclosure of acceleration clause -- deference to Federal Reserve Board --
Headnote:[1A][1B][1C]
The Truth in Lending Act (15 USCS 1601 et seq.) does not mandate a general rule that the existence of an acceleration clause giving the creditor a right to accelerate payment of the entire debt upon the buyer's default always be disclosed on the face of a standard retail installment contract; in view of the fact that the issue of acceleration disclosure is not governed by clear expression in the Act or implementing Regulation Z of the Federal Reserve Board (12 CFR Part 226), a high degree of deference to the judgment of the Board and its staff that the Act and Regulation Z impose no such uniform disclosure requirement and that acceleration rebate practices need be disclosed only when they diverge from other prepayment rebate practices is mandated.

**[***LEdHN2]**
LENDERS §1
Truth in Lending Act -- construction --
Headnote:[2]
Interpretation of the Truth in Lending Act (15 USCS 1601 et seq.) and implementing Regulation Z of the Federal Reserve Board (12 CFR Part 226) demands an examination of their express language, and absent a clear expression it is necessary to consider the implicit character of the statutory scheme.

**[***LEdHN3]**
LENDERS §1
Truth in Lending Act -- default, delinquency, or similar charge -- disclosure -- acceleration of payments --
Headnote:[3]
A "default, delinquency, or similar charg[e]" subject to mandatory disclosure on the front page of a retail installment contract under the Truth in Lending Act (15 USCS 1638(a)(9), 1639(a)(7)) and Federal Reserve

Page 3

Board Regulation Z ( 12 CFR 226.8(b)(4)) refers to a specific assessable penalty sum, and is not broad enough to apply to acceleration of payments.

[***LEdHN4]
COURTS §93
STATUTES §129
construction -- judicial extrapolation -- related statutes and administrative provisions --
Headnote:[4]
Courts must decide cases unanticipated by legislators enacting a statute by extrapolating from related statutes and administrative provisions, but where legislative silence betokens permission or considered abstention from regulation, rather than a lack of prescience, courts are not accredited to supersede Congress or the appropriate agency by embellishing upon the regulatory scheme.

[***LEdHN5]
LENDERS §1
STATUTES §158.8
Truth in Lending Act -- construction -- deference to Federal Reserve Board --
Headnote:[5]
In interpreting the Truth in Lending Act (15 USCS 1601 et seq.) and implementing Regulation Z of the Federal Reserve Board (12 CFR Part 226), Board staff opinions construing the Act or Regulation should be dispositive unless demonstrably irrational, the Act being best construed by those who give it substance in promulgating regulations under it, and Congress having specifically designated the Board and staff as the primary source for interpretation and application of truth in lending law.

[***LEdHN6]
ERROR §1750
remand -- issues open for consideration --
Headnote:[6A][6B]
Upon remand by the United States Supreme Court, after reversal of a Federal Court of Appeals' decision which erroneously rejected the views of the Federal Reserve Board and staff and held that separate disclosure of acceleration rebate practices on the front page of retail installment contracts is always required by the Truth in Lending Act (15 USCS 1601 et seq.), the argument that a creditor violated the Act and implementing Board Regulation Z (12 CFR Part 226) because its credit contracts with borrowers contained language concerning acceleration rebates that assertedly contradicted the disclosures on the face of the contracts, which contradiction could run afoul of 12 CFR 226.8(b)(7) or 226.6(c), is open for decision, the borrowers having prevailed in the federal courts below upon broader rulings that acceleration clause

disclosure was generally required and the courts below not having addressed the specific allegation of contradiction.

SYLLABUS: Respondents financed their purchases of automobiles through standard retail installment contracts that were assigned to petitioner finance company. Each contract provided that respondents were to pay a precomputed finance charge, and, as required by the Truth in Lending Act (TILA) and implementing Federal Reserve Board (FRB) Regulation Z, the front page of each contract disclosed and explained certain features of the contract, including a disclosure that the buyer could prepay his obligations under the contract in full at any time prior to maturity of the final installment and that if he did so he would receive a rebate of the unearned portion of the finance charge. The face of the contract also stated that temporary [****2] default on a particular installment would result in a delinquency charge, but no mention was made of a clause in the contract giving the creditor a right to accelerate payment of the entire debt upon the buyer's default. Respondents thereafter brought separate suits in District Court, alleging, inter alia, that petitioner finance company had violated TILA and Regulation Z by failing to disclose on the front page of the contract that the creditor retained the right to accelerate payment of the debt. The District Court in two of the suits held that facial disclosure of the acceleration clauses was mandated by the provisions of TILA, 15 U. S. C. §§ 1638 (a)(9), 1639 (a)(7), that compel publication of "default, delinquency, or similar charges payable in the event of late payments." On a consolidated appeal, the Court of Appeals agreed that TILA imposes a general acceleration-clause disclosure requirement, but rather than holding that acceleration is a default charge, the Court of Appeals based its decision on the principle that under Regulation Z the creditor must disclose whether a rebate of unearned interest will be made upon acceleration and also must disclose [****3] the method by which the amount of unearned interest will be computed if the debt is accelerated. In so holding, the court rejected the FRB staff's contrary interpretation of the pertinent statutory and regulatory provisions that specific disclosure of an acceleration rebate policy is only necessary when that policy varies from the custom with respect to voluntary prepayment rebates.

