930 F.2d 608; 1991 U.S. App. LEXIS 5871

M. Nahas & Co., Inc., Appellant, v. First National Bank of Hot Springs, Appellee

No. 90-2102

UNITED STATES COURT OF APPEALS FOR THE EIGHTH CIRCUIT

930 F.2d 608; 1991 U.S. App. LEXIS 5871

January 11, 1991, Submitted
April 10, 1991, Filed

**PRIOR HISTORY:** [**1] Appeal from the United States District Court for the Western District of Arkansas. Honorable Oren Harris, Judge.

## CASE SUMMARY

**PROCEDURAL POSTURE:** Plaintiff sought to recover from defendant, interest paid in excess of the maximum lawful rate under state law and a usury penalty under Ark. Const. art. 19, § 13. The United States District Court for the Western District of Arkansas, dismissed the complaint, and plaintiff appealed.

**OVERVIEW:** Plaintiff sought to recover from defendant, interest paid in excess of the maximum lawful rate under state law and a usury penalty under Ark. Const. art. 19, § 13. The district court dismissed the complaint, holding that defendant had properly removed the case from state court, and that the action was barred by the two year statute of limitations for usury actions under the usury provisions of the National Bank Act, 12 U.S.C.S. § 86. Plaintiff appealed. The court affirmed. It held that § 86, as an exclusive federal usury remedy against national banks, remained undisturbed by the passage of both the Monetary Control Act, Pub. L. No. 96-221, 94 Stat. 132, and the amendment to Ark. Const. Art. 19, § 13. It further held that since § 86 provided an exclusive federal remedy, had the case not been removed, the state court would have been required by the supremacy clause to apply its two year statute of limitations and plaintiffs' action would have been barred. It also held that removal to federal court was proper, and that the district court properly denied plaintiff's motion to remand, and dismissed its action.

**OUTCOME:** The court affirmed the district court's denial of plaintiff's motion to remand, and its dismissal of the complaint. It held that 12 U.S.C.S. § 86, was an exclusive federal remedy for usury against national banks. Since § 86 provided an exclusive federal remedy, the action would have been barred, even if not removed to federal court, and removal to federal court was proper.

**CORE TERMS:** usury, state law, Monetary Control Act, removal, national bank, federal preemption, interest rates, override, time-barred, statute of limitations, regulation, scattered, National Bank Act, concurrent jurisdiction, usurious interest, properly removed, federal question, cause of action, well-pleaded, competitors, preemption, congressional intent, federal jurisdiction, interest rate, federal law, charging, reflecting, displace

**LexisNexis(TM) Headnotes**

*Banking Law > National Banks > Interest & Usury*

[HN1]See 12 U.S.C. S. § 86.

*Banking Law > National Banks > Interest & Usury*

[HN2]Since Congress has provided a penalty for usury by national banks, the cause of action under 12 U.S.C.S. § 86 preempts the field and leaves no room for varying state penalties.

*Constitutional Law > State Constitutional Operation & Amendment*

[HN3]See Ark. Const. Art. 19, § 13(d)(ii).

*Banking Law > National Banks > Interest & Usury*

[HN4] 12 U.S.C.S. § 86 is an exclusive federal remedy, under which suits may be brought in federal court

**COUNSEL:** Counsel who presented argument on behalf of the Appellant was Donald M. Spears of Malvern, Arkansas.

Counsel who presented argument on behalf of the Appellee was Michael S. McCrary of Hot Springs, Arkansas.

**JUDGES:** Arnold, Circuit Judge, Bright, Senior Circuit Judge, and Loken, Circuit Judge.

**OPINIONBY:** LOKEN

**OPINION:** [*609] LOKEN, Circuit Judge

Plaintiff M. Nahas & Co., Inc. appeals from a district court n1 order dismissing its complaint that sought to

930 F.2d 608; 1991 U.S. App. LEXIS 5871

recover from defendant First National Bank of Hot Springs, a national bank, interest paid in excess of the maximum lawful rate under Arkansas law, together with the usury penalty provided in Art. 19, § 13 of the Arkansas Constitution. The district court held that plaintiff's usury claim against a national bank must necessarily be characterized as federal, that defendant had properly removed the case from state court, and that plaintiff's action was barred by the two year statute of limitations for usury actions under the National Bank Act, 12 U.S.C. § 86. We affirm.

- - - - - - - - - - - - - - Footnotes - - - - - - - - -
- - - - - -

n1 The Hon. Oren Harris, United States Senior District Judge, Western District of Arkansas, 739 F. Supp. 1338.

- - - - - - - - - - - - End Footnotes- - - - - - - -
- - - - - -

[**2]

On November 19, 1982, plaintiff borrowed $ 400,000 from defendant at an initial interest rate of 14.5%. The loan including all interest was repaid in full in February 1987. Plaintiff commenced this action in state court in February 1990, alleging that the interest charged from June 1985 until August 1986 was usurious under Arkansas law. Thus, it is conceded that plaintiff's claim is time-barred if governed by the two year federal statute of limitations. However, plaintiff argues that its suit is under state law and is governed by an Arkansas five year statute of limitations, and that in any event defendant improperly removed this action. We disagree.

[*610] I.

"National banks are brought into existence under federal legislation, are instrumentalities of the Federal Government and are necessarily subject to the paramount authority of the United States. Nevertheless, national banks are subject to the laws of a State in respect of their affairs unless such laws interfere with the purposes of their creation, tend to impair or destroy their efficiency as federal agencies or conflict with the paramount law of the United States." *First National Bank in St. Louis v. Missouri,* 263 U.S. 640, 656, 68 L. Ed. 486, 44 S. Ct. 213 (1924). [**3]

In the politically sensitive realm of usury regulation, Congress has for more than a century exercised its preemptive power to regulate national banks. With respect to the substantive regulation of what interest rates may be charged, Congress has with some exceptions adopted the policy of allowing a national bank to charge interest "at the rate allowed by the laws

of the State . . . where the bank is located . . . and no more," 12 U.S.C. § 85, consistent with its broad objective of promoting competitive equality between national banks and their locally-chartered competitors. At the same time, however, Congress has prescribed in the national banking laws precisely what remedies are available against a national bank for usury, in order to promote remedial uniformity and to protect national banks from destructive usury penalties frequently available under state law. See *Farmers' & Mechanics' National Bank v. Dearing,* 91 U.S. 29, 23 L. Ed. 196 (1875).

This federal remedy for usurious interest paid to a national bank is presently found in [HN1] 12 U.S.C. § 86, which provides in relevant part:Charging a rate of interest greater than is allowed by section 85 of this title, when knowingly [**4] done, shall be deemed a forfeiture of the entire interest . . . . In case the greater rate of interest has been paid, the person by whom it has been paid . . . may recover back . . . twice the amount of the interest thus paid from the association taking or receiving the same: *Provided,* That such action is commenced within two years from the time the usurious transaction occurred.



This provision including the two year limitation was first enacted in 1864. It is well settled that, "[HN2]since Congress has provided a penalty for usury, that action preempts the field and leaves no room for varying state penalties." *First National Bank in Mena v. Nowlin,* 509 F.2d 872, 881 (8th Cir. 1975). See *McCollum v. Hamilton National Bank,* 303 U.S. 245, 82 L. Ed. 819, 58 S. Ct. 568 (1938); *Barnet v. National Bank,* 98 U.S. 555, 25 L. Ed. 212 (1879); *United Missouri Bank v. Danforth,* 394 F. Supp. 774, 779-780 (W.D. Mo. 1975).

Plaintiff contends, however, that Congress drastically changed this situation when it passed the Depository Institutions Deregulation and Monetary Control Act of 1980 ("Monetary Control Act"), n2 which expressly preempted state usury limits on [**5] certain types of national bank loans for a three year period, or for a shorter period if a state adopted a law "which states explicitly and by its terms that such State does not want the provisions of this part to apply with respect to loans made in such State." Pub.L.No. 96-221, §§ 511, 512(a)(2). In 1982, Arkansas responded by amending Ark. Const. Art. 19, § 13 to increase the interest rates that may lawfully be charged by Arkansas banks. By that action, plaintiff argues, Arkansas overrode 12 U.S.C. § 85, "and by construction 12 U.S.C. § 86," so that plaintiff's usury cause of action is entirely

930 F.2d 608; 1991 U.S. App. LEXIS 5871

governed by Arkansas law, including the applicable state statute of limitations.

- - - - - - - - - - - - - Footnotes - - - - - - - - - - - - - -

n2 Pub. L. No. 96-221, 94 Stat. 132 (codified as amended in scattered sections of 12 U.S.C.).

- - - - - - - - - - - End Footnotes- - - - - - - - - - - - -

There are two fatal flaws to this argument. [HN3]First, the amended Arkansas Constitution expressly provides:

The provisions hereof are not intended and shall not be deemed to supersede or otherwise invalidate any provisions of federal law applicable to loans or interest [**6] rates . . . .

Ark. Const. Art. 19, § 13(d)(ii). This court has held that, by this provision, Arkansas [*611] "specifically endorsed . . . federal preemption." *In re Lawson Square, Inc., 816 F.2d 1236, 1240 (8th Cir. 1987).* Thus, even if the Monetary Control Act gave Arkansas the power to override § 86, it plainly has not done so.

Second, and more fundamentally, we think plaintiff's argument misconstrues the Monetary Control Act. That Act was the latest in a series of federal usury overrides n3 reflecting Congress' frustration with what it perceived to be unrealistically low state law interest rate limits. The statute modified Congress' traditional policy, reflected in § 85, of subjecting national banks to those state limits. However, to assuage critics of further federal control over banking, this preemption of state interest rate ceilings was limited to three years and further limited by giving the states a chance to "override the override" by adopting usury laws expressly intended to displace the new Monetary Control Act limits.

- - - - - - - - - - - - - Footnotes - - - - - - - - - - - - - -

n3 The Monetary Control Act was preceded by the 1974 Brock Act, Title II, Pub. L. No. 93-501, 88 Stat. 1557, 1558-60 (codified as amended in scattered sections of 12 U.S.C.), and the 1979 Borrower's Relief Act, Pub. L. No. 96-104, 93 Stat. 789 (codified as amended in scattered sections of 12 U.S.C.).

- - - - - - - - - - - End Footnotes- - - - - - - - - - - - -

[**7]

All of this deals with § 85 and the substantive regulation of interest rates. There is nothing in the Monetary Control Act suggesting a congressional intent to override § 86, that is, to end federal preemption of the usury penalties that may be recovered against national banks. It would be anomalous, indeed, to construe a statute that was intended to *increase* federal preemption of state substantive usury law as also reflecting a hidden congressional intent to *decrease* federal preemption of usury penalties. After careful examination of the legislative history of the Monetary Control Act, we can divine no such Congressional intent. We hold, therefore, that § 86 as an exclusive federal usury remedy against national banks remained undisturbed by the passage of both the Monetary Control Act and the amendment to Ark. Const. Art. 19, § 13.

II.

The above discussion demonstrates that plaintiff's usury action is time-barred, wherever brought. Because Section 86 does not create exclusive federal jurisdiction, the state court in which plaintiff commenced this action had jurisdiction. However, § 86 provides an exclusive federal remedy and therefore, had the case not been removed, the [**8] state court would have been required by the Supremacy Clause to apply § 86's two year statute of limitations and grant defendant's motion to dismiss. Instead, defendant removed the action to federal court. Plaintiff moved to remand and has properly preserved the removal issue on appeal. Whether this case was properly removed is a more difficult question than whether it is time-barred.

Removal of a state court action without regard to the citizenship of the parties is appropriate if the suit could have been brought in federal district court, as "founded on a claim or right arising under the Constitution, treaties or laws of the United States." *28 U.S.C. § 1441*(b). This federal jurisdiction exists only when a federal question is presented on the face of the plaintiff's properly pleaded complaint. Under the "well-pleaded complaint" doctrine, the plaintiff is master of his claim and may avoid federal removal jurisdiction by exclusive reliance on state law. *Caterpillar Inc. v. Williams, 482 U.S. 386, 392, 96 L. Ed. 2d 318, 107 S. Ct. 2425 (1987).* When plaintiff's action is properly brought under state law, the defendant is not entitled to remove simply because federal law or principles of federal preemption [**9] will provide a defense, even a complete defense, to plaintiff's state law claims. Under this doctrine, in areas other than usury, national banks have been denied removal even though the National Bank Act would ultimately control all or part of plaintiff's state

930 F.2d 608; 1991 U.S. App. LEXIS 5871

law action. *See, e.g., Gully v. First National Bank,* 299 U.S. 109, 81 L. Ed. 70, 57 S. Ct. 96 (1936); *First National Bank of Aberdeen v. Aberdeen National Bank,* 627 F.2d 843 (8th Cir. 1980).

[*612] However, there is an exception to the well-pleaded complaint rule: "a plaintiff cannot thwart the removal of a case by inadvertently, mistakenly or fraudulently concealing the federal question that would necessarily have appeared if the complaint had been well pleaded." 1A Moore's Federal Practice para. 0.160[3.-3], at p. 234 (1990 ed.). This is a narrow exception, limited to federal statutes that "so completely pre-empt a particular area, that any civil complaint raising this select group of claims is necessarily federal." *Metropolitan Life Ins. Co. v. Taylor,* 481 U.S. 58, 65, 95 L. Ed. 2d 55, 107 S. Ct. 1542 (1987).

The primary example of this "complete preemption" is § 301 of the Labor Management Relations Act, 29 U.S.C. § 185. In [**10] *Avco Corp. v. Aero Lodge No. 735, Int'l Ass'n of Machinists,* 390 U.S. 557, 20 L. Ed. 2d 126, 88 S. Ct. 1235 (1968), which first held that a defendant may remove a § 301 suit despite the state court's concurrent jurisdiction, the effect of removal was to dissolve a labor injunction granted by the state court that the federal court was prohibited from granting by the Norris LaGuardia Act. *Avco* thus illustrates that this type of removal is most appropriate where Congress has created an exclusive federal remedy that displaces any overlapping or inconsistent state remedies.

That is precisely the situation here. [HN4]Section 86 is an exclusive federal remedy, created by Congress over 100 years ago to prevent the application of overly-punitive state law usury penalties against national banks. It is now settled that suits under § 86 may be brought in federal court. *Burns v. American National Bank and Trust Co.,* 479 F.2d 26 (8th Cir. 1973) (en banc). Thus, whether or not plaintiff artfully attempted to couch its complaint wholly in state law terms, it was necessarily federal in nature and properly removable. *See Beemam v. MBank Houston, N.A.,* 691 F. Supp. 1027 (S.D. Tex. 1988). [**11]

It is perhaps worth noting that we do not consider our removal decision in this case to be inconsistent with the alternative ground discussed in *Marquette National Bank v. First National Bank of Omaha,* 422 F. Supp. 1346, 1351-1353 (D. Minn. 1976). *Marquette* involved a competitor's suit in state court to enjoin a national bank from charging interest rates in excess of those permitted under § 85. Thus, the exclusive remedy in § 86 for usurious interest paid was not implicated, state law provided the basis for the plaintiff's cause of action, and there was no federal policy requiring the

federal court to disturb the state court's concurrent jurisdiction over § 85 issues by removal.

Accordingly, we conclude that the district court properly denied plaintiff's motion to remand and dismissed the action as time-barred, and we affirm.

439 U.S. 299; 99 S. Ct. 540; 58 L. Ed. 2d 534; 1978 U.S. LEXIS 45

MARQUETTE NATIONAL BANK OF MINNEAPOLIS v. FIRST OF OMAHA SERVICE CORP. ET AL.

No. 77-1265

SUPREME COURT OF THE UNITED STATES

439 U.S. 299; 99 S. Ct. 540; 58 L. Ed. 2d 534; 1978 U.S. LEXIS 45

October 31, 1978, Argued
December 18, 1978, Decided *
* Together with No. 77-1258, Minnesota v. First of Omaha Service Corp. et al., also on certiorari to the same court.

**PRIOR HISTORY:** [****1]

CERTIORARI TO THE SUPREME COURT OF MINNESOTA.

**DISPOSITION:** 262 N. W. 2d 358, affirmed.

## CASE SUMMARY

**PROCEDURAL POSTURE:** Petitioner national bank sought review of an order from the Supreme Court of Minnesota, which reversed an order granting petitioner partial summary judgment that enjoined respondent national bank from engaging in solicitation of Minnesota residents or other credit card activity in that state in violation of the statute. Petitioner alleged that the National Bank Act, 12 U.S.C.S. § 85, did not relieve respondent of complying with the statute.

**OVERVIEW:** The Court affirmed the reversal of partial summary judgment in favor of petitioner granting an injunction against respondent from engaging in credit card activity in Minnesota. Respondent was a national bank located in Nebraska and began soliciting customers in Minnesota, offering a different interest rate structure. Petitioner national bank sought injunction against respondent, alleging injury in that petitioner was losing customers to respondent and that respondent was violating the state usury statute. On review, the Court found that respondent was a national bank and was governed by federal law, and held that the National Bank Act, 12 U.S.C.S. § 85 was controlling. Respondent was entitled to charge interest allowed in its resident state, even though that rate was greater than that permitted by petitioner's state.

**OUTCOME:** The order reversing partial summary judgment in favor of petitioner was affirmed because respondent was a national bank, and therefore governed by federal law, which permitted respondent to charge interest to out-of-state customers at the rate allowed by respondent's resident state, even though that rate was higher than allowed in the customer's state.

**CORE TERMS:** National Bank Act, national bank, merchant, resident, participating, interstate, savings bank, cardholder, national banking, customer, billing, cycle, credit card, discount, rate of interest, interest rates, credit cards, usury laws, organization certificate, inequalities, unpaid, per centum, comptroller, territory, currency, redemption, extending, card, finance charge, competitive

**LexisNexis(TM) Headnotes**

*Banking Law > Federal Acts > National Bank Act*

*Banking Law > National Banks > Interest & Usury*

[HN1]See 12 U.S.C.S. § 85.

*Banking Law > Federal Acts > National Bank Act*

*Banking Law > National Banks > Organization*

[HN2]The National Bank Act, 12 U.S.C.S. § 22, provides that a national bank must create an "organization certificate" which specifically states the place where its operations of discount and deposit are to be carried on, designating the state, territory, or district, and the particular county and city, town, or village.

*Banking Law > National Banks > Interest & Usury*

[HN3]See Minn. Stat. § 48.185, (1978).

*Banking Law > Federal Acts > National Bank Act*

[HN4]See 12 U.S.C.S. § 94.

*Banking Law > National Banks > Interest & Usury*

[HN5]National banks are an instrumentality of the federal government, created for a public purpose, and as such necessarily subject to the paramount authority of the United States, and the interest rate that a national bank may charge in its credit card program are governed by federal law.

*Banking Law > National Banks > Interest & Usury*

[HN6]See 12 U.S.C.S. § 85.

**11**

*Banking Law > Federal Acts > National Bank Act*

*Banking Law > National Banks > Interest & Usury*

[HN7]The National Bank Act, 12 U.S.C.S. § 85 plainly provides that a national bank may charge interest on "any loan" at the rate allowed by the laws of the State in which the bank is "located".

*Banking Law > Federal Acts > National Bank Act*

*Banking Law > National Banks > Organization*

[HN8]The National Bank Act, 12 U.S.C.S. § 22 requires a national bank to state in its organization certificate the place where its operations of discount and deposit are to be carried on, designating the state, territory, or district, and the particular county and city, town, or village.

*Banking Law > Bank Expansion > Branch Banking*

[HN9]Although Nebraska law prohibits branch banking, it permits the establishment of not more than two detached auxiliary teller offices which must be maintained within the corporate limits of the city in which such bank is located pursuant to Neb. Rev. Stat. §§ 8-157(1) and (2) (1977).

*Banking Law > Federal Acts > National Bank Act*

*Banking Law > National Banks > Organization*

[HN10]With respect to the venue provision of the National Bank Act, 12 U.S.C.S. § 94, a national bank is "located" either in the place designated in its "organization certificate," under 12 U.S.C.S. § 22, or in the places in which it has established authorized branches.

*Banking Law > Federal Acts > National Bank Act*

*Banking Law > National Banks > Organization*

[HN11]The mere fact that a national bank has enrolled another state's residents, merchants, and banks in its credit card program does not suffice to "locate" that bank in that state for purposes of the National Bank Act, 12 U.S.C.S. § 85.

*Banking Law > National Banks > Bank Powers*

*Banking Law > Federal Acts > National Bank Act*

[HN12]The National Bank Act, 12 U.S.C.S. § 85 and its predecessors have been interpreted for over a century to give advantages to national banks over their state competitors.

*Constitutional Law > Supremacy Clause*

*Banking Law > National Banks > Interest & Usury*

[HN13]To the extent the enumerated federal rates of interest are greater than permissible state rates, state usury laws must, of course, give way to the federal statute.

**SUMMARY:** A national bank which was enrolled in the BankAmericard plan, and which had its principal banking offices in Minnesota, instituted an action for injunctive relief in the District Court of Hennepin County, Minnesota, contending that Minnesota's usury statute was violated by another national bank, which had a charter address in Nebraska, in charging the higher interest rate allowed by Nebraska law with regard to transactions of its BankAmericard cardholders who resided in Minnesota. Entering partial summary judgment for the plaintiff, the District Court held that the Minnesota usury statute was not preempted by the provision of the National Bank Act (12 USCS 85) that authorizes a national bank to charge interest "on any loan" at the rate allowed by the laws of the state where the bank is "located." The Supreme Court of Minnesota reversed, holding that Nebraska usury laws governed the operation of the Nebraska national bank's credit card program in Minnesota (262 NW2d 358).

On certiorari, the United States Supreme Court affirmed. In an opinion by Brennan, J., expressing the unanimous view of the court, it was held that under the pertinent provisions of 12 USCS 85, the Nebraska national bank properly charged its Minnesota credit card customers the interest rate allowed by Nebraska law, the bank being "located" in Nebraska for purposes of the National Bank Act, since (1) the bank's charter address was in Nebraska, (2) the bank operated no branch banks in Minnesota, (3) credit on the use of the credit cards was extended in Nebraska by the bank's honoring there of sales drafts from participating Minnesota merchants and banks, and (4) Nebraska was where finance charges on unpaid balances of cardholders were assessed, payments on unpaid balances were received, and credit cards were issued-- the mere fact that the bank enrolled Minnesota residents, merchants, and other banks in its credit card program not sufficing to "locate" the bank in Minnesota for purposes of 12 USCS 85.

**LAWYERS' EDITION HEADNOTES:**

[***LEdHN1]
USURY §20
 national bank -- credit cards -- interstate transactions --

Headnote: [1A] [1B] [1C]
Under the provision of the National Bank Act (12 USCS 85) authorizing a national bank to charge interest "on any loan" at the rate allowed by the laws of the state where the bank is "located," a national bank based in one state may charge its out-of-state credit

card customers an interest rate on unpaid balances allowed by its home state, even though that rate is greater than that permitted by the usury laws of the state of the bank's nonresident customers, the bank being "located" in its home state for purposes of the Act, where (1) the bank's charter address was in its home state, (2) the bank operated no branch banks in the second state, (3) credit on the use of the credit cards was extended in the home state by the bank's honoring there of sales drafts from participating out-of-state merchants and banks, and (4) the bank's home state was where finance charges on unpaid balances of cardholders were assessed, payments on unpaid balances were received, and credit cards were issued; the mere fact that the bank enrolled out-of-state residents, merchants, and other banks in its credit card program does not suffice to "locate" the bank in the second state for purposes of 12 USCS 85.

[***LEdHN2]
ERROR §874.5
  certiorari -- timeliness of filing petition --
Headnote: [2A] [2B]
A petition to the United States Supreme Court for certiorari to review a judgment of a state's highest court is timely under 28 USCS 2101(c) when it was filed within 90 days after the state court had entered a document stating that the lower state court's judgment was reversed, even though more than 90 days had elapsed after the state's highest court had filed its opinion and after that court had denied a rehearing.

[***LEdHN3]
BANKS §57
INTEREST §44
  national bank -- interest on credit cards --
Headnote: [3]
A national bank is an instrumentality of the federal government, created for a public purpose, and as such necessarily subject to the paramount authority of the United States; the interest rate that a national bank may charge in its credit card program is governed by federal law.

[***LEdHN4]
VENUE §4
  action against national bank --
Headnote: [4A] [4B]
With respect to the venue provision of the National Bank Act (12 USCS 94), a national bank is "located" in the state designated in its organization certificate.

[***LEdHN5]
VENUE §4
  action against national bank --
Headnote: [5A] [5B]

The mere fact that a national bank "transacts business" or even violates the Securities Exchange Act of 1934 (15 USCS 78a et seq.) in a state other than that of its organization certificate does not suffice to locate the bank in the foreign state for purposes of venue under the National Bank Act (12 USCS 94).

[***LEdHN6]
COURTS §153
INTEREST §44
USURY §20
  National Bank Act -- interest on interstate transactions --
Headnote: [6A] [6B]
Interstate loans made by a national bank are not exempt from the reach of the provision of the National Bank Act (12 USCS 85) authorizing a national bank to charge interest "on any loan" at the rate allowed by the laws of the state where the bank is "located," the impairment of the states' ability to enact effective usury laws caused by the "exportation" of interest rates in interstate transactions being implicit in the structure of the National Bank Act; the protection of state usury laws is an issue of legislative policy, and any plea to alter 12 USCS 85 to further that end is better addressed to the wisdom of Congress than to the judgment of the United States Supreme Court.

[***LEdHN7]
STATES §33.5
  National Bank Act -- interest rates -- state usury laws --
Headnote: [7A] [7B]
Under the provisions of the National Bank Act (12 USCS 85) authorizing a national bank to charge interest on loans at the rate allowed by the laws of the state where the bank is located or at certain rates based on the discount rate on ninety-day commercial paper in effect at the federal reserve bank in the federal reserve district where the bank is located, whichever may be greater, state usury laws must give way to the federal statute to the extent that the enumerated federal rates of interest are greater than permissible state rates.

SYLLABUS: The First National Bank of Omaha (Omaha Bank) is a national banking association chartered in Nebraska; it is enrolled in the BankAmericard plan, and solicits for that plan in Minnesota. Omaha Bank charges its Minnesota cardholders interest on their unpaid balances at a rate permitted by Nebraska law, but in excess of that permitted by Minnesota law. The Marquette National Bank of Minneapolis (Marquette), a Minnesota-chartered national banking association enrolled in the BankAmericard plan, brought suit in Minnesota against Omaha Bank and its subsidiary, respondent

First of Omaha Service Corp., *inter alia*, to enjoin the operation of Omaha Bank's BankAmericard program in Minnesota until such time as it complied with the Minnesota usury law. Rejecting respondent's contention that Minnesota's usury law was preempted by the National Bank Act provision codified as 12 U. S. C. § 85, which authorizes a national banking association "to charge on any loan" [****2] interest at the rate allowed by the laws of the State "where the bank is located," the state trial court granted Marquette's motion for partial summary judgment. The Minnesota Supreme Court reversed. *Held*: Section 85 permits Omaha Bank to charge its Minnesota BankAmericard customers the higher interest rate that is sanctioned by Nebraska law. Pp. 307-319.

(a) As a national bank, Omaha Bank is a federal instrumentality whose interest rate for its BankAmericard program is governed by federal law, and under § 85 a national bank may charge interest "on any loan" at the rate allowed by the laws of the State where the bank is "located." P. 308.

(b) Apart from its BankAmericard program, Omaha Bank is located in Nebraska, where it is chartered. P. 309.

(c) Omaha Bank cannot be deprived of its Nebraska location merely because under the BankAmericard program it extends credit to residents of another State, for it is in Nebraska that credit is extended by the Bank's honoring sales drafts of Minnesota customers, unpaid-balance finance charges are assessed, payments are received, and credit cards are issued. Pp. 310-312.

(d) Nor does the statutory location of the bank change because [****3] the credit cards can be used to purchase goods and services outside Nebraska. Pp. 312-313.

(e) Congress in enacting the National Bank Act of 1864 intended to facilitate a "national banking system," whose interstate nature was fully recognized, and there was no intention to exempt interstate loans from the reach of the predecessor of 12 U. S. C. § 85. Pp. 313-318.

(f) Though the "exportation" of interest rates, such as occurred here, may impair the ability of States to maintain effective usury laws, such impairment has always been implicit in the National Bank Act and any correction of that situation would have to be achieved legislatively. Pp. 318-319.

**COUNSEL:** Richard B. Allyn, Solicitor General of Minnesota, argued the cause for petitioner in No. 77-1258. With him on the briefs were Warren Spannaus, Attorney General, Stephen Shakman, Jacqueline P.

Taylor, and Barry R. Greller, Special Assistant Attorneys General, and Thomas R. Muck, Assistant Attorney General. John Troyer argued the cause for petitioner in No. 77-1265. With him on the briefs was J. Patrick McDavitt.

Robert H. Bork argued the cause for respondent First of Omaha Service Corp. in both cases. [****4] On the brief was Clay R. Moore. +

> + Briefs of amici curiae urging reversal were filed by Richard C. Turner, Attorney General, and Julian B. Garrett, Assistant Attorney General, for the State of Iowa; and by Roger A. Peterson for the Minnesota AFL-CIO.
>
> Peter D. Schellie filed a brief for the Consumer Bankers Assn. as amicus curiae urging affirmance.
>
> Briefs of amici curiae were filed by James F. Bell and Calvin Davison for the Conference of State Bank Supervisors; and by Joseph DuCoeur and Alan I. Becker for the First National Bank of Chicago.

**JUDGES:** BRENNAN, J., delivered the opinion for a unanimous Court.

**OPINIONBY:** BRENNAN

**OPINION:** [*301] [***537] [**542] MR. JUSTICE BRENNAN delivered the opinion of the Court.

[***LEdHR1A] [1A]The question for decision is whether the National Bank Act, Rev. Stat. § 5197, as amended, 12 U. S. C. § 85, n1 authorizes a national bank based in one State to charge its out-of-state credit-card [***538] customers an interest rate on unpaid balances allowed by its home State, when that rate is greater than that permitted by the State of the bank's nonresident [****5] customers. The Minnesota Supreme Court held that the bank is allowed by § 85 to charge the higher rate. 262 N. W. 2d 358 (1977). We affirm.

- - - - - - - - - - - - - - Footnotes - - - - - - - - - -
- - - - - - -

n1 Section 85 states in pertinent part:

[HN1]"Any association may take, receive, reserve, and charge on any loan or discount made, or upon any notes, bills of exchange, or other evidences of debt, interest at the rate allowed by the laws of the State, Territory, or District where the bank is located, or at a rate of 1 per centum in excess of the discount rate on ninety-day

commercial paper in effect at the Federal reserve bank in the Federal reserve district where the bank is located, or in the case of business or agricultural loans in the amount of $ 25,000 or more, at a rate of 5 per centum in excess of the discount rate on ninety-day commercial paper in effect at the Federal Reserve bank in the Federal Reserve district where the bank is located, whichever may be the greater, and no more, except that where by the laws of any State a different rate is limited for banks organized under State laws, the rate so limited shall be allowed for associations organized or existing in any such State under this chapter." See §§ 201, 206 of Pub. L. 93-501, 88 Stat. 1558, 1560.

- - - - - - - - - - - End Footnotes- - - - - - - - - - - - -

[****6]

I

The First National Bank of Omaha (Omaha Bank) is a national banking association with its charter address in Omaha, Neb. n2 Omaha Bank is a card-issuing member in the BankAmericard plan. This plan enables cardholders to purchase goods and services from participating merchants and to [*302] obtain cash advances from participating banks throughout the United States and the world. Omaha Bank has systematically sought to enroll in its BankAmericard program the residents, merchants, and banks of the nearby State of Minnesota. The solicitation of Minnesota merchants and banks is carried on by respondent First of Omaha Service Corp. (Omaha Service Corp.), a wholly owned subsidiary of Omaha Bank.

- - - - - - - - - - - - - Footnotes - - - - - - - - - - - - -

n2 The National Bank Act, Rev. Stat. § 5134, 12 U. S. C. § 22, [HN2]provides that a national bank must create an "organization certificate" which specifically states "[the] place where its operations of discount and deposit are to be carried on, designating the State, Territory, or District, and the particular county and city, town, or village."

- - - - - - - - - - - End Footnotes- - - - - - - - - - - - -

[****7]

Minnesota residents are obligated to pay Omaha Bank interest on the outstanding balances of their BankAmericards. Nebraska law permits Omaha Bank to charge interest on the unpaid balances of cardholder accounts at a rate of 18% per year on the first $ 999.99, and 12% per year on amounts of $ 1,000 and over. n3 Minnesota law, however, fixes the permissible annual interest on such accounts at 12%. n4 To compensate [*303] [**543] for [***539] the reduced interest, Minnesota law permits banks to charge annual fees of up to $ 15 for the privilege of using a bank credit card. n5

- - - - - - - - - - - - - Footnotes - - - - - - - - - - - - -

n3 See Neb. Rev. Stat. §§ 8-815 to 8-823, 8-825 to 8-829 (1974). Omaha Bank assesses a finance charge on the daily outstanding balance of cash advances and on the entire previous balance of purchases of goods or services before deducting any payments made during the billing period. No finance charges are imposed, however, on the purchases portion of the account balance when the previous month's total balance is paid in full on or before the due date shown on the monthly statement. See Stipulation of Facts, App. 93a-94a.

[****8]

n4 Minnesota Stat. § 48.185 (1978) provides in pertinent part:

[HN3]"Subdivision 1. Any bank organized under the laws of this state, any national banking association doing business in this state, and any savings bank organized and operated pursuant to Chapter 50, may extend credit through an open end loan account arrangement with a debtor, pursuant to which the debtor may obtain loans from time to time by cash advances, purchase or satisfaction of the obligations of the debtor incurred pursuant to a credit card plan, or otherwise under a credit card or overdraft checking plan.

. . . .

"Subd. 3. A bank or savings bank may collect a periodic rate of finance charge in connection with extensions of credit pursuant to this section, which rate does not exceed one percent per month computed on an amount no greater than the average daily balance of the account during each monthly billing cycle. If the

billing cycle is other than monthly, the maximum finance charge for that billing cycle shall be that percentage which bears the same relation to one percent as the number of days in the billing cycle bears to 30.

"Subd. 4.  No charges other than those provided for in subdivision 3 shall be made directly or indirectly for any credit extended under the authority of this section, except that there may be charged to the debtor:

"(a) Annual charges, not to exceed $ 15 per annum, payable in advance, for the privilege of using a bank credit card which entitled the debtor to purchase goods or services from merchants, under an arrangement pursuant to which the debts resulting from the purchases are paid or satisfied by the bank or savings bank and charged to the debtor's open end loan account with the bank or savings bank . . . .

"Subd. 5.  If the balance in a revolving loan account under a credit card plan is attributable solely to purchases of goods or services charged to the account during one billing cycle, and the account is paid in full before the due date of the first statement issued after the end of that billing cycle, no finance charge shall be charged on that balance.

"Subd. 6.  This section shall apply to all open end credit transactions of a bank or savings bank in extending credit under an open end loan account or other open end credit arrangement to persons who are residents of this state, if the bank or savings bank induces such persons to enter into such arrangements by a continuous and systematic solicitation either personally or by an agent or by mail, and retail merchants and banks or savings banks within this state are contractually bound to honor credit cards issued by the bank or savings bank, and the goods, services and loans are delivered or furnished in this state and payment is made from this state.  A term of a writing or credit card device executed or signed by a person to evidence an open end credit arrangement specifying:

"(a) that the law of another state shall apply;

"(b) that the person consents to the jurisdiction of another state; and

"(c) which fixes venue;

"is invalid with respect to open end credit transactions to which this section applies.  An open end credit arrangement made in another state with a person who was a resident of that state when the open end credit arrangement was made is valid and enforceable in this state according to its terms to the extent that it is valid and enforceable under the laws of the state applicable to the transaction.

"Subd. 7.  Any bank or savings bank extending credit in compliance with the provisions of this section, which is injured competitively by violations of this section by another bank or savings bank, may institute a civil action in the district court of this state against that bank or savings bank for an injunction prohibiting any violation of this section.  The court, upon proper proof that the defendant has engaged in any practice in violation of this section, may enjoin the future commission of that practice.  Proof of monetary damage or loss of profits shall not be required. . . .  The relief provided in this subdivision is in addition to remedies otherwise available against the same conduct under the common law or statutes of this state."

