175 B.R. 122; 1994 Bankr. LEXIS 1876

In Re: SUZANNE MYERS, Debtor; SUZANNE MYERS, Plaintiff vs. FEDERAL HOME LOAN MORTGAGE CO., AMERICA'S MORTGAGE SERVICING, INC. n1 and CENTURY MORTGAGE CO., INC., Defendants

n1 On October 3, 1994, summary judgment was granted in favor of America's Mortgage Servicing, Inc. ("AMSI") It is not further involved in these proceedings.

No. 92-22754, Chapter 13, Adversary Proc. No. 93-1487

UNITED STATES BANKRUPTCY COURT FOR THE DISTRICT OF MASSACHUSETTS

175 B.R. 122; 1994 Bankr. LEXIS 1876

November 22, 1994, Filed
November 22, 1994, Decided

## CASE SUMMARY

**PROCEDURAL POSTURE:** Plaintiff debtor sought relief against defendant creditor for violation of the Consumer Credit Cost Disclosure Act (CCCDA), Mass. Gen. Laws, ch. 140D et seq. for failure to provide a disclosure statement. The creditor sought summary judgment or dismissal for failure to state a claim upon which relief could be granted. The debtor contested the motion.

**OVERVIEW:** The creditor alleged that the case was barred by the statute of limitations. The court rejected this argument because the four year statute of limitations of the CCCDA, Mass. Gen. Laws ch. 140D, § 10(f), applied to this action, which was commenced within this time period. The court also rejected the creditor's claim that it was not liable as an assignee. The court held that the statutory requirement of a facial violation did not affect an action against an assignee by a party who had the right to rescind a transaction under the CCCDA. The debtor alleged that she gave a timely notice of rescission under § 10 of the CCCDA. However, the creditor contended that, as a Chapter 7 bankruptcy debtor, the debtor could not tender return of the sums that were advanced, as required by law, and, thus, could not fulfill this condition precedent to recovery. The court rejected this argument because it ignored the final sentence of § 10(b) of the CCCDA that granted the court the power to exempt transactions from its provisions. The court held that rescission by an obligor was not conditioned by tender or payment in the context of a bankruptcy case, and thus, the debtor had alleged a valid claim.

**OUTCOME:** The court denied the creditor's motion for summary judgment or to dismiss the debtor's action.

**CORE TERMS:** rescission, assignee, disclosure, obligor, consumer, summary judgment, statute of limitations, right to rescind, facially, notice, federally, chartered, disclosure statement, regulation, exemption, repayment, exempt, consumer credit, motion to dismiss, consummation, conditioned, effective, expired, expire, Disclosure Act, Lending Act, specifically provided, limitation period, security interest, legal impediment

## LexisNexis(TM) Headnotes

*Civil Procedure > Summary Judgment > Summary Judgment Standard*

[HN1]Fed. R. Civ. P. 56 provides that the judgment sought shall be rendered forthwith if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law.

*Civil Procedure > Pleading & Practice > Defenses, Objections & Demurrers > Failure to State a Cause of Action*

[HN2]A motion to dismiss under F. R. Civ. P. 12(b)(6) that attacks the legal sufficiency of the claim made and presents no factual assertions should not be granted unless it clearly appears, according to the facts alleged, that the plaintiff cannot recover on any viable theory.

*Banking Law > Bank Activities > Consumer Protection > Truth in Lending*

[HN3]An obligor's right of rescission shall expire three years after the date of consummation of the transaction or upon the sale of the property, whichever occurs first under 15 U.S.C.S. § 1635(f).

*Banking Law > Bank Activities > Consumer Protection > Truth in Lending*

[HN4]Credit transactions subject to the Massachusetts Truth in Lending Act are exempt from chapters two and four of the federal Truth in Lending Act. The

Case 1:04-cv-11954-RCL    Document 13-5    Filed 03/24/2005    Page 2 of 43

175 B.R. 122; 1994 Bankr. LEXIS 1876

exemption does not apply to transactions in which a federally chartered institution is a creditor.

*Banking Law > Bank Activities > Consumer Protection > Truth in Lending*

[HN5]A Truth in Lending Act creditor must fall within the statutory definition, which provides that the term "creditor" refers only to a person who both (1) regularly extends consumer credit and (2) is the person to whom the debt arising from the consumer credit transaction is initially payable on the face of the evidence of indebtedness. 5 U.S.C.S. § 1602(f).

*Banking Law > Bank Activities > Consumer Protection > Truth in Lending*

[HN6]Section § 33(c) of the Consumer Credit Cost Disclosure Act, Mass. Gen. Laws ch. 140D, § 33(c), provides that any consumer who has the right to rescind a transaction under § 10 may rescind the transaction as against an assignee of the obligation.

*Banking Law > Bank Activities > Consumer Protection > Truth in Lending*

[HN7]Mass. Gen. Laws ch. 260, § 5A. provides that, in actions under the Consumer Credit Cost Disclosure Act, whether for damages, penalties or other relief and brought by any person, shall be commenced only within four years next after the cause of action accrues.

*Banking Law > Bank Activities > Consumer Protection > Truth in Lending*

[HN8]Section 33(a) of the Consumer Credit Cost Disclosure Act, Mass. Gen. Laws ch. 140D, § 33(a), provides that, except as otherwise specifically provided in this chapter, or any rule or regulation issued thereunder, any civil action for a violation of this chapter or any rule or regulation that may be brought against a creditor may be maintained against any assignee of such creditor only if the violation for which such action or proceeding is brought is apparent on the face of the disclosure statement, except where the assignment was involuntary.

*Banking Law > Bank Activities > Consumer Protection > Truth in Lending*

[HN9]The facial violation requirement does not affect an action against an assignee by one who has the right to rescind a transaction under § 10 of the Consumer Credit Cost Disclosure Act, Mass. Gen. Laws ch. 140D, § 10.

*Banking Law > Bank Activities > Consumer Protection > Truth in Lending*

[HN10]The giving of a timely notice of rescission triggers two events under § 10(b) of the Consumer Credit Cost Disclosure Act, Mass. Gen. Laws ch.

140D, § 10(b): (1) Within 20 days after receipt of a notice of rescission, the creditor shall return to the obligor any money or property given as earnest money, down payment, or otherwise, and shall take any action necessary or appropriate to reflect the termination of any security interest created under the transaction; and (2) If the creditor has delivered any property to the obligor, the obligor may retain possession of it. Upon the performance of the creditor's obligations under this section, the obligor shall tender the property to the creditor.

*Banking Law > Bank Activities > Consumer Protection > Truth in Lending*

[HN11]Rescission by an obligor under the Truth in Lending Act is not conditioned by tender or payment in the context of a bankruptcy case.

COUNSEL: [**1] Gary Klein, National Consumer Law Center, Boston, MA.

Bernadette Sullivan, Greater Boston Legal Services, Dorchester, MA., for Suzanne Myers.

Bradley W. Snyder, David Yanofsky, Looney & Grossman, Boston, MA., for Federal Home Loan Mortgage Co.

JUDGES: William C. Hillman, United States Bankruptcy Judge

OPINIONBY: William C. Hillman

OPINION: [*124]

DECISION ON MOTION FOR SUMMARY JUDGMENT

Suzanne Myers ("Myers") filed her original petition in this case under Chapter 7 on December 18, 1992. On April 27, 1993, the case was converted to one under Chapter 13.

In this adversary proceeding, filed June 20, 1993, she seeks relief against the Federal Home Loan Mortgage Co. (commonly, and herein, called "Freddie Mac") and Century Mortgage Co., Inc. ("Century") (collectively the "defendants"). The bases of the claims made are violations of the Consumer Credit Cost Disclosure Act, M.G.L. c. 140D ("CCCDA") and the Consumer Protection Act, M.G.L. c. 93A ("93A"), in connection with a mortgage loan which she obtained from Century.

In particular, she charges:

*Count I:* Failure to provide a disclosure statement in conformity to CCCDA, giving rise to a right to rescind, $ 2,000 in damages plus attorneys' fees and costs.

Case 1:04-cv-11954-RCL    Document 13-5    Filed 03/24/2005    Page 3 of 43

175 B.R. 122; 1994 Bankr. LEXIS 1876

*Count* **[\*\*2]** *II:* Violation of 93A arising from the same facts as Count I.

*Count III:* The filed proof of claim is excessive. n2

- - - - - - - - - - - - - - Footnotes - - - - - - - - - -
- - - - - -

n2 The claim was filed by AMSI but, by an agreed order of October 3, 1994, it was amended to substitute Freddie Mac as the claimant.

- - - - - - - - - - - - End Footnotes- - - - - - -
- - - - - -

Freddie Mac has moved for summary judgment alleging that:

1. This action is barred by the three year statute of limitations of the Federal Consumer Cost Disclosure Act, commonly called the Truth in Lending Act ("TILA").

2. If CCCDA does apply, Freddie Mac is an "assignee," not a "creditor" within the meaning of CCCDA.

3. As an assignee, Freddie Mac's liability is limited to cases involving facially defective disclosure statements.

4. Myers cannot demonstrate a facially apparent defect in the disclosure statement.

Summary Judgment Motions

Fed. R. Civ. P. 56, made applicable to adversary proceedings by Fed. R. Bankr. P. 7056, governs motions for summary judgment. It provides that "[HN1]The judgment sought shall be rendered forthwith if the pleadings, depositions, **[\*\*3]** answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law."

The present motion is more akin to [HN2]a motion to dismiss under F. R. Civ. P. 12(b)(6), as it attacks the legal sufficiency of the claim made and no factual assertions are involved. Such a motion should not be granted unless "it clearly appears, according to the facts alleged, that the plaintiff cannot recover on any viable theory." *Garita Hotel Limited Partnership v. Ponce Federal Bank, 958 F.2d 15, 17 (1st Cir. 1992).*

The applicable statute of limitations

Freddie Mac's first argument is that demand in this case was not made until December 18, 1992, more than three years after the loan closing at which the alleged **[\*125]** violations occurred. As a result, it says, the claim is outside of the three year limitation period of TILA. n3 Plaintiff agrees as to the operative date but counters by urging that the applicable law is the Massachusetts CCCDA's four year period. M.G.L. c. 140D, § 10(f).

- - - - - - - - - - - - - Footnotes - - - - - - - - -
- - - - - -

n3 "[HN3]An obligor's right of rescission shall expire three years after the date of consummation of the transaction or upon the sale of the property, whichever occurs first...." 15 U.S.C. § 1635(f). There is no contention that the property has ever been sold.

- - - - - - - - - - - End Footnotes- - - - - - -
- - - - - -

**[\*\*4]**

TILA is a comprehensive statute designed "to assure a meaningful disclosure of credit terms so that the consumer will be able to compare more readily the various credit terms available to him and void the uniformed use of credit..." 15 U.S.C. § 1601(a).It provides two types of remedies for violation of its provisions. A right of rescission is created by 15 U.S.C. § 1635. That right, as relevant here, "shall expire three years after the date of consummation of the transaction...." 15 U.S.C. § 1635(f).

The same section provides that "In any action in which it is determined that a creditor has violated this section, in addition to rescission the court may award relief under section 1640 of this title for violations of this subchapter not relating to the right to rescind." 15 U.S.C. § 1635(g).

Thus, if a § 1635 right of rescission is found to exist, it is possible to look beyond that conclusion for violations condemned by § 1640. As relevant here, the last cited section provides that

"any creditor who fails to comply **[\*\*5]** with any requirement imposed under this part, n4 including any requirement under section 1635 ... with respect to any person is liable to such person in an amount equal to the sum of--(1) any actual damage sustained by such person as a result of the failure;

(2)(A) (i) in the case of an individual action twice the amount of any finance charge in connection with the transaction ..., except that the liability under this

subparagraph shall not be less than $ 100 nor greater than $ 1,000; or

(B) ...; and

(3) in the case of any successful action to enforce the foregoing liability or in any action in which a person is determined to have a right of rescission under section 1635 of this title, the costs of the action, together with a reasonable attorney's fee as determined by the court." 15 U.S.C. § 1640(a) (footnote added).

- - - - - - - - - - - - - - Footnotes - - - - - - - - - - - - - - - -

n4 The "part" referred to is Part B - Credit Transactions, which comprises §§ 1631-1646.

- - - - - - - - - - - End Footnotes- - - - - - - - - - - - -

This section has its own statute of limitations. The action [**6] must be brought "within one year from the date of the occurrence of the violation." 15 U.S.C. § 1640(e).

Since it has been agreed that the operative date for Myers' action was more than three years from the date of the violation, both portions of the claim for relief, rescission and damages, would be barred if the Federal statute is applicable.

However, Congress left the door open for states to create their own truth-in-lending acts, so long as the disclosures required were substantially the same as those of TILA. The Federal Reserve Board (the "Board") is given the option to determine whether a particular state's laws require disclosures "substantially the same in meaning as a disclosure required by this subchapter." n5 15 U.S.C. § 1610(a)(2). In so doing,"The Board shall by regulation exempt from the requirements of this part any class of credit transactions within any State if it determines that under the law of that State that class of transactions is subject to requirements substantially similar to those imposed under this part, and that there is adequate provision for enforcement."15 U.S.C. § 1633. [**7]

- - - - - - - - - - - - - - Footnotes - - - - - - - - - - - - - - - -

n5 The "subchapter" is Subchapter I, which includes §§ 1601-1667e.

- - - - - - - - - - - End Footnotes- - - - - - - - - - - - -

The Board has ruled that

[HN4]
"Credit transactions subject to the Massachusetts Truth in Lending Act are exempt from chapters 2 and 4 of the Federal act. [*126] (The exemption does not apply to transactions in which a federally chartered institution is a creditor.)"

48 Fed. Reg. 14882, 14890 (April 6, 1983). n6

- - - - - - - - - - - - - - Footnotes - - - - - - - - - - - - - - - -

n6 Chapters 2 and 4 are Parts B and D of TILA.

- - - - - - - - - - - End Footnotes- - - - - - - - - - - - -

The defendants urge that Massachusetts law is inapplicable in the present case because Freddie Mac is a federally chartered institution and is a creditor. Resolution of that argument requires answers to two sub-questions, to wit:

1. Is Freddie Mac a federally chartered institution?

The Federal Home Loan Mortgage Corporation was created by Chapter 11A of Title 12 of the United States Code. See 12 U.S.C. § 1451 [**8] (b). It is a federally chartered institution. The cases which Freddie Mac cites, while apposite, are no substitute for the statutory citation which was not provided.

2. Is Freddie Mac a "creditor" within the meaning of TILA?

As relevant to the facts of this case, [HN5]a TILA "creditor" must fall within the statutory definition:"The term 'creditor' refers only to a person who both (1) regularly extends ... consumer credit ... and (2) is the person to whom the debt arising from the consumer credit transaction is initially payable on the face of the evidence of indebtedness...."15 U.S.C. § 1602(f) (emphasis added).

It is Century, not Freddie Mac, whose name appears on the face of the note. Freddie Mac is not a "creditor" within the definition. As a result, it is not excepted from the exemption. The Massachusetts four year statute of limitations will control.

Freddie Mac contends that "the longer [Massachusetts] limitation period is explicitly preempted by Federal Law" without any citation of authority. I have been unable to determine the basis of that claim, which is contrary to my reading of the statute.

Is Freddie Mac liable    [**9] under Massachusetts law?

175 B.R. 122; 1994 Bankr. LEXIS 1876

Liability as assignee

Assuming that Massachusetts law is applicable, Freddie Mac contends that it is not a "creditor" within the meaning of the CCCDA, but is an "assignee" under that statute. As a result, it argues, it is not liable for a rescission remedy since that relief lies only against a creditor. As noted above, the CCCDA and TILA definitions of "creditor" are the same. Freddie Mac is not a creditor under the former statute, for the reasons stated in the TILA analysis above, but that does not resolve the present issue. Freddie Mac's argument ignores the specific language of [HN6]CCCDA § 33(c):"Any consumer who has the right to rescind a transaction under section ten may rescind the transaction as against an assignee of the obligation." n7

- - - - - - - - - - - - - - Footnotes - - - - - - - - -
- - - - - -

n7 This language is substantively identical to TILA § 1641(c).

- - - - - - - - - - - - End Footnotes- - - - - - - -
- - - - - -

Myers alleges a right to rescind under § 10. Accordingly, Freddie Mac's argument seeking summary judgment as to the claim for rescission because it is not a creditor is not well [**10] founded. It is liable as an assignee.

Liability for monetary damages

Myers has also demanded monetary damages and attorneys' fees.

While the Board has ruled that Massachusetts creditors are exempt from TILA, as quoted above, it has also determined that the exemption does not extend to § 1640 (or § 1641 discussed below). This, it is said,

"assures that consumers retain access to both federal and state courts in seeking damages or civil penalties for violations, while creditors retain the defenses specified in those sections."

48 Fed. Reg. 14882, 14890 (April 6, 1983).

Since the internal statute of limitations of § 1635, quoted above, has expired, no remedies are available to Myers under it. The absence of a rescission remedy eliminates the referral over to § 1635(g). The direct damages claim under § 1640 has a one year [*127] limitations period, 15 U.S.C. § 1640(e), which has also expired.

If Myers is to have a damages remedy, it must be found in CCCDA.

The Massachusetts statute contains a precise parallel to TILA § 1635(g):"In any action in which it is determined that a creditor has violated this section, in [**11] addition to rescission the court may award relief under section thirty-two not relating to the right to rescind."M.G.L. c. 140D § 10(g).

It is in the referenced section that the Federal and Massachusetts statutes have a significant difference.

TILA contains, as noted, a specific one year statute of limitations. 15 U.S.C. § 1640(e). No such provision is contained in CCCDA.

The Supreme Judicial Court had considered the parallel provision of the earlier Massachusetts statute, M.G.L. c. 140C, which was repealed by Mass. St. 1981, c. 733, § 1. It held that recoveries under that statute were penalties to which the one year statute of limitations of M.G.L. c. 260 § 5 would apply. Lynch v. Signal Finance Co., 367 Mass. 503, 506, 327 N.E.2d 732 (1975). Within months, the General Court added a new section to the provisions on limitation of actions to provide [HN7]that actions under CCCDA"whether for damages, penalties or other relief and brought by any person ... shall be commenced only within four years next after the cause of action accrues."M.G.L. c. 260 § 5A. n8

- - - - - - - - - - - - - - Footnotes - - - - - - - - -
- - - - - -

n8 The statute originally referred to C. 140C. The reference was changed when C. 140D was adopted. Mass. St. 1982, c. 332., § 11.

- - - - - - - - - - - - End Footnotes- - - - - - - -
- - - - - -

[**12]

The damages and fee claims are not barred by the statute of limitations.

"Facially defective" disclosure statements

Freddie Mac next contends that it, as an assignee, is not liable because of the following language of [HN8]CCCDA § 33(a):"Except as otherwise specifically provided in this chapter, or any rule or regulation issued thereunder, any civil action for a violation of this chapter or any rule or regulation ... which may be brought against a creditor may be maintained against any assignee of such creditor *only if the violation for which such action or proceeding is brought is apparent on the face of the disclosure statement, except where the assignment was involuntary."*(Emphasis by Freddie Mac).

Case 1:04-cv-11954-RCL    Document 13-5    Filed 03/24/2005    Page 6 of 43

175 B.R. 122; 1994 Bankr. LEXIS 1876

Freddie Mac neglects to emphasize the first words of the sentence: *"Except as otherwise specifically provided in this chapter"*. To find a specific exception it need only look to subsection (c) of the same section, quoted above.

But Freddie Mac argues that since subsection (c) "does not address the requirement of a violation on the face of a disclosure statement" it is not intended to override the "facially defective" provision of subsection (a).

The suggested reading [**13] does violence to the statute. If subsection (c) did not exist, the situation would be exactly that proposed by Freddie Mac - there could be no action against an assignee for any violation unless it was facially apparent. We must assume that Congress and the General Court intended to accomplish something when subsection (c) was adopted. It can have only one purpose - to reverse the liability rule of subsection (a) for assignees when the violation is a failure to give disclosures, which is the ground upon which one may seek rescission. *See Hunter v. Richmond Equity,* 1987 WL 10973 (N.D. Ala. 1987) (§ 1641(c) provides a right to rescind exercisable against assignee whether or not violation is apparent); S. Rep. 96-368 § 516 (Sub-section (c) eliminates ambiguity; consumer's exercise of right effective against assignee because otherwise no effective rescission remedy exists).

Looking at the federal policy and the realities of the secondary market for consumer paper, the distinction makes sense. If assignees could be bound by deficiencies in the instruments purchased what were not apparent on the face of the documents, the flow of those documents in commerce would be impeded. [*128] However, [**14] when the TILA/CCCDA violation is a failure to give disclosures, an assignee is on instant notice when it does not receive a copy of the appropriate disclosures with the loan documents. It can protect itself easily and without undue delay.

I hold that [HN9]the facial violation requirement does not affect an action against an assignee by one who has the right to rescind a transaction under CCCDA § 10.

Is tender necessary for rescission?

Myers alleges the giving of a timely notice of rescission under CCCDA § 10(a). [HN10]Giving of the notice triggers two events, both specified in CCCDA § 10(b):[1] "Within twenty days after receipt of a notice of rescission, the creditor shall return to the obligor any money or property given as earnest money, down payment, or otherwise, and shall take any action necessary or appropriate to reflect the termination of any security interest created under the transaction."

[2] "If the creditor has delivered any property to the obligor, the obligor may retain possession of it. Upon the performance of the creditor's obligations under this section, the obligor shall tender the property to the creditor...."

Freddie Mac contends that Myers, as a Chapter 7 debtor, [**15] cannot tender return of the sums advanced as required by law and hence cannot fulfill a condition precedent to recovery. In so doing, it ignores the final sentence of § 10(b):"The procedures prescribed by this subsection shall apply except when otherwise ordered by a court."

The power of a court under the last quoted provision has been subject to varying judicial interpretations. I will limit my discussion to cases where the person seeking rescission has claimed the protection of the Bankruptcy Code.

In what appears to be the only reported decision in this Circuit, the obligor seeking rescission had filed his petition under Chapter 7. Judge Carter held that the power to "otherwise order" permitted him to change the order of the steps set out in TILA § 1635(b), or its identical counterpart in the Maine statute. He conditioned rescission of the loan upon repayment of the loan proceeds to the lender, dismissing the cases permitting rescission without repayment as unpersuasive. *New Maine National Bank v. Gendron,* 780 F. Supp. 52, 57 (D. Me. 1991).

I respectfully disagree with that conclusion. I find the opposite view more compelling. n9

- - - - - - - - - - - - - - Footnotes - - - - - - - - - - - - - - - - -

n9 I have also considered and disagreed with other decisions, such as *In re Foster,* 105 Bankr. 67 (Bankr. N.D. Okla. 1989).