Held: TILA does not mandate a general rule of disclosure for acceleration clauses. Pp. 559-570.

(a) The issue of acceleration disclosure is not governed by clear expression in the statute or regulations. An acceleration clause cannot be equated with a "default, delinquency, or similar [charge]," subject to disclosure

under §§ 1638 (a)(9) and 1639 (a)(7) and Regulation Z, and the prepayment rebate disclosure requirement of Regulation Z also fails to afford direct support for an invariable specific acceleration disclosure rule. Pp. 559-562.

(b) In the absence of an express statutory mandate that acceleration procedures be invariably disclosed, a high degree of deference to the FRB staff's consistent administrative interpretation that the statute and regulations impose no such uniform requirement [****4] is warranted. Although the staff might have decided that acceleration rebates are so analytically distinct from identical voluntary prepayment rebates as to warrant separate disclosure, it was reasonable to conclude, alternatively, that ordinary consumers would be concerned chiefly about differing financial consequences. Pp. 562-570.

COUNSEL: William M. Burke argued the cause for petitioners. With him on the briefs were George R. Richter, Jr., Ronald M. Bayer, Herbert H. Anderson, and John M. Berman.

Richard A. Slottee argued the cause for respondents. With him on the brief were William H. Clendenen, Jr., and Richard Kanter.

Stuart A. Smith argued the cause for the United States as amicus curiae urging reversal. With him on the brief were Solicitor General McCree, Assistant Attorney General Shenefield, John J. Powers III, and Marion L. Jetton. +

> +Briefs of amici curiae urging reversal were filed by Roland E. Brandel for the California Bankers Association; by Peter D. Schellie and Theodore R. Boehm for the Consumer Bankers Association; and by William H. Allen and Vernon L. Evans for the National Consumer Finance Association et al.
>
> Margaret S. Rigg and Willard P. Ogburn filed a brief for the National Clients Council, Inc., as amicus curiae urging affirmance.

[****5]

JUDGES: BRENNAN, J., delivered the opinion for a unanimous Court. BLACKMUN, J., filed a concurring opinion, in which BURGER, C. J., joined, post, p. 570.

OPINIONBY: BRENNAN

OPINION: [*557] [***26] [**792] MR. JUSTICE BRENNAN delivered the opinion of the Court.

[***LEdHR1A] [1A]The issue for decision in this case is whether the Truth in Lending Act (TILA), 82 Stat. 146, as amended, 15 U. S. C. § 1601 et seq., requires that the existence of an acceleration clause always be disclosed on the face of a credit agreement. The Federal Reserve Board staff has consistently construed the statute and regulations as imposing no such uniform requirement. Because we believe that a high degree of deference to this administrative interpretation is warranted, we hold that TILA does not mandate a general rule of disclosure for acceleration clauses.

[**793] I

The several respondents in this case purchased automobiles from various dealers, financing their purchases through standard retail installment contracts that were assigned to petitioner Ford Motor Credit Co. (FMCC), a finance company. Each [****6] contract provided that respondents were to pay a precomputed finance charge. As required by TILA and Federal Reserve Board Regulation Z, which implements the Act, the front page of each contract disclosed and explained certain features of the agreement. See 15 U. S. C. § 1631; 12 CFR § 226.6 (a) (1979). Among these disclosures was a paragraph informing the buyer that he

"may prepay his obligations under this contract in full at any time prior to maturity of the final installment hereunder, and, if he does so, shall receive a rebate of the unearned portion of the Finance Charge computed under the sum of the digits method. . . ."

The face of the contract also stated that temporary default on a particular installment would result in a predetermined [*558] delinquency charge. Not mentioned on the disclosure page was a clause in the body of the contract giving the creditor a right to accelerate payment of the entire debt upon the buyer's default. n1



- - - - - - - - - - - - - - Footnotes - - - - - - - - - - - - - - - -

n1 "In the event Buyer defaults in any payment . . . Seller shall have the right to declare all amounts due or to become due hereunder to be immediately due and payable. . . ."

- - - - - - - - - - - - - End Footnotes- - - - - - - - - - - - - -

[****7]

Respondents subsequently commenced four separate suits against FMCC in the United States District Court for the District of Oregon, alleging, inter alia, that

FMCC **[\*\*\*27]** had violated TILA and Regulation Z by failing to disclose on the front page of the contract that the creditor retained the right to accelerate payment of the debt. n2 In two of the suits, n3 the District Court held that facial disclosure of the acceleration clauses was mandated by the provision of TILA that compels publication of "default, delinquency, or similar charges payable in the event of late payments," 15 U. S. C. §§ 1638 (a) (9), 1639 (a)(7). App. 30-31, 37, 69-71. Respondents in the other two actions prevailed on different grounds. n4 All four cases were consolidated on appeal to the Ninth Circuit.