[****9]

n5 See Minn. Stat. § 48.185 (4)(a) (1978), *supra*, n. 4.

- - - - - - - - - - - - End Footnotes- - - - - - - - - - - - -

[*304]    The instant case began when petitioner Marquette National Bank of Minneapolis (Marquette), n6 itself a national banking association enrolled in the BankAmericard plan, n7 brought suit in the District Court of Hennepin County, Minn., to enjoin Omaha Bank and Omaha Service Corp. from soliciting in Minnesota for Omaha Bank's BankAmericard program until such time as that program complied with Minnesota law. n8 Marquette claimed to be losing customers to Omaha Bank because, unlike the Nebraska bank, Marquette was forced by the low rate of interest permissible under Minnesota law to charge

a $ 10 annual fee for the use of its credit cards. App. 7a-15a, 45a-48a.

- - - - - - - - - - - - - Footnotes - - - - - - - - - - - - - - -

n6 Marquette is petitioner in No. 77-1265.

n7 The principal banking offices of Marquette are located in the County of Hennepin in the State of Minnesota. See n. 2, *supra.*

n8 Marquette also asked for compensatory and punitive damages. App. 16a.

- - - - - - - - - - - - End Footnotes- - - - - - - - - - - - -

[****10]

Marquette named as defendants Omaha Bank, Omaha Service Corp., which is organized under the laws of Nebraska but qualified to do business and doing business in Minnesota, n9 and the Credit Bureau of St. Paul, Inc., a corporation organized under the laws of Minnesota having its principal [**544] office [*305] in St. Paul, Minn. Omaha Service Corp. participates [***540] in Omaha Bank's BankAmericard program by entering into agreements with banks and merchants necessary to the operation of the BankAmericard scheme. *Id.,* at 30a. At the time Marquette filed its complaint, Omaha Service Corp. had not yet entered into any such agreements in Minnesota, although it intended to do so. *Id.,* at 30a, 92a, 94a. For its services, Omaha Service Corp. receives a fee from Omaha Bank, but it does not itself extend credit or receive interest. n10 *Id.,* at 94a, 97a-110a. It was alleged that the Credit Bureau of St. Paul, Inc., solicited prospective cardholders for Omaha Bank's BankAmericard program in Minnesota. *Id.,* at 9a, 30a.

- - - - - - - - - - - - - Footnotes - - - - - - - - - - - - - - -

n9 The principal offices of Omaha Service Corp. are located in Omaha, Neb.

[****11]

n10 Omaha Service Corp. does, however, accept assignments of delinquent accounts from Omaha Bank and, as an incident to collecting these accounts, does collect interest. *Id.,* at 94a.

- - - - - - - - - - - - End Footnotes- - - - - - - - - - - - -

The defendants sought to remove Marquette's action to Federal District Court. See 12 U. S. C. § 94. n11

Marquette responded by dismissing without prejudice its action against Omaha Bank, see Fed. Rule Civ. Proc. 41 (a)(1)(i), and the District Court, citing *Gully v. First Nat. Bank,* 299 U.S. 109 (1936), remanded the case to the District Court of Hennepin County. *Marquette Nat. Bank* v. *First Nat. Bank of Omaha,* 422 F.Supp. 1346 (Minn. 1976). Marquette thereupon moved for partial summary judgment to have Omaha Bank's BankAmericard program declared in violation of the Minnesota usury statute, Minn. Stat. § 48.185 (1978), n12 and permanently to enjoin the remaining defendants from engaging in [*306] any activity in connection with the offering or operation of that program in further violation of Minnesota law. Defendants argued that the [****12] National Bank Act, Rev. Stat. § 5197, as amended, 12 U. S. C. § 85, n13 pre-empted Minn. Stat. § 48.185 and enforcement of that statute against Omaha Bank's BankAmericard program. Upon being notified of this challenge to Minn. Stat. § 48.185, the Attorney General of the State of Minnesota n14 intervened as a party plaintiff and joined in Marquette's prayer for a declaratory judgment and permanent injunction.

- - - - - - - - - - - - - Footnotes - - - - - - - - - - - - - - -

n11 The venue provision of the National Bank Act, Rev. Stat. § 5198, 12 U. S. C. § 94, states:

[HN4]"Suits, actions and proceedings against any association under this chapter may be had in any district or Territorial court of the United States held within the district in which such association may be established, or in any State, county, or municipal court in the county or city in which said association is located having jurisdiction in similar cases."

n12 See n. 4, *supra.*

n13 See n. 1, *supra.*

n14 The State of Minnesota is petitioner in No. 77-1258.

- - - - - - - - - - - - End Footnotes- - - - - - - - - - - - -

[****13]

The District Court of Hennepin County granted plaintiffs' motion for partial summary judgment, holding in an unreported opinion that "nothing contained in the National Bank Act, 12 U. S. C. § 85, precludes or preempts the application and enforcement of Minnesota Statutes, § 48.185 to the First National Bank of Omaha's BankAmericard program as solicited

and operated in the State of Minnesota." App. 139a-140a. The court enjoined Omaha Service Corp., "as agent of the First National Bank of Omaha," from "engaging in any solicitation of residents of the State of Minnesota or other activity in connection with the offering or operation of a bank credit card program in the **[***541]** State of Minnesota in violation of Minnesota Statutes, § 48.185." n15 *Id.*, at 140a-141a.

- - - - - - - - - - - - - - Footnotes - - - - - - - - - - - - - - - -

n15 Defendant Credit Bureau of St. Paul, Inc., was not named as an addressee of the injunction, and it is not before this Court.

- - - - - - - - - - - End Footnotes- - - - - - - -

**[***LEdHR2A]**  **[2A]**On appeal,  **[****14]** the Minnesota Supreme Court reversed. Noting that Marquette's dismissal of Omaha Bank was a procedural device that removed the case from the jurisdiction of the federal courts of the Eighth Circuit, and noting that a recent decision of the Court of Appeals for the Eighth Circuit had made it plain that in its judgment the usury laws of Nebraska rather than Minnesota should govern the operation of Omaha Bank's BankAmericard program in Minnesota, **[**545]** see *Fisher* v. **[*307]** *First Nat. Bank of Omaha*, 548 F.2d 255 (1977), n16 the Minnesota Supreme Court concluded that it would be "inappropriate for this court to permit the use of procedural devices to obtain a result inconsistent with the existing doctrine in the Eighth Circuit." 262 N. W. 2d, at 365. n17 Plaintiffs filed timely petitions for writs of certiorari, n18 which we granted, 436 U.S. 916 (1978), in order to decide the appropriate application of 12 U. S. C. § 85.

- - - - - - - - - - - - - - Footnotes - - - - - - - - - - - - - - - -

n16 In its opinion the Eighth Circuit relied upon the decision of the Court of Appeals for the Seventh Circuit in *Fisher* v. *First Nat. Bank of Chicago*, 538 F.2d 1284 (1976).

**[****15]**

n17 The Supreme Court of Iowa has since reached a contrary conclusion. See *Iowa ex rel. Turner* v. *First of Omaha Service Corp.*, 269 N. W. 2d 409 (1978), appeal docketed, No. 78-846.

n18

**[***LEdHR2B]**  **[2B]**We reject respondent's argument that the petitions are untimely. The opinion of the Minnesota Supreme Court was filed on November 10, 1977. Petitioners filed a timely petition for rehearing, which, under Minnesota law, defers the entry of judgment until after the disposition of the petition. See Minn. Rules Civ. App. Proc. 136.02, 140. The petition for rehearing was denied on December 8, 1977; judgment was entered on December 14, 1977, by way of a separate document stating that "the order and judgment of the Court below, herein appealed from, . . . be and the same hereby is in all things reversed." App. H to Pet. for Cert. in No. 77-1265. Petitions for certiorari were filed in this Court on March 13, 1978, within the 90 days "after the entry of such judgment or decree" allotted by 28 U. S. C. § 2101 (c). See *Puget Sound Power & Light Co.* v. *King County*, 264 U.S. 22, 24-25 (1924); *Commissioner* v. *Estate of Bedford*, 325 U.S. 283, 284-288 (1945).

- - - - - - - - - - - End Footnotes- - - - - - - - - - - - -

**[****16]**

II

In the present posture of this case Omaha Bank is no longer a party defendant. The federal question presented for decision is nevertheless the application of 12 U. S. C. § 85 to the operation of Omaha Bank's BankAmericard program. There is no allegation in petitioners' complaints that either Omaha Service Corp. or the Minnesota merchants and banks participating in the BankAmericard program are themselves **[*308]** extending credit in violation of Minn. Stat. § 48.185 (1978), and we therefore have no occasion to determine the application of the National Bank Act in such a case.

**[***LEdHR3]**  **[3][HN5]**Omaha Bank is a national bank; it is an "[instrumentality] of the Federal government, created for a public purpose, and as such necessarily subject to the paramount authority of the United States." *Davis* v. *Elmira Savings Bank*, 161 U.S. 275, 283 (1896). **[***542]** The interest rate that Omaha Bank may charge in its BankAmericard program is thus governed by federal law. See *Farmers' & Mechanics' Nat. Bank* v. *Dearing*, 91 U.S. 29, 34 (1875). **[****17]** The provision of § 85 called into question states:

[HN6]"Any association may take, receive, reserve, and charge on any loan or discount made, or upon any notes, bills of exchange, or other evidences of debt, interest at the rate allowed by the laws of the State, Territory, or District *where the bank is located, . . .* and no more, except that where by the laws of any State a different rate is limited for banks organized under State laws, the rate so limited shall be allowed for associations organized or existing in any such State under this chapter." (Emphasis supplied.)

[HN7]Section 85 thus plainly provides that a national bank may charge interest "on any loan" at the rate allowed by the laws of the State in which the bank is "located." The question before us is therefore narrowed to whether Omaha Bank and its BankAmericard program are "located" in Nebraska and for that reason entitled to charge its Minnesota customers the rate of interest authorized by Nebraska law. n19

- - - - - - - - - - - - - Footnotes - - - - - - - - - - - - - - -

n19 We have no occasion in this case to parse the meaning of the phrase in § 85 "associations *organized or existing* in any such State . . . ." (Emphasis added.) This phrase occurs in the "except" clause of § 85, which, at least since *Tiffany v. National Bank of Missouri,* 18 Wall. 409 (1874), has been interpreted as an "enabling" clause. "If there is a rate of interest fixed by State laws for lenders generally, the banks are allowed to charge that rate, but no more, except that if State banks of issue are allowed to reserve more, the same privilege is allowed to National banking associations." *Id.,* at 411. Since there is in this case no allegation or proof that Minnesota state banks are "allowed to reserve more" than the rate of interest "for lenders generally," we need not determine the relationship of the phrase "organized or existing" to the term "located."

- - - - - - - - - - - End Footnotes- - - - - - - - - - - - - -

[****18]

[*309]

[***LEdHR1B] [1B] [***LEdHR4A] [4A]There is no question but that Omaha Bank itself, apart from its BankAmericard [**546] program, is located in Nebraska. Petitioners concede as much. See Brief for Petitioner in No. 77-1258, p. 3; Brief for Petitioner in

No. 77-1265, pp. 3, 16, 33-34. [HN8]The National Bank Act requires a national bank to state in its organization certificate "[the] place where its operations of discount and deposit are to be carried on, designating the State, Territory, or district, and the particular county and city, town, or village." Rev. Stat. § 5134, 12 U. S. C. § 22. The charter address of Omaha Bank is in Omaha, Douglas County, Neb. The bank operates no branch banks in Minnesota, cf. *Seattle Trust & Savings Bank* v. *Bank of California,* 492 F.2d 48 (CA9 1974), nor apparently could it under federal law. n20 See 12 U. S. C. § 36 (c). n21

- - - - - - - - - - - - - Footnotes - - - - - - - - - - - - - - -

n20 There is no contention that Omaha Bank could qualify to operate a branch bank in Minnesota under the grandfather provisions of 12 U. S. C. § 36 (a).

[HN9]Although Nebraska law prohibits branch banking, it permits the establishment of not more than two "detached auxiliary teller offices" which must be maintained "within the corporate limits of the city in which such bank is located." Neb. Rev. Stat. §§ 8-157 (1) and (2) (1977). Nebraska also permits banks to operate manned or unmanned "electronic satellite facilities." § 8-157 (3). There is no contention in this case that Omaha Bank operates such facilities in the State of Minnesota.

[****19]

n21

[***LEdHR4B] [4B]Last Term *Citizens & Southern Nat. Bank* v. *Bougas,* 434 U.S. 35 (1977), held that, [HN10]with respect to the venue provision of the National Bank Act, 12 U. S. C. § 94, supra, n. 11, a national bank is "located" either in the place designated in its "organization certificate," 12 U. S. C. § 22, supra, n. 2, or in the places in which it has established authorized branches. Omaha Bank is thus also "located" in Nebraska for purposes of 12 U. S. C. § 94.

- - - - - - - - - - - End Footnotes- - - - - - - - - - - - - -

The [***543] State of Minnesota, however, contends that this conclusion [*310] must be altered if Omaha Bank's BankAmericard program is considered: "In the context of a national bank which systematically solicits

439 U.S. 299; 99 S. Ct. 540; 58 L. Ed. 2d 534; 1978 U.S. LEXIS 45

Minnesota residents for credit cards to be used in transactions with Minnesota merchants the bank must be deemed to be 'located' in Minnesota for purposes [****20] of this credit card program." Reply Brief for Petitioner in No. 77-1258, p. 7.

**[***LEdHR1C]**  [1C]We disagree. Section 85 was originally enacted as § 30 of the National Bank Act of 1864, n22 13 Stat. 108. n23 The congressional debates surrounding the enactment of § 30 were conducted on the assumption that a national bank was "located" for purposes of the section in the State named in its organization certificate. See Cong. Globe, 38th Cong., 1st Sess., 2123-2127 (1864). Omaha Bank cannot be deprived of this location merely because it is extending [**547] credit to residents of a foreign State. Minnesota residents were always free to visit Nebraska and receive loans in that State. It has [*311] not been suggested that Minnesota usury laws would apply to such transactions. Although the convenience of modern mail permits Minnesota residents holding Omaha Bank's BankAmericards to receive loans without visiting Nebraska, credit on the use of their cards is nevertheless similarly extended by Omaha Bank in Nebraska by the bank's honoring of the sales drafts of participating Minnesota merchants and banks. n24 [****21] Finance charges [***544] on the unpaid balances of cardholders [*312] are assessed by the bank in Omaha, Neb., and all payments on unpaid balances are remitted to the bank in Omaha, Neb. Furthermore, the bank issues its BankAmericards in Omaha, Neb., after credit assessments made by the bank in that city. App. 30a.

- - - - - - - - - - - - - - Footnotes - - - - - - - - - - - - - - - -

n22 Although the Act of June 3, 1864, ch. 106, 13 Stat. 99, was originally entitled "An Act to Provide a National Currency . . . ," its title was altered by Congress in 1874 to "the national-bank act." Ch. 343, 18 Stat. 123.

n23 Section 30 was, in its pertinent parts, virtually identical with the current § 85. Section 30 stated:

"[Every] association may take, reserve, receive, and charge on any loan, or discount made, or upon any note, bill of exchange, or other evidences of debt, interest at the rate allowed by the laws of the state or territory where the bank is located, and no more, except that where by the laws of any state a different rate is limited for banks of issue organized under

state laws, the rate so limited shall be allowed for associations organized in any such state under this act."

Section 30 was preceded by § 46 of the National Currency Act of 1863, 12 Stat. 678, which provided:

"[Every] association may take, reserve, receive, and charge on any loan, or discount made, or upon any note, bill of exchange, or other evidence of debt, such rate of interest or discount as is for the time the established rate of interest for delay in the payment of money, in the absence of contract between the parties, by the laws of the several States in which the associations are respectively located, and no more . . . ."

[****22]

n24 Once again, there is no allegation in these cases that either Omaha Service Corp. or any of the Minnesota merchants or banks participating in Omaha Bank's BankAmericard program are themselves extending credit in violation of Minn. Stat. § 48.185 (1978).

In their stipulation of facts, the parties describe the operation of the BankAmericard program as follows:

"III

. . . .

"While participating Minnesota banks will not have the authority to issue cards or extend credit directly in connection with BankAmericard transactions, they will advertise the BankAmericard plan and solicit applications for BankAmericards from Minnesota residents which are then forwarded to First National Bank of Omaha for acceptance or rejection, and they will serve as a depository for BankAmericard sales drafts deposited by participating merchants with whom defendant First of Omaha Service Corporation has member agreements.

. . . .

"V

"Minnesota cardholders wishing to purchase goods and services or obtain cash advances with a BankAmericard issued by

the First National Bank of Omaha, sign a BankAmericard form evidencing the transaction which is authenticated by the cardholder's BankAmericard credit card, and exchange the signed form for goods or services or cash from a participating Minnesota merchant or bank, respectively. The sales draft forms are then deposited by the participating Minnesota merchant in his account with a participating Minnesota bank for credit, which will then forward them and cash advance drafts drawn on such bank to the First National Bank of Omaha for credit.

"VI

"The First National Bank of Omaha renders periodic statements to its Minnesota cardholders and charges finance charges on the unpaid balance of the cardholder's account. . . . Payments of account balances are remitted by Minnesota residents directly to the First National Bank of Omaha.

"VII

"The defendant First of Omaha Service Corporation and participating Minnesota banks are or will be paid a fee for their services rendered to the First National Bank of Omaha. Defendant First of Omaha Service Corporation and the participating Minnesota banks do not directly receive interest. However, the First of Omaha Service Corporation does accept assignments of delinquent accounts from the First National Bank of Omaha, and as an incident to collecting these accounts, does collect interest." App. 92a-94a.

- - - - - - - - - - - - End Footnotes- - - - - - - - - - - - -

[****23]

[***LEdHR5A] [5A]Nor can the fact that Omaha Bank's BankAmericards are used "in transactions with Minnesota merchants" be determinative of the bank's location for purposes of § 85. The bank's BankAmericard enables its holder "to purchase goods and services from participating merchants and obtain cash advances from participating banks throughout the United States and the world." Stipulation of Facts, App. 91a. Minnesota residents can thus use their Omaha Bank BankAmericards to purchase services in

the State of New York or mail-order goods from the State of Michigan. If the location of the bank were to depend on the whereabouts of each credit card transaction, the meaning of the term "located" would be so stretched as to throw into confusion the complex system of modern interstate banking. A national bank could never be certain whether its contacts with residents of foreign States were sufficient to alter its location for purposes of § 85. We do not choose to invite these difficulties by rendering so elastic the term "located." [****24] [HN11]The mere fact that Omaha Bank has enrolled Minnesota residents, merchants, and banks in its [*313] BankAmericard program thus [**548] does not suffice to "locate" that bank in Minnesota for purposes of 12 U. S. C. § 85. n25 See Second Nat. [***545] Bank of Leavenworth v. Smoot, 9 D. C. 371, 373 (1876).

- - - - - - - - - - - - - - Footnotes - - - - - - - - - -

n25

[***LEdHR5B] [5B]Similarly, the mere fact that a national bank "transacts business" or even violates the Securities Exchange Act of 1934 in a State other than that of its "organization certificate," see n. 2, supra, does not suffice to locate the bank in the foreign State for purposes of venue under the National Bank Act, 12 U. S. C. § 94, supra, n. 11. Radzanower v. Touche Ross & Co., 426 U.S. 148 (1976). See Bank of America v. Whitney Central Nat. Bank, 261 U.S. 171 (1923); cf. Cope v. Anderson, 331 U.S. 461, 467 (1947).

- - - - - - - - - - - - End Footnotes- - - - - - - - - - - -

[****25]

III

Since Omaha Bank and its BankAmericard program are "located" in Nebraska, the plain language of § 85 provides that the bank may charge "on any loan" the rate "allowed" by the State of Nebraska. Petitioners contend, however, that this reading of the statute violates the basic legislative intent of the National Bank Act. See Train v. Colorado Public Interest Research Group, 426 U.S. 1, 9-10 (1976). At the time Congress enacted § 30 of the National Bank Act of 1864, 13 Stat. 108, so petitioners' argument runs, it intended "to insure competitive equality between state and national banks in the charging of interest." Brief for Petitioner in No. 77-1265, p. 24. This policy could best be effectuated by limiting national banks to the rate of interest allowed by the States in which the

439 U.S. 299; 99 S. Ct. 540; 58 L. Ed. 2d 534; 1978 U.S. LEXIS 45

banks were located. Since Congress in 1864 was addressing a financial system in which incorporated banks were "local institutions," it did not "contemplate a national bank soliciting customers and entering loan agreements outside of the state in which it was established." Brief for Petitioner in No. 77-1258, p. 17. Therefore to interpret § 85 to apply to interstate loans such [****26] as those involved in this case would not only enlarge impermissibly the original intent of Congress, but would also undercut the basic policy [*314] foundations of the statute by upsetting the competitive equality now existing between state and national banks.

[***LEdHR6A] [6A]We cannot accept petitioners' argument. Whatever policy of "competitive equality" has been discerned in other sections of the National Bank Act, see, e. g., *First Nat. Bank v. Dickinson*, 396 U.S. 122, 131 (1969); *First Nat. Bank of Logan v. Walker Bank & Trust Co.*, 385 U.S. 252, 261-262 (1966), § 30 [HN12]and its descendants have been interpreted for over a century to give "advantages to National banks over their State competitors." *Tiffany v. National Bank of Missouri*, 18 Wall. 409, 413 (1874). "National banks," it was said in *Tiffany*, "have been National favorites." n26 The policy of competitive equality between state and national banks, however, is not truly at the core of this [****27] case. Instead, we are confronted by the inequalities that occur when a national bank applies the interest rates of its home State in its dealing with residents of a foreign State. These inequalities affect both national and state banks in the foreign State. Indeed, in the instant case Marquette is a national bank claiming to be injured by the unequal interest rates charged by another national bank. n27 Whether the inequalities which thus occur when the interest [***546] rates of one State are "exported" into another violate the intent of Congress in enacting § 30 in part depends on whether Congress in 1864 was aware of the existence of a system of interstate banking in which such inequalities would seem a necessary part.

-------------- Footnotes ---------
------

n26 The "most favored lender" status for national banks under *Tiffany* has since been incorporated into the regulations of the Comptroller of the Currency. See 12 CFR § 7.7310 (a) (1978).

n27 We accept for purposes of argument Marquette's premise that it is injured competitively because Omaha Bank can charge higher prices for the use of its money.

----------- End Footnotes---------
------

[****28]
Close examination of the National Bank Act of 1864, its legislative history, and its historical context makes clear that, contrary [**549] to the suggestion of petitioners, Congress intended [*315] to facilitate what Representative Hooper n28 termed a "national banking system." Cong. Globe, 38th Cong., 1st Sess., 1451 (1864). See also Report of the Comptroller of the Currency 4 (1864). Section 31 of the Act, for example, fully recognized the interstate nature of American banking by providing that three-fifths of the 15% of the aggregate amount of their notes in circulation that national banks were required to "have on hand, in lawful money" could

"consist of balances due to an association available for the redemption of its circulating notes from associations approved by the comptroller of the currency, organized under this act, in the cities of Saint Louis, Louisville, Chicago, Detroit, Milwaukie [sic], New Orleans, Cincinnati, Cleveland, Pittsburg, Baltimore, Philadelphia, Boston, New York, Albany, Leavenworth, San Francisco, and Washington City." 13 Stat. 108, 109. n29

[*316] The debates surrounding the enactment of this section portray a banking [****29] system of great regional interdependence. Senator Chandler of Michigan, for example, noted:

"[The] banking business of the Northwest is done upon bills of exchange. The wool clip of Michigan, the wheat crop of Michigan, the hog crop of Iowa, are all purchased with drafts drawn chiefly upon [New York, Philadelphia, and Boston]. The wool clip is chiefly bought by drafts upon Boston. I put in the three cities because it is convenient to the customer, to the broker, to the merchant, [***547] to be enabled to purchase a draft upon either one of these three places." Cong. Globe, 38th Cong., 1st Sess., 2144 (1864). n30

See also *id.*, at 1343, 1376, 2143-2145, 2152, 2181-2182. Similarly, the debates surrounding the enactment of § 41 of the Act, which provided that the shares of a national bank could be taxed as personal property "in the assessment of taxes imposed by or under state authority at the place where such bank is located, and not elsewhere," 13 Sta. 112, demonstrated [*317] a sensitive awareness of the possibilities of interstate ownership and control of national banks.

439 U.S. 299; 99 S. Ct. 540; 58 L. Ed. 2d 534; 1978 U.S. LEXIS 45

See, *e. g.,* [**550] Cong. Globe, 38th Cong., 1st Sess., 1271, 1898-1899 (1864). [****30]

- - - - - - - - - - - - - - Footnotes - - - - - - - - -
- - - - - -

n28 Representative Hooper reported the bill that was to become the National Bank Act of 1864 to the House from the Ways and Means Committee. See Million, The Debate on the National Bank Act of 1863, 2 J. Pol. Econ. 251, 279 (1894).

n29 Section 31 also provided:

"[The] cities of Charleston and Richmond may be added to the list of cities in the national associations of which other associations may keep three fifths of their lawful money, whenever, in the opinion of the comptroller of the currency, the condition of the southern states will warrant it." 13 Stat. 109.

See also § 32 of the National Bank Act of 1864, 13 Stat. 109.

Senator Sherman, sponsor of the Act in the Senate, described in the following terms the purpose of § 31:

"The first important provision of this bill is, that it provides centers of redemption. Under the old bill, a bank was not bound to redeem its issues except at its own counter. If it failed to redeem there, then provision was made for winding it up. Under the present bill, certain cities of the United States are designated where the banks are required to redeem their issues. Each bank is to redeem its issue at its center of redemption as prescribed by the Comptroller of the Currency. The cities named are the principal cities along the Atlantic coast, Cincinnati, Louisville, Chicago, Detroit, and two or three other places. That will strengthen the system very much by relieving the noteholder from the trouble of going from any part of the United States to a remote village or city, and there demanding redemption at the counter of the bank." Cong. Globe, 38th Cong., 1st Sess., 1865 (1864).

[****31]

n30 Senator Chandler was proposing an amendment to the provision of § 31 which required every national bank located in the enumerated cities to "have on hand, in lawful money of the United States, an amount equal to at least twenty-five per centum of the aggregate amount of its notes in circulation and its deposits." 13 Stat. 108. The amendment read:

"And one half of said twenty-five per cent. in banks organized under this act in the cities of St. Louis, Louisville, Chicago, Detroit, Milwaukee, Cincinnati, Cleveland, Pittsburg, and Portland may consist of balances due to the association available for the redemption of its circulating notes, from an association in the cities of New York, Boston, or Philadelphia." Cong. Globe, 38th Cong., 1st Sess., 2143 (1864).

- - - - - - - - - - - End Footnotes- - - - - - -
- - - - - -

Although in the debates surrounding the enactment of § 30 there is no specific discussion of the impact of interstate loans, these debates occurred in the context of a developed interstate loan market. As early as 1839 this Court had occasion to note: "Money is frequently borrowed in one state, by a corporation created in another. [****32] The numerous banks established by different states are in the constant habit of contracting and dealing with one another. . . . These usages of commerce and trade have been so general and public, and have been practiced for so long a period of time, and so generally acquiesced in by the states, that the Court cannot overlook them . . . ." *Bank of Augusta* v. *Earle,* 13 Pet. 519, 590-591 (1839). Examples of this interstate loan market have been noted by historians of American banking. See, *e. g.,* 1 F. Redlich, The Molding of American Banking 49 (1968); 1 F. James, The Growth of Chicago Banks 546 (1938); Breckenridge, Discount Rates in the United States, 13 Pol. Sci. Q. 119, 136-138 (1898). Evidence of this market is to be found in the numerous judicial decisions in cases arising out of interstate loan transactions. See, *e. g.,* *Woodcock* v. *Campbell,* 2 Port. 456 (Ala. 1835); *Clarke* v. *Bank of Mississippi,* 10 Ark. 516 (1850); *Planters Bank* v. *Bass,* 2 La. Ann. 430 (1847); *Knox* v. *Bank of United States,* 27 Miss. 65 (1854); *Bard* v. *Poole,* 12 N. Y. 495 (1855); [****33] *Curtis* v. *Leavitt,* 15 N. Y. 9 (1857). After passage of the National Bank Act of 1864, cases involving interstate loans begin to appear with some frequency in federal courts. See, *e. g.,* *In re Wild,* 29 F. Cas. 1211 (No. 17,645) (SDNY 1873); *Cadle* v. *Tracy,* 4 F. Cas. 967 (No. 2,279) (SDNY 1873); *Farmers' Nat. Bank* v. *McElhinney,* 42 F. 801 (SD Iowa 1890); *Second Nat. Bank of Leavenworth* v. *Smoot,* 9 D. C. 371 (1876).

439 U.S. 299; 99 S. Ct. 540; 58 L. Ed. 2d 534; 1978 U.S. LEXIS 45

[*318]

[***LEdHR6B]    [6B]We cannot assume that Congress was oblivious to the existence of such common commercial transactions. We find it implausible to conclude, therefore, that Congress meant through its silence to exempt interstate loans from the reach of § 30. We would certainly be exceedingly [***548] reluctant to read such a hiatus into the regulatory scheme of § 30 in the absence of evidence of specific congressional intent. Petitioners have adduced no such evidence.

[***LEdHR7A]    [7A]Petitioners' final argument is that [****34] the "exportation" of interest rates, such as occurred in this case, will significantly impair the ability of States to enact effective usury laws. This impairment, however, has always been implicit in the structure of the National Bank Act, since citizens of one State were free to visit a neighboring State to receive credit at foreign interest rates. n31 Cf. 38 Cong. Globe, 38th Cong., 1st Sess., 2123 (1864). This impairment may in fact be accentuated by the ease with which interstate credit is available by [*319] mail through the use of modern credit cards. But the protection of state usury laws is an issue of legislative policy, and any plea to alter § 85 to further that end is better addressed to [**551] the wisdom of Congress than to the judgment of this Court.

- - - - - - - - - - - - - - Footnotes - - - - - - - - - - - - - - - -

n31 When the National Bank Act of 1864 originally passed the House, it imposed a uniform maximum rate of interest of 7% on all national banks. See Cong. Globe, 38th Cong., 1st Sess., 1866 (1864) (remarks of Sen. Sherman); J. Knox, A History of Banking in the United States 238-239, 248, 255-256 (1903, 1969 reprint). Such a provision, of course, would have eliminated interstate inequalities among national banks resulting from differing state usury rates.

[***LEdHR7B]    [7B]The present § 85 provides that national banks may charge interest "at the rate allowed by the laws of the State . . . where the bank is located, or at a rate of 1 per centum in excess of the discount rate on ninety-day commercial paper in effect at the Federal reserve bank in the Federal reserve district where the bank is located, or in the case of business or agricultural loans in the amount of $ 25,000 or more, at a rate of 5 per centum in excess of the discount rate on ninety-day commercial paper in effect at the Federal Reserve bank in the Federal reserve district where the bank is located, whichever may be the greater, and no more . . . ."

See §§ 201, 206 of Pub. L. 93-501, 88 Stat. 1558, 1560. [HN13]To the extent the enumerated federal rates of interest are greater than permissible state rates, state usury laws must, of course, give way to the federal statute.

- - - - - - - - - - - - End Footnotes- - - - - - - - - - - - - -

[****35]

*Affirmed.*

**REFERENCES:**
Return To Full Text Opinion

10 Am Jur 2d, Banks 14, 15, 692; 45 Am Jur 2d, Interest and Usury 14-17, 63, 117, 308

 12 USCS 85

US L Ed Digest, Usury 20

ALR Digests, Usury 20

L Ed Index to Annos, Banks; Interest; Usury

ALR Quick Index, Credit Cards; National Banks; Usury

Federal Quick Index, Credit Cards; Interest; National Banks

Annotation References:

Validity of state statute regulating activities of national banks. 98 L Ed 775.

Computation of service or interest charge on bank credit cards as usurious under National Bank Act (12 USCS 85). 38 ALR Fed 805.

Not Reported in N.E.2d
2 Mass.L.Rptr. 269, 1994 WL 879676 (Mass.Super.)
(Cite as: 1994 WL 879676 (Mass.Super.))

**Page 3**

Superior Court of Massachusetts.

David MAYO and others [FN1]

FN1. Thelma Mayo, Leonora Mayo, Calvin Smith, and Sarah Smith.

v.

KEY FINANCIAL SERVICES, INC. and another [FN2]

FN2. Advanced Financial Services, Inc.

No. 926441D.

June 22, 1994.

FLANNERY, J.

*1 Plaintiffs, David, Thelma, and Leonora Mayo (hereinafter "the Mayos") and Calvin and Sarah Smith (hereinafter "the Smiths"), bring this action against the defendants, Key Financial Services, Inc. (Key) and Advanced Financial Services, Inc. (Advanced), seeking rescission of their respective loan agreements pursuant to the Massachusetts Consumer Credit Disclosure Act, G.L.c. 140D § 10 (MCCDA) (Count II), and restitution of alleged excessive points paid on the loans (Count III). [FN3] On Count II, the plaintiffs contend that Advanced understated the finance charges on their loan applications. and that the understatements amount to material nondisclosures under MCCDA, allowing the plaintiffs to rescind the agreements. As to Count III, the plaintiffs assert that the points they were charged on the loans were excessive in violation of G.L.c. 183, § 63 , and they seek restitution from the defendants of the allegedly excessive points.

FN3. The plaintiffs have chosen not to pursue their usury claim (Count I). The word "point" as used in real estate financing denotes a fee or charge equal to one percent of the principal amount of the loan which is collected by the lender. The point (or points) is paid in addition to the stated interest rate on the face of the loan. Black's Law Dictionary 1156 (rev. 6th ed.1990).

```
1 four-page mortgage           $20.00
1 one-page mortgage rider       $1.00
1 one-page legal description    $1.00
1 one-page assignment          $10.00
Total:                         $32.00
```

(Advanced exhibit, Dennis Hardiman affidavit, ¶ 4; Plaintiffs' exhibit D, Powers affidavit, ¶ 19).

Advanced, a Rhode Island corporation, assigned the

Key and Advanced claim that any understatement of the respective finance charges is immaterial as a matter of law and further assert that Massachusetts law does not apply to this action. Key also claims that G.L.c. 183, § 63, does not provide a private right of action, and alternatively, that as assignee of the plaintiffs' loans, it did not receive any excessive points.

Key also argues that the statute of limitations has expired on all claims. The parties cross-move for summary judgment on Count II pursuant to Mass.R.Civ.P. 56 and the defendants move for summary judgment on Count III. For the following reasons, the plaintiffs' motion for summary judgment is allowed on Count II and the defendants' motion for summary judgment is denied.

BACKGROUND

On May 6, 1989, the Smiths and Advanced entered into a loan agreement in which Advanced loaned the Smiths $12,100. The Smiths executed a note in favor of Advanced and repayment was secured by a mortgage on the Smith residence, located in Hyde Park, Massachusetts. The Truth-In-Lending Disclosure form states the Smiths' finance charge as $15,575.80. [FN4] The "Itemization of the Amount Financed" form for the Smith loan states that the Smiths were charged a $50 public official recording fee and were also charged $35 for title insurance. These charges were not included in the finance charge calculation.

FN4. The finance charge is the cost of consumer credit as a dollar amount. It includes any charge payable directly or indirectly by the consumer and imposed directly or indirectly by the creditor as an incident to or a condition of the extension of credit. It does not include any charge of a type payable in a comparable cash transaction. 209 CMR 32.04(A).

Recording the documents of the Smith loan at the Registry of Deeds cost Advanced $32. The $32 cost is broken down as follows:

agreement to Key, a New York corporation.

On May 8, 1989, the Mayos and Advanced entered into a loan agreement in the amount of $171,600. The

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in N.E.2d
(Cite as: 1994 WL 879676, *1 (Mass.Super.))