- - - - - - - - - - - - End Footnotes- - - - - - - - - - - - - -

[**16]

As Judge Hutton stated in *Celona v. Equitable National Bank:*

"Judicial preconditioning of cancellation of the creditor's lien on the customer's tender is inappropriate in bankruptcy cases."

98 Bankr. 705, 707 (E.D. Pa. 1989).

He found that the bankruptcy court had been correct when it ordered the voiding of the creditor's security interest without tender of repayment, with the amount due being treated as an unsecured debt.

The difference between cases where the obligor is the subject of bankruptcy proceedings and otherwise is well stated by Judge Deitz:"In a non-bankruptcy setting, the rights and duties of the parties upon TIL rescission are clear and absolute. Each party must make the other as whole as he would have been had the contract never been entered into. In the absence of bankruptcy, there is no legal impediment to either party doing what is required to restore the status quo ante. Consequently, the creditor's statutory duty to perform first merely establishes the order of performance; it does not alter the ultimate effect on the remedy.

"Bankruptcy, however, relieves the debtor from his obligation to pay the creditor upon rescission. [**17] Conditioning rescission upon the debtor's payment therefore imposes an obligation from which the debtor has been legally freed. Unlike the situation [*129] absent bankruptcy, there is a legitimate, legal impediment to the debtor's reciprocal performance. It would be palpably unfair to deny the relief to which a consumer is entitled under TIL because that consumer has also availed himself of bankruptcy relief. To do so would require that the consumer choose between bankruptcy and TIL, something neither form of statutory relief contemplates.

"The equities ... lie in the debtor's favor. Upholding the creditor's plea ... would allow the creditor to escape the consequences of a serious TIL violation, while at the same time negating the fresh start given the debtors upon their discharge."

_In re Piercy,_ 18 Bankr. 1004, 1007-1008 (Bankr. W.D. Ky 1982). See also _In re Chancy,_ 33 Bankr. 355, 356-357 (Bankr. N.D. Okla. 1983).

I hold that [HN11]rescission by an obligor is not conditioned by tender or payment in the context of a bankruptcy case.

The 93A claims

A violation of CCCDA is a violation of Ch. 93A. CCCDA § 34. Having held that, [**18] as a legal matter, Myers has alleged a valid claim under CCCDA she has also alleged a claim under Ch. 93A.

Freddie Mac's assertions with regard to the Ch. 93A claims not previously discussed need little attention. If notice was required under the circumstances of this case, the allegations of the complaint, if established, would demonstrate that notice was adequately given.

Conclusion

In the context of the legal principles enunciated above, and my conclusions as to the applicable law, I find that Freddie Mac has not satisfied its burden of proof, either as a motion for summary judgment or as a motion to dismiss.

The motion is denied. A separate order will enter. A pre-trial conference will be scheduled in ordinary course.

William C. Hillman

United States Bankruptcy Judge

Dated: 11/22/94

ORDER   ON   MOTION   FOR   SUMMARY JUDGMENT

The motion for summary judgment of Federal Home Loan Mortgage Co. is _DENIED_ for the reasons stated in the attached decision.

William C. Hillman

United States Bankruptcy Judge

Dated: November 22, 1994

513 U.S. 251; 115 S. Ct. 810; 130 L. Ed. 2d 740; 1995 U.S. LEXIS 691; 63 U.S.L.W. 4076; Fed. Sec. L. Rep. (CCH) P98,511; 95 Cal. Daily Op. Service 429; 95 Daily Journal DAR 789; 8 Fla. L. Weekly Fed. S 534

NATIONSBANK OF NORTH CAROLINA, N. A., ET AL., PETITIONERS 93-1612 v. VARIABLE ANNUITY LIFE INSURANCE CO. ET AL. EUGENE A. LUDWIG, COMPTROLLER OF THE CURRENCY, ET AL., PETITIONERS 93-1613 v. VARIABLE ANNUITY LIFE INSURANCE COMPANY ET AL.

No. 93-1612

SUPREME COURT OF THE UNITED STATES

513 U.S. 251; 115 S. Ct. 810; 130 L. Ed. 2d 740; 1995 U.S. LEXIS 691; 63 U.S.L.W. 4076; Fed. Sec. L. Rep. (CCH) P98,511; 95 Cal. Daily Op. Service 429; 95 Daily Journal DAR 789; 8 Fla. L. Weekly Fed. S 534

December 7, 1994, Argued
January 18, 1995, * Decided

* Together with No. 93-1613, Ludwig, Comptroller of the Currency, et al. v. Variable Annuity Life Insurance Co. et al., also on certiorari to the same court.

**PRIOR HISTORY:** [****1] ON WRITS OF CERTIORARI TO THE UNITED STATES COURT OF APPEALS FOR THE FIFTH CIRCUIT.

**DISPOSITION:** 998 F. 2d 1295, reversed.

### CASE SUMMARY

**PROCEDURAL POSTURE:** Petitioner small bank challenged the judgment of the U.S. Court of Appeals for the Fifth Circuit, which held that the Comptroller of the Currency's decision to allow the small bank to sell annuities was unreasonable under the National Bank Act, 12 U. S. C. S. § 24 Seventh.

**OVERVIEW:** The Comptroller of the Currency determined that federal law permitted small banks serving towns of less than 5,000 people to sell annuities. Petitioner small bank sought and received permission from the Comptroller to sell annuities, and respondent insurance company sued, arguing that under the National Bank Act, 12 U.S.C.S. § 24 Seventh, petitioner was not permitted to sell insurance annuities. A judgment was rendered for respondent, and petitioner appealed. The United States Supreme Court held that the Comptroller was primarily responsible for overseeing banks and was entitled to reasonable deference for its decisions. The Court determined that the Comptroller's decision to allow small banks to sell annuities was reasonable, as well as his determination that annuities were not insurance. The Court reversed the decision of the lower court and held that petitioner was permitted to sell annuities under the National Bank Act.

**OUTCOME:** The Court reversed the decision of the lower court and held that the Comptroller of the Currency's decision that annuities were not insurance and that petitioner would be able to sell them was reasonable and entitled to deference from the courts.

**CORE TERMS:** annuity, business of banking, purchaser, brokerage, customer, selling, incidental, variable, necessary to carry, administrator, National Bank Act, subsidiary, functionally, mortality, broker, issuer, invest, buying and selling, debt instruments, incidental power, deference, sentence, deposits, qualify, life insurance, state law, banking, stock, insurance law, specifically enumerated

**LexisNexis(TM) Headnotes**

*Banking Law > National Banks > Bank Powers*

*Banking Law > Federal Acts > National Bank Act*

[HN1]See 12 U.S.C.S. § 24 Seventh.

*Banking Law > Regulatory Agencies > Office of the Comptroller of the Currency*

[HN2]As the administrator charged with supervision of the National Bank Act, the Comptroller of the Currency bears primary responsibility for surveillance of the business of banking authorized by 12 U.S.C.S. § 24 Seventh.

*Administrative Law > Judicial Review > Standards of Review > Standards Generally*

*Banking Law > Regulatory Agencies > Office of the Comptroller of the Currency*

[HN3]Courts should give great weight to any reasonable construction of a regulatory statute adopted by the agency charged with the enforcement of that statute. The Comptroller of the Currency is charged with the enforcement of banking laws to an extent that warrants the invocation of this principle with respect to his deliberative conclusions as to the meaning of these laws.

*Banking Law > National Banks > Bank Powers*

513 U.S. 251; 115 S. Ct. 810; 130 L. Ed. 2d 740; 1995 U.S. LEXIS 691; 63 U.S.L.W. 4076; Fed. Sec. L. Rep. (CCH) P98,511; 95 Cal. Daily Op. Service 429; 95 Daily Journal DAR 789; 8 Fla. L. Weekly Fed. S 534

*Banking Law > Federal Acts > National Bank Act*

*Banking Law > Regulatory Agencies > Office of the Comptroller of the Currency*

[HN4]The business of banking is not limited to the enumerated powers in 12 U.S.C.S. § 24 Seventh and the Comptroller of Currency therefore has discretion to authorize activities beyond those specifically enumerated. The exercise of the Comptroller's discretion, however, must be kept within reasonable bounds.

*Banking Law > National Banks > Insurance Brokerage*

[HN5]See 12 U.S.C.S. § 92.

**DECISION:** National bank, through brokerage subsidiary, held entitled, based on determination by Comptroller of Currency, to serve as agent in sale of fixed, variable, and hybrid annuities.

**SUMMARY:** Under 12 USCS 24 Seventh, national banks have the power to carry on the business of banking. Under 12 USCS 92, national banks in towns of no more than 5,000 people are expressly authorized to sell insurance, which express authorization arguably implies that banks in larger towns may not sell insurance. A national bank and its brokerage subsidiary sought permission from the Comptroller of the Currency for the brokerage subsidiary to act as an agent in the sale of fixed, variable, and hybrid annuities. The Comptroller determined that (1) brokerage of annuities was, under 24 Seventh, an incidental power necessary to carry on the business of banking; and (2) because, for the purpose of determining whether a national bank could serve as an annuities sale agent, annuities were properly classified as investments, not insurance, within the meaning of 92, 92 was not implicated. Thus, the Comptroller granted the bank's application and specified that the bank would act as only an agent with no principal stake in annuity contracts. In a suit filed by an insurance company challenging the Comptroller's decision, the United States District Court for the Southern District of Texas granted summary judgment in favor of the Comptroller and the bank (786 F Supp 639). The United States Court of Appeals for the Fifth Circuit reversed, (1) expressing the view that 92 bars banks not located in small towns from selling insurance, and (2) rejecting the Comptroller's view that annuities are not insurance for purposes of 92 (998 F2d 1295). The Court of Appeals then denied rehearing en banc (13 F3d 833).

On certiorari, the United States Supreme Court reversed. In an opinion by Ginsburg, J., expressing the

unanimous view of the court, it was held that the bank could serve as an agent in the sale of fixed, variable, and hybrid annuities, because the court would (1) respect as reasonable the Comptroller's conclusion that brokerage of annuities was, under 24 Seventh, an incidental power necessary to carry on the business of banking, where banks, by providing customers with the opportunity to invest in one or more annuity options, were essentially offering financial investment instruments of the kind congressional authorization, under 24 Seventh, permitted banks to broker; and (2) further defer to the Comptroller's determination that 92 was not implicated, since the Comptroller's classification of annuities as investments, based on the tax deferral and investment features that distinguished annuities from insurance, was at least reasonable.

**LAWYERS' EDITION HEADNOTES:**

[***LEdHN1]
BANKS §90
sale of annuities -- national bank as agent -- deference to Comptroller of Currency --
Headnote:[1A][1B][1C][1D][1E][1F]
A national bank, through its brokerage subsidiary, may serve as an agent in the sale of fixed, variable, and hybrid annuities, because the United States Supreme Court will (1) respect as reasonable the conclusion of the Comptroller of the Currency that brokerage of annuities is, under 12 USCS 24 Seventh, an incidental power necessary to carry on the business of banking, since (a) modern annuities answer essentially the same need as the standard savings bank deposits of old, (b) banks, by providing customers with the opportunity to invest in one or more annuity options, are essentially offering financial investment instruments of the kind congressional authorization, under 24 Seventh, permits banks to broker, and (c) the Comptroller specified that the bank in question will act only as an agent with no principal stake in annuity contracts; and (2) further defer to the Comptroller's determination that because, for the purpose of determining whether a national bank may serve as an annuities sale agent, annuities are properly classified as investments, not insurance, within the meaning of 12 USC 92--which, by expressly authorizing national banks in towns of no more than 5,000 people to sell insurance, arguably implies that banks in larger towns may not sell insurance-- 92 is not implicated, since the Comptroller's classification of annuities as investments, based on the tax deferral and investment features that distinguish annuities from insurance, which indemnifies loss, is at least reasonable, where (a) annuities serve an important investment purpose and are functionally similar to other investments that banks typically sell, (b)

513 U.S. 251; 115 S. Ct. 810; 130 L. Ed. 2d 740; 1995 U.S. LEXIS 691; 63 U.S.L.W. 4076; Fed. Sec. L. Rep. (CCH) P98,511; 95 Cal. Daily Op. Service 429; 95 Daily Journal DAR 789; 8 Fla. L. Weekly Fed. S 534

although fixed annuities more closely resemble insurance than do variable annuities, fixed annuities too have significant investment features and are functionally similar to debt instruments, and (c) mindful that fixed annuities are often packaged with variable annuities, the Comptroller reasonably chose to classify the two together.

[***LEdHN2]
ADMINISTRATIVE LAW §276
judicial review -- statutory construction --
Headnote:[2]
When the United States Supreme Court confront a statutory exposition by an expert administrator from a federal administrative agency, the court inquires first whether the intent of Congress is clear as to the precise question at issue; if so, that is the end of the matter; however, if the statute is silent or ambiguous with respect to the specific issue, the question for the court is whether the agency's answer is based on a permissible construction of the statute; if the administrator's reading fills a gap or defines a term in a way that is reasonable in light of the legislature's revealed design, the court gives the administrator's judgment controlling weight.

[***LEdHN3]
BANKS §90
powers of national bank -- securities --
Headnote:[3A][3B]
The "business of banking" in a National Bank Act provision, 12 USCS 24 Seventh, which provides that national banks have power to carry on the business of banking, is not limited to the five activities specifically enumerated in the first sentence of 24 Seventh, as (1) the second sentence of 24 Seventh, in limiting banks' dealing in securities, presupposes that banks have authority not circumscribed by the enumerated activities, and (2) Congress' insertion of the limitation concerning securities decades after the Act's initial adoption makes sense only if banks already had authority to deal in securities, authority presumably encompassed within the existing "business of banking" language; the Comptroller of the Currency therefore has discretion to authorize activities beyond those specifically enumerated; the exercise of the Comptroller's discretion, however, must be kept within reasonable bounds, where ventures distant from dealing in financial investment instruments--for example, operating a general travel agency--may exceed those bounds.

[***LEdHN4]
INSURANCE §1
sale of product -- loans --

Headnote:[4]
The sale of a product by an insurance company does not inevitably render the product insurance; although insurance companies have long offered loans on the security of life insurance, a loan does not thereby become insurance.

[***LEdHN5]
COURTS §850
insurance -- national banks -- state law --
Headnote:[5]
Courts have no cause to dictate to the Comptroller of the Currency that "insurance" be defined under 12 USCS 92--which, by expressly authorizing national banks in towns of no more than 5,000 people to sell insurance, arguably implies that banks in larger towns may not sell insurance--by reference to state law, as including annuities, because (1) treatment of annuities under state law is contextual, where states generally classify annuities as insurance when defining the powers of insurance companies and state insurance regulators, but in diverse settings, states have resisted lump classification of annuities as insurance; (2) a characterization fitting in certain contexts may be unsuitable in others; and (3) the federal banking law does not plainly require automatic reference to state law in classifying annuities, where (a) the Comptroller has concluded that the federal regime is best served by classifying annuities according to their functional characteristics, and (b) Congress has not ruled out that course.

[***LEdHN6]
BANKS §90
INSURANCE §309
national banks -- sale of annuities -- life interest in real property --
Headnote:[6]
The fact that some annuities functionally resemble life insurance by placing mortality risk on the parties does not preclude the United States Supreme Court from deferring to a determination by the Comptroller of the Currency that annuities are not insurance within the meaning of 12 USCS 92--which, by expressly authorizing national banks in towns of no more than 5,000 people to sell insurance, arguably implies that banks in larger towns may not sell insurance--where (1) many fixed and variable annuities currently available (a) do not feature the life term featured under a classic fixed annuity, and (b) instead provide for payments over a term of years; and (2) the presence of mortality risk does not necessarily qualify an investment as insurance under 92, as (a) a life interest in real property is not insurance, although such an interest imposes a mortality risk on the purchaser, and

513 U.S. 251; 115 S. Ct. 810; 130 L. Ed. 2d 740; 1995 U.S. LEXIS 691; 63 U.S.L.W. 4076; Fed. Sec. L. Rep. (CCH) P98,511; 95 Cal. Daily Op. Service 429; 95 Daily Journal DAR 789; 8 Fla. L. Weekly Fed. S 534

(b) some conventional debt instruments similarly impose mortality risk.

[***LEdHN7]
BANKS §90
national banks -- powers -- position of Comptroller of Currency --
Headnote:[7]
An asserted inconsistency in the position of the Comptroller of the Currency as to whether annuities are insurance within the meaning of 12 USCS 92, which, by expressly authorizing national banks in towns of no more than 5,000 people to sell insurance, arguably implies that banks in larger towns may not sell insurance--where, in a prior case, a letter from a member of the Comptroller's staff described annuity investments as insurance arrangements--does not preclude the United States Supreme Court from deferring to the Comptroller's determination, in the instant case involving a bank selling annuities only as an agent, that annuities are not insurance within the meaning of 92, for (1) the proposal disfavored in the letter in the prior case did not clearly involve a bank selling annuities as an agent rather than as a principal, (2) unlike the Comptroller's letter in the instant case, the letter in the prior case did not purport to represent the Comptroller's position, and (3) any change in the Comptroller's position might reduce, but would not eliminate, the deference that the court owes the Comptroller's reasoned determinations.

**SYLLABUS:** Petitioner national bank and its brokerage subsidiary applied to the Comptroller of the Currency, charged by Congress with superintendence of national banks, to allow the subsidiary to act as an agent in the sale of annuities. Under the proposed plan, bank customers could purchase a "variable annuity" -- which invests payments in a designated way and yields income that varies with investment performance -- a "fixed" annuity -- which yields income that does not vary -- or a hybrid account. Granting the application, the Comptroller typed the annuity sales "incidental" to "the business of banking" under the National Bank Act, 12 U.S.C. § 24 Seventh. The Comptroller further concluded that annuities are not "insurance" within the meaning of § [****2] 92; that provision, by expressly authorizing banks in towns of no more than 5,000 people to sell insurance, arguably implies that banks in larger towns may not sell insurance. Respondent Variable Annuity Life Insurance Co. (VALIC), which sells annuities, filed a suit challenging the Comptroller's decision. The District Court upheld the Comptroller's conclusions as a permissible reading of the Act. Reversing the District Court's judgment, the Court of Appeals held that § 92 bars banks not located

in small towns from selling insurance, and rejected the Comptroller's conclusion that annuities are not insurance under § 92.

*Held:* The Comptroller's determination that national banks may serve as agents in the sale of annuities is a reasonable construction of the Act and therefore warrants judicial deference. Pp. 256-264.

(a) If a statute is silent or ambiguous with respect to the precise question at issue, the reviewing court must determine whether the answer reached by the agency charged with the statute's enforcement is based on a permissible construction. If an expert administrator's reading fills a gap or defines a term in a way that is reasonable in light of Congress' revealed [****3] design, the administrator's judgment is given controlling weight. Pp. 256-257.

(b) The Court respects as reasonable the Comptroller's conclusion that brokerage of annuities is an "incidental power . . . necessary to carry on the business of banking" under § 24 Seventh. In interpreting "the business of banking" to include brokerage of financial investment instruments, the Comptroller better comprehends the Act's terms than does VALIC, whose reading confines national banks to the five activities listed in § 24 Seventh's first sentence and endeavors incidental thereto: discounting and negotiating evidences of debt; receiving deposits; buying and selling money; making loans; and obtaining, issuing, and circulating notes. The section's second sentence, which limits banks' "dealing in securities," recognizes that banks otherwise have the authority the sentence addresses, even though that authority is not specifically enumerated; Congress thus evidenced its intent to accord banks authority "to carry on the business of banking" through customer services not circumscribed by the five listed activities. The Comptroller therefore has discretion, within reasonable bounds, to permit banking [****4] activities beyond those the statute sets forth as exemplary. Here, the Comptroller reasonably concluded that the authority to sell annuities qualifies as part of the authority to purchase and sell financial investment instruments. Modern annuities, though more sophisticated than the standard savings bank deposits of old, answer essentially the same need. By providing customers with the opportunity to invest in one or more annuity options, banks are essentially offering financial investment instruments of the kind congressional authorization permits them to broker. Pp. 257-260.

(c) The Court further defers to the Comptroller's determination that annuities are properly classified as investments, not "insurance" within § 92's meaning.

513 U.S. 251; 115 S. Ct. 810; 130 L. Ed. 2d 740; 1995 U.S. LEXIS 691; 63 U.S.L.W. 4076; Fed. Sec. L. Rep. (CCH) P98,511; 95 Cal. Daily Op. Service 429; 95 Daily Journal DAR 789; 8 Fla. L. Weekly Fed. S 534

The Comptroller's classification of annuities, based on the tax deferral and investment features that distinguish them from insurance, is at least a reasonable interpretation of the controlling legislation. A key feature of insurance is that it indemnifies loss. As the Comptroller observes, annuities serve an important investment purpose and are functionally similar to other investments that banks typically sell. And though fixed annuities more closely [****5] resemble insurance than do variable annuities, fixed annuities too have significant investment features and are functionally similar to debt instruments. Moreover, mindful that fixed annuities are often packaged with variable annuities, the Comptroller reasonably chose to classify the two together. In light of the foregoing, the Court need not reach the question whether § 92, by negative implication, precludes national banks in places more populous than 5,000 from selling insurance. Pp. 260-264.

COUNSEL: Edward C. DuMont argued the cause for petitioners in No. 93-1613. With him on the briefs were Solicitor General Days, Assistant Attorney General Hunger, Deputy Solicitor General Bender, Mark B. Stern, Jacob M. Lewis, Julie L. Williams, L. Robert Griffin, and Yvonne D. McIntire. Steven S. Rosenthal argued the cause for petitioners in No. 93-1612. With him on the briefs were Robert M. Kurucza and Robert G. Ballen.

David Overlock Stewart argued the cause for respondents in both cases. With him on the brief were Alan G. Priest, Raymond C. Ortman, Jr., and William A. Wilson. +
+ Briefs of amici curiae urging reversal were filed for the American Bankers Association et al. by John J. Gill III, Michael F. Crotty, James T. McIntyre, Richard M. Whiting, and David L. Glass; for the Conference of State Bank Supervisors et al. by David W. Roderer, Eric L. Hirschhorn, Donn C. Meindertsma, J. Thomas Cardwell, Leonard J. Rubin, and M. Brooks Senn; and for the New York Clearing House Association by John L. Warden, Michael M. Wiseman, Theodore Edelman, and Norman R. Nelson.