- - - - - - - - - - - - - - Footnotes - - - - - - - - -

n2 The individual suits were *Milhollin* v. *Ford Motor Credit Co.*, Civ. No. 75-334 (1976); *Eaton* v. *Ford Motor Credit Co.*, Civ. No. 76-575 (1977); *Andresen* v. *Ford Motor Credit Co.*, Civ. No. 76-1090 (1977); and *Messinger* v. *Ford Motor Credit Co.*, Civ. No. 76-475 (1977).

**[\*\*\*\*8]**

n3 *Milhollin* and *Eaton, supra* n. 2.

n4 *Andresen* and *Messinger, supra* n. 2.

- - - - - - - - - - - End Footnotes- - - - - - - - - - - - -

The Court of Appeals agreed with the District Court that TILA imposes a general acceleration-clause disclosure requirement. n5 Rather than resting on the District Court's holding that acceleration is a default charge, however, the Court of Appeals based its decision on the narrower principle that under Regulation Z "[the] creditor must disclose whether a rebate of unearned interest will be made upon acceleration **[\*559]** and also disclose the method by which the amount of unearned interest will be computed if the debt is accelerated." 588 F.2d 753, 757 (1978), quoting *St. Germain* v. *Bank of Hawaii*, 573 F.2d 572, 577 (CA9 1977). See 12 CFR § 226.8 (b)(7) (1979). Implicit in the conclusion of the Court of Appeals -- and explicit in its preceding *St. Germain* decision -- was the rejection of a contrary administrative interpretation of the pertinent statutory and regulatory provisions. In adopting its particular approach, the Court **[\*\*\*\*9]** of Appeals mapped a path through the disclosure thicket that diverges from the routes traveled by the Courts of Appeals for several other Circuits. n6 We **[\*\*794]** granted certiorari, 442 U.S. 940 (1979), to resolve the conflict. We reverse.

- - - - - - - - - - - - - - Footnotes - - - - - - - - -

n5 The Court of Appeals rejected the grounds for TILA liability relied upon by the District Court in *Andresen* and *Messinger*, and remanded those two cases for consideration under the acceleration-clause theory.

n6 The Courts of Appeals for the Eighth and Tenth Circuits have flatly declared that a creditor's rebate practice upon acceleration never need be disclosed. *Griffith* v. *Superior Ford*, 577 F.2d 455 (CA8 1978); *United States ex rel. Hornell* v. *One 1976 Chevrolet*, 585 F.2d 978 (CA10 1978). The Courts of Appeals for the Third and District of Columbia Circuits have held that acceleration rebate policies need not be separately disclosed when state law or the contract compels the creditor to rebate under acceleration, as under voluntary prepayment. *Johnson* v. *McCrackin-Sturman Ford, Inc.*, 527 F.2d 257 (CA3 1975); *Price* v. *Franklin Investment Co.*, 187 U. S. App. D. C. 383, 574 F.2d 594 (1978). The Court of Appeals for the First Circuit has also adopted the position that separate disclosure is not required when the creditor is obliged to treat acceleration and voluntary prepayment alike for rebate purposes; that court has emphasized that the critical factor is the creditor's legal obligation to rebate, rather than its unbidden rebate policy. *McDaniel* v. *Fulton Nat. Bank*, 571 F.2d 948 (en banc), clarified, 576 F.2d 1156 (1978) (en banc).

- - - - - - - - - - - End Footnotes- - - - - - - - - - - - -

**[\*\*\*\*10]**

II

**[\*\*\*LEdHR1B]** **[1B]** **[\*\*\*LEdHR2]** **[2][HN1]**The Truth in Lending Act has the broad purpose of promoting "the informed use of credit" by assuring "meaningful disclosure of **[\*\*\*28]** credit terms" to consumers. 15 U. S. C. § 1601. Because of their complexity and variety, however, credit transactions defy exhaustive regulation by a single statute. **[HN2]**Congress therefore delegated expansive authority to **[\*560]** the Federal Reserve Board to elaborate and expand the legal framework governing commerce in credit. 15 U. S. C. § 1604; *Mourning* v.

444 U.S. 555; 100 S. Ct. 790; 63 L. Ed. 2d 22; 1980 U.S. LEXIS 60

*Family Publications Service, Inc.,* 411 U.S. 356 (1973). The Board executed its responsibility by promulgating Regulation Z, 12 CFR Part 226 (1979), which at least partly fills the statutory gaps. Even Regulation Z, however, cannot speak explicitly to every credit disclosure [****11] issue. At the threshold, therefore, [HN3]interpretation of TILA and Regulation Z demands an examination of their express language; absent a clear expression, it becomes necessary to consider the implicit character of the statutory scheme. For the reasons following we conclude that [HN4]the issue of acceleration disclosure is not governed by clear expression in the statute or regulation, and that it is appropriate to defer to the Federal Reserve Board and staff in determining what resolution of that issue is implied by the truth-in-lending enactments.