Mayos executed a note secured by a mortgage on their home located in Dorcester, Massachusetts, in favor of Advanced.     The TruthIn-Lending Disclosure form provided to the Mayos by Advanced states that the Mayos' finance charge was $26,009.45.     On the "Itemization of the Amount Financed in your Mortgage Loan" form, the Mayos were charged $50 as a public officials recording fee.    The Mayos were also charged $515 for title insurance.    The recording fees and title insurance charge were excluded from the calculation of the finance charge.    Advanced assigned the agreement to Key.

*2 The Mayos and Smiths executed the agreement at Advanced's office, located in Rhode Island.

## DISCUSSION

Summary judgment shall be granted where there are no genuine issues as to any material fact and where the moving party is entitled to judgment as a matter of law. *Kourouvacilis v. General Motors Corp.,* 410 Mass. 706, 716 (1991); *Cassesso v. Commissioner of Correction,* 390 Mass. 419, 422 (1983); Mass.R.Civ.P. 56(c).    The moving party bears the burden of affirmatively demonstrating the absence of a triable issue "and [further,] that the moving party is entitled to judgment as a matter of law." *Pederson v. Time, Inc.,* 404 Mass. 14, 16-17 (1989).    Where both parties have moved for summary judgment and "in essence there is no real dispute as to the salient facts or if only a question of law is involved," summary judgment shall be granted to the party entitled to judgment as a matter of law. *Cassesso, supra.*

General Laws c. 140D § 10(a) permits obligors who use their residence for security on a loan the right to rescind the transaction until midnight of the third business day following the consummation of the transaction.    The three-day period allowing rescission is extended to four years if the lender failed to deliver *material disclosures* to the obligors. *Id.*

In the case at bar, the Mayos and Smiths contend that the finance charge disclosed to each of them by Advanced was understated and that failure to disclose an accurate finance charge amounts to a material nondisclosure, entitling them to rescind the agreement. [FN5]    For plaintiffs to prevail and rescind the loan agreements, the finance charge must have been understated and the understatement must be material within the meaning of G.L.c. 140D, § 10.

> FN5. The only issue before the court on Count II is whether an understatement of the finance charge amounts to a material nondisclosure. Since the parties did not

argue or brief whether the plaintiffs followed the appropriate procedural steps to rescind, the court assumes these steps were followed.    See plaintiffs' exhibit B, rescission notices dated October 23, 1992.

### Count IIoRescission
I. Did Advanced understate the Smiths' and Mayos' respective finance charges?    The Smith Transaction

As discussed above, the Smiths were charged a $50 recording fee and a $35 title insurance fee, which were not included in the finance charge.    The Code of Massachusetts Regulations, c. 209, § 32.04(c)(7), the promulgated regulations to G.L.c. 140D, allows the lender to exclude from the finance charge title insurance fees and recording fees if the fees are "bona fide and reasonable in amount."    In other words, if the amount charged for these fees is not reasonable or bona fide, the overcharge must be included in the finance charge.

a. Recording fees

General Laws c. 262, § 38 dictates public official recording fees necessary to record documents affecting title to Massachusetts real estate.    Under the statute, recording a four-page mortgage is $20 and $1 for each additional page. *Id.* For recording other papers, such as assignments or discharges, the fee is $10.

There is no dispute between the parties that recording the Smith transaction at the Registry of Deeds cost $32. (Hardiman's aff't, ¶ 4;     Powers aff't, ¶ 19.) Accordingly, the Smiths were overcharged at least $18 to record the transaction, and this amount should have been included in the finance charge since it is the amount in excess of the bona fide or reasonable amount of recording fees.

*3 In addition, the $10 assignment recording fee should also have been included in the finance charge.  209 CMR 32.04(b)(6) states that a finance charge includes:
   Charges imposed on a creditor by another person for purchasing or accepting a consumer's obligation, if the consumer is required to pay the charges in cash, as an addition to the obligation, or as a deduction from the proceeds of the obligation.
This section of the Code of Massachusetts Regulations is the analog to 12 CFR § 226.4(b)(6), which was promulgated under the federal Truth-in-Lending Act. The Massachusetts Truth-in-Lending Act is closely modeled on the federal Truth-in-Lending Act. *Lynch v. Signal Finance Co. of Quincy,* 367 Mass. 503, 505 (1975).    Where a statute is drafted to parallel a federal statute, it should be construed in accordance with federal law. *Vasys v. Metropolitan District Commission,* 387

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Mass. 51, 54 (1982).

The bankruptcy court has interpreted 12 CFR § 226.4(b)(6) to mean that where a creditor separately imposes a charge on the customer to cover the cost of making an assignment, the charge is a finance charge which must be included in the finance charge calculation. *In re Brown,* 106 B.R. 852, 858-59 (1989). The court, relying on the plain language and the official commentary to § 226.4(b)(6), further stated that requiring the consumer to pay for the assignment may not be excluded from the finance charge even if disclosed. *Id.* at 859. Since the failure of the lender to include the cost of the assignment in the finance charge resulted in the finance charge being understated, the court determined this understatement to be a material nondisclosure, allowing the obligor to rescind the transaction. *Id.* at 863; see also *Cheshire Mortgage Service, Inc. v. Montes,* 223 Conn. 80, 100- 01 (1992) (holding that failure to include cost of future assignment in finance charge amounts to a material nondisclosure giving the defendants the right to rescind under the federal Truth-in-Lending Act).

Since the Smiths were charged for the assignment of the transaction to Key, evidenced by Hardiman's affidavit and the disclosure form, under 209 CMR 32.04(b)(6) this charge was either in addition to the obligation of the loan agreement or the amount was deducted from the loan proceeds. The $10 assignment cost which Advanced charged the Smiths should have been included in the total finance charge. As a result, Advanced understated the Smiths' finance charge by $28.

b. Title insurance.

The Smiths were charged $35 for title insurance on a $12,100 loan. The Smiths contend that the defendants charged them $3 per $1,000 loaned to them and that in 1989 a reasonable and bona fide rate for title insurance was $1.25/ $1.50 per $1,000. Accordingly, the Smiths contend that their title insurance should have cost $25 dollars, and the $10 overcharge should have been

| 4-page mortgage           | $20 |
| 1 one-page rider          | $1  |
| 1 one-page legal description | $1  |
| 1 mortgage discharge      | $10 |
| Total:                    | $32 |

Advanced counters this evidence by offering Hardiman's affidavit which states that the total recording fee cost $52. Hardiman breaks down the $52 figure as Powers does but also offers exhibits that demonstrate an additional one-page discharge, adding another $10, as

included in the finance charge because the amount was not bona fide or reasonable.

**\*4** To support their argument, the Smiths offer affidavit evidence of three real estate attorneys who state that the reasonable rate for title insurance on Massachusetts property in 1989 was $1.25/$1.50 per thousand dollars loaned. (See plaintiffs' exhibit D, Powers aff't, ¶ 8; Marioles aff't, ¶ 8(a); Campbell aff't, ¶ 5.) To counter the Smiths' evidence, Advanced offers Hardiman's affidavit and a rate chart from the title insurer, which states that Advanced actually paid $50 for the Smiths' title insurance. Hardiman states that $50 was the minimum amount the insurer would accept. (Hardiman aff't, § 5 and exhibit D attached--Title Insurance Company "Schedule of Title Insurance Premium Rates, Commonwealth of Massachusetts.") Accordingly, there exists an issue of fact as to whether the Smiths were overcharged or undercharged for title insurance. [FN6] Although this fact remains in dispute, it is not necessary to decide this issue since the Smiths were overcharged for recording fees by $28 resulting in an understatement of the finance charge.

> FN6. Even if the Smiths were undercharged for the title insurance, the undercharge cannot offset the overcharge on the recording fee because the $35 title insurance fee would be bona fide and the $28 overcharge on the recording fees is not bona fide and should have been included in the finance charge.

The Mayo transaction

The Mayos contend that to record the proper documents at the Registry of Deeds cost only $32 but they were charged $50, and that the title insurance only cost $215 but Advanced charged them $515.

a. The Recording fee

The Mayos offer Powers's affidavit to demonstrate that the bona fide and reasonable costs of the recording fees that could be excluded from the finance charge amounted to $32. (Plaintiffs' exhibit D, Powers aff't, ¶ 19.) The $32 fee is comprised of the following:

well as a $10 cost to assign the agreement to Key, totalling $52. As discussed above, the $10 assignment fee should have been included in the finance charge bringing Advanced's total cost to record down to $42. Accordingly, the Mayos were overcharged $8 which was

Not Reported in N.E.2d
(Cite as: 1994 WL 879676, *4 (Mass.Super.))

not bona fide or reasonable. In regard to the recording fee, there is no dispute Advanced understated the Mayos' finance charge by $8.

### b. The Title insurance fees

In accordance with the Smiths, the Mayos contend that the reasonable and bona fide rate of title insurance in 1989 was $1.25/$1.50 per $1,000 loaned and under such rates, on a $171,600 loan, they should have been charged $215, not the $515 they were charged. The Mayos offer affidavit evidence that the cost of the title insurance should have been $215. (Powers aff't.) Hardiman's affidavit states that charging the Mayos $3 per $1000 borrowed was not unreasonable and that lenders who do business in several states (such as Advanced) frequently see title insurance rates much higher than $1.25/$1.50. (Hardiman aff't, ¶ 10.) To buttress Hardiman's opinion, rate cards for title insurance in Rhode Island from two major insurers are attached to his affidavit. Upon close examination of these exhibits Hardiman offers, the court finds that the rate the Mayos were charged was unreasonable and not bona fide.

*5 The rate cards are very similar in regards to title insurance fees. (Hardiman aff't, exhibit H.) Under either rate card, a $100,000 mortgage loan would cost $225 for insurance and $1.75 per $1,000 over the base amount of $100,000. Since the Mayos were loaned $171,600, the maximum fee the Mayos should have been charged that could be excluded from the finance charge would be $350.30 ($225 for the first $100,000 plus $125.30 for the $71,600 over the initial $100,000 at a rate of $1.75 = $350.30). Hardiman's assertion that a $2.50/$3 rate was reasonable is inaccurate because a $2.50 rate was only charged on loans between $0 and $50,000, and the rate decreased as the loan value increased. Since the Mayos borrowed $171,600 the rates are substantially lower as is evidenced by the exhibits provided by Hardiman. Accordingly, applying the rates Hardiman offers to support his assertion of reasonableness, Advanced still understated the Mayos' finance charge by $164.70 ($515/ $350.30 = $164.70). [FN7]

FN7. Furthermore, the court also notes that Hardiman offers a premium rate chart from American Title Insurance Company for rates in the Commonwealth of Massachusetts in order to establish that the Smiths' title insurance cost a minimum of $50. In an attempt to establish that $515 fee for title insurance charged to the Mayos was reasonable, Advanced offers rate charts from the state of Rhode Island. The use of different states' insurance rate charts for different loans, where both loans involve property located in the Commonwealth, leads to a

reasonable inference that Hardiman's attempt to justify the insurance fees is inconsistent. This inference is buttressed by the plaintiffs' affidavit evidence in which real estate attorney Marioles states that property located in Massachusetts is subject to Massachusetts insurance rates, not Rhode Island. (Marioles aff't, ¶ 8.)

In addition, to show that Advanced inflated the title insurance fee, the Mayos offer the insurance policy issued to them from American Title Insurance Company which states that the premium paid to the insurer for title insurance on the Mayos' loan was $215. This fee is at the rate of $1.25 per $1,000 for $172,000 of the amount borrowed. Accordingly, the policy demonstrates that the bona fide and reasonable rate for title insurance for the Mayos' loan in May 1989 was $215 and the $300 overcharge should have been included in the finance charge. Reviewing all the evidence presented on the Mayos' title insurance fee, it is undisputed that Advanced understated the Mayos' finance charge between $164.70 and $300.

### II. Does the understatement of the respective finance charges extend the period of rescission from three days to four years?

The Mayos and Smiths contend that because their respective finance charges were understated, the rescission period extended from three days to four years. [FN8] The issue presented is whether the respective understated amounts in the finance charge amount to "material nondisclosures." Footnote 48 to § 32.23(a)(3) defines "material nondisclosures" as "the required disclosures of the annual percentage rate, the *finance charge,* the amount financed, the total payments, and the payment schedule. 209 CMR § 32.23(a)(3) n. 48 (emphasis added). The Code of Federal Regulation, c. 12, u226.23(a)(3) n. 48 defines "material disclosure" for the federal Truth-in-Lending Act using exactly the same language as 209 CMR 32.23(a)(3) n. 48. Accordingly, this court looks to federal interpretation of 12 CFR § 226.23(a)(3) n. 48 to determine whether the understated finance charges amount to material nondisclosures. See *Vasys, supra.*

FN8. The parties place much emphasis on whether an inaccuracy of the finance charge by $10 is the "bright line" for determining whether the understatement of the finance charge amounts to a material nondisclosure. Since both the Mayos' and Smiths' finance charges were understated in excess of $10, the court does not need to decide whether an understatement of the finance charge less than $10 amounts to a material nondisclosure. *Steele v. Ford Motor Credit Co.,* 783 F.2d 1016, 1018-19 n. 3 (11th Cir.1986).

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in N.E.2d
(Cite as: 1994 WL 879676, *5 (Mass.Super.))

In 1980, the federal Truth-in-Lending Act was amended. *In re Brown, supra* at 853. A material disclosure relates to information that would affect the credit shopper's decision to use the credit, and materiality should be determined by an objective standard based upon what a reasonable consumer would find significant. *Steele v. Ford Motor Credit Co.*, 783 F.2d 1016, 1019 (11th Cir.1986). Since the amendment, the federal courts have generally held that where the finance charge is understated, the inaccuracy amounts to a material nondisclosure extending the period of rescission. See *Smith v. Fidelity Consumer Discount Company*, 898 F.2d 896, 899-905 (3d Cir.1990) (holding that 12 CFR § 226.23(a)(3) n. 48 means that failure to accurately disclose the finance charge is a material violation of the federal Truth-in-Lending Act, entitling the borrower to rescind the loan transaction); *Steele, supra,* at 1019-20 (any understatement of the finance charge is material because any understatement would be of some significance to the reasonable consumer since it represents the total cost of the loan to the borrower); *In re Brown, supra,* at 861-62 (understated finance charge amounts to a material nondisclosure extending the rescission period of the borrower); see also *Bustamante v. First Federal S. & L. Ass'n,* 619 F.2d 360, 364 (5th Cir.1980), citing *Harris v. Tower Loan of Mississippi, Inc.,* 609 F.2d 120, 122-23 (5th Cir.1980) (understated finance charge is a material nondisclosure); *Brodo v. Bankers Trust Co.,* 847 F.Supp. 353, 356 (1994) (failure to disclose proper finance charge or amount financed constitutes a material violation which entitles the borrower to rescind the loan).

**\*6** Advanced and Key attempt to demonstrate that even if the finance charges were understated, the understatements do not amount to material nondisclosures. The defendants rely on *Malfa v. Household Bank, F.S.B.,* 825 F.Supp. 1018 (S.D.Fla.1993). In *Malfa,* the plaintiff asserted that the defendant had not made three material disclosures, entitling the plaintiff to extend the rescission period. *Id.* at 1020-22. The plaintiff argued that the defendant failed to disclose 1) the annual percentage rate and finance charge in a manner more conspicuous than the other terms within the agreement; 2) that certain charges amounting to a fee and tax had been improperly excluded from the finance charge; and 3) that pest control inspection fees should have been included in the finance charge. [FN9] *Id.* The court determined that the "more conspicuous rule" amounted to a technical violation and that the terms had been disclosed. *Id.* at 1021. The court also determined that the pest inspection fees were properly excluded from the finance charge. *Id.* at 1022.

FN9. The court also examined whether the rescission

notice contained sufficient information regarding the plaintiff's rights. *Malfa, supra* at 1022.

In examining the fee and tax excluded from the finance charge, the *Malfa* court found that these charges were disclosed on a HUD-1 Settlement Statement where the federal Truth-in-Lending Act required the disclosure of these fees be on a Disclosure Statement. *Id.* at 1021. If these charges were itemized and disclosed on a Disclosure Statement, they could be excluded from the finance charge. *Id.* The court also determined that since the fees were not disclosed on the proper form, the charges should have been included in the finance charge. *Id.* However, the court also determined that disclosure of these charges on the wrong form amounted to a technical violation because they were still itemized and disclosed, and, in addition, the charges would have to be paid as a matter of law regardless of the lender chosen. *Id.* at 1021- 22. In essence, the court noted that these charges do not affect the consumer's decision in choosing a lender. *Id.* The court relied on *Steele, supra,* in reaching its decision, distinguishing the fees in *Malfa* as ones prescribed by law. *Id.*

The case at bar is closer to the facts of *Steele* than *Malfa.* Like *Steele,* the amounts that Advanced and Key should have included in the finance charge calculations were not prescribed by law but were merely inflated fees which the defendants retained for themselves. Furthermore, the fee and tax in *Malfa* could be excluded from the finance charge if disclosed on the proper Disclosure Statement form. In *Malfa,* the defendant disclosed charges but on the wrong form. Here, the inflated fees had to be included in the finance charge even if disclosed elsewhere. Only bona fide and reasonable fees could be excluded from the finance charge. In addition, unlike *Malfa,* the inflated amounts charged to the Mayos and Smiths were not disclosed elsewhere and were required to be included in the finance charge. These inflated charges were not prescribed by law and the understatement of the finance charge would be of some significance to a reasonable consumer shopping for loans. The plaintiffs' motion for summary judgment on Count II is allowed and the defendants' motion for summary judgment on Count II is denied.

## Count III--Restitution

**\*7** General Laws c. 183, § 63 states in relevant part that: A mortgagee shall not charge ... points ... or similar fees in a mortgage transaction involving a residential property located in the commonwealth ... except to the extent such ... points constitute reimbursement for reasonable originating or underwriting expenses, as determined by the

Not Reported in N.E.2d
(Cite as: 1994 WL 879676, *7 (Mass.Super.))

commissioner, incurred by the mortgagee for the intended purpose of selling mortgage loans in the secondary mortgage market ...

The plaintiffs allege that they were charged excessive points on their respective loan agreements in violation of G.L.c. 183, § 63, entitling them to restitution. Key contends that the restitution claim is barred by the tort three-year statute of limitations. Key also argues that under G.L.c. 183, § 63, there exists no private right of action, and even if a right of action does exist, Key, as assignee, did not collect any points from the Smiths and only collected one point from the Mayos.

Under G.L.c. 260, § 2A, the statute of limitations for a tort action is three years. General Laws c. 183, § 63, is designed to protect consumers from sharp practices of mortgage lenders. Thus the statute has characteristics that are common to consumer protection statutes. Claims arising under G.L.c. 183, § 63 must adhere to the procedural requirements of G.L.c. 260, § 5A. See *Micera v. Neworld Bank,* 412 Mass. 728, 732 (1992) (holding statute protecting consumer in mortgage loan transaction is a consumer protection statute). General Laws c. 260, § 5A requires the consumers to bring an action within four years from the accrual of the action. The plaintiffs have brought this action within the four-year statute of limitations and the action is not barred.

Since G.L.c. 183, § 63 does not expressly provide for a private right of action and there is no case law deciding this issue, *Ludlow Education Association v. Ludlow,* 31 Mass. 110 (1991), offers guidance. In *Ludlow,* the Court of Appeals held that:

where the applicable law evidences a special legislative concern for an identified interest of a group of which the plaintiff is a member, and not merely a concern for the public generally, a private cause of action will be implied if the injury suffered falls within the area of concern.

*Id.* at 120. Under the principle in *Ludlow,* the right under the statute may be asserted by any appropriate common law remedy that is available. *Id.* at 119.

General Laws c. 183, § 63 evidences a special legislative concern for mortgagors dealing with lenders taking advantage of unequal bargaining power. The Smiths and Mayos assert that they have suffered the harm the statute seeks to prevent. The common law remedy that the plaintiffs have chosen is restitution. Under the principle discussed in *Ludlow,* I conclude that G.L.c. 183, § 53 affords a private right of action.

Key's contention that it did not receive any excessive points from the Smiths and Mayos remains in dispute. The Hardiman affidavit states that any prepaid points

charged to the Smiths or Mayos were collected by Advanced and that Key only received one point on the Mayo loan. (Hardiman aff't, ¶ 11.)

**\*8** The plaintiffs counter Hardiman's affidavit by offering evidence that shows Key's desire to continue to collect points and that Advanced was merely acting as Key's agent. To establish an agency relationship, the plaintiffs' evidence demonstrates that Key controlled the loan closings and that Key provided the funds for the Smith and Mayo transactions. The documents further demonstrate that Key controlled and approved all phases of the loan transactions between the parties. (See plaintiffs' opposition to cross-motions for summary judgment, ex. C, Key memorandum showing a desire to continue to collect points; ex. D, Key's confirmation to Advanced approving Mayo and Smith loan.) The evidence the plaintiffs offer establishes that there exists a genuine issue of material fact as to whether Key collected any of the points in the Mayo and Smith transactions and whether Advanced acted as Key's agent. If Advanced was acting as Key's agent, Key would be vicariously responsible for the unlawful conduct of its agent. *Kelley v. Rossi,* 395 Mass. 659, 661 (1985). Accordingly, the defendants' motion for summary judgment as to Count III is denied.

### Choice of Law

The defendants assert that Massachusetts law is inapplicable to this action since Key is a New York corporation and Advanced is a Rhode Island corporation, and the loans were signed in Rhode Island. The defendants argue that Rhode Island law applies to this action, and that the Massachusetts consumer protection statutes that the plaintiffs rely on are inapplicable. The defendants' argument is without merit.

A choice-of-law analysis is necessary where the law of the forum does not coincide with the law of the sister state. *Chas. T. Main, Inc. v. Fireman's Fund Ins. Co.,* 406 Mass. 862, 863 (1990); see also *Cosme v. Whitin Machine Works, Inc.,* 417 Mass. 643, 644 (1994) (applying Connecticut's statute of repose to an action brought in Massachusetts would bar plaintiff's claim); *Bushkin Associates, Inc. v. Raytheon Co.,* 393 Mass. 622 (1985) (choice-of-law analysis necessary where action would be barred by New York statute of frauds but not barred by Massachusetts statute).

Applying a choice-of-law analysis to the case at bar clearly shows that Massachusetts law applies. A choice-of-law question does not turn on where the contract was made. *Id.* at 630. In Massachusetts, the Supreme Judicial Court has adopted a functional choice-of-law approach by examining various choiceinfluencing

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in N.E.2d                                          Page 9
**(Cite as: 1994 WL 879676, *8 (Mass.Super.))**

factors. *Id.* at 631.   The court determines which state has the most significant relationship to the transaction and the parties.  In determining which law should apply, the court begins by examining the contacts which the relevant states have with the parties and occurrence in the case. *Cosme, supra* at 647.

Here, the mortgages that the plaintiffs signed state that the law governing the transaction is the jurisdiction where the property is located, which is Massachusetts (Hardiman aff't, ex.   C, G/¶ 13).   The plaintiffs are residents of Massachusetts and the subject property is located in Massachusetts.   The soliciting for the loans occurred in Massachusetts. (See Complaint, ex. 1.) The injurious consequences of the material nondisclosures result in Massachusetts.   The only contact of states other than Massachusetts is that the defendants are from New York and Rhode Island and the agreements were signed in Rhode Island.

**\*9** In examining the relevant interests of Massachusetts and Rhode Island, it is obvious that Rhode Island has an interest in protecting against fraud in its state. Massachusetts shares this interest in its own state and enacted General Law c. 140D and G.L.c. 183, § 63 to protect the Massachusetts consumer from fraud and to ensure mortgagees are held accountable for any unscrupulous conduct.

The justified expectations of the parties also favor applying Massachusetts law.   As discussed above, the signed mortgages inform each party that the law of Massachusetts shall apply to transactions arising from the mortgage transaction.   Accordingly, Massachusetts has a more significant relationship to the parties and the occurrence than does Rhode Island.   Massachusetts law applies to this action.

### ORDER

For the foregoing reasons, it is hereby ORDERED that the plaintiffs' motion for summary judgment on Count II is ALLOWED and the defendants' motion for summary judgment on Count II and Count III is DENIED.   It is further DECLARED that the plaintiffs have validly rescinded their respective loan agreements with the defendants.   The parties shall arrange a proper schedule for return of all consideration thus far exchanged.   If the parties fail to agree upon an appropriate schedule for return of all the consideration, a motion may be brought to determine the schedule of repayment.

The plaintiffs are entitled to costs and reasonable attorneys fees pursuant to G.L.c. 140D, § 32(3).

2 Mass.L.Rptr. 269, 1994 WL 879676 (Mass.Super.)

END OF DOCUMENT

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

17 U.S. 316; 4 L. Ed. 579; 1819 U.S. LEXIS 320; 4 A.F.T.R. (P-H) 4491; 4 Wheat. 316; 42 Cont. Cas. Fed. (CCH) P77,296

MCCULLOCH v. The STATE OF MARYLAND et al.

SUPREME COURT OF THE UNITED STATES

17 U.S. 316; 4 L. Ed. 579; 1819 U.S. LEXIS 320; 4 A.F.T.R. (P-H) 4491; 4 Wheat. 316; 42 Cont. Cas. Fed. (CCH) P77,296

March 6, 1819, Decided

**PRIOR HISTORY:  [***1]**

ERROR to the Court of Appeals of the State of Maryland.

This was in action of debt brought by the defendant in error, John James, who sued as well for himself as for the State of Maryland, in the County Court of Baltimore County, in the said State, against the plaintiff in error, McCulloch, to recover certain penalties under the act of the legislature of Maryland, hereafter mentioned. Judgment being rendered against the plaintiff in error, upon the following statement of facts, agreed and submitted to the Court by the parties, was affirmed by the Court of Appeals of the State of Maryland, the highest Court of law of said State, and the cause was brought, by writ of error, to this Court.

It is admitted by the parties in this cause, by their counsel, that there was passed on the 10th day of April, 1816, by the Congress of the United States, an act, entitled, "an act to incorporate the subscribers to the Bank of the United States;" and that there was passed, on the 11th day of February, 1818, by the General Assembly of Maryland, an act, entitled, "an act to impose a tax on all Banks, or branches thereof, in the State of Maryland, not chartered by the legislature," which said acts [***2] are made part of this statement, and it is agreed may be read from the statute books in which they are respectively printed.   It is further admitted, that the President, Directors and Company of the Bank of the United States, incorporated by the act of Congress aforesaid, did organize themselves, and go into full operation in the City of Philadelphia, in the State of Pennsylvania, in pursuance of the said act, and that they did on the    day of    eighteen hundred and seventeen, establish a branch of the said Bank, or an office of discount and deposit in the city of Baltimore, in the state of Maryland, which has from that time until the first day of May, eighteen hundred and eighteen, ever since transacted and carried on business as a Bank, or office of discount and deposit, and as a branch of the said Bank of the United States, by issuing Bank notes and discounting promissory notes, and performing other operations usual and customary for Banks to do and perform, under the authority and by the direction rection of the said President, Directors and Company of the Bank of the United States, established at Philadelphia as aforesaid.   It is further admitted, that the said President, [***3] Directors and Company of the said Bank, had no authority to establish the said branch, or office of discount and deposit at the city of Baltimore, from the State of Maryland, otherwise than the said State having adopted the Constitution of the United States, and composing one of the States of the Union.   It is further admitted, that James William McCulloch, the defendant below, being the cashier of the said branch of office of discount and deposit, did, on the several days set forth in the declaration in this cause, issue the said respective Bank notes therein described, from the said branch, or office, to a certain George Williams, in the city of Baltimore, in part payment of a promissory note of the said Williams, discounted by the said branch or office, which said respective Bank notes were not, nor was either of them, so issued on stamped paper in the manner prescribed by the act of Assembly aforesaid.    It is further admitted, that the said President, Directors and Company of the Bank of the United States, and the said branch or office of discount and deposit have not, nor has either of them, paid in advance, or otherwise, the sum of fifteen thousand dollars, to the Treasurer of [***4] the Western shore, for the use of the State of Maryland, before the issuing of the said notes, or any of them, nor since those periods.  And it is further admitted, that the Treasurer of the Western Shore of Maryland, under the direction of the Governor and Council of the said State, was ready, and offered to deliver to the said President, Directors and Company of the said Bank, and to the said branch, or office of discount and deposit, stamped paper of the kind and denomination required and described in the said act of Assembly.

The question submitted to the Court for their decision in this case, is as to the validity of the said act of the General Assembly of Maryland, on the ground of its being repugnant to the constitution of the United States, and the act of Congress aforesaid, or to one of them.  Upon the foregoing statement of facts, and the pleadings in this cause, (all errors in which are hereby

**13**

17 U.S. 316; 4 L. Ed. 579; 1819 U.S. LEXIS 320; 4 A.F.T.R. (P-H) 4491; 4 Wheat. 316; 42 Cont. Cas. Fed. (CCH) P77,296

agreed to be mutually released,) if the Court should be of opinion that the plaintiffs are entitled to recover, then judgment it is agreed shall be entered for the plaintiffs for twenty-five hundred dollars, and costs of suit. But if the Court should be of opinion that the plaintiffs [***5] are not entitled to recover upon the statement and pleadings aforesaid, then judgment of non pros shall be entered, with costs to the defendant.

It is agreed that either party may appeal from the decision of the County Court, to the Court of Appeals, and from the decision of the Court of Appeals to the Supreme Court of the United States according to the modes and usages of law, and have the same benefit of this statement of facts, in the same manner as could be had if a jury had been sworn and empannelled in this cause, and a special verdict had been found, or these facts had appeared and been stated in an exception taken to the opinion of the Court, and the Court's direction to the jury thereon.

Copy of the Act of the Legislature of the State of Maryland, referred to in the preceding statement.

An Act to impose a Tax on all Banks or Branches thereof in the State of Maryland, not chartered by the Legislature.

Be it enacted by the General Assembly of Maryland, That if any Bank has established, or shall without authority from the State first had and obtained, establish any branch, office of discount and deposit, or office of pay and receipt, in any part of the State, it shall not [***6] be lawful for the said branch, office of discount and deposit, or office of pay and receipt, to issue notes in any manner, of any other denomination than five, ten, twenty, fifty, one hundred, five hundred and one thousand dollars, and no note shall be issued except upon stamped paper of the following denominations; that is to say, every five dollar note shall be upon a stamp of ten cents; every ten dollar note upon a stamp of twenty cents; every twenty dollar note, upon a stamp of thirty cents; every fifty dollar note, upon a stamp of fifty cents; every one hundred dollar note, upon a stamp of one dollar; every five hundred dollar note, upon a stamp of ten dollars; and every thousand dollar note, upon a stamp of twenty dollars; which paper shall be furnished by the Treasurer of the Western Shore, under the direction of the Governor and Council, to be paid for upon delivery; Provided always, That any institution of the above description may relieve itself from the operation of the provisions aforesaid, by paying annually, in advance, to the Treasurer of the Western Shore, for the use of the State, the sum of fiften thousnad dollars.

And be it enacted, That the President, Cashier, [***7] each of the Directors and Officers of every institution established, or to be established as aforesaid, offending against the provisions aforesaid, shall forfeit a sum of five hundred dollars for each and every offence, and every person having any agency in circulating any note aforesaid, not stamped as aforesaid directed, shall forfeit a sum not exceeding one hundred dollars; every penalty aforesaid to be recovered by indictment, or action of debt, in the County Court of the county where the offence shall be committed, one half to the informer, and the other half to the use of the State.

And be it enacted, That this act shall be in full force and effect from and after the first day of May next.

## CASE SUMMARY

**PROCEDURAL POSTURE:** Defendant appealed a judgment of the Court of Appeals of the State of Maryland finding for plaintiff, who brought suit against defendant to recover certain penalties under a Maryland act imposing a tax on all banks in the state of Maryland not chartered by the Maryland legislature.

**OVERVIEW:** The Maryland legislature had passed an act to impose a tax on all banks, or its branches, within the state of Maryland, not chartered by the legislature. The defendant, a cashier at the Bank of the United States, had issued notes that were not issued on stamped paper in the manner prescribed by the state act. The plaintiff, State of Maryland, brought suit to recover penalties under the act. The county court found for the plaintiff, and the court of appeals affirmed. On appeal, the court reversed holding that the act to incorporate the Bank of the United States was a law made in pursuance of the Constitution. Moreover, the court held that the law imposing a tax on the Bank of the United States was unconstitutional and void because the states had no power to burden the operations of the constitutional laws enacted by Congress.

**OUTCOME:** The court reversed the decision to uphold the tax on the Bank of the United States and held that the tax was unconstitutional because the states had no power to burden the operations of the constitutional laws enacted by Congress.

**CORE TERMS:** sovereignty, taxation, general government, sovereign, pursuance, carrying, convention, incidental, admit, duty, power of taxation, executing, supremacy, import, means employed, supreme law, enumerated, confidence, entrusted, restrain, punish, powers vested, great powers, indispensably, constituents, beneficial, prescribed, delegated, conducive, conferred

17 U.S. 316; 4 L. Ed. 579; 1819 U.S. LEXIS 320; 4 A.F.T.R. (P-H) 4491; 4 Wheat. 316; 42 Cont. Cas. Fed. (CCH) P77,296

**LexisNexis(TM) Headnotes**

*Constitutional Law > Supremacy Clause*

[HN1]The government of the Union, though limited in its powers, is supreme within its sphere of action.

*Constitutional Law > Supremacy Clause*

[HN2]The government of the United States, though limited in its powers, is supreme; and its laws, when made in pursuance of the constitution, form the supreme law of the land, any thing in the constitution or laws of any State to the contrary notwithstanding.

*Constitutional Law > Congressional Duties & Powers > Reserved Powers*

[HN3]U.S. Const. amend. X, which was framed for the purpose of quieting the excessive jealousies which had been excited, omits the word "expressly," and declares only that the powers not delegated to the United States, nor prohibited to the States, are reserved to the States or to the people; thus leaving the question, whether the particular power which may become the subject of contest has been delegated to the one government, or prohibited to the other, to depend on a fair construction of the whole instrument.

*Constitutional Law > Congressional Duties & Powers > Necessary & Proper Clause*

[HN4]The Constitution of the United States has not left the right of Congress to employ the necessary means, for the execution of the powers conferred on the government, to general reasoning. To its enumeration of powers is added that of making all laws which shall be necessary and proper, for carrying into execution the foregoing powers, and all other powers vested by the Constitution, in the government of the United States, or in any department thereof.

*Constitutional Law > Congressional Duties & Powers > Presentment & Veto*

[HN5]A government is created by the people, having legislative, executive, and judicial powers. Its legislative powers are vested in a Congress, which is to consist of a Senate and House of Representatives. Each house may determine the rule of its proceedings; and it is declared that every bill which shall have passed both houses, shall, before it becomes a law, be presented to the President of the United States.

*Constitutional Law > Congressional Duties & Powers > Presentment & Veto*

[HN6]U.S. Const. art. I, § 7 describes the course of proceedings, by which a bill shall become a law; and, then, U.S. Const. art. I, § 8 enumerates the powers of Congress.

*Constitutional Law > Congressional Duties & Powers > Necessary & Proper Clause*

[HN7]Congress is not empowered by it to make all laws, which may have relation to the powers conferred on the government, but such only as may be "necessary and proper" for carrying them into execution.

*Constitutional Law > Congressional Duties & Powers > Necessary & Proper Clause*

[HN8]The sound construction of the Constitution must allow to the national legislature that discretion, with respect to the means by which the powers it confers are to be carried into execution, which will enable that body to perform the high duties assigned to it, in the manner most beneficial to the people. Let the end be legitimate, let it be within the scope of the Constitution, and all means which are appropriate, which are plainly adapted to that end, which are not prohibited, but consist with the letter and spirit of the Constitution, are constitutional.

*Constitutional Law > Congressional Duties & Powers > Necessary & Proper Clause*

[HN9]If a corporation may be employed indiscriminately with other means to carry into execution the powers of the government, no particular reason can be assigned for excluding the use of a bank, if required for its fiscal operations. To use one, must be within the discretion of Congress, if it be an appropriate mode of executing the powers of government. That it is a convenient, a useful, and essential instrument in the prosecution of its fiscal operations, is not now a subject of controversy. The time has passed away when it can be necessary to enter into any discussion in order to prove the importance of this instrument, as a means to effect the legitimate objects of the government.