Briefs of amici curiae urging affirmance were filed for Tom Gallagher, Treasurer and Insurance Commissioner of Florida, et al. by David J. Busch, Richard Blumenthal, Attorney General of Connecticut, pro se, and Mark F. Kohler, Assistant Attorney General, J. Joseph Curran, Jr., Attorney General of Maryland, Gary L. Spaeth, Heidi Heitkamp, Attorney General of North Dakota, Jeffrey B. Pine, Attorney

General of Rhode Island, and Maureen G. Glynn, Special Assistant Attorney General; for the American Academy of Actuaries by Lauren M. Bloom; for the American Council of Life Insurance by Gary E. Hughes, Allen R. Caskie, and Phillip E. Stano; for the American Land Title Association by Sheldon E. Hochberg; for the National Association of Insurance Commissioners by Susan E. Martin and Ellen Dollase Wilcox; and for the National Association of Life Underwriters et al. by Ann M. Kappler and Scott A. Sinder.

[****6]

JUDGES: GINSBURG, J., delivered the opinion for a unanimous Court.

OPINIONBY: GINSBURG

OPINION: [**812] [*254] [***746] JUSTICE GINSBURG delivered the opinion of the Court.

[***LEdHR1A]    [1A]These consolidated cases present the question whether national banks may serve as agents in the sale of annuities. The Comptroller of the Currency, charged by Congress with superintendence of national banks, determined that federal law permits such annuity sales as a service to bank customers. Specifically, the Comptroller considered the sales at issue "incidental" to "the business of banking" under the National Bank Act, Rev. Stat. § 5136, as amended, 12 U.S.C. § 24 Seventh (1988 ed. and Supp. V). The Comptroller further concluded that annuities are not "insurance" within the meaning of § 92; that provision, by expressly authorizing banks to sell insurance in towns of no more than 5,000 people to sell insurance, arguably implies that banks in larger towns may not sell insurance. The United States District Court for the [***747] Southern District of Texas upheld the Comptroller's conclusions as a permissible [****7] reading of the National Bank Act, but the United States Court of Appeals for the Fifth Circuit reversed. We are satisfied that the Comptroller's construction of the Act is reasonable and therefore warrants judicial deference. Accordingly, we reverse the judgment of the Court of Appeals.

I

Petitioner NationsBank of North Carolina, N. A., a national bank based in Charlotte, and its brokerage subsidiary sought permission from the Comptroller of the Currency, pursuant to 12 CFR § 5.34 (1994), for the brokerage subsidiary to act as an agent in the sale of annuities. Annuities are contracts under which the

513 U.S. 251; 115 S. Ct. 810; 130 L. Ed. 2d 740; 1995 U.S. LEXIS 691; 63 U.S.L.W. 4076; Fed. Sec. L. Rep. (CCH) P98,511; 95 Cal. Daily Op. Service 429; 95 Daily Journal DAR 789; 8 Fla. L. Weekly Fed. S 534

purchaser makes one or more premium payments to the issuer in exchange for a series of payments, which continue either for a fixed period or for the life of the purchaser or a designated beneficiary. When a purchaser invests in a "variable" annuity, the purchaser's money is invested in a designated way and payments to the purchaser vary with investment performance. In a classic "fixed" annuity, in contrast, payments do not vary. Under [*255] the contracts NationsBank proposed to sell, purchasers could direct their payments to a variable, fixed, or hybrid account, and would be [****8] allowed periodically to modify their choice. The issuers would be various insurance companies. See Letter from J. Michael Shepherd, Senior Deputy Comptroller, to Robert M. Kurucza (Mar. 21, 1990), App. to Pet. for Cert. in No. 93-1612, pp. 35a-36a (Comptroller's Letter).

The Comptroller granted NationsBank's application. He concluded that national banks have authority to broker annuities within "the business of banking" under 12 U.S.C. § 24 Seventh. He further concluded that § 92, addressing insurance sales by banks in towns with no more than 5,000 people, did not impede his approval; for purposes of that provision, the Comptroller explained, [**813] annuities do not rank as "insurance." See Comptroller's Letter 41a-47a.

Respondent Variable Annuity Life Insurance Co. (VALIC), which sells annuities, challenged the Comptroller's decision. VALIC filed suit in the United States District Court for the Southern District of Texas seeking declaratory and injunctive relief pursuant to the Administrative Procedure Act, 5 U.S.C. § 706(2)(A), and 28 U.S.C. §§ 2201, 2202 (1988 ed. and Supp. V). The District Court granted [****9] summary judgment in favor of the Comptroller and NationsBank. *Variable Annuity Life Ins. Co.* v. *Clarke*, 786 F. Supp. 639 (1991). The United States Court of Appeals for the Fifth Circuit reversed. *Variable Annuity Life Ins. Co.* v. *Clarke*, 998 F.2d 1295 (1993). Relying on its decision in *Saxon* v. *Georgia Assn. of Independent Ins. Agents. Inc.*, 399 F.2d 1010 (1968), the Fifth Circuit first held that § 92 bars banks not located in small towns from selling insurance, and then rejected the Comptroller's view that annuities are not insurance for purposes of § 92. See 998 F.2d at 1298-1302.

Four judges dissented from the failure of the court to grant rehearing en banc. The dissenters maintained that the panel had not accorded due deference to the Comptroller's reasonable statutory interpretations. *Variable Annuity* [*256] *Life Ins. Co.* v. *Clark*, 13 F.3d 833, 837-838 (CA5 1994). n1 We granted certiorari. 511 U.S. 1141 (1994).



- - - - - - - - - - - - - Footnotes - - - - - - - - - - - - - - - -

n1 The dissenters also observed that 6 of the court's 13 active judges were disqualified from participating in the case. 13 F. 3d, at 834.

- - - - - - - - - - - - End Footnotes- - - - - - - - - - - - - -

[****10]

II

A

Authorizing national banks to "carry on the business of banking," the National Bank Act provides that such banks shall have power --[HN1]"To exercise . . . all such incidental powers as shall be necessary to carry on the business of banking; by discounting and negotiating promissory notes, drafts, bills of exchange, and other evidences of debt; by receiving deposits; by buying and selling exchange, coin, and bullion; by loaning money on personal security; and by obtaining, issuing, and circulating notes . . . . The business of dealing in securities and stock by the [bank] shall be limited to purchasing and selling such securities and stock without recourse, solely upon the order, and for the account of, customers, and in no case for its own account, and the [bank] shall not underwrite any issue of securities or stock . . . ." 12 U.S.C. § 24 Seventh (1988 ed. and Supp. V).

[***LEdHR2] [2][HN2]As the administrator charged with supervision of the National Bank Act, see §§ 1, 26-27, 481, the Comptroller bears primary responsibility for surveillance of "the business of banking" authorized [****11] by § 24 Seventh. We have reiterated:

"'It is settled that [HN3]courts should give great weight to any reasonable construction of a regulatory statute adopted by the agency charged with the enforcement of that statute. The Comptroller of the Currency is charged with the enforcement of banking laws to an extent that warrants the invocation of this principle with [*257] respect to his deliberative conclusions as to the meaning of these laws.'" *Clarke* v. *Securities Industry Assn.*, 479 U.S. 388, 403-404, 93 L. Ed. 2d 757, 107 S. Ct. 750 (1987) (quoting *Investment Company Institute* v. *Camp*, 401 U.S. 617, 626-627, 28 L. Ed. 2d 367, 91 S. Ct. 1091 (1971)).

513 U.S. 251; 115 S. Ct. 810; 130 L. Ed. 2d 740; 1995 U.S. LEXIS 691; 63 U.S.L.W. 4076; Fed. Sec. L. Rep. (CCH) P98,511; 95 Cal. Daily Op. Service 429; 95 Daily Journal DAR 789; 8 Fla. L. Weekly Fed. S 534

[***748] Under the formulation now familiar, when we confront an expert administrator's statutory exposition, we inquire first whether "the intent of Congress is clear" as to "the precise question at issue." _Chevron U.S.A. Inc._ v. _Natural Resources Defense Council, Inc._, 467 U.S. 837, 842, 81 L. Ed. 2d 694, 104 S. Ct. 2778 (1984). If so, "that is the end of the matter." _Ibid._ But "if the statute is silent or ambiguous with respect to the specific issue, [****12] the question for the court is whether the agency's answer is based on a permissible construction of the statute." _Id., at 843._ If the administrator's reading fills a gap or defines a term in a way that is reasonable in light of the legislature's [**814] revealed design, we give the administrator's judgment "controlling weight." _Id., at 844._

In authorizing NationsBank to broker annuities, the Comptroller invokes the power of banks to "broker a wide variety of financial investment instruments," Comptroller's Letter 38a, which the Comptroller considers "part of [banks'] traditional role as financial intermediaries," _ibid._, and therefore an "incidental power . . . necessary to carry on the business of banking." 12 U.S.C. § 24 Seventh; see also Interpretive Letter No. 494 (Dec. 20, 1989) (discussing features of financial investment instruments brokerage that bring this activity within the "business of banking") (cited in Comptroller's Letter 38a). The Comptroller construes the § 24 Seventh authorization of "incidental powers . . . necessary to carry on the business of banking" as an independent grant of authority; he [****13] reads the specific powers set forth thereafter as exemplary, not exclusive.

VALIC argues that the Comptroller's interpretation is contrary to the clear intent of Congress because the banking power on which the Comptroller relies -- "brokering financial investment instruments" -- is not specified in § 24 Seventh. [*258] Brief for Respondent 35-45. According to VALIC, the five specific activities listed in § 24 Seventh after the words "business of banking" are exclusive -- banks are confined to these five activities and to endeavors incidental thereto. _Id._, at 35-36. VALIC thus attributes no independent significance to the words "business of banking." We think the Comptroller better comprehends the Act's terms.

[***LEdHR3A] [3A]The second sentence of § 24 Seventh, in limiting banks' "dealing in securities," presupposes that banks have authority not circumscribed by the five specifically listed activities. Congress' insertion of the limitation decades after the Act's initial adoption makes sense only if banks

already _had_ authority to deal in securities, authority presumably encompassed within the "business [****14] of banking" language which dates from 1863. VALIC argues, however, that the limitation was imposed by the Glass-Steagall Act of 1933, and that the power Glass-Steagall presupposed was specifically granted in the McFadden Act of 1927. Brief for Respondent 46. While the statute's current wording derives from the Glass-Steagall Act, see Act of June 16, 1933, ch. 89, § 16, 48 Stat. 184, the earlier McFadden Act does not bolster VALIC's case, for that Act, too, _limited_ an activity already part of the business national banks did. See Act of Feb. 25, 1927, § 2(b), 44 Stat. 1226 ("_Provided_, That the business of buying and selling investment securities shall hereinafter be limited [***749] to buying and selling without recourse . . . ."); see also _Clarke_ v. _Securities Industry Assn._, 479 U.S. at 407-408 (even before the McFadden Act, banks conducted securities transactions on a widespread basis); 2 F. Redlich, The Molding of American Banking: Men and Ideas, pt. 2, pp. 389-393 (1951) (describing securities activities of prominent early national banks). n2

[***LEdHR3B] [3B]

- - - - - - - - - - - - - - Footnotes - - - - - - - - - -
- - - - - - -

n2 We expressly hold that [HN4]the "business of banking" is not limited to the enumerated powers in § 24 Seventh and that the Comptroller therefore has discretion to authorize activities beyond those specifically enumerated. The exercise of the Comptroller's discretion, however, must be kept within reasonable bounds. Ventures distant from dealing in financial investment instruments -- for example, operating a general travel agency -- may exceed those bounds.

- - - - - - - - - - - - - End Footnotes- - - - - - - -
- - - - - - -

[****15]

[*259] B

[***LEdHR1B] [1B]As we have just explained, the Comptroller determined, in accord with the legislature's intent, that "the business of banking" described in § 24 Seventh covers brokerage of financial investment instruments, and is not confined to the examples specifically enumerated. He then reasonably concluded that the authority to sell annuities qualifies as part of, or incidental to, the

513 U.S. 251; 115 S. Ct. 810; 130 L. Ed. 2d 740; 1995 U.S. LEXIS 691; 63 U.S.L.W. 4076; Fed. Sec. L. Rep. (CCH) P98,511; 95 Cal. Daily Op. Service 429; 95 Daily Journal DAR 789; 8 Fla. L. Weekly Fed. S 534

business of banking. National banks, the Comptroller observed, are authorized to serve as agents for their customers in the purchase and sale of various financial investment instruments, Comptroller's Letter 38a, n3 and annuities are widely recognized as just such investment products. See D. Shapiro & T. Streiff, Annuities 7 **[\*\*815]** (1992) (in contrast to life insurance, "annuities . . . are primarily investment products"); 1 J. Appleman & J. Appleman, Insurance Law and Practice § 84, p. 295 (1981) ("Annuity contracts must . . . be recognized as investments rather than as insurance.").

- - - - - - - - - - - - - - Footnotes - - - - - - - - - - - - - - - -

n3 The Comptroller referred to Interpretive Letter No. 494 (Dec. 20, 1989) (approving brokerage of agricultural, oil, and metals futures).

- - - - - - - - - - - - End Footnotes- - - - - - - - - - - - - - -

**[\*\*\*\*16]**

By making an initial payment in exchange for a future income stream, the customer is deferring consumption, setting aside money for retirement, future expenses, or a rainy day. For her, an annuity is like putting money in a bank account, a debt instrument, or a mutual fund. Offering bank accounts and acting as agent in the sale of debt instruments and mutual funds are familiar parts of the business of banking. See, e. g., *Securities Industry Assn.* v. *Board of Governors, FRS*, 468 U.S. 207, 215, 82 L. Ed. 2d 158, 104 S. Ct. 3003 (1984) ("Banks long have arranged the purchase and sale of securities as an accommodation to their customers."); *First Nat. Bank of Hartford* v. *Hartford*, 273 U.S. 548, 559-560, 71 L. Ed. 767, 47 S. Ct. 462 (1927) (banks have authority **[\*260]** to sell mortgages and other debt instruments they have originated or acquired by discount).

**[\*\*\*LEdHR1C]**    [1C]In sum, modern annuities, though more sophisticated than the standard savings bank deposits of old, answer essentially the same need. By providing customers with the opportunity to invest in one or more **[\*\*\*\*17]** annuity options, banks are essentially offering financial investment instruments of the kind congressional authorization permits them to broker. Hence, the Comptroller reasonably typed the permission NationsBank sought as an "incidental **[\*\*\*750]** power . . . necessary to carry on the business of banking." n4

**[\*\*\*LEdHR1D]**    [1D]

- - - - - - - - - - - - - - Footnotes - - - - - - - - - -

n4 Assuring that the brokerage in question would not deviate from traditional bank practices, the Comptroller specified that NationsBank "will act only as agent, . . . will not have a principal stake in annuity contracts and therefore will incur no interest rate or actuarial risks." Comptroller's Letter 48a.

- - - - - - - - - - - - End Footnotes- - - - - - - - - - - - - - -

III

A

In the alternative, VALIC argues that 12 U.S.C. § 92 (1988 ed., Supp. V) bars NationsBank from selling annuities as agent. That section provides:

[HN5]"In addition to the powers now vested by law in [national banks] any such [bank] located and doing business in any place the population **[\*\*\*\*18]** of which does not exceed five thousand inhabitants . . . may . . . act as the agent for any fire, life, or other insurance company authorized by the authorities of the State in which said bank is located to do business in said State, by soliciting and selling insurance and collecting premiums on policies issued by such company . . . ."

**[\*\*\*LEdHR1E]**    [1E]The parties disagree about whether § 92, by negative implication, precludes national banks located in places more populous than 5,000 from selling insurance. We do not reach **[\*261]** this question because we accept the Comptroller's view that, for the purpose at hand, annuities are properly classified as investments, not "insurance."

**[\*\*\*LEdHR4]**    [4]Again, VALIC contends that the Comptroller's determination is contrary to the plain intent of Congress, or else is unreasonable. In support of its position that annuities are insurance, VALIC notes first that annuities traditionally have been sold by insurance companies. But the sale of a product by an insurance company does not inevitably render the **[\*\*\*\*19]** product insurance. For example, insurance companies have long offered loans on the security of life insurance, see 3 Appleman & Appleman, Insurance Law and Practice § 1731, p. 562 (1967), but a loan does not thereby become insurance.

**[\*\*\*LEdHR5]**    [5]VALIC further asserts that most States have regulated annuities as insurance and that

513 U.S. 251; 115 S. Ct. 810; 130 L. Ed. 2d 740; 1995 U.S. LEXIS 691; 63 U.S.L.W. 4076; Fed. Sec. L. Rep. (CCH) P98,511; 95 Cal. Daily Op. Service 429; 95 Daily Journal DAR 789; 8 Fla. L. Weekly Fed. S 534

Congress intended to define insurance under § 92 by reference to state law. Treatment of annuities under state law, however, is contextual. States generally classify annuities as insurance when defining the powers of insurance companies and state insurance regulators. See, e. g., 998 F.2d at 1300, n. 2 (citing statutes). But in diverse settings, States have resisted lump classification of annuities as insurance. See, e. g., In re New York State Assn. of Life Underwriters, Inc. v. New York State Banking Dept., 83 N.Y.2d 353, 363, 632 N.E.2d 876, 881, 610 N.Y.S.2d 470 [**816] (1994) (rejecting "assertion that annuities are insurance which [state-chartered] banks are not authorized to sell," even though state insurance law "includes 'annuities' [****20] in its description of 'kinds of insurance authorized'"); In re Estate of Rhodes', 197 Misc. 232, 237, 94 N.Y.S.2d 406, 411 (Surr. Ct. 1949) (annuity contracts do not qualify for New York estate tax exemption applicable to insurance); Commonwealth v. Metropolitan Life Ins. Co., 254 Pa. 510, 513-516, 98 A. 1072, 1073 (1916) (annuities are not insurance for purposes of tax that insurance companies pay on insurance premiums received within [*262] [***751] the State); State ex rel. Equitable Life Assurance Soc. of United States v. Ham, 54 Wyo. 148, 159, 88 P.2d 484, 488 (1939) (same).

As our decisions underscore, a characterization fitting in certain contexts may be unsuitable in others. See, e. g., Atlantic Cleaners & Dyers, Inc. v. United States, 286 U.S. 427, 433, 76 L. Ed. 1204, 52 S. Ct. 607 (1932) ("meaning [of words] well may vary to meet the purposes of the law"; courts properly give words "the meaning which the legislature intended [they] should have in each instance"); cf. Cook, "Substance" and "Procedure" in the Conflict of Laws, 42 Yale L. J. 333, 337 (1933) ("The [****21] tendency to assume that a word which appears in two or more legal rules, and so in connection with more than one purpose, has and should have precisely the same scope in all of them, runs all through legal discussions. It has all the tenacity of original sin and must constantly be guarded against."). Moreover, the federal banking law does not plainly require automatic reference to state law here. The Comptroller has concluded that the federal regime is best served by classifying annuities according to their functional characteristics. Congress has not ruled out that course, see Chevron, 467 U.S. at 842; courts, therefore, have no cause to dictate to the Comptroller the state-law constraint VALIC espouses.

[***LEdHR6]    [6]VALIC further argues that annuities functionally resemble life insurance because some annuities place mortality risk on the parties. Under a classic fixed annuity, the purchaser pays a

sum certain and, in exchange, the issuer makes periodic payments throughout, but not beyond, the life of the purchaser. In pricing such annuities, issuers rely on actuarial assumptions about how long [****22] purchasers will live.

While cognizant of this similarity between annuities and insurance, the Comptroller points out that mortality risk is a less salient characteristic of contemporary products. Many annuities currently available, both fixed and variable, do not feature a life term. Instead they provide for payments over a term of years; if the purchaser dies before the term ends, [*263] the balance is paid to the purchaser's estate. Moreover, the presence of mortality risk does not necessarily qualify an investment as "insurance" under § 92. For example, VALIC recognizes that a life interest in real property is not insurance, although it imposes a mortality risk on the purchaser. Tr. of Oral Arg. 42. Some conventional debt instruments similarly impose mortality risk. See Note, Reverse Annuity Mortgages and the Due-on-Sale Clause, 32 Stan. L. Rev. 143, 145-151 (1979).

B

[***LEdHR7]    [7]VALIC also charges the Comptroller with inconsistency. As evidence, VALIC refers to a 1978 letter from a member of the Comptroller's staff describing annuity investments as insurance arrangements. Brief for Respondent [****23] 16-17; see Letter from Charles F. Byrd, Assistant Director, Legal Advisory Services Division, Office of the Comptroller of the Currency (June 16, 1978), App. to Brief in Opposition 1a-2a (Byrd Letter). We note, initially, that the proposal disfavored in the 1978 letter did not clearly involve a bank selling annuities as an agent, rather than as a principal. See Byrd Letter 1a ("The bank would purchase a group annuity policy from an insurer and then sell [***752] annuity contracts as investments in trust accounts."). Furthermore, unlike the Comptroller's letter to NationsBank here, the 1978 letter does not purport to represent the Comptroller's position. Compare Byrd Letter 1a ("It is my opinion . . .") with Comptroller's Letter 35a ("The OCC's legal position on this issue was announced in a [prior 1990 letter]. Since I find neither policy nor supervisory reasons to object [**817] to this proposal, the Subsidiary may proceed."). Finally, any change in the Comptroller's position might reduce, but would not eliminate, the deference we owe his reasoned determinations. See Good Samaritan Hospital v. Shalala, 508 U.S. 402, 417, 124 L. Ed. 2d 368, 113 S. Ct. 2151 (1993) [****24] (quoting NLRB

513 U.S. 251; 115 S. Ct. 810; 130 L. Ed. 2d 740; 1995 U.S. LEXIS 691; 63 U.S.L.W. 4076; Fed. Sec. L. Rep. (CCH) P98,511; 95 Cal. Daily Op. Service 429; 95 Daily Journal DAR 789; 8 Fla. L. Weekly Fed. S 534

v. *Iron Workers*, 434 U.S. 335, 351, 98 S. Ct. 651, 54 L. Ed. 2d 586 (1978)).

[***LEdHR1F]  [1F]The Comptroller's classification of annuities, based on the tax deferral and investment features that distinguish them [*264] from insurance, in short, is at least reasonable. See Comptroller's Letter 44a. A key feature of insurance is that it indemnifies loss. See Black's Law Dictionary 802 (6th ed. 1990) (first definition of insurance is "contract whereby, for a stipulated consideration, one party undertakes to compensate the other for loss on a specified subject by specified perils"). As the Comptroller observes, annuities serve an important investment purpose and are functionally similar to other investments that banks typically sell. See *supra*, at 259-260. And though fixed annuities more closely resemble insurance than do variable annuities, fixed annuities too have significant investment features and are functionally similar to debt instruments. Moreover, mindful that fixed annuities are often packaged with variable annuities, the Comptroller reasonably chose to classify the [****25] two together.