Respondents have advanced two theories to buttress their claim that the Act and Regulation expressly mandate disclosure of acceleration clauses. In the District Court, they contended that acceleration clauses were comprehended by the general statutory prescription that a creditor shall disclose "default, delinquency, or similar charges payable in the event of late payments," 15 U. S. C. §§ 1638 (a)(9), 1639 (a)(7), and were included within [****12] the provision of Regulation Z requiring disclosure of the "amount, or method of computing the amount, of any default, delinquency, or similar charges payable in the event of late payments," 12 CFR § 226.8 (b)(4) (1979). Before this Court, respondents follow the Court of Appeals in arguing that 12 CFR § 226.8 (b)(7) may be the source of an obligation to disclose procedures governing the rebate of unearned finance charges that accrue under acceleration. That section commands:

[HN5]"[identification] of the method of computing any unearned portion of the finance charge in the event of prepayment in full of an obligation which includes precomputed [*561] finance charges and a statement of the amount or method of computation of any charge that may be deducted from the amount of any rebate of such unearned finance charge that will be credited to an obligation or refunded to the customer."

A fair reading of the pertinent provisions does not sustain respondents' contention that acceleration clauses are within their terms.

[***LEdHR3] [3] [****13] [HN6]An acceleration clause cannot be equated with a "default, delinquency, or similar [charge]," subject to disclosure under 15 U. S. C. §§ 1638 (a)(9), 1639 (a)(7), and 12 CFR § 226.8 (b)(4). [HN7]The prerogative of acceleration affords the creditor a mechanism for collecting the outstanding portion of a debt on which there has been a partial

default. In itself, acceleration entails no monetary penalty, although a creditor may [**795] independently impose such a penalty, for example, by failing to rebate unearned finance charges. [HN8]A [***29] "default, delinquency, or similar [charge]," on the other hand, self-evidently refers to a specific assessable sum. Thus, within the trade, delinquency charges are understood to be "the compensation a creditor receives on a precomputed contract for [****14] the debtor's delay in making timely instalment payments," 1 CCH Consumer Credit Guide paras. 4230, 4231 (1977) (emphasis added). Acceleration is not compensatory; a creditor accelerates to avoid further delay by demanding immediate payment of the outstanding debt. See *id.*, para. 4231; Uniform Consumer Credit Code of 1968, § 2.203, official comment 2, 7 U. L. A. 315-316 (1978); § 2.204 (3), *id.*, at 317.

The language employed in TILA §§ 1638 (a)(9) and 1639 (a)(7), and in 12 CFR § 226.8 (b)(4) (1979), confirms the interpretation of "charges" as specific penalty sums. The statutory provisions speak of "charges *payable* in the event of late payments." (Emphasis added.) Even if one considers the burdensomeness of acceleration as a form of "charge" upon the debtor, it would hardly make sense to speak of [*562] that burden as "payable" to the creditor. Similarly Regulation Z orders disclosure of the "*amount, or method of computing the amount*, of any default, delinquency, or similar charges. . . ." (Emphasis added.) That command has no sensible application to the remedy of acceleration. In short, we would have to stretch these provisions [****15] beyond their obvious limits to construe them as a mandate for the disclosure of acceleration clauses. n7

- - - - - - - - - - - - - - Footnotes - - - - - - - - - - - - - - -

n7 Seven of the Courts of Appeals, including that for the Ninth Circuit, have refused to treat acceleration *simpliciter* as a "charge" within 15 U. S. C. § 1638 (a)(9) and 12 CFR § 226.8 (b)(4) (1979). *Johnson v. McCrackin-Sturman Ford, Inc.,* 527 F.2d, at 265-268 (CA3); *McDaniel v. Fulton Nat. Bank,* 576 F.2d, at 1157 (CA5) (en banc); *Croysdale v. Franklin Sav. Assn.,* 601 F.2d 1340, 1342-1343, and n. 2 (CA7 1979); *Griffith v. Superior Ford,* 577 F.2d, at 457-459 (CA8); *St. Germain v. Bank of Hawaii,* 573 F.2d 572, 573-574 (CA9 1977); *United States ex rel. Hornell v. One 1976 Chevrolet,* 585 F.2d, at 981 (CA10); *Price v. Franklin Investment Co.,*

444 U.S. 555; 100 S. Ct. 790; 63 L. Ed. 2d 22; 1980 U.S. LEXIS 60

187 U. S. App. D. C., at 393, 574 F.2d, at 604.

- - - - - - - - - - - End Footnotes- - - - - - - - - - - - - -

The prepayment rebate disclosure [****16] regulation, 12 CFR § 226.8 (b)(7) (1979), also fails to afford direct support for an invariable specific acceleration disclosure rule. To be sure, payment by the debtor in response to acceleration might be deemed a prepayment within the ambit of that regulation. But so long as the creditor's rebate practice under acceleration is identical to its policy with respect to voluntary prepayments, *separate* disclosure of the acceleration policy does not seem obligatory under a literal reading of the regulation. Section 226.8 (b)(7), therefore, [HN9]squares with the position of the Federal Reserve Board staff that specific disclosure of acceleration rebate policy is only necessary when that policy varies from the custom with respect to voluntary prepayment rebates. FRB Official Staff Interpretation No. FC-0054, 12 CFR Part 226 Appendix, p. 627 (1979).