*Banking Law > National Banks*

*Constitutional Law > Congressional Duties & Powers > Necessary & Proper Clause*

[HN10]The act to incorporate the Bank of the United States is a law made in pursuance of the Constitution, and is a part of the supreme law of the land.

*Constitutional Law > Congressional Duties & Powers > Spending & Taxation*

*Constitutional Law > Relations Among Governments*

[HN11]The power of taxation is one of vital importance; that it is retained by the States; that it is not abridged by the grant of a similar power to the government of the Union; that it is to be concurrently

17 U.S. 316; 4 L. Ed. 579; 1819 U.S. LEXIS 320; 4 A.F.T.R. (P-H) 4491; 4 Wheat. 316; 42 Cont. Cas. Fed. (CCH) P77,296

exercised by the two governments: are truths which have never been denied.

*Constitutional Law > Congressional Duties & Powers > Spending & Taxation*

[HN12]The power of taxing the people and their property is essential to the very existence of government, and may be legitimately exercised on the objects to which it is applicable, to the utmost extent to which the government may choose to carry it. The only security against the abuse of this power, is found in the structure of the government itself. In imposing a tax the legislature acts upon its constituents. This is in general a sufficient security against erroneous and oppressive taxation.

*Constitutional Law > Relations Among Governments*

[HN13]The people of all the states have created the general government, and have conferred upon it the general power of taxation. The people of all the states, and the states themselves, are represented in Congress, and, by their representatives, exercise this power. When they tax the chartered institutions of the states, they tax their constituents; and these taxes must be uniform. But, when a state taxes the operations of the government of the United States, it acts upon institutions created, not by their own constituents, but by people over whom they claim no control.

*Constitutional Law > Supremacy Clause*

[HN14]An act passed by the legislature of Maryland, imposing a tax on the Bank of the United States, is unconstitutional and void.

**LAWYERS' EDITION HEADNOTES:**
Congress has power to incorporate a bank.

The government of the Union is a government of the people; it emanates from them; its powers are granted by them; and are to be exercised directly on them, and for their benefit.

The government of the Union, though limited in its powers, is supreme within its sphere of action; and its laws, when made in pursuance of the constitution, form the supreme law of the land.

There is nothing in the constitution of the United States, similar to the articles of confederation, which exclude incidental or implied powers.

If the end be legitimate, and within the scope of the constitution, all the means which are appropriate, which are plainly adapted to that end, and which are not prohibited, may constitutionally be employed to carry it into effect.

The power of establishing a corporation is not a distinct sovereign power or end of government, but only the means of carrying into effect other powers

which are sovereign. Whenever it becomes an appropriate means of exercising any of the powers given by the constitution to the government of the Union, it may be exercised by that government.

If a certain means to carry into effect any of the powers, expressly given by the constitution to the government of the government of the Union, be an appropriate measure, not prohibited by the constitution, the degree of its necessity is a question of legislative discretion, not of judicial cognizance.

The act of the 10th April, 1816, c. 44, to "incorporate the subscribers to the Bank of the United States," is a law made in pursuance of the constitution.

The Bank of the United States has, constitution ally, a right to establish its branches or offices of discount and deposit within any state.

The state, within which such branch may be established, cannot, without violating the constitution, tax that branch.

The state governments have no right to tax any of the constitutional means employed by the government of the Union to execute its constitutional powers.

The states have no power, by taxation, or otherwise, to retard, impede, burden, or in any manner control the operations of the constitutional laws enacted by Congress, to carry into effect the powers vested in the national government.

This principle does not extend to a tax paid by the real property of the Bank of the United States, in common with the other real property in a particular state, nor to a tax imposed on the proprietary interest which the citizens of that state may hold in this institution, in common with other property of the same description throughout the state.

**SYLLABUS:** Congress has power to incorporate a Bank.

The government of the Union is a government of the People; it emanates from them; its powers are granted by them; and are to be exercised directly on them, and for their benefit.

The government of the Union, though limited in its powers, is supreme within its sphere of action; and its laws, when made in pursuance of the constitution, form the supreme law of the land.

There is nothing in the Constitution of the United States, similar to the [***8] articles of Confederation, which exclude incidental or implied powers.

If the end be legitimate, and within the scope of the constitution, all the means which are appropriate, which are plainly adapted to that end, and which are not prohibited, may constitutionally be employed to carry it into effect.

17 U.S. 316; 4 L. Ed. 579; 1819 U.S. LEXIS 320; 4 A.F.T.R. (P-H) 4491; 4 Wheat. 316; 42 Cont. Cas. Fed. (CCH) P77,296

The power of establishing a corporation is not a distinct sovereign power or end of government, but only the means of carrying into effect other powers which are sovereign. Whenever it becomes an appropriate means of exercising any of the powers given by the constitution to the government of the Union, it may be exercised by that government.

If a certain means to carry into effect any of the powers, expressly given by the constitution to the government of the Union, be an appropiate measure, not prohibited by the constitution, the degree of its necessity is a question of legislative discretion, not of judicial cognizance.

The act of the 10th April, 1816, c. 44., to "incorporate the subscribers to the Bank of the United States," is a law made in pursuance of the constitution.

The Bank of the United States has, constitutionally, a right to establish its branches or offices of discount [***9] and deposit within any State.

The State, within which such branch may be established, cannot, without violating the constitution, tax that branch.

The State governments have no right to tax any of the constitutional means employed by the goverment of the Union to execute its constitutional powers.

The States have no power, by taxation, or otherwise, to retard, impede, burden, or in any manner controul the operations of the constitutional laws enacted by Congress, to carry into effect the powers vested in the national government.

This principle does not extend to a tax paid by the real property of the Bank of the United States, in common with the other real property in a particular State, nor to a tax imposed on the proprietary interest which the citizens of the State may hold in this institution, in common with other property of the same description throughout the State.

**COUNSEL:** Mr. Webster, for the plaintiff in error, n1 1. stated, that the question whether Congress constitutionally possesses the power to incorporate a bank, might be raised upon this record; and it was in the discretion of the defendant's counsel to agitate it. But it might have been hoped that it was not now to [***10] be considered as an open question. It is a question of the utmost magnitude, deeply interesting to the government itself, as well as to individuals. The mere discussion of such a question may most essentially affect the value of a vast amount of private property. We are bound to suppose that the defendant in error is well aware of these consequences, and would not have intimated an intention to agitate such a question, but with a real design to make it a topic of serious discussion, and with a view of demanding upon it the solemn judgment of this Court. This question arose early after the adoption of the constitution, and was discussed, and settled, as far as legislative decision could settle it, in the first Congress. The arguments drawn from the constitution in favour of this power, were stated, and exhausted, in that discussion. They were exhibited, with characteristic perspicuity and force, by the first Secretary of the Treasury, in his report to the President of the United States. The first Congress created and incorporated a bank. n2 Nearly each succeeding Congress, if not every one, has acted and legislated on the presumption of the legal existence of such a power in [***11] the government. Individuals, it is true, have doubted, or thought otherwise; but it cannot be shown that either branch of the legislature has, at any time, expressed an opinion against the existence of the power. The executive government has acted upon it; and the courts of law have acted upon it. Many of those who doubted or denied the existence of the power, when first attempted to be exercised, have yeilded to the first decision, and acquiesced in it, as a settled question. When all branches of the government have thus been acting on the existence of this power nearly thirty years, it would seem almost too late to call it in question, unless its repugnancy with the constitution were plain and manifest. Congress, by the constitution, is invested with certain powers; and, as to the objects, and within the scope of these powers, it is sovereign. Even without the aid of the general clause in the constitution, empowering Congress to pass all necessary and proper laws for carrying its powers into execution, the grant of powers itself necessarily implies the grant of all usual and suitable means for the execution of the powers granted. Congress may declare war; it may consequently [***12] carry on war, by armies and navies, and other suitable means and methods of warfare. So it has power to raise a revenue, and to apply it in the support of the government, and defence of the country. It may, of course, use all proper and suitable means, not specially prohibited, in the raising and disbursement of the revenue. And if, in the progress of society and the arts, new means arise, either of carrying on war, or of raising revenue, these new means doubtless would be properly considered as within the grant. Steam frigates, for example, were not in the minds of those who framed the constitution, as among the means of naval warfare; but no one doubts the power of Congress to use them, as means to an authorized end. It is not enough to say, that it does not appear that a bank was in the contemplation of the framers of the constitution. It was not their intention, in these cases, to enumerate

17 U.S. 316; 4 L. Ed. 579; 1819 U.S. LEXIS 320; 4 A.F.T.R. (P-H) 4491; 4 Wheat. 316; 42 Cont. Cas. Fed. (CCH) P77,296

particulars. The true view of the subject is, that if it be a fit instrument to an authorized purpose, it may be used, not being specially prohibited. Congress is authorized to pass all laws "necessary and proper" to carry into execution the powers conferred on it. These words, "necessary [***13] and proper," in such an instrument, are probably to be considered as synonimous. Necessary powers must here intend such powers as are suitable and fitted to the object; such as are best and most useful in relation to the end proposed. If this be not so, and if Congress could use no means but such as were absolutely indispensable to the existence of a granted power, the government would hardly exist; at least, it would be wholly inadequate to the purposes of its formation. A bank is a proper and suitable instrument to assist the operations of the government, in the collection and disbursement of the revenue; in the occasional anticipations of taxes and imposts; and in the regulation of the actual currency, as being a part of the trade and exchange between the States. It is not for this Court to decide whether a bank, or such a bank as this, be the best possible means to aid these purposes of government. Such topies must be left to that discussion which belongs to them in the two houses of Congress. Here, the only question is, whether a bank, in its known and ordinary operations, is capable of being so connected with the finances and revenues of the government, as to be fairly [***14] within the discretion of Congress, when selecting means and instruments to execute its powers and perform its duties. A bank is not less the proper subject for the choice of Congress, nor the less constitutional, because it requires to be executed by granting a charter of incorporation. It is not, of itself, unconstitutional in Congress to create a corporation. Corporations are but means. They are not ends and objects of government. No government exists for te purpose of creating corporations as one of the ends of its being. They are institutions established to effect certain beneficial purposes; and, as means, take their character generally from their end and object. They are civil or eleemosynary, public or private, according to the object intended by their creation. They are common means, such as all governments use. The State governments create corporations to execute powers confided to their trust, without any specific authority in the State constitutions for that purpose. There is the same reason that Congress should exercise its discretion as to the means by which it must execute the powers conferred upon it. Congress has duties to perform and powers to execute. It [***15] has a right to the means by which these duties can be properly and most usefully performed, and these powers executed. Among other means, it has established a bank; and

before the act establishing it can be pronounced unconstitutional and void, it must be shown, that a bank has no fair connection with the execution of any power or duty of the national government, and that its creation is consequently a manifest usurpation.

n1 This case involving a constitutional question of great public importance, and the sovereign rights of the United States and the State of Maryland; and the government of the United States having directed their Attorney General to appear for the plaintiff in error, the Court dispensed with its general rule, permitting only two counsel to argue for each party.

n2 Act of February 5th, 1791, c. 84.

2. The second question is, whether, if the bank be constitutionally created, the State governments have power to tax it? The people of the United States have seen fit to divide sovereignty, and to establish a complex system. They have conferred certain powers on the State Governments, and certain other powers on the National Government. As it was easy to foresee [***16] that questions must arise between these governments thus constituted, it became of great moment to determine upon what principle these questions should be decided, and who should decide them. The constitution, therefore, declares, that the constitution itself, and the laws passed in pursuance of its provisions, shall be the supreme law of the land, and shall control all State legislation and State constitutions, which may be incompatible therewith; and it confides to this Court the ultimate power of deciding all questions arising under the constitution and laws of the United States. The laws of the United States, then, made in pursuance of the constitution, are to be the supreme law of the land, any thing in the laws of any State to the contrary notwithstanding. The only inquiry, therefore, in this case is, whether the law of the State of Maryland imposing this tax be consistent with the free operation of the law establishing the bank, and the full enjoyment of the privileges conferred by it? If it be not, then it is void; if it be, then it may be valid. Upon the supposition that the bank is constitutionally created, this is the only question; and this question seems answered [***17] as soon as it is stated. If the States may tax the bank, to what extent shall they tax it, and where shall they stop? An unlimited power to tax involves, necessarily, a power to destroy; because there is a limit beyond which no institution and no property can bear taxation. A question of constitutional power can hardly be made to depend on a question of more or less. If the States may tax, they have no limit but their discretion; and the

17 U.S. 316; 4 L. Ed. 579; 1819 U.S. LEXIS 320; 4 A.F.T.R. (P-H) 4491; 4 Wheat. 316; 42 Cont. Cas. Fed. (CCH) P77,296

bank, therefore, must depend on the discretion of the State governments for its existence. This consequence is inevitable. The object in laying this tax, may have been revenue to the State. In the next case, the object may be to expel the bank from the State; but how is this object to be ascertained, or who is to judge of the motives of legislative acts? The government of the United States has itself a great pecuniary interest in this corporation. Can the States tax this property? Under the Confederation, when the national government, not having the power of direct legislation, could not protect its own property by its own laws, it was expressly stipulated, that "no impositions, duties, or restrictions, should be laid by any State on the [***18] property of the United States." Is it supposed that property of the United States is now subject to the power of the State governments, in a greater degree than under the Confederation? If this power of taxation be admitted, what is to be its limit? The United States have, and must have, property locally existing in all the States; and may the States impose on this property, whether real or personal, such taxes as they please? Can they tax proceedings in the Federal Courts? If so, they can expel those judicatures from the States. As Maryland has undertaken to impose a stamp tax on the notes of this bank, what hinders her from imposing a stamp tax also on permits, clearances, registers, and all other documents connected with imposts and navigation? If by one she can suspend the operations of the bank, by the other she can equally well shut up the custom house. The law of Maryland, in question, makes a requisition. The sum called for is not assessed on property, nor deducted from profits or income. It is a direct imposition on the power, privilege, or franchise of the corporation. The act purports, also, to restrain the circulation of the paper of the bank to bills of certain [***19] descriptions. It narrows and abridges the powers of the bank in a manner which, it would seem, even Congress could not do. This law of Maryland cannot be sustained but upon principles and reasoning which would subject every important measure of the national government to the revision and control of the State legislatures. By the charter, the bank is authorized to issue bills of any denomination above five dollars. The act of Maryland purports to restrain and limit their powers in this respect. The charter, as well as the laws of the United States, makes it the duty of all collectors and receivers to receive the notes of the bank in payment of all debts due the government. The act of Maryland makes it penal, both on the person paying and the person receiving such bills, until stamped by the authority of Maryland. This is a direct interference with the revenue.The legislature of Maryland might, with as much propriety, tax treasury notes. This is either an attempt to expel the bank from the State; or it is an attempt to raise a revenue for State purposes, by an imposition on property and franchises holden under the national government, and created by that government for purposes [***20] connected with its own administration. In either view there cannot be a clearer case of interference. The bank cannot exist, nor can any bank established by Congress exist, if this right to tax it exists in the State governments. One or the other must be surrendered; and a surrender on the part of the government of the United States would be a giving up of those fundamental and essential powers without which the government cannot be maintained. A bank may not be, and is not, absolutely essential to the existence and preservation of the government. But it is essential to the existence and preservation of the government, that Congress should be able to exercise its constitutional powers, at its own discretion, without being subject to the control of State legislation. The question is not whether a bank be necessary, or useful, but whether Congress may not constitutionally judge of that necessity or utility; and whether, having so judged and decided, and having adopted measures to carry its decision into effect, the State governments may interfere with that decision, and defeat the operation of its measures. Nothing can be plainer than that, if the law of Congress establishing [***21] the bank be a constitutional act, it must have its full and complete effects. Its operation cannot be either defeated or impeded by acts of State legislation. To hold otherwise, would be to declare, that Congress can only exercise its constitutional powers subject to the controlling discretion, and under the sufferance, of the State governments.

Mr. Hopkinson, for the defendants in error, proposed three questions for the consideration of the Court. 1. Had Congress a constitutional power to incorporate the bank of the United States? 2. Granting this power to Congress, has the bank, of its own authority, a right to establish its branches in the several States? 3. Can the bank, and its branches thus established, claim to be exempt from the ordinary and equal taxation of property, as assessed in the States in which they are placed?

1. The first question has, for many years, divided the opinions of the first men of our country. He did not mean to controvert the arguments by which the bank was maintained on its original establishment. The power may now be denied, in perfect consistency with those arguments. It is agreed, that no such power is expressly granted by the constitution.It [***22] has been obtained by implication; by reasoning from the 8th section of the 1st article of the constitution; and asserted to exist, not of and by itself, but as an

17 U.S. 316; 4 L. Ed. 579; 1819 U.S. LEXIS 320; 4 A.F.T.R. (P-H) 4491; 4 Wheat. 316; 42 Cont. Cas. Fed. (CCH) P77,296

appendage to other granted powers, as necessary to carry them into execution. If the bank be not "necessary and proper" for this purpose, it has no foundation in our constitution, and can have no support in this Court. But it strikes us at once, that a power, growing out of a necessity which may not be permanent, may also not be permanent. It has relation to circumstances which change; in a state of things which may exist at one period, and not at another. The argument might have been perfectly good, to show the necessity of a bank for the operations of the revenue, in 1791, and entirely fail now, when so many facilities for money transactions abound, which were wanting then. That some of the powers of the constitution are of this fluctuating character, existing, or not, according to extraneous circumstances, has been fully recognized by this Court at the present term, in the case of Sturges v. Crowninshield. n3 Necessity was the plea and justification of the first bank of the United States. If the same necessity existed [***23] when the second was established, it will afford the same justification; otherwise, it will stand without justification, as no other is pretended. We cannot, in making this inquiry, take a more fair and liberal test, than the report of General Hamilton, the father and defender of this power. The uses and advantages he states, as making up the necessity required by the constitution, are three. 1. The augmentation of the active and productive capital of the country; by making gold and silver the basis of a paper circulation. 2. Affording greater facility to the government, in procuring pecuniary aids; especially in sudden emergencies.This, he says, is an indisputable advantage of public banks. 3. The facility of the payment of taxes, in two ways; by loaning to the citizen, and enabling him to be punctual; and by increasing the quantity of circulating medium, and quickening circulation by bank bills, easily transmitted from place to place. If we admit, that these advantages, or conveniences, amount to the necessity required by the constitution, for the creation and exercise of powers not expressly given; yet it is obvious they may be derived from any public banks, and do not call [***24] for a bank of the United States, unless there should be no other public banks, or not a sufficiency of them for these operations. In 1791, when this argument was held to be valid and effectual, there were but three banks in the United States, with limited capitals, and contracted spheres of operation. Very different is the case now, when we have a banking capital to a vast amount vested in banks of good credit, and so spread over the country, as to be convenient and competent for all the purposes enumerated in the argument. General Hamilton, conscious that his reasoning must fail, if the State banks were adequate for his objects, proceeds to show

they were not. Mr. Hopkinson particularly examined all the objections urged by General Hamilton, to the agency of the State banks then in existence, in the operations required for the revenue; and endeavoured to show, that they had no application to the present number, extent, and situation of the State banks; relying only on those of a sound and unquestioned credit and permanency. He also contended, that the experience of five years, since the expiration of the old charter of the bank of the United States, has fully shown the competency [***25] of the State banks, to all the purposes and uses alleged as reasons for erecting that bank, in 1791. The loans to the government by the State banks, in the emergencies spoken of; the accommodation to individuals, to enable them to pay their duties and taxes; the creation of a circulating currency; and the facility of transmitting money from place to place, have all been effected, as largely and beneficially, by the State banks, as they could have been done by a bank incorporated by Congress. The change in the country, in relation to banks, and an experience that was depended upon, concur in proving, that whatever might have been the truth and force of the bank argument in 1791, they were wholly wanting in 1816.

n3 Ante, p. 122.

2. If this bank of the United States has been lawfully created and incorporated, we next inquire, whether it may, of its own authority, establish its branches in the several States, without the direction of Congress, or the assent of the States. It is true, that the charter contains this power, but this avails nothing, if not warranted by the constitution. This power to establish branches, by the directors of the bank, must be maintained and justified, [***26] by the same necessity which supports the bank itself, or it cannot exist. The power derived from a given necessity, must be co-extensive with it, and no more. We will inquire, 1. Does this necessity exist in favour of the branches? 2. Who should be the judge of the necessity, and direct the manner and extent of the remedy to be applied? Branches are not necessary for any of the enumerated advantages. Not for pecuniary aids to the government; since the ability to afford them must be regulated by the strength of the capital of the parent bank, and cannot be increased by scattering and spreading that capital in the branches. Nor are they necessary to create a circulating medium; for they create nothing; but issue paper on the faith and responsibility of the parent bank, who could issue the same quantity on the same foundation; the distribution of the notes of the parent bank can as well be done, and, in fact, is done, by the State banks. Where, then, is that necessity to be found for the branches, whatever may be allowed to

17 U.S. 316; 4 L. Ed. 579; 1819 U.S. LEXIS 320; 4 A.F.T.R. (P-H) 4491; 4 Wheat. 316; 42 Cont. Cas. Fed. (CCH) P77,296

the bank itself? It is undoubtedly true, that these branches are established with a single view to trading, and the profit of the stockholders, and not for [***27] the convenience or use of the government; and, therefore, they are located at the will of the directors, who represent and regard the interests of the stockholders, and are such themselves. If this is the case, can it be contended, that the State rights of territory and taxation are to yield for the gains of a money-trading corporation; to be prostrated at the will of a set of men who have no concern, and no duty, but to increase their profits? Is this the necessity required by the constitution for the creation of undefined powers? It is true, that, by the charter, the government may require a branch in any place it may designate, but if this power is given only for the uses or necessities of the government, then the government only should have the power to order it. In truth, the directors have exercised the power, and they hold it without any control from the government of the United States; and, as is now contended, without any control of the State governments. A most extravagant power to be vested in a body of men, chosen annually by a very small portion of our citzens, for the purpose of loaning and trading with their money to the best advantage! A State will not suffer [***28] its own citizens to erect a bank without its authority, but the citizens of another State may do so; for it may happen that the State thus used by the bank for one of its branches, does not hold a single share of the stock. 2. But if these branches are to be supported, on the ground of the constitutional necessity, and they can have no other foundation, the question occurs, who should be the judge of the existence of the nexessity, in any proposed case; of the when and the where the power shall be exercised, which the necessity requires. Assuredly, the same tribunal which judges of the original necessity on which the bank is created, should also judge of any subsequent necessity requiring the extension of the remedy. Congress is that tribunal; the only one in which it may be safely trusted; the only one in which the States to be affected by the measure, are all fairly represented. If this power belongs to Congress, it cannot be delegated to the directors of a bank, any more than any other legislative power may be transferred to any other body of citizens: if this doctrine of necessity is without any known limits, but such as those who defend themselves by it, may choose for the [***29] time to give it; and if the powers derived from it, are assignable by the Congress to the directors of a bank; and by the directors of the bank to any body else; we have really spent a great deal of labour and learning to very little purpose, in our attempt to establish a form of government in which the powers of those who govern shall be strictly defined and controlled; and the rights of the government secured from the usurpations of unlimited or unknown powers. The establishment of a bank in a State, without its assent; without regard to its interests, its policy, or institutions, is a higher exercise of authority, than the creation of the parent bank; which, if confined to the seat of the government, and to the purposes of the government, will interfere less with the rights and policy of the States, than those wide spreading branches, planted every where, and influencing all the business of the community. Such an exercise of sovereign power, should, at least, have the sanction of the sovereign legislature to vouch that the good of the whole requires it, that the necessity exists which justifies it. But will it be tolerated, that twenty directors of a trading corporation, having [***30] no object but profit, shall, in the pursuit of it, tread upon the sovereignty of the State; enter it without condescending to ask its leave; disregard, perhaps, the whole system of its policy; overthrow its institutions, and sacrifice its interests?

3. If, however, the States of this Union have surrendered themselves in this manner, by implication, to the Congress of the United States, and to such corporations as the Congress, from tiem to time, may find it "necessary and proper" to create; if a State may no longer decide, whether a trading association, with independent powers and immunities, shall plant itself in its territory, carry on its business, make a currency and trade on its credit, raising capitals for individuals as fictitious as its own; if all this must be granted, the third and great question in this cause presents itself for consideration; that is, shall this association come there with rights of sovereignty, paramount to the sovereignty of the State, and with privileges possessed by no other persons, corporations or property in the State? in other words, can the bank and its branches, thus established, claim to be exempt from the ordinary and equal taxation of property, [***31] as assessed in the States in which they are placed? As this overwhelming invasion of State sovereignty is not warranted by any express clause or grant in the constitution, and never was imagined by any State that adopted and ratified that constitution, it will be conceded, that it must be found to be necessarily and indissolubly connected with the power to establish the bank, or it must be repelled. The Court has always shown a just anxiety to prevent any conflict between the federal and State powers; to construe both so as to avoid an interference if possible, and to preserve that harmony of action in both, on which the prosperity and happiness of all depend. If, therefore, the right to incorporate a national bank may exist, and he exercised consistently with the right of the State, to tax the

17 U.S. 316; 4 L. Ed. 579; 1819 U.S. LEXIS 320; 4 A.F.T.R. (P-H) 4491; 4 Wheat. 316; 42 Cont. Cas. Fed. (CCH) P77,296

property of such bank within its territory, the Court will maintain both rights; although some inconvenience or diminution of advantage may be the consequence. It is not for the directors of the bank to say, you will lessen our profits by permitting us to be taxed; if such taxation will not deprive the government of the uses it derives from the agency and operations of the bank. The necessity [***32] of the government is the foundation of the charter; and beyond that necessity it can claim nothing in derogation of State authority. If the power to erect this corporation were expressly given in the constitution, still it would not be construed to be an exclusion of any State right, not absolutely incompatible and repugnant. The States need no reservation or acknowledgment of their right; all remain that are not expressly prohibited, or necessarily excluded; and this gives our opponents the broadest ground they can ask. The right now assailed by the bank, is the right of taxing property within the territory of the State. This is the highest attribute of sovereignty, the right to raise revenue; in fact, the right to exist; without which no other right can be held or enjoyed. The general power to tax is not denied to the States, but the bank claims to be exempted from the operation of this power. If this claim is valid, and to be supported by the Court, it must be, either, 1. From the nature of the property. 2. Because it is a bank of the United States. 3. From some express provision of the constitution; or, 4. Because the exemption is indispensably necessary to the exercise [***33] of some power granted by the constitution.

First. There is nothing in the nature of the property of bank stock that exonerates it from taxation. It has been taxed, in some form, by every State in which a bank has been incorporated; either annually and directly, or by a gross sum paid for the charter. The United States have not only taxed the capital or stock of the State banks, but their business also, by imposing a duty on all notes discounted by them. The bank paid a tax for its capital; and every man who deals with the bank, by borrowing, paid another tax for the portion of the same capital he borrowed. This species of property, then, so far from having enjoyed any exemption from the calls of the revenue, has been particularly burthened; and been thought a fair subject of taxation both by the Federal and State governments.

Second. Is it then exempt, as being a bank of the United States? How is it such? In name only. Just st the Bank of Pennsylvania, or the Bank of Maryland, land, are banks of those States. The property of the bank, real or personal, does not belong to the United States only as a stockholder, and as any other stockholders. The United States might have [***34] the same interest in any other bank, turnpike, or canal company. So far as they hold stock, they have a property in the institution, and no further; so long and no longer. Nor is the direction and management of the bank under the control of the United States. They are represented in the board by the directors appointed by them, as the other stockholders are represented by the directors they elect. A director of the government has no more power or right than any other director. As to the control the government may have over the conduct of the bank, by its patronage and deposits, it is precisely the same it might have over any other bank, to which that patronage would be equally important. Strip it of its name, and we find it to be a mere association of individuals, putting their money into a common stock, to be loaned for profit, and to divide the gains. The government is a partner in the firm, for gain also; for, except a participation of the profits of the business, the government could have every other use of the bank without owning a dollar in it. It is not, then, a bank of the United States, if by that we mean an institution belonging to the government, directed by it, [***35] or in which it has a permanent, indissoluble interest. The convenience it affords in the collection and distribution of the revenue, is collateral, secondary, and may be transferred at pleasure to any other bank. It forms no part of the construction or character of this bank; which, as to all its rights and powers, would be exactly what it now is if the government was to seek and obtain all this convenience from some other source; if the government were to withdraw its patronage, and sell out its stock. How, then, can such an institution claim the immunities of sovereignty; nay, that sovereignty does not possess? for a sovereign, who places his property in the territory of another sovereign, submits it to the demands of the revenue, which are but justly paid, in return for the protection afforded to the property. General Hamilton, in his report on this subject, so far from considering the bank a public institution, connected with, or controlled by the government, holds it to be indispensable that it should not be so. It must be, says he, under private, not public, direction; under the guidance of individual interest, not public policy. Still, he adds, the state may be holder [***36] of part of its stock; and, consequently, (what! it becomes public property? no!) a sharer of the profits. He traces no other consequence to that circumstance. No rights are founded on it; no part of its utility or necessity arises from it. Can an institution, then, purely private, and which disclaims any public character, be clothed with the power and rights of the government, and demand subordination from the State government, in virtue of the federal authority, which it undertakes to wield at its own will and pleasure? Shall it be private in its direction and

17 U.S. 316; 4 L. Ed. 579; 1819 U.S. LEXIS 320; 4 A.F.T.R. (P-H) 4491; 4 Wheat. 316; 42 Cont. Cas. Fed. (CCH) P77,296

interests; public in its rights and privileges: a trading money-lender in its business; an uncontrolled sovereign in its powers? If the whole bank, with all its property and business, belonged to the United States, it would not, therefore, be exempted from the taxation of the States. To this purpose, the United States and the several States must be considered as sovereign and independent; and the principle is clear, that a sovereign putting his property within the territory and jurisdiction of another sovereign, and of course under his protection, submits it to the ordinary taxation of the State, and must contribute fairly [***37] to the wants of the revenue. In other words, the jurisdiction of the State extends over all its territory, and every thing within or upon it, with a few known exceptions. With a view to this principle, the constitution has provided for those cases in which it was deemed necessary and proper to give the United States jurisdiction within a State, in exclusion of the State authority; and even in these cases, it will be seen, it cannot be done without the assent of the State. For a seat of government, for forts, arsenals, dock-yards, &c. the assent of the State to surrender its jurisdiction is required; but the bank asks no consent, and is paramount to all State authority, to all the rights of territory, and demands of the public revenue. We have not been told, whether the banking houses of this corporation, and any other real estate it may acquire, for the accommodation of its affairs, are, also, of this privileged order of property. In principle, it must be the same; for the privilege, if it exists, belongs to the corporation, and must cover equally all its property. It is understood, that a case was lately decided by the Supreme Court of Pennsylvania, and from which no appeal [***38] has been taken, on the part of the United States to this Court, to show that United States' property, as such, has no exemption from State taxation. A fort, belonging to the federal government, near Pittsburgh, was sold by public auction; the usual auction duty was claimed, and the payment resisted, on the ground that none could be exacted from the United States. The Court decided otherwise. In admitting Louisiana into the Union, and so, it is believed, with all the new States, it is expressly stipulated, "that no taxes shall be imposed on lands, the property of the United States." There can, then, be no pretence, that bank property, even belonging to the United States, is, on that account, exonerated from State taxation.

Third. If, then neither the nature of the property, nor the interest the United States may have in the bank, will warrant the exemption claimed, is there any thing expressed in the constitution to limit and control the State right of taxation, as now contended for? We find but one limitation to this essential right, of which the States were naturally and justly most jealous. In the 10th section of the 1st article, it is declared, that "no State shall, without [***39] the consent of Congress, lay any imposts or duties, on imports or exports, except what may be absolutely necessary for executing its inspection laws." And there is a like prohibition to laying any duty of tonnage. Here, then, is the whole restriction, or limitation, attempted to be imposed by the constitution, on the power of the States to raise revenue, precisely in the same manner, from the same subjects, and to the same extent, that any sovereign and independent State may do; and it never was understood by those who made, or those who received the constitution, that any further restriction ever would, or could, be imposed. This subject did not escape either the assailants or the defenders of our form of government; and their arguments and commentaries upon the instrument ought not to be disregarded in fixing its construction. It was foreseen, and objected, by its opponents, that, under the general sweeping power given to Congress, "To make all laws which shall be necessary and proper, for carrying into execution the foregoing powers" &c. the States might be exposed to great dangers, and the most humiliating and oppressive encroachments, particularly in this very matter of taxation. [***40] By referring to the Federalist, the great champion of the constitution, the objections will be found stated, together with the answers to them. It is again and again replied, and most solemnly asserted, to the people of these United States, that the right of taxation in the States is sacred and inviolable, with "the sole exception of duties on imports and exports;" that "they retain the authority in the most absolute and unqualified sense; and that an attempt on the part of the national government to abridge them in the exercise of it, would be a violent assumption of power, unwarranted by any article or clause of its constitution." With the exception mentioned, the Federal and State powers of taxation are declared to be concurrent; and if the United States are justified in taxing State banks, the same equal and concurrent authority will justify the State in taxing the Bank of the United States, or any other bank. n4 The author begins, No. 34, by saying, "I flatter myself it has been clearly shown, in my last number, that the particular States, under the proposed constitution, would have CO EQUAL authority with the Union, in the article of revenue, except as to duties on imports." [***41] Under such assurances from those who made, who recommended, and carried, the constitution, and who were supposed best to understand it, was it received and adopted by the people of these Unined States; and now, after a lapse of nearly thirty years, they are to be informed that all this is a mistake, all these assurances are unwarranted, and that the Federal

17 U.S. 316; 4 L. Ed. 579; 1819 U.S. LEXIS 320; 4 A.F.T.R. (P-H) 4491; 4 Wheat. 316; 42 Cont. Cas. Fed. (CCH) P77,296

Government does possess most productive and important powers of taxation, neither on imports, exports, or tonnage, but strictly internal, which are prohibited to the States. The question then was, whether the United States should have any command of the internal revenue; the pretension now is, that they shall enjoy exclusively the best portion of it. The question was then quieted by the acknowledgment of a co-equal right; it is now to be put at rest by the prostration of the State power. The Federal Government is to hold a power by implication and ingenious inference from general words in the constitution, which it can hardly be believed would have been suffered in an express grant. If, then, the people were not deceived when they were told that, with the exceptions mentioned, the State right of taxation is sacred and inviolable; [***42] and it be also true that the Bank of the United States cannot exist under the exercise of that right, the consequence ought to be, that the Bank must not exist; for if it can live only by the destruction of such a right -- if it can live only by the exercise of a power which this Court solemnly declared to be a "violent assumption of power, unwarranted by any clause in the constitution" -- we cannot hesitate to say, let it not live. But in truth this is not the state of the controversy. No such extremes are presented for our choice. We only require, that the bank shall not violate State rights, in establishing itself, or its branches; that it shall be submitted to the jurisdiction and laws of the State, in the same manner with other corporations and other property; and all this may be done without ruining the institution, or destroying its national uses. Its profits will be diminished by contributing to the revenue of the State; and this is the whole effect that ought, in a fair and liberal spirit of reasoning, to be anticipated. But, at all events, we show, on the part of the State, a clear, general, absolute, and unqualified right of taxation, (with the exception stated;) and [***43] protest against such a right being made to yield to implications and obscure constructions of indefinite clauses in the constitution. Such a right must not be defeated by doubtful pretensions of power, or arguments of convenience or policy to the government; much less to a private corporation. It is not a little alarming to trace the progress of this argument. The power to raise the bank is founded on no provision of the constitution that has the most distant allusion to such an institution; there is not a word in that instrument that would suggest the idea of a bank to the most fertile imagination; but the bank is created by implication and construction, made out by a very subtle course of reasoning; then, by another implication, raised on the former, the bank, this creature of construction, claims the right to enter the territory of a State without its

assent; to carry on its business when it pleases, and where it pleases, against the will, and perhaps in contravention of the policy, of the sovereign owner of the soil. Having such great success in the acquirement of implied rights, the experiment is now pushed further; and not contented with having obtained two rights in this [***44] extraordinary way, the fortunate adventurer assails the sovereignty of the State, and would strip from it its most vital and essential power. It is thus with the famous fig tree of India, whose branches shoot from the trunk to a considerable distance; then drop upon the earth, where they take root and become trees, from which also other branches shoot, and plant and propagate and extend themselves in the same way, until gradually a vast surface is covered, and every thing perishes in the spreading shade.

   n4 Letters of Publius, or The Federalist, Nos. 31 -- 36.