* * *

We respect as reasonable the Comptroller's conclusion that brokerage of annuities is an "incidental power . . . necessary to carry on the business of banking." We further defer to the Comptroller's reasonable determination that 12 U.S.C. § 92 is not implicated because annuities are not insurance within the meaning of that section. Accordingly, the judgment of the Court of Appeals for the Fifth Circuit is

*Reversed.*

**REFERENCES:**
Return To Full Text Opinion

Go to Supreme Court Brief(s)
Go to Oral Argument Transcript

10 Am Jur 2d, Banks 271, 303

4A Federal Procedure, L Ed, Banking and Financing 8:417

3A Federal Procedural Forms, L Ed, Banking and Financing 8:373, 8:418

12 USCS 24, 92

L Ed Digest, Banks 90

L Ed Index, Annuities; Banks; Comptroller

ALR Index, Annuities; Banks and Banking; Comptroller of Currency; National Banks

Annotation References:

Supreme Court's view as to weight and effect to be given, on subsequent judicial construction, to prior [****26] administrative construction of statute. 39 L Ed 2d 942.

1989 U.S. Dist. LEXIS 4796

LOIS M. NICHOLS v. MID-PENN CONSUMER DISCOUNT CO.

Civil Action No. 88-1253

UNITED STATES DISTRICT COURT FOR THE EASTERN DISTRICT OF PENNSYLVANIA

1989 U.S. Dist. LEXIS 4796

April 28, 1989, Decided and Filed; May 1, 1989, Entered

**CORE TERMS:** refinancing, borrower, mortgage, disclosure, consumer, rescission, unearned, lender, security interest, rebate, right to rescind, cancel, disclosure statement, finance, finance charge, disclose, retention, state law, residency, rescind, duty, notice, formula, refund, discount, reconsideration, supplemental, prepayment, actionable, computed

**COUNSEL: [*1]**

Arthur J. Matusow, Esq., Philadelphia PA, Susan DeJarnatt, Esq., Community Legal Services, Philadelphia PA, Joseph Simmons, Deputy in Charge of Bankruptcy Operations, Phila PA, for Plaintiffs.

**OPINIONBY:** BECHTLE

**OPINION:** MEMORANDUM AND ORDER

LOUIS C. BECHTLE, UNITED STATES DISTRICT JUDGE

Presently before the court is this appeal from the bankruptcy court pursuant to 28 U.S.C. § 1334. For the reasons stated herein, after full consideration of the supporting legal briefs, reply briefs, supplemental briefs and affidavits, the decision of the bankruptcy court will be affirmed.

I. BACKGROUND

This is a cross-appeal from the January 15, 1988 Order of the bankruptcy court granting in part and denying in part, the parties' cross-motions for summary judgment in this action brought by the appellee/cross-appellant Nichols ("Nichols" or "debtor") alleging numerous violations of the Truth in Lending Act (15 U.S.C. § 1601, et seq.) ("TILA" or "Act") and Regulation Z (12 C.F.R. § 226.1, et seq.) ("Reg Z") The appellant/cross-appellee Mid-Penn Consumer Discount Company ("Mid Penn" or "Lender") also appeals the bankruptcy court's order denying its motion for reconsideration of its decision in this matter. [*2]

In the time period preceding April, 1984, Nichols borrowed money from Mid-Penn on at least five occasions. In each of these transactions, Mid-Penn obtained a mortgage in the debtor's residency and recorded it in Philadelphia's City Hall Department of Records. The following chart contains the relevant information as to each of the five loans between the parties:

| Date | Amt. Financed Not Provided("NP") | Finance Charge | Mortgage Satisfaction Date | Date Satisfaction Recorded |
|---|---|---|---|---|
| 03/19/82 | NP | NP | 07/06/83 | 12/07/83 |
| 12/17/82 | NP | NP | 07/06/83 | 12/07/83 |
| 07/05/83 | $ 1,950.72 | $ 857.28 | 01/19/84 | 02/10/84 |
| 11/30/83 | $ 2,301.08 | $ 1,010.92 | NP | NP |
| 04/16/84 | $ 2,502.00 | $ 1,098.00 | NP | NP |

The terms of these loans were as follows:

| DATE | AMOUNT FINANCED | APR | FINANCE CHARGE | TOTAL PRICE |
|---|---|---|---|---|
| Not Available ("NA") | | | | |

| | | | | |
|---|---|---|---|---|
| 03/26/82 | NA | NA | NA | NA |
| 12/17/82 | NA | NA | NA | NA |
| 07/05/83 | NA | NA | NA | NA |
| 11/30/83 | $ 2,301.28 | $ 25.42 | $ 1,010.92 | $ 3,312.00 |
| 04/16/84 | $ 2,502.00 | $ 25.39 | $ 1,098.00 n1 | $ 3,600.00 |

[*3]

n1 In the last two financings, Mid-Pen levied service charges of $ 67.00 and $ 72.00 respectively upon the loans.

With each of these loans, Mid-Penn gave Nichols a TILA Disclosure Statement and a Notice of Right to Cancel. The 1984 Notice of Right to Cancel advised Nichols of the following:

You are entering into a transaction that will result in a (mortgage/lien/security interest) (on/in) your home.

. . . . .

If you cancel the transaction, the (mortgage/lien/security interest) is also cancelled.

On November 24, 1986, Nichols, through her attorney, notified Mid-Penn that she was rescinding both the November 30, 1983 and April 16, 1984 loans. By letter dated December 12, 1986, Mid-Penn told Nichols that it would not rescind either of the transactions. The total credit extended to Nichols in connection with the last two (2) loans was $ 4,649.69. Nichols had paid Mid-Penn, directly or through refinancing, a total of $ 4,362.06 prior to the November 24, 1986 demand for rescission.

The bankruptcy court decided this action on the parties' agreed stipulation of facts. The court held that there was no right to rescind the April 16, 1984 loan, but permitted rescission of the November 30, [*4] 1983 loan because it concluded Mid-Penn misinformed Nichols in the Notice of Right to Cancel as to the number of mortgages of record the lender would have against the debtor's home. The court found that Mid-Penn failed to immediately satisfy the prior mortgage it had in Nichols' residency after the November 30, 1983 transaction which resulted in the lender holding multiple mortgages on the property which it never disclosed to the debtor. The mortgage obtained as a result of the 1983 loan was eventually "satisfied" by Mid-Penn on January 19, 1984, but was never formally recorded until February 10, 1984. Nichols was awarded $ 1,000.00 in damages under the TILA for Mid-Penn's failure to rescind the November, 1983 loan.

Subsequent to this decision, motions for reconsideration were filed by both parties. Mid-Penn claimed that the bankruptcy court erred by imposing a duty upon it not legally mandated in holding that a mortgage securing a previous loan transaction must be satisfied immediately upon the passing of the three day rescission period prescribed in the TILA. Nichols sought reconsideration of the court's Order denying the right to rescind the April, 1984 loan based on Mid-Penn's [*5] failure to disclose hidden finance changes and its classifying charges and "total of payments" as estimates. Each of these motions was denied by the bankruptcy court below, and the contentions raised therein now form the basis of the present appeal.

II. DISCUSSION

A. The Purpose and Enforcement of the TILA and Reg Z.

The courts in this Circuit recognize that the purpose of the TILA is to inform consumers of the true cost of credit:

The Truth in Lending Act was passed primarily to aid the unsophisticated consumer so that he would not be easily misled as to the total costs of financing . . . Thus, the Act seeks "to assure a meaningful disclosure of credit terms so that the consumer will be able to compare more readily the various terms available to him and avoid the uninformed use of credit". 15 U.S.C. § 1601.

Thomka v. A.Z. Chevrolet Inc., 619 F.2d 246, 248 (3d Cir. 1980). Accord, Mourning v. Family Publications Service, 411 U.S. 356, 364-65 (1973); Gennuso v. Commercial Bank and Trust Company, 566 F.2d 437, 441 (3d Cir. 1977).

The TILA is a remedial statute designed to protect consumers who are not on an equal footing with creditors, either in bargaining [*6] for credit terms or in knowledge of credit provisions. As such, it is liberally construed in favor of the consumer. See, e.g., N.C. Freed Co., Inc. v. Bd. of Governors of Federal Reserve System, 473 F.2d 1210, 1214 (2d Cir. 1973); Sellers v. Wolman, 510 F.2d 119, 122 (5th Cir. 1975).

1989 U.S. Dist. LEXIS 4796

To accomplish its purpose, the TILA and its implementing regulation, Reg Z, requires creditors to disclose to borrowers certain credit terms and dictate the manner in which they must be made. The Act is enforced by a system of "strict liability in favor of consumers." Thomka v. A.Z. Chevrolet Inc., supra, 619 F.2d at 248. Even a single actionable violation of the TILA gives rise to full liability for statutory damages. This "private attorney general" scheme of enforcement was intended to obviate the need for a large federal bureaucracy performing the task. See Ives v. W.T. Grant Co., 522 F.2d 749, 756 (2d Cir. 1975). While the statutory damages may not be related to the actual injury in a particular case (for which there is additional compensation over and above the statutory amount), the certainty of their automatic assessment was intended to have a deterrent effect on creditors.

There [*7] is strong evidence that this deterrence scheme has worked as intended. In 1973, when Congress considered amendments restricting Truth-In-Lending class actions, the two agencies principally charged with administrative enforcement of the TILA both argued strongly that creditors' exposure to civil liability for violations was crucial to the TILA's enforcement. According to the Federal Reserve Board, the threat of sizable damage awards was necessary to "insure that management will strive with diligence to achieve compliance." Hearings on S.1630 and S.914. before the Subcommittee on Consumer Credit of the Senate on Banking, Housing and Urban Affairs, 93d Cong., 1st Sess. 54 (1973). The Chairman of the Federal Trade Commission stated:

Our experience in enforcing Truth-in-Lending legislation persuades us that only a high degree of civil liability can provide that deterrence essential to achieving compliance with these provisions.

Id. at 90.

Hence, it is not surprising that this Circuit has repeatedly held that the literal language of the damage provisions must be followed, and that damages must be awarded whenever an actionable violation exists, even in the face of creditor protestation [*8] that the violation was only "technical" or "minor." Thomka v. A.Z. Chevrolet, Inc., supra, 619 F.2d at 250; Gennuso v. Commercial Bank and Trust Company, supra, 566 F.2d at 441-2. Only such unswervingly strict enforcement by the courts can assure that creditors will continue to be diligent in complying with all of the requirements of the Act.

The TILA enforcement scheme was refined by the 1980 Truth-in-Lending Simplification and Reform Act, 15 U.S.C. §§ 1601-1693 ("the simplified TILA") and revisions to Reg Z, effective on October 1, 1982. The amendments apply to both loans at issue here. Under the simplified TILA, borrowers can sue creditors in two separate circumstances.

First, the TILA and Reg Z continue to guarantee meaningful disclosure of credit terms by requiring the creditor to give the borrower a Disclosure Statement specifying the credit terms in clear and straight forward language. TILA, 15 U.S.C. § 1601, 1638; Reg Z, 12 C.F.R. § 226.1, 226.17-18. Within one (1) year of the transaction, the borrower can sue the creditor for actual damages and twice the finance charge (up to a maximum of $ 1,000.00), if the Disclosure Statement violates the TILA in any of the ways [*9] enumerated in 15 U.S.C. § 1640(a). These actionable violations include the failure to disclose the security interest accurately on the Disclosure Statement itself. Id.

Second, the TILA gives an important additional right to the borrower who gives up a non-purchase money security interest in his or her home. Such borrowers have the right to rescind the transaction, whether it is an original loan or a refinancing with new funds, for three (3) days. 15 U.S.C. § 1635(a). The creditor must notify the borrower of this right; how to exercise it; and the effect of a rescission. Id; Reg Z, 12 C.F.R. § 226.23(b). The Notice must also clearly disclose the retention or acquisition of a security interest in the borrower's home. TILA at § 1635(a), Reg Z at § 226.23. If the creditor fails to give borrower a Notice that fully complies with § 226.23, then the right to rescind the transaction is extended for up to three (3) years. Reg Z, 12 C.F.R. 226.23(a)(3). The right to rescind is also extended if the creditor's Disclosure Statement does not accurately provide material disclosures, such as finance charges and the total of payments. Id., at n. 48.

In other words, if either the [*10] Disclosure Statement or the Notice of Right to Cancel fails to comply with the TILA's specified disclosure requirements, the consumer has a continuous right to rescind for as long as the creditor fails to comply, to a maximum of three (3) years. 15 U.S.C. § 1635(f). See e.g., Ljepava v. M.L.B.C. Properties, Inc., 511 F.2d 935 (9th Cir. 1975); Sosa v. Fite, 498 F.2d 114 (5th Cir. 1974); Cerasta v. Hibernia National Bank, 411 F.Supp. 176 (E.D. Pa. 1976); aff'd on this issue, rev'd and remanded on other grounds, 575 F.2d 580 (5th Cir. 1978). See also, Aquino v. Public Finance Consumer Discount Co., 606 F.Supp. 504 (E.D. Pa. 1985). Exercise of the right to rescind under section 1635(a) results in the consumer's discharge of liability for any finance or other charges, and any security interest which has been taken becomes void. 15 U.S.C. § 1635(b). Further, within twenty (20) days of receiving

notice of rescission, the creditor must return any money given by the borrower, including loan payments, and must take appropriate steps to terminate any security interest created. Once the creditor has performed these obligations, the consumer must tender the property obtained [*11] by the loan or its reasonable value. 15 U.S.C. § 1635(b). Aquino, supra, 606 F.Supp. at 509. If a creditor fails to fulfill its duties where the borrower properly rescinds, the creditor is liable for damages for that failure in addition to its liability for damages for an underlying disclosure violation. 15 U.S.C. § 1635(g).

With these general principles in mind, the Court now turns its attention to the specific issues raised by the parties on this appeal.

B. The bankruptcy court did not err in allowing rescission of the November 30, 1983 loan

The gist of Mid-Penn's argument on appeal is that the bankruptcy court erred in holding that a lender's failure to satisfy a mortgage from a prior transaction "immediately" upon passage of the three-day rescission period amounts to a retention of multiple mortgages in a debtor's residency that must be disclosed even when the lender has no intention of maintaining the prior mortgage, and plans on satisfying such obligations. Mid-Penn argues that because the July, 1983 mortgage was ultimately "satisfied," the inaccuracies in the 1983 Notice of Right to Cancel did not violate either the TILA or Reg Z. Furthermore, Mid-Penn contends [*12] that, because it ultimately satisfied the pre-1984 mortgages, and the November, 1983 loan was paid in full as a result of the 1984 refinancing it could have done nothing in response to the debtor's demand for rescission of the November 1983 loan. The Court finds neither of these arguments persuasive.

As indicated above, the TILA and Reg Z are designed to ensure that borrowers receive accurate and complete information about credit transactions in order for them to make an informed decision as to the type of loan obligations that are assumed, as well as to allow for comparison of alternative credit options. To this end, § 226.23(b)(1) of Reg Z provides that a creditor must "clearly and conspicuously disclose the retention or acquisition of a security interest in the consumer's principal dwelling." The record clearly indicates that the 1983 Notice of Right to Cancel did not satisfy this requirement, because Mid-Penn failed to inform Nichols that it would hold, though only for a short time, multiple mortgages in her home. As this court stated in Bookhart v. Mid Penn Consumer Discount Co., 559 F.Supp. 208 (E.D. Pa. 1983), the borrower's interest in her home is greatly affected [*13] by the total encumbrances on that interest and her ability to

get additional credit could turn on the number of mortgages recorded against her home. Id. at 211. Thus, all encumbrances against the borrower's principal residency should have been revealed in the disclosure statement and Notice of Right to Cancel.

Mid-Penn's assertion that its ultimate satisfaction of the pre-1984 mortgages absolves it of its disclosure responsibilities under the TILA is incorrect. It cannot be stressed enough that the TILA imposes no duty on a creditor to satisfy prior mortgages. It is a disclosure statute. All the Act requires is that a creditor tell the borrower whether it has retained or will acquire a mortgage in the borrower's home. The TILA does not preclude a creditor from retaining multiple mortgages; it does, however, require disclosure of the nature of the credit transaction at the time of its inception. The notice Mid-Penn gave to Nichols in November, 1983 failed to do this. As a result, the debtor was entitled to rescind the transaction for up to three (3) years, a right properly exercised here.

Furthermore, this court is not persuaded by Mid-Penn's assertion that it could not have done [*14] anything in response to Nichols' demand for rescission of the November, 1983 loan. This argument ignores a creditor's rescission duties under the TILA. If a loan is rescinded, § 1635 of the TILA provides:

Within 20 days after receipt of a notice of rescission, the creditor shall return to the obligor any money or property given as earnest money, down payment, or otherwise . .

Thus, Mid-Penn could have returned any monies Nichols paid in connection with the transaction as § 1635 requires. Thus, it is disingenuous for Mid-Penn to now say that it could have taken no action in response to the debtor's rescission of the 1983 loan.

In view of the above, the court holds that it was not improper for the bankruptcy court to have concluded that Mid-Penn violated the TILA and Reg Z by failing to disclose the fact that it would retain multiple mortgages in the borrower's residency. Thus, the bankruptcy court's decision on this issue is now affirmed. n2

n2 In is supplemental briefs, Mid-Penn advised the court that the Federal Reserve Board recently amended its official staff commentary regarding Reg Z's Requirement of disclosure of security interests. The change became effective as of February 28, 1989, and the amended commentary now states:

2(a)(25) "Security Interest"

"6. Specificity of disclosure. A creditor need not separately disclose multiple security interests that it may hold in the same collateral. The creditor need only disclose that the transaction is secured by collateral, even when security interests from prior transactions remain of record and a new security interest is taken in connection with the transaction."

Mid-Penn presently argues that this new commentary, along with the other points raised in its previous briefs, shows that the bankruptcy court erred on the disclosure issue. The Court does not think that this change in the agency's commentary rectifies the aforementioned problem with Mid-Penn's arguments on this issue. Mid-Penn was obligated to satisfy the disclosure requirements outlined in Reg Z as it existed at the time of the November, 1983 loan transaction. A subsequent change in the agency's official commentary concerning regulations it has promulgated does not exonerate Mid-Penn's actions in this regard.

**[*15]**
C. The bankruptcy court did not err in denying rescission of the April 16, 1984 loan

Nichols contends that she should have been allowed to rescind the April, 1984 loan due to Mid-Penn's failure to disclose hidden finance charges imposed on her in the April, 1984 transaction. It is alleged that these finance charges were improperly included within the "amount financed" portion of the disclosure statement rather than within the "finance charge" section, rendering each of these disclosures inaccurate. Relying on its earlier decision in Jones v. Mid-Penn, slip op. Civ. 86-05212 (Bankr. E.D. Pa. Oct. 23, 1987) the bankruptcy court summarily rejected this claim, concluding that because the Pennsylvania law authorized the rebate formula Mid-Penn used in its refinancings, it was not required to disclose to the borrower the retention of unearned interest that the rebate formula provided. The debtor claims that the bankruptcy court misperceived her argument on this point and now seeks a reversal of its order denying rescission of the April, 1984 loan.

Nichols contends that an interest charge for a fractional month after the date of a refinancing transaction is a cost of credit in the **[*16]** "refinancing transaction" that must be disclosed as part of the "finance charges," rather than as part of the "amount financed" in a TILA disclosure for refinancing transactions. The debtor further argues that, at the very least, Mid-Penn should

have calculated "time unearned interest" for credit cost disclosure purposes by prorating the difference between the rebate figures for remaining periods of thirty-one and thirty-two months to account for the portion of the fifth month that had not yet expired. Applying this approach, Nichols maintains that the time amount of unearned interest with proper proration should have been the sum of $ 732.67. The debtor now claims that because Mid-Penn did not rebate $ 28.73 of this amount, it should have disclosed this amount as part of the loan's "finance charges," because it was a retention of unearned interest, and deducted $ 28.73 from the "amount financed" portion of the statement. Since Mid-Penn failed to do this, Nichols asserts that she properly exercised her rights of rescission in the April, 1984 loan.

The crucial question here is whether the disclosures contained in the Truth in Lending Disclosure Statement given to the debtor in connection **[*17]** with the April 16, 1984 transaction complied with the requirements of Reg Z, § 226.20. Section 226.20 states:

A refinancing occurs when an existing obligation that was subject to this subpart is satisfied and replaced by a new obligation undertaken by the same consumer. A refinancing is a new transaction requiring new disclosures to the consumer. The new finance charge shall include any unearned portion of the finance charge that is not credited to the existing obligation.

(Emphasis added)

Thus, the basic question that must now be considered is whether the interest retained by Mid-Penn in connection with the refinancing was "earned" or "unearned." If this retained interest was "unearned," the debtor was improperly denied her right to rescind the April 16, 1984 loan.

The debtor bases her present arguments on the case of Steele v. Ford Motor Credit Company, 783 F.2d 1016 (11th Cir. 1986). In Steele, the Court found that interest retained on the refinancing at issue was "unearned" and therefore should have been disclosed by defendant upon its refinancing of a previous loan. The similarity between Steele and the case at bar is only that in both cases the creditor, **[*18]** in calculating the amount of rebate to which the debtor was entitled on refinancing, computed the interest to the end of the month in which the refinancing occurred rather than to the date of the payoff of the prior loan.

As previously stated, Section 226. 20 of Reg Z requires that when a refinancing occurs, the new finance charge shall include any unearned portion of the old finance

charge that is not credited to the existing obligation. Steele points out that neither the Act nor Reg Z define when interest is earned or when it is unearned. Thus, courts confronted with this question turn to state law. The district court in Steele held that the interest retained was unearned under Georgia law and therefore should have been disclosed.

As stated in Steele, anything above that to which a lender is properly entitled is considered "unearned" which must be disclosed to a borrower if the lender plans to retain such interest after its refinancing of a previous loan. Steele, supra. 783 F.2d at 1017. The issue is whether Mid-Penn was "properly entitled" to the interest it retained after its refinancing of the April, 1984 loan. To make this determination, the court must look to [*19] Pennsylvania's law governing the calculation of rebates on loan refinancings. The present transaction was governed by the Pennsylvania Consumer Discount Company Act, 7 Pa.Cons.Stat.Ann § 6201, et seq. ("PCDCA"). This act specifies the method to be used upon a prepayment or refinancing in order to calculate the rebate due the consumer. The PCDCA states in pertinent part:

On any contract which is wholly prepaid by cash, renewal or otherwise, at any time prior to maturity, the licensee shall refund to the consumer a portion of the interest or discounts. The portion to be refunded shall be that proportion of the interest or discount which the sum of the monthly balances originally scheduled to be outstanding during the full months following such prepayment in full bears to the sum of all monthly balances originally scheduled to be outstanding, both sums to be determined by the schedule of payments in the original contract . . . Such refund shall be computed and paid or credited at the time of prepayment on the contract.