III

[***LEdHR1C] [1C]Notwithstanding the absence of an express statutory mandate that acceleration procedures be invariably disclosed, the [*563] Court of [****17] Appeals has held that the "creditor must [always] disclose whether a rebate of unearned interest will be made upon acceleration and also disclose the method by which the amount of unearned interest will be [***30] computed if the debt is accelerated." *St. Germain* v. *Bank of Hawaii*, 573 F.2d, at 577; accord, 588 F.2d, at 757-758. In so deciding, the Court of Appeals in *St. Germain* explicitly rejected the view of the Federal Reserve Board staff that the right of acceleration need *not* be disclosed, and that rebate practice under acceleration must be disclosed only if it differs from the creditor's rebate policy with respect to voluntary prepayment. FRB Official Staff Interpretation No. FC-0054, *supra*; see FRB Public Information Letter No. 851, [1974-1977 Transfer Binder] CCH Consumer Credit Guide para. 31,173; FRB Public Information Letter No. 1208, *id*., para. 31,647; FRB Public Information Letter No. 1324, 5 CCH Consumer [**796] Credit Guide para. 31,827 (1979). n8 Rather, *St. Germain* declared that it would [*564] "choose the direction [***31] that makes more sense to us in trying to achieve the congressional [****18] purpose of providing meaningful disclosure to the debtor about the costs of his borrowing." 573 F.2d, at 576-577.

- - - - - - - - - - - - - - - Footnotes - - - - - - - - - - - - - - -

n8 Official Staff Interpretation No. FC-0054 provides, in pertinent part:

"It is staff's opinion that the phrase 'default, delinquency, or similar charges in the event of late payments,' found in § 128 (a)(9) and § 129 (a)(7) of the Truth in Lending Act and § 226.8 (b)(4) of Regulation Z, refers to specific sums assessed against a borrower solely because of failure to make payments when due. It is staff's opinion that the mere right to accelerate contained in a contractual provision which sets out the creditor's right to accelerate the entire obligation upon a certain event (generally the obligor's failure to make a payment when due) is not a *charge* payable in the event of late payment. Therefore, it need not be disclosed under § 226.8 (b)(4).

"Your [sic] refer to a prior Public Information Letter, No. 851, which discusses the right of acceleration. . . . Staff understands that letter to say that early payment of the balance of a precomputed finance charge obligation by a customer upon acceleration by the creditor is essentially the same as a prepayment of the obligation. Therefore, if the creditor does not rebate unearned finance charges in accordance with the rebate provisions disclosed under § 226.8 (b)(7) when the customer pays the balance of the obligation upon acceleration, any amounts retained beyond those which would have been rebated under the disclosed rebate provisions do represent the type of charge that must be disclosed under § 226.8 (b)(4)." (Emphasis added.)

Information Letter No. 851 states, in part:

"For the purposes of Truth in Lending disclosures, this staff views an acceleration of payments as essentially a prepayment of the contract obligation. As such, the disclosure provisions of § 226.8 (b)(7) . . . of the Regulation, which require the creditor to identify the method of rebating any unearned portion of the finance charge or to disclose that no rebate would be made, apply. If the creditor rebates under

444 U.S. 555; 100 S. Ct. 790; 63 L. Ed. 2d 22; 1980 U.S. LEXIS 60

one method for acceleration and another for voluntary prepayment, both methods would need to be identified under § 226.8 (b)(7). . . .

"If, under the acceleration provision, a rebate is made by the creditor in accordance with the disclosure of the rebate provisions of § 226.8 (b)(7), we believe that there is no *additional* 'charge' for late payments made by the customer and therefore no need to disclose under the provisions of § 226.8 (b)(4). On the other hand, if upon acceleration of the unpaid remainder of the total of payments, the creditor does not rebate unearned finance charges in accordance with the rebate provisions disclosed in § 226.8 (b)(7), any amounts retained beyond those which would have been rebated under the disclosed rebate provisions represent a 'charge' which should be disclosed under § 226.8 (b)(4)."

Information Letter No. 1208 states, in part:

"In FC-0054, staff took the position that a creditor's right of acceleration upon default by the obligor need not be disclosed as a default, delinquency, or late payment charge within the context of § 226.8 (b)(4). The interpretation went on to state, however, that since early payment of the balance of an obligation upon acceleration is essentially the same as voluntary prepayment, if the creditor does not rebate unearned finance charges in the former situation in accordance with the rebate provisions disclosed under § 226.8 (b)(7), any extra amounts retained represent the type of charge that must be disclosed under § 226.8 (b)(4)."

Information Letter No. 1324 states, in part:

"The staff's position . . . is that if a creditor rebates unearned finance charges in connection with prepayment upon acceleration using the same method as for voluntary prepayment and that method has been properly disclosed in accordance with § 226.8 (b)(7), there is no default charge. However, any amounts retained by a creditor upon acceleration which would have been rebated under the disclosed rebate provisions would represent the type

of default charge which must be disclosed pursuant to § 226.8 (b)(4)."

In *St. Germain*, the Court of Appeals spurned these administrative opinions as a source of interpretative guidance on the ground that the several letters were "conflicting signals." 573 F.2d, at 576. As we read the Staff Opinion and Letters, however, they are fundamentally consistent, if somewhat inartfully drafted. The staff's position in each appears to be that separate disclosure of acceleration rebate practices is unnecessary when those practices parallel voluntary prepayment rebate policy. On the other hand, where acceleration rebates are less than voluntary prepayment rebates, acceleration policy must be separately explained under § 226.8 (b)(4) and, perhaps as well, under § 226.8 (b)(7). Neither the Opinion nor the Letters suggest that acceleration rebate policy must be separately disclosed in all instances.