What have we opposed to these doctrines, so just and reasonable? Distressing inconveniences ingeniously contrived; supposed dangers; fearful distrusts; anticipated violence and injustice from the States, and consequent ruin to the bank. A right to tax is a right to destroy, is the whole amount of the argument, however varied by ingenuity, or embellished by eloquence. It is said the States will abuse the power; and its exercise will produce infinite inconvenience and embarrassment to the bank. Now if this were true, it cannot help our opponents; because if the States have the power contended for, this Court cannot take [***45] it from them, under the fear that they may abuse it; nor indeed for its actual abuse; and if they have it not, they may not use it, however moderately and discreetly. Nor is there any more force in the argument, that the bank property will be subjected to double or treble taxation. Each State will tax only the capital really employed in it; and it is always in the power of the bank to show how its captial is distributed. But it is feared the capital in a State may be taxed in gross; and the individual stockholders also taxed for the same stock. Is this common case of a double taxation of the same article, to be a cause of alarm now? Our revenue laws abound with similar cases; they arise out of the very nature of our double government. So says the Federalist; and it is the first time it has been the ground of complaint. Poll taxes are paid to the federal and State governments; licenses to retail spirits; land taxes; and the whold round of internal duties, over which both governments have a concurrent, and, until now, it was supposed, a co-equal right. Were not the State banks taxed by the federal, and also by the State governments; in some by a bonus for the charter; in others [***46] directly and annually? The

17 U.S. 316; 4 L. Ed. 579; 1819 U.S. LEXIS 320; 4 A.F.T.R. (P-H) 4491; 4 Wheat. 316; 42 Cont. Cas. Fed. (CCH) P77,296

circumstance, that the taxes go to different governments in these cases, in wholly immaterial to those who pay; unless it is that it increases the danger of excess and oppression. It is justly remarked on this subject, by the Federalist, that our security from excessive burthens on any source of revenue, must be found in mutual forbearance and discretion in the use of the power; this is the only security, and the authority of this Court can add nothing to it. When that fails, there is an end to the confederation, which is founded on a reasonable and honourable confidence in each other. It has been most impressively advanced, that the States, under pretence of taxing, may prohibit and expel the banks; that in the full exercise of this power, they may tax munitions of war; ships about to sail and armies on their march; nay, the spirit of the Court is to be aroused by the fear that judicial proceedings will also come under this all destroying power. Loans may be delayed for stamps, and the country ruined for the want of the money. But whenever the States shall be in a disposition to uproot the general government, they will take more direct and speedy means; [***47] and until they have this disposition, they will not use these. What power may not be abused; and whom or what shall we trust, if we guard ourselves with this extreme caution? The common and daily intercourse between man and man; all our relations in society, depend upon a reasonable confidence in each other. It is peculiarly the basis of our confederation, which lives not a moment after we shall cease to trust each other. If the two governments are to regard each other as enemies, seeking opportunities of injury and distress, they will not long continue friends. This sort of timid reasoning about the powers of the government, has not escaped the authors so often alluded to; who, in their 31st number, treat it very properly. Surely the argument is as strong against giving to the United States the power to incorporate a bank with branches. What may be more easily, or more extensively abused; and what more powerful engine can we imagine to be brought into operation against the revenues and rights of the States? If the federal government must have a bank for the purposes of its revenue, all collision will be avoided by establishing the parent bank in its own District, where it [***48] holds an exclusive jurisdiction; and planting its branches in such States as shall assent to it; and using State banks where such assent cannot be obtained. Speaking practically, and by our experience, it may be safely asserted, that all the uses of the bank to the government might be thus obtained. Nothing would be wanting but profits and large dividends to the stockholders, which are the real object in this contest. Whatever may be the right of the United States to establish a bank, it cannot be better than that of the States. Their lawful power to

incorporate such institutions, has never yet been questioned; whatever may be in reserve for them, when it may be found "necessary and proper" for the interests of the national bank to crush the State institutions, and curtail the State authority. Granting, that these rights are equal in the two governments; and that the sovereignty of the State, within its territory, over this subject, is but equal to that of the United States; and that all sovereign power remains undiminished in the States, except in those cases in which it has, by the constitution, been expressly and exclusively transferred to the United States: the sovereign power [***49] of taxation (except on foreign commerce) being, in the language of the Federalist, co-equal in the two governments; it follows, as a direct and necessary consequence, that having equal powers to erect banks, and equal powers of taxation on property of that description, being neither imports, exports or tonnage, whatever jurisdiction the federal government may exercise in this respect, over a bank created by a State, any State may exercise over a bank created by the United States. Now, the federal government has assumed the right of taxing the State banks, precisely in the manner in which the State of Maryland has proceeded against the bank of the United States; and as this right has never been resisted or questioned, it may be taken to be admitted by both parties; and must be equal and common to both parties, or the fundamental principles of our confederation have been strangely mistaken, or are to be violently overthrown. It has also been suggested that the bank may claim a protection from this tax, under that clause of the constitution, which prohibits the States from passing laws, which shall impair the obligation of contracts. The charter is said to be the contract between the [***50] government and the stockholders; and the interests of the latter will be injured by the tax which reduces their profits. Many answers offer themselves to this argument. In the first place, the United States cannot, either by a direct law, or by a contract with a third party, taken away any right from the States not granted by the constitution; they cannot do collaterally and by implication, what cannot be done directly. Their contracts must conform to the constitution, and not the constitution to their contracts. If, therefore, the States have, in some other way, parted with this right of taxation, they cannot be deprived of it by a contract between other parties. Under this doctrine, the United States might contract away every right of every State; and any attempt to resist it would be called a violation of the obligations of a contract. Again; the United States have no more right to violate contracts than the States, and surely they never imagined they were doing so, when they taxed so liberally the stock of the State banks. Again; it

17 U.S. 316; 4 L. Ed. 579; 1819 U.S. LEXIS 320; 4 A.F.T.R. (P-H) 4491; 4 Wheat. 316; 42 Cont. Cas. Fed. (CCH) P77,296

might as well be said that tax on real estate, imposed after a sale of it, and not then perhaps contemplated, or new duties imposed on merchandize [***51] after it is ordered, violates the contract between the vendor and the purchaser, and diminishes the value of the property. In fact, all contracts in relation to property, subject to taxation, are presumed to have in view the probability or possibility that they will be taxed; and the happening of the event never was imagined to interfere with the contract, or its lawful obligations.

The Attorney-General, for the plaintiff in error, argued, 1. That the power of Congress to create a bank ought not now to be questioned, after its exercise ever since the establishment of the constitution, sanctioned by every department of the government: by the legislature, in the charter of the bank, and other laws connected with the incorporation; by the executive, in its assent to those laws; and by the judiciary, in carrying them into effect. After such a lapse of time, and so many concurrent acts of the public authorities, this exercise of power must be considered as ratified by the voice of the people, and sanctioned by precedent. In the exercise of criminal judicature, the question of constitutionality could not have been overlooked by the Courts, who have so often inflicted punishment for [***52] acts which would be no crimes, if these laws were repugnant to the fundamental law.

2. The power to establish such a corporation is implied, and involved in the grant of specific powers in the constitution; because the end involves the means necessary to carry it into effect. A power without the means to use it, is a nullity. But we are not driven to seek for this power in implication: because the constitution, after enumerating certain specific powers, expressly gives to Congress the power "to make all laws which shall be necessary and proper for carrying into execution the foregoing powers, and all other powers vested by this constitution in the government of the United States, or in any department or officer thereof." If, therefore, the act of Congress establishing the bank was necessary and proper to carry into execution any one or more of the enumerated powers, the authority to pass it is expressly delegated to Congress by the constitution. We contend that it was necessary and proper to carry into execution several of the enumerated powers, such as, the power of levying and collecting taxes throughout this widely extended empire; of paying the public debts, both in the United [***53] States and in foreign countries; of borrowing money, at home and abroad; of regulating commerce with foreign nations, and among the several States; of raising and supporting armies and a navy; and of carrying on war. That banks, dispersed throughout the country, are appropriate means of carrying into execution all these powers cannot be denied. Our history furnishes abundant experience of the utility of a national bank as an instrument of finance. It will be found in the aid derived to the public cause from the Bank of North America, established by Congress, during the war of the revolution; in the great utility of the former bank of the United States; and in the necessity of resorting to the instrumentality of the banks incorporated by the States, during the interval between the expiration of the former charter of the United States Bank in 1811, and the establishment of the present bank in 1816; a period of war, the calamities of which were greatly aggravated by the want of this convenient instrument of finance. Nor is it required that the power of establishing such a monied corporation should be indispensably necessary to the execution of any of the specified powers of the government. [***54] An interpretation of this clause of the constitution so strict and literal, would render every law which could be passed by Congress unconstitutional: for of no particular law can it be predicated, that it is absolutely and indispensably necessary to carry into effect any of the specified powers; since a different law might be imagined, which could be enacted tending to the same object, though not equally well adapted to attain it. As the inevitable consequence of giving this very restricted sense to the word "necessary," would be to annihilate the very powers it professes to create; and as so gross an absurdity cannot be imputed to the framers of the constitution, this interpretation must be rejected. Another not less inadmissible consequence of this construction is, that it is fatal to the permanency of the constitutional powers; it makes them dependent for their being on extrinsic circumstances, which, as these are perpetually shifting and changing, must produce correspondent changes in the essence of the powers on which they depend. But surely the constitutionality of any act of Congress cannot depend upon such circumstances. They are the subject of legislative discretion, [***55] not of judicial cognizance. Nor does this position conflict with the doctrine of the Court in Sturges v. Crowninshield. n5 The Court has not said, in that case, that the powers of Congress are shifting powers, which may or may not be constitutionally exercised, according to extrinsic or temporary circumstances; but it has merely determined, that the power of the State legislatures over the subject of bankruptcies is subordinate to that of Congress on the same subject, and cannot be exercised so as to conflict with the uniform laws of bankruptcy throughout the Union which Congress may establish. The power, in this instance, resides permanently in Congress, whether it chooses to

Page 14

17 U.S. 316; 4 L. Ed. 579; 1819 U.S. LEXIS 320; 4 A.F.T.R. (P-H) 4491; 4 Wheat. 316; 42 Cont. Cas. Fed. (CCH) P77,296

exercise it or not; but its exercise on the part of the States is precarious, and dependent, in certain respects, upon its actual exercise by Congress. The Convention well knew that it was utterly vain and nugatory to give to Congress certain specific powers, without the means of enforcing those powers. The auxiliary means, which are necessary for this purpose, are those which are useful and appropriate to produce the particular end. "Necessary and proper" are, then, equivalent to needful and adapted. Such [***56] is the popular sense in which the word necessary is sometimes used. That use of it is confirmed by the best authorities among lexicographers. Among other definitions of the word "necessary," Johnson gives "needful;" and he defines "need," the root of the latter, by the words "want, occasion." Is a law, then, wanted, is there occasion for it, in order to carry into execution any of the enumerated powers of the national government; Congress has the power of passing it. To make a law constitutional, nothing more is necessary than that it should be fairly adapted to carry into effect some specific power given to Congress. This is the only interpretation which can give effect to this vital clause of the constitution; and, being consistent with the rules of the language, is not to be rejected because there is another interpretation equally consistent with the same rules, but wholly inadequate to convey what must have been the intention of the Convention. Among the multitude of means to carry into execution the powers expressly given to the national government, Congress is to select, from time to time, such as are most fit for the purpose. It would have been impossible to enumerate [***57] then all in the constitution; and a specification of some, omitting others, would have been wholly useless. The Court, in inquiring whether Congress has made a selection of constitutional means, is to compare the law in question with the powers it is intended to carry into execution; not in order to ascertain whether other or better means might have been selected, for that is the legislative province, but to see whether those which have been chosen have a natural connection with any specific power; whether they are adapted to give it effect; whether they are appropriate means to an end. It cannot be denied, that this is the character of the Bank of the United States. But it is said, that the government might use private bankers, or the banks incorporated by the States, to carry on their fiscal operations. This, however, presents a mere question of political expediency, which, it is repeated, is exclusively for legislative consideration; which has been determined by the legislative wisdom; and cannot be reviewed by the Court. It is objected, that this act creates a corporation; which, being an exercise of a fundamental power of sovereignty, can only be claimed by Congress, under

[***58] their grant of specific powers. But to have enumerated the power of establishing corporations among the specific powers of Congress, would have been to change the whole plan of the constitution; to destroy its simplicity, and load it with all the complex details of a code of private jurisprudence. The power of establishing corporations is not one of the ends of government; it is only a class of means for accomplishing its ends. An enumeration of this particular class of means, omitting all others, would have been a useless anomaly in the constitution. It is admitted, that this is an act of sovereignty, and so is any other law. If the authority of establishing corporations be a sovereign power, the United States are sovereign, as to all the powers specifically given to their government, and as to all others necessary and proper to carry into effect those specified. If the power of chartering a corporation be necessary and proper for this purpose, Congress has it to an extent as ample as any other sovereign legislature. Any government of limited sovereignty, can create corporations only with reference to the limited powers that government possesses. The inquiry then reverts, whether [***59] the power of incorporating a banking company, be a necessary and proper means of executing the specific powers of the national government. The immense powers incontestably given, show that there was a disposition, on the part of the people, to give ample means to carry those powers into effect. A State can create a corporation, in virtue of its sovereignty, without any specific authority for that purpose, conferred in the State constitutions. The United States are sovereign as to certain specific objects, and may, therefore, erect a corporation for the purpose of effecting those objects. If the incorporating power had been expressly granted as an end, it would have conferred a power not intended; if granted as a means, it would have conferred nothing more than was before given by necessary implication. Nor does the rule of interpretation we contend for, sanction any usurpation, on the part of the national government; since, if the argument be, that the implied powers of the constitution may be assumed and exercised, for purposes not really connected with the powers specifically granted, under colour of some imaginary relation between them: the answer is, that this is nothing more [***60] than arguing from the abuse of constitutional powers, which would equally apply against the use of those that are confessedly granted to the national government; that the danger of the abuse will be checked by the judicial department, which, by comparing the means with the proposed end, will decide whether the connection is real, or assumed as the pretext for the usurpation of powers not belonging to the government; and that whatever may be the

Page 15

17 U.S. 316; 4 L. Ed. 579; 1819 U.S. LEXIS 320; 4 A.F.T.R. (P-H) 4491; 4 Wheat. 316; 42 Cont. Cas. Fed. (CCH) P77,296

magnitude of the danger from this quarter, it is not equal to that of annihilating the powers of the government, to which the opposite doctrine would inevitably tend.

3. If, then, the establishment of the parent bank itself be constitutional, the right to establish the branches of that bank in the different States of the Union follows, as an incident of the principal power. The expediency of this ramification Congress is alone to determine. To confine the operations of the bank to the District of Columbia, where Congress has the exclusive power of legislation, would be as absured as to confine the Courts of the United States to thei District. Both institutions are wanted, wherever the administration of justice or of the revenue is wanted. [***61] The right, then, to establish these branches, is a necessary part of the means. This right is not delegated by Congress to the parent bank. The act of Congress for the establishment of offices of discount and deposit, leaves the time and place of their establishment to the directors, as a matter of detail. When established, they rest, not on the authority of the parent bank, but on the authority of Congress.

4. The only remaining question is, whether the act of the State of Maryland, for taxing the bank thus incorporated, be repugnant to the constitution of the United States? We insist that any such tax, by authority of a State, would be unconstitutional, and that this act is so, from its peculiar provisions. But it is objected, that, by the 10th amendment of the constitution, all powers not expressly delegated to the United States, nor prohibited to the States, are reserved to the latter. It is said, that this being neither delegated to the one, nor prohibited to the other, must be reserved: And it is also said, that the only prohibition on the power of State taxation, which does exist, excludes this case, and thereby leaves it to the original power of the States. The only [***62] prohibition is, as to laying any imposts, or duties on imports and exports, or tonnage duty, and this not being a tax of that character, is said not to be within the terms of the prohibition; and, consequently, it remains under the authority of the States. But, we answer, that this does not contain the whole wum of constitutional restrictions on the authority of the States. There is another clause in the constitution, which has the effect of a prohibition on the exercise of their authority, in numerous cases. The 6th article of the constitution of the United States, declares, that the laws made in pursuance of it, "shall be the supreme law of the land, any thing in the constitution, or laws of any State to the contrary notwithstanding." By this declaration, the States are prohibited from passing any acts which shall be repugnant to a law of the United States. The Court

has already instructed us in the doctrine, that there war certain powers, which, from their nature, are exclusively vested in Congress. n6 So we contend here, that the only ground on which the constitutionality of the bank is maintainable, excludes all interference with the exercise of the power by the States. This [***63] ground is, that the bank, as ordained by Congress, is an instrument to carry into execution its specified powers; and in order to enable this instrument to operate effectually, it must be under the direction of a single head. It cannot be interfered with, or controlled in any manner, by the States, without putting at hazard the accomplishment of the end, of which it is but a means. But the asserted power to tax any of the institutions of the United States, presents directly the question of the supremacy of their laws over the State laws. If this power really exists in the States, its natural and direct tendency is to annihilate any power which belongs to Congress, whether express or implied. All the powers of the national government are to be executed in the States, and throughout the States; and if the States legislatures can tax the instruments by which those powers are executed, they may entirely defeat the execution of the powers. If they may tax an institution of finance, they may tax the proceedings in the Courts of the United States. If they may tax to one degree, they may tax to any degree; and nothing but their own discretion can impose a limit upon this exercise of [***64] their authority. They may tax both the bank and the Courts, so as to expel them from the States. But, surely, the framers of the constitution did not intend that the exercise of all the powers of the national government should depend upon the discretion of the State governments. This was the vice of the former confederation, which it was the object of the new constitution to eradicate. It is a direct collision of powers between the two governments. Congress says, there shall be a branch of the bank in the State of Maryland. That State says, there shall not. Which power is supreme? Besides, the charter, which is a contract between the United States and the corporation, is violated by this act of Maryland. A new condition is annexed by a sovereignty which was no party to the contract. The franchise, or corporate capacity, is taxed by a legislature, between whom and the object of taxation there is no political connection.

   n6 Vide Sturges v. Crowninshield, ante, p. 122.

Mr. Jones, for the defendants in error, contended, 1. That this was to be considered as an open question, inasmuch as it had never before been submitted to judicial determination. The practice of the government, [***65] however inveterate, could never

17 U.S. 316; 4 L. Ed. 579; 1819 U.S. LEXIS 320; 4 A.F.T.R. (P-H) 4491; 4 Wheat. 316; 42 Cont. Cas. Fed. (CCH) P77,296

be considered as sanctioning a manifest usurpation; still less could the practice, under a constitution of a date so recent, be put in competition with the cotemporaneous exposition of its illustrious authors, as recorded for our instruction, in the "Letters of Publius," or Federalist. This interpretation of the constitution, which was contended for by the State of Maryland, would be justified from that text book, containing a commentary, such as no other age or nation furnishes, upon its public law.

2.    is insisted, that the constitution was formed and adopted, not by the people of the United States at large, but by the people of the respective States. To suppose that the mere proposition of this fundamental law threw the American people into one aggregate mass, would be to assume what the instrument itself does not profess to establish.    It is, therefore, a compact between the States, and all the powers which are not expressly relinquished by it, are reserved to the States.We admit, that the 10th amendment to the constitution is merely declaratory; that it was adopted ex abundanti cautela; and that with it nothing more is reserved than [***66] would have been reserved without it.  But it is contended, on the other side, that not only the direct powers, but all incidental powers, partake of the supreme power, which is sovereign. This is an inherent sophism in the opposite argument, which depends on the conversion and ambiguity of terms.   What is meant by sovereign power?   It is modified by the terms of the grant under which it was given.   They do not import sovereign power generally, but sovereign power limited a particular cases; and the question again recurs, whether sovereign power was given in this particular case.   Is it true, that by conferring sovereign powers on a limited, delegated government, sovereign means are also granted?   Is there no restriction as to the means of exercising a general power?  Sovereignty was vested in the former confederation as fully as in the present national government.  There was nothing which forbad the old confederation from taxing the people, except that three modes of raising revenue were pointed out, and they could resort to no other.   All the powers given to Congress under that system, except taxation, operated as directly on the people, as the powers given to the present government.   [***67] The constitution does not profess to prescribe the ends merely for which the government was instituted, but also to detail the most important means by which they were to be accomplished.  "To levy and collect taxes," "to borrow money," "to pay the public debts," "to raise and support armies," "to provide and maintain a navy," are not the ends for which this or any other just government is established.   If a banking corporation

can be said to be involved in either of these means, it must be as an instrument to collect taxes, to borrow money, and to pay the public debts.  Is it such an instrument?It may, indeed, facilitate the operation of other financial institutions; but in its proper and natural character, it is a commercial institution, a partnership incorporated for the purpose of carrying on the trade of banking.  But we contend that the government of the United States must confine themselves, in the collection and expenditure of revenue, to the means which are specifically enumerated in the constitution, or such auxiliary means as are naturally connected with the specified means.  But what natural connection is there between the collection of taxes, and the incorporation of a [***68] company of bankers?  Can it possibly be said, that because Congress is invested with the power of raising and supporting armies, that it may give a charter of monopoly to a trading corporation as a bounty for enlisting men?  Or that, under its more analogous power of regulating commerce, it may establish an East or a West India company, with the exclusive privilege of trading with those parts of the world?  Can it establish a corporation of farmers of the revenue, or burthen the internal industry of the States with vexatious monopolies of their staple productions?    There is an obvious distinction between those means which are incidental to the particular power, which follow as a corollary from it, and those which may be arbitrarily assumed as convenient to the execution of the power, or usurped under the pretext of necessity.  For example: the power of coining money implies the power of establishing a mint.  The power of laying and collecting taxes implies the power of regulating the mode of assessment and collection, and of appointing revenue officers; but it does not imply the power of establishing a great banking corporation, branching out into every district of the country, and [***69] inundating it with a flood of paper money.    To derive such a tremendous authority from implication, would be to change the subordinate into fundamental powers; to make the implied powers greater than those which are expressly granted; and to change the whole scheme and theory of the government.  It is well known, that many of the powers which are expressly granted to the national government in the constitution, were most reluctantly conceded by the people, who were lulled into confidence by the assurances of its advocates, that it contained no latent ambiguity, but was to be limited to the literal terms of the grant: and in order to quiet all alarm, the 10th article of amendments was added, declaring "that the powers not delegated to the United States by the constitution, nor prohibited by it to the States, are reserved to the States respectively, or to the people." It would seem that human language could not

Page 17

17 U.S. 316; 4 L. Ed. 579; 1819 U.S. LEXIS 320; 4 A.F.T.R. (P-H) 4491; 4 Wheat. 316; 42 Cont. Cas. Fed. (CCH) P77,296

furnish words less liable to misconstruction! But it is contended, that the powers expressly granted to the national government in the constitution, are enlarged to an indefinite extent, by the sweeping clause, authorizing Congress to make all laws which shall be necessary and **[\*\*\*70]** proper for carrying into execution the powers expressly delegated to the national government, or any of its departments or officers. Now, we insist, that this clause shows that the intention of the Convention was, to define the powers of the government with the utmost precision and accuracy. The creation of a sovereign legislature implies an authority to pass laws to execute its given powers. This clause is nothing more than a declaration of the authority of Congress to make laws, to execute the powers expressly granted to it, and the other departments of the government. But the laws which they are authorized to make, are to be such as are necessary and proper for this purpose. No terms could be found in the language more absolutely excluding a general and unlimited discretion than these. It is not "necessary or proper," but "necessary and proper." The means used must have both these qualities. It must be, not merely convenient -- fit -- adapted -- proper, to the accomplishment of the end in view; it must likewise be necessary for the accomplishment of that end. Many means may be proper which are not necessary; because the end may be attained without them. The word "necessary," **[\*\*\*71]** is said to be a synonyme of "needful." But both these words are defined "indispensably requisite;" and most certainly this is the sense in which the word "necessary" is used in the constitution. To give it a more lax sense, would be to alter the whole character of the government as a sovereignty of limited powers. This is not a purpose for which violence should be done to the obvious and natural sense of any terms, used in an instrument drawn up with great simplicity, and with extraordinary precision. The only question, then, on this branch of the argument, will be, whether the establishment of a banking corporation be indispensably requisite to execute any of the express powers of the government? So far as the interest of the United States is concerned as partners of this company of bankers, or so far as the corporation may be regarded as an executive officer of the government, acquiring real and personal property in trust for the use of the government, it may be askd, what right the United States have to acquire property of any kind, except that purchased by the consent of the legislature of the State in which such property may be, for the erection of forts, magazines, &c.; and **[\*\*\*72]** ships or munitions of war, constructed or purchased by the United States, and the public treasure? Their right of acquiring property is absolutely limited to the subjects specified, which were the only

means, of the nature of wealth or property, with which the people thought it necessary to invest them. The people never intended they should become bankers or traders of any description. They meant to leave to the States the power of regulating the trade of banking, and every other species of internal industry; subject merely to the power of Congress to regulate foreign commerce, and the commerce between the different States, with which it is not pretended that this asserted power is connected. The trade of banking within the particular States would then either be left to regulate itself, and carried on as a branch of private trade, as it is in many countries; or banking companies would be incorporated by the State legislatures to carry it on, as has been the usage of this country. But in either case, Congress would have nothing to do with the subject. The power of creating corporations is a distinct sovereign power, applicable to a great variety of objects, and not being expressly **[\*\*\*73]** granted to Congress for this, or any other object, cannot be assumed by implication. If it might be assumed for this purpose, it might also be exercised to create corporations for the purpose of constructing roads and canals; a power to construct which has been also lately discovered among other secrets of the constitution, developed by this dangerous doctrine of implied powers. Or it might be exercised to establish great trading monopolies, or to lock up the property of the country in mortmain, by some strained connection between the exercise of such powers, and those expressly given to the government.

3. Supposing the establishment of such a banking corporation, to be implied as one of the means necessary and proper to execute the powers expressly granted to the national government, it is contended by the counsel opposed to us, that its property is exempted from taxation by the State governments, because they cannot interfere with the exercise of any of the powers, express or implied, with which Congress is invested. But the radical vice of this argument is, that the taxing power of the States, as it would exist, independent of the constitution, is in no respect limited or controlled **[\*\*\*74]** by that supreme law, except in the single case of imposts and tonnage duties, which the States cannot lay, unless for the purpose of executing their inspection laws. But their power of taxation is absolutely unlimited in every other respect. Their power to tax the property of this corporation cannot be denied, without at the same time denying their right to tax any property of the United States. The property of the bank cannot be more highly privileged than that of the government. But they are not forbidden from taxing the property of the government, and therefore cannot be constructively prohibited from taxing that of the bank. Being

17 U.S. 316; 4 L. Ed. 579; 1819 U.S. LEXIS 320; 4 A.F.T.R. (P-H) 4491; 4 Wheat. 316; 42 Cont. Cas. Fed. (CCH) P77,296

prohibited from taxing exports and imports, and tonnage, and left free from any other prohibition, in this respect; they may tax every thing else but exports, imports, and tonnage. The authority of "the Federalist" is express, that the taxing power of Congress does not exclude that of the States over any other objects except these. If, then, the exercise of the taxing power of Congress does not exclude that of the States, why should the exercise of any other power by Congress, exclude the power of taxation by the States? If an express power will [***75] not exclude it, shall an implied power have that effect? If a power of the same kind will not exclude it, shall a power of a different kind? The unlimited power of taxation results from State sovereignty. It is expressly takn away only in the particular instances mentioned. Shall others be added by implication? Will it be pretended that there are two species of sovereignty in our government? Sovereign power is absolute, as to the objects to which it may be applied. But the sovereign power of taxation in the States, may be applied to all other objects, except imposts and tonnage: Its exercise cannot, therefore, be limited and controlled by the exercise of another sovereign power in Congress. The right of both sovereignties are co-equal and co-extensive. The trade of banking may be taxed by the State of Maryland; the United States may incorporate a company to carry on the trade of banking, which may establish a branch in Maryland: The exercise of the one sovereign power, cannot be controlled by the exercise of the other. It can no more be controlled in this case, than if it were the power of taxation in Congress, which was interfered with by the power of taxation in the State, [***76] both being exerted concurrently on the same object. In both cases, mutual confidence, discretion, and forbearance, can alone qualify the exercise of the conflicting powers, and prevent the destruction of either. This is an anomaly, and perhaps an imperfection in our system of government. But neither Congress nor this Court, can correct it. That system was established by reciprocal concessions and compromises between the State and Federal governments. Its harmony can only be maintained in the same spirit. Even admitting that the property of the United States, (such as they have a right to hold,) their forts and dock yards, their ships and military stores, their archives and treasures, public institutions of war, or revenue or justice, are exempt by necessary implication from State taxation; does it therefore follow, that this corporation, which is a partnership of bankers, is also exempt? They are not collectors of the revenue, any more than any State bank or foreign bankers, whose agency the government may find it convenient to employ as depositaries of its funds. They may be employed to remit those funds from one place to another, or to procure loans, or to buy and sell stock: [***77] but it is in a commercial, and not an administrative character, that they are thus employed. The corporate character with which these persons are cloathed, does not exempt them from State taxation. It is the nature of their employment as agents or officers of the government, if any thing, which must create the exemption. But the same employment of the State bank or private bankers, would equally entitle them to the same exemption. Nor can the exemption of the stock of this corporation from State taxation, be claimed on the ground of the proprietary interest which the United States have in it as stockholders. Their interest is undistinguishably blended with the general capital stock; if they will mix their funds with those of bankrs, or engage as partners in any other branch of commerce, their sovereign character and dignity are lost in the mercantile character which they have assumed; and their property thus employed becomes subject to local taxation, like other capital employed in trade.

Mr. Martin, Attorney General of Maryland, 1. read several extracts from the Federalist, and the debates of the Virginia and New-York Conventions, to show that the cotemporary exposition of the [***78] constitution by its authors, and by those who supported its adoption, was wholly repugnant to that now contended for by the counsel for the plaintiff in error. That it was then maintained, by the enemies of the constitution, that it contained a vast variety of powers, lurking under the generality of its phraseology, which would prove highly dangerous to the liberties of the people, and the rights of the States, unless controlled by some declaratory amendment, which should negative their existence. This apprehension was treated as a dream of distempered jealousy. The danger was denied to exist; but to provide an assurance against the possibility of its occurrence, the 10th amendment was added to the constitution. This, however, could be considered as nothing more than declaratory of the sense of the people, as to the extent of the powers conferred on the new government. We are now called upon to apply that theory of interpretation which was then rejected by the friends of the new constitution, and we are asked to engraft upon it powers of vast extent, which were disclaimed by them, and which, if they held been fairly avowed at the time, would have prevented its adoption. Before [***79] we do this, they must, at least, be proved to exist, upon a candid examination of this instrument, as if it were now for the first time submitted to interprepation. Although we cannot, perhaps, be allowed to say, that the States have been "deceived in their grant;" yet we may justly claim something like a rigorous demonstration of this power,

17 U.S. 316; 4 L. Ed. 579; 1819 U.S. LEXIS 320; 4 A.F.T.R. (P-H) 4491; 4 Wheat. 316; 42 Cont. Cas. Fed. (CCH) P77,296

which no where appears upon the face of the constitution, but which is supposed to be tacitly inculcated in its general object and spirit. That the scheme of the framers of the constitution intended to leave nothing to implication, will be evident from the consideration, that many of the powers expressly given are only means to accomplish other powers expressly given. For example: The power to declare war involves, by necessary implication, if any thing was to be implied, the powers of raising and supporting armies, and providing and maintaining a navy, to prosecute the war then declared. So, also, as money is the sinew of war, the powers of laying and collecting taxes, and of borrowing money, are involved in that of declaring war. Yet, all these powers are specifically enumerated. If, then, the Convention has specified some powers, which, [***80] being only means to accomplish the ends of government, might have been taken by implication; by what just rule of construction are other sovereign powers, equally vast and important, to be assumed by implication? We insist, that the only safe rule is the plain letter of the constitution; the rule which the constitutional legislators themselves have prescribed, in the 10th amendment, which is merely declaratory; that the powers not delegated to the United States, nor prohibited to the States, are reserved to the States respectively, or to the people. The power of establishing corporations is not delegated to the United States, nor prohibited to the individual States. It is, therefore, reserved to the States, or to the people. It is not expressly delegated, either as an end, or a means of national government. It is not to be taken by implication, as a means of executing any or all of the powers expressly granted; because other means, not more important or more sovereign in their character, are expressly enumerated. We still insist, that the authority of establishing corporations is one of the great sovereign powers of government. It may well exist in the State governments, without [***81] being expressly conferred in the State constitutions; because those governments have all the usual powers which belong to every political society, unless expressly forbidden, by the letter of the State constitutions, from exercising them. The power of establishing corporations has been constantly exercised by the State governments, and no portion of it has been ceded by them to the government of the United States.

2. But, admitting that Congress has a right to incorporate a banking company, as one of the means necessary and proper to execute the specific powers of the national government; we insist, that the respective States have the right to tax the property of that corporation, within their territory; that the United States cannot, by such an act of incorporation, withdraw any part of the property within the State from the grasp of taxation. It is not necessary for us to contend, that any part of the public property of the United States, its munitions of war, its ships, and treasure, are subject to State taxation. But if the United States hold shares in the stock of a private banking company, or any other trading company, their property is not exempt from taxation, in common [***82] with the other capital stock of the company; still less can it communicate to the shares belonging to private stockholders, an immunity from local taxation. The right of taxation by the State, is co-extensive with all private property within the State. The interest of the United States in this bank is private property, though belonging to public persons. It is held by the government, as an undivided interest with private stockholders. It is employed in the same trade, subject to the same fluctuations of value, and liable to the same contingencies of profit and loss. The shares belonging to the United States, or of any other stockholders, are not subjected to direct taxation by the law of Maryland. The tax imposed, is a stamp tax upon the notes issued by a banking house within the State of Maryland. Because the United States happen to be partially interested, either as dormant or active partners, in that house, is no reason why the State should refrain from laying a tax which they have, otherwise, a constitutional right to impose, any more than if they were to become interested in any other house of trade, which should issue its notes, or bills of exchange, liable to a stamp [***83] duty, by a law of the State. But it is said that a right to tax, in this case, implies a right to destroy; that it is impossible to draw the line of discrimination between a tax fairly laid for the purposes of revenue, and one imposed for the purpose of prohibition. We answer, that the same objection would equally apply to the right of Congress to tax the State banks; since the same difficulty of discriminating occurs in the exercise of that right. The whole of this subject of taxation is full of difficulties, which the Convention found it impossible to solve, in a manner entirely satisfactory. The first attempt was to divide the subjects of taxation between the State and the national government. This being found impracticable, or inconvenient, the State governments surrendered altogether their right to tax imports and exports, and tonnage; giving the authority to tax all other subjects to Congress, but reserving to the States a concurrent right to tax the same subjects to an unlimited extent. This was one of the anomalies of the government, the evils of which must be endured, or mitigated by discretion and mutual forbearance. The debates in the State conventions show that the [***84] power of State taxation was understood to be absolutely unlimited, except as to imposts and tonnage

17 U.S. 316; 4 L. Ed. 579; 1819 U.S. LEXIS 320; 4 A.F.T.R. (P-H) 4491; 4 Wheat. 316; 42 Cont. Cas. Fed. (CCH) P77,296

duties. The States would not have adopted the constitution upon any other understanding. As to the judicial proceedings, and the custom house papers of the United States, they are not property, by their very nature; they are not the subjects of taxation; they are the proper instruments of national sovereignty, essential to the exercise of its powers, and in legal contemplation altogether extra-territorial as to State authority.