7 Pa.Cons.Stat.Ann § 6214D. The regulations promulgated by the Department state:

On a loan contract which is wholly prepaid prior to maturity, licensee shall [*20] refund to the consumer the unearned portion of the interest or discount. The refund shall be computed in accordance with the formula contained in Section 14 D of the Act (7 P.S. Section 6214 D), which formula is the sum of the digits method commonly known as the Rule of 78's." 10 Pa. Code Section 41.3 (f)

This issue was addressed at length by the bankruptcy court in the Jones case cited earlier. In Jones, the court held that if the method of calculation of rebates utilized by a lender is authorized under state law, interest which accrues should be considered "earned" for

purposes of the TILA and Reg Z. Jones, slip op. pg. 12. In rejecting the rule outlined in the Steele case, this court stated:

The decision in Steele v. Ford Motor Credit Co., 783 F.2d 1016 (11th Cir. 1986), the sole authority relied upon by her, is therefore of little help to the Debtor. The court there states that "[n]either the (TILA) nor Regulation Z says anything about when interest is earned and when it is unearned. Thus, courts confronted with that question turn to state law." Id. at 1018. We believe that this statement meant that interest charges allowable under state law must be deemed [*21] "earned." This is another way of stating our initial observation, at page 10 Supra, that 12 C.F.R. Sec. 226.20 (a) does not require a lender to utilize a "fair" method of calculating rebates in financing transactions, like the actuarial method, but only the method required by state law. In Steele. the applicable state law obviously did not, as we hold the PCDCA does, permit the lender to calculate rebates by considering a partial month as a full month.

Id. at pg. 13.

The bankruptcy court found that the method of calculation used by Mid-Penn was authorized by § 6201 of the PCDCA. There appears to be no reason for disturbing this conclusion. Thus, in view of this fact, the court concludes that the interest taken in the refinancing was "earned" for purposes of the TILA and Reg Z. Consequently, there was no duty under § 226.20 to disclose separately the interest retained by Mid-Penn upon its refinancing of the previous loan. Accordingly, the bankruptcy court's decision on this issue will be affirmed.

CONCLUSION

For the foregoing reasons, the bankruptcy court's January 15, 1988 decision in this matter will be affirmed.

An appropriate Order will be entered.

ORDER [*22] - April 28, 1989, Filed

AND NOW, to wit, this 28th day of April, 1989, in accordance with the accompanying Memorandum, after thorough consideration of the supporting legal briefs, reply briefs, supplemental briefs, and affidavits, IT IS ORDERED that the bankruptcy court's decision of January 15, 1988 in this matter is hereby affirmed.

323 F. Supp. 2d 202; 2004 U.S. Dist. LEXIS 12136

RAUL J. RODRIGUES and JO-ANN E. RODRIGUES, Plaintiffs, v. MEMBERS MORTGAGE CO., INC. and PLYMOUTH SAVINGS BANK, Defendants.

CIVIL ACTION NO. 03-11301-PBS

UNITED STATES DISTRICT COURT FOR THE DISTRICT OF MASSACHUSETTS

323 F. Supp. 2d 202; 2004 U.S. Dist. LEXIS 12136

June 30, 2004, Decided

**SUBSEQUENT HISTORY:** Class certification granted by, Motion granted by Rodrigues v. Members Mortg. Co., 2005 U.S. Dist. LEXIS 2159 (D. Mass., Feb. 3, 2005)

**DISPOSITION:** [**1] Defendant's motion to dismiss allowed in part and denied in part.

## CASE SUMMARY

**PROCEDURAL POSTURE:** Plaintiff borrowers brought a proposed class action against defendants, a mortgage company and an assignee, alleging violations of the disclosure requirements of the Federal Truth in Lending Act (TILA), 15 U.S.C.S. § 1601 et seq., and the Massachusetts Consumer Credit Cost Disclosure Act (CCCDA), Mass. Gen. Laws ch. 140D. The assignee filed a partial motion to dismiss.

**OVERVIEW:** The borrowers obtained a second mortgage loan from the mortgage company, which assigned the loan to the assignee on the same day the borrowers entered into the loan agreement. At the loan signing, the borrowers signed a notice of the right to cancel (notice form) and a confirmation of non-exercise of the right to cancel (confirmation form). The court determined that the borrowers could not state a claim under TILA based upon the mortgage company's designation of the assignee as the recipient of the borrowers' rescission notice, because the technical violation of Federal Reserve Board Regulation Z, 12 C.F.R. pt. 226 (2004), was a minor deviation with no potential for actual harm. However, the borrowers' claim regarding the assignee's purported practice of presenting both the notice form and the confirmation form at the time of closing survived dismissal. Also, the borrowers' claim for statutory damages under 15 U.S.C.S. § 1640(e) was time-barred. Finally, the court dismissed the CCCDA claims because the CCCDA did not apply since the transaction occurred in Rhode Island.

**OUTCOME:** The court allowed the assignee's motion to dismiss with respect to the portions of the borrowers' complaint alleging violations of TILA based on the designation of the assignee as the recipient of rescission notice, with respect to the claim for statutory damages, and with respect to the CCCDA claims. The court denied the motion to dismiss as to the remaining claims.

**CORE TERMS:** borrower, rescission, notice, disclosure, consumer, right to rescind, cancel, signing, lender, rescind, regulation, assignee, election, statute of limitations, misleading, recipient, designate, obligor, confirmation, mortgage, specify, actual harm, objectively, confusing, cooling, exempt, refinancing, substantially similar, lending, hypertechnical

## LexisNexis(TM) Headnotes

*Civil Procedure > Pleading & Practice > Defenses, Objections & Demurrers > Failure to State a Cause of Action*

[HN1]For purposes of a motion to dismiss, the court takes as true the well-pleaded facts as they appear in the complaint, extending the plaintiff every reasonable inference in his favor.

*Civil Procedure > Pleading & Practice > Defenses, Objections & Demurrers > Failure to State a Cause of Action*

[HN2]A complaint should not be dismissed under Fed. R. Civ. P. 12(b)(6) unless it appears beyond doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief.

*Banking Law > Bank Activities > Consumer Protection > Truth in Lending*

[HN3]The Federal Truth in Lending Act, 15 U.S.C.S. § 1601 et seq., and the Massachusetts Consumer Credit Cost Disclosure Act, Mass. Gen. Laws ch. 140D, require lenders to make certain disclosures informing consumers of their right to rescind lending transactions when the loan is secured by the borrowers' primary residence.

*Banking Law > Bank Activities > Consumer Protection > Truth in Lending*

[HN4]The content and presentation of loan agreements are regulated under the Federal Truth in Lending Act,

Case 1:04-cv-11954-RCL    Document 13-5    Filed 03/24/2005    Page 25 of 43

323 F. Supp. 2d 202; 2004 U.S. Dist. LEXIS 12136

15 U.S.C.S. § 1601 et seq., and implementing Federal Reserve Board Regulation Z, 12 C.F.R. pt. 226 (2004).

*Banking Law > Bank Activities > Consumer Protection > Truth in Lending*

[HN5]The Federal Truth in Lending Act, 15 U.S.C.S. § 1601 et seq., provides in relevant part: In the case of any consumer credit transaction in which a security interest is or will be retained or acquired in any property which is used as the principal dwelling of the person to whom credit is extended, the obligor shall have the right to rescind the transaction until midnight of the third business day following the consummation of the transaction or the delivery of the information and rescission forms required under this section together with a statement containing the material disclosures required under this subchapter, whichever is later, by notifying the creditor, in accordance with regulations of the Federal Reserve Board, of his intention to do so. The creditor shall clearly and conspicuously disclose, in accordance with regulations of the Board, to any obligor in a transaction subject to 15 U.S.C.S. § 1635 the rights of the obligor under § 1635. 15 U.S.C.S. § 1635(a).

*Banking Law > Bank Activities > Consumer Protection > Truth in Lending*

[HN6]Under the Federal Truth in Lending Act, 15 U.S.C.S. § 1601 et seq., borrowers who secure debt by refinancing their primary residence must receive notice that "clearly and conspicuously" discloses their right to rescind the transaction for three business days following the closing of the transaction. 12 C.F.R. § 226.17.

*Banking Law > Bank Activities > Consumer Protection > Truth in Lending*

[HN7]See 12 C.F.R. § 226.17.

*Banking Law > Bank Activities > Consumer Protection > Truth in Lending*

[HN8]In the context of the Federal Truth in Lending Act (TILA), 15 U.S.C.S. § 1601 et seq., the sufficiency of TILA-mandated disclosures must be analyzed from the vantage point of an ordinary consumer. The sole instance in which the statute and its implementing regulations allow the consumer to waive his right to rescind within three days is where the consumer believes that a bona fide emergency necessitates an immediate extension of credit. 12 C.F.R. § 226.23(e).

*Banking Law > Bank Activities > Consumer Protection > Truth in Lending*

[HN9]To exercise the right to rescind, the consumer shall notify the creditor of the rescission by mail, telegram, or other means of written communication. 12 C.F.R. § 226.23(a)(2).

*Banking Law > Bank Activities > Consumer Protection > Truth in Lending*

[HN10]Federal Reserve Board Regulation Z, 12 C.F.R. pt. 226 (2004), requires lenders to inform borrowers how to exercise the right to rescind, with a form for that purpose, designating the address of the creditor's place of business. 12 C.F.R. § 226.15(b)(3).

*Banking Law > Bank Activities > Consumer Protection > Truth in Lending*

[HN11]A creditor is defined as the person to whom the debt arising from the consumer credit transaction is initially payable on the face of the evidence of indebtedness. 15 U.S.C.S. § 1602(f).

*Banking Law > Bank Activities > Consumer Protection > Truth in Lending*

[HN12]15 U.S.C.S. § 1640(a) imposes liability for damages only on "creditors." The Federal Truth in Lending Act, 15 U.S.C.S. § 1601 et seq., also provides that with certain exceptions, any civil action for a violation of this subchapter which may be brought against a creditor may be maintained against any assignee of such creditor only if the violation for which each action or proceeding is brought is apparent on the face of the disclosure statement, except where the assignment was involuntary. 15 U.S.C.S. § 1641(a). Any consumer who has a right to rescind a transaction under 15 U.S.C.S. § 1635 may rescind the transaction as against any assignee of the obligation. 15 U.S.C.S. § 1641(c).

*Banking Law > Bank Activities > Consumer Protection > Truth in Lending*

[HN13]In lieu of designating a creditor as the party to receive a borrower's rescission notice, the Official Staff Commentary to Federal Reserve Board Regulation Z (Regulation Z), 12 C.F.R. pt. 226 (2004), allows a creditor to designate its agent as the recipient of notice. 12 C.F.R. pt. 226, Supp. I, para. 15(a)(2)-1. The creditor may designate an agent to receive notice of rescission so long as the agent's name and address appear on the notice provided to the consumer. 12 C.F.R. § 226, Supp. I, para. 15(a)(2)-1. Regulation Z does not specify whether a creditor may designate an assignee as the party to receive a consumer's rescission notice.

*Banking Law > Bank Activities > Consumer Protection > Truth in Lending*

[HN14]While it is true that the Federal Truth in Lending Act (TILA), 15 U.S.C.S. § 1601 et seq., is a hypertechnical statute, de minimis violations in

Case 1:04-cv-11954-RCL     Document 13-5     Filed 03/24/2005     Page 26 of 43

323 F. Supp. 2d 202; 2004 U.S. Dist. LEXIS 12136

compliance with notice requirements with no potential for actual harm do not violate TILA. Thus, even if there were a technical violation of Federal Reserve Board Regulation Z, 12 C.F.R. pt. 226 (2004), any failure to provide the address of the initial creditor on the notice is a minor deviation with no potential for actual harm where the creditor has designated the assignee as the designated recipient of the rescission notice, and its address was plainly given.

*Banking Law > Bank Activities > Consumer Protection > Truth in Lending*

[HN15]In the context of the Federal Truth in Lending Act, 15 U.S.C.S. § 1601 et seq., an analysis of disclosure requirements is not "mechanical" but rather should be based on the "totality of the circumstances." There is no per se ban on providing both an acknowledgment receipt and waiver of rescission on the same form.

*Banking Law > Bank Activities > Consumer Protection > Truth in Lending*

[HN16]In the context of the Federal Truth in Lending Act, 15 U.S.C.S. § 1601 et seq., and the notice informing the borrowers of their right to rescind and the confirmation of non-exercise of that right, although there is no bar to the provision of both forms simultaneously, concerns are triggered when a borrower is asked to sign the waiver at the closing, before the three-day cooling off period has expired.

*Governments > Legislation > Statutes of Limitations > Time Limitations*

*Banking Law > Bank Activities > Consumer Protection > Truth in Lending*

[HN17]15 U.S.C.S. § 1635(f) provides the statute of limitations applicable to an obligor's right of rescission.

*Governments > Legislation > Statutes of Limitations > Time Limitations*

*Banking Law > Bank Activities > Consumer Protection > Truth in Lending*

[HN18]See 15 U.S.C.S. § 1635(f).

*Banking Law > Bank Activities > Consumer Protection > Truth in Lending*

[HN19]When a borrower has a right to rescind based on violations of 15 U.S.C.S. § 1635, the borrower has the right to additional relief.

*Banking Law > Bank Activities > Consumer Protection > Truth in Lending*

[HN20]See 15 U.S.C.S. § 1635(g).

*Governments > Legislation > Statutes of Limitations > Time Limitations*

*Banking Law > Bank Activities > Consumer Protection > Truth in Lending*

[HN21]15 U.S.C.S. § 1640(e) provides that any action to recover statutory damages under § 1640 may be brought within one year from the date of the occurrence of the violation. 15 U.S.C.S. § 1640(e).

*Governments > Legislation > Statutes of Limitations > Time Limitations*

*Banking Law > Bank Activities > Consumer Protection > Truth in Lending*

[HN22]A claim for statutory damages under the Federal Truth in Lending Act, 15 U.S.C.S. § 1601 et seq., must be brought within one year of the date the disclosure violation occurred.

*Governments > Legislation > Statutes of Limitations > Time Limitations*

*Banking Law > Bank Activities > Consumer Protection > Truth in Lending*

[HN23]Actions for statutory damages under the Federal Truth in Lending Act, 15 U.S.C.S. § 1601 et seq., must be brought within one year from the date of the occurrence of the violation. 15 U.S.C.S. § 1640(e).

*Banking Law > Bank Activities > Consumer Protection > Truth in Lending*

[HN24]Like its federal counterpart, the Massachusetts Consumer Credit Cost Disclosure Act (CCCDA), Mass. Gen. Laws ch. 140D, is designed to protect consumers and assure a meaningful disclosure of credit terms. The disclosure requirements of the Federal Truth in Lending Act (TILA), 15 U.S.C.S. § 1601 et seq., and CCCDA are essentially the same and generally do not require separate analysis. The relationship between CCCDA and TILA involves an unusual interplay of federal and state law.

*Banking Law > Bank Activities > Consumer Protection > Truth in Lending*

[HN25]Lending transactions "within" Massachusetts are exempt from the disclosure requirements of the Federal Truth in Lending Act (TILA), 15 U.S.C.S. § 1601 et seq., and Federal Reserve Board Regulation Z, 12 C.F.R. pt. 226 (2004). 15 U.S.C.S. § 1633; 12 C.F.R. § 226.29.

*Banking Law > Bank Activities > Consumer Protection > Truth in Lending*

[HN26]The Federal Reserve Board shall by regulation exempt from the requirements of this part any class of credit transactions within any State if it determines that

323 F. Supp. 2d 202; 2004 U.S. Dist. LEXIS 12136

under the law of that State that class of transactions is subject to requirements substantially similar to those imposed under this part, and that there is adequate provision for enforcement. 15 U.S.C.S. § 1633.

*Banking Law > Bank Activities > Consumer Protection > Truth in Lending*

[HN27]Pursuant to its authority under 15 U.S.C.S. § 1633, the Federal Reserve Board has determined that the Massachusetts Consumer Credit Cost Disclosure Act, Mass. Gen. Laws ch. 140D, imposes requirements "substantially similar" to the Federal Truth in Lending Act (TILA), 15 U.S.C.S. § 1601 et seq., and therefore credit transactions within Massachusetts are exempt from TILA's disclosure requirements. 12 C.F.R. pt. 226, Supp. I § 29(a)(4). Transactions within Massachusetts are exempt from the federal disclosure requirements. 12 C.F.R. pt. 226, Supp. I § 29(a)(4). This exemption, however, does not extend to the civil liability provisions of TILA. 12 C.F.R. § 226.29(b)(1). No exemptions granted under this section shall extend to the civil liability provisions of 15 U.S.C.S. §§ 1640 and 1641 of TILA. 12 C.F.R. pt. 226, Supp. I § 29(b). The provision that an exemption may not extend to 15 U.S.C.S. §§ 1640 and 1641 of TILA assures that consumers retain access to both Federal and State Courts. 12 C.F.R. pt. 226, Supp. I § 29(b).

*Governments > Legislation > Statutes of Limitations > Time Limitations*

*Banking Law > Bank Activities > Consumer Protection > Truth in Lending*

[HN28]While the Federal Truth in Lending Act (TILA), 15 U.S.C.S. § 1601 et seq., and the Massachusetts Consumer Credit Cost Disclosure Act (CCCDA), Mass. Gen. Laws ch. 140D, are substantially similar, they differ in their respective statutes of limitations. TILA provides a one-year statute of limitations for damages under 15 U.S.C.S. § 1640(e) and a three-year limit for rescission under 15 U.S.C.S. § 1635(f), whereas CCCDA provides a four-year statute of limitations for both rescission and damages claims. Mass. Gen. Laws ch. 140(D), § 10(f); Mass. Gen. Laws ch. 260, § 5A.

COUNSEL: For Jo-Anne Rodrigues, Raul J. Rodrigues, Plaintiffs: Cathleen M Combs, LEAD ATTORNEY, Law Offices of Claude Lefebvre & Sons, Christopher M. Lefebvre, LEAD ATTORNEY, Pawtucket, RI.

For Jo-Anne Rodrigues, Raul J. Rodrigues, Plaintiffs: Tara L. Goodwin, LEAD ATTORNEY, Edelman, Combs & Latturner, Heather Piccirilli, LEAD ATTORNEY, Edelman, Combs & Latturner, Chicago, IL.

For Jo-Anne Rodrigues, Raul J. Rodrigues, Plaintiffs: Christopher M. Lefebvre, LEAD ATTORNEY, Pawtucket, RI.

For Members Mortgage Company, Inc., Counter Claimant: Arlene J. Fothergill, LEAD ATTORNEY, Law Office of Charles F. Houghton, Charles F. Houghton, LEAD ATTORNEY, Charles F. Houghton, Stoneham, MA.

For Plymouth Savings Bank, Counter Claimant: Daniel J. Pasquarello, U. Gwyn Williams, LEAD ATTORNEYS, Goodwin Procter, LLP, Boston, MA.

For [**2] Jo-Anne Rodrigues, Raul J. Rodrigues, Counter Defendants: Christopher M. Lefebvre, LEAD ATTORNEY, Pawtucket, RI.

For Members Mortgage Company, Inc., Defendant: Robin Stein, LEAD ATTORNEY, Law Offices of Charles F. Houghton, Stoneham, MA.

JUDGES: PATTI B. SARIS, United States District Judge.

OPINIONBY: PATTI B. SARIS

OPINION:    [*204]    MEMORANDUM AND ORDER

Saris, U.S.D.J.

## I. INTRODUCTION

Plaintiffs Raul and Jo-Ann Rodrigues bring this proposed class action against Members Mortgage Company ("Members") and Plymouth Savings Bank ("Plymouth") for violating the disclosure requirements of the Federal Truth in Lending Act, 15 U.S.C. § 1635 ("TILA") and the Massachusetts Consumer Credit Cost Disclosure Act, Mass. Gen. Laws ch. 140D ("CCCDA").

Plymouth has filed a partial motion to dismiss pursuant to Fed. R. Civ. P. 12(b)(6), which the Court ALLOWS in part.

## II. ALLEGED FACTS

On August 29, 2001, Plaintiffs Raul and Jo-Ann Rodrigues obtained a $ 53,000 second mortgage loan for the purpose of refinancing prior debts. The Plaintiffs are residents of Rhode Island, the loan was secured by refinancing the mortgage on [**3] their Rhode Island home, and the loan signing took place in Rhode Island. n1 The Plaintiffs entered into this loan

323 F. Supp. 2d 202; 2004 U.S. Dist. LEXIS 12136

agreement with Members Mortgage Company, a Massachusetts corporation. On the same day the Plaintiffs entered into this agreement, Members assigned the Rodrigues' loan to Plymouth Savings Bank. Plymouth is a state-chartered bank with offices in Middleboro, Massachusetts.

- - - - - - - - - - - - - - Footnotes - - - - - - - - -
- - - - - -

n1 The Complaint fails to specify where the loan signing took place. During oral argument, however, Plaintiffs' counsel made clear that the loan signing took place in Rhode Island.

- - - - - - - - - - - End Footnotes- - - - - - - -
- - - - - -

At the loan signing, the Plaintiffs were presented with several forms, including a form entitled "Notice Of Right To Cancel" ("Notice"). It informs the borrower: "You have a legal right under federal law to cancel the new transaction, without cost, within three business days of August 29, 2001." The form specifies how to cancel by notifying the Plymouth Savings Bank:"Attn: Loan Closing Department, 151 Campanelli Drive, Middleboro, MA 02346" [**4]

(written in bold face).

In addition to the Notice Form, the Plaintiffs received a separate form entitled "Confirmation of Non-Exercise of Right to Cancel" ("Confirmation of Non-Exercise"). After specifically naming Plymouth Savings Bank as the lender, it stated:

1. **Transaction:** On August 29, 2001, (the "Closing Date"), the borrowers listed above (whether one or more, referred to as "Borrower") and Lender entered into a mortgage loan transaction.

2. **Notice of Right to Cancel Received:** Borrower acknowledges that on the Closing Date, Lender notified Borrower in writing of Borrower's right to cancel the loan within three (3) business [*205] days of whichever of the following events occurred last:(1) the date Borrower entered into the transaction;

(2) the date Borrower received a *Truth-In-Lending Disclosure;* or

(3) the date Borrower received notice of Borrower's Right to cancel.

3. **Truth-in-Lending Disclosure:** Borrower acknowledges that, on the Closing Date, Lender

provided Borrower with a *Truth-In-Lending Disclosure.*

4. **Right to Cancel Not Exercised:** Borrower acknowledges that, after waiting three (3) business days, Borrower [**5] has not exercised and does not want to exercise the right to cancel the transaction which right Borrower has under law.

5. **Request for Proceeds:** Borrower requests Lender to disburse the loan proceeds in reliance on this document.

Borrower has signed this confirmation this     day of    .

RAUL R. RODRIGUES Borrower

JO-ANN E. RODRIGUES Borrower

The Plaintiffs did not wait three days to complete the Confirmation of Non-Exercise. Instead, they signed the form on August 29 although the Confirmation was post-dated September 4, 2001. (It is unclear when that date was type-written). The Plaintiffs allege it is Plymouth's standard practice to have consumers sign both the Notice and Confirmation of Non-Exercise at the time of closing. (Amended Complaint P 15.)