- - - - - - - - - - - - End Footnotes- - - - - - - - - - - - - -

[****19]

[*565]      [***LEdHR4]    [4][HN10]It is a commonplace that courts will further legislative goals by filling the interstitial silences within a statute or a regulation. Because legislators cannot foresee all eventualities, judges must decide unanticipated cases by extrapolating from related statutes or administrative provisions.  [**797] But [HN11]legislative silence is not always the result of a lack of prescience; it may instead betoken permission or, perhaps, considered abstention from regulation. In that event, judges are not accredited to supersede Congress or the appropriate agency by embellishing upon the regulatory scheme. Accordingly, caution must temper judicial creativity in the face of legislative or regulatory silence.

[***LEdHR5]    [5]At the very least, that caution requires attentiveness to the views of the administrative entity appointed to apply and enforce [****20]  a statute.    And [HN12]deference is especially appropriate in the process of interpreting the Truth in Lending Act and Regulation Z.  Unless demonstrably irrational, Federal Reserve Board staff opinions construing the Act or Regulation should be dispositive for several reasons.

[*566]  The Court has often repeated the general proposition that [HN13]considerable respect is due "the interpretation given [a] statute by the officers or

agency charged with its administration.'" *Zenith Radio Corp.* v. *United States*, 437 U.S. 443, 450 (1978), quoting *Udall* v. *Tallman*, 380 U.S. 1, 16 (1965); see, *e. g.*, *Power Reactor Co.* v. *Electricians*, 367 U.S. 396, 408 (1961). An agency's construction of its own regulations has been regarded as especially due that respect. See *Bowles* v. *Seminole Rock Co.*, 325 U.S. 410, 413-414 (1945). This [****21] [HN14]traditional acquiescence in administrative expertise is particularly apt under TILA, where the Federal Reserve Board has played a pivotal role in "setting [the statutory] machinery in motion. . . ." *Norwegian Nitrogen Products Co.* v. *United States*, 288 U.S. 294, 315 (1933). As we emphasized in *Mourning* v. *Family Publications Service, Inc.*, 411 U.S. 356 (1973), Congress delegated broad administrative lawmaking power to the Federal Reserve Board when it framed TILA. The Act is best construed by those who gave it [***32] substance in promulgating regulations thereunder. n9

- - - - - - - - - - - - - - - Footnotes - - - - - - - - - - - - - - - -

n9 To be sure, the administrative interpretations proffered in this case were issued by the Federal Reserve staff rather than the Board. But to the extent that deference to administrative views is bottomed on respect for agency expertise, it is unrealistic to draw a radical distinction between opinions issued under the imprimatur of the Board and those submitted as official staff memoranda. See FRB Public Information Letter No. 444, [1969-1974 Transfer Binder] CCH Consumer Credit Guide para. 30,640. At any rate, it is unnecessary to explore the Board/staff difference at length, because Congress has conferred special status upon official staff interpretations. See 15 U. S. C. § 1640 (f); 12 CFR § 226.1 (d) (1979).

- - - - - - - - - - - - End Footnotes- - - - - - - - - - - - - -

[****22]

Furthermore, [HN15]Congress has specifically designated the Federal Reserve Board and staff as the primary source for interpretation and application of truth-in-lending law. Because creditors need sure guidance through the "highly technical" Truth in Lending Act, S. Rep. No. 93-278, p. 13 (1973), legislators have twice acted to promote reliance upon Federal Reserve pronouncements. In 1974, TILA was amended to [*567] provide creditors with a defense from liability based upon good-faith compliance with a "rule, regulation, or interpretation" of the Federal Reserve Board itself. § 406, 88 Stat. 1518, codified at 15 U. S. C. § 1640 (f). The explicit purpose of the amendment was to relieve the creditor of the burden of choosing "between the Board's construction of the Act and the creditor's own assessment of how a court may interpret the Act." S. Rep. No. 93-278, *supra*, at 13. The same rationale prompted a further change in the statute in 1976, authorizing a liability defense for "conformity with any interpretation or approval by an official or employee of the [****23] Federal Reserve System duly authorized by the Board to issue such interpretations or approvals. . . ." § 3 (b), 90 Stat. 197, codified at 15 U. S. C. § 1640 (f); see 122 Cong. Rec. 2836 (1976) (remarks of Sen. Garn); *id.*, at 2852 (remarks of Rep. Annunzio, chairman of Consumer Affairs Subcommittee); *ibid.* (remarks of Rep. Rousselot); 121 Cong. Rec. 36927 (1975) (remarks of Rep. Annunzio); [**798] *id.*, at 36927-36928 (remarks of Rep. Wylie). n10

- - - - - - - - - - - - - - - Footnotes - - - - - - - - - - - - - - - -

n10 Title 12 CFR § 226.1 (d) (1979) authorizes the issuance of official staff interpretations that trigger the application of § 1640 (f). Official interpretations are published in the Federal Register, and opportunity for public comment may be requested. 12 CFR § 226.1 (d). Unofficial interpretations have no special status under § 1640 (f).