Mr. Pinkney, for the plaintiff in error, in reply, stated, 1.That the cause must first be cleared of a question which ought not to have been forced into the argument -- whether the act of Congress establishing the bank was consistent with the constitution? This question depended both on authority and on principle. No topics to illustrate it could be drawn from the confederation, since the present constitution was as different from that, as light from darkness. The former was a mere federative league; an alliance offensive and defensive between the States, such as there had been many examples of in the history of the world. It had no power of coercion but [***85] by arms. Its radical vice, and that which the new constitution was intended to reform, was legislation upon soverign States in their corporate capacity. But the constitution acts directly on the people, by means of powers communicated directly from the people. No State, in its corporate capacity, ratified it; but it was proposed for adoption to popular conventions. It springs from the people, precisely as the State constitutions spring from the people, and acts on them in a similar manner. It was adopted by them in the geographical sections into which the country is divided. The federal powers are just as sovereign as these of the States.The State sovereignties are not the authors of the constitution of the United States. They are preceding in point of time, to the national sovereignty, but they are postponed to it in point of supremacy, by the will of the people. The means of giving efficacy to the sovereign authorities vested by the people in the national government, are those adapted to the end; fitted to promote, and having a natural relation and connexion with, the objects of that government. The constitution, by which these authorities, and the means of executing them, [***86] are given, and the laws made in pursuance of it, are declared to be the supreme law of the land; and they would have been such, without the insertion of this declaratory clause. They must be supreme, or they would be nothing. The constitutionality of the establishment of the bank, as one of the means necessary to carry into effect the authorities vested in the national government, is no longer an open question. It has been long since settled by decisions of the most revered authority, legislative, executive, and

judicial. A legislative construction, in a doubtful case, persevered in for a course of years, ought to be binding upon the Court. This, however, is not a question of construction merely, but of political necessity, on which Congress must decide. It is conceded, that a manifest usurpation cannot be maintained in this mode; but, we contend, that this is such a doubtful case, that Congress may expound the nature and extent of the authority under which it acts, and that this practical interpretation has become incorporated into the constitution. There are two distinguishing points which entitle it to great respect. The first is, that it was a cotemporaneous construction; [***87] the second is, that it was made by the authors of the constitution themselves. The members of the convention who framed the constitution, passed into the first Congress, by which the new government was organized. They must have understood their own work. They determined that the constitution gave to Congress the power of incorporating a banking company. It was not required that this power should be expressed in the text of the constitution; it might safely be left to implication. An express authority to erect corporations generally, would have been perilous; since it might have been constructively extended to the creation of corporations entirely unnecessary to carry into effect the other powers granted; we do not claim an authority in this respect, beyond the sphere of the specific powers. The grant of an authority to erect certain corporations, might have been equally dangerous, by omitting to provide for others, which time and experience might show to be equally, and even more necessary. It is a historical fact of great importance in this discussion, that amendments to the constitution were actually proposed, in order to guard against the establishment of commercial monopolies. [***88] But if the general power of incorporating did not exist, why seek to qualify it, or to guard against its abuse? The legislative precedent established in 1791, has been followed up by a series of acts of Congress, all confirming the authority. Political considerations alone might have produced the refusal to renew the charter in 1811; at any rate, we know that they mingled themselves in the debate, and the determination. In 1815, a bill was passed by the two houses of Congress, incorporating a national bank; to which the President refused his assent, upon political considerations only, waiving the question of constitutionality as being settled by cotemporaneous exposition, and repeated subsequent recognitions. In 1816, all branches of the legislature concurred in establishing the corporation, whose chartered rights are now in judgment before the Court. None of these measures ever passed sub silentio; the proposed incorporation was always discussed, and opposed, and supported, on

17 U.S. 316; 4 L. Ed. 579; 1819 U.S. LEXIS 320; 4 A.F.T.R. (P-H) 4491; 4 Wheat. 316; 42 Cont. Cas. Fed. (CCH) P77,296

constitutional grounds, as well as on considerations of political expediency. Congress is, prima facie, a competent judge of its own constitutional powers. It is not, as in questions of privilege, the [***89] exclusive judge; but it must first decide, and that in a proper judicial character, whether a law is constitutional, before it is passed. It had an opportunity of exercising its judgment in this respect, upon the present subject, not only in the principal acts incorporating the former, and the present bank, but in the various incidental statutes subsequently enacted on the same subject; in all of which, the question of constitutionality was equally open to debate, but in none of which was it agitated.

There are, then, in the present case, the repeated determinations of the three branches of the national legislature, confirmed by the constant acquiescence of the State sovereignties, and of the people, for a considerable length of time. Their strength is fortified by judicial authority. The decisions in the Courts, affirming the constitutionality of these laws, passed, indeed, sub silentio; but it was the duty of the judges, especially in criminal cases, to have raised the question; and we are to conclude, from this circumstance, that no doubt was entertained respecting it. And if the question be examined on principle, it will be found not to admit to doubt. Has Congress, abstractedly, [***90] the authority to erect corporations? This authority is not more a sovereign power than many other powers which are acknowledged to exist, and which are but means to an end. All the objects of the government are national objects, and the means are, and must be, fitted to accomplish them. These objects are enumerated in the constitution, and have no limits but the constitution itself. A more perfect union is to be formed; justice to be established; domestic tranquillity insured; the common defence provided for; the general welfare promoted; the blessings of liberty secured to the present generation, and to posterity.For the attainment of these vast objects, the government is armed with powers and faculties corresponding in magnitude. Congress has power to lay and collect taxes and duties, imposts and excises; to pay the debts, and provide for the common defence and general welfare of the United States; to borrow money on the credit of the nation; to regulate commerce; to establish uniform naturalization and bankrupt laws; to coin money, and regulate the circulating medium, and the standard of weights and measures; to establish post offices and post roads; to promote the progress [***91] of science and the useful arts, by granting patents and copy-rights; to constitute tribunals inferior to the Supreme Court, and to define and punish offences against the law of nations; to declare and carry on war; to raise and support armies, and to provide and maintain a navy; to discipline and govern the land and naval forces; to call forth the militia to execute the laws, suppress insurrections, and repel invasions; to provide for organizing, arming, and disciplining the militia; to exercise exclusive legislation, in all cases, over the district where the seat of government is established, and over such other portions of territory as may be ceded to the Union for the erection of forts, magazines, &c.; to dispose of, and make all needful rules and regulations respecting the territory or other property belonging to the United States; and to make all laws which shall be necessary and proper for carrying into execution these powers and all other powers vested in the national government or any of its departments or officers. The laws thus made are declared to be the supreme law of the land; and the judges in every State are bound thereby, any thing in the constitution or laws of any [***92] State to the contrary notwithstanding. Yet it is doubted, whether a government invested with such immense powers has authority to erect a corporation within the sphere of its general objects, and in order to accomplish some of those objects! The State powers are much less in point of magnitude, though greater in number; yet it is supposed the States possess the authority of establishing corporations, whilst it is denied to the general government. It is conceded to the State legislatures, though not specifically granted, because it is said to be an incident of State sovereignty; but it is refused to Congress, because it is not specifically granted, though it may be necessary and proper to execute the powers which are specifically granted. But the authority of legislation in the State government is not unlimited. There are several limitations to their legislative authority. First; from the nature of all government, especially of republican government, in which the residuary powers of sovereignty, not granted specifically, by inevitable implication, are reserved to the people. Secondly; from the express limitations contained in the State constitutions. And, Thirdly; from the express [***93] prohibitions to the States contained in the United States' constitution. The power of erecting corporations is no where expressly granted to the legislatures of the States in their constitutions; it is taken by necessary implication: but it cannot be exercised to accomplish any of the ends which are beyond the sphere of their constitutional authority. The power of erecting corporations is not an end of any government; it is a necessary means of accomplishing the ends of all governments. It is an authority inherent in, and incident to, all sovereignty. The history of corporations will illustrate this position. They were transplanted from the Roman law into the

17 U.S. 316; 4 L. Ed. 579; 1819 U.S. LEXIS 320; 4 A.F.T.R. (P-H) 4491; 4 Wheat. 316; 42 Cont. Cas. Fed. (CCH) P77,296

common law of England, and all the municipal codes of modern Europe. From England they were derived to this country. But, in the civil law, a corporation could be created by a mere voluntary association of individuals. n7 And, in England, the authority of parliament is not necessary to create a corporate body. The king may do it, and may communicate his power to a subject; n8 so little is this regarded as a transcendent power of sovereignty in the British constitution. So, also, in our constitution it ought to be regarded [***94] as but a subordinate power, to carry into effect the great objects of government. The State governments cannot establish corporations to carry into effect the national powers given to Congress, nor can Congress create corporations to execute the peculiar duties of the State governments. But so much of the power or faculty of incorporation as concerns national objects has passed away from the State legislatures, and is vested in the national government. An act of incorporation is but a law, and laws are but means to peromote the legitimate end of all government -- the felicity of the people. All powers are given to the national government, as the people will. The reservation in the 10th amendment to the constitution, of "powers not delegated to the United States," is not confined to powers not expressly delegated. Such an amendment was indeed proposed; but it was perceived, that it would strip the government of some of its most essential powers, and it was rejected. Unless a specific means be expressly prohibited to the general government, it has it, within the sphere of its specified powers. Many particular means are, of course, involved in the general means necessary to carry [***95] into effect the powers expressly granted, and, in that case, the general means become the end, and the smaller objects the means. It was impossible for the framers of the constitution to specify prospectively all these means, both because it would have involved an immense variety of details, and because it would have been impossible for them to foresee the infinite variety of circumstances in such an unexampled state of political society as ours, forever changing and forever improving. How unwise would it have been to legislate immutably for exigencies which had not then occurred, and which must have been foreseen but dimly and imperfectly! The security against abuse is to be found in the constitution and nature of the government, in its popular character and structure. The statute book of the United States is filled with powers derived from implication. The power to lay and collect taxes will not execute itself. Congress must designate in detail all the means of collection. So, also, the power of establishing post offices and post roads, involves that of punishing the offence of robbing the mail. But there is no more

necessary connexion between the punishment of mail robbers, [***96] and the power to establish post roads, than there is between the institution of a bank, and the collection of the revenue and payment of the public debts and expenses. So, light houses, beacosns, buoys, and public piers, have all been established under the general power to regulate commerce. But they are not indispensably necessary to commerce. It might linger on without these aids, though exposed to more perils and losses. So, Congress has authority to coin money, and to guard the purity of the circulating medium, by providing for the punishment of counterfeiting the current coin: but laws are also made for punishing the offence of uttering and passing the coin thus counterfeited. It is the duty of the Court to construe the constitutional powers of the national government liberally, and to mould them so as to effectuate its great objects. Whence is derived the power to punish smuggling? It does not collect the impost, but it is a means more effectually to prevent the collection from being diminished in amount, by frauds upon the revenue laws. Powers, as means, may then be implied in many cases. And if so, why not in this case as well as any other? The power of making all [***97] needful rules and regulations respecting the territory of the United States, is one of the specified powers of Congress.Under this power, it has never been doubted, that Congress had authority to establish corporations in the territorial governments. But this power is derived entirely from implication. It is assumed as an incident to the principal power.If it may be assumed in that case, upon the ground that it is a necessary means of carrying into effect the power expressly granted, why may it not be assumed in the present case, upon a similar ground? It is readily admitted, that there must be a relation in the nature and fitness of things, between the means used and the end to be accomplished. But the question is, whether the necessity which will justify a resort to a certain means must be an absolute, indispensable, inevitable necessity?The power of passing all laws necessary and proper to carry into effect the other powers specifically granted, is a political power; it is a matter of legislative discretion, and those who exercise it, have a wide range of choice in selecting means. In its exercise, the mind must compare means with each other. But absolute necessity excludes [***98] all choice; and therefore, it cannot be this species of necessity which is required. Congress alone has the fit means of inquiry and decision. The more or less of necessity never can enter as an ingredient into judicial decision. Even absolute necessity cannot be judged of here; still less can practical necessity be determined in a judicial forum. The judiciary may, indeed, and must, see that what has been done is not a mere evasive pretext,

17 U.S. 316; 4 L. Ed. 579; 1819 U.S. LEXIS 320; 4 A.F.T.R. (P-H) 4491; 4 Wheat. 316; 42 Cont. Cas. Fed. (CCH) P77,296

under which the national legislature travels out of the prescribed bounds of its authority, and encroaches upon State sovereignty, or the rights of the people. For this purpose, it must inquire whether the means assumed have a connexion, in the nature and fitness of things, with the end to be accomplished. The vast variety of possible means, excludes the practicability of judicial determination as to the fitness of a particular means. It is sufficient that it does not appear to be violently and unnaturally forced into the service, or fraudulently assumed, in order to usurp a new substantive power of sovereignty. A phiological analysis of the terms "necessary and proper" will illustrate the argument. Compare these terms as they are used [***99] in that part of the constitution now in question, with the qualified manner in which they are used in the 10th section of the same article. In the latter, it is provided that "no State shall, without the consent of Congress, lay any imposts or duties, on imports or exports, except what may be absolutely necessary for executing its inspection laws." In the clause in question, Congress is invested with the power "to make all laws which shall be necessary and proper for carrying into execution the foregoing powers," &c. There is here then, no qualification of the necessity. It need not be absolute. It may be taken in its ordinary grammatical sense. The word necessary, standing by itself, has no inflexible meaning; it is used in a sense more or less strict, according to the subject. This, like many other words, has a primitive sense, and another figurative and more relaxed; it may be qualified by the addition of adverbs of diminution or enlargement, such as very, indispensably, more, less, or absolutely necessary; which last is the sense in which it is used in the 10th section of this article of the constitution. But that it is not always used in this strict and rigorous sense, [***100] may be proved by tracing its definition and etymology in every human language.

n7 1 Bl. Com. 471.

n8 1 Bl. Com. 474.

If, then, all the powers of the national government are sovereign and supreme; if the power of incorporation is incidental, and involved in the others; if the degree of political necessity which will justify a resort to a particular means, to carry into execution the other powers of the government, can never be a criterion of judicial determination, but must be left to legislative discretion; it only remains to inquire, whether a bank has a natural and obvious connection with other express or implied powers, so as to become a necessary and proper means of carrying them into execution. A bank might be established as a branch of the public administration without incorporation. The

government might issue paper upon the credit of the public faith, pledged for its redemption, or upon the credit of its property and funds.Let the office where this paper is issued be made a place of deposit for the money of individuals, and authorize its officers to discount, and a bank is created. It only wants the forms of incorporation. But, surely, it will not be pretended, that [***101] clothing it with these forms would make such an establishment unconstitutional. In the bank which is actually established and incorporated, the United States are joint stockholders, and appoint joint directors; the secretary of the treasury has a supervising authority over its affairs; it is bound, upon his requisition, to transfer the funds of the government wherever they may be wanted; it performs all the duties of commissioners of the loan office; it is bound to loan the government a certain amount of money on demand; its notes are receivable in payment for public debts and duties; it is intimately connected, according to the usage of the whole world, with the power of borrowing money, and with all the financial operations of the government. It has, also, a close connection with the power of regulating foreign commerce, and that between the different States. It provides a circulating medium, by which that commerce can be more conveniently carried on, and exchanges may be facilitated. It is true, there are State banks by which a circulating medium to a certain extent is provided. But that only diminishes the quantum of necessity, which is no criterion by which to test the constitutionality [***102] of a measure. It is also connected with the power of making all needful regulations for the government of the territory, "and other property of the United States." If they may establish a corporation to regulate their territory, they may establish one to regulate their property. Their treasure is their property, and may be invested in this mode. It is put in partnership; but not for the purpose of carrying on the trade of banking, as one of the ends for which the government was established; but only as an instrument or means for executing its sovereign powers. This instrument could not be rendered effectual for this purpose but by mixing the property of individuals with that of the public. The bank could not otherwise acquire a credit for its notes. Universal experience shows, that, if altogether a government bank, it could not acquire, or would soon lose, the confidence of the community.

2. As to the branches, they are identical with the parent bank. The power to establish them is that species of subordinate power, wrapped up in the principal power, which Congress may place at its discretion.

17 U.S. 316; 4 L. Ed. 579; 1819 U.S. LEXIS 320; 4 A.F.T.R. (P-H) 4491; 4 Wheat. 316; 42 Cont. Cas. Fed. (CCH) P77,296

3. The last, and greatest, and only difficult question in the cause, is that which [***103] respects the assumed right of the States to tax this bank, and its branches, thus established by Congress? This is a question, comparatively of no importance to the individual States, but of vital importance to the Union. Deny this exemption to the bank as an instrument of government, and what is the consequence? There is no express provision in the constitution, which exempts any of the national institutions or property from State taxation. It is only by implication that the army, and navy, and treasure, and judicature of the Union are exempt from States taxation. Yet they are practically exempt; and they must be, or it would be in the power of any one State of destroy their use. Whatever the United States have a right to do, the individual States have no right to undo. The power of Congress to establish a bank, like its other sovereign powers, is supreme, or it would be nothing. Rising out of an exertion of paramount authority, it cannot be subject to any other power. Such a power in the States, as that contended for on the other side, is manifestly repugnant to the power of Congress; since a power to establish implies a power to continue and preserve. There is a manifest [***104] repugnancy between the power of Maryland to tax, and the power of Congress to preserve, this institution. A power to build up what another may pull down at pleasure, is a power which may provoke a smile, but can do nothing else. This law of Maryland acts directly on the operations of the bank, and may destroy it. There is no limit or check in this respect, but in the discretion of the State legislature. That discretion cannot be controlled by the national councils. Whenever the local councils of Maryland will it, the bank must be expelled from that State. A right to tax without limit or control, is essentially a power to destroy. If one national institution may be destroyed in this manner, all may be destroyed in the same manner. If this power to tax the national property and institutions exists in the State of Maryland, it is unbounded in extent. There can be no check upon it, either by Congress, or the people of the other States. Is there then any intelligible, fixed, defined boundary of this taxing power? If any, it must be found in this Court. If it does not exist here, it is a nonentity. But the Court cannot say what is an abuse, and what is a legitimate use of the [***105] power. The legislative intention may be so masked, as to defy the scrutinizing eye of the Court. How will the Court ascertain, a priori, that a given amount of tax will crush the bank? It is essentially a question of political economy, and there are always a vast variety of facts bearing upon it. The facts may be mistaken. Some important considerations belonging to the subject may be kept out of sight. They must all vary with times and circumstances. The result, then, must determine whether the tax is destructive. But the bank may linger on for some time, and that result cannot be known until the work of destruction is consummated. A criterion which has been proposed, is to see whether the tax has been laid, impartially, upon the State banks, as well as the Bank of the United States. Even this is an unsafe test; for the State governments may wish, and intend, to destroy their own banks. The existence of any national institution ought not to depend upon so frail a security. But this tax is levelled exclusively at the branch of the United States' Bank established in Maryland. There is, in point of fact, a branch of no other bank within that State, and there can legally be [***106] no other. It is a fundamental article of the State constitution of Maryland, that taxes shall operate on all the citizens impartially, and uniformly, in proportion to their property, with the exception, however, of taxes laid for political purposes. This is a tax laid for a political purpose; for the purpose of destroying a great institution of the national government; and if it were not imposed for that purpose, it would be repugnant to the State constitution, as not being laid uniformly on all the citizens, in proportion to their property. So that the legislature cannot disavow this to be its object, without, at the same time, confessing a manifest violation of the State constitution. Compare this act of Maryland with that of Kentucky, which is yet to come before the Court, and the absolute necessity of repressing such attempts in their infancy, will be evident. Admit the constitutionality of the Maryland tax, and that of Kentucky follows inevitably. How can it be said, that the office of discount and deposit in Kentucky cannot bear a tax of sixty thousand dollars per annum, payable monthly? Probably it could not; but judicial certainty is essential; and the Court has no means [***107] of arriving at that certainty. There is then, here, an absolute repugnancy of power to power; we are not bound to show, that the particular exercise of the power in the present case is absolutely repugnant. It is sufficient that the same power may be thus exercised.

There certainly may be some exceptions out of the taxing power of the States, other than those created by the taxing power of Congress; because, if there were no implied exceptions, then the navy, and other exclusive property of the United States, would be liable to State taxation. If some of the powers of Congress, other than its taxing power, necessarily involve incompatibility with the taxing power of the States, this may be incompatible. This is incompable; for a power to impose a tax ad libitum upon the notes of the bank, is a power to repeal the law, by which the

17 U.S. 316; 4 L. Ed. 579; 1819 U.S. LEXIS 320; 4 A.F.T.R. (P-H) 4491; 4 Wheat. 316; 42 Cont. Cas. Fed. (CCH) P77,296

bank was created. The bank cannot be useful, it cannot act at all, unless it issues notes. If the present tax does not disable the bank from issuing its notes, another may; and it is the authority itself which is questioned as being entirely repugnant to the power which established, and preserves the bank. Two powers thus hostile and incompatible [***108] cannot co-exist. There must be, in this case, an implied exception to the general taxing power of the States, because it is a tax upon the legislative faculty of Congress, upon the national property, upon the national institutions. Because the taxing powers of the two governments are concurrent in some respects, it does not follow, that there may not be limitations on the taxing power of the States, other than those which are imposed by the taxing power of Congress. Judicial proceedings are practically a subject of taxation in many countries, and in some of the States of this Union. The States are not expressly prohibited in the constitution from taxing the judicial proceedings of the United States. Yet such a prohibition must be implied, or the administration of justice in the national Courts might be obstructed by a prohibitory tax. But such a tax is no more a tax on the legislative faculty of Congress than this. The branch bank in Maryland is as much an institution of the sovereign power of the Union, as the Circuit Court of Maryland. One is established in virtue of an express power; the other by an implied authority; but both are equal, and equally supreme. All the property [***109] and all the institutions of the United States are, constructively, without the local, territorial jurisdiction of the individual States, in every respect, and for every purpose, including that of taxation. This immunity must extend to this case, because the power of taxation imports the power of taxation for the purpose of prohibition and destruction. The immunity of foreign public vessels from the local jurisdiction, whether State or national, was established in the case of the Exchange, n9 not upon positive municipal law, nor upon conventional law; but it was implied, from the usage of nations, and the necessity of the case. If, in favour of foreign governments, such an edifice of exemption has been built up, independent of the letter of the constitution, or of any other written law, shall not a similar edifice be raised on the same foundations, for the security of our own national government? So, also, the jurisdiction of a foreign power, holding a temporary possession of a portion of national territory, is no where provided for in the constitution; but is derived from inevitable implication. n10 These analogies show, that there may be exemptions from State jurisdiction, not [***110] detailed in the constitution, but arising out of general considerations. If Congress has power to do a particular act, no State can impede, retard, or burthen it. Can there be a stronger ground, to infer a cessation of State jurisdiction?

n9 7 Cranch, 116.

n10 The United States v. Rice, ante, p. 246.

The bank of the United States is as much an instrument of the government for fiscal purposes, as the Courts are its instruments for judicial purposes. They both proceed from the supreme power, and equally claim its protection. Though every State in the Union may impose a stamp tax, yet no State can lay a stamp tax upon the judicial proceedings or custom-house papers of the United States. But there is no such express exception to the general taxing power of the State contained in the constitution. It arises from the general nature of the government, and from the principle of the supremacy of the national powers, and the laws made to execute them, over the State authorities and State laws.

It is objected, however, that the act of Congress, incorporating the bank, withdraws property from taxation by the State, which would be otherwise liable to State taxation. We answer, that [***111] it is immaterial, if it does thus withdraw certain property from the grasp of State taxation, if Congress had authority to establish the bank, since the power of Congress is supreme. But, in fact, it withdraws nothing from the mass of taxable property in Maryland, which that State could tax. The whole capital of the bank belonging to private stockholders, is drawn from every State in the Union, and the stock belonging to the United States, previously constituted a part of the public treasure. Neither the stock belonging to citizens of other States, nor the privileged treasure of the United States mixed up with this private property, were previously liable to taxation in Maryland; and as to the stock belonging to its own citizens, it still continues liable to State taxation, as a portion of their individual property, in common with all the other private property in the State. The establishment of the bank, so far from withdrawing any thing from taxation by the State, brings something into Maryland which that State may tax. In produces revenue to the citizens of Maryland, which may be taxed equally and uniformly, with all their other private property. The materials of which the [***112] ships of war, belonging to the United States, are constructed, were previously liable to State taxation. But the instant they are converted into public property, for the public defence, they cease to be subject to State taxation. So here the treasure of the United States, and that of individuals, citizens of Maryland, and of other States, are undistinguishably confounded in the capital

Page 26

17 U.S. 316; 4 L. Ed. 579; 1819 U.S. LEXIS 320; 4 A.F.T.R. (P-H) 4491; 4 Wheat. 316; 42 Cont. Cas. Fed. (CCH) P77,296

stock of this great national institution, which, it has been before shown, could be made useful as an instrument of finance, in no other mode than by thus blending together the property of the government and of private merchants. This partnership is, therefore, one of necessity, on the part of the United States. Either this tax operates upon the franchise of the bank, or upon its property. If upon the former, then it comes directly in conflict with the exercise of a great sovereign authority of Congress; if upon the latter, then it is a tax upon the property of the United States; since the law does not, and cannot, in imposing a stamp tax, distinguish their interest from that of private stockholders.

But it is said, that Congress possesses and exercises the unlimited authority of taxing the State [***113] banks; and, therefore, the States ought to have an equal right to tax the bank of the United States. The answer to this objection is, that, in taxing the State banks, the States in Congress exercise their power of taxation. Congress exercises the power of the people. The whole acts on the whole. But the State tax is a part acting on the whole. Even if the two cases were the same, it would rather exempt the State banks from federal taxation, than subject the bank of the United States to taxation by a particular State. But the State banks are not machines essential to execute the powers of the State sovereignties, and, therefore, this is out of the question. The people of the United States, and the sovereignties of the several States, have no control over the taxing power of a particular State. But they have a control over the taxing power of the United States, in the responsibility of the members of the House of Representatives to the people of the State which sends them, and of the senators to the legislature by whom they are chosen.    But there is no correspondent responsibility of the local legislature of Maryland, for example, to the people of the other States of the Union.  [***114] The people of other States are not represented in the legislature of Maryland, and can have no control, directly or indirectly, over its proceedings.   The legislature of Maryland is responsible only to the people of that State. The national government can withdraw nothing from the taxing power of the States, which is not for the purpose of national benefit and the common welfare, and within its defined powers. But the local interests of the States are in perpetual conflict with the interests of the Union; which shows the danger of adding power to the partial views and local prejudices of the States. If the tax imposed by this law be not a tax on the property of the United States, it is not a tax on any property; and it must, consequently, be a tax on the faculty, or franchise. It is, then, a tax on the legislative faculty of the Union, on the charter of the bank. It imposes a stamp duty upon the notes of the bank, and thus stops the very source of its circulation and life. It is as much a direct interference with the legislative faculty of Congress, as would be a tax on patents, or copy rights, or custom-house papers, or judicial proceedings.

Since, then, the constitutional [***115] government of this republican empire cannot be practically enforced, so as to secure the permanent glory, safety, and felicity of this great country, but by a fair and liberal interpretation of its powers; since those powers could not all be expressed in the constitution, but many of them must be taken by implication; since the sovereign powers of the Union are supreme, and, wherever they come in direct conflict and repugnancy with those of the State governments, the latter must give way; since it has been proved that this is the case as to the institution of the bank, and the general power of taxation by the States; since this power, unlimited and unchecked, as it necessarily must be, by the very nature of the subject, is absolutely inconsistent with, and repugnant to, the right of the United States to establish a national bank; if the power of taxation be applied to the corporate property, or franchise, or property of the bank, and might be applied in the same manner, to destroy any other of the great institutions and establishments of the Union, and the whole machine of the national government might be arrested in its motions, by the exertion, in other cases, of the same power which [***116] is here attempted to be exerted upon the bank: no other alternative remains, but for this Court to interpose in authority, and save the nation from the consequences of this dangerous attempt.

OPINIONBY: MARSHALL

OPINION:  [*400]    [**600]  Mr. Chief Justice MARSHALL delivered the opinion of the Court.

In the case now to be determined, the defendant, a sovereign State, denies the obligation of a law enacted by the legislature of the Union, and the plaintiff, on his part, contests the validity of an act which has been passed by the legislature of that State. The constitution of our country, in its most interesting and vital parts, is to be considered; the conflicting powers of the government of the Union and of its members, as marked in that constitution, are to be discussed; and an opinion given, which may essentially influence the great operations of the government. No tribunal can approach such a question without a deep sense of its importance, and of the awful responsibility involved in its decision.  But it must be decided peacefully, or remain a source of [*401] hostile legislation, perhaps

17 U.S. 316; 4 L. Ed. 579; 1819 U.S. LEXIS 320; 4 A.F.T.R. (P-H) 4491; 4 Wheat. 316; 42 Cont. Cas. Fed. (CCH) P77,296

of hostility of a still more serious nature; and if it is to be so decided, by this [***117] tribunal alone can the decision be made. On the Supreme Court of the United States has the constitution of our country devolved this important duty.

The first question made in the cause is, has Congress power to incorporate a bank?

It has been truly said, that this can scarcely be considered as an open question, entirely unprejudiced by the former proceedings of the nation respecting it. The principle now contested was introduced at a very early period of our history, has been recognised by many successive legislatures, and has been acted upon by the judicial department, in cases of peculiar delicacy, as a law of undoubted obligation.

It will not be denied, that a bold and daring usurpation might be resisted, after an acquiescence still longer and more complete than this. But it is conceived that a doubtful question, one on which human reason may pause, and the human judgment be suspended, in the decision of which the great principles of liberty are not concerned, but the respective powers of those who are equally the representatives of the people, are to be adjusted; if not put at rest by the practice of the government, ought to receive a considerable impression from that practice. [***118] An exposition of the constitution, deliberately established by legislative acts, on the faith of which an immense property has been advanced, ought not to be lightly disregarded.

The power now contested was exercised by the first Congress elected under the present constitution. [*402] The bill for incorporating the bank of the United States did not steal upon an unsuspecting legislature, and pass unobserved. Its principle was completely understood, and was opposed with equal zeal and ability. After being resisted, first in the fair and open field of debate, and afterwards in the executive cabinet, with as much persevering talent as any measure has ever experienced, and being supported by arguments which convinced minds as pure and as intelligent as this country can boast, it became a law. The original act was permitted to expire; but a short experience of the embarrassments to which the refusal to revive it exposed the government, convinced those who were most prejudiced against the measure of its necessity, and induced the passage of the present law. It would require no ordinary share of intrepidity to assert that a measure adopted under these circumstances was a bold [***119] and plain usurpation, to which the constitution gave no countenance.

These observations belong to the cause; but they are not made under the impression that, were the question entirely new, the law would be found irreconcilable with the constitution.

In discussing this question, the counsel for the State of Maryland have deemed it of some importance, in the construction of the constitution, to consider that instrument not as emanating from the people, but as the act of sovereign and independent States. The powers of the general government, it has been said, are delegated by the States, who alone are truly sovereign; and must be exercised in subordination to the States, who alone possess supreme dominion.

[*403] It would be difficult to sustain this proposition. The Convention which framed the constitution was indeed elected by the State legislatures. But the instrument, when it came from their hands, was a mere proposal, without obligation, or pretensions to it. It was reported to the then existing Congress of the United States, with a request that it might "be submitted to a Convention of Delegates, chosen in each State by the people thereof, under the recommendation of [***120] its Legislature, for their assent and ratification." This mode of proceeding was adopted; and by the Convention, by Congress, and by the State Legislatures, the instrument was submitted to the people. They acted upon it in the only manner [**601] in which they can act safely, effectively, and wisely, on such a subject, by assembling in Convention. It is true, they assembled in their several States -- and where else should they have assembled? No political dreamer was ever wild enough to think of breaking down the lines which separate the States, and of compounding the American people into one common mass. Of consequence, when they act, they act in their States. But the measures they adopt do not, on that account, cease to be the measures of the people themselves, or become the measures of the State governments.

From these Conventions the constitution derives its whole authority. The government proceeds directly from the people; is "ordained and established" in the name of the people; and is declared to be ordained, "in order to form a more perfect union, establish justice, ensure domestic tranquillity, and secure [*404] the blessings of liberty to themselves and to [***121] their posterity." The assent of the States, in their sovereign capacity, is implied in calling a Convention, and thus submitting that instrument to the people. But the people were at perfect liberty to accept or reject it; and their act was final. It required not the affirmance, and could not be negatived, by the State governments.

17 U.S. 316; 4 L. Ed. 579; 1819 U.S. LEXIS 320; 4 A.F.T.R. (P-H) 4491; 4 Wheat. 316; 42 Cont. Cas. Fed. (CCH) P77,296

The constitution, when thus adopted, was of complete obligation, and bound the State sovereignties.

It has been said, that the people had already surrendered all their powers to the State sovereignties, and had nothing more to give. But, surely, the question whether they may resume and modify the powers granted to government does not remain to be settled in this country. Much more might the legitimacy of the general government be doubted, had it been created by the States. The powers delegated to the State sovereignties were to be exercised by themselves, not by a distinct and independent sovereignty, created by themselves. To the formation of a league, such as was the confederation, the State sovereignties were certainly competent. But when, "in order to form a more perfect union," it was deemed necessary to change this alliance into an effective [***122] government, possessing great and sovereign powers, and acting directly on the people, the necessity of referring it to the people, and of deriving its powers directly from them, was felt and acknowledged by all.

The government of the Union, then, (whatever may be the influence of this fact on the case,) is, [*405] emphatically, and truly, a government of the people. In form and in substance it emanates from them. Its powers are granted by them, and are to be exercised directly on them, and for their benefit.

This government is acknowledged by all to be one of enumerated powers. The principle, that it can exercise only the powers granted to it, would seem too apparent to have required to be enforced by all those arguments which it enlightened friends, while it was depending before the people, found it necessary to urge. That principle is now universally admitted. But the question respecting the extent of the powers actually granted, is perpetually arising, and will probably continue to arise, as long as our system shall exist.

In discussing these questions, the conflicting powers of the general and State governments must be brought into view, and the supremacy of their [***123] respective laws, when they are in opposition, must be settled.

If any one proposition could command the universal assent of mankind, we might expect it would be this -- [HN1]that the government of the Union, though limited in its powers, is supreme within its sphere of action. This would seem to result necessarily from its nature. It is the government of all; its powers are delegated by all; it represents all, and acts for all. Though any one State may be willing to control its operations, no State is willing to allow others to control them. The nation, on those subjects on which

it can act, must necessarily bind its component parts. But this question is not left to mere reason: the people have, in express terms, decided it, by saying, [*406] "this constitution, and the laws of the United States, which shall be made in pursuance thereof," "shall be the supreme law of the land," and by requiring that the members of the State legislatures, and the officers of the executive and judicial departments of the States, shall take the oath of fidelity to it.

[HN2]The government of the United States, then, though limited in its powers, is supreme; and its laws, when made in pursuance of the [***124] constitution, form the supreme law of the land, "any thing in the constitution or laws of any State to the contrary notwithstanding."

Among the enumerated powers, we do not find that of establishing a bank or creating a corporation. But there is no phrase in the instrument which, like the articles of confederation, excludes incidental or implied powers; and which requires that every thing granted shall be expressly and minutely described. Even [HN3]the 10th amendment, which was framed for the purpose of quieting the excessive jealousies which had been excited, omits the word "expressly," and declares only that the powers "not delegated to the United States, nor prohibited to the States, are reserved to the States or to the people;" thus leaving the question, whether the particular power which may become the subject of contest has been delegated to the one government, or prohibited to the other, to depend on a fair construction of the whole instrument. The men who drew and adopted this amendment had experienced the embarrassments resulting from the insertion of this word in the articles [*407] of confederation, and probably omitted it to avoid those embarrassments. A constitution, [***125] to contain an accurate detail of all the subdivisions of which its great powers will admit, and of all the means by which they may be carried into execution, would partake of the prolixity of a legal code, and could scarcely be embraced by the human mind. It would probably never be understood by the public. Its nature, therefore, requires, that only its great outlines should be marked, its important objects designated, and the minor ingredients which compose those objects be deduced from the nature of the objects themselves. That this idea was entertained by the framers of the American constitution, is not only to be inferred from the nature of the instrument, but from the language. Why else were some of the limitations, found in the ninth section of the 1st [**602] article, introduced? It is also, in some degree, warranted by their having omitted to use any restrictive term which might prevent its receiving a fair and just interpretation. In

17 U.S. 316; 4 L. Ed. 579; 1819 U.S. LEXIS 320; 4 A.F.T.R. (P-H) 4491; 4 Wheat. 316; 42 Cont. Cas. Fed. (CCH) P77,296

considering this question, then, we must never forget, that it is a constitution we are expounding.