On July 8, 2003, two years after the loan signing, the Plaintiffs notified Members and Plymouth of their election to rescind their mortgage loan. Plymouth honored the Rodrigues' rescission request by promptly depositing the contested loan funds into escrow. On July 11, 2003, the Plaintiffs filed a complaint with this Court alleging violations of TILA, 15 U.S.C. § 1601, *et seq.*, and [**6] its implementing Federal Reserve Board Regulation Z, 12 C.F.R. pt. 226. The Plaintiffs also ask this Court to exercise supplemental jurisdiction over the alleged CCCDA violations, Mass. Gen. Laws. ch. 140D, § 10 and the Massachusetts Division of Banks regulations, Mass. Regs. Code tit. 209, § 32.23.

### III. STANDARD OF REVIEW

[HN1]For purposes of this motion, the Court takes as true "the well-pleaded facts as they appear in the complaint, extending [the] plaintiff every reasonable inference in his favor." Coyne v. City of Somerville, 972 F.2d 440, 442-43 (1st Cir. 1992) (citing Correa-Martinez v. Arrillaga-Belendez, 903 F.2d 49, 51 (1st Cir. 1990)). [HN2]A complaint should not be dismissed under Fed. R. Civ. P. 12(b)(6) unless "'it appears beyond doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief.'" Roeder v. Alpha Indus., Inc., 814 F.2d 22, 25 (1st Cir. 1987) (quoting Conley v. Gibson, 355 U.S. 41, 45-46, 2 L. Ed. 2d 80, 78 S. Ct. 99 (1957)).

### IV. ANALYSIS

323 F. Supp. 2d 202; 2004 U.S. Dist. LEXIS 12136

A. TILA Statutory Background

[HN3]TILA and CCCDA require lenders to [**7] make certain disclosures informing consumers of their right to rescind lending transactions when the loan is secured by the borrowers' primary residence. Congress enacted TILA "so that the consumer will be able to compare more readily the various credit terms available to him and avoid the uninformed use of credit, and to protect the consumer against inaccurate and unfair credit billing and credit card practices." 15 U.S.C. § 1601(a). [HN4]The content and presentation of loan agreements are regulated under TILA and implementing Federal Reserve Board Regulation Z, [*206]  12 C.F.R. § 226 (2004). "Regulation Z" specifies the notice requirements and rescission rights at issue in this case. 12 C.F.R. §§ 226.15 (2004).

[HN5]TILA provides in relevant part:In the case of any consumer credit transaction ... in which a security interest ... is or will be retained or acquired in any property which is used as the principal dwelling of the person to whom credit is extended, the obligor shall have the right to rescind the transaction until midnight of the third business day following the consummation of the transaction or the delivery of the information [**8] and rescission forms required under this section together with a statement containing the material disclosures required under this subchapter, whichever is later, by notifying the creditor, in accordance with regulations of the [Federal Reserve] Board, of his intention to do so. The creditor shall clearly and conspicuously disclose, in accordance with regulations of the Board, to any obligor in a transaction subject to this section the rights of the obligor under this section.15 U.S.C. § 1635(a). [HN6]Under TILA, borrowers who secure debt by refinancing their primary residence must receive notice that "clearly and conspicuously" discloses their right to rescind the transaction for three business days following the closing of the transaction. 12 C.F.R. § 226.17 [HN7]("The creditor shall make the disclosure required by this subpart cleanly and conspicuously."). [HN8]The sufficiency of TILA-mandated disclosures must be analyzed from the vantage point of an ordinary consumer. See Smith v. The Cash Store Management, 195 F.3d 325, 327-28 (7th Cir. 1999) (holding that the allegation that the stapled receipt obscured the disclosures [**9] and that the printed contents of the receipt were confusing or misleading states a valid legal claim under TILA. The sole instance in which the statute and its implementing regulations allow the consumer to waive her right to rescind within three days is where the consumer believes that a bona fide emergency necessitates an immediate extension of credit. 12 C.F.R. § 226.23(e).

[HN9]"To exercise the right to rescind, the consumer shall notify the creditor of the rescission by mail, telegram, or other means of written communication." 12 C.F.R. § 226.23(a)(2). [HN10]Regulation Z also requires lenders to inform borrowers "how to exercise the right to rescind, with a form for that purpose, designating the address of the creditor's place of business." 12 C.F.R. 226.15(b)(3) (emphasis added).

B. Notice to the Assignee

At issue in this case is whether a creditor may designate an assignee instead of the creditor as the recipient of the rescission notice. [HN11]A creditor is defined as "the person to whom the debt arising from the consumer credit transaction is initially payable on the face of the evidence of indebtedness [**10] ..." 15 U.S.C. § 1602(f). Section 1640(a) [HN12]imposes liability for damages only on "creditors". TILA also provides that with certain exceptions, "any civil action for a violation of this subchapter ... which may be brought against a creditor may be maintained against any assignee of such creditor only if the violation for which each action or proceeding is brought is apparent on the face of the disclosure statement, except where the assignment was involuntary." Id. at § 1641(a). "Any consumer who has a right to rescind a transaction under § 1635 of this title may rescind the transaction as against any assignee of the obligation." Id. at § 1641(c).

[HN13]In lieu of designating a creditor as the party to receive a borrower's rescission [*207] notice, the Official Staff Commentary to Regulation Z allows a creditor to designate its agent as the recipient of notice. 12 C.F.R. 226, Supp. I, P 15(a)(2)-1 ("The creditor may designate an agent to receive [notice of rescission] so long as the agent's name and address appear on the notice provided to the consumer ...."). Regulation Z does not specify whether a creditor may designate an assignee, such as Plymouth, as the [**11] party to receive a consumer's rescission notice.

Defendant argues that if a borrower can rescind the transaction with respect to an assignee, and a creditor has the right to designate an agent to receive the notice of rescission, it follows that a creditor may designate its assignee as the recipient of a borrower's rescission notice so long as there is a clear and conspicuous notice of how a consumer should exercise his rescission rights. Pointing to the plain language of the regulation, the Plaintiffs rely on the line of caselaw holding that TILA is a hypertechnical statute. See Cash Store Management, 195 F.3d at 328 (subject to narrow exceptions, "hypertechnicality reigns" in the application of TILA). [HN14]While it is true that TILA is a hypertechnical statute, de minimis violations

in compliance with notice requirements with "no potential for actual harm" do not violate TILA. Cf. Bizier v. Globe Fin. Servs., Inc., 654 F.2d 1, 4 (1st Cir. 1981) (holding that a failure to meet disclosure request was not de minimis or hypertechnical where the "inaccuracy does have the potential for actual harm"); see also Smith v. Highland Bank, 108 F.3d 1325, 1327 (11th Cir. 1997) [**12] ("TILA does not require perfect notice; rather it requires a clear and conspicuous notice of rescission rights.") (quoting Veale v. Citibank, F.S.B., 85 F.3d 577, 580 (11th Cir. 1996); Smith v. Chapman, 614 F.2d 968, 972 (5th Cir. 1980) ("Strict compliance does not necessarily mean punctilious compliance if, with minor deviations from the language described in the Act, there is still a substantial, clear disclosure of the fact or information demanded by the applicable statute or regulation."). Thus, even if there were a technical violation of Regulation Z, any failure to provide the address of the initial creditor on the notice is a minor deviation with "no potential for actual harm" where the creditor has designated the assignee as the designated recipient of the rescission notice, and its address was plainly given.

The Defendant's Motion to Dismiss the portion of the Plaintiffs' claim alleging TILA violations based on the designation of Plymouth as the recipient of rescission notice is **ALLOWED**.

## C. Waiver

In connection with their refinancing transaction, the Plaintiffs received two separate documents: the Notice informing them [**13] of their right to rescind and the Confirmation of Non-Exercise of that right. The Plaintiffs signed both of these documents at the time of closing. The Plaintiffs claim that Plymouth's purported practice of presenting both documents at the time of closing is misleading because it gives borrowers the impression they have waived their rescission rights by signing a confirmation of non-exercise on the date the transaction is consummated.

In support of their position, the Plaintiffs rely heavily on the Eleventh Circuit's decision in Rodash v. AIB Mortgage Co., 16 F.3d 1142 (11th Cir. 1994). In Rodash, the form disclosing the rescission rights contained a single signature line for the purpose of acknowledging both receipt of TILA's disclosure requirements and the election not to exercise rescission rights. Id. at 1145. The Rodash court held that this practice was objectively misleading: [*208] Several considerations compel this conclusion. First, the appellees' proffering of the Election Not to Cancel during the transaction would confuse any reasonable borrower because it implies, incorrectly, that waiver is generally possible within the three-day [**14] cooling

off period. Indeed, the presentation of a waiver form on the day of the transaction contradicted the very purpose of the cooling off period: to give the consumer time to consider the terms of her financial commitments. Second, by having Rodash sign a certificate of non-rescission on the date of the transaction, the appellees suggested that she had foreclosed her right of rescission. Thus, if Rodash had changed her mind the next day and wished to rescind the transaction, it would have been reasonable for her not to have exercised that right as a direct result of the improper furnishing of the Election Not to Cancel. Third, the appellees' practice of placing the acknowledgment and the waiver on the same page -- indeed, in the same boilerplate paragraph -- is confusing because an objective borrower may not understand what she is signing. Finally, we find that the appellees' practice of handing the consumer a waiver form the same day as the mortgage and Note is a misleading one, as the consumer, here Rodash, could reasonably think that she had to sign that form -- as she must sign the other forms -- to consummate the mortgage transaction.

Id. at 1146. The [**15] Plaintiffs place too much emphasis on Rodash because, as the Eleventh Circuit pointed out in a subsequent opinion, Congress amended TILA in 1995 to express its disapproval of lender liability resulting from minor violations of TILA's disclosure requirements. See Highland Bank, 108 F.3d at 1327 n.4. In Highland Bank, the Eleventh Circuit limited the reach of Rodash:Although Smith urges us to follow Rodash, the instant case is distinguishable in several material aspects. First, even though the Certificate of Confirmation appears on the same page as the Acknowledgment of Receipt, it is in a distinct paragraph, and, importantly, must be separately signed. Second, although the form was proffered on the date of the mortgage transaction, it does not mislead the consumer as to whether she may rescind during the three-day period following the transaction. It indicates that the consumer is not to sign the Certificate of Confirmation until more than three business days have elapsed, and the Certificate of Confirmation subsection of the form is dated several days after the Acknowledgment of Receipt. Third, Highland's form provided Smith with much more [**16] detailed information about how to cancel the mortgage transaction than the form at issue in Rodash, thereby counteracting any confusion that the form might otherwise cause. Finally, although Smith creatively illustrates how one could be misled by the "Note" below the Certificate of Confirmation, it is clear that the intent of the "Note" is to ensure that all of

Case 1:04-cv-11954-RCL    Document 13-5    Filed 03/24/2005    Page 31 of 43

323 F. Supp. 2d 202; 2004 U.S. Dist. LEXIS 12136

the signatories to the Acknowledgment of Receipt concur in the decision not to rescind.

Id. at 1327 (footnotes omitted). Distinguishing Rodash as involving egregious facts, the court emphasized that [HN15]an analysis of disclosure requirements is not "mechanical" but rather should be based on the "totality of the circumstances." Id. Highland Bank also held there is no *per se* ban on providing both an acknowledgment receipt and waiver of rescission on the same form. Id. at 1327 n.1. Highland Bank is unhelpful on one key point: it does not specify when the waiver was signed.

[*209]  [HN16]Although there is no bar to the provision of both forms simultaneously, concerns are triggered when a borrower is asked to sign the waiver at the closing, before the three-day cooling off period has [**17] expired. As one court pointed out:

the language of the election not to rescind is both objectively false and internally inconsistent. While the first two sections of the one-page notice document explicitly state the time period and procedure for rescission, the disputed provision states on the very same page that the lender "certif[ies] that the rescission period *has expired*." Such a statement is simply false and directly in conflict with the language stating "you have a legal right under federal law to cancel this transaction, without cost, within *THREE (3) BUSINESS DAYS* ...." A prospective borrower signing the document at closing is bound to be confused about whether her right of rescission has actually passed.

Wiggins v. Avco Fin. Servs., 62 F. Supp. 2d 90, 96-97 (D.D.C. 1999) (finding TILA violation where "plaintiff did not receive clear and conspicuous notice of her right to rescind" "because the election not to rescind is inherently confusing in both its language and its placement on the notice document as a whole"). Similarly, here the "confirmation" in section 4 states that: "Right to Cancel Not Exercised: Borrower acknowledges that, [**18] after waiting three (3) business days, Borrower has not exercised and does not want to exercise the right to cancel the transaction which right Borrower has under law." See also Pulphus v. Sullivan, 2003 U.S. Dist. LEXIS 7080 ,2003 WL 1964333 at *15 (N.D. Ill. Apr. 28, 2003) (plaintiff stated a claim for failure to provide notice of rescission rights where she alleged that, although her confirmation of election not to rescind was dated three business days after the closing, she was directed to sign it on the day of the closing); Latham v. Residential Loan Ctrs. of Am., Inc., 2004 U.S. Dist. LEXIS 7993, 2004 WL 1093315 at *4 (N.D. Ill. May 6, 2004) (same). Defendant cites only one contrary

case, ContiMortgage Corp. v. Delawder,2001 Ohio App. LEXIS 3410, 2001 WL 884085 (Ohio App. July 30, 2001), but that case is not persuasive for a number of reasons. First, it was decided after a bench trial, not in the context of a motion to dismiss. Second, it appears to be unpublished, and third, it acknowledges that it is disagreeing with federal caselaw concluding that the signing of a post-dated waiver of the right to rescind a loan transaction violates the TILA.

Here, the Plaintiffs were asked to sign both the rescission notice [**19] and the Confirmation of Non-Exercise at the time of closing. Objectively speaking, there is nothing misleading about the boilerplate forms themselves, nor is there anything objectively misleading about providing both forms at the closing. What has the serious potential for actual harm is the request to sign both forms at the closing. Not only might a reasonable borrower believe it was necessary to sign both forms at the time of closing, but the practice is particularly confusing because a reasonable borrower might not understand that despite signing the confirmation he still had the right to rescind in the three day cooling off period. The Defendant's Motion to Dismiss is **DENIED.**

D. Statute of Limitations

Section 1635(f) [HN17]provides the statute of limitations applicable to an obligor's right of rescission. With exception not applicable here, this section states: [HN18]"An obligor's right of rescission shall expire three years after the date of consummation of the transaction or upon the sale of the property, whichever occurs first, notwithstanding the fact that the information and forms received under this section or any other disclosures required under this part have [**20] not been delivered to the obligor [*210] ...." 15 U.S.C. § 1635(f). [HN19]When a borrower has a right to rescind based on violations of Section 1635, the borrower has the right to additional relief. Section 1635(g) provides: [HN20]"In any action in which it is determined that a creditor has violated this section, in addition to rescission the court may award relief under section 1640 of this title for violations of this subchapter not relating to the right to rescind." Id. at § 1635(g). Section 1640(e) [HN21]provides that "any action [to recover statutory damages] under this section may be brought ... within one year from the date of the occurrence of the violation." Id. at § 1640(e) (emphasis added).

The Defendant argues that the Plaintiffs' claim for statutory damages is time-barred because the Plaintiffs filed their original complaint in July 2003, two years after the alleged disclosure violations took place. The Plaintiffs contend that when a borrower has three years

to exercise his right of rescission based on disclosure violations under § 1635(f), the statutory damages period under § 1640(e) is extended for three years.

Most courts have held that [HN22]a claim for statutory [**21] damages under TILA must be brought within one year of the date the disclosure violation occurred. See, e.g., Smith v. Fid. Consumer Disc. Co., 898 F.2d 896, 903 (3d Cir. 1990); Rudisell v. Fifth Third Bank, 622 F.2d 243, 246 (6th Cir. 1980) (one-year statute of limitations on claim for damages starts to run on date disclosures should have been made); Basham v. Fin. Am. Corp., 583 F.2d 918, 927-28 (7th Cir. 1978); Wiggins, 62 F. Supp. 2d at 97; but see McIntosh v. Irwin Union Bank and Trust, Co., 215 F.R.D. 26, 30 (D. Mass. 2003) (holding that "if the plaintiffs have the right to rescind based on a lack of a material disclosure, the three year period for rescission claims under Section 1635(g) applies").

This Court concludes that [HN23]actions for statutory damages under TILA must be brought "within one year from the date of the occurrence of the violation." 15 U.S.C § 1640(e). Based on the foregoing, the Defendants' Motion to Dismiss the Plaintiffs' claim for statutory damages under Section 1640(e) is **ALLOWED.**

### E. CCCDA Claim

In addition to claims brought under [**22] TILA, the Plaintiffs also allege that Members and Plymouth violated the disclosure requirements of CCCDA, Mass. Gen. Laws ch. 140D. [HN24]Like its federal counterpart, CCCDA is designed to protect consumers and assure a meaningful disclosure of credit terms. Desrosiers v. Transamerica Fin. Corp., 212 B.R. 716, 722 (Bankr. D. Mass. 1997). The disclosure requirements of TILA and CCCDA are essentially the same and generally do not require separate analysis. Bizier, 654 F.2d at 2. The relationship between CCCDA and TILA involves "an unusual interplay of federal and state law." Id.

This case raises the novel issue of whether a plaintiff may bring a CCCDA claim against a Massachusetts lender when the transaction giving rise to the claim takes place in another state. Had the Plaintiffs' lending transaction taken place in Massachusetts instead of Rhode Island, the issue of whether CCCDA applies to their transaction would be straightforward, because [HN25]lending transactions "within" Massachusetts are exempt from the disclosure requirements of TILA and Regulation Z. See 15 U.S.C. § 1633; 12 C.F.R. § 226.29. Section [**23] 1633 of TILA provides:[HN26]The [Federal Reserve] Board shall by regulation exempt from the requirements of this part

any class of credit transactions within any State if it determines that under the law of that State that class of transactions is subject to [*211] requirements substantially similar to those imposed under this part, and that there is adequate provision for enforcement.15 U.S.C. § 1633 (emphasis added).

[HN27]Pursuant to its authority under Section 1633, the Federal Reserve Board has determined that CCCDA imposes requirements "substantially similar" to TILA and therefore credit transactions within Massachusetts are exempt from TILA's disclosure requirements. See 12 C.F.R. pt. 226, Supp. I § 29(a)(4); Bizier, 654 F.2d at 2. ("Transactions within Massachusetts [are exempt] from the federal disclosure requirements."). This exemption, however, does not extend to the civil liability provisions of TILA. 12 C.F.R. § 226.29(b)(1) ("No exemptions granted under this section shall extend to the civil liability provisions of sections [1640] and [1641] of the Act."). See 12 C.F.R. pt. 226, Supp. I § 29(b) [**24] ("The provision that an exemption may not extend to sections [1640 and 1641] of the Act assures that consumers retain access to both Federal and State Courts ....").

[HN28]While TILA and CCCDA are substantially similar, they differ in their respective statutes of limitations. TILA provides a one-year statute of limitations for damages under § 1640(e) and a three-year limit for rescission under § 1635 (f), whereas CCCDA provides a four-year statute of limitations for both rescission and damages claims. Mass. Gen. Laws ch. 140(D), § 10(f) (statute of limitations for rescission); Mass. Gen. Laws ch. 260, § 5A (statute of limitations for damages).

Here, because the transaction occurred in Rhode Island, CCCDA does not apply and TILA provides the governing statute of limitations. Defendant's Motion to Dismiss the Plaintiffs' CCCDA claim is **ALLOWED.**

### V. ORDER

For the foregoing reasons, the Defendant's Motion to Dismiss (Docket No. 26) is **ALLOWED** with respect to the portions of the Plaintiffs' complaint alleging violations of TILA based on the designation of Plymouth as the recipient of rescission notice, **ALLOWED** with [**25] respect to the Plaintiffs' claim for statutory damages, and **ALLOWED** with respect to Plaintiffs' CCCDA claim. Otherwise, the motion is **DENIED.**

PATTI B. SARIS

United States District Judge

1996 U.S. Dist. LEXIS 21901

ROBERT SALOIS AND DIANNE E. SALOIS, NINON R.L. FREEMAN, AND DAVID M. LEARY AND LINDA SCURINI-LEARY, INDIVIDUALLY AND ON BEHALF OF OTHERS SIMILARLY SITUATED, Plaintiffs, v. THE DIME SAVINGS BANK OF NEW YORK, FSB, HARRY W. ALBRIGHT, JR., JOHN B. PETTIT, JR., WILLIAM J. MELLIN, WILLIAM J. CANDEE III, WILLIAM A. VOLCKHAUSEN, JAMES E. KELLY, RALPH SPITZER, ROBERT G. TURNER, BRIAN GERAGHTY, LAWRENCE W. PETERS, E. JUDD STALEY III, AND JOHN DOE COMPANIES, Defendants.

CIVIL ACTION NO. 95-11967-PBS

UNITED STATES DISTRICT COURT FOR THE DISTRICT OF MASSACHUSETTS

1996 U.S. Dist. LEXIS 21901

November 13, 1996, Decided

**DISPOSITION:** [*1] Defendants' motion to dismiss (Docket No. 51) ALLOWED without prejudice.

## CASE SUMMARY

**PROCEDURAL POSTURE:** Defendant bank and its employees filed a motion to dismiss plaintiff borrowers class action suit which alleged the bank violated federal and state law with respect to the advertisement, sale, and servicing of the negative-amortization mortgages that it issued, arguing that all claims were barred by the statutes of limitations because they were filed over seven years after the execution of the plaintiffs' loan agreements.

**OVERVIEW:** The borrowers filed their class action suit over seven years after the last corrective document was sent by the bank and its employees. The statutes of limitations on the federal claims ranged from one year to four years. Unless the actions had accrued at a later date, or had been tolled by fraudulent concealment, all federal claims were time-barred. Any claims which accrued prior to four years prior to the date of filing were time-barred. The borrowers' RICO injuries were sustained, if at all, when their mortgages were issued, and when payments were made under the mortgages. At least two predicate acts had been committed by the second mortgage payment, and the statute of limitations began to run. The statute of limitations was not tolled because they could not have known of the injuries, despite the allegations that their loan documents omitted important information, and were sufficiently complicated that the actual material terms were concealed from all but a few well-trained mortgage analysts.

**OUTCOME:** The bank and it's employees' motion for summary judgment was granted as all claims arising out of the representations, disclosures, and fees at the time the loans were issued were time-barred. The breach of contract claims that the loans continued to be serviced improperly throughout the repayment period were also time-barred.