- - - - - - - - - - - - End Footnotes- - - - - - - - - - - - - -

The enactment and expansion of § 1640 (f) has significance beyond the express creation of a good-faith immunity. n11 That statutory [****24] provision signals an unmistakable congressional decision to treat administrative rulemaking and interpretation [*568] under TILA as authoritative. Moreover, language in the legislative history evinces a decided preference for resolving interpretive issues by uniform administrative decision, rather than piecemeal through litigation. n12 [***33] See S. Rep. No. 93-278, *supra*, at 13-14; 122 Cong. Rec. 2852 (1976) (remarks of Rep. Annunzio); 121 Cong. Rec. 36927 (1975) (remarks of Rep. Annunzio). Courts should honor that congressional choice. Thus, while not abdicating their ultimate judicial responsibility to determine the law, cf. generally *SEC* v. *Chenery Corp.*, 318 U.S. 80, 92-94 (1943), judges ought to refrain from substituting their own interstitial lawmaking for that of the Federal Reserve, so long as the latter's lawmaking is not irrational.

444 U.S. 555; 100 S. Ct. 790; 63 L. Ed. 2d 22; 1980 U.S. LEXIS 60

- - - - - - - - - - - - - - Footnotes - - - - - - - - -
- - - - - -

n11 Although FMCC claims that its pre-1976 disclosure policy comported with Official Staff Interpretation No. FC-0054 (issued in 1977), it has not argued before this Court that it is entitled to the immunity afforded by the 1976 amendment to § 1640 (f). We need not decide, therefore, whether the 1976 amendment may be invoked with respect to contracts formed before its enactment or whether conformity with a subsequently issued official staff interpretation constitutes "compliance" within the terms of § 1640 (f).

[****25]

n12 That preference is understandable. As the divergence of judicial views on the acceleration disclosure issue illustrates, see n. 6, *supra*, litigation is not always the optimal process by means of which to formulate a coherent and predictable body of technical rules.

- - - - - - - - - - - - End Footnotes- - - - - - -
- - - - - -

Finally, wholly apart from jurisprudential considerations or congressional intent, deference to the Federal Reserve is compelled by necessity; a court that tries to chart a true course to the Act's purpose embarks upon a voyage without a compass when it disregards the agency's views. The concept of "meaningful disclosure" that animates TILA, see *St. Germain, 573 F.2d, at 577,* cannot be applied in the abstract. *Meaningful* disclosure does not mean *more* disclosure. Rather, it describes a balance between "competing considerations of complete disclosure . . . and the need to avoid . . . [informational overload]." S. Rep. 96-73, p. 3 (1979) (accompanying S. 108, Truth in Lending Simplification and Reform Act); see S. Rep. No. 95-720, pp. 2-3 (1978); 63 Federal Reserve Board Ann. Rep. 326, 349-350 (1976); [****26] Comment, Acceleration Clause Disclosure Under the Truth in Lending Act, 77 Colum. L. Rev. 649, 662-663 (1977). And striking the appropriate balance is an empirical process that entails investigation into consumer psychology and that presupposes [*569] broad experience with credit practices. Administrative agencies are simply better suited than courts to engage in such a process.

The Federal Reserve Board staff treatment of acceleration disclosure rationally accommodates the conflicting demands for completeness and for simplicity. In determining that [HN16]acceleration rebate practices need be disclosed only when they diverge from other prepayment rebate practices, the Federal Reserve has adopted what may be termed a "bottom-line" approach: that the most important information in a credit purchase is that which explains differing net charges and rates. Cf. S. Rep. No. 96-73, *supra,* at 3-4; 63 Federal Reserve Board Ann. Rep., *supra,* at 350-352. Although the staff might have decided that acceleration rebates are so analytically distinct from identical voluntary prepayment [****27] rebates as to warrant separate disclosure, it was reasonable to conclude, alternatively, that ordinary consumers would be concerned chiefly [**799] about differing financial consequences. n13 [*570] Faced with [***34] an apparent lacuna in the express prescriptions of TILA and Regulation Z, the Court of Appeals had no ground for displacing the Federal Reserve staff's expert judgment.

- - - - - - - - - - - - - - Footnotes - - - - - - - - -
- - - - - -

n13 The Federal Reserve might reasonably have adopted the disclosure approach of the Court of Appeals for the Fifth Circuit, focusing upon a creditor's contractual acceleration rebate *rights*, rather than upon the creditor's operating rebate *policy*. See *McDaniel v. Fulton Nat. Bank, 576 F.2d, at 1157.* But, again, it was equally logical to conclude that so long as the creditor's actual practice upon acceleration was the same as its practice upon prepayment, it was not necessary to require disclosure of the creditor's unexercised rights in the disclosure statement itself.

In arguing for affirmance, respondents contend that disclosure of a creditor's rebate policy at the time of credit contract formation is no guarantee against a change in that policy at some future date, perhaps after the TILA statute of limitations has run. See 15 U. S. C. § 1640 (e). But when a genuine change in policy occurs after disclosure, the statute itself may arguably contemplate that the creditor be immune from liability. See 15 U. S. C. § 1634; S. Rep. No. 392, 90th Cong., 1st Sess., 18 (1967). On the other hand, if the creditor envisioned a change in policy at the time it disclosed practices contemporaneously in force, then the debtor might conceivably have a claim for fraud. In any event, it is open to the Federal Reserve to consider

this question when reviewing its position on acceleration rebate disclosure.