Although, among the enumerated powers of government, we do not find the word "bank" or "incorporation," we find the great powers to [***126] lay and collect taxes; to borrow money; to regulate commerce; to declare and conduct a war; and to raise and support armies and navies. The sword and the purse, all the external relations, and no inconsiderable portion of the industry of the nation, are entrusted to its government.It can never be pretended [*408] that these vast powers draw after them others of inferior importance, merely because they are inferior. Such an idea can never be advanced.But it may with great reason be contended, that a government, entrusted with such ample powers, on the due execution of which the happiness and prosperity of the nation so vitally depends, must also be entrusted with ample means for their execution. The power being given, it is the interest of the nation to facilitate its execution. It can never be their interest, and cannot be presumed to have been their intention, to clog and embarrass its execution by withholding the most appropriate means. Throughout this vast republic, from the St. Croix to the Gulph of Mexico, from the Atlantic to the Pacific, revenue is to be collected and expended, armies are to be marched and supported. The exigencies of the nation may require that the [***127] treasure raised in the north should be transported to the south, that raised in the east conveyed to the west, or that this order should be reversed. Is that construction of the constitution to be preferred which would render these operations difficult, hazardous, and expensive? Can we adopt that construction, (unless the words imperiously require it,) which would impute to the framers of that instrument, when granting these powers for the public good, the intention of impeding their exercise by withholding a choice of means? If, indeed, such be the mandate of the constitution, we have only to obey; but that instrument does not profess to enumerate the means by which the powers it confers may be executed; nor does it prohibit the creation of a corporation, [*409] if the existence of such a being be essential to the beneficial exercise of those powers. It is, then, the subject of fair inquiry, how far such means may be employed.

It is not denied, that the powers given to the government imply the ordinary means of execution. That, for example, of raising revenue, and applying it to national purposes, is admitted to imply the power of conveying money from place to place, as [***128] the exigencies of the nation may require, and of employing the usual means of conveyance. But it is denied that the government has its choice of means; or, that it may

employ the most convenient means, if, to employ them, it be necessary to erect a corporation.

On what foundation does this argument rest? On this alone: The power of creating a corporation, is one appertaining to sovereignty, and is not expressly conferred on Congress. This is true. But all legislative powers appertain to sovereignty. The original power of giving the law on any subject whatever, is a sovereign power; and if the government of the Union is restrained from creating a corporation, as a means for performing its functions, on the single reason that the creation of a corporation is an act of sovereignty; if the sufficiency of this reason be acknowledged, there would be some difficulty in sustaining the authority of Congress to pass other laws for the accomplishment of the same objects.

The government which has a right to do an act, and has imposed on it the duty of performing that act, must, according to the dictates of reason, be allowed [*410] to select the means; and those who contend that it [***129] may not select any appropriate means, that one particular mode of effecting the object is excepted, take upon themselves the burden of establishing that exception.

The creation of a corporation, it is said, appertains to sovereignty. This is admitted. But to what portion of sovereignty does it appertain? Does it belong to one more than to another? In America, the powers of sovereignty are divided between the goverement of the Union, and those of the States. They are each sovereign, with respect to the objects committed to it, and neither sovereign with respect to the objects committed to the other. We cannot comprehend that train of reasoning which would maintain, that the extent of power granted by the people is to be ascertained, not by the nature and terms of the grant, but by its date. Some State constitutions were formed before, some since that of the United States. We cannot believe that their relation to each other is in any degree dependent upon this circumstance. Their respective powers must, we think, be precisely the same as if they had been formed at the same time. Had they been formed at the same time, and had the people conferred on the general government the [***130] power contained in the constitution, and on the States the whole residuum of power, would it have been asserted that the government of the Union was not sovereign with respect to those objects which were entrusted to it, in relation to which its laws were declared to be supreme? If this could not have been asserted, we cannot well comprehend the process of reasoning [*411] which maintains, that a power a appertaining to sovereignty cannot be connected with

17 U.S. 316; 4 L. Ed. 579; 1819 U.S. LEXIS 320; 4 A.F.T.R. (P-H) 4491; 4 Wheat. 316; 42 Cont. Cas. Fed. (CCH) P77,296

that vast portion of it which is granted to the general government, so far as it is calculated to subserve the legitimate objects of that government. The power of creating a corporation, though appertaining to sovereignty, is not, like the power of making war, or levying taxes, or of regulating commerce, a great substantive and independent power, which cannot be implied as incidental to other powers, or used as a means of executing them. It is never the end for which other powers are exercised, but a means by which other objects are accomplished. No contributions are made to charity for the sake of an incorporation, but a corporation is created to administer the charity; no seminary of learning is instituted in order to [***131] be incorporated, but the corporate character is [**603] conferred to subserve the purposes of education. No city was ever built with the sole object of being incorporated, but is incorporated as affording the best means of being well governed. The power of creating a corporation is never used for its own sake, but for the purpose of effecting something else. No sufficient reason is, therefore, perceived, why it may not pass as incidental to those powers which are expressly given, if it be a direct mode of executing them.

But [HN4]the constitution of the United States has not left the right of Congress to employ the necessary means, for th execution of the powers conferred on the government, to general reasoning. To its enumeration of powers is added that of making "all [*412] laws which shall be necessary and proper, for carrying into execution the foregoing powers, and all other powers vested by this constitution, in the government of the United States, or in any department thereof."

The counsel for the State of Maryland have urged various arguments, to prove that this clause, though in terms a grant of power, is not so in effect; but is really restrictive of the general [***132] right, which might otherwise be implied, of selecting means for executing the enumerated powers.

In support of this proposition, they have found it necessary to contend, that this clause was inserted for the purpose of conferring on Congress the power of making laws. That, without it, doubts might be entertained, whether Congress could exercise its powers in the form of legislation.

But could this be the object for which it was inserted? [HN5]A government is created by the people, having legislative, executive, and judicial powers. Its legislative powers are vested in a Congress, which is to consist of a Senate and House of Representatives. Each house may determine the rule of its proceedings; and it is declared that every bill which shall have passed both houses, shall, before it becomes a law, be presented to the President of the United States. [HN6]The 7th section describes the course of proceedings, by which a bill shall become a law; and, then, the 8th section enumerates the powers of Congress. Could it be necessary to say, that a legislature should exercise legislative powers, in the shape of legislation? After allowing each house to prescribe [*413] its own course of proceeding, [***133] after describing the manner in which a bill should become a law, would it have entered into the mind of a single member of the Convention, that an express power to make laws was necessary to enable the legislature to make them? That a legislature, endowed with legislative powers, can legislate, is a proposition too self-evident to have been questioned.

But the argument on which most reliance is placed, is drawn from the peculiar language of this clause. [HN7]Congress is not empowered by it to make all laws, which may have relation to the powers conferred on the government, but such only as may be "necessary and proper" for carrying them into execution. The word "necessary," is considered as controlling the whole sentence, and as limiting the right to pass laws for the execution of the granted powers, to such as are indispensable, and without which the power would be nugatory. That it excludes the choic of means, and leaves to Congress, in each case, that only which is most direct and simple.

Is it true, that this is the sense in which the word "necessary" is always used? Does it always import an absolute physical necessity, so strong, that one an absolute physical necessity, so strong, [***134] that one thing, to which another may be termed necessary, cannot exist without that other? We think it does not. If reference be had to its use, in the common affairs of the world, or in approved authors, we find that it frequently imports no more than that one thing is convenient, or useful, or essential to another. To employ the means necessary to an end, is generally understood as employing any means calculated to [*414] produce the end, and not as being confined to those single means, without which the end would be entirely unattainable. Such is the character of human language, that no word conveys to the mind, in all situations, one single definite idea; and nothing is more common than to use words in a figurative sense. Almost all compositions contain words, which, taken in their rigorous sense, would convey a meaning different from that which is obviously intended. It is essential to just construction, that many words which import something excessive, should be understood in a more mitigated sense -- in that sense which common usage justifies. The word "necessary" is of this description. It has not a fixed character peculiar to

17 U.S. 316; 4 L. Ed. 579; 1819 U.S. LEXIS 320; 4 A.F.T.R. (P-H) 4491; 4 Wheat. 316; 42 Cont. Cas. Fed. (CCH) P77,296

itself. It admits of all degrees [***135] of comparison; and is often connected with other words, which increase or diminish the impression the mind receives of the urgency it imports. A thing may be necessary, very necessary, absolutely or indispensably necessary. To no mind would the same idea be conveyed, by these several phrases. This comment on the word is well illustrated, by the passage cited at the bar, from the 10th section of the 1st article of the constitution. It is, we think, impossible to compare the sentence which prohibits a State from laying "imposts, or duties on imports or exports, except what may be absolutely necessary for executing its inspection laws," with that which authorizes Congress "to make all laws which shall be necessary and proper for carrying into execution" the powers of the general government, without feeling a conviction that the convention understood itself to change materially [*415] the meaning of the word "necessary," by prefixing the word "absolutely." This word, then, like others, in used in various senses; and, in its construction, the subject, the context, the intention of the person using them, are all to be taken into view.

Let this be done in the case under consideration. [***136] The subject is the execution of those great powers on which the welfare of a nation essentially depends. It must have been the intention of those who gave these powers, to insure, as far as human prudence could insure, their beneficial execution. This could not be done by confiding the choice of means to such narrow limits as not to leave it in the power of Congress to adopt any which might be appropriate, and which were conducive to the end.This provision is made in a constitution intended to endure for ages to come, and, consequently, to be adapted to the various crises of [**604] human affairs. To have prescribed the means by which government should, in all future time, execute its powers, would have been to change, entirely, the character of the instrument, and give it the properties of a legal code. It would have been an unwise attempt to provide, by immutable rules, for exigencies which, if foreseen at all, must have been seen dimly, and which can be best provided for as they occur. To have declared that the best means shall not be used, but those alone without which the power given would be nugatory, would have been to deprive the legislature of the capacity to avail [***137] itself of experience, to exercise its reason, and to accommodate its legislation to circumstances. [*416] If we apply this principle of construction to any of the powers of the government, we shall find it so pernicious in its operation that we shall be compelled to discard it. The powers vested in Congress may certainly be carried into execution, without prescribing

an oath of office. The power to exact this security for the faithful performance of duty, is not given, nor is it indispensably necessary.The different departments may be established; taxes may be imposed and collected; armies and navies may be raised and maintained; and money may be borrowed, without requiring an oath of office. It might be argued, with as much plausibility as other incidental powers have been assailed, that the Convention was not unmindful of this subject. The oath which might be exacted -- that of fidelity to the constitution -- is prescribed, and no other can be required. Yet, he would be charged with insanity who should contend, that the legislature might not superadd, to the oath directed by the constitution, such other oath of office as its wisdom might suggest.

So, with respect to the [***138] whole penal code of the United States: whence arises the power to punish in cases not prescribed by the constitution? All admit that the government may, legitimately, punish any violation of its laws; and yet, this is not among the enumerated powers of Congress. The right to enforce the observance of law, by punishing its infraction, might be denied with the more plausibility, because it is expressly given in some cases. Congress is empowered "to provide for the punishment [*417] of counterfeiting the securities and current coin of the United States," and "to define and punish piracies and felonies committed on the high seas, and offences against the law of nations." The several powers of Congress may exist, in a very imperfect state to be sure, but they may exist and be carried into execution, although no punishment should be inflicted in cases where the right to punish is not expressly given.

Take, for example, the power "to establish post offices and post roads." This power is executed by the single act of making the establishment. But, from this has been inferred the power and duty of carrying the mail along the post road, from one post office to another. And, from this [***139] implied power, has again been inferred the right to punish those who steal letters from the post office, or rob the mail. It may be said, with some plausibility, that the right to carry the mail, and to punish those who rob it, is not indispensably necessary to the establishment of a post office and post road. This right is indeed essential to the beneficial exercise of the power, but not indispensably necessary to its existence. So, of the punishment of the crimes of stealing or falsifying a record or process of a Court of the United States, or of perjury in such Court. To punish these offences is certainly conducive to the due administration of justice. But courts may exist, and may decide the causes brought before them, though such crimes escape punishment.

17 U.S. 316; 4 L. Ed. 579; 1819 U.S. LEXIS 320; 4 A.F.T.R. (P-H) 4491; 4 Wheat. 316; 42 Cont. Cas. Fed. (CCH) P77,296

The baneful influence of this narrow construction on all the operations of the government, and the absolute [*418] impracticability of maintaining it without rendering the government incompetent to its great objects, might be illustrated by numerous examples drawn from the constitution, and from our laws. The good sense of the public has pronounced, without hesitation, that the power of punishment appertains to sovereignty, [***140] and may be exercised whenever the sovereign has a right to act, as incidental to his constitutional power. It is a means for carrying into execution all sovereign powers, and may be used, although not indispensably necessary. It is a right incidental to the power, and conducive to its beneficial exercise.

If this limited construction of the word "necessary" must be abandoned in order to punish, whence is derived the rule which would reinstate it, when the government would carry its powers into execution by means not vindictive in their nature? If the word "necessary" means "needful," "requisite," "essential," "conducive to," in order to let in the power of punishment for the infraction of law; why is it not equally comprehensive when required to authorize the use of means which facilitate the execution of the powers of government without the infliction of punishment?"

In ascertaining the sense in which the word "necessary" is used in this clause of the constitution, we may derive some aid from that with which it is associated. Congress shall have power "to make all laws which shall be necessary and proper to carry into execution" the powers of the government. If the word "necessary" [***141] was used in that strict and rigorous sense for which the counsel for the State of [*419] Maryland contend, it would be an extraordinary departure from the usual course of the human mind, as exhibited in composition, to add a word, the only possible effect of which is to qualify that strict and rigorous meaning; to present to the mind the idea of some choice of means of legislation not straitened and compressed within the narrow limits for which gentlemen contend.

But the argument which most conclusively demonstrates the error of the construction contended for by the counsel for the State of Maryland, is founded on the intention of the Convention, as manifested in the whole clause. To waste time and argument in proving that, without it, Congress might carry its powers into execution, would be not much less idle than to hold a lighted taper to the sun. As little can it be required to prove, that in the absence of this clause, Congress would have some choice of

means. That it might employ [**605] those which, in its judgment, would most advantageously effect the object to be accomplished. That any means adapted to the end, any means which tended directly to the execution [***142] of the constitutional powers of the government, were in themsevles constitutional. This clause, as construed by the State of Maryland, would abridge, and almost annihilate this useful and necessary right of the legislature to select its means. That this could not be intended, is, we should think, had it not been already controverted, too apparent for controversy. We think so for the following reasons:

1st. The clause is placed among the powers of Congress, not among the limitations on those powers.

[*420] 2nd. Its terms purport to enlarge, not to diminish the powers vested in the government. In purports to be an additional power, not a restriction on those already granted. No reason has been, or can be assigned for thus concealing an intention to narrow the discretion of the national legislature under words which purport to enlarge it. The framers of the constitution wished its adoption, and well knew that it would be endangered by its strength, not by its weakness.Had they been capable of suing language which would convey to the eye one idea, and, after deep reflection, impress on the mind another, they would rather have disguised the grant of power, than its limitation. [***143] In, then, their intention had been, by this clause, to restrain the free use of means which might otherwise have been implied, that intention would have been inserted in another place, and would have been expressed in terms resembling these. "In carrying into execution the foregoing powers, and all others," &c. "no laws shall be passed but such as are necessary and proper." Had the intention been to make this clause restrictive, it would unquestionably have been so in form as well as in effect.

The result of the most careful and attentive consideration bestowed upon this clause is, that if it does not enlarge, it cannot be construed to restrain the powers of Congress, or to impair the right of the legislature to exercise its best judgment in the selection of measures to carry into execution the constitutional powers of the government. If no other motive for its insertion can be suggested, a sufficient one is found in the desire to remove all doubts respecting [*421] the right to legislate on that vast mass of incidental powers which must be involved in the constitution, if that instrument be not a splendid bauble.

We admit, as all must admit, that the powers of the government [***144] are limited, and that its limits are not to be transcended. But we think [HN8]the

Case 1:04-cv-11954-RCL    Document 13-4    Filed 03/24/2005    Page 59 of 72

17 U.S. 316; 4 L. Ed. 579; 1819 U.S. LEXIS 320; 4 A.F.T.R. (P-H) 4491; 4 Wheat. 316; 42 Cont. Cas. Fed. (CCH) P77,296

sound construction of the constitution must allow to the national legislature that discretion, with respect to the means by which the powers it confers are to be carried into execution, which will enable that body to perform the high duties assigned to it, in the manner most beneficial to the people. Let the end be legitimate, let it be within the scope of the constitution, and all means which are appropriate, which are plainly adapted to that end, which are not prohibited, but consist with the letter and spirit of the constitution, are constitutional.

That a corporation must be considered as a means not less usual, not of higher dignity, not more requiring a particular specification than other means, has been sufficiently proved. If we look to the origin of corporations, to the manner in which they have been framed in that government from which we have derived most of our legal principles and ideas, or to the uses to which they have been applied, we find no reason to suppose that a constitution, omitting, and wisely omitting, to enumerate all the means for carrying into execution the great powers vested [***145] in government, ought to have specified this. Had it been intended to grant this power as one which should be distinct and independent, to be exercised in any case whatever, it [*422] would have found a place among the enumerated powers of the government. But being considered merely as a means, to be employed only for the purpose of carrying into execution the given powers, there could be no motive for particularly mentioning it.

The propriety of this remark would seem to be generally acknowledged by the universal acquiescence in the construction which has been uniformly put on the 3rd section of the 4th article of the constitution. The power to "make all needful rules and regulations respecting the territory or other property belonging to the United States," is not more comprehensive, than the power "to make all laws which shall be necessary and proper for carrying into execution" the powers of the government. Yet all admit the constitutionality of a territorial government, which is a corporate body.

[HN9]If a corporation may be employed indiscriminately with other means to carry into execution the powers of the government, no particular reason can be assigned for excluding the [***146] use of a bank, if required for its fiscal operations. To use one, must be within the discretion of Congress, if it be an appropriate mode of executing the powers of government. That it is a convenient, a useful, and essential instrument in the prosecution of its fiscal operations, is not now a subject of controversy. All those who have been concerned in the administration of our finances, have concurred in representing its importance and necessity; and so strongly have they been felt, that statesmen of the first class, whose previous opinions [*423] against it had been confirmed by every circumstance which can fix the human judgment, have yielded those opinions to the exigencies of the nation. Under the confederation, Congress, justifying the measure by its necessity, transcended perhaps its powers to obtain the advantage of a bank; and our own legislation attests the universal conviction of the utility of this measure. The time has passed away when it can be necessary to enter into any discussion in order to prove the importance of this instrument, as a means to effect the legitimate objects of the government.

But, were its necessity less apparent, none can deny its being [***147] an appropriate measure; and if it is, the degree of its necessity, as has been very justly observed, is to be discussed in another place. Should Congress, in the execution of its powers, adopt measures which are prohibited by the constitution; or should Congress, under the pretext of executing its powers, [**606] pass laws for the accomplishment of objects not entrusted to the government; it would become the painful duty of this tribunal, should a case requiring such a decision come before it, to say that such an act was not the law of the land. But where the law is not prohibited, and is really calculated to effect any of the objects entrusted to the government, to undertake here to inquire into the degree of its necessity, would be to pass the line which circumscribes the judicial department, and to tread on legislative ground. This court disclaims all pretensions to such a power.

[*424] After this declaration, it can scarcely be necessary to say, that the existence of State banks can have no possible influence on the question. No trace is to be found in the constitution of an intention to create a dependence of the government of the Union on those of the States, for [***148] the execution of the great powers assigned to it. Its means are adequate to its ends; and on those means alone was it expected to rely for the accomplishment of its ends. To impose on it the necessity of resorting to means which it cannot control, which another government may furnish or withhold, would render its course precarious, the result of its measures uncertain, and create a dependence on other governments, which might disappoint its most important desigue, and is incompatible with the language of the constitution. But were it otherwise, the choice of means implies a right to choose a national bank in preference to State banks, and Congress alone can make the election.

17 U.S. 316; 4 L. Ed. 579; 1819 U.S. LEXIS 320; 4 A.F.T.R. (P-H) 4491; 4 Wheat. 316; 42 Cont. Cas. Fed. (CCH) P77,296

After the most deliberate consideration, it is the unanimous and decided opinion of this Court, that [HN10]the act to incorporate the Bank of the United States is a law made in pursuance of the constitution, and is a part of the supreme law of the land.

The branches, proceeding from the same stock, and being conducive to the complete accomplishment of the object, are equally constitutional. It would have been unwise to locate them in the charter, and it would be unnecessarily inconvenient to employ the legislative [***149] power in making those subordinate arrangements. The great duties of the bank are prescribed; those duties require branches; and the bank itself [*425] may, we think, be safely trusted with the selection of places where those branches shall be fixed; reserving always to the government the right to require that a branch shall be located where it may be deemed necessary.

It being the opinion of the Court, that the act incorporating the bank is constitutional; and that the power of establishing a branch in the State of Maryland might be properly exercised by the bank itself, we proceed to inquire --

2. Whether the State of Maryland may, without violating the constitution, tax that branch?

That [HN11]the power of taxation is one of vital importance; that it is retained by the States; that it is not abridged by the grant of a similar power to the government of the Union; that it is to be concurrently exercised by the two governments: are truths which have never been denied. But, such is the paramount character of the constitution, that its capacity to withdraw any subject from the action of even this power, is admitted. The States are expressly forbidden to lay any duties on imports [***150] or exports, except what may be absolutely necessary for executing their inspection laws. If the obligation of this prohibition must be conceded -- if it may restrain a State from the exercise of its taxing power on imports and exports; the same paramount character would seem to restrain, as it certainly may restrain, a State from such other exercise of this power, as is in its nature incompatible with, and repugnant to, the constitutional laws of the Union. A law, absolutely repugnant to another, as entirely [*426] repeals that other as if express terms of repeal were used.

On this ground the counsel for the bank place its claim to be exempted from the power of a State to tax its operations. There is no express provision for the case, but the claim has been sustained on a principle which so entirely pervades the constitution, is so intermixed with the materials which compose it, so interwoven with its web, so blended with its texture, as to be incapable of being separated from it, without rending it into shreds.

This great principle is, that the constitution and the laws made in pursuance thereof are supreme; that they control the constitution and laws of the respective States, [***151] and cannot be controlled by them. From this, which may be almost termed an axiom, other propositions are deduced as corollaries, on the truth or error of which, and on their application to this case, the cause has been supposed to depend. These are, 1st. that a power to create implies a power to preserve. 2nd. That a power to destroy, if wielded by a different hand, is hostile to, and incompatible with these powers to create and to preserve. 3d. That where this repugnancy exists, that authority which is supreme must control, not yield to that over which it is supreme.

These propositions, as abstract truths, would, perhaps, never be controverted. Their application to this case, however, has been denied; and, both in maintaining the affirmative and the negative, a splendor of eloquence, and strength of argument, seldom, if ever, surpassed, have been displayed.

[*427] The power of Congress to create, and of course to continue, the bank, was the subject of the preceding part of this opinion; and is no longer to be considered as questionable.

That the power of taxing it by the States may be exercised so as to destroy it, is too obvious to be denied. But taxation is said to [***152] be an absolute power, which acknowledges no other limits than those expressly prescribed in the constitution, and like sovereign power of every other description, is trusted to the discretion of those who use it. But the very terms of this argument admit that the sovereignty of the State, in the article of taxation itself, is subordinate to, and may be controlled by the constitution of the United States. How far it has been controlled by that instrument must be a question of construction. In making this construction, no principle not declared, can be admissable, which would defeat the legitimate operations of a supreme government. It is of the very essence of supremacy to remove all obstacles to its action within its own sphere, and so to modify every power vested in subordinate [**607] governments, as to exempt its own operations from their own influence. This effect need not be stated in terms. It is so involved in the declaration of supremacy, so necessarily implied in it, that the expression of it could not make it more certain. We must, therefore, keep it in view while construing the constitution.

17 U.S. 316; 4 L. Ed. 579; 1819 U.S. LEXIS 320; 4 A.F.T.R. (P-H) 4491; 4 Wheat. 316; 42 Cont. Cas. Fed. (CCH) P77,296

The argument on the part of the State of Maryland, is, not that the [***153] States may directly resist a law of Congress, but that they may exercise their [*428] acknowledged powers upon it, and that the constitution leaves them this right in the confidence that they will not abuse it.

Before we proceed to examine this argument, and to subject it to the test of the constitution, we must be permitted to bestow a few considerations on the nature and extent of this original right of taxation, which is acknowledged to remain with the States. It is admitted that [HN12]the power of taxing the people and their property is essential to the very existence of government, and may be legitimately exercised on the objects to which it is applicable, to the utmost extent to which the government may chuse to carry it. The only security against the abuse of this power, is found in the structure of the government itself. In imposing a tax the legislature acts upon its constituents. This is in general a sufficient security against erroneous and oppressive taxation.

The people of a State, therefore, give to their government a right of taxing themselves and their property, and as the exigencies of government cannot be limited, they prescribe no limits to the exercise of this [***154] right, resting confidently on the interest of the legislator, and on the influence of the constituents over their representative, to guard then against its abuse. But the means employed by the government of the Union have no such security, nor is the right of a State to tax them sustained by the same theory. Those means are not given by the people of a particular State, not given by the constituents of the legislature, which claim the right to tax them, but by the people of all the States. They are given by all, [*429] for the benefit of all -- and upon theory, should be subjected to that government only which belongs to all.

It may be objected to this definition, that the power of taxation is not confined to the people and property of a State. It may be exercised upon every object brought within its jurisdiction.

This is true. But to what source do we trace this right? It is obvious, that it is an incident of sovereignty, and is co-extensive with that to which it is an incident. All subjects over which the sovereign power of a State extends, are objects of taxation; but those over which it does not extend, are, upon the soundest principles, exempt from taxation. This [***155] proposition may almost be pronounced self-evident.

The sovereignty of a State extends to every thing which exists by its own authority, or is introduced by

its permission; but does it extend to those means which are employed by Congress to carry into execution powers conferred on that body by the people of the United States? We think it demonstrable that it does not. Those powers are not given by the people of a single State. They are given by the people of the United States, to a government whose laws, made in pursuance of the constitution, are declared to be supreme. Consequently, the people of a single State cannot confer a sovereignty which will extend over them.

If we measure the power of taxation residing in a State, by the extent of sovereignty which the people of a single State possess, and can confer on its government, we have an intelligible standard, applicable [*430] to every case to which the power may be applied. We have a principle which leaves the power of taxing the people and property of a State unimpaired; which leaves to a State the command of all its resources, and which places beyond its reach, all those powers which are conferred by the people of [***156] the United States on the government of the Union, and all those means which are given for the purpose of carrying those powers into execution. We have a principle which is safe for the States, and safe for the Union. We are relieved, as we ought to be, from clashing sovereignty; from interfering powers; from a repugnancy between a right in one government to pull down what there is an acknowledged right in another to build up; from the incompatibility of a right in one government to destroy what there is a right in another to preserve. We are not driven to the perplexing inquiry, so unfit for the judicial department, what degree of taxation is the legitimate use, and what degree may amount to the abuse of the power. The attempt to use it one the means employed by the government of the Union, in pursuance of the constitution, is itself an abuse, because it is the usurpation of a power which the people of a single State cannot give.

We find, then, on just theory, a total failure of this original right to tax the means employed by the government of the Union, for the execution of its powers. The right never existed, and the question whether it has been surrendered, cannot arise. [***157]

But, waiving this theory for the present, let us resume the inquiry, whether this power can be exercised [*431] by the respective States, consistently with a fair construction of the constitution?

That the power to tax involves the power to destroy; that the power to destroy may defeat and render useless the power to create; that there is a plain repugnance, in

17 U.S. 316; 4 L. Ed. 579; 1819 U.S. LEXIS 320; 4 A.F.T.R. (P-H) 4491; 4 Wheat. 316; 42 Cont. Cas. Fed. (CCH) P77,296

conferring on one government a power to control the constitutional measures of another, which other, with respect to those very measures, is declared to be supreme over that which exerts the control, are propositions not to be denied. But all inconsistencies are to be reconciled by the magic of the word CONFIDENCE. Taxation, it is said, does not necessarily and unavoidably destroy. To carry it to the excess of destruction would be an abuse, to presume which, would banish that confidence which is essential to all government.

But is this a case of confidence? Would the people of any one State trust those of another with a power to control the most insignificant operations of their State government? We know they would not. Why, then, should we suppose that the people of any one State should be willing to trust those [***158] of another with a power to control the operations of a government to [**608] which they have confided their most important and most valuable interests? In the legislature of the Union alone, are all represented. The legislature of the Union alone, therefore, can be trusted by the people with the power of controlling measures which concern all, in the confidence that it will not be abused. This, then, is not a case of confidence, and we must consider it as it really is.

[*432] If we apply the principle for which the State of Maryland contends, to the constitution generally, we shall find it capable of changing totally the character of that instrument. We shall find it capable of arresting all the measures of the government, and of prostrating it at the foot of the States. The American people have declared their constitution, and the laws made in pursuance thereof, to be supreme; but this principle would transfer the supremacy, in fact, to the States.

If the States may tax one instrument, employed by the goverment in the execution of its powers, they may tax any and every other instrument. They may tax the mail; they may tax the mint; they may tax patent rights; they [***159] may tax the papers of the custom-house; they may tax judicial process; they may tax all the means employed by the government, to an excess which would defeat all theends of government. This was not intended by the American people. They did not design to make their government dependent on the States.

Gentlemen say, they do not claim the right to extend State taxation to these objects. They limit their pretensions to property. But on what principle is this distinction made? Those who make it have furnished no reason for it, and the principle for which they contend denies it. They contend that the power of taxation has no other limit than is found in the 10th

section of the 1st article of the constitution; that, with respect to every thing else, the power of the States is supreme, and admits of no control. If this be true, the distinction between property and [*433] other subjects to which the power of taxation is applicable, is merely arbitrary, and can never be sustained. This is not all. If the controling power of the States be established; if their supremacy as to taxation be acknowledged; what is to restrain their exercising this control in any shape they may please [***160] to give it? Their sovereignty is not confined to taxation. That is not the only mode in which it might be displayed. The question is, in truth, a question of supremacy; and if the right of the States to tax the means employed by the general government be conceded, the declaration that the constitution, and the laws made in pursuance thereof, shall be the supreme law of the land, is empty and unmeaning declamation.

In the course of the argument, the Federalist has been quoted; and the opinions expressed by the authors of that work have been justly supposed to be entitled to great respect in expounding the constitution. No tribute can be paid to them which exceeds their merit; but in applying their opinions to the cases which may arise in the progress of our government, a right to judge of their correctness must be retained; and, to understand the argument, we must examine the proposition it maintains, and the objections against which it is directed. The subject of those numbers, from which passages have been cited, is the unlimited power of taxation which is vested in the general government. The objection to this unlimited power, which the argument seeks to remove, is stated [***161] with fullness and clearness. It is, "that an indefinite power of taxation in the latter (the government [*434] of the Union) might, and probably would, in time, deprive the former (the government of the States) of the means of providing for their own necessities; and would subject them entirely to the mercy of the national legislature. As the laws of the Union are to become the supreme law of the land; as it is to have power to pass all laws that may be necessary for carrying into execution the authorities with which it is proposed to vest it; the national government might at any time abolish the taxes imposed for State objects, upon the pretence of an interference with its own. It might allege a necessity for doing this, in order to give efficacy to the national revenues; and thus all the resources of taxation might, by degrees, become the subjects of federal monopoly, to the entire exclusion and destruction of the State governments."

The objections to the constitution which are noticed in these numbers, were to the undefined power of the government to tax, not to the incidental privilege of

17 U.S. 316; 4 L. Ed. 579; 1819 U.S. LEXIS 320; 4 A.F.T.R. (P-H) 4491; 4 Wheat. 316; 42 Cont. Cas. Fed. (CCH) P77,296

exempting its own measures from State taxation. The consequences apprehended from [***162] this undefined power were, that it would absorb all the objects of taxation, "to the exclusion and destruction of the State governments." The arguments of the Federalist are intended to prove the fallacy of these apprehensions; not to prove that the government was incapable of executing any of its powers, without exposing the means it employed to the embarrassments of State taxation. Arguments urged against these objections, and these apprehensions, are to be understood as relating to the points they [*435] mean to prove. Had the authors of those excellent essays been asked, whether they contended for that construction of the constitution, which would place with the reach of the States those measures which the government might adopt for the execution of its powers; no man, who has read their instructive pages, will hesitate to admit, that their answer must have been in the negative.

It has also been insisted, that, as the power of taxation in the general and State governments is acknowledged to be concurrent, every argument which would sustain the right of the general government to tax banks chartered by the States, will equally sustain the right of the States to tax banks [***163] chartered by the general government.

But the two cases are not on the same reason. [HN13]The people of all the States have created the general government, and have conferred upon it the general power of taxation. The people of all the States, and the States themselves, are represented in Congress, and, by their representatives, exercise this power. When they tax the chartered institutions of the States, they tax their constituents; and these taxes must be uniform. But, when a State taxes the operations of the government of the United States, it acts upon institutions created, not by their own constituents, but by people over [**609] whom they claim no control. It acts upon the measures of a government created by others as well as themselves, for the benefit of others in common with themselves. The difference is that which always exists, and always must exist, between the action of the whole on a [*436] part, and the action of a part on the whole -- between the laws of a government declared to be supreme, and those of a government which, when in opposition to those laws, is not supreme.

But if the full application of this argument could be admitted, it might bring into question [***164] the right of Congress to tax the State banks, and could not prove the right of the States to tax the Bank of the United States.

The Court has bestowed on this subject its most deliberate consideration. The result is a conviction that the States have no power, by taxation or otherwise, to retard, impede, burden, or in any manner control, the operations of the constitutional laws enacted by Congress to carry into execution the powers vested in the general government. This is, we think, the unavoidable consequence of that supremacy which the constitution has declared.

We are unanimously of opinion, that [HN14]the law passed by the legislature of Maryland, imposing a tax on the Bank of the United States, is unconstitutional and void.

This opinion does not deprive the States of any resources which they originally possessed. It does not extend to a tax paid by the real property of the bank, in common with the other real property within the State, nor to a tax imposed on the interest which the citizens of Maryland may hold in this institution, in common with other property of the same description throughout the State. But this is a tax on the operations of the bank, and is, consequently, [***165] a tax on the operation of an instrument employed by the government [*437] of the Union to carry its powers into execution. Such a tax must be unconstitutional.

JUDGMENT. This cause came on to be heard on the transcript of the record of the Court of Appeals of the State of Maryland, and was argued by counsel. On consideration whereof, it is the opinion of this Court, that the Act of the Legislature of Maryland is contrary to the Constitution of the United States, and void; and, therefore, that the said Court of Appeals of the State of Maryland erred in affirming the judgment of the Baltimore County Court, in which judgment was rendered against James W. McCulloch; but that the said Court of Appeals of Maryland ought to have reversed the said judgment of the said Baltimore County Court, and ought to have given judgment for the said appellant, McCulloch. It is, therefore, Adjudged and Ordered, that the said judgment of the said Court of Appeals of the State of Maryland in this case, be, and the same hereby is, reversed and annulled. And this Court, proceeding to render such judgment as the said Court of Appeals should have rendered; it is further Adjudged and Ordered, that the [***166] judgment of the said Baltimore County Court be reversed and annulled, and that judgment be entered in the said Baltimore County Court for the said James W. McCulloch.