**CORE TERMS:** statute of limitations, mortgage, time-barred, disclosure, interest rate, fraudulent concealment, amortization, monthly payments, deferred, monthly, fiduciary relationship, motion to dismiss, cause of action, corrective, discover, tolling, monthly payment, borrower, cap, breach of contract, four-year, breached, tolled, servicing, concealed, consumer, Parity Act, limitations period, fiduciary duty, et seq

**LexisNexis(TM) Headnotes**

*Civil Procedure > Pleading & Practice > Defenses, Objections & Demurrers > Failure to State a Cause of Action*

*Torts > Business & Employment Torts > Deceit & Fraud*

[HN1]In ruling on a motion to dismiss for failure to state a claim, a court may look only to the complaint itself, even if the defendant raises affirmative defenses. The motion shall be allowed if it appears beyond doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief. The court must accept all factual allegations in the complaint as true, and draw all reasonable inferences in favor of the plaintiff. Although fraud must be pled with particularity, Fed. R. Civ. P. 9(b), other claims require only a short and plain statement of the claim showing that the pleader is entitled to relief. Fed. R. Civ. P. 8(a). However, the court need not accept legal conclusions or bald assertions made without factual support.

*Governments > Legislation > Statutes of Limitations > Statutes of Limitations Generally*

*Civil Procedure > Pleading & Practice > Defenses, Objections & Demurrers > Failure to State a Cause of Action*

*Civil Procedure > Pleading & Practice > Defenses, Objections & Demurrers > Affirmative Defenses*

[HN2]The statute of limitations defense may be addressed in a Fed. R. Civ. P. 12(b)(6) motion when the defense is obvious on the face of the pleadings.

*Criminal Law & Procedure > Criminal Offenses > Racketeering > Racketeer Influenced & Corrupt Organizations*

[HN3]The Racketeer Influenced and Corrupt Organizations Act (RICO), 18 U.S.C.S. §§ 1962(c) and 1964(c), imposes civil liability for injury to business or property by reason of a violation of 18 U.S.C.S. § 1962, which in turn makes it a crime for any person employed by or associated with any enterprise to conduct or participate, directly or indirectly, in the conduct of such enterprise's affairs through a pattern of racketeering activity. An act of racketeering activity is the commission of one of the crimes enumerated in the statute pursuant to 18 U.S.C.S. § 1961(1). A pattern of racketeering activity requires at least two acts of racketeering activity under 18 U.S.C.S. § 1961(5).

*Governments > Legislation > Statutes of Limitations > Statutes of Limitations Generally*

*Criminal Law & Procedure > Criminal Offenses > Racketeering > Racketeer Influenced & Corrupt Organizations*

[HN4]Because Racketeer Influenced and Corrupt Organizations Act (RICO) does not include a limitations period, the Clayton Act's four-year period, 18 U.S.C.S. § 15b, applies to civil RICO claims. The four-year period begins to run when a plaintiff knew or should have known of his injury. Once each element of RICO has been satisfied, and the plaintiff has cause to know of the injury, the statute will run. Even an additional predicate act within the limitations period will not save the action.

**COUNSEL:** For ROBERT SALOIS, DIANNE E. SALOIS, Plaintiffs: Dana L. Mason, Hargraves, Karb, Wilcox & Galvani, Framingham, MA.

For DIANNE E. SALOIS, Plaintiff: Evans J. Carter, Hargraves, Karb, Wilcox & Galvani, Framingham, MA.

For DIME BANCORP, INC. aka Dime Savings Bank of New York FSB, HARRY W. ALBRIGHT, JOHN B. PETTIT, JR., WILLIAM A. VOLCHAUSEN, LAWRENCE W. PETERS, E. JUDD STALEY,

RALPH SPITZER, WILLIAM J. CANDEE, Defendants: William S. Eggeling, Roscoe Trimmier, Darlene C. Lynch, Ropes & Gray, Boston, MA.

For JAMES E. KELLY, Defendant: William S. Eggeling, Roscoe Trimmier, Darlene C. Lynch, Theodore W. Ruger, Ropes & Gray, Boston, MA.

For WILLIAM J. MELLIN, Defendant: William S. Eggeling, Roscoe Trimmier, Ropes & Gray, Boston, MA.

**JUDGES:** PATTI B. SARIS, United States District Judge.

**OPINIONBY:** PATTI B. SARIS

**OPINION: MEMORANDUM AND ORDER**

November 13, 1996

SARIS, U.S.D.J.

**I. INTRODUCTION**

Plaintiffs filed this proposed class action on September 1, 1995, alleging that the Dime Savings Bank ("Dime") and its employees violated federal and state law with respect to the advertisement, sale, [*2] and servicing of the negative-amortization mortgages that it issued in Massachusetts from 1986 to 1989. n1 The graduated payment, variable rate mortgages were designed so that the monthly payments would not cover the monthly interest, causing the principal balance to increase over the repayment period. Plaintiffs complain that Dime, on its own and through its subsidiary Dime Real Estate Services of Massachusetts, misrepresented the nature of the mortgages, failed to make the required statutory disclosures, and made the loan documents sufficiently complicated that the ordinary consumer would be unable to understand the terms of the loan. They also allege that the servicing of the loans was contrary to the loan documents and Massachusetts law.

- - - - - - - - - - - - - - Footnotes - - - - - - - - - - - - - -

n1 The thirteen count, 277 paragraph, second amended complaint dated February 15, 1996 added new named plaintiffs, Ms. Ninon Freeman and the Leary's. The statute of limitations analysis does not hinge on when the parties were named as plaintiffs. The second amended complaint alleges violations of the Racketeer Influenced Corrupt Organizations Act, 18 U.S.C. §§ 1961-1968 (RICO) (Count II), the Truth-In-Lending Act, 15 U.S.C. §

1601 et seq. (Count III), the Real Estate Settlement Procedures Act, 12 U.S.C. §§ 2601-2617 (RESPA) (Count IV), the Parity Act, 12 U.S.C. §§ 3801-3806 (Count V), the Massachusetts Consumer Credit Cost Disclosure Act, Mass. Gen. L. ch. 140D (Count VI), the Massachusetts Consumer Protection Act, Mass. Gen. L. ch. 93A (Count VII), breach of contract (Count VIII - Recission), breach of the covenant of good faith & fair dealing (Count IX), breach of fiduciary duty (Count X), fraud, deceit, and misrepresentation (Count XI), civil conspiracy (Count XII), and negligent misrepresentation, negligent hiring and supervision, and vicarious liability (Count XIII). Plaintiffs make a jury demand, and seek declaratory judgment (Count I), certification of a class, damages, rescission, injunction against foreclosure, and attorney's fees.

- - - - - - - - - - - - End Footnotes- - - - - - - -
- - - - -

**[\*3]**

Defendants move to dismiss, arguing that all claims are barred by the statutes of limitations because they were filed over seven years after the execution of the plaintiffs' loan agreements. Plaintiffs respond that the inadequate and misleading disclosures prevented them from discovering their claims despite the exercise of reasonable diligence, and that defendants fraudulently concealed their claims. Defendants also argue that the complaint fails to state a claim on the merits, and that they are not properly subject to the personal jurisdiction of this court.

The Court concludes that all claims arising out of the representations, disclosures, and fees at the time the loans were issued are time-barred. The breach of contract claims that the loans continued to be serviced improperly throughout the repayment period are also time-barred with respect to the specific allegations and attachments to the Second Amended Complaint. Accordingly, defendants' motion for summary judgment is **ALLOWED** without prejudice to the Salois' claim of breach of the settlement agreement.

## II. FACTUAL BACKGROUND

Accepting all facts pled in the complaint as true for the purposes of this **[\*4]** motion, the Court treats the following facts as undisputed.

The Dime Savings Bank of New York, FSB ("Dime"), a federally chartered savings bank, set up and controlled subsidiaries in states throughout the eastern United States, including Massachusetts. Operating as The Dime Real Estate Services - Massachusetts ("DRES-MA"), defendants conducted loan transactions out of a number of offices in Massachusetts, between July 1, 1986 and December 31, 1989. The bank made more than four thousand mortgage loans in Massachusetts during that time period, totalling in excess of six hundred million dollars. (Compl. P 4.) By 1990 DRES-MA was dissolved and/or merged into Dime. (Compl. P 12.) Dime continued to service at least some of the loans. (Compl. Ex. F.) The current holders of the outstanding mortgage loans which Dime originated have been designated the "John Doe Companies."

### A. The Alleged Product and Sales Scheme

In Massachusetts, Dime marketed primarily the "Impact Loan", instructing loan production representatives ("LPRs") who marketed the loans to the public to push the sale of that type of loan to the exclusion of other options. (Compl. P 79.) Dime's "Impact Loan" featured both **[\*5]** graduated monthly payments and a variable interest rate. It had two additional distinctive features. First, it was designed to negatively amortize. Second, it required very little verification of employment, income, or assets. (Compl. PP 36-37.)

### 1. Negative amortization

Monthly loan payments are fully "amortizing" when they cover the monthly interest on the loan and pay down the principal. "Negative amortization" occurs when the monthly payment is insufficient to cover the monthly interest. The unpaid interest is added to the principal, and begins to accrue interest itself. Thus, despite the borrower's regular payments, the principal owed on the loan increases over time. Under the Dime agreements, no payments were applied to the principal until all deferred interest had been paid. (Compl. P 53.)

Dime made its loans more attractive to plaintiffs and others by offering a discounted interest rate of 7.5% for the first six months, and a cap of 9.5% for the second six months. (Compl. P 57.) Only after that time would the rate charged conform to the Cost of Funds index plus three per cent, as described in the loan agreement, with a cap of 13.875%. (Compl. Ex. C.) Once the interest **[\*6]** rate rose, the principal would begin to negatively amortize, unless and until falling interest rates and/or increased monthly payments resulted in a payment which covered the monthly interest. (Compl. P 40.)

After the first six months, the monthly statements showed increases in the principal balance "like clockwork." (P40, 62). "Deferred interest" began to

appear on the statements in the second year of the loan. (Compl. P 62.) Once the principal balance reached 110% of the original principal, the borrower would be required to make fully amortizing payments. (Compl. P 42.)

## 2. Loan verification

Dime instructed its managers and LPRs to ensure that the loan verification supported the application. As a matter of policy, loan approvals were granted on the basis of the value of the real estate being sold, rather than on the basis of the borrowers' down payment or financial credentials. (Compl. Ex. X.) In addition, LPRs and attorneys were instructed not to investigate the existence or source of down payment funds and closing costs. (Compl. P 86.) In some cases, the down payment would come from a second mortgage on the property being purchased. (Compl. P 161.)

## 3. Marketing

The [*7] complaint alleges that defendants engaged in a calculated scheme to market their loans which included: (1) fraudulent mortgage advertisements, disclosures, and loan documents; (2) federal Truth-in-Lending Disclosure Statements, Loan Commitments, and mortgage loan documents which omitted important information and were sufficiently complicated that the actual material terms would be concealed from all but a few well-trained mortgage analysts; and (3) unfair and/or deceptive marketing tactics such as product tampering and equity skimming. (Compl. P 43.) At no time in the "typical" transaction would the LPR tell the borrower the loan was a negative amortization loan. (Compl. P 165.)

As part of the general scheme of loan sales, Dime told potential borrowers "We always do it this way," and "You don't need an attorney. Dime's attorney will handle things." The Salois' were instructed that they would not need their own attorney, so they did not hire one. (Compl. P 162.)

## 4. Foreclosure

In the event of foreclosure on a property, Dime would typically debit the entire amount of the mortgage loan as a "tax loss carry forward," and expend a lesser amount to purchase the property. This allowed [*8] the bank to avoid the paper loss through a tax savings. (Compl. P 103.) From 1990 to 1993, Dime had a foreclosure rate of sixty per cent, the highest rate in the country. (Compl. P 104.) In 1993, Dime was able to shield approximately forty-four million dollars of income from any federal corporate income taxes and still had approximately two-hundred thirty-nine million dollars worth of "tax loss carry forward." (Compl. P 105.)

## B. The Plaintiffs' Loans

There are three loans specifically at issue in this complaint. Ninon R.L. Freeman, who was added as a plaintiff in the amended complaint, obtained a loan from Dime with her then-husband for $ 150, 000 to refinance their Newton, Massachusetts home on November 18, 1986. This loan was paid off in full in December 1993 and Ms. Freeman still resides at that residence.

The Learys put down $ 70,000 on their first home in Tewksbury and executed a $ 100,000 loan from Dime on April 15, 1987. This property was foreclosed upon in May 1991. (Compl. P 182.)

Robert and Dianne Salois entered a loan agreement with Dime for $ 145,600 on or about June 16, 1987, when they signed the Adjustable Rate Note and executed a mortgage security interest [*9] in the home they were purchasing. They had made a $ 36,400 down payment, and at the time the initial complaint was filed, still resided in that home. (Compl. P 174.)

## 1. The Loan Documents

The plaintiffs signed Adjustable Rate Notes as part of their loan application processes. (Compl. Ex. C.) They understood the Adjustable Rate Note to be a final contract between Dime and themselves. They took the Note to be a complete and integrated document. (Compl. PP 174-175.)

The Salois' loan documents are attached to the complaint as a representative example. Under the title "ADJUSTABLE RATE MORTGAGE," appears the following: THIS NOTE CONTAINS PROVISIONS ALLOWING FOR CHANGES IN MY INTEREST RATE AND MY MONTHLY PAYMENT, WITH LIMITATIONS, AND ALLOWS FOR INCREASES IN THE PRINCIPAL AMOUNT TO BE REPAID (Negative Amortization). The document describes how the interest rate on the mortgage will be calculated throughout the course of the loan. On the second page of the three-page document, under the heading "Additions to My Unpaid Principal (Negative Amortization)", is a section which reads in full,The amount of my monthly payment could be less than the amount of the interest portion of [*10] the Full Payment Amount after each Interest Change Date. If so, each month that my monthly payment is less than the interest portion, the Note Holder will subtract the amount of my monthly payment from the amount of the interest portion and will add the difference to my unpaid principal. The Note Holder will also add interest on the amount of this difference to my unpaid principal each month. The interest rate on the interest

1996 U.S. Dist. LEXIS 21901

added to the principal will be the rate required by Section 4(A) above.

Additionally, the Federal Truth in Lending Disclosure Statement, a one-page document signed by both Salois' on May 7, 1987, explained negative amortization under a bold-faced heading directly above their signatures. This section indicates the amount by which the loan principal would increase if monthly payments were insufficient to cover the interest rate differential. (Compl. Ex. L.)

The Adjustable Rate Note provided that in the event of changes in the amount of monthly payments a telephone number of a person who would answer questions would be provided. (Compl. P 65, Ex. C.) However, when borrowers, including plaintiffs, called Dime to find out what "deferred interest" was, customer **[*11]** service representatives did not accurately answer their questions. (Compl. P 65.)

## 2. The Correction of the Salois' Note

On February 29, 1988 and June 1, 1988, Dime sent the Salois' new Adjustable Rate Notes to execute. The new notes were to change what Dime first said was "procedural only", and then said was only a typewriting error. (Compl. PP 184-85.) The original note (Compl. Ex. C.) states the loan was capped at two-per-cent change in interest rate per "Interest Rate Change Date", i.e. per month, as defined by the preceding paragraph of that document. The corrected documents, which plaintiffs allege were not signed until "at least 1988", would have removed the cap on monthly interest adjustments, leaving only the overall 13.875% rate cap. (Compl. Exs. D, E.) The cover letter signed by Dana S. Cohen, Esq. explains that the initial note "incorrectly reflects the limits on your interest rate, by stating that the cap is two (2%) percent per change date." (Ex. D). The changes were made by crossing out the 2 percent cap and writing in "N/A".

## 3. The Salois' back charges

In February 1995, the Salois' were notified that they owed Dime $ 12,575.95 in back charges, and that if **[*12]** they would make such a payment their account would be fully up-to-date and their loan would be reinstated. (Compl. P 191.) The Salois' paid the full amount but on or about March 10, 1995 were notified that $ 1,115.50 was still outstanding ($ 15 in returned check fees. $ 496.95 in unpaid late charges, and $ 604.05 for a short-fall in the escrow balance). (Compl. P 192.)

## D. The Instant Action

This action was commenced on September 1, 1995. The Salois' state they were not aware of their claims until advised by their attorney in the last week of September, 1994. (Compl. P 153.) Ms. Freeman and the Learys were advised by the same attorney in the summer of 1995. The plaintiffs do not allege facts to explain what prompted them to consult legal counsel.

## III. DISCUSSION

### A. Motion to Dismiss for Failure to State a Claim

[HN1]In ruling on a motion to dismiss for failure to state a claim, the Court may look only to the complaint itself, Harper v. Cserr, 544 F.2d 1121, 1122 (1st Cir. 1976), even if the defendant raises affirmative defenses, DiMella v. Gray Lines of Boston, Inc., 836 F.2d 718, 719-20 (1st Cir. 1988). The motion shall be allowed if "it appears beyond **[*13]** doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief." Roeder v. Alpha Indus., Inc., 814 F.2d 22, 25 (1st Cir. 1987) (quoting Conley v. Gibson, 355 U.S. 41, 45-46, 2 L. Ed. 2d 80, 78 S. Ct. 99 (1957)).

The Court must accept all factual allegations in the complaint as true, United States v. Mississippi, 380 U.S. 128, 143, 13 L. Ed. 2d 717, 85 S. Ct. 808 (1965), and draw all reasonable inferences in favor of the plaintiff, Coyne v. City of Somerville, 972 F.2d 440, 442-42 (1st Cir. 1992). Although fraud must be pled with particularity, Fed. R. Civ. P. 9(b), other claims require only "a short and plain statement of the claim showing that the pleader is entitled to relief," Fed. R. Civ. P. 8(a). However, the court need not accept "legal conclusions or . . . bald assertions" made without factual support. Resolution Trust Corp. v. Driscoll, 985 F.2d 44, 48 (1st Cir. 1993); see generally Boston & Maine Corp. v. Town of Hampton, 987 F.2d 855, 863 (1st Cir. 1992) (discussing the tension among First Circuit cases with respect to the particularity required in pleadings).

Defendants move for dismissal of this case **[*14]** on the basis of the affirmative defense of limitation of the action, as well as on the merits. [HN2]The statute of limitations defense may be addressed in a Rule 12(b)(6) motion when the defense is obvious on the face of the pleadings. See Aldahonda-Rivera v. Parke Davis & Co., 882 F.2d 590, 592 (1st Cir. 1989); see also 5 Charles A. Wright & Arthur R. Miller, Federal Practice & Procedure § 1277 n.13 (1990).

### B. Federal claims

The plaintiffs' mortgages were issued November 18, 1986, April 15, 1987, and June 16, 1987, and corrected mortgage documents were presented to the Salois' in February and June, 1988. This action was not filed

until September 1, 1995, over seven years after the last corrective document was sent. The statutes of limitations on the federal claims range from one year to four years. Therefore, unless the actions accrued at a later date, or were tolled by fraudulent concealment, all federal claims are time-barred. Federal common law determines when the statute begins to run on the federal claims. See Maggio v. Gerard Freezer & Ice Co., 824 F.2d 123, 127 (1st Cir. 1987).

**1. RICO (Count II)**

[HN3]RICO imposes civil liability for injury to business [*15] or property "by reason of a violation of section 1962," which in turn makes it a crime "for any person employed by or associated with any enterprise . . . to conduct or participate, directly or indirectly, in the conduct of such enterprise's affairs through a pattern of racketeering activity." 18 U.S.C. §§ 1962(c), 1964(c). An act of "racketeering activity" is the commission of one of the crimes enumerated in the statute. § 1961(1). A "pattern of racketeering activity" requires at least two acts of racketeering activity. § 1961(5).

[HN4]Because RICO does not include a limitations period, the Clayton Act's four-year period, 18 U.S.C. § 15b, has been held to apply to civil RICO claims. See Agency Holding Corp. v. Malley-Duff & Assoc., Inc., 483 U.S. 143, 156, 107 S. Ct. 2759, 2767, 97 L. Ed. 2d 121 (1987). The four-year period begins to run "when a plaintiff knew or should have known of his injury." Rodriguez v. Banco Central, 917 F.2d 664, 666 (1st Cir. 1990). Once each element of RICO has been satisfied, and the plaintiff has cause to know of the injury, the statute will run. See id. at 667. Even an additional predicate act within the limitations period will not save the [*16] action. See id. at 666-67. As the complaint was filed September 1, 1995, any claims which accrued prior to September 1, 1991, are time-barred.

Plaintiffs allege that the defendants, through DRES-MA, engaged in a pattern of racketeering activities between July 1, 1986, and December 31, 1989, while "developing, marketing, providing, and servicing 'Impact Loans' in Massachusetts." They allege that defendants committed mail and wire fraud by defrauding the plaintiffs and others "into taking mortgage loan(s) with Dime and making down payments and monthly payments that they otherwise would not have entered into or have been obligated to make, in order to benefit the defendants." Under the plaintiffs' theory, then, they sustained injuries when they were defrauded into taking out the mortgages and continuing to make payments under the mortgages.

These RICO injuries were sustained, if at all, when the mortgages were issued, and when payments were made under the mortgages. At least two predicate acts had been committed by the second mortgage payment, and the statute of limitations began to run. n2 Plaintiffs argue, however, that the statute of limitations ought to be tolled because they [*17] could not have known of the injuries. They argue that their loan documents omitted important information, and were sufficiently complicated that the actual material terms were concealed from all but a few well-trained mortgage analysts.



- - - - - - - - - - - - - - Footnotes - - - - - - - - -

n2 Even if the two predicate acts were the two corrective loan documents mailed in 1988, the claim is still time-barred.

- - - - - - - - - - - - End Footnotes- - - - - - - - - - - - - -

However, all information necessary to ascertain the cause of action was in the plaintiffs' possession from the time they entered the loan agreements. See Maggio, 824 F.2d at 129 (tolling unavailable where plaintiff had ample information at his disposal to suggest cause of action). Any failure to provide a required disclosure would have been discoverable as soon as the loan transaction was completed. Cf. Lynch v. Signal Finance Co., 367 Mass. 503, 507-08, 327 N.E.2d 732, 734 (1975) (rejecting tolling where "plaintiffs knew the terms of the loan and knew what had been disclosed to them and what had not"). The loan documents notified plaintiffs of the possibility [*18] of negative amortization, when it would apply, and how it would work. If the LPR's had misrepresented the nature of the loans, the loan documents plaintiffs signed would have put them on notice of the fraud.