- - - - - - - - - - - End Footnotes- - - - - - - - - - - - - -

[****28]    [***LEdHR6A]    [6A]Accordingly, we decide that the Court of Appeals erred in rejecting the views of the Federal Reserve Board and staff, and holding that separate disclosure of acceleration rebate practices is always required. n14

- - - - - - - - - - - - - - Footnotes - - - - - - - - - - - - - - -

[***LEdHR6B]  [6B]

n14 Respondents argue before this Court that even under the Federal Reserve staff's view, petitioners violated TILA and Regulation Z because the credit contract itself contained language concerning acceleration rebates that assertedly contradicted the disclosures on the face of the contract. That contradiction, if present, could run afoul of 12 CFR § 226.8 (b)(7) or § 226.6 (c) (1979), as those provisions are understood by the agency staff. See FRB Public Information Letter No. 1324, *supra* n. 8. But respondents prevailed in the District Court and in the Court of Appeals upon broader rulings that acceleration clause disclosure was generally required; neither court addressed the specific allegation of contradiction. Therefore, if properly presented, the contradiction issue is open for decision on remand.

- - - - - - - - - - - End Footnotes- - - - - - - - - - - - - -

[****29]

*Reversed and remanded.*

CONCURBY: BLACKMUN

CONCUR: MR. JUSTICE BLACKMUN, with whom THE CHIEF JUSTICE joins, concurring.

I join the Court's opinion but write separately because I do not fully agree with the statement in note 13 of the opinion, *ante*, at 569, that the Federal Reserve Board's approach to the disclosure of acceleration rebates is "equally logical" with other alternatives it might have chosen. In particular, I am concerned that the Board's emphasis on a creditor's rebate *policy* rather than its contract *rights* steers the Truth in Lending Act away from the moorings of contract law in a manner that may not prove salutary for the welfare of consumers of financial credit.

To be sure, consumers contemplating installment purchases are concerned with the "bottom line," *ante*, at 569, of how much they will be required to pay. But there is little doubt, in my view, that consumers who read the required disclosures [*571] think that they are reading a description of their legal rights and obligations, and not merely an explanation of "practices" or "policies" of the creditor that may be changed to their detriment at the creditor's will. Although there may [****30] be reason to believe that a major finance company, such as Ford Motor Credit Co., will adhere to its rebate practices despite the legal right to demand more upon acceleration than it said it would, I am not sanguine that a less responsible organization always will do the same. The result could be confusion and unanticipated financial loss, as well as fruitless litigation.

[***35] Ultimately, I think the interpretation adopted by the Fifth Circuit in *McDaniel v. Fulton Nat. Bank*, 571 F.2d 948 (en banc), clarified, 576 F.2d 1156 (1978) (en banc), which requires disclosure of the creditor's right to retain finance charges upon acceleration when it differs from the right to such charges upon prepayment, may prove to be a sounder and more durable application [**800] of the statute than the position currently adopted by the Board. Nevertheless, I agree with the Court that the Board's approach is reasonable. In order to uphold the Board's position, "we need not find that its construction is the only reasonable one, or even that it is the result we would have reached had the question arisen in the first instance in judicial proceedings." *Udall v. Tallman*, 380 U.S. 1, 16 (1965), [****31] quoting *Unemployment Comm'n v. Aragon*, 329 U.S. 143, 153 (1946). Accordingly, I agree that the courts should not add to the disclosure obligations that the Board has outlined through its staff opinions.

REFERENCES:
Return To Full Text Opinion

Go to Supreme Court Briefs

Go to Oral Argument Transcript

Am Jur 2d, New Topic Service, Consumer Credit Protection 18.5

444 U.S. 555; 100 S. Ct. 790; 63 L. Ed. 2d 22; 1980 U.S. LEXIS 60

6 Federal Procedural Forms L Ed, Consumer Credit Protection 14:83

24 Am Jur Pl & Pr Forms (Rev), Truth in Lending and Consumer Credit Protection, Form 71

5 Am Jur Legal Forms 2d, Consumer Credit Protection Acts 66:35

3 Am Jur Proof of Facts 453, Credit

15 USCS 1601 et seq.

US L Ed Digest, Pawnbrokers and Money Lenders 1

L Ed Index to Annos, Truth in Lending Act

ALR Quick Index, Truth in Lending

Federal Quick Index, Consumer Credit Protection

Annotation References:

Supreme Court's view as to weight and effect to be given, on subsequent judicial construction, to prior administrative construction of statute. 39 L Ed 2d 942.

What constitutes "default, delinquency, or similar charges payable in the event of late payments" [****32] which must be disclosed under 128(a)(9) and 129(a)(7) of Truth in Lending Act (15 USCS 1638(a)(9), 1639(a)(7)) and 226.8(b)(4) of Regulation Z ( 12 CFR 226.8(b)(4)). 34 ALR Fed 467.