2001 U.S. Dist. LEXIS 24716

THOMAS MELVIN, Plaintiff v. U.S. BANK N.A. ND., Defendant

CIVIL ACTION NO. 01-30082-FHF

UNITED STATES DISTRICT COURT FOR THE DISTRICT OF MASSACHUSETTS

2001 U.S. Dist. LEXIS 24716

September 28, 2001, Decided

**DISPOSITION:** [*1] Defendant's motion to dismiss plaintiff's complaint and amended complaint allowed.

## CASE SUMMARY

**PROCEDURAL POSTURE:** Plaintiff borrower's action alleged disclosure violations under the Truth in Lending Act (TILA), 15 U.S.C.S. § 1601 et seq., and the Massachusetts Consumer Credit Cost Disclosure Act (CCCDA), Mass. Gen. Laws ch. 140D, § 1 et seq., and sought rescission and statutory damages. Defendant lender moved to dismiss arguing the TILA claims failed because the CCCDA solely governed rescission, and the damages claims were barred by 15 U.S.C.S. § 1640(e).

**OVERVIEW:** Under 12 C.F.R. § 226.29(b)(1), the Massachusetts borrower could bring a claim for damages under 15 U.S.C.S. § 1640, but could not rescind a credit transaction under 15 U.S.C.S. § 1635. He could pursue that remedy only under the CCCDA. As such, the borrower had no viable rescission claim under TILA. The borrower was left with rescission claims under the CCCDA, and with statutory damages claims under TILA and the CCCDA, to the extent the damages claims were not time-barred. The loan was consummated well before the one-year period specified in 15 U.S.C.S. § 1640(e). As such, the federal damages claim under 15 U.S.C.S. § 1640 was time barred. The borrower was left with a state law damage claim under the four-year statute of limitations of Mass. Laws ch. 260, § 5A. It was conceded that diversity jurisdiction did not exist under 28 U.S.C.S. § 1332. Noting the early stage of the litigation, the existence of uncertainty in circumscribing the contours of CCCDA, and the uncertainty of whether a state court, in construing the CCCDA, would follow the lead of the federal courts construing TILA, the court declined to exercise supplemental jurisdiction.

**OUTCOME:** The motion to dismiss was allowed. However, the state claims were dismissed without prejudice as to being subsequently filed in the state court.

**CORE TERMS:** rescission, state law, supplemental jurisdiction, statute of limitations, federal claim, consumer, viable, damage claim, time-barred, exemption, motion to dismiss, federal statute, set forth, et seq, disclosure, state-law, complains, one-year, pleads, statutory scheme, construing

**LexisNexis(TM) Headnotes**

*Civil Procedure > Pleading & Practice > Defenses, Objections & Demurrers > Failure to State a Cause of Action*

[HN1]The standard for ruling on a motion to dismiss under Fed. R. Civ. P. 12(b)(6) requires the court to accept the factual averments contained in the complaint as true, indulging every reasonable inference helpful to the plaintiff's cause. The court may grant such a motion only if it clearly appears, according to the facts alleged, that the plaintiff cannot recover on any viable theory.

*Banking Law > Bank Activities > Consumer Protection > Truth in Lending*

[HN2]The Truth in Lending Act (TILA), 15 U.S.C.S. § 1601 et seq., and the Massachusetts Consumer Credit Cost Disclosure Act (CCCDA), Mass. Gen. Laws ch. 140D, § 1 et seq., were both enacted to assure a meaningful disclosure of credit terms so that consumers would be able to compare more readily the various credit terms available to them and avoid the uninformed use of credit, and to protect consumers against inaccurate and unfair credit billing and credit card practices. 15 U.S.C.S. § 1601(a). Both statutes provide consumers with remedies in the forms of a right of rescission and a right to damages. 15 U.S.C.S. § 1635(a) provides a right to rescission under TILA. 15 U.S.C.S. § 1640 provides a right to damages under TILA. Mass Gen. Laws ch. 140D, § 10(a) provides a right to rescission under CCCDA. Mass. Gen. Laws ch. 140D, § 32 provides a right to damages under CCCDA.

*Banking Law > Bank Activities > Consumer Protection > Truth in Lending*

[HN3]Pursuant to authority granted in 15 U.S.C.S. § 1633, the Board of Governors of the Federal Reserve System exempted credit transactions subject to the

14

Massachusetts Consumer Credit Cost Disclosure Act (CCCDA), Mass. Gen. Laws ch. 140D, § 1 et seq., from chapters 2 and 4 of the Truth in Lending Act (TILA), 15 U.S.C.S. § 1601 et seq. 48 Fed. Reg. 14882, 14890 (April 6, 1983). Chapter 2 includes 15 U.S.C.S §§ 1631-1646 and would preclude the federal remedies from the claims of a Massachusetts borrower. However, the Board revived the federal damages remedy from exemption when it enacted a regulation providing that no exemptions granted under 12 C.F.R. 226.29 shall extend to the civil liability provisions of 15 U.S.C.S. § 1640. 12 C.F.R. § 226.29(b)(1). Accordingly, a Massachusetts resident can bring a claim for damages under 15 U.S.C.S. § 1640, but cannot rescind a credit transaction under 15 U.S.C.S. § 1635; he or she can pursue that remedy only under CCCDA.

*Banking Law > Bank Activities > Consumer Protection > Truth in Lending*

[HN4]The Truth in Lending Act, 15 U.S.C.S. § 1601 et seq., contains a one-year statute of limitations for a damage claim, while the limitation period for a claim for damages under the Massachusetts Consumer Credit Cost Disclosure Act, Mass. Gen. Laws ch. 140D, § 1 et seq., is four years. 15 U.S.C.S. § 1640(e); Mass. Gen. Laws ch. 260, § 5A.

*Civil Procedure > Jurisdiction > Subject Matter Jurisdiction > Supplemental Jurisdiction*

[HN5]The power of a federal court to hear and to determine state-law claims in non-diversity cases depends upon the presence of at least one "substantial" federal claim in the lawsuit. However, supplemental jurisdiction is discretionary when federal claims are dismissed early in the litigation, as in a federal-question case, the termination of the foundational federal claim does not divest the district court of power to exercise supplemental jurisdiction but, rather, sets the stage for an exercise of the court's informed discretion.

*Civil Procedure > Jurisdiction > Subject Matter Jurisdiction > Supplemental Jurisdiction*

[HN6]As a general principle, the unfavorable disposition of a plaintiff's federal claims at the early stages of a suit, before the commencement of trial, will trigger the dismissal without prejudice of any supplemental state-law claims. Likewise, another factor to be weighed is the clarity of the law that governs a pendent claim, for a federal court may be wise to forego the exercise of supplemental jurisdiction when the state law that undergirds the nonfederal claim is of dubious scope and application.

**COUNSEL:** For Thomas Melvin, PLAINTIFF: Christopher M Lefebvre, Claude Lefebvre & Christopher M, Lefevbre Law Offices, Pawtucket, RI USA.

For Thomas Melvin, PLAINTIFF: Cathleen M Combs, Edelman, Combs & Latturner, Chicago, IL USA.

For US Bank NA ND, DEFENDANT: Kevin C Maynard, Bulkley, Richardson & Gelinas, Springfield, MA USA.

**JUDGES:** Frank H. Freedman, Senior United States District Judge.

**OPINIONBY:** Frank H. Freedman

**OPINION:** MEMORANDUM AND ORDER

September 28, 2001

FREEDMAN, S.J.

I. INTRODUCTION

Thomas Melvin ("plaintiff") brings this proposed class action and complains that his loan, and numerous other similarly situated loans, violate the federal Truth in Lending Act, 15 U.S.C. § 1601 et seq., ("TILA") (as amended by the Home Ownership and Equity Protection Act, 15 U.S.C. §§ 1602(aa) and 1639 ("HOEPA")), and/or violate the Massachusetts Consumer Credit Cost Disclosure Act, Mass. Gen. Laws ch. 140D § 1, et seq. [*2] ("CCCDA"), and are therefore subject to rescission and statutory damages. Specifically, plaintiff complains that statutory disclosures were not made to him prior to the consummation of his loan transaction on August 18, 1998, and that his loan documentation did not include terms that preclude application of a prepayment penalty if the prepayment is the result of refinancing with the same lender.

Defendant moves to dismiss plaintiff's Complaint pursuant to Federal Rule of Civil Procedure 12(b)(6), arguing that Counts I and II of the Complaint fail to state a federal claim because the Massachusetts statute, CCCDA, solely governs any claim for rescission, and that Count III is barred by the applicable federal statute of limitations. Following a hearing on August 29, 2001, the Court took both the Motion to Dismiss the Complaint and the Motion to Dismiss the Amended Complaint n1 under advisement.

- - - - - - - - - - - - - - Footnotes - - - - - - - - - - - - - - - -

n1 Plaintiff has amended his complaint to include claims under CCCDA and thus

defendant has filed separate but interrelated motions responsive to both the Complaint and the Amended Complaint.

- - - - - - - - - - - - End Footnotes- - - - - - - - - - - - -

[*3]

II. DISCUSSION

A. Standard of Review

[HN1]The standard for ruling on a motion to dismiss under Federal Rule of Civil Procedure 12(b)(6) requires the Court to accept the "factual averments contained in the complaint as true, indulging every reasonable inference helpful to the plaintiff's cause." Garita Hotel Ltd. P'ship v. Ponce Fed. Bank, 958 F.2d 15, 17 (1st Cir. 1992). The Court may grant such a motion "only if it clearly appears, according to the facts alleged, that the plaintiff cannot recover on any viable theory." Id. (quoting Correa-Martinez v. Arrillaga-Belendez, 903 F.2d 49, 52 (1st Cir. 1990)).

A decision on defendant's motion to dismiss requires resolving the nexus of the federal TILA statutory scheme with the exemption granted to the co-existing CCCDA, to glean whether federal or Massachusetts law controls each of plaintiff's claims. After this initial determination as to the applicable law, the appropriate statute of limitation may thereafter be applied to demonstrate whether the damage claim is time-barred, and whether jurisdiction shall continue to be most appropriate in this court.

B. TILA and CCCD

Plaintiff has [*4] set forth various rescission and damage claims and pleads that each is governed by TILA. However, with the submission of his Amended Complaint, he additionally pleads that each claim may be governed by CCCDA. In general, as to both the Complaint and the Amended Complaint, Count I seeks a declaration of the entitlement to rescission on behalf of a class. See Complaint at PP 30-38; Amended Complaint at PP 32-40. Count II is an individual claim by plaintiff seeking a judgment of rescission along with related attorney's fees, litigation expenses and costs, and "such other or further relief as the Court deems appropriate." See Complaint at PP 39-41; Amended Complaint at PP 41-43. Count III is a claim for statutory damages under both the federal statute, as provided for in 15 U.S.C. § 1640 ("section 1640"), and the state statute as provided in Mass. Gen. Laws ch. 140D, § 32. See Complaint at PP 42-44; Amended Complaint at PP 44-46.

[HN2]TILA and CCCDA were both enacted "to assure a meaningful disclosure of credit terms so that . . . consumer[s] would be able to compare more readily the various credit terms available to [them] and avoid the uninformed [*5] use of credit, and to protect . . . consumer[s] against inaccurate and unfair credit billing and credit card practices." 15 U.S.C. § 1601(a). Both statutes provide consumers with remedies in the forms of a right of rescission and a right to damages. See 15 U.S.C. § 1635(a) (right to rescission under TILA); 15 U.S.C. § 1640 (right to damages under TILA); Mass Gen. Laws ch. 140D, § 10(a) (right to rescission under CCCDA); Mass. Gen. Laws ch. 140D, § 32 (right to damages under CCCDA).

[HN3]Pursuant to authority granted in 15 U.S.C. § 1633, the Board of Governors of the Federal Reserve System (the "Board") exempted credit transactions subject to CCCDA "from chapters 2 and 4 of the Federal act." See 48 Fed. Reg. 14882, 14890 (April 6, 1983). Chapter 2 includes TILA sections 1631 through 1646 and would preclude the federal remedies from the claims of a Massachusetts borrower. However, the Board revived the federal damages remedy from exemption when it enacted a regulation providing that "no exemptions granted under this section shall extend to the civil liability provisions [*6] of section [1640]." See 12 C.F.R. § 226.29(b)(1) . Accordingly, a Massachusetts resident can bring a claim for damages under section 1640 of TILA, but cannot rescind a credit transaction under section 1635 of that statute; he or she can pursue that remedy only under CCCDA. See, e.g., In re Fidler, 226 B.R. 734, 736 (Bankr. D. Mass. 1998); In re Desrosiers, 212 B.R. 716, 722 (Bankr. D. Mass. 1997); In re Myers, 175 B.R. 122, 125-126 (Bankr. D. Mass. 1994). As such, the Court concludes that plaintiff has no viable rescission claim under the federal statutory scheme and therefore will dismiss Count I and Count II to the extent a TILA claim is stated. n2

- - - - - - - - - - - - - - Footnotes - - - - - - - - - - - - - - -

n2 The Court notes that as to Count I and Count II plaintiff is left with rescission claims under CCCDA, and as to Count III he is left with statutory damages claims under both TILA and CCCDA, to the extent the damages claims do not prove time-barred below.

- - - - - - - - - - - - End Footnotes- - - - - - - - - - - - - - -

C. Statute of Limitations [*7]

In Count III, plaintiff states a claim for damages under section 1640, or alternatively under CCCDA. See Complaint at PP 42-44; Amended Complaint at PP 44-46. [HN4]TILA contains a one-year statute of limitations for a damage claim, while the limitation period for CCCDA damages is four years. See 15 U.S.C. § 1640(e); Mass. Gen. Laws ch. 260 § 5A. Therefore, because the closing of the loan occurred on August 18, 1998, the loan was consummated well before the one-year period specified in the federal statute. See Complaint at P 14; Amended Complaint at P 14. As such, the federal damages remedy provided by section 1640 is clearly time barred and must be dismissed, leaving plaintiff with a state law damage claim under the four-year statute of limitations of CCCDA.

D. Jurisdiction

To recount, the Court is dismissing plaintiff's federal rescission claims as exempt from TILA and plaintiff's federal section 1640 damages claim as time-barred. The Court, however, notes that plaintiff is still left with state law claims under CCCDA. Accordingly, the Court must now consider whether it will retain jurisdiction over the remaining state law claims.

At the [*8] hearing on August 29, 2001, plaintiff's counsel conceded that diversity jurisdiction did not exist between the parties. See 28 U.S.C. § 1332. Thus, the Court is left to decide whether supplemental jurisdiction shall continue to be entertained upon the dismissal of the federal claims.

It is a fundamental principle that [HN5]"the power of a federal court to hear and to determine state-law claims in non-diversity cases depends upon the presence of at least one 'substantial' federal claim in the lawsuit." Newman v. Burgin. 930 F.2d 955, 963 (1st Cir. 1991) (citing United Mine Workers v. Gibbs, 383 U.S. 715, 726, 16 L. Ed. 2d 218, 86 S. Ct. 1130 (1966)). However, supplemental jurisdiction is discretionary when federal claims are dismissed early in the litigation, as "in a federal-question case, the termination of the foundational federal claim does not divest the district court of power to exercise supplemental jurisdiction but, rather, sets the stage for an exercise of the court's informed discretion." Roche v. John Hancock Mutual Life Ins. Co., 81 F.3d 249, 256-257 [*9] (1st Cir. 1996). See also 28 U.S.C. § 1367(c)(3) ("district court may decline to exercise supplemental jurisdiction if [federal claims are dismissed]").

As to the discretion of the district court, the First Circuit Court of Appeals has held that [HN6]"as a general principle, the unfavorable disposition of a plaintiff's federal claims at the early stages of a suit, before the commencement of trial, will trigger the dismissal without prejudice of any supplemental state-law claims." Rodriguez v. Doral Mortgage Corp., 57 F.3d 1168, 1177 (1st Cir. 1995). Likewise, "another factor to be weighed is the clarity of the law that governs a pendent claim, for a federal court may be wise to forego the exercise of supplemental jurisdiction when the state law that undergirds the nonfederal claim is of dubious scope and application." Id.

After weighing all the attendant circumstances in this case, most particularly noting the early stage of this litigation, the existence of some uncertainty in circumscribing the contours of CCCDA, and the uncertainty whether the Massachusetts Supreme Judicial Court, in construing CCCDA, will follow the lead of the federal courts construing TILA, this Court deems that the most appropriate [*10] disposition at this time is to dismiss plaintiff's state law claims without prejudice. Therefore, for the reasons set forth, the Court will allow both defendant's Motion to Dismiss the Complaint and Motion to Dismiss the Amended Complaint. However, given that plaintiff appears to have viable claims under state law, the CCCDA claims in Count I, Count II, and Count III shall be dismissed without prejudice.

III. CONCLUSION

For the foregoing reasons, defendant's Motion to Dismiss the Complaint and defendant's Motion to Dismiss the Amended Complaint are hereby ALLOWED. To the extent that Count I, Count II, and Count III set forth CCCDA claims, each is dismissed without prejudice as to being subsequently filed in the Massachusetts courts.

It is So Ordered.

Frank H. Freedman

Senior United States District Judge

309 B.R. 502; 2004 U.S. Dist. LEXIS 8148

In re REBECCA SUE MOURER and RONALD LEE MOURER, Debtors. REBECCA SUE MOURER and RONALD LEE MOURER, Plaintiffs-Appellees, v. EQUICREDIT CORPORATION OF AMERICA, Defendant-Appellant.

Case No. 1:03-CV-141

UNITED STATES DISTRICT COURT FOR THE WESTERN DISTRICT OF MICHIGAN, SOUTHERN DIVISION

309 B.R. 502; 2004 U.S. Dist. LEXIS 8148

March 31, 2004, Decided

**SUBSEQUENT HISTORY:** Adversary proceeding at, Costs and fees proceeding at, Motion denied by Mourer v. Equicredit Corp. of Am. (In re Mourer), 313 B.R. 701, 2004 Bankr. LEXIS 1267 (Bankr. W.D. Mich., Aug. 23, 2004)

**PRIOR HISTORY:** [**1] Bkrtcy Case No. SG 00-1-103, Adv. Pro. No. 01-88196. Mourer v. Equicredit Corp. of Am. (In re Mourer), 287 B.R. 889, 2003 Bankr. LEXIS 19 (Bankr. W.D. Mich., 2003)

**DISPOSITION:** Bankruptcy court AFFIRMED in part and REVERSED in part. Bankruptcy court's order VACATED and matter REMANDED for entry of new judgment.

## CASE SUMMARY

**PROCEDURAL POSTURE:** Defendant mortgagee sought review of an order from a bankruptcy court, which held that it violated the Home Ownership and Equity Protection Act (HOEPA) provisions of the Truth in Lending Act (TILA), 15 U.S.C.S. §§ 1601-1666I, in its home refinancing transaction with plaintiffs, Chapter 13 bankruptcy debtors. The debtors challenged an order holding that they were estopped from rescinding the transaction altogether.

**OVERVIEW:** The debtors commenced an adversary proceeding in the bankruptcy court, seeking to rescind a mortgage refinancing transaction because the mortgagee had charged excessive points and fees and failed to make certain required disclosures. The bankruptcy court awarded partial relief to the debtors, but held that they were estopped from rescinding the transaction altogether. On appeal, the court found that the bankruptcy court's holding that the yield spread premium (YSP) was a fee that was to be included in the calculation of the eight percent trigger of 26 C.F.R. § 226.32(a)(1)(ii) flew in the face of that very provision's express inclusion only of fees payable by the consumer at or before loan closing. There was no evidence that the debtors paid the YSP at or before loan closing. Although the bankruptcy court did not

expressly address the rebuttable presumption of 15 U.S.C.S. § 1635(c), the implicit finding that it had been adequately rebutted by the debtors' testimony was not clearly erroneous. Finally, the court found that, because the debtors did not exercise their right to rescind within three days after receipt of the disclosures, their right to rescind had clearly expired.

**OUTCOME:** The court affirmed the order of the bankruptcy court in part and reversed it in part. The order was vacated, and the matter was remanded to the bankruptcy court for the entry of a new judgment.

**CORE TERMS:** disclosure, notice, right to rescind, rescission, consumer, rescind, consummation, midnight, delivery, cancel, expiration date, finance charge, confirmation, refinancing, calculation, expire, premium, spread, Equity Protection Act, rebuttable presumption, adversary proceeding, secured creditor, remedial statute, required notice, notice of right, de novo review, plain meaning, home loan, acknowledgments, unambiguous

## LexisNexis(TM) Headnotes

*Civil Procedure > Appeals > Standards of Review > De Novo Review*

[HN1]Matters of law are subject to de novo review.

*Banking Law > Bank Activities > Consumer Protection > Truth in Lending*

[HN2]The Truth in Lending Act (TILA) is a remedial statute and should be construed liberally in favor of the consumer.

*Governments > Legislation > Interpretation*

[HN3]Although courts are obliged to construe a law so as to effectuate its purpose, this duty does not include license to ignore the law's clear and unambiguous terms or to refrain from enforcing them in accordance with their plain meaning.

*Governments > Legislation > Interpretation*

**15**

309 B.R. 502; 2004 U.S. Dist. LEXIS 8148

[HN4]When a law's meaning is plain and unambiguous on its face, the court's task to construe it is at an end.

*Banking Law > Bank Activities > Consumer Protection > Truth in Lending*

[HN5]The Truth in Lending Act (TILA) is a remedial statute. It is also highly technical. To impose requirements on lenders at odds with the plain meaning of the express terms of Regulation Z is simply not fair and is contrary to law.

*Civil Procedure > Appeals > Standards of Review > Clearly Erroneous Review*

[HN6]An appellate court may set aside a finding of fact only if it is clearly erroneous.

*Banking Law > Bank Activities > Consumer Protection > Truth in Lending*

[HN7]Under 12 C.F.R. § 226.23(a)(3), consumers have the right to rescind the transaction until midnight of the third business day following consummation, delivery of the required notice to rescind, or delivery of all material disclosures, whichever occurred last. Further, if the required notice or material disclosures are not delivered, the right to rescind shall expire three years after consummation.

*Banking Law > Bank Activities > Consumer Protection > Truth in Lending*

[HN8]12 C.F.R. § 226.23(b)(1)(v) provides that a notice of the right to rescind must clearly and conspicuously disclose the date the rescission period expires.

**COUNSEL:** Rebecca Sue Mourer, plaintiff, Pro se, Kent City, MI.

Ronald Lee Mourer, plaintiff, Pro se, Kent City, MI.

For EquiCredit Corporation of America, appellant: David G. Hagens, LEAD ATTORNEY, Dykema Gossett PLLC (Grand Rapids), Randall J. Groendyk, LEAD ATTORNEY, Varnum, Riddering, Schmidt & Hewlett, LLP (Grand Rapids), Grand Rapids, MI.

For EquiCredit Corporation of America, defendant: Randall J. Groendyk, LEAD ATTORNEY, Varnum, Riddering, Schmidt & Hewlett, LLP (Grand Rapids), Grand Rapids, MI.

For EquiCredit Corporation of America, Cascade Capital Funding, LLC, appellants: David G. Hagens, LEAD ATTORNEY, Dykema Gossett PLLC (Grand Rapids), Grand Rapids, MI.

For Cascade Capital Funding, LLC, defendant: Michael M. Malinowski, LEAD ATTORNEY, Michael M. Malinowski, P.L.C., Grand Rapids, MI.

For Rebecca Sue Mourer, Ronald Lee Mourer, appellees: Michael O. Nelson, LEAD ATTORNEY, Grand Rapids, MI.

Rebecca Sue Mourer, [**2] debtor, Pro se, Kent City, MI.

Ronald Lee Mourer, debtor, Pro se, Kent City, MI.

Dan Casamatta, interested party, Pro se, Grand Rapids, MI.

Brett N. Rodgers, interested party, Pro se, Grand Rapids, MI.

Daniel M. LaVille, interested party, Pro se, Grand Rapids, MI.

**JUDGES:** DAVID W. McKEAGUE, UNITED STATES DISTRICT JUDGE.

**OPINIONBY:** DAVID W. McKEAGUE

**OPINION: [\*503] MEMORANDUM OPINION**

This is an appeal from an order of the bankruptcy court in a Chapter 13 adversary proceeding. The bankruptcy court held that EquiCredit Corporation of America violated the Truth in Lending Act and the Home Ownership and Equity Protection Act in its refinancing of the debtors' home loan by failing to make required disclosures. The bankruptcy court awarded partial relief to the debtors, but held they were estopped from rescinding the transaction altogether. Having duly considered the parties' briefs and exhibits and having heard oral arguments of counsel, the Court concludes, for the reasons that follow, that the judgment of the bankruptcy court must be affirmed in part and reversed in part.

**[\*504] I**

In May 2000, debtors Rebecca Sue Mourer and Ronald Lee Mourer refinanced their home loan through the [**3] services of mortgage broker Cascade Capital Funding LLC ("Cascade"). The total amount of the loan, from mortgagee EquiCredit Corporation of America ("EquiCredit"), was $ 58,228.00. The Mourers were able to pay off their car loan, a previous mortgage and delinquent taxes, and received cash in the amount of $ 5,006.01. At the closing, on May 5, 2000, the Mourers learned that the interest rate on the loan was 13.3729%, rather than the 10.75% rate that had initially been estimated. In addition, the Mourers were required to pay points and fees in connection with

309 B.R. 502; 2004 U.S. Dist. LEXIS 8148

the loan, including a broker fee of $ 3,500, a processing and underwriting fee of $ 370, and a "yield spread premium" of $ 1,248. The yield spread premium was actually paid by EquiCredit to Cascade and recouped by EquiCredit from the Mourers through a higher interest rate on the loan. The Mourers recognized that they could have refused to consummate the transaction at this point, but were anxious to pay off their pre-existing debts.

On December 20, 2000, the Mourers petitioned for Chapter 13 bankruptcy relief and listed EquiCredit as a secured creditor for an outstanding indebtedness of $ 60,000. The Mourers submitted a proposed [**4] plan, which was confirmed on February 28, 2001. The plan treated EquiCredit as a secured creditor and provided that EquiCredit would receive monthly payments of $ 661.13, to commence on February 1,2001. On May 8, 2001, the Mourers commenced an adversary proceeding in the bankruptcy court, seeking to rescind the refinancing transaction because EquiCredit had charged excessive points and fees and failed to make certain required disclosures, in violation of the Home Ownership and Equity Protection Act ("HOEPA") provisions of the Truth in Lending Act ("TILA"), 15 U.S.C. §§ 1601-1666i, as implemented by Regulation Z, 12 C.F.R. Pt. 226.

The bankruptcy court found partly in their favor, concluding that the yield spread premium ("YSP") was, under 12 C.F.R. § 226.4(a), a "finance charge" paid indirectly by the Mourers incident to the extension of credit. As such, the YSP was deemed to be among the total "points and fees" payable by the Mourers at or before the loan closing, under 12 C.F.R. § 226.32(a)(1). Because the addition of the YSP to the calculation resulted in total points and fees exceeding 8% of the total loan [**5] amount, the Regulation Z disclosure requirements were deemed triggered. The bankruptcy court found that these requirements had not been met. The Court also found that EquiCredit had failed to provide required disclosures to the Mourers in a form they could keep, in violation of 12 C.F.R. § 226.17. The bankruptcy court awarded the Mourers damages under 15 U.S.C. § 1640. The court denied the Mourers' request to rescind the transaction, however, holding that such relief was barred by the prior confirmation of their Chapter 13 plan.

On appeal, EquiCredit insists the YSP is not a finance charge paid directly by the borrowers and that the bankruptcy court's ruling is contrary to law. In addition, EquiCredit maintains that all disclosures required under TILA were in fact made. In their cross-appeal, the Mourers contend the bankruptcy court erroneously denied them their right to rescind.

**II**

There being no disputed question of fact concerning the proper treatment of the YSP under HOEPA and its implementing regulations, the bankruptcy court's ruling [*505] in this regard is a [HN1]matter of law subject to de novo review. In re Charfoos. 979 F.2d 390, 392 (6th Cir. 1992). [**6]

In holding that the YSP of $ 1,248 paid by EquiCredit to Cascade, and ultimately to be paid by the Mourers to EquiCredit over the course of the loan (in the form of a 1.1%-enhanced interest rate on the borrowed principal) was a "fee payable by the consumer at or before the loan closing" under 12 C.F.R. § 226.32(a)(1)(ii), the bankruptcy court concededly overlooked the "letter of the law" in order to enforce the "spirit of the law." The court properly observed that [HN2]TILA is a remedial statute and should be construed liberally in favor of the consumer. Pfennig v. Household Credit Services, Inc.. 286 F.3d 340, 344 (6th Cir. 2002). The court also properly concluded that the YSP is a finance charge or fee that is indirectly paid by the Mourers. It is also true that the purpose of TILA, to assure meaningful disclosure of creditterms to consumers, see id., would arguably be better served by requiring full disclosure of the YSP.

Yet, [HN3]although the courts are obliged to construe the law so as to effectuate its purpose, this duty does not include license to ignore the law's clear and unambiguous terms or to refrain from enforcing them in accordance [**7] with their plain meaning. See United States v. Miami University. 294 F.3d 797, 812 (6th Cir. 2002)(observing that [HN4]when a law's meaning is plain and unambiguous on its face, the court's task to construe it is at an end). The bankruptcy court's holding that the YSP is a fee that must be included in the calculation of the 8% trigger of 12 C.F.R. § 226.32(a)(1)(ii) flies in the face of that very provision's express inclusion only of "fees payable by the consumer at or before loan closing." There is no evidence or even contention that the Mourers paid the YSP at or before loan closing. The YSP was paid by EquiCredit to Cascade at the time of closing, but to the extent this obligation was payable by the Mourers, it was payable in the form of a higher interest rate, not at or before the closing, but over the course of the loan. It necessarily follows that the YSP is not properly included in the calculation of the 8% trigger. The bankruptcy court's contrary conclusion is not supported by any case law authority. Nor have the Mourers identified any.

[HN5]TILA is a remedial statute. It is also highly technical. Pfennig. 286 F.3d at 344. [**8] To impose requirements on lenders at odds with the plain meaning of the express terms of Regulation Z is simply not fair

and is contrary to law. Accordingly, the bankruptcy court's ruling is in this respect overturned.

## III

EquiCredit also takes issue with the bankruptcy court's holding that it did not comply with the disclosure requirements of 12 C.F.R. § 226.17(a) and (b), i.e., to make the required disclosures, in writing, in a form that the consumer may keep, before consummation of the transaction. EquiCredit points to acknowledgments signed by Rebecca Mourer, attesting to her receipt of the required disclosures at the time of closing. These acknowledgments give rise to a rebuttable presumption of delivery of the disclosures. 15 U.S.C. § 1635(c). In accepting the Mourers' testimony that they did not, in fact, receive copies of the documents to keep at the time of the closing, the bankruptcy court is said to have improperly ignored this statutory presumption.

The bankruptcy court's determination that the Mourers were not provided the disclosures in a form they could keep at the time of closing is [HN6]a finding of fact which this [**9] Court may set aside only if clearly erroneous. Charfoos, 979 F.2d at [*506] 392. The bankruptcy court heard the testimony of Rebecca Mourer and Ronald Mourer, both of whom testified that they hurriedly signed many documents without reading them. Both testified unequivocally that they were not given copies of documents to keep at the time of the closing. Rebecca Mourer further testified to the extreme difficulties she experienced in trying to obtain copies, beginning the first business day after the closing and continuing for approximately two months.

The Mourers' testimony is essentially undisputed. The bankruptcy court had the opportunity to observe their demeanor and assess their credibility. Although the bankruptcy court did not expressly address the rebuttable presumption of 15 U.S.C. § 1635(c), the implicit finding that it had been adequately rebutted by the Mourers' testimony cannot be said to be clearly erroneous. See Stone v. Mehlberg, 728 F. Supp. 1341, 1353-54 (W.D. Mich. 1989)(holding presumption adequately rebutted by borrowers' incontroverted affidavits). On this point, the ruling of the bankruptcy court must be affirmed. [**10]

## IV

In their cross-appeal, the Mourers maintain that rescission is an available remedy notwithstanding the Court's conclusion, above, that the HOEPA protections were not triggered by this refinancing transaction. They contend their right of rescission pursuant to 12 C.F.R. § 226.23 was extended by virtue of the creditor's failure to give proper notice of the right to rescind and that the bankruptcy court erroneously applied estoppel by confirmation to deny this remedy.

This claim of error presents a question of law subject to *de novo* review.

Under 12 C.F.R. § 226.23(a)(3), [HN7]the Mourers had the right to rescind the transaction until midnight of the third business day following consummation, delivery of the required notice to rescind, or delivery of all material disclosures, whichever occurred last. Further, "if the required notice or material disclosures are not delivered, the right to rescind shall expire three years after consummation." *Id.* Applying this language, the bankruptcy court summarily determined that because the material disclosures were not delivered to the Mourers within three days after consummation, their [**11] right to rescind was extended for three years.

The bankruptcy court's reasoning is flawed in that it ignores the undisputed fact that the material disclosures, including notice of the right to rescind, *were* delivered to the Mourers, albeit several weeks after the closing. Hence, under 12 C.F.R. § 226.23(a)(3), their right to rescind was extended until midnight of the third business day following delivery of the disclosures and notice. The three-year extension (or limitation) would have come into play only if the disclosures were not delivered to the Mourers. It being undisputed that the Mourers did not exercise their right to rescind within three days after receipt of the disclosures, the right had clearly expired.

Anticipating this analysis, the Mourers now argue that the notice of right to rescind which they did receive did not conform to the requirements of 12 C.F.R. § 226.23(b) and was therefore not valid. Among other things, [HN8]the notice must clearly and conspicuously disclose "the date the rescission period expires." 12 C.F.R. § 226.23(b)(1)(v). The notice they finally received provides in relevant [**12] part:You have the legal right under federal law to cancel this transaction, without cost, within three business days from whichever of the following events occurs last:

[*507] 1) the date of the transaction, which is May 5, 2000; or

2) the date you received your Truth in Lending disclosures; or

3) the date you received this notice of your right to cancel.

...

If you decide to cancel this transaction, you may do so by notifying us in writing, at ...

309 B.R. 502; 2004 U.S. Dist. LEXIS 8148

You may use any written statement that is signed and dated by you and states your intention to cancel, and/or you may use this notice by dating and signing below.
...

If you cancel by mail or telegram, you must send the notice no later than midnight of May 9, 2000 (date)(or midnight of the third business day following the latest of the three events listed above).

The Mourers contend this notice is inadequate because it does not specify "the date" the rescission period expires. In support, the Mourers cite *Semar v. Platte Valley Federal Savings & Loan Ass'n, 791 F.2d 699, 704 (9th Cir. 1986)*(holding typographical error, omitting expiration date from notice, is technical [**13] violation of TILA notice requirements), and *Reynolds v. D&N Bank, 792 F. Supp. 1035, 1037-38 (E.D. Mich. 1992)*(holding notice deficient in several respects, one of which was omission of expiration date).

Here, in contrast to the cited cases, the notice expiration date blank is filled in, and accurately so. In fact, the notice conforms precisely to the model form provided at 12 C.F.R. Pt. 226, Appendix H, specifically identified at 12 C.F.R. § 226.23(b)(2) as satisfying the disclosure requirements of § 226.23(b)(1). The notice of right to rescind received by the Mourers was therefore proper in all respects. It follows that their right to rescind expired three days after they received the required disclosures and notice, and long before they attempted to exercise the right.

Accordingly, the Court concurs with the bankruptcy's determination that rescission is unavailable to the Mourers, although it is unnecessary to take up the question of estoppel by confirmation to reach this result.

**V**

In sum, the ruling of the bankruptcy court is **AFFIRMED** in part and **REVERSED** in part. The bankruptcy court's January 10, 2003 order will [**14] be **VACATED** and the matter will therefore be **REMANDED** to the bankruptcy court for the entry of a new judgment order consistent with this opinion and awarding appropriate relief to the Mourers based exclusively on the violation of the 12 C.F.R. § 226.17 disclosure requirements. An order consistent with this opinion shall issue forthwith.

Dated: March 31, 2004

/s/ David W. McKeague

UNITED STATES DISTRICT JUDGE