Plaintiffs acknowledge that the loan documents revealed the possibility of negative amortization (Compl. P 55), but complain that the documents failed to disclose the certainty of negative amortization. In the seventh month of the loan, however, the increasing principal began to appear on the bills. In the second year, the deferred interest began to appear. Reasonable diligence would have led the plaintiffs to discover by 1988 that the negative amortization described in the loan documents had begun. See Aldahonda-Rivera v. Parke Davis & Co., 882 F.2d 590, 594 (1st Cir. 1989) ("The limitations period will be suspended only upon a clear showing of diligent efforts to discover the cause of the injury . . . ."); see also Maggio, 824 F.2d at 128 ("Whether a plaintiff should have discovered the fraud

is an objective question requiring the court to determine if the plaintiff possessed such knowledge as would alert a reasonable investor to the possibility of fraud.") (internal [*19] quotations omitted).

Plaintiffs have failed to allege facts to show reasonably diligent efforts to understand their loans or to make them understandable. Cf. Lynch, 367 Mass. at 508, 327 N.E.2d at 735 (rejecting tolling where "discovery of the nondisclosure may have required merely the making of mathematical computations from known data or the receipt of information as to the governing legal requirements"). Plaintiffs signed their loan documents when the loans were issued, and received statements every month thereafter. No facts are alleged as to what prompted plaintiffs to consult an attorney, if not their loan documents and monthly statements. As in Aldahonda-Rivera, here "the only logical conclusion that can be drawn is that [the plaintiffs] filed [their] complaint [several] years too late because it took [them] that long to consult an attorney." n3 882 F.2d at 593. If the plaintiffs' loan documents and statements prompted them to consult an attorney in 1994 and 1995, unprompted by any new disclosure, there is no reason they could not have consulted an attorney several years earlier.

- - - - - - - - - - - - - - Footnotes - - - - - - - - - - - - - - - - - -

n3 The briefs suggest that the Salois' were prompted to seek legal advice because financial circumstances led to their inability to meet their monthly payments.

- - - - - - - - - - - - End Footnotes- - - - - - - - - - - - - -

[*20]

Plaintiffs further allege that defendants fraudulently concealed the cause of action, such that the statute of limitations should be tolled in their favor. In federal question cases, the fraudulent concealment doctrine "operates to toll the statute of limitations where a plaintiff has been injured by fraud and remains in ignorance of it without any fault or want of diligence or care on his part . . . until the fraud is discovered." Maggio, 824 F.2d at 127 (quoting Cook v. Avien, 573 F.2d 685, 694-95 (1st Cir. 1978)). Plaintiffs "must demonstrate that (1) defendants engaged in a course of conduct designed to conceal evidence of their alleged wrongdoing and that (2) [the plaintiffs] were not on actual or constructive notice of the evidence, despite (3) their exercise of reasonable diligence." J. Geils Band Employee Benefit Plan v. Smith Barney Shearson, Inc., 76 F.3d 1245, 1255 (1st Cir. 1996), cert. denied, 519 U.S. 823, 136 L. Ed. 2d 39, 117 S. Ct.

81 (1996). "Furthermore, it is [plaintiffs'] burden under Federal Rule of Civil Procedure 9(b) to plead with particularity the facts giving rise to the fraudulent concealment claim." Id.

As discussed above, the explanations of [*21] negative amortization in the loan documents, combined with the appearance of increased principal and deferred interest on the monthly statements by the second year, constituted notice of any misrepresentations with respect to whether or not the loans would negatively amortize. There is no indication that plaintiffs, if they did not understand their loans, exercised reasonable diligence in seeking an explanation. Therefore they cannot take advantage of the federal fraudulent concealment doctrine.

The motion to dismiss is **ALLOWED** with respect to Count II, because it is barred by the four-year statute of limitations and no viable theory for tolling has been advanced.

2. TILA, Parity Act and RESPA Claims (Counts III, IV, IV)

Claims for rescission under the federal Truth-in-Lending Act (TILA), 15 U.S.C. § 1601 et seq., must be brought within three years of the "consummation of the transaction or upon the sale of the property, whichever occurs first, notwithstanding the fact that the disclosures required under this section or any other material disclosures required under this chapter have not been delivered to the obligor." 15 U.S.C. § 1635(f). As this language elucidates, [*22] nondisclosure is not a continuing violation for purposes of the statute of limitations. See Moor v. Travelers Ins. Co., 784 F.2d 632, 633 (5th Cir. 1986) (citing In re Smith, 737 F.2d 1549, 1552 (11th Cir. 1984)). The last contract was consummated in June 1987 and "corrected" in 1988, and the complaint was not filed until September 1995. To the extent the plaintiffs seek rescission under TILA, the claim is time-barred.

Failure to make the disclosures required by the TILA also creates liability for damages. An action for damages must be brought "within one year from the date of the occurrence of the violation." 15 U.S.C. § 1640(e). Although the one-year period typically runs from the consummation of the transaction, King v. California, 784 F.2d 910, 915 (9th Cir. 1986), cert. denied, 484 U.S. 802, 98 L. Ed. 2d 11, 108 S. Ct. 47 (1987); Moor, 784 F.2d at 633, "the doctrine of equitable tolling may, in the appropriate circumstances, suspend the limitations period until the borrower discovers or had reasonable opportunity to discover the fraud or nondisclosures that form the basis of the TILA action," King, 784 F.2d at 915; see also Jones v. TransOhio Sav. Ass'n, [*23] 747 F.2d 1037,

1996 U.S. Dist. LEXIS 21901

1041 (6th Cir. 1984). "To clothe himself in the protective garb of the tolling doctrine, a plaintiff must show that the defendant concealed the reprobated conduct and despite the exercise of due diligence, he was unable to discover that conduct." Moor, 784 F.2d at 634 (refusing to toll statute because, by the consummation of the loan, plaintiff knew or should have known that the required information had not been disclosed). As discussed above, plaintiffs have failed to plead facts constituting reasonable diligence sufficient to toll the statute of limitations.

Acts in violation of the Alternative Mortgage Transactions Parity Act (Parity Act), 12 U.S.C. § 3801 et seq., are to be treated as violations of TILA. See 12 U.S.C. § 3806. The Parity Act claim is therefore time-barred for the reasons stated.

Finally, plaintiffs allege in their Real Estate Settlement Practices (RESPA) claim, 12 U.S.C. § 2601 et seq., that defendants failed to make required disclosures, overcharged for certain services, and took kickbacks at the time the loans were issued. RESPA provides a one-year statute of limitations "from the date of the occurrence of the violation." 12 [*24] U.S.C. § 2614. As discussed above, with the notable exception of the alleged kickbacks, most of the missing disclosures or overcharges would have been apparent at the issuance of the loans. In the second-amended complaint, plaintiffs allege for the first time that defendants charged more for the title insurance premium than was paid to the title insurance company and obtained discounts and/or kickbacks from title insurance companies. P 126(c)(vi). Although, to be sure, kickbacks are by their nature fraudulent and secret, the doctrine of equitable tolling does not apply. Hardin v. City Title & Escrow Co., 254 U.S. App. D.C. 370, 797 F.2d 1037, 1039 (D.C. Cir. 1986). This claim is therefore also time-barred.

Accordingly, the motion to dismiss is **ALLOWED** with respect to Counts III, IV, and V.

C. State claims

Plaintiffs' state claims accrue according to Massachusetts' "discovery rule" and may be tolled under the Massachusetts doctrine of fraudulent concealment.

1. Discovery rule

Under the Massachusetts "discovery rule," an action accrues when the injured party knew or, in the exercise of reasonable diligence, should have known, the factual basis for the [*25] cause of action. See Tagliente v. Himmer, 949 F.2d 1, 4 (1st Cir. 1991) (citing Maggio, 824 F.2d at 130); Puritan Medical

Center, Inc. v. Cashman, 413 Mass. 167, 175, 596 N.E.2d 1004, 1010 (1992). "The standard set forth by the discovery rule is an objective one. . . . In order for the statute of limitations to be tolled pursuant to the discovery rule, the factual basis for the cause of action must have been 'inherently unknowable' at the time of injury." Tagliente, 949 F.2d at 4. The burden is on the plaintiff to prove that in the exercise of reasonable diligence he could not have known of the misrepresentation within the statute of limitations. Id. at 5 (citing Friedman v. Jablonski, 371 Mass. 482, 485-87, 358 N.E.2d 994, 998 (1976)).

2. Fraudulent Concealment

Massachusetts law also provides for the tolling of statutes of limitations by fraudulent concealment. Under Mass. Gen. L. ch. 260 § 12 (1990):

If a person liable to a personal action fraudulently conceals the cause of action from the knowledge of the person entitled to bring it, the period prior to the discovery of his cause of action by the person so entitled shall be excluded in determining the [*26] time limited for the commencement of the action.

In Massachusetts, fraudulent concealment requires either (1) an affirmative act of concealment done with intent to deceive, or (2) breach of a fiduciary duty of full disclosure. Puritan Medical Center v. Cashman, 413 Mass. 167, 176, 596 N.E.2d 1004, 1010 (1992) (where "a fiduciary relationship exists between plaintiff and defendant . . . mere failure to reveal information may be sufficient to constitute fraudulent concealment for the purposes of § 12") (internal quotations and citations omitted). Plaintiffs have not alleged any affirmative acts of concealment.

Instead, plaintiffs argue that Dime owed them fiduciary duties. A fiduciary relationship exists when a party places special trust and confidence in another who knowingly accepts the responsibility. In re Fordham, 130 B.R. 632, 648-49 (Bankr. D. Mass. 1991). "Plaintiff alone, by reposing trust and confidence in the defendant, cannot thereby transform a business relationship into one which is fiduciary in nature." Broomfield v. Kosow, 349 Mass. 749, 755, 212 N.E.2d 556, 560 (Mass. 1965); see also In re Fordham, 130 B.R. at 649 ("Although [plaintiffs] [*27] avow that they placed trust and confidence in [defendants] they may not abandon all caution and responsibility for their own protection and unilaterally impose a fiduciary relationship."). "Traditionally, Massachusetts courts have viewed a bank's relationship to its customers as one of creditor and debtor, a relationship which imposes no duty to counsel or make disclosures to the customer." Flaherty v. Baybank

Merrimack Valley, N.A., 808 F. Supp. 55, 64 (D. Mass. 1992).

It is true that Dime had a statutory duty, under Mass. Gen. L. ch. 184 § 17B, to inform plaintiffs of their right to obtain separate counsel and to explain that Dime's attorneys represented Dime's interests. Plaintiffs allege these disclosures were never made. However, there is no authority for the proposition that failure to comply with this statutory requirement is sufficient to impose a fiduciary duty upon a bank for the purposes of fraudulent concealment. Cf. Lynch, 367 Mass. at 507-08, 327 N.E.2d at 735 (rejecting contention that "breach of the statutory duty imposed by the TILA should be given the same effect as breach of a fiduciary duty" in tolling statute of limitations).

In support of their argument [*28] that there was a fiduciary relationship, plaintiffs allege having been told that they did not need their own attorney and that Dime's attorney would "handle things." Significantly, there is no allegation that anyone told plaintiffs that Dime's attorney would represent their interests. Rather, the allegation is that plaintiffs were told an attorney was not necessary for the completion of the transaction. Cf. Flaherty, 808 F. Supp. at 61 (holding reliance on attorneys "patently unreasonable" as a matter of law, where the "attorneys clearly represented the banks" and the "plaintiffs failed to communicate, either by words or actions, that they were relying on these attorneys to serve their interests"). The discouragement of the retainer of separate counsel that is alleged here is, without more, an insufficient basis for the formation of a fiduciary relationship between parties to a one-time business transaction.

The cases relied upon by plaintiffs are distinguishable. Both concerned long-time friends and advisors of plaintiffs, who clearly knew they were being relied upon and accepted that trust. In Broomfield v. Kosow, 349 Mass. at 757, 212 N.E.2d at 561, for two years there [*29] had been "a close business relationship and business friendship between the two men." In Reed v. A.E. Little Co., 256 Mass. 442, 446, 152 N.E. 918, 919 (Mass. 1926), plaintiff called upon defendant and asked him to "advise him as a friend in the interest of the plaintiff, in respect to the matters therein contained, and whether it was for the plaintiff's best interest to sign such an agreement." That court found the crucial determinant of a fiduciary relationship to be whether the defendant could exert influence over the person trusting him. Given that there is no such long-standing friendship, or ability to exert influence in the case at bar, the plaintiffs have not alleged sufficient facts to establish a fiduciary relationship between the parties.

Therefore, the Massachusetts statutes of limitations cannot be tolled on the basis of breach of fiduciary duty.

### 3. Massachusetts Consumer Credit Cost Disclosure Act (Count VI)

The requirements of the Massachusetts Consumer Credit Cost Disclosure Act ("MCCCDA"), Mass. Gen. L. ch. 140D, are substantially the same as the requirements of the federal TILA. Plaintiffs allege that Dime violated MCCCDA by failing to give complete and [*30] accurate disclosures with respect to the loan. This claim is governed by a four-year statute of limitations. Mass. Gen. L. ch. 140D § 10(f). It is time-barred for the same reasons discussed in the context of the TILA claim. Moreover, "in Massachusetts, one who signs an agreement is presumed to have read and understood its contents." Lerra v. Monsanto Co., 521 F. Supp. 1257, 1262 (D. Mass. 1981). Thus plaintiffs cannot rely on the argument that they were unable to understand their loan documents. The motion to dismiss is **ALLOWED** with respect to Count VI.

### 4. Chapter 93A (Count VII)

Chapter 93A makes unlawful "unfair methods of competition and unfair or deceptive acts or practices in the conduct of any trade or commerce," Mass. Gen. L. ch. 93A § 2, and authorizes any person injured by such acts to bring an action for damages and/or injunctive relief, ch. 93A § 9(1). Under the Attorney General's regulations enacted under Chapter 93A, an act or practice violates section two if it "fails to comply with existing statutes, rules, regulations or laws, meant for the protection of the public's health, safety, or welfare promulgated by the Commonwealth or any political subdivision [*31] thereof intended to provide the consumers of this Commonwealth protection," 940 Code Mass. Regs. § 3.16(3), or if it "violates the Federal Trade Commission Act, the Federal Consumer Credit Protection Act or other Federal consumer protection statutes," § 3.16(4). Chapter 93A claims are subject to a four-year statute of limitations. Mass. Gen. L. ch. 260 § 5A.

Plaintiffs allege first that Dime violated the requirements for "graduate payment mortgages" in Mass. Gen. L. ch. 167E by failing to provide the option to change to a more conventional mortgage, failing to offer a conventional mortgage, and failing sufficiently to explain the terms of the mortgage. These claims, however, accrued and should have been discovered at the time the loan was issued and are therefore time-barred.

Plaintiffs also allege that Dime violated Chapter 93A by "bait and switch" advertising, product tampering, and equity skimming in the development and

marketing of its loans. Compl. PP 200-207. These claims are also barred by the four-year statute of limitations. All the information necessary to discover these claims was in the plaintiffs' possession from the time they entered into the loans. The alleged violation [*32] of Mass. Gen. L. ch. 183 § 63, which regulates the fees charged at the time the loan is issued, is also time-barred, as are the alleged violations of Mass. Gen. L. ch. 184 §§ 17B & 17D, which mandate that certain disclosures be made at the time of the loan. n4 As the complaint does not allege that Dime's duty to pay real estate taxes in accordance with Mass. Gen. L. ch. 183 § 62 continued beyond the first year of the loan (Compl. P 137), this claim is also time-barred.

- - - - - - - - - - - - - Footnotes - - - - - - - - - - - - - - - - - - -

n4 Defendants correctly point out that Chapter 184, § 17D, did not go into effect until 1988, which was after the issuance of the plaintiffs' loans.

- - - - - - - - - - - - End Footnotes- - - - - - - - - - - - - -

On the other hand, several of plaintiffs' claims are continuing violations that are not barred by the statute of limitations. Plaintiffs allege that Dime violated Mass. Gen. L. ch. 167E § 2(B)(9) by changing the payment amount more than once a year. If the evidence shows that the monthly payment has changed more than once a year within the past four years, this claim is not time-barred. The complaint [*33] does not foreclose this possibility. Additionally, plaintiffs allege that Dime violated the requirements for variable rate mortgages in Mass. Gen. L. ch. 167E § 2(B)(10), by changing the rate of interest more than once every six months. As the interest changed five times in 1995, this claim is not time-barred.

However, defendants argue that Chapter 167E doesn't apply to Dime because a federal bank is not subject to regulation by the Massachusetts commissioner of banks. n5 Mass. Gen. L. ch. 167E. § 1 (defining bank as a savings bank, co-operative bank, or trust company subject to the supervision of the Commissioner of banks). The second amended complaint does not allege defendants fall within this definition of bank.

- - - - - - - - - - - - - Footnotes - - - - - - - - - - - - - - - - - - -

n5 Dime does not argue that this statute is in applicable due to pre-emption. See generally Grunbeck v. Dime Sav. Bank of New York, FSB, 74 F.3d 331 (1st Cir. 1996) (state statute requiring computation

of interest on a simple interest basis not pre-empted).

- - - - - - - - - - - - End Footnotes- - - - - - - - - - - - - -

Finally, plaintiffs allege that Dime [*34] violated federal fair debt collection protections when, on February 24, 1994, it sent a collection letter on another's letterhead to create the false belief that an entity other than Dime was participating in the collection process. Compl. P 208; see 15 U.S.C. § 1692j ("It is unlawful to design, compile, and furnish any form knowing that such form would be used to create the false belief in a consumer that a person other than the creditor of such consumer is participating in the collection of or in an attempt to collect a debt such consumer allegedly owes such creditor, when in fact such person is not so participating."). However, this claim arose on February 24, 1994 and the complaint was filed on September 1, 1995. Therefore, this Court lacks jurisdiction pursuant to 15 U.S.C. § 1692j(b) and § 1692K(d) (permitting federal jurisdiction over claims brought within one year from the date on which the violation occurs). Cf. Mattson v. U.S. West Communications, Inc., 967 F.2d 259, 261 (8th Cir. 1992) (holding that the statute of limitations was jurisdictional).

The motion to dismiss Count VII is therefore **ALLOWED.**

5. Breach of contract and the covenant of good [*35] faith and fair dealing (Counts VIII & IX)

The plaintiffs also allege that Dime has breached its contract on several occasions. "Actions of contract . . . shall, except as otherwise provided, be commenced only within six years next after the cause of action accrues." Mass. Gen. L. ch. 260 § 2.

First, plaintiffs argue that Dime breached its contractual promise to provide "the name and telephone number of a person who will answer any question [they] may have regarding the notice" (Compl. Ex. C, P 4(E)), when its customer service representatives would not accurately answer questions about deferred interest. (Compl. P 65.) The complaint states that the plaintiffs called Dime to inquire about the deferred interest "when 'deferred interest' started appearing on the plaintiffs' monthly payment statements." (Compl. P 194.) As the deferred interest appeared on the statements at the latest in mid-1988, seven years before the complaint was filed, this claim is time-barred. If the failure to answer questions over the phone was a breach of contract, plaintiffs had all information necessary to discover their cause of action as soon as the phone conversations took place.

1996 U.S. Dist. LEXIS 21901

Next, the Salois' [*36] argue that Dime breached its contract in 1988 when it sent them letters requesting that they sign the 'corrective' documents, because the letters materially altered the terms of the loan. (Compl. P 253.) However, this claim is barred by the six-year statute of limitations because the Salois were on notice of the precise change in the proposed modified contract by June, 1988.

The Salois' also argue that "Dime breached the Adjustable Rate Note by servicing it as if the purported 'corrective' documents had been signed, even before they had been signed." (Compl. P 253.) Specifically, they allege that Dime did not comply with the cap on variation in the interest rate that appeared in the original loan documents and instead applied a rate permitted only by the corrective documents. Whether or not this claim would be time-barred, it must be dismissed based on the documents attached to the complaint. Although the complaint alleges that the original note capped the interest rate variation at 2% per year, the attached note makes clear that the interest cap was per "Interest Rate Change Date," or per month. (Compl. Ex. C.) Plaintiffs own charts reveal that the interest rate never changed [*37] more than 2% per month. (Compl. Ex. Y.)

Plaintiffs' memorandum of law specifies the basis for Ms. Freeman's breach of contract claim. Ms. Freeman alleges that defendants breached the loan which called for a 7.5% rate cap for twelve months. (Exh. A, P2(D)). However, plaintiff was aware of this no later than 1987. Therefore, her contract claim is time-barred.

Finally, the Salois' allege that in February 1995, Dime agreed with the Salois' that their account would be fully up to date if they paid $ 12,575.95 by the end of the month. Compl. P 191. After paying the required amount on time, however, the Salois' were informed that additional funds were due. The plaintiffs do not assert this alleged breach of a settlement agreement as a basis for its breach of contract claim. (See PP 252-259). Even if it had been adequately alleged, it does not involve enough money to support this Court's diversity jurisdiction.

The motion to dismiss Counts VIII and IX is therefore **ALLOWED** without prejudice to filing an action for breach of the settlement agreement in state court. n6


- - - - - - - - - - - - - Footnotes - - - - - - - - - - - - - - - -

n6 There are also conclusory allegations that Dime failed to service the contract properly within the six years prior to the commencement of the suit. This dismissal is without prejudice to any claims of breach of contract based on inadequate servicing not addressed in this opinion.

- - - - - - - - - - - - End Footnotes- - - - - - - - - - - -

[*38]

6. Remaining tort claims (Counts X, XI, XII, & XIII)

Finally, plaintiffs bring several tort claims. In Massachusetts, "actions of tort . . . shall be commenced only within three years next after the cause of action accrues." Mass. Gen. L. ch. 260 § 2A.

Plaintiffs allege in Count X that Dime breached a fiduciary duty by (1) telling the plaintiffs they could afford the monthly payments when they couldn't; and (2) failing to give proper disclosures. However, as discussed above, the plaintiffs have failed to plead facts sufficient to establish a fiduciary relationship between the parties.

Plaintiffs claim in Count XI that Dime acted fraudulently by misrepresenting (1) whether the loan would be certain to enter negative amortization, (2) whether the plaintiffs could afford the monthly payments on their loan, and (3) whether the corrective notes materially altered the terms of the loan. Next, plaintiffs allege (Count XII) that defendants conspired to wrongfully procure their mortgage notes. Compl. P 268. In their final claim (Count XIII), plaintiffs allege that the defendants' employees negligently induced them to enter into the loan agreements. Compl. P 274. Because the latest [*39] of the alleged misrepresentations, conspiracies, and negligent acts occurred in 1988, when the corrective notes were sent, all are barred by the three-year statute of limitations for Massachusetts torts. See Mass. Gen. L. ch. 260 § 2A.

The motion to dismiss is therefore **ALLOWED** with respect to Counts X, XI, XII, and XIII.

IV. **ORDER**

Defendants' motion to dismiss (Docket No. 51) is therefore **ALLOWED** without prejudice to filing a breach of settlement agreement claim in state court.

PATTI B. SARIS

United States District Judge