791 F.2d 699; 1986 U.S. App. LEXIS 25987

J. LAWRENCE SEMAR and SYBIL C. SEMAR, Plaintiffs-Appellants/Cross-Appellees, v. PLATTE VALLEY FEDERAL SAVINGS & LOAN ASSOCIATION, Defendant-Appellee/Cross-Appellant

Nos. 85-5619, 85-5654

UNITED STATES COURT OF APPEALS FOR THE NINTH CIRCUIT

791 F.2d 699; 1986 U.S. App. LEXIS 25987

February 5, 1986, Argued and Submitted
June 6, 1986

**PRIOR HISTORY:** [**1]

Appeal from the United States District Court for the Central District of California, David W. Williams, District Judge, Presiding, DC No. CV 84-3462 DWW.

### CASE SUMMARY

**PROCEDURAL POSTURE:** Plaintiffs appealed the United States District Court for the Central District of California order calculating the amount owed defendant, creditor, in a suit brought under the Truth in Lending Act, 15 U.S.C.S. § 1635.

**OVERVIEW:** Plaintiffs appealed the district court's calculation of the amount owed defendant creditor in a suit brought under the Truth in Lending Act (TILA), 15 U.S.C.S. § 1635. The district court granted plaintiffs a recision of their loan agreement, finding that defendant failed to comply with the buyer's remorse provision allowing plaintiffs to rescind the agreement in three business days. The appeals court affirmed in part and modified the district court's judgment. The appeals court held that under TILA defendant was required to provide the specific date on which the three-day recision period expired. Noncompliance with the statutory requirement resulted in recision of the agreement within three years after the agreement was consummated. The court held that plaintiffs were entitled to recission and that the court did not have discretion where defendant failed to raise the creditor good faith defense under § 1640(c). Next, the court held that the district court incorrectly included finance charges in the amount owed defendant, holding that under TILA a borrower was not liable for any finance or other charge.

**OUTCOME:** The court affirmed in part and modified the district court's judgment holding that plaintiffs were entitled to recission of the agreement where defendant failed to comply with the three-day rescission provision under the Truth in Lending act. The court remanded for the purpose of deciding the 1985 sales costs issue and entering judgment in accordance with the opinion.

**CORE TERMS:** rescission, obligor, borrower, consumer, rescind, lender, right to rescind, owe, expiration date, finance charge, regulations, equitable, calculation, formula, omission, security interest, discrepancy, modify, loan agreement, bona fide, finance, expire, disclosure statement, notice, consummation, disclosure, one-year, owed, impose liability, customary

### LexisNexis(TM) Headnotes

*Banking Law > Bank Activities > Consumer Protection > Truth in Lending*

[HN1]The Truth in Lending Act "buyer's remorse" provision allows borrowers three business days to rescind, without penalty, a consumer loan that uses their principal dwelling as security. 15 U.S.C.S. § 1635(a).

*Banking Law > Bank Activities > Consumer Protection > Truth in Lending*

[HN2]The Truth in Lending Act, and its regulations, issued by the Federal Reserve System, 12 C.F.R. §§ 226.1-.29, require the lender to provide a form stating the specific date on which the three-day rescission period expires. 15 U.S.C.S. § 1635(a); 12 C.F.R. § 226.23(b)(5). If the lending institution omits the expiration date and fails to cure the omission by subsequently providing the information, the borrower may rescind the loan within three years after it was consummated. 15 U.S.C.S. § 1635(f).

*Banking Law > Bank Activities > Consumer Protection > Truth in Lending*

[HN3]See 15 U.S.C.S. § 1635(a).

*Banking Law > Bank Activities > Consumer Protection > Truth in Lending*

[HN4]See 12 C.F.R. § 226.23.

791 F.2d 699; 1986 U.S. App. LEXIS 25987

*Banking Law > Bank Activities > Consumer Protection > Truth in Lending*

[HN5]See 15 U.S.C.S. § 1635(f).

*Banking Law > Bank Activities > Consumer Protection > Truth in Lending*

[HN6]Under a Truth in Lending Act rescission, the security interest is dissolved, the lender returns the borrower's payments, and the borrower returns the loan proceeds, less any "finance or other charge." 15 U.S.C.S. § 1635(b).

*Banking Law > Bank Activities > Consumer Protection > Truth in Lending*

[HN7]See 15 U.S.C.S. § 1635(b).

*Civil Procedure > Appeals > Standards of Review > De Novo Review*

[HN8]An appellate court reviews de novo the grant of rescission because it is based on statutory interpretation.

*Banking Law > Bank Activities > Consumer Protection > Truth in Lending*

[HN9]A lender's violation of Truth in Lending Act (TILA) allows the borrower to rescind a consumer loan secured by the borrower's primary dwelling. 15 U.S.C.S. § 1635(a). Technical or minor violations of TILA as well as major violations, impose liability on the creditor and entitle the borrower to rescind.

*Banking Law > Bank Activities > Consumer Protection > Truth in Lending*

[HN10]To insure that the consumer is protected the Truth in Lending Act must be absolutely complied with and strictly enforced.

*Banking Law > Bank Activities > Consumer Protection > Truth in Lending*

[HN11]12 C.F.R. §§ 226.1-29 makes clear that failure to fill in the expiration date of the rescission form is a violation of the Truth in Lending Act.

*Banking Law > Bank Activities > Consumer Protection > Truth in Lending*

[HN12]See 15 U.S.C.S. § 1640(c).

*Banking Law > Bank Activities > Consumer Protection > Truth in Lending*

[HN13]On rescission, the security interest is dissolved and the borrower returns "the property" to the lender. 15 U.S.C.S. § 1635(b). The Truth in Lending Act specifically states that the borrower "is not liable for any finance or other charge."

*Banking Law > Bank Activities > Consumer Protection > Truth in Lending*

[HN14]Interest is a finance charge. 15 U.S.C.S. § 1605(a).

*Banking Law > Bank Activities > Consumer Protection > Truth in Lending*

[HN15]See 15 U.S.C.S. § 1605(a).

*Banking Law > Bank Activities > Consumer Protection > Truth in Lending*

[HN16]Creditors are liable for "a reasonable attorney's fees as determined by the court" when borrowers obtain rescission under the Truth in Lending Act (TILA). 15 U.S.C.S. § 1640(a)(3). The district court must base its calculation of a reasonable attorney's fee in a TILA case. The failure to follow these guidelines constitutes an abuse of discretion.

COUNSEL: Dennis H. Doss, Esq., Doss & Cavett, Newport Beach, California, for Appellant.

John L. Fort, Ryan Hirota, Long Beach, California, for Appellee.

JUDGES: Fletcher, Ferguson, and Nelson, Circuit Judges.

OPINIONBY: FERGUSON

OPINION: [*700] FERGUSON, Circuit Judge:

Plaintiffs J. Lawrence Semar and Sybil C. Semar appeal the district court's calculation of the amount they owe defendant Platte Valley Federal Savings & Loan Association under a Truth in Lending Act [*701] ("TILA") loan rescission. They argue that the district court erred by including interest and other loan charges. They also appeal the district court's calculation of attorney's fees awarded to them.

Defendant Platte Valley cross-appeals the district court's grant of rescission and award of attorney's fees. Platte Valley argues that a purely technical violation of TILA does not require rescission. The appeals are consolidated.

We affirm the district court's grant of rescission of the loan and award of attorney's fees. We modify the amount the Semars [**2] owe Platte Valley and the attorney's fees award. We remand for determination of who should bear reasonable sales costs from the 1985 sale of the property.

I.

In 1982 the Semars sought a long-term loan to pay off a one-year second trust deed loan on their house. Before they began shopping for the loan, they asked Ali Malekzadeh for advice. n1 Malekzadeh cautioned

791 F.2d 699; 1986 U.S. App. LEXIS 25987

against accepting a loan with a prepayment penalty clause, contacted lenders for them, and recommended United Financial Services ("United") as a potential lender.

- - - - - - - - - - - - - - Footnotes - - - - - - - - - - - - - - - -

n1 The Semars describe themselves as unsophisticated borrowers and Malekzadeh as "a friend who was also a part-time real estate broker." Platte Valley characterizes them as sophisticated borrowers, and says Malekzadeh was a real estate licensee giving advice to the Semars as clients. Platte Valley uses this characterization to argue that the Semars do not deserve the benefits of TILA.

- - - - - - - - - - - - End Footnotes- - - - - - - - - - - - -

On July 6, 1982 the Semars applied with United for a second trust deed loan on their house to replace [**3] the second trust deed loan coming due. United brokered the loan through defendant Platte Valley. On July 15 or 16, United told the Semars that Platte Valley insisted on a prepayment penalty clause. Though dissatisfied, the Semars signed the loan documents on July 16. n2

- - - - - - - - - - - - - - Footnotes - - - - - - - - - - - - - - - -

n2 The amount of the fifteen-year loan was $134,000.00, at an annual interest rate of 16.875%. Of the proceeds, $109,144.98 went to pay off the one-year loan, $11,354.02 went to the loan's "Settlement Charges," and $13,501.00 went to the Semars.

- - - - - - - - - - - - End Footnotes- - - - - - - - - - - - -

TILA required that the documents state specifically the last date on which the Semars could rescind the loan agreement without penalty. 15 U.S.C. § 1635(a); n3 12 C.F.R. § 226.23(b) (5). n4 [HN1]TILA's "buyer's remorse" provision allows borrowers three business days to rescind, without penalty, a consumer loan that uses their principal dwelling as security. 15 U.S.C. § 1635 [**4] (a). [HN2]TILA and its regulations, issued by the Federal Reserve System, 12 C.F.R. §§ 226.1-.29 ("Reg Z"), require the lender to provide a form stating the specific date on which the three-day rescission period expires. 15 U.S.C. § 1635(a); 12 C.F.R. § 226.23(b)(5). If the lending institution omits the

expiration date and fails to cure [*702] the omission by subsequently providing the information, the borrower may rescind the loan within three years after it was consummated. 15 U.S.C. § 1635(f). n5

- - - - - - - - - - - - - - Footnotes - - - - - - - - - - - - - - - -

n3 15 U.S.C. § 1635(a) [HN3]provides:

Except as otherwise provided in this section, in the case of any consumer credit transaction (including opening or increasing the credit limit for an open end credit plan) in which a security interest, including any such interest arising by operation of law, is or will be retained or acquired in any property which is used as the principal dwelling of the person to whom credit is extended, the obligor shall have the right to rescind the transaction until midnight of the third business day following the consummation of the transaction or the delivery of the information and rescission forms required under this section together with a statement containing the material disclosures required under this subchapter, whichever is later, by notifying the creditor, in accordance with regulations of the Board, of his intention to do so. The creditor shall clearly and conspicuously disclose, in accordance with regulations of the Board, to any obligor in a transaction subject to this section the rights of the obligor under this section. The creditor shall also provide, in accordance with regulations of the Board, appropriate forms for the obligor to exercise his right to rescind any transaction subject to this section.

[**5]

n4 12 C.F.R. § 226.23 [HN4]provides:

(b) *Notice of right to rescind.* In a transaction subject to rescission, a creditor shall deliver 2 copies of the notice of the right to rescind to each consumer entitled to rescind. The notice shall be on a separate document that identifies the transaction and shall clearly and conspicuously disclose the following:

. . . .

(5) The date the rescission period expires.

n5 15 U.S.C. § 1635(f) [HN5]provides:

An obligor's right of rescission shall expire three years after the date of consummation of the transaction or upon the sale of the property, whichever occurs first, notwithstanding the fact that the information and forms required under this section or any other disclosures required under this part have not been delivered to the obligor, except that if (1) any agency empowered to enforce the provisions of this subchapter institutes a proceeding to enforce the provisions of this section within three years after the date of consummation of the transaction, (2) such agency finds a violation of this section, and (3) the obligor's right to rescind is based in whole or in part on any matter involved in such proceeding, then the obligor's right of rescission shall expire three years after the date of consummation of the transaction or upon the earlier sale of the property, or upon the expiration of one year following the conclusion of the proceeding, or any judicial review or period for judicial review thereof, whichever is later.

- - - - - - - - - - - - End Footnotes- - - - - - - - - - - - - -

[**6]

Platte Valley's form omitted the expiration date, n6 although it stated that the rescission right expired three business days after July 16. Platte Valley concedes this technical violation of TILA. The Semars contend they were entitled to rescind the loan agreement for up to three years because of this violation.

- - - - - - - - - - - - - - Footnotes - - - - - - - - - - - - - - -

n6 Cartel Financial Services, a subsidiary of Platte Valley, prepared the loan documents. A Cartel employee testified that she noticed the space on the form for the expiration date was blank and informed her supervisor of the omission, but that Cartel did not cure the defect. Platte Valley does not raise a good-faith defense based on an unnoticed clerical error, *see* 15 U.S.C. § 1640(c) (lender not liable for TILA violation if it shows "that the violation was not intentional and resulted from a bona fide error . . . [such as a] clerical . . . error[]").

- - - - - - - - - - - - End Footnotes- - - - - - - - - - - - - -

The loan documents also contained a discrepancy of $1,274.75 between the total charges listed on the disclosure [**7] statement required by the Truth in Lending Act ("Disclosure Statement") ($10,079.27) and the total charges listed on the Closing Statement ($11,354.02). The Disclosure Statement listed the amount the Semars were told the loan charges would be; the Closing Statements listed the amount actually charged. The Semars contend they are entitled to rescind because of the discrepancy, which they claim is "material." The district court found the discrepancy not material.

The Semars made thirteen payments, totaling $26,655.33, but stopped making payments in September 1983. Platte Valley recorded a Notice of Default on January 23, 1984. The Semars sent a Notice of Rescission February 15, 1984. Platte Valley initiated foreclosure proceedings and on May 10, 1984 recorded a Notice of Sale for May 31, 1984.

On May 10, 1984, the Semars filed an action in federal district court for rescission under TILA. The district court preliminarily enjoined foreclosure on the Semars' house. The Semars filed for bankruptcy in October 1984, and the bankruptcy court ordered them to make monthly payments of $1,350.00 to Platte Valley. The Semars made two payments, totaling $2,700.00, by December 1984. They again [**8] defaulted. Thus, the total of the Semars' payments to Platte Valley was $29,355.33. Because the Semars could make no more payments, they agreed to the sale of their home. The district court dissolved its preliminary injunction, and the home was sold in early 1985 for $170,000.00. The district court placed the proceeds in an escrow account.

Before deciding whether rescission was proper, the district court asked the parties each to calculate the amount the Semars would owe Platte Valley if the court granted rescission. [HN6]Under a TILA rescission, the security interest is dissolved, the lender returns the borrower's payments, and the borrower returns the loan proceeds, less any "finance or other charge." 15 U.S.C. § 1635(b). n7

- - - - - - - - - - - - - - Footnotes - - - - - - - - - - - - - - -

n7 15 U.S.C. § 1635(b) [HN7]provides:

When an obligor exercises his right to rescind under subsection (a) of this section, he is not liable for any finance or other charge, and any security interest given by the obligor, including any such interest arising by operation of law, becomes void

791 F.2d 699; 1986 U.S. App. LEXIS 25987

upon such a rescission. Within 20 days after receipt of a notice of rescission, the creditor shall return to the obligor any money or property given as earnest money, downpayment, or otherwise, and shall take any action necessary or appropriate to reflect the termination of any security interest created under the transaction. If the creditor has delivered any property to the obligor, the obligor may retain possession of it. Upon the performance of the creditor's obligations under this section, the obligor shall tender the property to the creditor, except that if return of the property in kind would be impracticable or inequitable, the obligor shall tender its reasonable value. Tender shall be made at the location of the property or at the residence of the obligor, at the option of the obligor. If the creditor does not take possession of the property within 20 days after tender by the obligor, ownership of the property vests in the obligor without obligation on his part to pay for it. The procedures prescribed by this subsection shall apply except when otherwise ordered by a court.

- - - - - - - - - - - - End Footnotes- - - - - - - - - - - - -

**[**9]**

[*703] The Semars suggested a formula of the loan amount ($134,000.00) less all payments made ($29,355.33) less the loan expenses ($11,354.02) n8 less the civil penalty the district court would award against Platte Valley for violating TILA ($1,000.00), or $92,290.65. Platte Valley suggested a formula of the principal due ($131,649.70) plus accrued interest at 16.875% ($16,291.62) plus late charges ($1,771.40) plus foreclosure expenses ($1,046.15), or $150,758.87.

$ 150,758.87 (Platte Valley's figure)

- 1,771.40 (late charges)

- 1,046.15 (foreclosure expenses)

$ 147,941.32

- - - - - - - - - - - - End Footnotes- - - - - - - - - - - - -

The Semars timely appeal [**11] the district court's calculation of the amount they owe Platte Valley and the hourly rate for attorney's fees. Platte Valley timely cross-appeals the order granting rescission and the award of attorney's fees. n10

This amount also happens to be what the Semars would have owed if the district court had not granted rescission but instead accelerated the loan.

- - - - - - - - - - - - - - Footnotes - - - - - - - - - - - -

n8 The loan expenses from the Closing Statement are reproduced at the end of this opinion as an appendix.

- - - - - - - - - - - - End Footnotes- - - - - - - - - - - -

The district court granted rescission, and used a formula of $147,941.32, n9 plus prospective interest from March 1984 at 13%, less a loan fee ($ 4,170.00) less mortgage insurance premiums ($ 78.16) less escrow fees ($ 421.50) less the civil penalty ($ 1,000.00), or $ 142,271.66 plus interest. [**10] In addition, the district court ordered that Platte Valley be reimbursed the expenses of the 1985 sale of the property. We agree with the Semars that this ruling should be remanded for consideration of the reasonableness of the sale costs and who should bear the costs. The district court ruled that the Semars were entitled to what was left of the $ 170,000 after Platte Valley received the $ 142,271.66 plus interest and the expenses for the sale of the house. The district court also awarded attorney's fees to the Semars at $100 an hour, lower than the $135 an hour rate that the Semars requested. Platte Valley did not contest the hourly rate requested by the Semars.

- - - - - - - - - - - - - - Footnotes - - - - - - - - - - - -

n9 The district court did not explain how it arrived at this beginning figure. However, the figure is merely Platte Valley's suggested figure less the late charges and foreclosure expenses:

- - - - - - - - - - - - - - Footnotes - - - - - - - - - - - -

n10 Because attorney's fees are mandatory if the Semars prevail on the rescission issue and precluded if Platte Valley prevails, see 15 U.S.C. § 1640(a)(3), Platte Valley does not treat the award of

791 F.2d 699; 1986 U.S. App. LEXIS 25987

attorney's fees as a separate issue on appeal.

- - - - - - - - - - - End Footnotes- - - - - - - - - - - -

II.

The Semars allege two grounds for rescission: the technical TILA violation of omitting the expiration date of their rescission right, and the "material" discrepancy between the total charges listed on the Disclosure Statement and the Closing Statement.

[HN8]We review de novo the grant of rescission because it is based on statutory interpretation. *Southeast Alaska Conservation Council, Inc. v. Watson*, 697 F.2d 1305, 1309 (9th Cir. 1983). [**12] We agree with the district court that the TILA violation entitled the Semars to rescission. We do not reach the issue of whether the discrepancy was sufficiently "material" to constitute another ground for rescission.

TILA and Reg Z contain detailed disclosure requirements for consumer [*704] loans. n11 [HN9]A lender's violation of TILA allows the borrower to rescind a consumer loan secured by the borrower's primary dwelling. 15 U.S.C. § 1635(a). Technical or minor violations of TILA or Reg Z, as well as major violations, impose liability on the creditor and entitle the borrower to rescind. [HN10]"To insure that the consumer is protected . . . [TILA and Reg Z must] be absolutely complied with and strictly enforced." *Mars v. Spartanburg Chrysler Plymouth, Inc.*, 713 F.2d 65, 67 (4th Cir. 1983) (holding that technical violation, even if merely a "minor variation in language and type size" from TILA requirements, imposes liability); *see also Huff v. Stewart-Gwinn Furniture Co.*, 713 F.2d 67, 69 (4th Cir. 1983) [**13] (minor violations of TILA and Reg Z impose liability even if, as creditor alleged, consumer "was not misled and was given a meaningful and correct disclosure of crucial credit terms").

- - - - - - - - - - - - - - Footnotes - - - - - - - - - - - - - - - -

n11 Platte Valley argues TILA does not cover the loan because Mr. Semar stated that "the additional money from my loan is to be used for back up business capital." TILA applies only to loans primarily for personal use. 15 U.S.C. § 1635(a). The district court's finding that these loan proceeds were primarily for personal use is not clearly erroneous. The primary purpose of the loan was to pay off the one-year loan; the proceeds intended for business

use (the proceeds left after the one-year loan and the loan charges were paid off, or $13,501.00) constituted only ten percent of the loan.

Congress overhauled TILA in 1980, effective October 1982. The Federal Reserve System amended Reg Z in 1981 to reflect the changes. In July 1982, Platte Valley could choose between complying with the former or the revised provisions. *See Mars v. Spartanburg Chrysler Plymouth, Inc.*, 713 F.2d 65, 66 & n.1 (4th Cir. 1983). Because the current TILA and Reg Z provisions at issue here are "essentially identical" to the former versions, the district court's analysis used the current provisions for convenience.

- - - - - - - - - - - - End Footnotes- - - - - - - - - - - -

[**14]

[HN11]Reg Z "makes clear that failure to fill in the expiration date of the rescission form is a violation of the TILA." *Williamson v. Lafferty*, 698 F.2d 767, 768-69 (5th Cir. 1983). n12 *Williamson* held that the omission of the expiration date, though a purely technical violation of TILA, entitled the plaintiff to rescind the loan agreement for up to three years, without regard to whether the omission was material. *Id.* at 768; *see also Aquino v. Public Finance Consumer Discount Co.*, 606 F. Supp. 504, 507 (E.D. Pa. 1985) (omission of expiration date of rescission right gives borrower right to rescind loan).

- - - - - - - - - - - - - - Footnotes - - - - - - - - - - - - - - - -

n12 Several years earlier, the Fifth Circuit found that, despite two minor defects in consumer loan documents, the lender was not liable under TILA. *Dixon v. D.H. Holmes Co.*, 566 F.2d 571 (5th Cir. 1978). *Dixon* is of little help, however. First, the technical violations were different: a term that should have been "unpaid balance of the cash price" was only "unpaid balance," and specific consequences of partial prepayment were omitted. Further, *Williamson* was decided later and is on point.

Some courts have indicated they might be unwilling to impose liability for technical violations, but the opinions are cautious and limited. *See, e.g., Krenisky v. Rollins Protective Services Co.*, 728 F.2d 64, 67-

68 (2d Cir. 1984) ("We need not consider whether departure from strict compliance with the regulations would be permissible when a violation is both *de minimus* and of benefit to the consumer.") (citing *Dixon*; *Kramer v. Marine Midland Bank*, 559 F. Supp. 273 (S.D.N.Y. 1983)).

- - - - - - - - - - - End Footnotes- - - - - - - - - - - -

**[**15]**

The Semars argue that *Williamson* supports their right to rescind the loan for up to three years after it was consummated. Platte Valley concedes the technical violation of TILA, but urges this court to distinguish cases like *Williamson*, because of their more sympathetic facts, n13 and to establish equitable discretion to vary the terms of TILA for borrowers less in need of protection.

- - - - - - - - - - - - - - Footnotes - - - - - - - - - -

n13 *Williamson* involved a divorced forty-three year old mother of seven children. She signed an agreement with a contractor to add a carport to her home and to extend one of her rooms. The contractor financed the arrangements, and used her home as security without telling her. 698 F.2d at 768.

- - - - - - - - - - - End Footnotes- - - - - - - - - - - -

The district court found the Semars to be unsympathetic plaintiffs. Nevertheless, it held that rescission was appropriate for the technical violation of TILA and its regulations. It correctly concluded that case law was contrary to Platte Valley's assertion that courts should assert equitable powers in cases **[**16]** with unsympathetic facts.

**[*705]** One reason courts reject imposing these equitable considerations on TILA is that the statute contains these considerations as defenses. Platte Valley overstates the potential harshness of requiring strict compliance with TILA and its regulations. 15 U.S.C. § 1640(c) [HN12]provides a good-faith defense for creditors:A creditor or assignee may not be held liable in any action brought under this section or section 1635 of this title for a violation of this subchapter if the creditor or assignee shows by a preponderance of evidence that the violation was not intentional and resulted from a bona fide error notwithstanding the maintenance of procedures reasonably adapted to

avoid any such error. Examples of a bona fide error include, but are not limited to, clerical, calculation, computer malfunction and programming, and printing errors, except that an error of legal judgment with respect to a person's obligations under this subchapter is not a bona fide error.

Platte Valley did not raise this defense, presumably because **[**17]** of the testimony that its subsidiary was aware of the defect and failed to cure it.

In addition, accepting Platte Valley's suggestion would frustrate the very purpose of TILA. Congress did not intend for TILA to apply only to sympathetic consumers; Congress designed the law to apply to all consumers, who are inherently at a disadvantage in loan and credit transactions. As the Semars point out, most TILA plaintiffs are not "model borrowers." The district court correctly rejected Platte Valley's suggestion of carving a wide exception to TILA's detailed provisions.

III.

We also hold that the district court erred in calculating the amount the Semars owe by making them liable for some "finance or other charges" in contravention of 15 U.S.C. § 1635(b). The formula suggested by the Semars, resulting in a liability to them of $92,290.65, is the correct one under TILA. We therefore modify the district court's judgment. Of the $170,000 proceeds from the sale of the Semars' home, Platte Valley will receive $92,290.65 less the attorney's fees award, and the Semars will receive the remainder, once the district court determines the issue of the 1985 sales costs. **[**18]**

[HN13]On rescission, the security interest is dissolved and the borrower returns "the property" -- in this case the loan proceeds -- to the lender. 15 U.S.C. § 1635(b). TILA specifically states that the borrower "is not liable for any finance or other charge." *Id.* [HN14]Interest is a finance charge. 15 U.S.C. § 1605(a); n14 *see Ljepava v. M.L.S.C. Properties, Inc.*, 511 F.2d 935, 938 (9th Cir. 1975) (district court subtracted from amount borrower owed lender under a TILA rescission "finance charge" that included 10% interest, commissions, and "extra payment"); 12 C.F.R. § 226.4(b)(1). The district court erred by making the Semars responsible for interest and many of the charges listed on the Closing Statement. The proper formula under the statute is the one suggested by the Semars: the loan amount less all charges in the loan agreement. Therefore, they owe Platte Valley $92,290.65.

- - - - - - - - - - - - - - Footnotes - - - - - - - - - -

791 F.2d 699; 1986 U.S. App. LEXIS 25987

n14 15 U.S.C. § 1605(a) [HN15]provides:

Except as otherwise provided in this section, the amount of the finance charge in connection with any consumer credit transaction shall be determined as the sum of all charges, payable directly or indirectly by the person to whom the credit is extended, and imposed directly or indirectly by the creditor as an incident to the extension of credit. The finance charge does not include charges of a type payable in a comparable cash transaction. Examples of charges which are included in the finance charge include any of the following types of charges which are applicable:

(1) Interest, time price differential, and any amount payable under a point, discount, or other system of additional charges.

(2) Service or carrying charge.

(3) Loan fee, finder's fee, or similar charge.

(4) Fee for an investigation or credit report.

(5) Premium or other charge for any guarantee or insurance protecting the creditor against the obligor's default or other credit loss.

- - - - - - - - - - - - End Footnotes- - - - - - - - - - - - -

**[**19]**

Platte Valley concedes that the Semars' formula is correct under TILA but argues [*706] that the district court has equitable discretion to alter the statute. Platte Valley cites _Rachbach v. Cogswell, 547 F.2d 502 (10th Cir. 1976),_ which held that the district court did not abuse its discretion by requiring the borrower to repay principal and interest in a TILA rescission. n15 However, this decision contravenes 15 U.S.C. § 1635(b), which states that a borrower is not liable for any finance charge, and 15 U.S.C. § 1605(a), which lists interest as an example of a finance charge. We defer to Congress' method of enforcing TILA and follow the plain language of the statutes.

- - - - - - - - - - - - - - Footnotes - - - - - - - - - - - - - - -

n15 Platte Valley cites other cases, but they hold only that courts have equitable discretion to alter the rescission procedures. _See, e.g., Palmer v. Wilson, 502 F.2d 860 (9th Cir. 1974)_ (where danger that creditor might not be

reimbursed by following procedures in TILA, district court has discretion to alter procedures). These cases support the district court's allowing Platte Valley to take what it is owed from the proceeds of the house sale before the Semars receive their share of the sale proceeds. The procedures are not at issue, however. In addition, the district court need not rely on equitable powers to alter the procedure. In 1980 Congress amended 15 U.S.C. § 1635(b) to give courts this authority statutorily. Depository Institutions Deregulation and Monetary Act of 1980, Pub. L. No. 96-221, tit. VI, § 612(a)(4), 94 Stat. 132, 175 (codified at 15 U.S.C. § 1635(b)) ("The procedures prescribed by this subsection shall apply except when otherwise ordered by a court.") The cases do not give courts equitable discretion to alter TILA's substantive provisions and are therefore irrelevant.

- - - - - - - - - - - - End Footnotes- - - - - - - - - - - - -

**[**20]**

The district court's calculation contravened TILA by requiring the Semars to repay interest and other charges. Thus, we modify the amount the Semars owe Platte Valley to $92,290.65.

IV.

The Semars argue that the district court abused its discretion n16 in awarding the attorney's fees at a rate lower than that the Semars' requested. Because the Semars submitted ample evidence that $135 an hour was a prevailing rate for this type of litigation, we modify the award to reflect a $135 an hour rate.

- - - - - - - - - - - - - - Footnotes - - - - - - - - - - - - - - -

n16 We review the amount of attorney's fees awarded for abuse of discretion. _Martinez v. Idaho First National Bank, 755 F.2d 1376, 1378 (9th Cir. 1985)._

- - - - - - - - - - - - End Footnotes- - - - - - - - - - - - -

[HN16]Creditors are liable for "a reasonable attorney's fee as determined by the court" when borrowers obtain rescission under TILA. 15 U.S.C. § 1640(a)(3). The district court must base its calculation of a reasonable attorney's [**21] fee in a TILA case on factors established in _Johnson v. Georgia Highway Express,_

791 F.2d 699; 1986 U.S. App. LEXIS 25987

*Inc.*, 488 F.2d 714, 717-19 (5th Cir. 1974), and repeated in *Kerr v. Screen Extras Guild, Inc.*, 526 F.2d 67, 70 (9th Cir. 1975), *cert. denied*, 425 U.S. 951, 96 S. Ct. 1726, 48 L. Ed. 2d 195 (1976). n17 *Martinez v. Idaho First National Bank*, 755 F.2d 1376, 1378 (9th Cir. 1985). "The failure to follow these guidelines constitutes an abuse of discretion." *Id.* (citing *Laborers Clean-Up Contract Administration Trust Fund v. Uriarte Clean-Up Service*, 736 F.2d 516, 525 (9th Cir. 1984)).

- - - - - - - - - - - - - - Footnotes - - - - - - - - - - - - - - - -

n17 The factors are the time and labor required, the novelty and difficulty of the questions involved, the skill requisite to perform the legal service properly, the preclusion of other employment by the attorney due to acceptance of the case, the customary fee, whether the fee is fixed or contingent, time limitations imposed by the client or the circumstances, the amount involved and the results obtained, the experience, reputation, and ability of the attorneys, the "undesirability" of the case, the nature and length of the professional relationship with the client, and awards in similar cases. *Kerr*, 526 F.2d at 70.

- - - - - - - - - - - - End Footnotes- - - - - - - - - - - - -

**[\*\*22]**

Two of the factors, "the customary fee" and "awards in similar cases," relate to prevailing rates in similar litigation. The Eleventh Circuit reversed an award of $60 an hour, based solely on rates "customarily charged for Truth-in-Lending cases in the northern district of Georgia," as being too low. *Varner v. Century Finance Co.*, 738 F.2d 1143, 1148 (11th Cir. 1984) (rates in TILA cases must be based on "customary fees in cases of like difficulty," not just other TILA cases).

We find that $135 an hour was reasonable and reflects prevailing rates in similar litigation. The Semars presented evidence to the district court that their counsel was granted this rate in a TILA case a year earlier. They also submitted a bankruptcy **[\*707]** court decision finding that the prevailing rate for "minimally experienced" bankruptcy attorneys was $125 an hour.

The district court found the number of hours expended, 153.95, to be reasonable, and Platte Valley does not contest this finding. We therefore modify the award from 153.95 hours at $100, or $15,395, to 153.95 hours at $135, or $20,783.25.

V.

The district court's grant of rescission is affirmed in part, modified **[\*\*23]** in part, and remanded. The amount the Semars owe Platte Valley and the attorney's fees award are modified. From the $170,000 proceeds from the sale of the house, Platte Valley is entitled to $71,507.40 ($92,290.65 owed by the Semars less $20,783.25 attorney's fees) and the Semars are entitled to the remaining $98,492.60. These figures may change once the district court resolves the 1985 sales costs issue.

Affirmed in part, modified in part and remanded for the purpose of deciding the 1985 sales costs issue and entering judgment in accordance with this opinion.

Plaintiffs are awarded costs in full.

APPENDIX

Closing Statement

| | |
|---|---|
| Loan Origination Fee | $ 4,170.00 |
| Broker Fee | 4,470.00 |
| Lender's Document Preparation Fee | 40.00 |
| Trustee Fee | 40.00 |
| Prepaid Interest | 753.72 |
| Hazard Insurance premiums | 473.00 |
| PMI Premium | 402.00 |
| Mortgage Insurance premium | 67.00 |
| Closing Fee | 301.00 |
| Notary Fees | 16.00 |
| Loan Tie-in Fee | 50.00 |

791 F.2d 699; 1986 U.S. App. LEXIS 25987

| | |
|---|---:|
| Data Processing Fee | 20.00 |
| Handling Lender's Statements-Payoff | 15.00 |
| Title Insurance | 438.80 |
| Sub-Escrow Fee | 30.00 |
| Recording Fee | 12.00 |
| Messenger Fee | 5.50 |
| | * $ 11,354.02 |

- - - - - - - - - - - - - - Footnotes - - - - - - - - - -
- - - - - -

* The Closing Statement lists $11,354.02 as the total of these figures and the parties treat it as correct. The correct total is actually $11,304.02. For convenience, however, we also use the $11,354.02 figure in our opinion.

- - - - - - - - - - - - End Footnotes- - - - - - - -
- - - - - -

[**24]

737 F.2d 1549; 1984 U.S. App. LEXIS 19828

In re: Patricia G. SMITH, Debtor, Patricia G. Smith, Plaintiff-Appellant, v. AMERICAN FINANCIAL SYSTEMS, INC., Defendant-Appellee

No. 82-8753

UNITED STATES COURT OF APPEALS FOR THE ELEVENTH CIRCUIT

737 F.2d 1549; 1984 U.S. App. LEXIS 19828

August 6, 1984

**PRIOR HISTORY:** [**1]

Appeal from the United States District Court for the Northern District of Georgia.

**DISPOSITION:** Affirmed.

## CASE SUMMARY

**PROCEDURAL POSTURE:** Appellant debtor sought review of a decision of the United States District Court for the Northern District of Georgia, which affirmed a bankruptcy court's decision that held appellant's original cause of action for money damages against appellee creditor, was time-barred by the Truth in Lending Act, 15 U.S.C.S. § 1640(e).

**OVERVIEW:** Appellant debtor had previously entered into a loan transaction with appellee creditor, whereby appellant secured her loan by granting appellee a security interest in her home and in other household consumer goods. Debtor subsequently filed an action in bankruptcy under Chapter 13 and sought to have her debt to appellee rescinded on the basis of material nondisclosure, but appellee did not respond. Appellant then scheduled the debt as a disputed claim in bankruptcy. Appellee counterclaimed and the bankruptcy court entered judgment in appellee's favor. The district court affirmed. On appeal, the court affirmed, reasoning appellant's action was time-barred by the Truth in Lending Act, 15 U.S.C.S. § 1640(e) and that appellant was not entitled to rescission because the failure to disclose the future advances provision in the disclosure statement was not material when the relevant information was disclosed in the deed.

**OUTCOME:** Judgment of the district court was affirmed because appellant was not entitled to monetary damages for creditor's technical violation of the Truth in Lending Act, because her action was time-barred and because she could not assert a recoupment theory.

**CORE TERMS:** recoupment, rescission, security interest, disclosure statement, nondisclosure, counterclaim, disclosure, cause of action, monetary damages, time-barred, failure to disclose, deed, statute of limitations, loan transaction, consumer, right to rescind, future advances, money damages, setoff, main action, affirmative action, occurrence, rescind, stale, mix, indebtedness, single transaction, automatic stay, borrowers, relevant information

**LexisNexis(TM) Headnotes**

*Banking Law > Bank Activities > Consumer Protection > Truth in Lending*

[HN1]A creditor is liable for money damages for any failure to comply with the requirements of the Truth in Lending Act, 15 U.S.C.S. § 1640(a).

*Banking Law > Bank Activities > Consumer Protection > Truth in Lending*

[HN2]Nondisclosure of a fact required to be disclosed by the Truth in Lending Act (Act), 15 U.S.C.S. § 1640(a), is a violation of the Act, and the omitted fact need not be material for the creditor to be liable for money damages.

*Banking Law > Bank Activities > Consumer Protection > Truth in Lending*

[HN3]The Truth in Lending Act, 15 U.S.C.S. § 1635 (1979), requires material nondisclosure for rescission.

*Banking Law > Bank Activities > Consumer Protection > Truth in Lending*

[HN4]See 15 U.S.C.S. § 1640(a).

*Banking Law > Bank Activities > Consumer Protection > Truth in Lending*

[HN5]When credit is secured, the Truth in Lending Act, 15 U.S.C.S. § 1638(a)(9) requires that the property, which secures the debt, be disclosed.

*Banking Law > Bank Activities > Consumer Protection > Truth in Lending*

[HN6]See 12 C.F.R. § 226.8(b)(5) (1977).

*Banking Law > Bank Activities > Consumer Protection > Truth in Lending*

[HN7]The Truth in Lending Act, 12 C.F.R. § 226.8(a) mandates disclosure of the nature of the security interest on the disclosure statement.

*Banking Law > Bank Activities > Consumer Protection > Truth in Lending*

[HN8]The failure to rescind when a debtor is entitled to rescission also violates the Truth in Lending Act. 15 U.S.C.S. § 1635(a) (1979) provides a right of rescission in specified circumstances when a debtor gives a security interest in his principal residence.

*Banking Law > Bank Activities > Consumer Protection > Truth in Lending*

[HN9]When the debtor exercises the right to rescind by notifying the creditor, the creditor must terminate its security interest in the debtor's property within twenty days.

*Banking Law > Bank Activities > Consumer Protection > Truth in Lending*

[HN10]When a creditor obtains a security interest in the debtor's primary residence, the debtor has a right to rescind for three days following the consummation of the transaction or following the delivery of all material disclosures. The debtor's right to rescind continues for three years if the disclosures remain deficient.

*Banking Law > Bank Activities > Consumer Protection > Truth in Lending*

[HN11]To bring an affirmative action against a creditor for statutory damages, the debtor must bring the action within one year from the date of the occurrence of the violation. The violation "occurs" when the transaction is consummated.

*Governments > Legislation > Statutes of Limitations > Statutes of Limitations Generally*

*Banking Law > Bank Activities > Consumer Protection > Truth in Lending*

[HN12]Nondisclosure is not a continuing violation for purposes of the statute of limitations.

*Governments > Legislation > Statutes of Limitations > Statutes of Limitations Generally*

*Banking Law > Banker's Lien & Right of Setoff*

[HN13]A setoff, unlike a recoupment, is subject to the statute of limitations.

*Banking Law > Bank Activities > Consumer Protection > Truth in Lending*

[HN14]Recoupment is the right of a debtor, in the same action, to cut down the creditor's demand either because the creditor does not comply with some cross obligation of the contract on which he sues or because

he violates some duty which the law imposes on him in the making or performance of that contract.

*Banking Law > Banker's Lien & Right of Setoff*

[HN15]Setoff is defined as a counter demand, which a creditor holds against a debtor, arising out of a transaction extrinsic to the creditor's cause of action.

*Governments > Legislation > Statutes of Limitations > Statutes of Limitations Generally*

[HN16]Recoupment is in the nature of a defense arising out of some feature of the transaction upon which the debtor's action is grounded. Such a defense is never barred by the statute of limitations so long as the main action itself is timely.

*Governments > Legislation > Statutes of Limitations > Statutes of Limitations Generally*

*Evidence > Procedural Considerations > Inferences & Presumptions*

*Banking Law > Bank Activities > Consumer Protection > Truth in Lending*

[HN17]To maintain a claim for monetary damages under Bull, a debtor must show that (1) the Truth in Lending Act violation and the creditor's debt claim arose from the same transaction, (2) debtor is asserting her claim as a defense, and (3) the "main action" is timely. All three requirements must be satisfied.

*Governments > Legislation > Statutes of Limitations > Statutes of Limitations Generally*

*Banking Law > Bank Activities > Consumer Protection > Truth in Lending*

[HN18]To encourage creditors to assert their rights in a timely fashion and to enforce the Truth in Lending Act, a debtor is allowed to assert the time-barred claim for statutory damages by way of recoupment.

*Civil Procedure > Pleading & Practice > Defenses, Objections & Demurrers > Affirmative Defenses*

[HN19]To qualify as recoupment a cause of action must be asserted defensively.

*Civil Procedure > Pleading & Practice > Defenses, Objections & Demurrers > Affirmative Defenses*

*Banking Law > Bank Activities > Consumer Protection > Truth in Lending*

[HN20]Where a debtor seeks statutory damages under the Truth in Lending Act (TILA), 15 U.S.C.S. § 1640(a)(2) and does not contend that she suffers any actual damage as a result of a creditor's nondisclosure that should be offset from the amount of the debt, the TILA claim is not "directed at or an answer to the

underlying debt," but rather it is an action for affirmative relief for statutory violations.

### Governments > Legislation > Statutes of Limitations > Statutes of Limitations Generally

[HN21]Bull requires that the "main action," that is, the debtor's cause of action, be timely. This requirement is based on the premise that, if the litigation is not stale, no issue raised by the litigation is stale. Accordingly, the statute of limitation aimed at precluding stale litigation will not cut off consideration of a defense to the action.

### Banking Law > Bank Activities > Consumer Protection > Truth in Lending

[HN22]A nondisclosure is material if it is of the type that a reasonable consumer would view as significantly altering the "total mix" of information made available. The information must be of the type that would affect a reasonable consumer's decision to use credit or to engage that creditor when "comparison shopping for credit." The information need not be so important that a reasonable consumer would probably change creditors on the basis of it, but it must be relevant to the credit decision.

### Banking Law > Bank Activities > Consumer Protection > Truth in Lending

[HN23]A creditor's failure to describe the breakdown of a service charge and the type of security interest created in the disclosure statement is not material when the disclosures are made simultaneously on other documents.

### Banking Law > Bank Activities > Consumer Protection > Truth in Lending

[HN24]The failure to describe property in a disclosure statement is not material, where a disclosure statement and a deed are executed as part of a single transaction and where there is no indication that the debtors do not know that a security interest is being taken in their home because the "total mix of information," is not affected by the nondisclosure.

**COUNSEL:** Ralph Goldberg, Atlanta, Georgia for Appellant.

W. Rhett Tanner, Atlanta, Georgia for Appellee.

**JUDGES:** Tjoflat and Fay, Circuit Judges, and Wisdom, * Senior Circuit Judge.

> \* Honorable John Minor Wisdom, U.S. Circuit Judge for the Fifth Circuit, sitting by designation.

**OPINIONBY:** WISDOM

**OPINION:** [*1550] WISDOM, Senior Circuit Judge:

This appeal raises two issues under the Truth In Lending Act (TILA). 15 U.S.C. § 1601 et seq. (1979). The district court granted summary judgment in favor of the creditor, American Financial Systems, Inc., against the debtor, Patricia Smith, on the grounds that her time-barred cause of action for monetary damages cannot be maintained by way of recoupment and that her request for rescission of the loan transaction under section 1635 fails to show material nondisclosure warranting rescission. First, this Court must determine whether Smith may recover damages for a violation of TILA on a recoupment theory when an affirmative action for damages is barred by the one-year limitation period. See id. § 1640(e). **[**2]** Second, this Court must decide whether the failure to disclose in the TILA disclosure statement that a debtor's residence secures future advances is material when the future advances provision is contained in a simultaneously executed Deed of Trust. The district court answered both questions in the negative. We affirm.

### I. FACTS

On September 2, 1977, Patricia Smith borrowed $5,323.95 from American Financial Systems, Inc. (AFS) and executed a Deed to Secure Debt granting AFS a security interest in her principal place of residence. n1 The Deed indicated that the residence secured "present and future indebtedness." The TILA disclosure statement identified the security interest in the residence, but failed to reveal that the residence secured future advances, as well as the present indebtedness. This nondisclosure is the basis for the present suit.

- - - - - - - - - - - - - - Footnotes - - - - - - - - - -
- - - - - -

n1 Smith also granted AFS a security interest in certain household consumer goods, a designated motor vehicle, and credit life insurance.

- - - - - - - - - - - - - End Footnotes- - - - - - - -
- - - - - -

On March 24, 1980, Smith **[**3]** instituted a Chapter 13 bankruptcy proceeding. One month later, Smith sent a rescission notice **[*1551]** to AFS seeking to rescind the loan transaction on the basis of a material nondisclosure, that is, that her residence secured future advances. AFS did not reply to the request for rescission. n2 Thereafter, Smith scheduled the debt owed to AFS as a disputed claim in the bankruptcy court, contending that she was entitled to rescission and to statutory damages both for AFS's failure to respond to her request for rescission and for its failure to disclose the extent of the security interest. See 15

U.S.C. §§ 1635, 1640 (1979). AFS counterclaimed for the amount of the debt, which was in default. Smith filed a "counterclaim" to AFS's counterclaim seeking "recoupment" of money damages for violations of TILA from any judgment that might be awarded to AFS on the debt.

- - - - - - - - - - - - - Footnotes - - - - - - - - - -
- - - - - -

n2 In the bankruptcy court, AFS maintained that its failure to respond was based on its belief that the automatic stay provisions of the Bankruptcy Reform Act of 1978, 11 U.S.C. § 362 (1979), prohibited any action concerning the debt. The bankruptcy court determined that the automatic stay did not apply to rescission actions, because such actions have the effect of freeing the property of the estate from a security agreement. In re Smith, Memorandum Opinion, (Bankr.N.D.Ga. Oct. 13, 1981). This issue was not raised on appeal.

- - - - - - - - - - - End Footnotes- - - - - - -
- - - - - -

[**4]

The bankruptcy court held that Smith's original cause of action for money damages was time-barred by section 1640(e), that she could not recoup the time-barred damages from AFS's recovery on the debt, and that she was not entitled to rescission because the failure to disclose the future advances provision in the disclosure statement was not material when the relevant information was disclosed in the Deed. The district court affirmed.

We agree with the district court's conclusion that Smith cannot recoup time-barred money damages from any judgment that might be awarded to AFS on the debt. Unlike the district court, we find that it is neither necessary nor advisable, in the circumstances of this case, to decide whether a debtor generally may recoup such damages. We also concur with the district court's finding that the nondisclosure is not material and therefore that Smith is not entitled to rescission of the loan transaction.

II. MONEY DAMAGES

A. The Availability of Money Damages Under TILA

Smith contends that she is entitled to damages under section 1640 for AFS's nondisclosure and for AFS's failure to rescind the loan transaction upon her request that it [**5] do so. [HN1]A creditor is liable for money damages for any failure to comply with the requirements of the Act. n3 [HN2]Nondisclosure of a fact required to be disclosed by the Act is a violation of the Act, and the omitted fact need not be material for the creditor to be liable for money damages. n4 Cf. [HN3] 15 U.S.C. § 1635 (1979), requiring material nondisclosure for rescission.

- - - - - - - - - - - - - Footnotes - - - - - - - - - -
- - - - - -

n3 [HN4] 15 U.S.C. § 1640(a) provides that"(a) . . . [Any] creditor who fails to comply with any requirement imposed under this part . . . with respect to any person is liable to such person in an amount equal to the sum of --(1) actual damage sustained by such person as a result of the failure:

(2)(A)(i) in the case of an individual action twice the amount of any finance charge in connection with the transaction . . ., except that the liability . . . shall not be less than $100 nor greater than $1,000."

[**6]

n4 This provision is aimed at enforcement of the Act. It is viewed as imposing a penalty on non-complying lenders, not as providing compensation to injured borrowers. Thus, neither materiality nor actual damage is required. Comment, Truth In Lending Act -- Defendant's Debt Counterclaim -- Compulsory or Permissive?, 28 Case W.Res.L.Rev. 434, 436 (1978); Ellis, The Applicability of the Statute of Limitations to Truth-In-Lending Counterclaims, 19 Am.Bus.L.J. 471, 472 (1982).

- - - - - - - - - - - End Footnotes- - - - - - -
- - - - - -

AFS concedes that it violated the Act by failing to disclose on the disclosure statement that Smith's residence secured future advances. [HN5]When credit is secured, the Act requires that the property which secures the debt be disclosed. Id. § 1638(a)(9). In determining the extent of disclosure required by this section, the regulations provide that "if other or future indebtedness is or may be secured by such property, this fact shall be clearly set forth in conjunction [*1552] [**7] with the description or identification of the type of security interest held". [HN6] 12 C.F.R. § 226.8(b)(5) (1977) (emphasis added). AFS clearly failed to meet this requirement. Nor can AFS argue that the requirement was satisfied by disclosure on a

separate document, in this case the deed showing the security interest. *See id.* § 226.8(a); [HN7]The TILA mandates disclosure of the nature of the security interest on the disclosure statement. *See id.* § 226.8(a); *Smathers v. Fulton Federal Savings & Loan Association,* 5 Cir. 1981, 653 F.2d 977, 979; *Matter of Garner,* 5 Cir. 1977, 556 F.2d 772, 777-78. AFS violated the Act, therefore, by failing to disclose the nature of its security interest on the disclosure statement given to Smith.

[HN8]The failure to rescind when a debtor is entitled to rescission also violates the Act. Section 1635 provides a right of rescission in specified circumstances when a debtor [**8] gives a security interest in his principal residence. n5 15 U.S.C. § 1635(a) (1979). [HN9]When the debtor exercises the right to rescind by notifying the creditor, the creditor must terminate its security interest in the debtor's property within twenty days. *Id.* § 1635(b). AFS did not respond to Smith's request and failed to terminate its security interest in Smith's residence. If Smith had a right to rescind in the circumstances of this case -- and we find that she did not -- AFS could be liable for monetary damages under section 1640. *Gerasta v. Hibernia National Bank,* 5 Cir. 1978, 575 F.2d 580.

- - - - - - - - - - - - - - Footnotes - - - - - - - - - - - - -

n5 [HN10]When a creditor obtains a security interest in the debtor's primary residence, the debtor has a right to rescind for three days following the consummation of the transaction or following the delivery of all material disclosures. The debtor's right to rescind continues for three years if the disclosures remain deficient. *See* 15 U.S.C. § 1635 (1979); 12 C.F.R. § 226.9(h) (1977); Sasamoto, *Recission Under the Truth-in-Lending Act: Protecting Debtor and Creditor Alike,* 20 Urb.L.Ann. 169 (1980).

- - - - - - - - - - - - - End Footnotes- - - - - - - - -

[**9]

B. *Maintaining an Action for Monetary Damages*

[HN11]To bring an affirmative action against a creditor for statutory damages, the debtor must bring the action "within one year from the date of the occurrence of the violation". n6 15 U.S.C. § 1640(e) (1979). The violation "occurs" when the transaction is consummated. *Wachtel v. West,* 6 Cir., 476 F.2d 1062, *cert. denied,* 1973, 414 U.S. 874, 94 S. Ct. 161, 38 L. Ed. 2d 114. [HN12]Nondisclosure is not a continuing

violation for purposes of the statute of limitations. *Id.* Accordingly, Smith's affirmative action for monetary damage, brought with her request for rescission in 1980, was clearly time-barred.

- - - - - - - - - - - - - - Footnotes - - - - - - - - - - - - -

n6 This section was amended in 1980 to take effect on October 1, 1982. It currently reads:

"Any action under this section may be brought in any United States district court, or in any other court of competent jurisdiction, within one year from the date of the occurrence of the violation. This subsection does not bar a person from asserting a violation of this subchapter in an action to collect the debt which was brought more than one year from the date of the occurrence of the violation as a matter of defense by recoupment or set-off in such action, except as otherwise provided by State law."

15 U.S.C. 1640(e) (1982 Supp.).

- - - - - - - - - - - - - End Footnotes- - - - - - - - -

[**10]

To avoid the time bar, Smith asserts that she can maintain her action for monetary damages defensively on a theory of recoupment. n7 AFS contends that a TILA counterclaim to a creditor's cause of action for the debt is a setoff, n8 not a recoupment. [HN13]A setoff, unlike a recoupment, is subject to the statute of limitations. *E.g., Hodges v. Community Loan & Investment Corp.,* 1975, 133 Ga. App. 336, 210 S.E.2d 826. The courts that have considered the question whether a TILA counterclaim is in the nature of setoff or recoupment have divided on the issue. *Compare Household Finance Corp. v. Hobbs,* 1978, Del.Super., 387 A.2d 198; *Pacific Concrete Federal* [*1553] *Credit Union v. Kauanoe,* 1980, 62 Haw. 334, 614 P.2d 936; *Wood Acceptance Co. v. King,* 1974, 18 Ill. App. 3d 149, 309 N.E.2d 403; *Templan Mid-City, Inc. v. Laughlin,* 1976, La.Ct.App., 333 So. 2d 738; *Garza v. Allied Finance Co.,* 1978, Tex.Civ.App., 566 S.W.2d 57, holding that a TILA counterclaim is in the nature of recoupment [**11] *with Basham v. Finance America Corp.,* 7 Cir. 1978, 583 F.2d 918; *Hewlett v. John Blue Employees Federal Credit Union,* 1976, Ala.App., 344 So. 2d 505; *Hodges v. Community Loan & Investment Corp.,* 1974, 133 Ga.App. 336, 210 S.E.2d 826, *aff'd in part and rev'd in part on other grounds,* 1975, 234 Ga. 427, 216 S.E.2d 274; and

*Public Loan v. Hyde*, 1977, 89 Misc. 2d 226, 390 N.Y.S.2d 971, holding that a TILA counterclaim is in the nature of a setoff.

- - - - - - - - - - - - - - Footnotes - - - - - - - - - - - - - - - -

n7 [HN14]Recoupment is "the right of a defendant, in the same action, to cut down the plaintiff's demand either because the plaintiff has not complied with some cross obligation of the contract on which he sues or because he has violated some duty which the law imposes on him in the making or performance of that contract." Ballentine's Law Dictionary 1070 (3rd ed. 1969).

n8 [HN15]Setoff is defined as "[a] counter demand which a defendant holds against a plaintiff, arising out of a transaction extrinsic to the plaintiff's cause of action." *Id.* at 1167.

- - - - - - - - - - - - End Footnotes- - - - - - - - - - - - - - -

**[**12]**

We leave this complex question for another day, because we find that on the facts of this case Smith cannot maintain her claim for monetary damages whether that claim is classified as a recoupment or as a setoff.

In *Bull v. United States*, 1935, 295 U.S. 247, 55 S. Ct. 695, 79 L. Ed. 1421, the Supreme Court held that

"recoupment [HN16]is in the nature of a defense arising out of some feature of the transaction upon which the plaintiff's action is grounded. Such a defense is never barred by the statute of limitations so long as the main action itself is timely."

295 U.S. at 262, 55 S. Ct. at 700 (footnote omitted). Thus, [HN17]to maintain her claim for monetary damages under *Bull*, Smith must show that (1) the TILA violation and the creditor's debt claim arose from the same transaction, (2) she is asserting her claim as a *defense*, and (3) the "main action" is timely. All three requirements must be satisfied.

The first requirement -- that the **[**13]** TILA violation and the state law debt claim arise from the "same transaction" -- is the subject of much dispute. In *Hodges v. Community Loan & Investment Corp. of North Georgia*, 1974, 133 Ga.App. 336, 210 S.E.2d 826, the Georgia appeals court applying Georgia law held that a TILA counterclaim is in the nature of setoff,

not recoupment, because the causes of action do not arise from the mutual obligations or covenants of the loan transaction. The court found that the TILA cause of action was an affirmative action for an independent wrong, not a defense to the justice of the creditor's cause of action on the debt. 210 S.E.2d at 832. Other courts have taken a more pragmatic approach and have reached a contrary result. In *Household Finance Corp. v. Hobbs*, 1978, Del.Super., 387 A.2d 198, the court held that a TILA counterclaim was a recoupment. The court determined that the TILA claim and the debt claim arose from the same transaction, because the credit terms that must be disclosed under TILA were an "integral part of a loan transaction" the breach of which forms the basis for the creditor's claim. *Id.* at 200. On a [**14] practical level, the court found that a contrary holding would defeat the purposes of TILA by encouraging lenders to wait more than one year to sue on a borrower's default. *Id.; see also* Note, *Consumer Protection -- Restrictions on Defenses and Counterclaims Based on Truth in Lending Violations*, 13 Wake Forest L.Rev. 189, 197 (1977). Many borrowers are unfamiliar with the requirements of TILA and do not know that they have a cause of action against the creditor until they consult a lawyer after being sued by the creditor. n9 *See* Comment, *Truth in Lending and the Statute of Limitations*, 21 Vill.L.Rev. 904, 913 (1976).

- - - - - - - - - - - - - - Footnotes - - - - - - - - - - - - - - - -

n9 The Seventh Circuit, responding to this argument, noted that "the design of TILA was to provide protection to consumers by affording them meaningful disclosure and thereby an opportunity to shop for credit. It was not designed, nor should it be used to thwart, the valid claims of creditors."

*Basham v. Finance Am. Corp.*, 7 Cir. 1978, 583 F.2d 918, 928.

- - - - - - - - - - - - - - -End Footnotes- - - - - - - - - - - - - - - -[HN18]

**[**15]**

To encourage creditors to assert their rights in a timely fashion and to enforce the TILA, a debtor is allowed to assert the time-barred claim for statutory damages by way of recoupment. We do not attempt to resolve this dispute, because we find that the second and third requirements of the *Bull* test dispose of Smith's contention.

**[*1554]** [HN19]To qualify as recoupment a cause of action must be asserted defensively. Under the facts of this case, Smith's cause of action is not asserted as a

defense. [HN20]Smith seeks statutory damages under section 1640(a)(2); she does not contend that she suffered any actual damage as a result of AFS's nondisclosure that should be offset from the amount of the debt. In such circumstances, the Seventh Circuit held that the TILA claim is not "directed at or an answer to the underlying debt", but rather that it is an action for *affirmative relief* for statutory violations. *Basham v. Finance America Corp., 7 Cir. 1978, 583 F.2d 918, 928.* **[**16]**

That Smith's suit is one for affirmative relief is exemplified by the procedural posture of this case. Smith haled AFS into court seeking monetary damages and rescission. Only then did AFS assert its claim on the underlying obligation. n10 Smith is now attempting to assert her time-barred affirmative claim as a counterclaim; this change of labels does not effect a change in the essential character of the action. Because Smith's claim is not asserted as a defense to or denial of the creditor's claim, it cannot be classified as a recoupment.

- - - - - - - - - - - - - Footnotes - - - - - - - - - - - - - - - -

n10 The automatic stay provided by the Bankruptcy Code would have prohibited any action by AFS after Smith instituted bankruptcy proceedings in March 1980.

- - - - - - - - - - - - End Footnotes- - - - - - - - - - - - - -

The procedural posture of the case points out an additional flaw in Smith's contention that her TILA cause of action is a recoupment not subject to the statute of limitations. [HN21]*Bull* requires that the "main action", that **[**17]** is, the *plaintiff's* cause of action, be timely. *Bull, 295 U.S. at 262, 55 S. Ct. at 700.* This requirement is based on the premise that, if the litigation is not stale, no issue raised by the litigation is stale. Accordingly, the statute of limitation aimed at precluding stale litigation will not cut off consideration of a defense to the action. *See United States v. Western Pacific Railroad, 1956, 352 U.S. 59, 72, 77 S. Ct. 161, 169, 1 L. Ed. 2d 126.* In this case, however, the "main action" was the action initiated by Smith as the original plaintiff in this case. This action is stale, and therefore Smith's counterclaim cannot be classified as a recoupment.

## III. RESCISSION

The TILA gives a right of rescission to a consumer debtor who gives a security interest in his principal residence in two circumstances: an unqualified right for three business days following the transaction or until three days after all *material* disclosures are delivered. *15 U.S.C. § 1635*(a) (1979); *see also 12 C.F.R. § 226.9(b) (1977).* Rescission for material nondisclosures is subject to a three-year statute of limitations. *15 U.S.C. § 1635* **[**18]** (f) (1979). This action was brought after the three-day period, but within the three-year period. Smith, therefore, is entitled to rescission only if she can show that AFS failed to make a material disclosure. Smith contends that the failure to disclose on the TILA disclosure form that her residence secured future indebtedness was a material omission that entitled her to rescission of the transaction. The district court found that, although the failure to disclose was a technical violation of Regulation Z, *12 C.F.R. § 226.8(b)(5) (1977),* the violation was not material, because the simultaneously executed security deed contained the omitted future advance clause. The district court held therefore that Smith was not entitled to rescind the transaction. We affirm.

[HN22]A nondisclosure is material if it is of the type that "a reasonable consumer would view as significantly altering the 'total mix' of information made available". *Davis v. Federal Deposit Insurance Co., 5 Cir. 1980, 620 F.2d 489, 492* (citation omitted), *modified,* 1981, *636 F.2d 1115.* The **[**19]** information must be of the type that would affect a reasonable consumer's decision to use credit or to engage that creditor when "comparison shopping for credit". n11 *Id.;* **[\*1555]** *see also Bustamante v. First Federal Savings & Loan Association, 5 Cir. 1980, 619 F.2d 360, 364.* The information need not be so important that a reasonable consumer would probably change creditors on the basis of it, but it must be relevant to the credit decision. *Jones v. Fitch, 5 Cir. 1982, 665 F.2d 586, 588.* We find that the total mix of information available to the consumer is not affected by the failure to disclose on the disclosure statement the extent of the security interest when the disclosure was clearly contained in a simultaneously executed deed.

- - - - - - - - - - - - - Footnotes - - - - - - - - - - - - - - - -

n11 In *Davis*, we held that [HN23]a creditor's failure to describe the breakdown of a service charge and the type of security interest created in the disclosure statement was not material when the disclosures were made simultaneously on other documents. *Davis v. Federal Deposit Ins. Corp., 5 Cir. 1980, 620 F.2d 489, 492, modified,* 1981, *636 F.2d 1115.*

- - - - - - - - - - - End Footnotes- - - - - - -
- - - - - -

**[\*\*20]**

Our holding is consistent with that reached by a panel of the Fifth Circuit in _Jones v. Fitch_, 5 Cir. 1982, 665 F.2d 586. In _Jones_, the disclosure statement did not contain a description of the real property that secured the debt. The property, however, was described fully in a simultaneously executed deed. The court found that [HN24]the failure to describe the property in the disclosure statement was not material, because the disclosure statement and the deed were executed as part of a _single transaction_ and that there was no indication that the debtors did not know that a security interest was being taken in their home. _Id._ at 589-90. The "total mix of information", therefore, was not affected by the nondisclosure. _Id._ at 589. In this case, we are presented with an analogous situation. As part of a single transaction, the parties executed a disclosure statement and a deed evincing the security interest. Smith signed the deed and received a copy of it along with the disclosure statement. The total mix of information was not altered **[\*\*21]** by the failure to disclose in one document information that was clearly disclosed in the other.

Our conclusion in this case is supported by comparing _Jones_ with a later decision of the Fifth Circuit, _Williamson v. Lafferty_, 5 Cir. 1983, 698 F.2d 767. In _Williamson_, the creditor failed to disclose completely the nature of security interest and the property to which it attached on the disclosure statement. Additionally, however, the deed of trust signed by the debtor was blank. The Court distinguished _Jones_, finding that when neither document contained the disclosures the failure to disclose was material, because nothing in the "single transaction" provided the relevant information to the debtor. _Id._ at 770. Unlike the debtor in _Williamson_, Smith was provided with the relevant information. The nondisclosure, although technically a violation of the Act, was not material so as to give Smith a right to rescind the transaction.

## IV. CONCLUSION

Smith is not entitled to recover monetary damages for AFS's technical violation of the Act, because her action was brought more than one year from the date of the occurrence and is time-barred **[\*\*22]** by section 1640(e) of the Act. Nor can she assert her time-barred claim for monetary damages on a recoupment theory, because her demand is not in the nature of a defense and the main action is not timely.

Smith does not have a right to rescind the loan transaction, because the challenged nondisclosure is not material. A reasonable consumer's decision to use credit would not be affected by a nondisclosure on the disclosure form when the identical information is disclosed fully on another document that is executed simultaneously.

The judgement of the district court is AFFIRMED.

LAWRENCE A. STEIN, Plaintiff, Appellant, v. ROYAL BANK OF CANADA, Defendant, Appellee.

No. 99-2110

UNITED STATES COURT OF APPEALS FOR THE FIRST CIRCUIT

239 F.3d 389; 2001 U.S. App. LEXIS 2399; 49 Fed. R. Serv. 3d (Callaghan) 332

February 14, 2001, Decided

**PRIOR HISTORY:** [**1] APPEAL FROM THE UNITED STATES DISTRICT COURT FOR THE DISTRICT OF PUERTO RICO. [Hon. Jose A. Fuste, U.S. District Judge].

**DISPOSITION:** Affirmed.

### CASE SUMMARY

**PROCEDURAL POSTURE:** Plaintiff appealed the judgment of the United States District Court for the District of Puerto Rico, which dismissed his action, in which he sought recovery from defendant bank for a setoff of a Certificate of Deposit (CD) owned by plaintiff against the debts of an unrelated third party that defaulted on its loan.

**OVERVIEW:** Although he had pledged the CD as collateral for defendant's extension of a loan to the third party, plaintiff argued that defendant's unilateral setoff was illegal under Puerto Rico law and contrary to the terms of the pledge agreement. Specifically, plaintiff argued that the provisions in the Civil Code of Puerto Rico (Code) dealing with the alienation of pledges, P.R. Laws Ann. tit. 31, §§ 5002, 5030, mandated procedures that applied irrespective of contrary contractual language. The court held that the statutory language was permissive, and that nothing within the Code prevented defendant from exercising a right to setoff as provided by agreement. The court next examined the pledge agreement to determine if it allowed defendant to use methods of alienating pledges other than what § 5030 provided. The court held that defendant had a broad grant of remedy, subject only to a general rule that the remedy be reasonable in the circumstances. Lastly, the court held that even if it were to impose a notice requirement upon defendant regarding its right to setoff, plaintiff had constructive notice of defendant's intention to setoff his CD in the event of the third party's default.

**OUTCOME:** Judgment of dismissal was affirmed. Plaintiff failed to allege facts indicating that defendant exceeded its authority under pledge agreement, when it exercised unilateral setoff on plaintiff's CD.

**CORE TERMS:** pledge, setoff, pledge agreement, translation, public institutions, default, notice, alienation, alienate, motion to dismiss, summary judgment, remedies available, irregular, pledged, permissive, alienating, mandatory, Local Rule, failed to provide, entry of judgment, oral argument, setting forth, proper case, proper time, affording, alienated, effective, converted, mortgage, auction

**LexisNexis(TM) Headnotes**

*Civil Procedure > Pleading & Practice > Pleadings > Amended Pleadings*

[HN1]A party may amend the party's pleading once as a matter of course at any time before a responsive pleading is served. Fed. R. Civ. P. 15.

*Civil Procedure > Pleading & Practice > Pleadings > Interpretation*

[HN2]The Federal Rules of Civil Procedure specifically exclude motions from the definition of a pleading. Fed. R. Civ. P. 7(a).

*Civil Procedure > Pleading & Practice > Defenses, Objections & Demurrers > Failure to State a Cause of Action*

[HN3]A court may properly consider the relevant entirety of a document integral to or explicitly relied upon in the complaint, even though not attached to the complaint, without converting a motion to dismiss into one for summary judgment.

*Civil Procedure > Pleading & Practice > Defenses, Objections & Demurrers > Failure to State a Cause of Action*

[HN4]The test for deciding whether a district court's ruling is a Fed. R. Civ. P. 12(b)(6) dismissal or an entry of summary judgment is whether the court actually took cognizance of supplementary materials.

*Civil Procedure > Pleading & Practice > Defenses, Objections & Demurrers > Failure to State a Cause of Action*

[HN5]When reviewing a dismissal under Fed. R. Civ. P. 12(b)(6), the court accepts all well-pleaded facts as true and draws all reasonable inferences in favor of the

239 F.3d 389; 2001 U.S. App. LEXIS 2399; 49 Fed. R. Serv. 3d (Callaghan) 332

non-movants, but will not accept a complainant's unsupported conclusions or interpretations of law.

### Commercial Law (UCC) > Secured Transactions (Article 9) > Remedies

[HN6]Rather than stating what a creditor "must" or "shall" do to alienate a pledge, P.R. Laws Ann. tit. 31, § 5030 states that a creditor to whom the debt has not been paid at the proper time may proceed to alienate the pledge by auction.

### Commercial Law (UCC) > Secured Transactions (Article 9) > Remedies

[HN7]It is also essential in these contracts to alienate a pledge that when the principal obligation is due, the things of which the pledge or mortgage consists may be alienated to pay the creditor. P.R. Laws Ann. tit. 31, § 5002.

### Commercial Law (UCC) > Secured Transactions (Article 9) > Remedies

[HN8]See P.R. Laws Ann. tit. 31, § 5030.

### Commercial Law (UCC) > Secured Transactions (Article 9) > Remedies

[HN9]See P.R. Laws Ann. tit. 31, § 5031.

### Governments > Courts > Court Records

[HN10]The court may commission unofficial translations and impose on the offending parties the costs incurred and, where appropriate, sanctions.

### Governments > Courts > Court Records

[HN11]The court will not receive documents not in the English language unless translations are furnished. 1st Cir. R. 30(d).

### Commercial Law (UCC) > Secured Transactions (Article 9) > Remedies

[HN12]See P.R. Laws Ann. tit. 31, § 5029.

**COUNSEL:** Alfredo Castellanos, with whom Kenneth C. Suria, and Castellanos Law Firm were on brief for appellant.

Fernando D. Castro, with whom Goldman, Antonetti & Cordova, PSC was on brief for appellee.

**JUDGES:** Before Selya, Circuit Judge, Bownes, Senior Circuit Judge, and Lipez, Circuit Judge.

**OPINIONBY:** LIPEZ

**OPINION:** [*391]

**LIPEZ, Circuit Judge.** Lawrence Stein appeals from the dismissal of the present action, in which he seeks recovery from the Royal Bank of Canada (the Bank) for a setoff of a Certificate of Deposit (the CD) owned by Stein against the debts of an unrelated third party that defaulted on its loan. Although he had pledged the CD as collateral for the Bank's extension of a loan to the third party, Stein argues that the Bank's unilateral setoff was illegal under Puerto Rico law and contrary to the terms of the pledge agreement. We disagree and affirm.

### I. Background

The facts in this case are straightforward. In accordance with the familiar standard for reviewing orders granting motions to dismiss, our summary is taken from the factual [**2] allegations in the complaint, read in the light most favorable to Stein, the non-movant. On March 24, 1995, Stein signed a general pledge agreement with Royal Bank. This agreement offered the CD, representing $ 550,000 plus interest, as collateral to the Bank for a loan to Prodisc Puerto Rico, Inc. (Prodisc). Stein held no official position with Prodisc, either as an officer, director or shareholder, but he nonetheless offered his own funds in support of this transaction.

Approximately two-and-a-half years later, the Bank debited $ 32,534.05 from the interest that it owed to Stein on the CD. It did so without prior notice to Stein, who became aware of the debit when he noticed the deduction on one of the statements connected with the CD. Stein wrote to the Bank, demanding an explanation and indicating that he felt it was improper for the Bank to setoff the interest without first giving him notice of either its intent to do so or of Prodisc's default. n1 It is not clear whether the Bank responded directly to Stein's letter. In December of 1997, however, the Bank wrote Stein, this time informing him that Prodisc had defaulted upon its obligation. Prodisc's outstanding debt was $ 1,300,000. [**3] In light of this default, and in accordance with its interpretation of the pledge agreement, the Bank advised Stein that it had setoff the pledged CD principal and remaining accrued interest against Prodisc's obligations. It justified this action on the ground that the CD constituted an "irregular pledge" under Puerto Rican law that "need not to be taken to a judicial procedure in the event of a default."

- - - - - - - - - - - - - - Footnotes - - - - - - - - - - - - - - - -

n1 Stein has never alleged that Prodisc was not in default. We therefore assume this fact for the purposes of our discussion.

- - - - - - - - - - - - End Footnotes- - - - - - - - - - - - - -

239 F.3d 389; 2001 U.S. App. LEXIS 2399; 49 Fed. R. Serv. 3d (Callaghan) 332

Stein instituted the present action six months later, claiming that the Bank's actions in this case were illegal and contrary to the agreement. In lieu of an answer, the Bank filed a motion to dismiss. Stein opposed the motion, and then filed a motion for summary judgment that was nearly identical to that opposition. The district court granted the Bank's motion and dismissed the case with prejudice. Stein now appeals.

## II. Amendment and dismissal of the complaint

Before turning [**4] to the substantive questions raised by this appeal, we briefly [*392] address Stein's allegations concerning the procedural underpinnings of the dismissal. Stein contends that the district court prevented him from amending his complaint and therefore improperly dismissed his claim. There is nothing in the record to support this argument. "[HN1]A party may amend the party's pleading once as a matter of course at any time before a responsive pleading is served . . . ." Fed. R. Civ. P. 15. [HN2]The rules specifically exclude motions from the definition of a pleading, see Rule 7(a), and Royal Bank did not file an answer or any other document that could be deemed a pleading. Consequently, Stein was free to amend his complaint at any time before the entry of judgment on the motion to dismiss. See 6 Charles Alan Wright, Arthur R. Miller & Mary Kay Kane, Federal Practice and Procedure § 1483 (2d ed. 1990). Approximately a year elapsed between the filing of the motion and the entry of judgment, affording Stein ample opportunity to correct any defects in the complaint that he may have discovered because of the motion to dismiss.

Stein's argument that the district court improperly converted the [**5] Bank's motion to dismiss into a motion for summary judgment is equally without record support. In conducting its review of the motion to dismiss, the district court considered only the complaint and the documents that were attached to it, the pledge agreement and two letters. The court's consideration of these documents was proper and did not convert the motion to dismiss into a motion for summary judgment. See Clorox Co. v. Proctor & Gamble Comm. Co., 228 F.3d 24, 32 (1st Cir. 2000) ("[HN3]We 'may properly consider the relevant entirety of a document integral to or explicitly relied upon in the complaint, even though not attached to the complaint, without converting the motion into one for summary judgment.'") (quoting Shaw v. Digital Equip. Corp., 82 F.3d 1194, 1220 (1st Cir. 1996)). Indeed, neither party introduced into the record any materials extraneous to the complaint, thus making it impossible for the court to have converted the Rule 12(b)(6)

motion into a motion for summary judgment. See Garita Hotel Ltd. Partnership v. Ponce Fed. Bank F.S.B., 958 F.2d 15, 18-19 (1st Cir. 1992) (stating that [HN4]the test for deciding whether a district [**6] court's ruling is a 12(b)(6) dismissal or an entry of summary judgment is "whether the court actually took cognizance of [supplementary materials]"). In our review of this case, we therefore apply the well-established standard governing motions to dismiss, affording plenary review to the district court's allowance of the motion. See TAG/ICIB Services, Inc. v. Pan Am. Grain Co., Inc., 215 F.3d 172, 175 (1st Cir. 2000). [HN5]We accept all well-pleaded facts as true and draw all reasonable inferences in favor of the non-movants, but will not accept "a complainant's unsupported conclusions or interpretations of law." Washington Legal Found. v. Massachusetts Bar Found., 993 F.2d 962, 971 (1st Cir. 1993); see also Abbott v. United States, 144 F.3d 1, 2 (1st Cir. 1998).

## III. The pledge agreement

Stein argues that the provisions in the Civil Code of Puerto Rico dealing with the alienation of pledges, see P.R. Laws Ann. tit. 31, §§ 5002, 5030, mandate procedures that apply irrespective of contrary contractual language. We disagree. Some provisions of the Civil Code dealing with pledges, codified at P.R. Laws Ann. tit. 31, §§ 5001-5031, are [**7] undeniably mandatory and are therefore not subject to change. See, e.g., P.R. Laws Ann. tit. 31, § 5001 (setting forth the "essential requisites of the contracts of pledge and of mortgage"). These provisions are either described as "essential," or they contain restrictive words such as "shall" that describe the duty that the particular section imposes. n2 See, e.g., P.R. Laws Ann. tit. 31, § 5023 ("A pledge shall not be effective against a third person, when evidence of [*393] its date is not shown by authentic documents."). Not all of the provisions relating to pledges, however, use this mandatory language, a point that Stein conceded at oral argument.

- - - - - - - - - - - - - Footnotes - - - - - - - - -
- - - - - -

n2 A number of these mandatory sections set forth the requirements that must be met for a pledge agreement to be effective. See, e.g., P.R. Laws Ann. tit. 31, §§ 5001, 5021 & 5023.


- - - - - - - - - - - - End Footnotes- - - - - - -
- - - - - -

Both sections setting forth, respectively, the authority of a creditor to alienate a pledge and the procedures for that alienation, use permissive or discretionary

language [**8] to describe the obligations they place upon the creditor. [HN6]Rather than stating what a creditor "must" or "shall" do to alienate a pledge, section 5030 states that a "creditor to whom the debt has not been paid at the proper time may proceed" to alienate the pledge by auction. P.R. Laws Ann. tit. 31, § 5030 (emphasis added). n3 Likewise, section 5002 states that "[HN7]it is also essential in these contracts that when the principal obligation is due, the things of which the pledge or mortgage consists may be alienated to pay the creditor." P.R. Laws Ann. tit. 31, § 5002. Although the creditor has the authority to alienate the pledge, the creditor is not required to exercise that power. This permissive language means that the parties can contract for different methods of alienating pledges. The permissive statutory procedures must be followed only where the agreement is silent on the method of alienation. If the parties have authorized alternative remedies within the pledge agreement, section 5030 no longer provides the exclusive remedy available to the creditor.

- - - - - - - - - - - - - - Footnotes - - - - - - - - - - - - - - -

n3 [HN8]Section 5030 provides:A creditor to whom the debt has not been paid at the proper time may proceed, before a notary, to alienate the pledge. This alienation must necessarily take place at public auction, and with the citation of the debtor and the owner of the pledge, in a proper case. If the pledge should not have been alienated at the first auction, a second one, with the same formalities, may be held; and should no result be attained, the creditor may become the owner of the pledge. In such case he shall be obliged to give a discharge for the full amount of his credit.P.R. Laws Ann. tit. 31, § 5030.

- - - - - - - - - - - End Footnotes- - - - - - - - - - - - -

[**9]

Our conclusion that sections 5002 and 5030 can be altered by contract is bolstered by an examination of section 5031. That section provides: "With regard to public institutions which by their character or special purpose loan money on pledge, the special laws and regulations relating thereto, and subsidiarily the provisions of sections 5001-5031 of this title shall be [HN9]observed." P.R. Laws Ann. tit. 31, § 5031. This section's explicit requirement that public institutions must observe the Code's pledge provisions confirms that non-"public institutions," such as the Bank, may opt out of these rules by contract. n4 There would be

no need to require public institutions to follow sections 5001-5031 if all of these provisions were otherwise mandatory.

- - - - - - - - - - - - - - Footnotes - - - - - - - - - - - - - - -

n4 Though "public institutions" is nowhere defined in the Civil Code, its use in other sections indicates that it encompasses governmental or quasi-governmental institutions rather than a private company, even if that company is within a heavily regulated industry. See, e.g., P.R. Laws Ann. tit. 31, § 1311 (noting that the waste water from "fountains, sewers and public institutions" belongs to the public domain); P.R. Laws Ann. tit. 31, § 3773 (including public institutions within a list of like organizations including municipalities and towns).

- - - - - - - - - - - - End Footnotes- - - - - - - - - - - - -

[**10]

Stein points to Banco Central y Economias v. Registrar, 1981 PR Sup. LEXIS 184, 111 D.P.R. 773 (1981) as standing for the proposition that a creditor has only two remedies available to alienate a pledge: either it must seek a judicial remedy or use the notary process provided in section 5030. n5 The Banco [*394] Central court, however, was not asked to decide whether the parties could vary section 5030 by agreement. At most, then, that court explicated only the scope of the default rules that apply in the absence of a contrary agreement. Consequently, Banco Central does not affect our conclusion that the alienation remedies available in the Civil Code can be altered by contract.

- - - - - - - - - - - - - - Footnotes - - - - - - - - - - - - - - -

n5 Stein has failed to provide "an official, certified or stipulated translation" of this case--or, indeed, of any other Spanish language case cited in his briefs--as required by Local Rule 30(d). Although "[HN10]we may commission unofficial translations and impose on the offending parties the costs incurred and, where appropriate, sanctions," Gonzalez-Morales v. Hernandez-Arencibia, 221 F.3d 45, 50 n.4 (1st Cir. 2000) (quoting Lama v. Borras, 16 F.3d 473, 478 n.6 (1st Cir. 1994), we have coped with the problem Stein has created by using informal

239 F.3d 389; 2001 U.S. App. LEXIS 2399; 49 Fed. R. Serv. 3d (Callaghan) 332

translations where necessary, see Rolon-Alvarado v. Municipality of San Juan, 1 F.3d 74, 77 n.1 (1st Cir. 1993). Though the failure of parties to provide translations can lead "to uncertainty about the meaning of important language," Lama v. Borras, 16 F.3d 473, 477 n.6 (1st Cir. 1994), Stein has waived any objections on those grounds, as well as any additional arguments based upon untranslated cases in his briefs, by his failure to provide the required translations. See Gonzales-Morales, 221 F.3d at 50 n.4.

- - - - - - - - - - - End Footnotes- - - - - - - - - - - - - -

[**11]

Having determined that nothing within the Civil Code of Puerto Rico prevents the Bank from exercising a right to setoff as provided by agreement, we next examine the pledge agreement to determine if that contract allows the Bank to use methods of alienating pledges other than what section 5030 provides. According to the pledge agreement, the Bank "had the option to use any remedies within its reach to collect [the] debts and principal obligations, without prejudice of later proceedings against all or any of the pledged securities, or the additional ones or substitutes thereof." n6 Stein contends that the phrase "remedies within its reach" limits the Bank to the remedies available to it in the Civil Code. Stein misconstrues this provision.

- - - - - - - - - - - - - - Footnotes - - - - - - - - - - - - - -

n6 The pledge agreement is written in Spanish. The parties have failed to provide a translation as required by Local Rule 30(d) ("[HN11]The Court will not receive documents not in the English language unless translations are furnished."). We therefore rely upon the partial translations contained in the parties' briefs and the district court's opinion. See Cumpiano v. Banco Santander Puerto Rico, 902 F.2d 148, 152 n.1 (1st Cir. 1990); see also United States v. Colon-Munoz, 192 F.3d 210, 223 n.22 (1st Cir. 1999) (noting that "we retain discretion to waive the requirements of the rule in appropriate circumstances").

- - - - - - - - - - - End Footnotes- - - - - - - - - - - - - -

[**12]

There is nothing in the phrase "remedies within its reach" that either expressly incorporates the Civil Code limits upon alienation or indicates that the parties intended such a limitation. Indeed, the parties could easily have accomplished the result argued by Stein by limiting the Bank to "remedies available at law" or by simply omitting all mention of the issue from the agreement. We therefore conclude that this phrase is a broad grant of remedy to the bank, subject only to a general rule that the remedy be reasonable in the circumstances. n7

- - - - - - - - - - - - - - Footnotes - - - - - - - - - - - - - -

n7 The Bank originally justified the setoff by arguing that the CD was an "irregular pledge" that, under the Civil Code, could be subject to a setoff even in the absence of an agreement allowing that remedy. On appeal, however, the Bank principally relies upon its rights under the agreement and presents this "irregular pledge" argument as an alternative justification for the setoff. Because we conclude that the pledge agreement authorized the Bank's actions, we do not reach this argument and express no opinion as to whether irregular pledges exist under Puerto Rico law or whether, assuming that they do, setoff would be an appropriate means of alienating them.

- - - - - - - - - - - End Footnotes- - - - - - - - - - - - - -

[**13]

Stein argues that the failure of the bank to give him notice of the setoff renders the setoff unreasonable. We disagree. Stein does not contest that the agreement lacks any provision that would require the Bank to give him notice prior to exercising its remedies. Stein could have bargained for notice if he had wanted it. Moreover, even if we were to impose a notice requirement upon the Bank, Stein had constructive notice of the Bank's intention to setoff his CD in the event of a Prodisc default. Almost three months before the Bank setoff the entire CD, the Bank setoff a portion of the interest due on that instrument. As Stein concedes in his brief, the Bank was well within its rights in the setoff of this interest, both under the Civil Code and the agreement. See P.R. Laws Ann. tit. 31, § 5026 ("If the pledge produces interest, the creditor shall set off that collected by him against that due him, and if none is due him, or to the extent that it exceeds

239 F.3d 389; 2001 U.S. App. LEXIS 2399; 49 Fed. R. Serv. 3d (Callaghan) 332

that legally due, he shall charge it to the principal."). The setoff of interest therefore constructively **[*395]** notified Stein that Prodisc was in financial difficulty and that its financial problems were causing it to default upon **[**14]** some of its obligations secured by the CD. That setoff also indicated that the Bank was willing to exercise its rights under the agreement to apply the CD against the outstanding Prodisc debt. In this context, Stein should have sought to protect his interests without need for further notice. n8 Because Stein has failed to allege facts indicating that the Bank exceeded its authority under the agreement, dismissal was appropriate.

- - - - - - - - - - - - - - Footnotes - - - - - - - - -
- - - - - -

n8 At oral argument, Stein argued that the lack of notice prevented him from negotiating an alternative solution with the Bank that might have saved his CD. The complaint gives no reason, however, why Stein could not have undertaken these actions in response to the setoff of interest. Furthermore, all of the actions that Stein proposes require the Bank's approval. [HN12]See P.R. Laws Ann. tit. 31, § 5029 ("The debtor cannot demand the restitution of the thing pledged, against the will of the creditor, until he has paid the debt and its interest, with the expenses, in a proper case."). Stein points to no provision in the agreement that, given notice, would have allowed him to unilaterally prevent the Bank from setting off his CD.

- - - - - - - - - - - End Footnotes- - - - - - -
- - - - - -

**[**15]**

**Affirmed.**

85 U.S. 409; 21 L. Ed. 862; 1874 U.S. LEXIS 1334; 18 Wall. 409

TIFFANY v. NATIONAL BANK OF MISSOURI.

SUPREME COURT OF THE UNITED STATES

85 U.S. 409; 21 L. Ed. 862; 1874 U.S. LEXIS 1334; 18 Wall. 409

January 19, 1874, Decided

## PRIOR HISTORY: [***1]

ERROR to the Circuit Court for the District of Missouri.

Tiffany, trustee of Darby, a bankrupt, brought an action of debt in the court below against the National Bank of Missouri, a corporation organized under the National Banking Act of June 3d, 1864, to recover under the provisions of the thirtieth section of the act twice the amount of interest paid by the said Darby, on certain loans made by the bank to him before he was adjudged a bankrupt. The ground of the action was, that the interest reserved and paid was 9 per cent.; a rate averred to be greater than the amount allowed by law, to wit, 8 per cent.

The provisions of the thirtieth section of the act, under which the suit was brought, are as follows:

"Every association organized under this act, may take, receive, reserve, and charge on any loans . . . interest at the rate allowed by the laws of the State or Territory where the bank is located, and no more; except that where, by the laws of any State, a different rate is limited for banks of issue organized under State laws, the rate so limited shall be allowed every association organized in any such State under this act. And when no rate is fixed by the laws of the State [***2] or Territory, the bank may take, receive, reserve or charge a rate not exceeding 7 per centum. . . .

"And in case a greater rate of interest has been paid, the person or persons paying the same, or their legal representatives, may recover back, in any action of debt, twice the amount of interest thus paid from the association taking or receiving the same." . . .

In Missouri, the banks of issue, organized under the State laws, are limited to 8 per cent., but the rate of interest allowed by the laws of the State generally is 10 per cent. As already signified, this bank had taken 9 per cent.

On demurrer the question was, whether the National banks in Missouri were allowed to charge more than 8 per cent. The court below adjudged that they were.

### CASE SUMMARY

**PROCEDURAL POSTURE:** Error to the Circuit Court for the District of Missouri, which held that respondent's interest rate of 9 percent charged on loans was not in violation of the National Banking Act.

**OVERVIEW:** Petitioner brought this action against respondent to recover under the provisions of the National Banking Act (the Act) twice the amount of interest a bankrupt paid on certain loans made by respondent to the bankrupt. Petitioner claimed that the maximum rate allowed by law was 8 percent. Respondent charged 9 percent. Banks of issue in Missouri were limited to 8 percent, but the rate of interest allowed by Missouri law was generally 10 percent. Respondent was located in Missouri. The Supreme Court affirmed. Respondent, a national bank, was allowed to charge up to 10 percent and was not limited to 8 percent. Respondent was allowed to charge what the rate of interest allowed by Missouri law. The Act was an enabling act, not a restraining one. The Act spoke of allowances to national banks and restrictions on state banks. The clear purpose of the Act was to allow national banks to compete with state banks. The Act therefore allowed national banks to charge the rate generally provided by a state law, but more if a bank of issue was allowed to charge more than the general rate.

**OUTCOME:** The Supreme Court affirmed the lower court's decision, finding that respondent did not violate the National Banking Act because respondent, a national bank located in Missouri, was allowed to charge 10 percent, the rate allowed to be charged by natural persons. The Act allowed national banks to charge the maximum rate allowed to be charged by state law in order to give national banks an edge in competing with state banks.

**CORE TERMS:** banks of issue, banking, rate of interest, higher rate, unfriendly, thirtieth, greater rate of interest, different rate, maximum rate, enacts

### LexisNexis(TM) Headnotes

*Governments > Legislation > Interpretation*

[HN1]In an action brought to recover that which is substantially a statutory penalty, the statute must receive a strict, that is, a literal construction. The

85 U.S. 409; 21 L. Ed. 862; 1874 U.S. LEXIS 1334; 18 Wall. 409

defendant is not to be subjected to a penalty unless the words of the statute plainly impose it.

*Banking Law > Federal Acts > National Bank Act*

[HN2]The National Banking Act enacts that every national banking association may take, receive, reserve, and charge on any loan or discount made, or upon any note, bill of exchange, or other evidences of debt, interest at the rate allowed by the laws of the state or territory where the bank is located, and no more; except that where, by the laws of any state, a different rate is limited for banks of issue, organized under state laws, the rate so limited shall be allowed for associations organized in any such state under the act.

*Banking Law > Federal Acts > National Bank Act*

[HN3]The act of Congress is an enabling statute, not a restraining one, except so far as it fixes a maximum rate in all cases where state banks of issue are not allowed a greater. There are three provisions in section thirty, each of them enabling. If no rate of interest is defined by state laws, 7 per cent is allowed to be charged. If there is a rate of interest fixed by state laws for lenders generally, the banks are allowed to charge that rate, but no more, except that if state banks of issue are allowed to reserve more, the same privilege is allowed to national banking associations. Such is the fair construction of the act of Congress, entirely consistent with its words and with its spirit. It speaks of allowances to national banks and limitations upon state banks, but it does not declare that the rate limited to state banks shall be the maximum rate allowed to national banks.

**LAWYERS' EDITION HEADNOTES:**

Statute imposing penalty, construction of -- what interest may be taken by National Banks. --

Headnote:

1. In an action to recover a statutory penalty, the statute must receive a literal construction, and the defendant is not to be subjected to a penalty unless the words of the statute plainly impose it.

2. Under the act of Congress, which provides that national banks may take, upon loans, the rate of interest allowed by the state where the bank is located, except that where, by the laws of the state, a different rate is limited for state banks, the rate so limited shall be allowed to national banks organized in such state; held, that national banks were not restricted to the rate allowed to banks of the state where, by the laws of the state, a greater rate was allowed to individual lenders generally, but were allowed to take the latter rate.

**SYLLABUS:** Under the thirtieth section of the National Banking Act, which enacts that National banks "may take, receive, reserve, and charge on any loan . . . interest at the rate allowed by the laws of the State or Territory where the bank is located, and no more; except that where, by the laws of any State, a different rate is limited for banks of issue, organized under State laws, the rate so limited shall be allowed for associations organized [***3] in any such State under the act:" National banks may take the rate of interest allowed by the State to natural persons generally, and a higher rate, if State banks of issue are authorized by the laws of the State to take it.

**COUNSEL:** Mr. S. Knox, for the appellant; Mr. J. O. Broadhead, contra.

**OPINIONBY:** STRONG

**OPINION:** [*410]  [**863] Mr. Justice STRONG delivered the opinion of the court.

[HN1]In an action like the present, brought to recover that which is substantially a statutory penalty, the statute must receive a strict, that is, a literal construction. The defendant is not to be subjected to a penalty unless the words of the statute plainly impose it. The question, therefore, is whether the thirtieth section of the act of Congress of June 3d, 1864, relative to National banking associations, clearly prohibits such associations in the State of Missouri from reserving [*411] and taking a greater rate of interest than 8 per cent., the rate limited by the laws of that State to be charged by the banks of issue organized under its laws. It is only in case a greater rate of interest has been paid than the National banking associations are allowed to receive that they are made liable [***4] to pay twice the interest. [HN2]The act of Congress enacts that every such association "may take, receive, reserve, and charge on any loan or discount made, or upon any note, bill of exchange, or other evidences of debt, interest at the rate allowed by the laws of the State or Territory where the bank is located, and no more; except that where, by the laws of any State, a different rate is limited for banks of issue, organized under State laws, the rate so limited shall be allowed for associations organized in any such State under the act." What, then, were the rates of interest allowed in Missouri when the loans were made by the defendants that are alleged to have been usurious? It is admitted to have been 10 per cent. per annum, allowed to all persons, except banks of issue organized under the laws of the State, and they were allowed to charge and receive only 8 per cent.

The position of the plaintiff is, that the general provision of the act of Congress that National banking associations may charge and receive interest at the rate

allowed by the laws of the State where they are located, has no application to the case of these defendants, and that they are restricted to the rate allowed [***5] to banks of issue of the State, that is, to 8 per cent. This, we think, cannot be maintained. [HN3]The act of Congress is an enabling statute, not a restraining one, except so far as it fixes a maximum rate in all cases where State banks of issue are not allowed a greater.    There are three provisions in section thirty, each of them enabling. If no rate of interest is defined by State laws, 7 per cent. is allowed to be charged. If there is a rate of interest fixed by State laws for lenders generally, the banks are allowed to charge that rate, but no more, except that if State banks of issue are allowed to reserve more, the same privilege is allowed to National banking associations. Such, we think, is the [*412] fair construction of the act of Congress, entirely consistent with its words and with its spirit. It speaks of allowances to National banks and limitations upon State banks, but it does not declare that the rate limited to State banks shall be the maximum rate allowed to National banks. There can be no question that if the banks of issue of Missouri were allowed to demand interest at a higher rate than 10 per cent. National banks might do likewise. And this would be [***6] for the reason that they would then come within the exception made by the statute, that is, the exception from the operation of the restrictive words "no more" than the general rate of interest allowed by law. But if it was intended they should in no case charge a higher rate of interest than State banks of issue, even though the general rule was greater, if the intention was to restrict rather than to enable, the obvious mode of expressing such an intention was to add the words "and no more," as they were added to the preceding clause of the section. The absence of those words, or words equivalent, is significant. Coupled with the general spirit of the act, and of all the legislation respecting National banks, it is controlling. It cannot be doubted, in view of the purpose of Congress in providing for the organization of National banking associations, that it was intended to give them a firm footing in the different States where they might be located.It was expected they would come into competition with State banks, and it was intended to give them at least equal advantages in such competition. In order to accomplish this they were empowered to reserve interest at the same rates, [***7] whatever those rates might be, which were allowed to similar State institutions.    This was considered indispensable to protect them against possible unfriendly State legislation. Obviously, if State statutes should allow to their banks of issue a rate of interest greater than the ordinary rate allowed to natural persons, National banking associations could not compete with them, unless allowed the same. On the other hand, if such associations were restricted [**864] to the rates allowed by the statutes of the State to banks which might be authorized by the State laws, unfriendly [*413] legislation might make their existence in the State impossible.  A rate of interest might be prescribed so low that banking could not be carried on, except at a certain loss. The only mode of guarding against such contingencies was that which, we think, Congress adopted.  It was to allow to National associations the rate allowed by the State to natural persons generally, and a higher rate, if State banks of issue were authorized to charge a higher rate. This construction accords with the purpose of Congress, and carries it out. It accords with the spirit of all the legislation of Congress.  [***8]  National banks have been National favorites.  They were established for the purpose, in part, of providing a currency for the whole country, and in part to create a market for the loans of the General government.  It could not have been intended, therefore, to expose them to the hazard of unfriendly legislation by the States, or to ruinous competition with State banks. On the contrary, much has been done to insure their taking the place of State banks.   The latter have been substantially taxed out of existence. A duty has been imposed upon their issues so large as to manifest a purpose to compel a withdrawal of all such issues from circulation.    In harmony with this policy is the construction we think should be given to the thirtieth section of the act of Congress we have been considering.  It gives advantages to National banks over their State competitors. It allows such banks to charge such interest as State banks may charge, and more, if by the laws of the State more may be charged by natural persons.

The result of this is that the defendants, in receiving 9 per cent. interest upon the loans made by them, have not transgressed the act of Congress, consequently they are under [***9] no liability to the plaintiff.

JUDGMENT AFFIRMED.

529 U.S. 89; 120 S. Ct. 1135; 146 L. Ed. 2d 69; 2000 U.S. LEXIS 1895; 68 U.S.L.W. 4184; 50 ERC (BNA) 1097; 2000 OSHD (CCH) P32,038; 2000 AMC 913; 2000 Cal. Daily Op. Service 1763; 2000 Daily Journal DAR 2409; 30 ELR 20438; 2000 Colo. J. C.A.R. 1233; 13 Fla. L. Weekly Fed. S 151

UNITED STATES, PETITIONER v. GARY LOCKE, GOVERNOR OF WASHINGTON, ET AL.
INTERNATIONAL ASSOCIATION OF INDEPENDENT TANKER OWNERS (INTERTANKO), PETITIONER v. GARY LOCKE, GOVERNOR OF WASHINGTON, ET AL.

Nos. 98-1701 and 98-1706

SUPREME COURT OF THE UNITED STATES

529 U.S. 89; 120 S. Ct. 1135; 146 L. Ed. 2d 69; 2000 U.S. LEXIS 1895; 68 U.S.L.W. 4184; 50 ERC (BNA) 1097; 2000 OSHD (CCH) P32,038; 2000 AMC 913; 2000 Cal. Daily Op. Service 1763; 2000 Daily Journal DAR 2409; 30 ELR 20438; 2000 Colo. J. C.A.R. 1233; 13 Fla. L. Weekly Fed. S 151

December 7, 1999, Argued
March 6, 2000 *, Decided
* Together with No. 98-1706, International Association of Independent Tanker Owners (Intertanko) v. Locke, Governor of Washington, et al., also on certiorari to the same court.

**PRIOR HISTORY:** [****1] ON WRITS OF CERTIORARI TO THE UNITED STATES COURT OF APPEALS FOR THE NINTH CIRCUIT.

**DISPOSITION:** 148 F.3d 1053, reversed and remanded.

### CASE SUMMARY

**PROCEDURAL POSTURE:** Petitioner sought review of a decision of the United States Court of Appeals for the Ninth Circuit that held Wash. Admin. Code § 317-21-130 et seq. (1999) was not preempted by a comprehensive federal regulatory scheme governing oil tankers.

**OVERVIEW:** The Supreme Court reversed a decision that held that a state could enforce its laws regulating oil tanker design, equipment, reporting, and operating requirements. If a vessel failed to comply with state rules, possible sanctions included statutory penalties, restrictions of the vessel's operations in state waters, and a denial of entry into state waters. The Supreme Court held that the court of appeals placed too much weight on the savings clauses contained in 33 U.S.C.S. § 2718. The evident purpose of the saving clauses was to preserve state laws which, rather than imposing substantive regulation of a vessel's primary conduct, established liability rules and financial requirements relating to oil spills. The Supremacy Clause dictated that federal judgment that a vessel was safe to navigate United States waters prevailed over contrary state judgment. Enforcement of state requirements would at least frustrate the congressional intention to establish a uniform federal regime controlling the design of oil tankers. Thus, the state regulations regarding general navigation watch procedures, English language skills, training, and casualty reporting were pre-empted.

**OUTCOME:** The Supreme Court reversed a decision that state could enforce its laws regulating oil tankers because the federal statutory scheme governing oil tankers preempted the state regulations.

**CORE TERMS:** vessel, regulation, tanker, oil, pre-emption, water, pre-empted, spill, port, saving, navigation, maritime, training, crew, qualification, manning, personnel, marine, pre-emptive, reporting, peculiarities, watch, state regulation, treaty, casualty, licensed, federal law, uniformity, commerce, traffic

**LexisNexis(TM) Headnotes**

*Civil Procedure > State & Federal Interrelationships > Federal Common Law*

[HN1]The enactment of a uniform federal scheme displaces state law.

*Transportation Law > Water Transportation > Maintenance & Safety*

[HN2]See 33 U.S.C.S. § 2718.

*Transportation Law > Water Transportation > Maintenance & Safety*

[HN3]See 33 U.S.C.S. § 2702(a).

*Civil Procedure > State & Federal Interrelationships > Federal Common Law*

[HN4]An "assumption" of non-preemption is not triggered when the state regulates in an area where there has been a history of significant federal presence.

*Transportation Law > Water Transportation > State & Local Regulation*

529 U.S. 89; 120 S. Ct. 1135; 146 L. Ed. 2d 69; 2000 U.S. LEXIS 1895; 68 U.S.L.W. 4184; 50 ERC (BNA) 1097; 2000 OSHD (CCH) P32,038; 2000 AMC 913; 2000 Cal. Daily Op. Service 1763; 2000 Daily Journal DAR 2409; 30 ELR 20438; 2000 Colo. J. C.A.R. 1233; 13 Fla. L. Weekly Fed. S 151

[HN5]When state laws bear upon national and international maritime commerce, there is no beginning assumption that concurrent regulation by the state is a valid exercise of its police powers. Rather, the Court must ask whether the local laws in question are consistent with the federal statutory structure, which has as one of its objectives a uniformity of regulation for maritime commerce.

*Transportation Law > Water Transportation > Maintenance & Safety*

*Civil Procedure > State & Federal Interrelationships > Federal Common Law*

[HN6]The states may enforce rules governed by Title I of the Ports and Waterways Safety Act of 1972 unless they run counter to an exercise of federal authority.

*Civil Procedure > State & Federal Interrelationships > Federal Common Law*

[HN7]Conflict preemption occurs when compliance with both state and federal law is impossible, or when the state law stands as an obstacle to the accomplishment and execution of the full purposes and objective of Congress.

*Civil Procedure > State & Federal Interrelationships > Federal Common Law*

[HN8]A federal agency acting within the scope of its congressionally delegated authority may preempt state regulation and hence render unenforceable state or local laws that are otherwise not inconsistent with federal law.

*Constitutional Law > Supremacy Clause*

*Civil Procedure > State & Federal Interrelationships > Federal Common Law*

[HN9]The relevant inquiry for pre-emption under Title I of the Ports and Waterways Safety Act of 1972 is whether the Coast Guard has promulgated its own requirement on the subject or has decided that no such requirement should be imposed at all.

*Civil Procedure > State & Federal Interrelationships > Federal Common Law*

[HN10]Where failure of federal officials affirmatively to exercise their full authority takes on the character of a ruling that no such regulation is appropriate or approved pursuant to the policy of the statute, states are not permitted to use their police power to enact such a regulation.

*Transportation Law > Water Transportation > Maintenance & Safety*

[HN11]See 33 U.S.C.S. § 1228(a)(7).

*Civil Procedure > State & Federal Interrelationships > Federal Common Law*

[HN12]It is not always a sufficient answer to a claim of preemption to say that state rules supplement, or even mirror, federal requirements.

*Civil Procedure > State & Federal Interrelationships > Federal Common Law*

[HN13]The appropriate inquiry of preemption is whether the purposes and objectives of the federal statutes, including the intent to establish a workable, uniform system, are consistent with concurrent state regulation.

*Transportation Law > Water Transportation > Maintenance & Safety*

[HN14]See 46 U.S.C.S. § 6101.

**DECISION:** State of Washington's rules regarding oil tanker ship crew training and English language skills, navigation watch, and marine casualty reporting held pre-empted by federal law; case remanded so validity of other Washington tanker rules could be assessed.

**SUMMARY:** A trade association that represented operators of oil tanker ships brought, in the United States District Court for the Western District of Washington, a suit seeking declaratory and injunctive relief against state and local officials who were responsible for enforcing certain Washington rules that imposed tanker design, equipment, reporting, and operating requirements. Environmental groups intervened in defense of the rules. The District Court, rejecting the trade association's arguments that the rules invaded areas long occupied by the Federal Government and imposed unique requirements in an area where national uniformity was mandated, upheld the rules (947 F Supp 1484). After the United States intervened on the trade association's behalf at the appeal stage, the United States Court of Appeals for the Ninth Circuit determined that the state could enforce all of the rules except one that required tankers to install certain navigation and towing equipment (148 F3d 1053). The Court of Appeals denied petitions for rehearing en banc (159 F3d 1220).

On certiorari, the United States Supreme Court reversed and remanded. In an opinion by Kennedy, J., expressing the unanimous view of the court, it was held that (1) three of the state rules--one that required a comprehensive training program for tanker crews, one that imposed English language proficiency requirements on tanker crews, and one that imposed

529 U.S. 89; 120 S. Ct. 1135; 146 L. Ed. 2d 69; 2000 U.S. LEXIS 1895; 68 U.S.L.W. 4184; 50 ERC (BNA) 1097; 2000 OSHD (CCH) P32,038; 2000 AMC 913; 2000 Cal. Daily Op. Service 1763; 2000 Daily Journal DAR 2409; 30 ELR 20438; 2000 Colo. J. C.A.R. 1233; 13 Fla. L. Weekly Fed. S 151

certain navigation watch requirements--were pre-empted by 46 USCS 3703(a), which required the United States Coast Guard to issue regulations for the design, construction, alteration, repair, maintenance, operation, equipping, personnel qualifications, and manning of tankers; (2) a fourth state rule, which required tankers to report certain marine casualties, was pre-empted by other sources of federal regulation of the same subject; and (3) the case would be remanded so that the Court of Appeals or the District Court could consider, after the development of a full record by all interested parties, whether the remaining state rules at issue were pre-empted by federal law.

**LAWYERS' EDITION HEADNOTES:**

[***LEdHN1]
STATES TERRITORIES POSSESSIONS §36
-- regulation of tankers -- federal pre-emption
Headnote:[1A][1B][1C][1D][1E][1F][1G][1H]
The United States Supreme Court will hold that four state rules concerning oil tanker ships are pre-empted by federal law, where the court determines that (1) the state rules involve a field in which Congress has legislated from the earliest days of the nation, creating an extensive federal statutory and regulatory scheme; (2) three of the state rules--one that requires a comprehensive training program for tanker crews, one that imposes English language proficiency requirements on tanker crews, and one that imposes certain navigation watch requirements--are pre-empted by 46 USCS 3703(a), which requires the United States Coast Guard to issue regulations for the design, construction, alteration, repair, maintenance, operation, equipping, personnel qualifications, and manning of tankers; and (3) the fourth state rule, which requires tankers to report certain marine casualties, is pre-empted by other sources of federal regulation of the same subject.

[***LEdHN2]
STATES TERRITORIES POSSESSIONS §36
-- tanker crews -- training -- federal pre-emption
Headnote:[2A][2B][2C]
A state rule--which requires that (1) an oil tanker ship's crew be certified as having completed a comprehensive training program approved by the state, (2) the tanker's master be trained in shipboard management, (3) licensed deck officers be trained in bridge resource management, automated radar plotting aids, shiphandling, crude oil washing, inert gas systems, cargo handling, oil spill prevention and response, and shipboard firefighting, and (4) a series of weekly, monthly, and quarterly drills occur--is pre-empted by

federal law, as (1) the state rule imposes requirements that control the staffing, operation, and manning of a tanker outside the state's waters; (2) the training and drill requirements pertain to operation and personnel qualification and so are pre-empted by 46 USCS 3703(a), which requires the United States Coast Guard to issue regulations addressing the design, construction, alteration, repair, maintenance, operation, equipping, personnel qualification, and manning of tankers; and (3) the United States Supreme Court's conclusion that training is a field reserved to the Federal Government receives further confirmation from the circumstances that (a) the International Convention of Standards of Training, Certification and Watchkeeping for Seafarers, With Annex, 1978 (CTIA No. 7624) addresses training and qualification requirements of the crew, and (b) the United States has enacted crew training requirements.

[***LEdHN3]
STATES TERRITORIES POSSESSIONS §36
-- tanker crews -- English language proficiency -- federal pre-emption
Headnote:[3A][3B]
A state rule that imposes an English language proficiency requirement on the crew of an oil tanker ship is pre-empted by federal law, as (1) the proficiency requirement is (a) not limited to governing local traffic or local peculiarities, and (b) a personal qualification pre-empted by 46 USCS 3703(a), which requires the United States Coast Guard to issue regulations addressing the design, construction, alteration, repair, maintenance, operation, equipping, personnel qualification, and manning of tankers; and (2) 33 USCS 1228(a)(7)--which provides that no tanker shall operate in the navigable waters of the United States if the tanker, while underway, does not have at least one licensed deck officer on the navigation bridge who is capable of clearly understanding English--may not be supplemented by laws enacted by the states without compromising the uniformity that the federal rule itself achieves.

[***LEdHN4]
STATES TERRITORIES POSSESSIONS §36
-- regulation of tankers -- navigation watch -- federal pre-emption
Headnote:[4A][4B]
A state rule which requires generally that the navigation watch on an oil tanker ship shall consist of at least two licensed deck officers, a helmsman, and a lookout is pre-empted by federal law, as the watch requirement (1) rather than being tied to the peculiarities of particular state waters, applies

529 U.S. 89; 120 S. Ct. 1135; 146 L. Ed. 2d 69; 2000 U.S. LEXIS 1895; 68 U.S.L.W. 4184; 50 ERC (BNA) 1097; 2000 OSHD (CCH) P32,038; 2000 AMC 913; 2000 Cal. Daily Op. Service 1763; 2000 Daily Journal DAR 2409; 30 ELR 20438; 2000 Colo. J. C.A.R. 1233; 13 Fla. L. Weekly Fed. S 151

throughout the state's waters and at all times, and (2) is a general operating requirement and is pre-empted as an attempt to regulate a tanker's operation and manning under 46 USCS 3703(a), which requires the United States Coast Guard to issue regulations addressing the design, construction, alteration, repair, maintenance, operation, equipping, personnel qualification, and manning of tankers.

[***LEdHN5]
STATES TERRITORIES POSSESSIONS §36
-- regulation of tankers -- casualty reporting -- federal pre-emption
Headnote:[5A][5B][5C]
A state reporting rule is pre-empted by federal law, as (1) the state rule requires oil tanker ships that ultimately reach the state's waters to make, with respect to certain marine casualties (a "collision," "allision," "near-miss incident," "marine casualty" of listed kinds, "accidental or intentional grounding," "failure of the propulsion or primary steering systems," "failure of a component or control system," "fire, flood, or other incident that affects the vessel's seaworthiness," and "spills of oil"), regardless of where such incidents might have occurred, a detailed report to the state on each incident, which report must (a) list the date, the location, the weather conditions, and the government agencies to whom the event was reported, and (b) contain a "brief analysis of any known causes" and a "description of measures taken to prevent a reoccurrence"; (2) Congress intended that United States Coast Guard regulations be the sole source of a vessel's reporting obligations with respect to the matters covered by the challenged state rule, where (a) under 46 USCS 6101, the Coast Guard is to prescribe regulations on the marine casualties to be reported and the manner of reporting, and (b) the statute lists the kinds of casualties that the regulations must cover; and (3) the state's reporting requirement (a) is a significant burden in terms of cost and the risk of innocent noncompliance, and (b) affects a vessel operator's out-of-state obligations and conduct, where a state's jurisdiction and authority are most in doubt.

[***LEdHN6]
APPEAL §1693
-- remand for development of full record
Headnote:[6A][6B][6C]
On certiorari to review a Federal Court of Appeals decision, on appeal from a Federal District Court, involving the issue whether certain state rules that impose design, equipment, reporting, and operating requirements regarding oil tanker ships are pre-empted by federal law, the United States Supreme Court,

having determined that some of the rules, the attempted reach of which is well demonstrated by the briefs and record before the Supreme Court, are pre-empted, will remand the two consolidated cases before it so that the balance of the rules may be assessed in light of the considerable federal interest at stake and in conformity with the principles that the Supreme Court discusses in its opinion in the cases; on remand, the Court of Appeals or District Court should consider whether the remaining rules are (1) pre-empted under (a) conflict pre-emption, pursuant to a provision of Title I of the Ports and Waterways Safety Act of 1972 (PWSA) (33 USCS 1223(a)(1)), which authorizes the United States Coast Guard to regulate tanker operation in United States waters, or (b) field pre-emption, pursuant to a provision of Title II of the PWSA (46 USCS 3703(a)), which requires the Coast Guard to issue regulations for the design, construction, alteration, repair, maintenance, operation, equipping, personnel qualifications, and manning of tankers, or (2) are otherwise pre-empted (a) by these Titles, or (b) under any other federal law or international agreement raised as possible sources of pre-emption; it is preferable that the remaining rules be considered by the Court of Appeals or by the District Court within the framework the Supreme Court has discussed, as (1) the United States did not participate in these cases until appeal, and (2) resolution of these cases would benefit from the development of a full record by all interested parties.

[***LEdHN7]
SHIPPING §2
-- Tank Vessel Act -- purpose
Headnote:[7]
The purpose of the Tank Vessel Act of 1936 (49 Stat 1889), which imposes specific requirements for operation of covered vessels, is to establish a reasonable and uniform set of rules and regulations concerning vessels carrying the type of cargo deemed dangerous.

[***LEdHN8]
APPEAL §1662
-- issue decided on other grounds
Headnote:[8]
On certiorari to review a Federal Court of Appeals decision involving the issue whether certain state rules that impose design, equipment, reporting, and operating requirements regarding oil tanker ships are pre-empted by federal law, where the United States argues that certain international treaties, as the supreme law of the land, have pre-emptive force over the state rules, the United States Supreme Court need

529 U.S. 89; 120 S. Ct. 1135; 146 L. Ed. 2d 69; 2000 U.S. LEXIS 1895; 68 U.S.L.W. 4184; 50 ERC (BNA) 1097; 2000 OSHD (CCH) P32,038; 2000 AMC 913; 2000 Cal. Daily Op. Service 1763; 2000 Daily Journal DAR 2409; 30 ELR 20438; 2000 Colo. J. C.A.R. 1233; 13 Fla. L. Weekly Fed. S 151

not reach that issue at this stage of the case, because the state rules that the Supreme Court addresses in detail--while remanding the case for further consideration concerning the issue of pre-emption of the state rules that the Supreme Court does not address in detail--have been determined by the Supreme Court to be pre-empted by federal statute and regulations.

[***LEdHN9]
EVIDENCE §459
-- treaties and international agreements
Headnote:[9]
The existence of international treaties and agreements on standards of shipping is relevant to the issue whether certain state rules that regulate the operation of oil tanker ships are pre-empted by federal law, for (1) these agreements give force to the longstanding principle that the enactment of a uniform federal scheme displaces state law, and (2) the treaties indicate that Congress will have demanded national uniformity regarding maritime commerce.

[***LEdHN10]
APPEAL §1662
-- possibility of decision on other grounds
Headnote:[10]
On certiorari to review a Federal Court of Appeals decision involving the issue whether certain state rules that impose design, equipment, reporting, and operating requirements regarding oil tanker ships are pre-empted by federal law--where (1) a significant and intricate complex of international treaties and maritime agreements bears upon the licensing and operation of tankers, (2) the United States argues that certain treaties pre-empt the state rules, and (3) the United States Supreme Court has (a) determined that some of the rules in issue are pre-empted, and (b) remanded for further consideration concerning the issue of pre-emption of the remaining rules--although in later proceedings, if it is deemed necessary for full disposition of the case, it should be open to the parties to argue whether the specific international agreements and treaties are of binding and pre-emptive force, the Supreme Court will not reach those questions, for it may be that pre-emption principles applicable to the basic federal statutory structure will suffice, upon remand, for a complete determination.

[***LEdHN11]
STATES TERRITORIES POSSESSIONS §36
-- regulation of tankers -- federal pre-emption -- Oil Pollution Act
Headnote:[11A][11B][11C][11D][11E]

From the text of Title I of the Oil Pollution Act of 1990 (OPA) (33 USCS 2701 et seq.)--which (1) amends the Ports and Waterways Safety Act of 1972 (PWSA) (33 USCS 1221 et seq.), which regulates the operation, design, and manning of oil tanker ships in United States waters, and (2) contains, in 33 USCS 2718, two saving clauses that preserve state authority concerning some regulation of tankers--and the long-established understanding of the appropriate balance between federal and state regulation of maritime commerce, the United States Supreme Court will hold that the pre-emptive effect, on state regulation of tankers, of the PWSA and the regulations promulgated under it are not affected by the OPA, as (1) Title I does not regulate vessel operation, design, or manning, (2) placement of the saving clauses in Title I suggests that Congress intended to preserve state laws of a scope similar to the matters contained in Title I, not all state laws similar to the (a) matters covered by the whole of the OPA, or (b) whole subject of maritime oil transport, (3) explicit qualifiers in the saving clauses are inconsistent with interpreting the clauses to alter the pre-emptive effect of the PWSA or regulations promulgated thereunder, (4) the clauses do not extend to subjects addressed in other titles of the OPA or other acts, and (5) limiting the saving clauses as so determined respects the established federal-state balance in matters of maritime commerce between the subjects as to which the states retain concurrent powers and those over which the federal authority displaces state control; the Supreme Court's holding in a prior case--to the effect that the PWSA and United States Coast Guard regulations promulgated under the PWSA pre-empted a state pilotage requirement, a state limitation on tanker size, and state design and construction rules for tankers--also survives the OPA's enactment.

[***LEdHN12]
STATES TERRITORIES POSSESSIONS §36
-- regulation of tankers -- pre-emption
Headnote:[12]
With respect to federal pre-emption of state laws that regulate the operation of oil tanker ships, the evident purpose of two saving clauses contained in an Oil Pollution Act of 1990 provision (33 USCS 2718) is to preserve state laws which, rather than imposing substantive regulation of a vessel's primary conduct, establish liability rules and financial requirements relating to oil spills.

[***LEdHN13]
STATES TERRITORIES POSSESSIONS §24
-- federal pre-emption -- saving clause

529 U.S. 89; 120 S. Ct. 1135; 146 L. Ed. 2d 69; 2000 U.S. LEXIS 1895; 68 U.S.L.W. 4184; 50 ERC (BNA) 1097; 2000 OSHD (CCH) P32,038; 2000 AMC 913; 2000 Cal. Daily Op. Service 1763; 2000 Daily Journal DAR 2409; 30 ELR 20438; 2000 Colo. J. C.A.R. 1233; 13 Fla. L. Weekly Fed. S 151

Headnote:[13]
With respect to federal pre-emption of state laws, the United States Supreme Court declines to give broad effect to saving clauses where doing so would upset the careful regulatory scheme established by federal law.

[***LEdHN14]
STATES TERRITORIES POSSESSIONS §22
-- federal pre-emption
Headnote:[14]
With respect to federal pre-emption of state laws, an assumption of nonpre-emption is not triggered when the state regulates in an area where there has been a history of significant federal presence.

[***LEdHN15]
COMMERCE §126
-- maritime -- federal and state laws
Headnote:[15]
With respect to federal pre-emption of state laws, in the area of national and international maritime commerce, there is no beginning assumption that concurrent regulation by the state is a valid exercise of its police powers; rather, a court must ask whether the local laws in question are consistent with the federal statutory structure, which has as one of its objectives a uniformity of regulation for maritime commerce.

[***LEdHN16]
STATES TERRITORIES POSSESSIONS §36
-- regulation of ports and waterways -- pre-emption
Headnote:[16A][16B][16C]
Title I of the Ports and Waterways Safety Act (33 USCS 1221 et seq.), which authorizes the United States Coast Guard to enact measures for controlling oil tanker ship traffic, or for protecting navigation and the marine environment, preserves the historic role of the states to regulate local ports and waters under appropriate circumstances, as (1) a prior United States Supreme Court decision confirms that the subject and scope of Title I allows a state to regulate its ports and waterways, so long as the regulation is based on the peculiarities of local waters that call for special precautionary measures, (2) there is no pre-emption of state law by operation of Title I itself if the (a) state regulation is so directed, and (b) Coast Guard has not adopted regulations on the subject or has determined that regulation is unnecessary or inappropriate, and (3) as the prior case itself made apparent, the states may enforce rules governed by Title I, unless they run counter to an exercise of federal authority; the analysis under Title I, then, is one of conflict pre-emption, which occurs when compliance with both state and

federal law is impossible, or when the state law stands as an obstacle to the accomplishment and execution of the full purposes and objective of Congress; in this context, Coast Guard regulations are to be given pre-emptive effect over conflicting state laws.

[***LEdHN17]
SHIPPING §2
-- regulation of tankers
Headnote:[17A][17B]
Uniform national rules regarding oil tanker ship design, operation, and seaworthiness are mandated by Title II of the Ports and Waterways Safety Act (46 USCS 3701 et seq.); Title II requires the United States Coast Guard to impose national regulations governing the general seaworthiness of tankers and their crews.

[***LEdHN18]
STATES TERRITORIES POSSESSIONS §4
-- residual and concurrent powers
Headnote:[18]
It is fundamental in the nation's federal structure that states have vast residual powers; these powers, unless constrained or displaced by the existence of federal authority or by proper federal enactments, are often exercised in concurrence with those of the national government.

[***LEdHN19]
STATES TERRITORIES POSSESSIONS §36
-- regulation of tankers -- Ports and Waterways Safety Act -- supremacy clause
Headnote:[19A][19B]
Under a provision of Title II of the Ports and Waterways Safety Act (46 USCS 3703(a))--which requires the United States Coast Guard to issue regulations addressing the design, construction, alteration, repair, maintenance, operation, equipping, personnel qualification, and manning of certain vessels--only the Federal Government may regulate the design, construction, alteration, repair, maintenance, operation, equipping, personnel qualification, and manning of oil tanker vessels, as (1) the field of pre-emption of state law established by 3703(a) cannot be limited to tanker "design" and "construction," terms which cannot be read in isolation from the other subjects found in that section; (2) Congress has left no room for state regulation of these matters; and (3) the Federal Constitution's supremacy clause (Art VI, cl 2) dictates that a federal judgment that a vessel is safe to navigate United States waters prevails over a contrary state judgment.

[***LEdHN20]

529 U.S. 89; 120 S. Ct. 1135; 146 L. Ed. 2d 69; 2000 U.S. LEXIS 1895; 68 U.S.L.W. 4184; 50 ERC (BNA) 1097; 2000 OSHD (CCH) P32,038; 2000 AMC 913; 2000 Cal. Daily Op. Service 1763; 2000 Daily Journal DAR 2409; 30 ELR 20438; 2000 Colo. J. C.A.R. 1233; 13 Fla. L. Weekly Fed. S 151

STATES TERRITORIES POSSESSIONS §36
-- regulation of tankers -- federal pre-emption
Headnote:[20]

With respect to the principles of conflict pre-emption that are applicable generally to Title I of the Ports and Waterways Safety Act (PWSA) (33 USCS 1221 et seq.), which, in 33 USCS 1223(a)(1), authorizes the United States Coast Guard to enact measures for controlling oil tanker ship traffic or for protecting navigation and the marine environment--and with respect to the principles of field pre-emption that are applicable generally to Title II of the PWSA (46 USCS 3701 et seq.), which, in 46 USCS 3703(a), requires the United States Coast Guard to issue regulations addressing the design, construction, alteration, repair, maintenance, operation, equipping, personnel qualification, and manning of oil tanker ships--conflict pre-emption under Title I will be applicable in some but not all cases concerning the issue whether federal law pre-empts state law regarding tankers, for (1) a regulation within a state's residual powers will often be of limited extraterritorial effect, not requiring a tanker to modify its primary conduct outside the specific body of water purported to justify the local rule, and (2) local rules not pre-empted under Title II (a) pose a minimal risk of innocent noncompliance, (b) do not affect vessel operation outside the jurisdiction, (c) do not require adjustment of systematic aspects of the vessel, and (d) do not impose a substantial burden on the vessel's operation within the local jurisdiction itself.

[***LEdHN21]
APPEAL §1088
-- issues raised in briefs
Headnote:[21]

On certiorari to review a Federal Court of Appeals decision involving the issue whether certain state rules that impose design, equipment, reporting, and operating requirements regarding oil tanker ships are pre-empted by federal law, the United States Supreme Court, although leaving the issue whether some of the rules are pre-empted to be addressed on remand, will address the issue whether four particular rules are pre-empted, because the attempted reach of the four rules is well demonstrated by the briefs and record before the Supreme Court.

[***LEdHN22]
STATES TERRITORIES POSSESSIONS §24
-- concurrent regulation -- federal pre-emption
Headnote:[22]

It is not always a sufficient answer to a claim that federal law pre-empts state rules to say that the state rules supplement, or even mirror, federal requirements; the appropriate inquiry is whether the purposes and objectives of the federal statute, including the intent to establish a workable, uniform system, are consistent with concurrent state regulation; when Congress has taken the particular subject matter in hand, coincidence is as ineffective as opposition, and a state law is not to be declared a help because it attempts to go farther than Congress has seen fit to go.

SYLLABUS: After the supertanker *Torrey Canyon* spilled crude oil off the coast of England in 1967, both Congress, in the Port and Waterways Safety Act of 1972 (PWSA), and the State of Washington enacted more stringent regulations for tankers and provided for more comprehensive remedies in the event of an oil spill. The ensuing question of federal pre-emption of the State's laws was addressed in *Ray v. Atlantic Richfield Co.*, 435 U.S. 151, 55 L. Ed. 2d 179, 98 S. Ct. 988. In 1989, the supertanker *Exxon Valdez* ran aground in Alaska, causing the largest oil spill in United States history. Again, both Congress and Washington responded. [****2] Congress enacted the Oil Pollution Act of 1990 (OPA). The State created a new agency and directed it to establish standards to provide the "best achievable protection" (BAP) from oil spill damages. That agency promulgated tanker design, equipment, reporting, and operating requirements. Petitioner International Association of Independent Tanker Owners (Intertanko), a trade association of tanker operators, brought this suit seeking declaratory and injunctive relief against state and local officials responsible for enforcing the BAP regulations. Upholding the regulations, the District Court rejected Intertanko's arguments that the BAP standards invaded an area long pre-empted by the Federal Government. At the appeal stage, the United States intervened on Intertanko's behalf, contending that the District Court's ruling failed to give sufficient weight to the substantial foreign affairs interests of the Federal Government. The Ninth Circuit held that the State could enforce its laws, save one requiring vessels to install certain navigation and towing equipment, which was "virtually identical to" requirements declared pre-empted in *Ray*.

*Held:* Washington's regulations regarding [****3] general navigation watch procedures, crew English language skills and training, and maritime casualty reporting are pre-empted by the comprehensive federal regulatory scheme governing oil tankers; the case is remanded so the validity of other Washington regulations may be assessed in light of the considerable federal interest at stake. Pp. 6-25.

529 U.S. 89; 120 S. Ct. 1135; 146 L. Ed. 2d 69; 2000 U.S. LEXIS 1895; 68 U.S.L.W. 4184; 50 ERC (BNA) 1097; 2000 OSHD (CCH) P32,038; 2000 AMC 913; 2000 Cal. Daily Op. Service 1763; 2000 Daily Journal DAR 2409; 30 ELR 20438; 2000 Colo. J. C.A.R. 1233; 13 Fla. L. Weekly Fed. S 151

(a) The State has enacted legislation in an area where the federal interest has been manifest since the beginning of the Republic and is now well established. Congress has, beginning with the Tank Vessel Act of 1936, enacted a series of statutes pertaining to maritime tanker transports. These include the PWSA, Title I of which authorizes, but does not require, the Coast Guard to enact measures for controlling vessel traffic or for protecting navigation and the marine environment, 33 U.S.C. § 1223(a), and Title II of which, as amended, requires the Coast Guard to issue regulations addressing the design, construction, alteration, repair, maintenance, operation, equipping, personnel qualification, and manning of covered vessels, 46 U.S.C. § 3703(a). Congress later enacted OPA, Title I of which, [****4] among other things, imposes liability for both removal costs and damages on parties responsible for an oil spill, 33 U.S.C. § 2702, and includes two saving clauses preserving the States' authority to impose additional liability, requirements, and penalties, §§ 2718(a) and (c). Congress has also ratified international agreements in this area, including the International Convention of Standards of Training Certification and Watchkeeping for Seafarers (STCW). Pp. 6-11.

(b) In *Ray*, the Court held that the PWSA and Coast Guard regulations promulgated under that Act pre-empted Washington's pilotage requirement, limitation on tanker size, and tanker design and construction rules. The *Ray* Court's interpretation of the PWSA is correct and controlling here. Its basic analytic structure explains why federal pre-emption analysis applies to the challenged regulations and allows scope and due recognition for the traditional authority of the States and localities to regulate some matters of local concern. In narrowing the pre-emptive effect given the PWSA in *Ray*, the Ninth Circuit placed more weight on OPA's saving clauses than they can bear. Like Title I [****5] of OPA, in which they are found, the saving clauses are limited to regulations governing liability and compensation for oil pollution, and do not extend to rules regulating vessel operation, design, or manning. Thus, the pre-emptive effect of the PWSA and its regulations is not affected by OPA, and *Ray*'s holding survives OPA's enactment undiminished. The *Ray* Court's prefatory observation that an "assumption" that the States' historic police powers were not to be superseded by federal law unless that was the clear and manifest congressional purpose does not mean that a presumption against pre-emption aids the Court's analysis here. An assumption of nonpre-emption is not triggered when the State regulates in an area where

there has been a history of significant federal presence. The *Ray* Court held, among other things, that Congress, in PWSA Title I, preserved state authority to regulate the peculiarities of local waters, such as depth and narrowness, if there is no conflict with federal regulatory determinations, see 435 U.S. at 171-172, 178, but further held that Congress, in PWSA Title II, mandated uniform federal rules on the subjects or matters there specified, [****6] *id.*, at 168. Thus, under *Ray*'s interpretation of the Title II provision now found at 46 U.S.C. § 3703(a), only the Federal Government may regulate the design, construction, alteration, repair, maintenance, operation, equipping, personnel qualification, and manning of tankers. The Court today reaffirms *Ray*'s holding on this point. Congress has left no room for state regulation of these matters. See *Fidelity Fed. Sav. & Loan Assn.* v. *De La Cuesta,* 458 U.S. 141, 73 L. Ed. 2d 664, 102 S. Ct. 3014. Although the *Ray* Court acknowledged that the existence of some overlapping coverage between the two PWSA titles may make it difficult to determine whether a pre-emption question is controlled by conflict pre-emption principles, applicable generally to Title I, or by field pre-emption rules, applicable generally to Title II, the Court declined to resolve every question by the greater pre-emptive force of Title II. Thus, conflict pre-emption will be applicable in some, although not all, cases. Useful inquiries in determining which title governs include whether the regulation in question is justified by conditions unique to a particular port or waterway, see [****7] *Ray,* 435 U.S. at 175, or whether it is of limited extraterritorial effect, not requiring the tanker to modify its primary conduct outside the specific body of water purported to justify the local rule, see 435 U.S. at 159-160, 171. Pp. 11-20.

(c) The field pre-emption rule surrounding PWSA Title II and 46 U.S.C. § 3703(a) and the superseding effect of additional federal statutes are illustrated by the pre-emption of four of Washington's tanker regulations, the attempted reach of which is well demonstrated by the briefs and record. First, the imposition of a series of training requirements on a tanker's crew does not address matters unique to Washington waters, but imposes requirements that control the staffing, operation, and manning of a tanker outside of those waters. The training and drill requirements pertain to "operation" and "personnel qualifications" and so are pre-empted by § 3703(a). That training is a field reserved to the Federal Government is further confirmed by the circumstance that the STCW Convention addresses crew "training" and "qualification" requirements, and that the United States

529 U.S. 89; 120 S. Ct. 1135; 146 L. Ed. 2d 69; 2000 U.S. LEXIS 1895; 68 U.S.L.W. 4184; 50 ERC (BNA) 1097; 2000 OSHD (CCH) P32,038; 2000 AMC 913; 2000 Cal. Daily Op. Service 1763; 2000 Daily Journal DAR 2409; 30 ELR 20438; 2000 Colo. J. C.A.R. 1233; 13 Fla. L. Weekly Fed. S 151

has enacted crew training regulations. **[****8]** Second, the imposition of English language proficiency requirements on a tanker's crew is not limited to governing local traffic or local peculiarities. It is pre-empted by § 3703(a) as a "personnel qualification" and by 33 U.S.C. § 1228(a)(7), which requires that any vessel operating in United States waters have at least one licensed deck officer on the navigation bridge who is capable of clearly understanding English. Third, Washington's general requirement that the navigation watch consist of at least two licensed deck officers, a helmsman, and a lookout is pre-empted as an attempt to regulate a tanker's "operation" and "manning" under § 3703(a). Fourth, the requirement that vessels in Washington waters report certain marine casualties regardless of where in the world they occurred cannot stand in light of Coast Guard regulations on the same subject that Congress intended be the sole source of a vessel's reporting obligations, see 46 U.S.C. §§ 6101, 3717(a)(4). On remand, Washington may argue that certain of its regulations, such as its watch requirement in times of restricted visibility, are of limited extraterritorial effect, are **[****9]** necessary to address the peculiarities of Puget Sound, and therefore are not subject to Title II field pre-emption, but should instead be evaluated under Title I conflict pre-emption analysis. Pp. 20-24.

(d) It is preferable that petitioners' substantial arguments as to pre-emption of the remaining Washington regulations be considered by the Ninth Circuit or by the District Court within the framework this Court has herein discussed. The United States did not participate in these cases until appeal, and resolution of the litigation would benefit from the development of a full record by all interested parties. If, pending adjudication on remand, Washington threatens to begin enforcing its regulations, the lower courts would weigh any stay application under the appropriate legal standards in light of the principles discussed herein and with recognition of the national interests at stake. Ultimately, it is largely for Congress and the Coast Guard to confront whether their regulatory scheme, which demands a high degree of uniformity, is adequate. States, as well as environmental groups and local port authorities, will participate in the process. See 46 U.S.C. § 3703 **[****10]** (a). Pp. 24-25.

148 F.3d 1053, reversed and remanded.

**COUNSEL:** C. Jonathan Benner argued the cause for petitioner in No. 98-1706.

David C. Frederick argued the cause for petitioner in No. 98-1701.

William B. Collins argued the cause for respondents.

**JUDGES:** KENNEDY, J., delivered the opinion for a unanimous Court.

**OPINIONBY:** KENNEDY

**OPINION:** **[*94]** **[**1140]** **[***80]** *JUSTICE KENNEDY* delivered the opinion of the Court.

The maritime oil transport industry presents ever-present, all too real dangers of oil spills from tanker ships, spills which could be catastrophes for the marine environment. After the supertanker *Torrey Canyon* spilled its cargo of 120,000 tons of crude oil off the coast of Cornwall, England, in 1967, both Congress and the State of Washington enacted more stringent regulations for these tankers and provided for more comprehensive remedies in the event of an oil spill. The ensuing question of federal pre-emption of the State's laws was addressed by the Court in *Ray v. Atlantic Richfield Co., 435 U.S. 151, 55 L. Ed. 2d 179, 98 S. Ct. 988 (1978).*

**[***LEdHR1A]** **[1A]** **[***LEdHR2A]** **[2A]** **[***LEdHR3A]** **[3A]** **[***LEdHR4A]** **[4A]** **[***LEdHR5A]** [5A] **[***LEdHR6A]** [6A]In 1989, the supertanker *Exxon Valdez* ran aground in Prince William Sound, Alaska, and its cargo of more than 53 million gallons of crude oil caused the largest oil spill in United States history. Again, both Congress and the State of Washington responded. Congress enacted new statutory provisions, and Washington adopted regulations governing **[****11]** tanker operations and design. Today we must determine whether these more recent state laws can stand despite the comprehensive federal regulatory scheme governing oil **[**1141]** tankers. Relying on the same federal statute that controlled the analysis in *Ray*, we hold that some of the State's regulations are pre-empted; as to the balance of the regulations, we remand the case so their validity may be assessed in light of the considerable federal interest at stake and in conformity with the principles we now discuss. **[*95]**

I

The State of Washington embraces some of the Nation's most significant waters and coastal regions. Its Pacific Ocean seacoast consists, in large part, of wave-exposed rocky headlands separated by stretches of beach. Washington borders as well on the Columbia

529 U.S. 89; 120 S. Ct. 1135; 146 L. Ed. 2d 69; 2000 U.S. LEXIS 1895; 68 U.S.L.W. 4184; 50 ERC (BNA) 1097; 2000 OSHD (CCH) P32,038; 2000 AMC 913; 2000 Cal. Daily Op. Service 1763; 2000 Daily Journal DAR 2409; 30 ELR 20438; 2000 Colo. J. C.A.R. 1233; 13 Fla. L. Weekly Fed. S 151

River estuary, dividing Washington from Oregon. Two other large estuaries, Grays Harbor and Willapa Bay, are also within Washington's waters. Of special significance in this case is the inland sea of Puget Sound, a 2,500 square mile body of water consisting of inlets, bays, and channels. More than 200 islands are located within the sound, and it sustains fisheries and plant and animal life of immense value to the Nation [****12] and to the world.

Passage from the Pacific Ocean to the quieter Puget Sound is through the Strait of Juan de Fuca, a channel 12 miles wide and 65 miles long which divides Washington from the Canadian Province of British Columbia. The international boundary is located midchannel. Access to Vancouver, Canada's largest port, is through [***81] the strait. Traffic inbound from the Pacific Ocean, whether destined to ports in the United States or Canada, is routed through Washington's waters; outbound traffic, whether from a port in Washington or Vancouver, is directed through Canadian waters. The pattern had its formal adoption in a 1979 agreement entered by the United States and Canada. Agreement for a Cooperative Vessel Traffic Management System for the Juan de Fuca Region, 32 U.S. T. 377, T. I. A. S. No. 9706.

In addition to holding some of our vital waters, Washington is the site of major installations for the Nation's oil industry and the destination or shipping point for huge volumes of oil and its end products. Refineries and product terminals are located adjacent to Puget Sound in ports including Cherry Point, Ferndale, Tacoma, and Anacortes. Canadian refineries are found near Vancouver [****13] on Burrard Inlet and the lower Fraser River. Crude oil is transported by sea to [*96] Puget Sound. Most is extracted from Alaska's North Slope reserve and is shipped to Washington on United States flag vessels. Foreign-flag vessels arriving from nations such as Venezuela and Indonesia also call at Washington's oil installations.

The bulk of oil transported on water is found in tankers, vessels which consist of a group of tanks contained in a ship-shaped hull, propelled by an isolated machinery plant at the stern. The Court described the increase in size and numbers of these ships close to three decades ago in *Askew* v. *American Waterways Operators, Inc.,* 411 U.S. 325, 335, 36 L. Ed. 2d 280, 93 S. Ct. 1590 (1973), noting that the average vessel size increased from 16,000 tons during World War II to 76,000 tons in 1966. (The term "tons" refers to "deadweight tons," a way of measuring the cargo-carrying capacity of the vessels.) Between 1955 and 1968, the world tanker fleet grew from 2,500

vessels to 4,300. *Ibid.* By December 1973, 366 tankers in the world tanker fleet were in excess of 175,000 tons, see 1 M. Tusiani, The Petroleum Shipping Industry 79 (1996), and by 1998 the number of vessels considered [****14] "tankers" in the merchant fleets of the world numbered 6,739, see U.S. Dept. of Transp., Maritime Administration, Merchant Fleets of the World 1 (Oct. 1998).

The size of these vessels, the frequency of tanker operations, and the vast amount of oil transported by vessels with but one or two layers of metal between the cargo and the water present serious risks. Washington's waters have been subjected [**1142] to oil spills and further threatened by near misses. In December 1984, for example, the tanker ARCO Anchorage grounded in Port Angeles Harbor and spilled 239,000 gallons of Alaskan crude oil. The most notorious oil spill in recent times was in Prince William Sound, Alaska, where the grounding of the *Exxon Valdez* released more than 11 million gallons of crude oil and, like the *Torrey Canyon* spill before it, caused public officials intense concern over the threat of a spill. [*97]

Washington responded by enacting the state regulations now in issue. The legislature created the Office of Marine Safety, which it directed to establish standards for spill prevention plans to provide "the best achievable protection [BAP] from damages caused by the discharge of oil." Wash. Rev. Code § 88.46.040(3) [****15] (1994). The Office of Marine Safety then promulgated the tanker design, equipment, [***82] reporting, and operating requirements now subject to attack by petitioners. Wash. Admin. Code (WAC) § 317-21-130 *et seq.* (1999). A summary of the relevant regulations, as described by the Court of Appeals, is set out in the Appendix, *infra.*

If a vessel fails to comply with the Washington rules, possible sanctions include statutory penalties, restrictions of the vessel's operations in state waters, and a denial of entry into state waters. Wash. Rev. Code §§ 88.46.070, 88.46.080, 88.46.090 (1994).

Petitioner International Association of Independent Tanker Owners ("Intertanko") is a trade association whose 305 members own or operate more than 2,000 tankers of both United States and foreign registry. The organization represents approximately 80% of the world's independently owned tanker fleet; and an estimated 60% of the oil imported into the United States is carried on Intertanko vessels. The association brought this suit seeking declaratory and injunctive relief against state and local officials responsible for enforcing the BAP regulations. Groups interested in environmental preservation intervened [****16] in

529 U.S. 89; 120 S. Ct. 1135; 146 L. Ed. 2d 69; 2000 U.S. LEXIS 1895; 68 U.S.L.W. 4184; 50 ERC (BNA) 1097; 2000 OSHD (CCH) P32,038; 2000 AMC 913; 2000 Cal. Daily Op. Service 1763; 2000 Daily Journal DAR 2409; 30 ELR 20438; 2000 Colo. J. C.A.R. 1233; 13 Fla. L. Weekly Fed. S 151

defense of the laws. Intertanko argued that Washington's BAP standards invaded areas long occupied by the Federal Government and imposed unique requirements in an area where national uniformity was mandated. Intertanko further contended that if local political subdivisions of every maritime nation were to impose differing regulatory regimes on tanker operations, the goal of national governments to develop effective international environmental and safety standards would be defeated. [*98]

Although the United States declined to intervene when the case was in the District Court, the governments of 13 ocean-going nations expressed concerns through a diplomatic note directed to the United States. Intertanko lodged a copy of the note with the District Court. The concerned governments represented that "legislation by the State of Washington on tanker personnel, equipment and operations would cause inconsistency between the regulatory regime of the US Government and that of an individual State of the US. Differing regimes in different parts of the US would create uncertainty and confusion. This would also set an unwelcome precedent for other Federally administered countries." Note Verbale from [****17] the Royal Danish Embassy to the U.S. Dep't of State 1 (June 14, 1996).

The District Court rejected all of Intertanko's arguments and upheld the state regulations. _International Assn. of Independent Tanker Owners (Intertanko) v. Lowry, 947 F. Supp. 1484 (WD Wash. 1996)._ The appeal followed, and at that stage the United States intervened on Intertanko's behalf, contending that the District Court's ruling failed to give sufficient weight to the substantial foreign affairs interests of the Federal Government. The United States Court of Appeals for the Ninth Circuit held that the State could enforce its laws, save the one requiring the vessels to install certain navigation and towing equipment. _159 F.3d 1220 (1998)_ [**1143] (The Court of Appeals reasoned that this requirement, found in WAC § 317-21-265, was "virtually identical to" requirements declared pre-empted in _Ray v. Atlantic Richfield Co., 435 U.S. 151, 55 L. Ed. 2d 179, 98 S. Ct. 988 (1978). 148 F.3d at 1066._ Over Judge Graber's dissent, the Court of Appeals denied petitions for rehearing [***83] en banc. _159 F.3d 1220 (1998)._ Judge Graber, although unwilling, without further analysis, to conclude [****18] that the panel reached the wrong result, argued that the opinion was "incorrect in two exceptionally important respects: (1) The opinion places too much weight on two clauses in Title I of OPA 90 [The Oil Pollution Act of 1990] [*99] that limit OPA 90's preemptive effect. (2)

Portions of the opinion that discuss the Coast Guard regulations are inconsistent with Ninth Circuit and Supreme Court precedent." _159 F.3d at 1221._ We granted certiorari and now reverse. _527 U.S. 1063, 120 S. Ct. 33, 144 L. Ed. 2d 835 (1999)._

II

[***LEdHR1B] [1B]The State of Washington has enacted legislation in an area where the federal interest has been manifest since the beginning of our Republic and is now well established. The authority of Congress to regulate interstate navigation, without embarrassment from intervention of the separate States and resulting difficulties with foreign nations, was cited in the Federalist Papers as one of the reasons for adopting the Constitution. _E.g._, The Federalist Nos. 44, 12, 64. In 1789, the First Congress enacted a law by which vessels with a federal certificate were entitled to "the benefits granted by any law of the United States." Act of Sept. 1, 1789, ch. 11, § 1, 1 Stat. 55. The importance [****19] of maritime trade and the emergence of maritime transport by steamship resulted in further federal licensing requirements enacted to promote trade and to enhance the safety of crew members and passengers. See Act of July 7, 1838, ch. 191, 5 Stat. 304; Act of Mar. 3, 1843, ch. 94, 5 Stat. 626. In 1871, Congress enacted a comprehensive scheme of regulation for steam powered vessels, including provisions for licensing captains, chief mates, engineers, and pilots. Act of Feb. 28, 1871, ch. 100, 16 Stat. 440.

The Court in _Cooley v. Board of Wardens of Port of Philadelphia ex rel. Soc. for Relief of Distressed Pilots. 53 U.S. 299, 12 HOW 299, 13 L. Ed. 996 (1852),_ stated that there would be instances in which state regulation of maritime commerce is inappropriate even absent the exercise of federal authority, although in the case before it the Court found the challenged state regulations were permitted in light of local needs and conditions. Where Congress had acted, however, the Court had little difficulty in finding state vessel requirements were pre-empted [*100] by federal laws which governed the certification of vessels and standards of operation. _Gibbons v. Ogden, 22 U.S. 1, 9 Wheat. 1, 6 L. Ed. 23 (1824),_ [****20] invalidated a New York law that attempted to grant a monopoly to operate steamboats on the ground it was inconsistent with the coasting license held by the vessel owner challenging the exclusive franchise. And in _Sinnot v. Davenport, 63 U.S. 227, 22 HOW 227, 16 L. Ed. 243 (1859),_ the Court decided that the federal license held by the vessel contained "the only guards and restraints,

529 U.S. 89; 120 S. Ct. 1135; 146 L. Ed. 2d 69; 2000 U.S. LEXIS 1895; 68 U.S.L.W. 4184; 50 ERC (BNA) 1097; 2000 OSHD (CCH) P32,038; 2000 AMC 913; 2000 Cal. Daily Op. Service 1763; 2000 Daily Journal DAR 2409; 30 ELR 20438; 2000 Colo. J. C.A.R. 1233; 13 Fla. L. Weekly Fed. S 151

which Congress has seen fit to annex to the privileges of ships and vessels engaged in the coasting trade." *Id.,* at 241. The Court went on to explain that in such a circumstance, state laws on the subject must yield: "In every such case, the act of Congress or treaty is supreme; and the law of the State, though enacted in the exercise of powers not controverted, must yield to it." *Id.,* at 243.

Against this background, Congress has enacted a series of statutes pertaining to maritime tanker transports [***84] and has ratified international agreements on the subject. We begin by referring to the principal statutes and international instruments discussed by the parties. [**1144]

*1. The Tank Vessel Act.*

[***LEdHR7] [7]The Tank Vessel Act of 1936, 49 Stat. 1889, enacted specific requirements for operation [****21] of covered vessels. The Act provided that "in order to secure effective provisions against the hazards of life and property," additional federal rules could be adopted with respect to the "design and construction, alteration, or repair of such vessels," "the operation of such vessels," and "the requirements of the manning of such vessels and the duties and qualifications of the officers and crews thereof." The purpose of the Act was to establish "a reasonable and uniform set of rules and regulations concerning . . . vessels carrying the type of cargo deemed dangerous." H. R. Rep. No. 2962, 74th Cong., 2d Sess., 2 (1936). The Tank Vessel Act was the primary source for regulating [*101] tank vessels for the next 30 years, until the *Torrey Canyon* grounding led Congress to take new action.

*2. The Ports and Waterways Safety Act of 1972.*

Responding to the *Torrey Canyon* spill, Congress enacted the Ports and Waterways Safety Act of 1972 (PWSA). The Act, as amended by the Port and Tanker Safety Act of 1978, 92 Stat. 1471, contains two somewhat overlapping titles, both of which may, as the *Ray* Court explained, preclude enforcement of state laws, though not by the same pre-emption [****22] analysis. Title I concerns vessel traffic "in any port or place under the jurisdiction of the United States." 110 Stat. 3934, 33 U.S.C. § 1223(a)(1) (1997 ed. Supp. III). Under Title I, the Coast Guard may enact measures for controlling vessel traffic or for protecting navigation and the marine environment, but it is not required to do so. *Ibid.*

Title II does require the Coast Guard to issue regulations, regulations addressing the "design, construction, alteration, repair, maintenance, operation, equipping, personnel qualification, and manning of vessels . . . that may be necessary for increased protection against hazards to life and property, for navigation and vessel safety, and for enhanced protection of the marine environment." 46 U.S.C. § 3703(a).

The critical provisions of the PWSA described above remain operative, but the Act has been amended, most significantly by the Oil Pollution Act of 1990 (OPA), 104 Stat. 484. OPA, enacted in response to the *Exxon Valdez* spill, requires separate discussion.

*3. The Oil Pollution Act of 1990.*

The OPA contains nine titles, two having the most significance for these cases. [****23] Title I is captioned "Oil Pollution Liability, and Compensation" and adds extensive new provisions to the United States Code. See 104 Stat. 2375, 33 U.S.C. § 2701 *et seq.* (1994 ed. and Supp. III). Title I imposes liability (for both removal costs and damages) on parties responsible [*102] for an oil spill. § 2702. Other provisions provide defenses to, and limitations on, this liability. 33 U.S.C. §§ 2703, 2704. Of considerable importance to these cases are OPA's saving clauses, found in Title I of the Act, § 2718, and to be discussed below. [***85]

Title IV of OPA is entitled "Prevention and Removal." For the most part, it amends existing statutory provisions or instructs the Secretary of Transportation (whose departments include the Coast Guard) to take action under previous grants of rulemaking authority. For example, Title IV instructs the Coast Guard to require reporting of marine casualties resulting in a "significant harm to the environment." 46 U.S.C. § 6101(a)(5) (1994 ed. and Supp. V). Title IV further requires the Secretary to issue regulations to define those areas, including Puget Sound, on which single hulled [****24] tankers shall be escorted by other vessels. 104 Stat. 523. By incremental dates specified in the Act, all covered tanker vessels must have a double hull. 46 U.S.C. § 3703a. [**1145]

*4. Treaties and International Agreements.*

The scheme of regulation includes a significant and intricate complex of international treaties and maritime agreements bearing upon the licensing and operation of vessels. We are advised by the United States that the international regime depends upon the principle of reciprocity. That is to say, the certification of a vessel

529 U.S. 89; 120 S. Ct. 1135; 146 L. Ed. 2d 69; 2000 U.S. LEXIS 1895; 68 U.S.L.W. 4184; 50 ERC (BNA) 1097; 2000 OSHD (CCH) P32,038; 2000 AMC 913; 2000 Cal. Daily Op. Service 1763; 2000 Daily Journal DAR 2409; 30 ELR 20438; 2000 Colo. J. C.A.R. 1233; 13 Fla. L. Weekly Fed. S 151

by the government of its own flag nation warrants that the ship has complied with international standards, and vessels with those certificates may enter ports of the signatory nations. Brief for United States 3.

Illustrative of treaties and agreements to which the United States is a party are the International Convention for the Safety of Life at Sea, 1974, 32 U.S. T. 47, T. I. A. S. No. 9700, the International Convention for Prevention of Pollution from Ships, 1973, 17 **[*103]** I. L. M. 546, and the International Convention of Standards of Training, Certification and Watchkeeping for Seafarers, With Annex, 1978 (STCW), **[****25]** S. Treaty Doc. No. 96-1, C. T. I. A. No. 7624.

**[***LEdHR8]** [8] **[***LEdHR9]** [9] **[***LEdHR10]** [10]The United States argues that these treaties, as the supreme law of the land, have pre-emptive force over the state regulations in question here. We need not reach that issue at this stage of the case because the state regulations we address in detail below are pre-empted by federal statute and regulations. The existence of the treaties and agreements on standards of shipping is of relevance, of course, for these agreements give force to the longstanding rule that [HN1]the enactment of a uniform federal scheme displaces state law, and the treaties indicate Congress will have demanded national uniformity regarding maritime commerce. *See Ray, 435 U.S. at 166* (recognizing Congress anticipated "arriving at international standards for building tank vessels" and understanding "the Nation was to speak with one voice" on these matters). In later proceedings, if it is deemed necessary for full disposition of the case, it should be open to the parties to argue whether the specific international agreements and treaties are of binding, pre-emptive force. We do not reach those questions, for it may be that pre-emption principles applicable **[****26]** to the basic federal statutory structure will suffice, upon remand, for a complete determination.

III

**[***LEdHR11A]** [11A]In *Ray v. Atlantic Richfield, supra,* the Court was asked to review, in light of an established federal and international regulatory scheme, comprehensive tanker regulations **[***86]** imposed by the State of Washington. The Court held that the PWSA and Coast Guard regulations promulgated under that Act pre-empted a state pilotage requirement, Washington's limitation on tanker size, and tanker design and construction rules. **[*104]**

In these cases, petitioners relied on *Ray* to argue that Washington's more recent state regulations were preempted as well. The Court of Appeals, however, concluded that *Ray* retained little validity in light of subsequent action by Congress. We disagree. The *Ray* Court's interpretation of the PWSA is correct and controlling. Its basic analytic structure explains why federal pre-emption analysis applies to the challenged regulations and allows scope and due recognition for the traditional authority of the States and localities to regulate some matters of local concern.

At the outset, it is necessary to explain that the essential framework of **[****27]** *Ray*, and of the PWSA which it interpreted, are of continuing force, neither having been superseded by subsequent authority relevant to these cases. In narrowing the pre-emptive effect given the PWSA in *Ray*, the Court of Appeals relied upon OPA's saving clauses, finding in their language a return of authority to the States. Title I of OPA contains two saving clauses, stating:

"(a) Preservation of State authorities . . . **[**1146]** [HN2]

"Nothing in this Act or the Act of March 3, 1851 shall --

"(1) affect, or be construed or interpreted as preempting, the authority of any State or political subdivision thereof from imposing any additional liability or requirements with respect to --

"(A) the discharge of oil or other pollution by oil within such State . . . .

" . . . . .

"(c) Additional requirements and liabilities; penalties

"Nothing in this Act, the Act of March 3, 1851 (46 U.S.C. 183 et seq.), or section 9509 of [the Internal Revenue Code of 1986 (26 U.S.C. 9509]), shall in any way affect, or be construed to affect, the authority of the United States or any State or political subdivision thereof -- **[*105]**

"(1) to impose additional liability **[****28]** or additional requirements

" . . . . .

"relating to the discharge, or substantial threat of a discharge, of oil." 33 U.S.C. § 2718.

The Court of Appeals placed more weight on the saving clauses than those provisions can bear, either from a textual standpoint or from a consideration of the whole federal regulatory scheme of which OPA is but a part.

Page 13

529 U.S. 89; 120 S. Ct. 1135; 146 L. Ed. 2d 69; 2000 U.S. LEXIS 1895; 68 U.S.L.W. 4184; 50 ERC (BNA) 1097; 2000 OSHD (CCH) P32,038; 2000 AMC 913; 2000 Cal. Daily Op. Service 1763; 2000 Daily Journal DAR 2409; 30 ELR 20438; 2000 Colo. J. C.A.R. 1233; 13 Fla. L. Weekly Fed. S 151

[***LEdHR11B]    [11B] [***LEdHR12]    [12]The saving clauses are found in Title I of OPA, captioned Oil Pollution Liability and Compensation and creating a liability scheme for oil pollution. In contrast to the Washington rules at issue here, Title I does not regulate vessel operation, design, or manning. Placement of the saving clauses in Title I of OPA suggests that Congress intended to preserve state laws of a scope similar to the matters contained in Title I of OPA, not all state laws similar to the matters covered by the whole of OPA or to the whole subject of maritime oil [***87] transport. The evident purpose of the saving clauses is to preserve state laws which, rather than imposing substantive regulation of a vessel's primary conduct, establish liability rules and financial requirements relating to oil spills. See _Gutierrez_ v. _Ada_, 528 U.S. 250,    , 145 L. Ed. 2d 747, 120 S. Ct. 740 [****29] (2000) (slip op., at 5) (words of a statute should be interpreted consistent with their neighbors to avoid giving unintended breadth to an Act of Congress).

Our conclusion is fortified by Congress' decision to limit the saving clauses by the same key words it used in declaring the scope of Title I of OPA. [HN3]Title I of OPA permits recovery of damages involving vessels "from which oil is discharged, or which pose the substantial threat of a discharge of oil." 33 U.S.C. § 2702(a). The saving clauses, in parallel manner, permit States to impose liability or requirements "relating to the discharge, or substantial threat of a discharge, of oil." § 2718(c). In its titles following Title I, OPA addresses matters including licensing and certificates of registry, 104 Stat. 509; [*106] duties of senior licensed officers to relieve the master, _id._, at 511; manning standards for foreign vessels, _id._, at 513; reporting of marine casualties, _ibid._; minimum standards for plating thickness, _id._, at 515; tank vessel manning requirements, _id._, at 517; and tank vessel construction standards, _id._, at 517-518, among other extensive regulations. If Congress [****30] had intended to disrupt national uniformity in all of these matters, it would not have done so by placement of the saving clauses in Title I.

[***LEdHR11C]    [11C]The saving clauses are further limited in effect to "this Act, the Act of March 3, 1851 . . . or section 9509 of the Internal Revenue Code." § 2718(a) and (c). These explicit qualifiers are inconsistent with interpreting the saving clauses to alter the pre-emptive effect of the PWSA or regulations promulgated thereunder. The text of the statute indicates no intent to allow States to impose

wide-ranging regulation of the at-sea operation of tankers. The clauses may preserve a State's ability to enact laws of a scope similar to Title I, [**1147] but do not extend to subjects addressed in the other titles of the Act or other acts.

[***LEdHR11D]    [11D]    [***LEdHR13] [13]Limiting the saving clauses as we have determined respects the established federal-state balance in matters of maritime commerce between the subjects as to which the States retain concurrent powers and those over which the federal authority displaces state control. We have upheld state laws imposing liability for pollution caused by oil spills. See _Askew_ v. _American Waterways Operators, Inc._, 411 U.S. at 325. [****31] Our view of OPA's savings clauses preserves this important role for the States, which is unchallenged here. We think it quite unlikely that Congress would use a means so indirect as the savings clauses in Title I of OPA to upset the settled division of authority by allowing states to impose additional unique substantive regulation on the at-sea conduct of vessels. We decline to give broad effect to saving clauses where doing so would upset the careful regulatory scheme established by federal law. See, _e.g._, _Morales_ [*107] v. _Trans World Airlines, Inc._, 504 U.S. 374, 385, 119 L. Ed. 2d 157, 112 S. Ct. 2031 (1992); _American Telephone & Telegraph Co._ v. _Central Office Telephone, Inc._, 524 U.S. 214, 227-28, 141 L. Ed. 2d 222, 118 S. Ct. 1956 (1998). [***88]

[***LEdHR11E]    [11E]From the text of OPA and the long-established understanding of the appropriate balance between federal and state regulation of maritime commerce, we hold that the pre-emptive effect of the PWSA and regulations promulgated under it are not affected by OPA. We doubt Congress will be surprised by our conclusion, for the Conference Report on OPA shared our view that the statute "does not disturb the Supreme Court's decision in _Ray_ v. _Atlantic Richfield Co._, 435 U.S. 151, 55 L. Ed. 2d 179, 98 S. Ct. 988 (1978). [****32] " H. R. Conf. Rep. No. 101-653, 101, p. 122 (1990). The holding in _Ray_ also survives the enactment of OPA undiminished, and we turn to a detailed discussion of that case.

As we mentioned above, the _Ray_ Court confronted a claim by the operator of a Puget Sound refinery that federal law precluded Washington from enforcing laws imposing certain substantive requirements on tankers. The _Ray_ Court prefaced its analysis of the state regulations with the following observation:

529 U.S. 89; 120 S. Ct. 1135; 146 L. Ed. 2d 69; 2000 U.S. LEXIS 1895; 68 U.S.L.W. 4184; 50 ERC (BNA) 1097; 2000 OSHD (CCH) P32,038; 2000 AMC 913; 2000 Cal. Daily Op. Service 1763; 2000 Daily Journal DAR 2409; 30 ELR 20438; 2000 Colo. J. C.A.R. 1233; 13 Fla. L. Weekly Fed. S 151

"The Court's prior cases indicate that when a State's exercise of its police power is challenged under the Supremacy Clause, 'we start with the assumption that the historic police powers of the States were not to be superseded by the Federal Act unless that was the clear and manifest purpose of Congress.' _Rice_ v. _Santa Fe Elevator Corp.,_ 331 U.S. 218, 230, 91 L. Ed. 1447, 67 S. Ct. 1146 (1947)." 435 U.S. at 157.

The fragmentary quote from _Rice_ does not support the scope given to it by the Court of Appeals or by respondents.

_Ray_ quoted but a fragment of a much longer paragraph found in _Rice_. The quoted fragment is followed by extensive and careful qualifications to show the **[\*\*\*\*33]** different approaches **[\*108]** taken by the Court in various contexts. We need not discuss that careful explanation in detail, however. To explain the full intent of the _Rice_ quotation, it suffices to quote in full the sentence in question and two sentences preceding it. The _Rice_ opinion stated: "The question in each case is what the purpose of Congress was. Congress legislated here in a field which the States have traditionally occupied. So we start with the assumption that the historic police powers of the States were not to be superseded by the Federal Act unless that was the clear and manifest purpose of Congress." 331 U.S. at 230 (citations omitted).

**[\*\*\*LEdHR1C]** **[1C]** **[\*\*\*LEdHR14]** **[14]**The qualification given by the word "so" and by the preceding sentences in _Rice_ are of considerable consequence. As _Rice_ indicates, **[HN4]**an "assumption" of nonpre-emption is not triggered when the State regulates in an area where there has been a history of significant federal presence. See also _Jones_ v. _Rath Packing Co.,_ 430 U.S. 519, 525, 51 L. Ed. 2d 604, 97 S. Ct. 1305 **[\*\*1148]** (1977) ("assumption" is triggered where "the field which Congress is said to have pre-empted has been traditionally occupied by the States"); _Medtronic, Inc._ v. _Lohr,_ 518 U.S. 470, 485, 135 L. Ed. 2d 700, 116 S. Ct. 2240 (1996) **[\*\*\*\*34]** (citing _Rice_ in case involving medical negligence, a subject historically regulated by the States). In _Ray,_ and in the case before us, Congress has legislated in the field from the earliest days of the Republic, creating an extensive federal statutory and regulatory scheme.

**[\*\*\*LEdHR15]** **[15]** **[\*\*\*LEdHR16A]** **[16A]** **[\*\*\*LEdHR17A]** **[17A]**[HN5]The state laws now in **[\*\*\*89]** question bear upon national and international maritime commerce, and in this area there is no

beginning assumption that concurrent regulation by the State is a valid exercise of its police powers. Rather, we must ask whether the local laws in question are consistent with the federal statutory structure, which has as one of its objectives a uniformity of regulation for maritime commerce. No artificial presumption aids us in determining the scope of appropriate local regulation under the PWSA, which, as we discuss below, does preserve, in Title I of that Act, the historic role of the States to regulate local ports and waters **[\*109]** under appropriate circumstances. At the same time, as we also discuss below, uniform, national rules regarding general tanker design, operation, and seaworthiness have been mandated by Title II of the PWSA.

**[\*\*\*LEdHR16B]** **[16B]** **[\*\*\*LEdHR18]** **[18]**The _Ray_ Court confirmed the important proposition that **[\*\*\*\*35]** the subject and scope of Title I of the PWSA allows a State to regulate its ports and waterways, so long as the regulation is based on "the peculiarities of local waters that call for special precautionary measures." 435 U.S. at 171. Title I allows state rules directed to local circumstances and problems, such as water depth and narrowness, idiosyncratic to a particular port or waterway. _Ibid._ There is no pre-emption by operation of Title I itself if the state regulation is so directed and if the Coast Guard has not adopted regulations on the subject or determined that regulation is unnecessary or inappropriate. This principle is consistent with recognition of an important role for States and localities in the regulation of the Nation's waterways and ports. _E.g._, _Cooley_, 12 HOW at 319 (recognizing state authority to adopt plans "applicable to the local peculiarities of the ports within their limits"). It is fundamental in our federal structure that states have vast residual powers. Those powers, unless constrained or displaced by the existence of federal authority or by proper federal enactments, are often exercised in concurrence with those **[\*\*\*\*36]** of the national government. _McCulloch_ v. _Maryland,_ 17 U.S. 316, 4 Wheat. 316, 4 L. Ed. 579 (1819).

**[\*\*\*LEdHR16C]** **[16C]**As _Ray_ itself made apparent, [HN6]the States may enforce rules governed by Title I of the PWSA unless they run counter to an exercise of federal authority. The analysis under Title I of the PWSA, then, is one of [HN7]conflict pre-emption, which occurs "when compliance with both state and federal law is impossible, or when the state law 'stands as an obstacle to the accomplishment and execution of the full purposes and objective of Congress.'" _California_ v. _ARC America Corp.,_ 490 U.S. 93, 100-101, 104 L. Ed. 2d 86, 109 S. Ct. 1661 (1989)

529 U.S. 89; 120 S. Ct. 1135; 146 L. Ed. 2d 69; 2000 U.S. LEXIS 1895; 68 U.S.L.W. 4184; 50 ERC (BNA) 1097; 2000 OSHD (CCH) P32,038; 2000 AMC 913; 2000 Cal. Daily Op. Service 1763; 2000 Daily Journal DAR 2409; 30 ELR 20438; 2000 Colo. J. C.A.R. 1233; 13 Fla. L. Weekly Fed. S 151

(citations omitted). In this context, Coast Guard regulations are to be given pre-emptive [*110] effect over conflicting state laws. _City of New York v. FCC, 486 U.S. 57, 63-64, 100 L. Ed. 2d 48, 108 S. Ct. 1637 (1988)_ ("'[HN8][A] federal agency acting within the scope of its congressionally delegated authority may pre-empt state regulation' and hence render unenforceable state or local laws that are otherwise not inconsistent with federal law"). _Ray_ defined [HN9]the relevant inquiry for Title I pre-emption as whether the Coast Guard has promulgated its own requirement on the subject or has decided that [****37] no such requirement should be imposed at all. _435 U.S. at 171-172;_ see also, _id. at 178_ ("[HN10]'where failure of . . . [***90] federal officials affirmatively to exercise their full authority takes on the character of a ruling that [**1149] no such regulation is appropriate or approved pursuant to the policy of the statute,' States are not permitted to use their police power to enact such a regulation. _Bethlehem Steel Co. v. New York State Labor Relations Board, 330 U.S. 767, 774, 91 L. Ed. 1234, 67 S. Ct. 1026 (1947)_"). _Ray_ also recognized that, even in the context of a regulation related to local waters, a federal official with an overview of all possible ramifications of a particular requirement might be in the best position to balance all the competing interests. _435 U.S. at 177._

[***LEdHR17B]     [17B]     [***LEdHR19A] [19A]While _Ray_ explained that Congress, in Title I of the PWSA, preserved state authority to regulate the peculiarities of local waters if there was no conflict with federal regulatory determinations, the Court further held that Congress, in Title II of the PWSA, mandated federal rules on the subjects or matters there specified, demanding uniformity. _Id., at 168_ ("Title II leaves no room for the [****38] States to impose different or stricter design requirements than those which Congress has enacted with the hope of having them internationally adopted or has accepted as the result of international accord. A state law in this area . . . would frustrate the congressional desire of achieving uniform, international standards"). Title II requires the Coast Guard to impose national regulations governing the general seaworthiness of tankers and their crews. _435 U.S. at 160._ Under _Ray's_ interpretation [*111] of the Title II PWSA provision now found at _46 U.S.C. § 3703_(a), only the Federal Government may regulate the "design, construction, alteration, repair, maintenance, operation, equipping, personnel qualification, and manning" of tanker vessels.

[***LEdHR19B]     [19B]In _Ray,_ this principle was applied to hold that Washington's tanker design and construction rules were pre-empted. Those requirements failed because they were within a field reserved for federal regulation under _46 U.S.C. § 391a_ (1982 ed.), the predecessor to § 3703(a). We reaffirm _Ray's_ holding on this point. Contrary to the suggestion of the Court of Appeals, the field of pre-emption established [****39] by § 3703(a) cannot be limited to tanker "design" and "construction," terms which cannot be read in isolation from the other subjects found in that section. Title II of the PWSA covers "design, construction, alteration, repair, maintenance, operation, equipping, personnel qualification, and manning" of tanker vessels. _Ibid._ Congress has left no room for state regulation of these matters. See _Fidelity Fed. Sav. & Loan Assn. v. De La Cuesta, 458 U.S. 141, 73 L. Ed. 2d 664, 102 S. Ct. 3014 (1982)_ (explaining field pre-emption). As the _Ray_ court stated: "The Supremacy Clause dictates that the federal judgment that a vessel is safe to navigate United States waters prevail over the contrary state judgment. Enforcement of the state requirements would at least frustrate what seems to us to be the evident congressional intention to establish a uniform federal regime controlling the design of oil tankers." _435 U.S. at 165._

[***LEdHR20]     [20]The existence of some overlapping coverage between the two titles of the PWSA may make it difficult to determine whether a pre-emption [***91] question is controlled by conflict pre-emption principles, applicable generally to Title I, or by field pre-emption rules, applicable [****40] generally to Title II. The _Ray_ Court acknowledged the difficulty, but declined to resolve every question by the greater pre-emptive force of Title II. We follow the same approach, and conflict pre-emption under [*112] Title I will be applicable in some, although not all, cases. We recognize that the terms used in § 3703(a) are quite broad. In defining their scope, and the scope of the resulting field pre-emption, it will be useful to consider the type of regulations the Secretary has actually promulgated under the section, as well as the section's list of specific types of regulation that must be included. Useful inquiries include whether the rule is justified by conditions unique to a particular port or waterway. See _id., at 175_ [**1150] (a Title I regulation is one "based on water depth in Puget Sound or on other local peculiarities"). Furthermore, a regulation within the State's residual powers will often be of limited extraterritorial effect, not requiring the tanker to modify its primary conduct outside the specific body of water purported to justify the local rule. Limited extraterritorial effect explains why _Ray_ upheld a state rule requiring a tug escort for certain

529 U.S. 89; 120 S. Ct. 1135; 146 L. Ed. 2d 69; 2000 U.S. LEXIS 1895; 68 U.S.L.W. 4184; 50 ERC (BNA) 1097; 2000 OSHD (CCH) P32,038; 2000 AMC 913; 2000 Cal. Daily Op. Service 1763; 2000 Daily Journal DAR 2409; 30 ELR 20438; 2000 Colo. J. C.A.R. 1233; 13 Fla. L. Weekly Fed. S 151

[****41] vessels, _id. at 171_, and why state rules requiring a registered vessel (_i.e.,_ one involved in foreign trade) to take on a local pilot have historically been allowed, _id. at 159-160._ Local rules not pre-empted under Title II of the PWSA pose a minimal risk of innocent noncompliance, do not affect vessel operations outside the jurisdiction, do not require adjustment of systemic aspects of the vessel, and do not impose a substantial burden on the vessel's operation within the local jurisdiction itself.

IV

[***LEdHR6B] [6B] [***LEdHR21] [21]The field pre-emption rule surrounding Title II and § 3703(a) and the superseding effect of additional federal statutes are illustrated by the pre-emption of four of Washington's tanker regulations. We address these because the attempted reach of the state rules is well demonstrated by the briefs and record before us; other parts of the state regulatory scheme can be addressed on remand.

[***LEdHR1D] [1D] [***LEdHR2B] [2B]First, Washington imposes a series of training requirements on a tanker's crew. WAC § 317-21-230; see also Appendix, _infra_, at   . A covered vessel is required to certify [*113] that its crew has "completed a comprehensive training program approved by the [State]." [****42] The State requires the vessel's master to "be trained in shipboard management" and licensed deck officers to be trained in bridge resource management, automated radar plotting aids, shiphandling, crude oil washing, inert gas systems, cargo handling, oil spill prevention and response, and shipboard fire fighting. The state law mandates a series of "weekly," "monthly," and "quarterly" drills.

[***LEdHR1E] [1E] [***LEdHR2C] [2C]This state requirement under WAC § 317-21-230 does not address matters unique to the waters of Puget Sound. On the contrary, it imposes requirements that control the staffing, operation, and manning of a tanker outside of Washington's waters. The training and drill requirements pertain to "operation" and "personnel qualifications" and so are pre-empted by 46 U.S.C. § 3703(a). Our conclusion [***92] that training is a field reserved to the Federal Government receives further confirmation from the circumstance that the STCW Convention addresses "training" and "qualification" requirements of the crew, Art. VI), and that the United States has enacted crew training requirements. _E.g.,_ 46 CFR Pts. 10, 12, 13, 15 (1999).

[***LEdHR1F] [1F] [***LEdHR3B] [3B]The second Washington rule we find pre-empted is WAC § 317-21-250; [****43] see also, Appendix, _infra_, at   -   . Washington imposes English language proficiency requirements on a tanker's crew. This requirement will dictate how a tanker operator staffs the vessel even from the outset of the voyage, when the vessel may be thousands of miles from Puget Sound. It is not limited to governing local traffic or local peculiarities. The State's attempted rule is a "personnel qualification" pre-empted by § 3703(a) of Title II. In addition, there is another federal statute, [HN11]33 U.S.C. § 1228(a)(7), on the subject. It provides: "No vessel . . . shall operate in the navigable waters of the United States . . . , if such vessel . . . while underway, does not have at least one licensed deck officer on the navigation bridge [*114] who is capable of clearly understanding English." The statute may not be supplemented by laws enacted by the States without compromising the uniformity the federal rule itself achieves.

[***LEdHR1G] [1G] [***LEdHR4B] [4B]The third Washington rule we find invalid under field pre-emption is a navigation [**1151] watch requirement in WAC § 317-21-200. Washington has different rules for navigation watch, depending on whether the tanker is operating in restricted visibility [****44] or not. We mention the restricted visibility rule below, but now evaluate the requirement which applies in general terms and reads: "The navigation watch shall consist of at least two licensed deck officers, a helmsman, and a lookout." The general watch requirement is not tied to the peculiarities of Puget Sound; it applies throughout Washington's waters and at all times. It is a general operating requirement and is pre-empted as an attempt to regulate a tanker's "operation" and "manning" under 33 U.S.C. § 3703(a).

We have illustrated field pre-emption under § 3703(a) by discussing three of Washington's rules which, under the current state of the record, we can determine cannot be enforced due to the assertion of federal authority found in that section. The parties discuss other federal statutory provisions and international agreements which also govern specific aspects of international maritime commerce. In appropriate circumstances, these also may have pre-emptive effect.

[***LEdHR1H] [1H] [***LEdHR5B] [5B]For example, the record before us reveals that a fourth state rule cannot stand in light of other sources of federal regulation of the same subject. Washington requires vessels that ultimately [****45] reach its waters to

529 U.S. 89; 120 S. Ct. 1135; 146 L. Ed. 2d 69; 2000 U.S. LEXIS 1895; 68 U.S.L.W. 4184; 50 ERC (BNA) 1097; 2000 OSHD (CCH) P32,038; 2000 AMC 913; 2000 Cal. Daily Op. Service 1763; 2000 Daily Journal DAR 2409; 30 ELR 20438; 2000 Colo. J. C.A.R. 1233; 13 Fla. L. Weekly Fed. S 151

report certain marine casualties. WAC § 317-21-130; see also Appendix, *infra*, at    . The requirement applies to incidents (defined as a "collision," "allision," "near-miss incident," "marine casualty" of listed kinds, "accidental or intentional grounding," "failure of the propulsion or primary steering systems," **[\*115]** "failure of a component or control system," "fire, flood, or other incident that affects the vessel's seaworthiness," and "spills of oil"), regardless of where in the world they **[\*\*\*93]** might have occurred. A vessel operator is required by the state regulation to make a detailed report to the State on each incident, listing the date, location, and weather conditions. The report must also list the government agencies to whom the event was reported and must contain a "brief analysis of any known causes" and a "description of measures taken to prevent a reoccurrence." *Ibid.*

**[\*\*\*LEdHR22]**    [22]The State contends that its requirement is not pre-empted because it is similar to federal requirements. This is an incorrect statement of the law. [HN12]It is not always a sufficient answer to a claim of pre-emption to say that state rules supplement, or even mirror, federal requirements. **[\*\*\*\*46]** The Court observed this principle when Commerce Clause doctrine was beginning to take shape, holding in *Sinnot v. Davenport.* 63 U.S. 227, 22 HOW 227, 16 L. Ed. 243 (1859), that Alabama could not require vessel owners to provide certain information as a condition of operating in state waters even though federal law also required the owner of the vessel "to furnish, under oath . . . all the information required by this State law." *Id., at 242.* [HN13]The appropriate inquiry still remains whether the purposes and objectives of the federal statutes, including the intent to establish a workable, uniform system, are consistent with concurrent state regulation. On this point, Justice Holmes' later observation is relevant: "When Congress has taken the particular subject matter in hand coincidence is as ineffective as opposition, and a state law is not to be declared a help because it attempts to go farther than Congress has seen fit to go." *Charleston & Western Carolina R. Co. v. Varnville Furniture Co.,* 237 U.S. 597, 604, 59 L. Ed. 1137, 35 S. Ct. 715 (1915).

**[\*\*\*LEdHR5C]**    [5C]We hold that Congress intended that the Coast Guard regulations be the sole source of a vessel's reporting obligations with respect to the **[\*\*\*\*47]** matters covered by the challenged state statute. [HN14]Under 46 U.S.C. § 6101, the Coast Guard "shall **[\*116]** prescribe regulations on the marine casualties to be reported and the manner of reporting," and the statute lists the kinds of casualties that the regulations must cover. **[\*\*1152]** See also §

3717(a)(4) (requiring the Secretary of Transportation to "establish a marine safety information system"). Congress did not intend its reporting obligations to be cumulative to those enacted by each political subdivision whose jurisdiction a vessel enters. The State's reporting requirement is a significant burden in terms of cost and the risk of innocent noncompliance. *The Roanoke,* 189 U.S. 185, 195, 47 L. Ed. 770, 23 S. Ct. 491 (1903) (the master of a vessel is in a position "such that it is almost impossible for him to acquaint himself with the laws of each individual State he may visit"). Furthermore, it affects a vessel operator's out-of-state obligations and conduct, where a State's jurisdiction and authority are most in doubt. The State reporting requirement under WAC § 317-21-130 is pre-empted.

V

**[\*\*\*LEdHR6C]**    [6C]As to conflict pre-emption under Title I, Washington argues that certain of its regulations, **[\*\*\*\*48]** such as its watch requirement in times of restricted visibility, are of limited extraterritorial effect and necessary to address the peculiarities of Puget Sound. On remand, the Court of Appeals or District Court should consider **[\*\*\*94]** whether the remaining regulations are preempted under Title I conflict pre-emption or Title II field pre-emption, or are otherwise pre-empted by these Titles or under any other federal law or international agreement raised as possible sources of pre-emption.

We have determined that Washington's regulations regarding general navigation watch procedures, English language skills, training, and casualty reporting are pre-empted. Petitioners make substantial arguments that the remaining regulations are preempted as well. It is preferable that the remaining claims be considered by the Court of Appeals or by the District Court within the framework we have discussed. The United States did not participate in **[\*117]** these cases until appeal. Resolution of these cases would benefit from the development of a full record by all interested parties.

We infer from the record that Washington is not now enforcing its regulations. If, pending adjudication of the case on remand, a **[\*\*\*\*49]** threat of enforcement emerges, the Court of Appeals or the District Court would weigh any application for stay under the appropriate legal standards in light of the principles we have discussed and with recognition of the national interests at stake.

529 U.S. 89; 120 S. Ct. 1135; 146 L. Ed. 2d 69; 2000 U.S. LEXIS 1895; 68 U.S.L.W. 4184; 50 ERC (BNA) 1097; 2000 OSHD (CCH) P32,038; 2000 AMC 913; 2000 Cal. Daily Op. Service 1763; 2000 Daily Journal DAR 2409; 30 ELR 20438; 2000 Colo. J. C.A.R. 1233; 13 Fla. L. Weekly Fed. S 151

When one contemplates the weight and immense mass of oil ever in transit by tankers, the oil's proximity to coastal life, and its destructive power even if a spill occurs far upon the open sea, international, federal, and state regulation may be insufficient protection. Sufficiency, however, is not the question before us. The issue is not adequate regulation but political responsibility; and it is, in large measure, for Congress and the Coast Guard to confront whether their regulatory scheme, which demands a high degree of uniformity, is adequate. States, as well as environmental groups and local port authorities, will participate in the process. See 46 U.S.C. § 3703(a) (requiring the Coast Guard to consider the views of "officials of State and local governments," "representative of port and harbor authorities," and "representatives of environmental groups" in arriving at national standards). The judgment of the [****50] Court of Appeals is reversed, and remand for further proceedings consistent with this opinion.

It is so ordered.

APPENDIX TO OPINION OF THE COURT

"1. Event Reporting -- WAC 317-21-130. Requires operators to report all events such as collisions, allisions and near-miss incidents for the five years preceding filing of a [*118] prevention plan, and all events that occur thereafter for tankers that operate in Puget Sound. [**1153]

"2. Operating Procedures -- [Watch Practices WAC-317-21-200.] Requires tankers to employ specific watch and lookout practices while navigating and when at anchor, and requires a bridge resource management system that is the 'standard practice throughout the owner's or operator's fleet,' and which organizes responsibilities and coordinates communication between members of the bridge.

"3. Operating Procedures -- Navigation WAC -- 317-21-205. Requires tankers in navigation in state waters to record positions every fifteen minutes, to write a comprehensive voyage plan before entering state waters, [***95] and to make frequent compass checks while under way.

"4. Operating Procedures -- Engineering WAC -- 317-21-210. Requires tankers in state waters to follow specified engineering [****51] and monitoring practices.

"5. Operating Procedures -- Prearrival Tests and Inspections WAC -- 317-21-215. Requires tankers to undergo a number of tests and inspections of engineering, navigation and propulsion systems twelve hours or less before entering or getting underway in state waters.

"6. Operating Procedures -- Emergency Procedures WAC -- 317-21-220. Requires tanker masters to post written crew assignments and procedures for a number of shipboard emergencies.

"7. Operating Procedures -- Events WAC -- 317-21-225. Requires that when an event transpires in state waters, such as a collision, allision or near miss incident, the operator is prohibited from erasing, discarding or altering the position plotting records and comprehensive written voyage plan.

"8. Personnel Policies, Training -- WAC -- 317-21-230. Requires operators to provide a comprehensive training program for personnel that goes beyond that necessary to obtain a license or merchant marine document, and which includes instructions on a number of specific procedures. [*119]

"9. Personnel Policies -- Illicit Drugs and Alcohol Use -- WAC 317-21-235. Requires drug and alcohol testing and reporting.

"10. Personnel Policies [****52] -- Personnel Evaluation -- WAC 317-21-240. Requires operators to monitor the fitness for duty of crew members, and requires operators to at least annually provide a job performance and safety evaluation for all crew members on vessels covered by a prevention plan who serve for more than six months in a year.

"11. Personnel Policies -- Work Hours WAC -- 317-21-245. Sets limitations on the number of hours crew members may work.

"12. Personnel Policies -- Language WAC -- 317-21-250. Requires all licensed deck officers and the vessel master to be proficient in English and to speak a language understood by subordinate officers and unlicensed crew. Also requires all written instruction to be printed in a language understood by the licensed officers and unlicensed crew.

"13. Personnel Policies -- Record Keeping WAC -- 317-21-255: Requires operators to maintain training records for crew members assigned to vessels covered by a prevention plan.

"14. Management WAC -- 317-21-260. Requires operators to implement management practices that demonstrate active monitoring of vessel operations and maintenance, personnel training, development, and fitness, and technological improvements in navigation. [****53]

529 U.S. 89; 120 S. Ct. 1135; 146 L. Ed. 2d 69; 2000 U.S. LEXIS 1895; 68 U.S.L.W. 4184; 50 ERC (BNA) 1097; 2000 OSHD (CCH) P32,038; 2000 AMC 913; 2000 Cal. Daily Op. Service 1763; 2000 Daily Journal DAR 2409; 30 ELR 20438; 2000 Colo. J. C.A.R. 1233; 13 Fla. L. Weekly Fed. S 151

"15. Technology WAC -- 317-21-265. Requires tankers to be equipped with global positioning system receivers, two separate radar systems, and an emergency towing system. [**1154]

"16. Advance Notice of Entry and Safety Reports WAC -- 317-21-540. Requires at least twenty-four hours notice prior to entry of a tanker into state waters, and requires that the [***96] notice report any conditions that pose a hazard to the vessel or the marine environment." 148 F.3d at 1058 (footnote omitted).

**REFERENCES:**
Return To Full Text Opinion


Go to Supreme Court Briefs

Go to Supreme Court Brief(s)

Go to Oral Argument Transcript

70 Am Jur 2d, Shipping 84, 86, 714; 72 Am Jur 2d, States, Territories, and Dependencies 18

33 USCS 1228(a)(7); 46 USCS 3703(a), 6101

L Ed Digest, States, Territories, and Possessions 36

L Ed Index, Gas and Oil; Ports and Waterways Safety Act; Preemption and Preemptive Rights; Ships and Shipping

Annotation References:

Damages compensable under federal maritime law for injuries [****54] caused by discharge of oil into navigable waters. 26 ALR Fed 346.

530 F.2d 576; 1976 U.S. App. LEXIS 13346

United States of America, Appellee, v. Jerome Delton Harris, Appellant

No. 75-1424

UNITED STATES COURT OF APPEALS FOR THE FOURTH CIRCUIT

530 F.2d 576; 1976 U.S. App. LEXIS 13346

November 6, 1975, Submitted
January 15, 1976, Decided

**PRIOR HISTORY:** [**1]

 Appeal from the United States District Court for the Eastern District of Virginia, at Richmond. Robert R. Merhige, Jr., District Judge.

**DISPOSITION:** Affirmed.

## CASE SUMMARY

**PROCEDURAL POSTURE:** Defendant appealed the order of the United States District Court for the Eastern District of Virginia at Richmond, which convicted him of bank robbery in violation of 18 U.S.C.S. § 2113(a), complaining that the trial court erred in denying several motions pertaining to the sufficiency of the evidence and in denying his motion for a new trial, the motion being based on the ground that one of the jurors may have been biased against him.

**OVERVIEW:** Defendant appealed his conviction for bank robbery, complaining that the trial court erred in denying several motions about the sufficiency of the evidence and in denying his motion for a new trial because one of the jurors may have been biased against him and that the trial court lacked jurisdiction. The court affirmed because the bank was a federally chartered institution within the federal court's jurisdiction regardless of its insured status with the Federal Deposit Insurance Corporation. The court found substantial evidence to affirm the jury's verdict beyond a reasonable doubt including that the robbery was carried out by intimidation because the bank teller testified that she was put in fear when defendant, after handing her a written note stating "this is a holdup," placed his hand in his pocket in such a manner that she assumed he had a weapon. No mention was made at trial of any challenge to a juror defendant knew until after the jury returned its verdict. Because the basis for a challenge to a juror could have been timely shown, the failure of defendant to object at the inception of the trial constituted a waiver of his right to challenge the jury composition.

**OUTCOME:** The court affirmed the judgment of the district court which convicted defendant of robbing a national bank.

**CORE TERMS:** insured, national bank, fingerprint evidence, fingerprint, indictment, deposit, juror, substantial evidence, confession, robbed, federal jurisdiction, probative value, bank robbery, bank teller, new trial, admissibility, questionable, intimidation, convicted, chartered, impressed, coverage, violence, weapon, prints, banking institution

### LexisNexis(TM) Headnotes

*Criminal Law & Procedure > Criminal Offenses > Property Crimes > Burglary & Criminal Trespass*

[HN1]The term "bank" as used in 18 U.S.C.S. § 2113(a) is defined by 18 U.S.C.S. § 2113(f) as: any member bank of the Federal Reserve System, any bank, banking association, trust company, savings bank, or other banking institution organized or operating under the laws of the United States, or any bank the deposits of which are insured by the Federal Deposit Insurance Corporation (FDIC). If a bank is described by its chartered name as a "National Bank," the court can take judicial notice that the bank is, in fact, a national bank. The determination that a bank that was robbed is a national bank is sufficient to identify it as one organized or operating under the laws of the United States, and thus within the purview of 18 U.S.C.S. §§ 2113(a) and (f). An allegation in an indictment that a defendant robbed a national bank is sufficient to establish jurisdiction under 18 U.S.C.S. § 2113(a). If a bank is a national bank, it is within the coverage of § 2113(a) regardless of its insured status with the FDIC.

*Civil Procedure > Jurisdiction > Subject Matter Jurisdiction > Federal Question Jurisdiction*

[HN2]Federal jurisdiction is properly established under 18 U.S.C.S. § 2113(a) where the bank that is robbed is either a federally chartered institution or a banking institution whose deposits are insured by the Federal Deposit Insurance Corporation.

**26**

*Civil Procedure > Appeals > Standards of Review > Substantial Evidence Rule*

[HN3]An appellate court must sustain the verdict of a jury if there is substantial evidence, taking the view most favorable to the government, to support the findings of guilt.

*Criminal Law & Procedure > Criminal Offenses > Crimes Against the Person > Robbery*

*Criminal Law & Procedure > Appeals > Standards of Review > Substantial Evidence Review*

[HN4]Evidence is sufficient to prove, as required by 18 U.S.C.S. § 2113(a), that a robbery was carried out by force and violence, or by intimidation if the defendant placed his hand in his pocket in such a manner that the teller assumed he had a weapon and was placed in fear. Although no weapon is shown and no verbal threat is made, the jury could properly conclude from this evidence that the defendant's conduct was reasonably calculated to produce fear.

*Criminal Law & Procedure > Evidence > Admission, Exclusion & Preservation*

[HN5]If no objection is made to the admissibility of evidence at trial and the admission of the evidence is not plain error, it is unnecessary to consider this point on appeal. Fed. R. Crim. P. 52(b).

*Criminal Law & Procedure > Juries & Jurors > Challenges for Cause*

[HN6]Where the basis for a challenge to a juror could be timely shown, the failure of the defendant to object at the inception of the trial constitutes a waiver of his right to challenge the composition of the jury.

**COUNSEL:** Clinton B. Corry, Jr., [Court-appointed counsel], for Appellant.

Charles L. Beard, Assistant United States Attorney, for Appellee.

**JUDGES:** Boreman, Senior Circuit Judge, and Winter and Craven, Circuit Judges.

**OPINIONBY:** PER CURIAM

**OPINION:** [*577] The appellant, Jerome Delton Harris, was convicted by a jury of bank robbery in violation of 18 U.S.C. § 2113(a). He has appealed, complaining that the trial court erred in denying several motions pertaining to the sufficiency of the evidence and in denying his motion for a new trial, the motion being based on the ground that one of the jurors may have been biased against him.

[*578] The record shows that the indictment charged that the appellant "did, by force, violence, and intimidation, take and attempt to take . . . money belonging to and in the care, custody, control, management, and possession of the Richmond National Bank" in violation of 18 U.S.C. § 2113(a). The indictment also specifically charged that "the [**2] deposits of [the] bank were then and there insured by the Federal Deposit Insurance Corporation." At trial, the bank manager testified that the bank was a national bank, and that it was her understanding that it had been insured by the Federal Deposit Insurance Corporation (FDIC) since 1966. The government also introduced a certificate issued to the "Richmond National Bank" by the FDIC in 1969. The appellant did not offer any evidence to contradict the government's evidence that the bank was a national bank and was insured by the FDIC. At the conclusion of the presentation of the government's evidence, however, Harris moved for a judgment of acquittal, urging that there was insufficient evidence to prove that the bank deposits were insured by FDIC. This motion was denied, and Harris argues that the district court's ruling constitutes reversible error. We affirm the judgment of the district court.

[HN1]The term "bank" as used in § 2113(a) is defined by § 2113(f) as: (1) any member bank of the Federal Reserve System, (2) any bank, banking association, trust company, savings bank, or other banking institution organized or operating under the laws of the United States, *or* (3) any bank [**3] the deposits of which are insured by the Federal Deposit Insurance Corporation.

If a bank is described by its chartered name as a "National Bank," the district court and this court can take judicial notice that the bank is, in fact, a national bank. See *United States v. Mauro*, 501 F.2d 45 (2 Cir. 1974), *cert. denied*, 419 U.S. 969, 42 L. Ed. 2d 186, 95 S. Ct. 235 (1974). The determination that a bank which has been robbed is a national bank is sufficient to identify it as one organized or operating under the laws of the United States, and thus within the purview of 18 U.S.C. §§ 2113(a) and (f). 501 F.2d at 48. We conclude that the allegation in the indictment that the appellant robbed "The Richmond National Bank" is sufficient to establish jurisdiction under 18 U.S.C. § 2113(a).

Since the bank was a national bank, as its official name clearly discloses, it was within the coverage of § 2113(a) regardless of its insured status with the FDIC. *Mauro, supra; Schoepflin v. United States*, 391 F.2d 390 (9 Cir. 1968), *cert. denied*, 393 U.S. 865, 21 L. Ed. 2d 133, 89 S. Ct. 146 (1968); [**4] *cf. United States v. Harper*, 241 F.2d 103 (7 Cir. 1957). Although the government may rely upon more than one basis for asserting jurisdiction in a prosecution under § 2113, the allegation in the indictment as to FDIC coverage

was mere surplusage and, as such, it may be properly disregarded. n1 *Mauro, supra*, 501 F.2d at 49.

- - - - - - - - - - - - - - Footnotes - - - - - - - - - - - - - - - -

n1 Harris complains that the district judge infringed upon the province of the jury by determining as a matter of law that the bank was insured by the FDIC. We find no merit in this complaint since federal jurisdiction was clearly established in this case without determining that the bank was so insured.

- - - - - - - - - - - - End Footnotes- - - - - - - - - - - - - -

While this appeal was being considered Harris sought and was granted permission to file a supplemental brief. In it he presents the further contention that the district court lacked jurisdiction because the statute under which he was convicted is unconstitutional to the extent that it purports to make bank robbery a federal crime when the bank robbers have [**5] not used the instrumentalities of interstate commerce. We find this contention to be completely without merit. It is beyond question that [HN2]federal jurisdiction is properly established under 18 U.S.C. § 2113(a) where the bank which is robbed is either a federally chartered institution or a banking institution whose deposits are insured by the Federal Deposit Insurance Corporation. Other courts have rejected arguments "challenging" federal jurisdiction on constitutional grounds similar to those [*579] presented by the appellant. *See, e.g., United States v. Phillips*, 482 F.2d 191 (8 Cir.), *cert. denied*, 414 U.S. 1114, 38 L. Ed. 2d 741, 94 S. Ct. 846 (1973); *United States v. Allen*, 458 F.2d 988 (3 Cir.), *cert. denied*, 406 U.S. 970, 32 L. Ed. 2d 670, 92 S. Ct. 2429 (1972); *Toles v. United States*, 308 F.2d 590 (9 Cir. 1962), *cert. denied*, 375 U.S. 836, 11 L. Ed. 2d 66, 84 S. Ct. 79 (1963).

Harris further asserts that the jury verdict was not supported by substantial evidence. It is well established, however, that [HN3]this court must sustain the verdict of [**6] a jury "if there is substantial evidence, taking the view most favorable to the government, to support the findings of guilt." *United States v. Sherman*, 421 F.2d 198, 199 (4 Cir. 1970), *cert. denied*, 398 U.S. 914, 26 L. Ed. 2d 78, 90 S. Ct. 1717 (1970). In the instant case the government introduced both fingerprint evidence and testimony of a detailed confession by Harris. Although the appellant repudiated the confession at trial, the government introduced three FBI agents who testified that Harris made a confession. Viewing, in context, the evidence

presented, we find substantial evidence to permit the jury to find a guilty verdict beyond a reasonable doubt.

Harris further contends that [HN4]the evidence was insufficient to prove, as required by § 2113(a), that the robbery was carried out "by force and violence, or by intimidation." The bank teller testified that Harris, after handing her a written note stating "this is a holdup," placed his right hand in his pocket in such a manner that she assumed he had a weapon and that she was placed in fear. Although no weapon was shown and no verbal threat was made, the jury could properly conclude from this [**7] evidence that the defendant's conduct was reasonably calculated to produce fear. *See United States v. Jacquillon*, 469 F.2d 380 (5 Cir. 1972), *cert. denied*, 410 U.S. 938, 35 L. Ed. 2d 604, 93 S. Ct. 1400 (1973); *United States v. Epps*, 438 F.2d 1192 (4 Cir. 1971).

The appellant also challenges the sufficiency of the fingerprint evidence introduced at the trial. He relies upon this court's decision in *United States v. Corso*, 439 F.2d 956 (4 Cir. 1971), reversing a conviction in part because "the probative value of an accused's fingerprints upon a readily movable object is highly questionable, unless it can be shown that such prints could have been impressed *only* during the commission of the crime." 439 F.2d at 957. Harris contends that the fingerprints identified as his on the written note presented to the bank teller could have been impressed on the paper before the demand was written or presented. Our holding in *Corso* is not dispositive of this question because that opinion merely states that when fingerprint evidence is of questionable probative value, it cannot sustain a conviction if it [**8] is the *only* substantive evidence presented. In the present case, the fingerprint evidence was in addition to the incriminating admissions by the defendant as shown by the government's evidence.

Harris also questions the admissibility of the fingerprint evidence on the grounds that this evidence was not adequately safeguarded before trial and that the government's fingerprint expert relied on photographs of the fingerprints as well as the actual prints. The government's evidence indicated that the fingerprints were protected in accordance with normal police procedures. [HN5]Since no objection was made to the admissibility of this evidence at trial and the admission of the evidence was not plain error, it is unnecessary to consider this point on appeal. *Cf. United States v. Graydon*, 429 F.2d 120 (4 Cir. 1970); *see* Fed.R.Crim.P. 52(b).

Finally, Harris appeals the denial of his motion for a new trial on the ground that one of the jurors knew him before the trial and may have been prejudiced against him. No mention was made at trial of any challenge to

530 F.2d 576; 1976 U.S. App. LEXIS 13346

this juror until after the jury returned its verdict. [HN6]Where the basis for a challenge to a juror could be timely [**9] shown the failure of the defendant to object at the inception of the trial constituted a waiver of his right to challenge the composition of the jury. *United States v. Ragland,* [*580] 375 F.2d 471, 475 (2 Cir. 1967); *Fabian v. United States,* 358 F.2d 187, 191 (8 Cir. 1966), *cert. denied,* 385 U.S. 821, 17 L. Ed. 2d 58, 87 S. Ct. 46 (1966); *Graham v. United States,* 257 F.2d 724, 729 (6 Cir. 1958); *Harbold v. United States,* 255 F.2d 202, 205 (10 Cir. 1958).

Accordingly, we dispense with oral argument and affirm the judgment of the district court.

*Affirmed.*

265 F. Supp. 2d 1162; 2003 U.S. Dist. LEXIS 7870

WELLS FARGO BANK, N.A., and WELLS FARGO HOME MORTGAGE, INC., Plaintiffs, v. DEMETRIOS A. BOUTRIS, in his official capacity as Commissioner of the California Department of Corporations, Defendant.

CIV. NO. S-03-0157 GEB JFM

UNITED STATES DISTRICT COURT FOR THE EASTERN DISTRICT OF CALIFORNIA

265 F. Supp. 2d 1162; 2003 U.S. Dist. LEXIS 7870

May 9, 2003, Decided
May 9, 2003, Filed

**PRIOR HISTORY:** Wells Fargo Bank, N.A. v. Boutris, 252 F. Supp. 2d 1065, 2003 U.S. Dist. LEXIS 4192 (E.D. Cal., Mar. 10, 2003)

**DISPOSITION:** Plaintiffs' motion for summary judgment was granted. Judgment was entered for Plaintiffs.

## CASE SUMMARY

**PROCEDURAL POSTURE:** Plaintiff national bank and its subsidiary sued defendant state corporations commissioner, alleging that the state's power to regulate the subsidiary was preempted by the National Bank Act and the state's per diem interest rate statutes were preempted by the Depository Institutions Deregulation Monetary Control Act (DIDMCA). They also asserted claims under 42 U.S.C.S. § 1983. The parties cross-moved for summary judgment.

**OVERVIEW:** The Office of the Comptroller of the Currency's (OCC's) regulation authorizing national banks to conduct permissible banking business activities through operating subsidiaries was within its discretionary authority and was a reasonable interpretation of the National Bank Act. Thus, the subsidiary was an operating subsidiary. The commissioner had no visitorial powers over the subsidiary as the OCC had authority to enact 12 C.F.R. § 7.4006, which limited the application of state law to subsidiaries of national banks, and the OCC's visitorial powers were exclusive. The OCC's exclusive visitorial regulation did not violate state constitutional sovereignty under the Tenth Amendment given congressional authority to establish national banks. The state per diem statutes were preempted by the DIDMCA as they were usury laws that prevented a lender from charging a specific pre-determined amount of interest and placed a ceiling on the interest rate and amount. The retaliation and 42 U.S.C.S. § 1983 claims failed. The commissioner was permanently enjoined from exercising visitorial powers and from enforcing Cal. Fin. Code § 50204(o) and Cal. Civ. Code § 2948.5 against the bank and subsidiary.

**OUTCOME:** The bank's and subsidiary's summary judgment motion was granted with respect to the Supremacy Clause claims, while the commissioner's summary judgment motion was granted with respect to the retaliation and other claims.

**CORE TERMS:** subsidiary, national bank, visitorial, mortgage, per diem, lender, license, regulation, amount of interest, regulatory authority, federal law, deed of trust, usury laws, preemption, lending, borrower, National Bank Act, preempt, recordation, residential, licensing, business of banking, summary judgment, real estate, retaliation, preempted, banking, usury, banking business, revocation

### LexisNexis(TM) Headnotes

*Banking Law > National Banks > Affiliates & Subsidiaries*

[HN1]See 12 C.F.R. § 7.4006.

*Banking Law > National Banks > Affiliates & Subsidiaries*

[HN2]Under 12 C.F.R. § 7.4006, an operating subsidiary of a national bank is considered to be an instrumentality of the federal government subject to the paramount authority of the United States.

*Constitutional Law > Supremacy Clause*

*Administrative Law > Separation & Delegation of Power > Legislative Controls*

[HN3]Whether a federal agency's promulgation of a regulation is within the sphere of authority delegated to it by Congress depends on congressional intent gleaned from the statute governing the federal agency. Preemption may be either express or implied, and is compelled whether Congress' command is explicitly stated in the statute's language or implicitly contained in its structure and purpose. When explicit pre-emption language does not appear, or does not directly answer the question, courts must consider whether the federal statute's structure and purpose or nonspecific statutory language, nonetheless reveal a clear, but implicit, pre-

emptive intent. A federal statute, for example, may create a scheme of federal regulation so pervasive as to make reasonable the inference that Congress left no room for the states to supplement it. Alternatively, federal law may be in irreconcilable conflict with state law. Compliance with both statutes, for example, may be a physical impossibility or the state law may stand as an obstacle to the accomplishment and execution of the full purposes and objectives of Congress.

*Constitutional Law > Supremacy Clause*

*Administrative Law > Separation & Delegation of Power > Legislative Controls*

[HN4]Federal regulations have no less pre-emptive effect than federal statutes.

*Banking Law > Federal Acts > National Bank Act*

[HN5]National banks are created and governed by the National Bank Act. The Act was enacted to facilitate a national banking system and to protect national banks against intrusive regulation by the states. The Act constitutes by itself a complete system for the establishment and government of national banks.

*Banking Law > Federal Acts > National Bank Act*

[HN6]The National Bank Act provides that national banks shall have power to exercise all such incidental powers as shall be necessary to carry on the business of banking; by discounting and negotiating promissory notes, drafts, bills of exchange, and other evidences of debt; by receiving deposits; by buying and selling exchange, coin, and bullion; by loaning money on personal security; and by obtaining, issuing, and circulating notes. 12 U.S.C.S. § 24 (Seventh).

*Banking Law > Federal Acts > National Bank Act*

*Banking Law > Regulatory Agencies > Office of the Comptroller of the Currency*

[HN7]The Office of the Comptroller of Currency is the administrator charged with supervision of the National Bank Act and bears primary responsibility for surveillance of the business of banking authorized by 12 U.S.C.S. § 24 (Seventh).

*Banking Law > Federal Acts > National Bank Act*

*Banking Law > Regulatory Agencies > Office of the Comptroller of the Currency*

[HN8]See 12 U.S.C.S. § 484(a).

*Banking Law > Regulatory Agencies > Office of the Comptroller of the Currency*

[HN9]See 12 U.S.C.S. § 481.

*Banking Law > Federal Acts > National Bank Act*

*Banking Law > Regulatory Agencies > Office of the Comptroller of the Currency*

[HN10]Incidental powers in 12 U.S.C.S. § 24 (Seventh) include activities that are convenient or useful in connection with the performance of one of the bank's established activities pursuant to its express powers under the National Bank Act. The business of banking is not limited to the enumerated powers in § 24 (Seventh). Therefore, the Office of the Comptroller of the Currency has discretion to authorize activities beyond those specifically enumerated. The exercise of the Comptroller's discretion, however, must be kept within reasonable bounds.

*Banking Law > National Banks > Affiliates & Subsidiaries*

[HN11]Under 12 C.F.R. § 5.34, a national bank may conduct in an operating subsidiary activities that are permissible for a national bank to engage in directly either as part of, or incidental to, the business of banking, as determined by the Office of the Comptroller of the Currency, or otherwise under other statutory authority. 12 C.F.R. § 5.34(e)(3) provides that an operating subsidiary conducts activities authorized under 12 C.F.R. § 5.34 pursuant to the same authorization, terms and conditions that apply to the conduct of such activities by its parent national bank.

*Banking Law > National Banks > Affiliates & Subsidiaries*

[HN12]Before a national bank can be authorized to conduct permissible banking activities through an operating subsidiary, the bank must comply with the Office of the Comptroller of the Currency's licensing requirements.

*Banking Law > National Banks > Affiliates & Subsidiaries*

[HN13]See 12 C.F.R. § 5.34(b).

*Banking Law > National Banks > Affiliates & Subsidiaries*

[HN14]See 12 C.F.R. § 5.34(e)(5)(iii).

*Banking Law > National Banks > Affiliates & Subsidiaries*

[HN15]See 12 U.S.C.S. § 24a(g)(3).

*Banking Law > Regulatory Agencies > Office of the Comptroller of the Currency*

*Banking Law > National Banks > Affiliates & Subsidiaries*

[HN16]Court decisions determining whether a particular activity is permissible for a national bank have treated the activities of an operating subsidiary as

being equivalent to the activities of the national bank. It is pellucid that the powers of national banks must be construed so as to permit the use of new ways of conducting the very old business of banking. It is also clear that the Office of the Comptroller of the Currency has been delegated the authority to determine, with considerable discretion, whether national banks may conduct banking business through operating subsidiaries.

*Banking Law > Regulatory Agencies > Office of the Comptroller of the Currency*

*Banking Law > National Banks > Affiliates & Subsidiaries*

[HN17]According to the United States District Court for the Eastern District of California, the Office of the Comptroller of the Currency's regulation authorizing national banks to conduct permissible banking business activities through operating subsidiaries is within its discretionary authority delegated to it by Congress and is a reasonable interpretation of the National Banking Act.

*Banking Law > Federal Acts > National Bank Act*

*Banking Law > Regulatory Agencies > Office of the Comptroller of the Currency*

[HN18]The Office of the Comptroller of the Currency's determination as to what activities are authorized under the National Bank Act is to be sustained if reasonable.

*Banking Law > National Banks > Bank Powers*

[HN19]Under 12 U.S.C.S. § 371, national banks may make, arrange, purchase, or sell loans or extensions of credit secured by liens on interests in real estate.

*Banking Law > Federal Acts > National Bank Act*

*Banking Law > Regulatory Agencies > Office of the Comptroller of the Currency*

[HN20]A regulation promulgated by the Office of the Comptroller of the Currency (OCC) is to be upheld if it is a reasonable interpretation of 12 U.S.C.S. § 24 (Seventh). Since the OCC is the regulator of national banks and administrator of the National Bank Act, its position on its authority to enact a regulation is entitled to great weight.

*Banking Law > Regulatory Agencies > Office of the Comptroller of the Currency*

*Banking Law > National Banks > Affiliates & Subsidiaries*

[HN21]See 12 C.F.R. § 5.34(e)(3).

*Banking Law > National Banks > Bank Powers*

*Banking Law > Federal Acts > National Bank Act*

[HN22]State attempts to control the conduct of national banks are void if they conflict with federal law, frustrate the purposes of the National Bank Act, or impair the efficiency of national banks to discharge their duties.

*Constitutional Law > Congressional Duties & Powers > Reserved Powers*

[HN23]See U.S. Const. amend. X.

*Banking Law > National Banks > Bank Powers*

*Constitutional Law > Congressional Duties & Powers > Reserved Powers*

[HN24]It has long been recognized that the United States Constitution authorizes Congress to establish national banks.

*Banking Law > Federal Acts > Depository Institutions Deregulation & Monetary Control Act*

[HN25]See 12 U.S.C.S. § 1735f-7a(a).

*Banking Law > Federal Acts > Depository Institutions Deregulation & Monetary Control Act*

[HN26]See 12 U.S.C.S. § 1725f-5(b).

*Banking Law > Federal Acts > Depository Institutions Deregulation & Monetary Control Act*

[HN27]For purposes of 12 U.S.C.S. § 1725f-5(b), a creditor is a person who both (1) regularly extends, whether in connection with loans, sales of property or services, or otherwise, consumer credit which is payable by agreement in more than four installments or for which the payment of a finance charge is or may be required, and (2) is the person to whom the debt arising from the consumer credit transaction is initially payable on the face of the evidence of indebtedness or, if there is no such evidence of indebtedness, by agreement. 15 U.S.C.S. § 1602(f).

*Banking Law > Bank Activities > Securities Activities > Mortgage-Backed Securities*

[HN28]See Cal. Civ. Code § 2948.5.

*Banking Law > Bank Activities > Securities Activities > Mortgage-Backed Securities*

[HN29]Under the California Residential Mortgage Lending Act, a licensee may not require a borrower to pay interest on the mortgage loan for a period in excess of one day prior to recording of the mortgage or deed of trust, except under certain circumstances. Cal. Fin. Code § 50204(o).

*Banking Law > Federal Acts > Depository Institutions Deregulation & Monetary Control Act*

265 F. Supp. 2d 1162; 2003 U.S. Dist. LEXIS 7870

[HN30]The Depository Institutions Deregulation Monetary Control Act of 1980 (DIDMCA) preempts the provisions of the constitution or the laws of any state expressly limiting the rate or amount of interest, discount points, finance charges, or other charges which may be charged, taken, received, or reserved on particular types of loans. 12 U.S.C.S. § 1735f-7a(a). The language of the statute does not expressly limit the preemptive scope of DIDMCA to state usury laws. But the relevant legislative history makes clear that Congress just intended to create a limited preemption of state usury laws.

*Banking Law > National Banks > Interest & Usury*

*Banking Law > Federal Acts > Depository Institutions Deregulation & Monetary Control Act*

[HN31]For purposes of the Depository Institutions Deregulation Monetary Control Act of 1980, usury is the receiving, securing, or taking of a greater sum or value for the loan or forbearance of money, goods, or things in action than is allowed by law, the exaction of a greater sum for the use of money than the highest rate of interest allowed by law. In California, usury has been defined as taking more than the law allows upon a loan or for forbearance of a debt. By prohibiting lenders from commencing to charge interest on loaned mortgage funds until one day prior to recordation, California's per diem statutes constitute usury laws.

*Real & Personal Property Law > Deeds & Recording > Bona Fide Purchasers*

[HN32]Once the lender distributes funds to the borrower, the borrower has received the benefit of the bargain. The act of recordation of the mortgage or deed of trust simply provides constructive notice of the contents of the recorded documents to third parties.

*Governments > Legislation > Interpretation*

[HN33]When engaged in the task of statutory interpretation, courts should attempt to give meaning to each word and phrase.

*Banking Law > Federal Acts > Depository Institutions Deregulation & Monetary Control Act*

[HN34]According to the United States District Court for the Eastern District of California, California's per diem statutes limit the time during which interest can be charged by prohibiting a lender from charging interest on loaned mortgage funds for a period in excess of one day prior to recordation of the mortgage. Cal. Civ. Code § 2948.5; Cal. Fin. Code § 50204(o). By restricting the time period in which a lender may collect interest on loaned mortgage funds, the language of the per diem statutes expressly limits the rate or amount of interest which may be charged. Therefore,

the Depository Institutions Deregulation Monetary Control Act of 1980 preempts California's per diem statutes.

*Constitutional Law > Civil Rights Enforcement > Civil Rights Act of 1871 > Coverage*

[HN35]According to the United States Court of Appeals for the Ninth Circuit, although the Supremacy Clause can be used to enjoin enforcement of a state statute that runs afoul of a federal legislative scheme, it does not provide a basis for a claim under 42 U.S.C.S. § 1983.

*Constitutional Law > Civil Rights Enforcement > Civil Rights Act of 1871 > Protected Rights*

[HN36]For purposes of 42 U.S.C.S. § 1983, an enforceable statutory right arises when (1) the plaintiff is an intended beneficiary of the statutory provision at issue, (2) the statute creates a binding obligation rather than merely a congressional preference for a certain kind of conduct, and (3) the plaintiff's interest is not so vague and amorphous as to be beyond the competence of the judiciary to enforce.

*Civil Procedure > Injunctions > Permanent Injunctions*

[HN37]The requirements for the issuance of a permanent injunction are the likelihood of substantial and immediate irreparable injury and the inadequacy of remedies at law. To meet this standard, the plaintiffs must establish actual success on the merits, and that the balance of equities favors injunctive relief. Where an injunction is sought against an agency of state government, the injunction must be scrutinized closely to make sure that the remedy protects the plaintiffs' federal constitutional and statutory rights but does not require more of state officials than is necessary to assure their compliance with federal law. This requires both that there be a determination that the conduct of the state officials violates federal constitutional law and that the scope of the injunction is no broader than necessary to provide complete relief to the named plaintiffs.

COUNSEL: [**1] For WELLS FARGO BANK, NA, WELLS FARGO HOME MORTGAGE, plaintiffs: William L. Stern, Severson and Werson, San Francisco, CA. E Edward Bruce, PRO HAC VICE, Stuart C Stock, PRO HAC VICE, Robert A Long, Jr, PRO HAC VICE, Keith A Noreika, PRO HAC VICE, Covington and Burling, Washington, DC.


For OFFICE OF THE COMPTROLLER OF THE CURRENCY, amicus: Horace G Sneed, Office of the Comptroller of the Currency, Washington, DC.

265 F. Supp. 2d 1162; 2003 U.S. Dist. LEXIS 7870

For DEMETRIOS A BOUTRIS, defendant: Judy Lynn Hartley, State of California, Department of Corporations, Los Angeles, CA.

**JUDGES:** GARLAND E. BURRELL, JR., UNITED STATES DISTRICT JUDGE.

**OPINIONBY:** GARLAND E. BURRELL, JR.

**OPINION:** [*1163] ORDER

Pending are cross-motions for summary judgment involving all claims in this action. This dispute concerns preemption under the National Bank Act ("the Act") of California's power to regulate an operating subsidiary of a national bank; whether a California official is liable for retaliation and 42 U.S.C. § 1983 claims for his exercise of state regulatory authority over that operating subsidiary; and, whether the Depository Institutions Deregulation Monetary Control Act of 1980 ("DIDMCA") preempts California's per diem interest [**2] statutes. n1

- - - - - - - - - - - - - - Footnotes - - - - - - - - - - - - - - - -

n1 California's per diem statutes prohibit mortgage lenders from charging any interest on residential mortgages for a period in excess of one day prior to recordation of the mortgage or deed of trust. See Cal. Fin. Code § 50204(o); Cal. Civ. Code § 2948.5.

- - - - - - - - - - - End Footnotes- - - - - - - - - - - - - -

Plaintiffs Wells Fargo Bank, N.A. ("Wells Fargo") and Wells Fargo Home Mortgage, Inc. ("WFHMI") move for summary judgment and a permanent injunction. Plaintiffs seek to permanently enjoin Defendant Demetrios Boutris, in his official capacity as the Commissioner of the California Department of Corporations ("Commissioner"), and his agents, "from exercising visitorial powers over Plaintiffs, or from otherwise preventing or interfering [**1164] with WFHMI's operations in California." (Pls.' Memo. of P. & A. in Support of Mot. for Summ. J. ("Pls.' Memo.") at 3.) The Office of the Comptroller of Currency ("OCC") participated as *amicus curiae* in this case. The Commissioner opposes the motion and moves for summary judgment on all claims or in the [**3] alternative for partial summary judgment. (Def.'s Memo. of P. & A. in Support of Mot. for Summ. J. ("Def's Memo.") at 1.) The Commissioner also argues that Wells Fargo lacks standing since he is not seeking to exercise his regulatory authority over Wells Fargo. Wells Fargo rejoins it has standing because it makes residential mortgage loans through its operating

subsidiary WFHMI and thus has sufficient interest in this action. Wells Fargo has standing.

The motions were argued May 5, 2003.

BACKGROUND

Wells Fargo is a federally chartered national banking association that is organized and exists under the National Bank Act, 12 U.S.C. § 21 *et seq.* (Pls.' Statement of Undisputed Facts ("Pls.' SUF") P 1.) WFHMI is a state-chartered corporation, which is a wholly owned operating subsidiary of Wells Fargo. (Id. P 2; Def.'s Statement of Undisputed Facts ("Def.'s SUF") P 3.) WFHMI makes more than $ 1 million in first-lien residential mortgage loans in California per year. (Pls.' SUF PP 3, 5.) Since 1996 until sometime in 2003 WFHMI held licenses to engage in real estate lending activities under the California Residential Mortgage Lending Act ("CRMLA") and [**4] the California Finance Lenders Law ("CFLL"). n2 (Def.'s SUF P 5.)

- - - - - - - - - - - - - - Footnotes - - - - - - - - - - - - - - - -

n2 At the May 5 hearing, Plaintiffs' counsel stated that subsequent to the March 10, 2003, preliminary injunction hearing in this action the Commissioner revoked WFHMI's CRMLA and CFLL licenses.

- - - - - - - - - - - End Footnotes- - - - - - - - - - - - - -

The Commissioner is charged with enforcing the CRMLA, the CFLL, and California Financial Code § 50204(o) (a per diem statute) against CRMLA licensees. (Id. P 6.) The Commissioner asserted regulatory, supervisory, examination and enforcement authority over WFHMI since it was a licensee under both the CRMLA and CFLL. (Id.) In August 2001 and at subsequent times, the Commissioner instituted regulatory examinations of WFHMI under the CFLL. (Id. P 17; Pls.' Response to Def.'s SUF P 17.)

On or about December 4, 2002, the Commissioner demanded that WFHMI conduct an audit of its residential mortgage loans made in California during 2001 and 2002. (Def.'s SUF P 18.) The purpose of the audit was to identify all loans where WFHMI charged per diem [**5] interest in violation of California Financial Code § 50204(o), so that WFHMI could make appropriate refunds, and identify instances of understating finance charges in violation of the federal Truth in Lending Act.(Id.) WFHMI objected to the Commissioner's request in a letter dated January 22, 2003, in which it asserted because it is an operating

Case 1:04-cv-11954-RCL    Document 13-6    Filed 03/24/2005    Page 57 of 68

265 F. Supp. 2d 1162; 2003 U.S. Dist. LEXIS 7870

subsidiary of a national bank it is subject to the OCC's exclusive regulatory authority. (Id. P 20.)

Subsequently, on January 27, 2003, Plaintiffs filed this federal lawsuit against the Commissioner. The Commissioner instituted administrative proceedings to revoke WFHMI's licenses under CRMLA and CFLL on February 4, 2003. (Id. P 23.) Plaintiffs unsuccessfully sought to enjoin those revocation proceedings. n3 Plaintiffs prevailed on the portion of their [*1165] preliminary injunction motion which sought to enjoin the Commissioner from exercising visitorial powers over Plaintiffs or from otherwise preventing WFHMI from conducting mortgage lending business in California.

- - - - - - - - - - - - - - Footnotes - - - - - - - - - - - - - - -

n3 This portion of Plaintiffs' preliminary injunction motion was denied because Plaintiffs' argument that WFHMI was entitled to keep its California mortgage lending licenses even though WFHMI had not complied with its licensing requirements and asserted those licenses were unnecessary for it to conduct its mortgage lending business in California was found unpersuasive.

- - - - - - - - - - - - End Footnotes- - - - - - - - - - - - -

**[**6]**

DISCUSSION n4

- - - - - - - - - - - - - - Footnotes - - - - - - - - - - - - - - -

n4 Summary judgment standards are well-known and will not be repeated unless relevant to a point decided.

- - - - - - - - - - - - End Footnotes- - - - - - - - - - - - -

I. Federal Preemption of the Commissioner's Exercise of Visitorial Powers over WFHMI

At the May 5 hearing the Commissioner argued that notwithstanding his revocation of WFHMI's California licenses for its mortgage lending business in California, he still is authorized to exercise visitorial powers over WFHMI. Wells Fargo counters since the OCC is exercising federal visitorial powers over its operating subsidiary WFHMI, the Commissioner is preempted from exercising the same regulatory authority over WFHMI. (Pls.' Memo. at 3.) The OCC

agrees with Plaintiffs' position, stating that "in its capacity as administrator of the national banking system . . . [and] pursuant to 12 U.S.C. § 484 and federal regulations, the OCC has exclusive 'visitorial' power over national banks and their operating subsidiaries except where federal law specifically provides otherwise. [**7] " n5 (OCC Amicus Br. at 2.) The OCC has promulgated 12 C.F.R. § 7.4006, which concerns its exclusive visitorial powers over national banks. Section 7.4006 provides, in pertinent part: [HN1]"unless otherwise provided by Federal law or OCC regulation, State laws apply to national bank operating subsidiaries to the same extent that those laws apply to the parent national bank." [HN2]Section 7.4006 considers an operating subsidiary of a national bank to be an "instrumentality of the federal government . . . subject to the paramount authority of the United States." Bank of America v. City and County of San Francisco, 309 F.3d 551, 561 (9th Cir. 2002).

- - - - - - - - - - - - - - Footnotes - - - - - - - - - - - - - - -

n5 "The term 'visitorial' powers as used in section 484 generally refers to the power of the OCC to 'visit' a national bank to examine its activities and its observance of applicable laws, and encompasses any examination of a national bank's records relative to the conduct of its banking business as well as any enforcement action that may be undertaken for violations of law." (OCC Amicus Br. at 2-3. )

The term "visitorial" power [in section 484] has deep historical roots. "At common law the right of visitation was exercised by the King as to civil corporations, . . . ." One of the earliest interpretations of the OCC's "visitorial power" within the context of . . . the predecessor [statute] to the current section 484, stated:

"Visitation, in law, is the act of a superior or superintending officer, who visits a corporation to examine into its manner of conducting its business, and enforce an observance of its laws and regulations. . . . The word ['visitation' has been defined] to mean 'inspection; superintendence; direction; regulation.'"

Case 1:04-cv-11954-RCL    Document 13-6    Filed 03/24/2005    Page 58 of 68

265 F. Supp. 2d 1162; 2003 U.S. Dist. LEXIS 7870

First Union Nat'l Bank v. Burke, 48 F. Supp. 2d 132, 144 (D. Conn. 1999) (internal citations omitted).

- - - - - - - - - - - End Footnotes- - - - - - - - - - - - -

[**8]

The Commissioner argues nothing in the Act empowered the OCC to issue § 7.4006. (Def.'s Opp'n to Pls.' Mot. for Summ. J. ("Def.'s Opp'n") at 3.) The OCC counters Congress implicitly authorized it to promulgate this regulation in the incidental powers section of 12 U.S.C. § 24 (Seventh), the visitorial powers section in 12 U.S.C. § 484, and through acknowledgment in the Gramm-Leach-Bliley Act ("GLBA") that national banks can have operating subsidiaries. The OCC contends § 7.4006 preempts the Commissioner's authority to exercise visitorial powers over WFHMI.

[HN3]Whether OCC's promulgation of § 7.4006 is within the sphere of authority [*1166] delegated to it by Congress depends on Congressional intent gleaned from the Act. "Preemption may be either express or implied, and 'is compelled whether Congress' command is explicitly 'stated in the statute's language or implicitly contained in its 'structure and purpose.'" Fidelity Federal Savings and Loan Ass'n v. de la Cuesta, 458 U.S. 141, 152-53, 73 L. Ed. 2d 664, 102 S. Ct. 3014 (1982) (citation omitted).

[When] explicit pre-emption language does not appear, or does not [**9] directly answer the question . . . courts must consider whether the federal statute's "structure and purpose" or nonspecific statutory language, nonetheless reveal a clear, but implicit, pre-emptive intent. . . . A federal statute, for example, may create a scheme of federal regulation "so pervasive as to make reasonable the inference that Congress left no room for the States to supplement it." . . . Alternatively, federal law may be in "irreconcilable conflict" with state law. . . . Compliance with both statutes, for example, may be a "physical impossibility," . . .; or, the state law may "stand as an obstacle to the accomplishment and execution of the full purposes and objectives of Congress.

Barnett Bank of Marion County, N.A. v. Nelson, 517 U.S. 25, 31, 134 L. Ed. 2d 237, 116 S. Ct. 1103 (1996) (citations omitted). [HN4]"Federal regulations have no less pre-emptive effect than federal statutes." Fidelity Federal Savings and Loan Ass'n. 458 U.S. at 153-54.

A. National Bank Act

[HN5]National banks are created and governed by the National Bank Act. The Act was enacted to "facilitate . . . 'a national banking system,'" Marquette Nat'l Bank of Minneapolis v. First of Omaha Serv. Corp., 439 U.S. 299, 314-15, 58 L. Ed. 2d 534, 99 S. Ct. 540 (1978) [**10] (quoting Cong. Globe, 38th Cong., 1st Sess., 1451 (1864)), and "to protect national banks against intrusive regulation by the States." Bank of America, 309 F.3d at 561. "The National Bank Act (12 U.S.C. § 21 et seq.) constitutes by itself a complete system for the establishment and government of national banks." Deitrick v. Greaney, 309 U.S. 190, 194, 84 L. Ed. 694, 60 S. Ct. 480 (1940) (quotations and citations omitted). [HN6]The Act provides national banks shall have power

to exercise . . . all such incidental powers as shall be necessary to carry on the business of banking; by discounting and negotiating promissory notes, drafts, bills of exchange, and other evidences of debt; by receiving deposits; by buying and selling exchange, coin, and bullion; by loaning money on personal security; and by obtaining, issuing, and circulating notes. . . .

12 U.S.C. § 24 (Seventh). [HN7]The OCC is the administrator charged with supervision of the Act and bears "primary responsibility for surveillance of 'the business of banking' authorized by § 24 (Seventh)." n6 NationsBank of North Carolina, N.A. v. Variable Annuity Life Ins. Co., 513 U.S. 251, 256, 130 L. Ed. 2d 740, 115 S. Ct. 810 (1995); [**11] see [*1167] 12 U.S.C. §§ 1, 26-27, 481. The Act prescribes: [HN8]"No national bank shall be subject to any visitorial powers except as authorized by Federal law, vested in the courts of justice or such as shall be, or have been exercised or directed by Congress. . . ." 12 U.S.C. § 484(A).

- - - - - - - - - - - - - - Footnotes - - - - - - - - - - - - - - - -

n6 The Act authorizes the OCC to [HN9]"appoint examiners who shall examine every national bank as often as the Comptroller of the Currency shall deem necessary. The examiner making the examination of any national bank shall have power to make a thorough examination of all the affairs of the bank and in doing so he shall have power to administer oaths and to examine any of the officers and agents thereof under oath and shall make a full and detailed report of the condition of said bank to the Comptroller of the Currency. . . ." 12 U.S.C. § 481. "The provisions of the Act requiring

265 F. Supp. 2d 1162; 2003 U.S. Dist. LEXIS 7870

periodic examinations and reports and the powers of the Comptroller are designed to insure prompt discovery of violations of the Act and in that event prompt remedial action by the Comptroller." Deitrick, 309 U.S. at 195.

- - - - - - - - - - - End Footnotes- - - - - - - - - - - - -

**[**12]**

The Commissioner concedes the OCC's exclusive visitorial power over national banks, but insists that regulatory authority does not extend to WFHMI. The Commissioner asserts nothing in the Act authorizes the OCC to prescribe it has exclusive visitorial authority over operating subsidiaries of national banks. (Def.'s Opp'n at 3.) He argues since an operating subsidiary is not a national bank, it should not be granted all the rights and privileges of a national bank. (Def.'s Memo. at 7.) Plaintiffs counter "that operating subsidiaries conduct only activities that the national bank is authorized to conduct, and therefore function as separately incorporated divisions or departments of the national bank. . . ." (Pls.' Memo. at 7.) The OCC agrees with Plaintiffs stating, "When established in accordance with the procedures mandated by the OCC Operating Subsidiary Rule and approved by the OCC, the operating subsidiary is a federally-authorized means by which a national bank may conduct federally-authorized activities." (OCC Amicus Br. at 13.)

B. Operating Subsidiaries

The OCC asserts that "pursuant to [national banks'] authority under 12 U.S.C. § 24 (Seventh) **[**13]** to exercise 'all such incidental powers as shall be necessary to carry on the business of banking,' national banks have long used separately incorporated entities to engage in activities that the bank itself is authorized to conduct." (Id. at 11-12.) [HN10]"Incidental powers [in § 24 (Seventh)] include activities that are 'convenient or useful in connection with the performance of one of the bank's established activities pursuant to its express powers under the National Bank Act.'" Bank of America, 309 F.3d at 562 (citations omitted). The United States Supreme Court held that the "'business of banking' is not limited to the enumerated powers in § 24 Seventh and that the Comptroller therefore has discretion to authorize activities beyond those specifically enumerated. The exercise of the Comptroller's discretion, however, must be kept within reasonable bounds." NationsBank of North Carolina, N.A., 513 U.S. at 258 n.2.

The OCC has promulgated an operating subsidiary rule in [HN11]12 C.F.R. § 5.34, which prescribes: "[a] national bank may conduct in an operating subsidiary activities that are permissible for a national bank to **[**14]** engage in directly either as part of, or incidental to, the business of banking, as determined by the OCC, or otherwise under other statutory authority. . . ." Section 5.34(e)(3) provides: "an operating subsidiary conducts activities authorized under this section pursuant to the same authorization, terms and conditions that apply to the conduct of such activities by its parent national bank." n7

- - - - - - - - - - - - - - Footnotes - - - - - - - - - -

n7 [HN12]Before a national bank can be authorized to conduct permissible banking activities through an operating subsidiary, the bank must comply with the OCC's licensing requirements. Under 12 C.F.R. § 5.34(b), [HN13]"A national bank must file a notice or application as prescribed in this section to acquire or establish an operating subsidiary, or to commence a new activity in an existing operating subsidiary." [HN14]"The OCC reviews a national bank's application to determine whether the proposed activities are legally permissible and to ensure that the proposal is consistent with safe and sound banking practices and OCC policy and does not endanger the safety or soundness of the parent national bank." Id. § 5.34(e)(5)(iii).

- - - - - - - - - - - End Footnotes- - - - - - - - - - - - -

**[**15]**

At the May 5 hearing, the Commissioner virtually conceded the OCC's construction **[*1168]** of 12 U.S.C. § 24 (Seventh) as authorizing national banks to conduct the business of banking through operating subsidiaries is entitled to deference by stating this construction is "probably" reasonable in light of NationsBank of North Carolina, N.A., 513 U.S. at 258 n.2. (Reporter's Transcript ("RT") at 30.) However, the Commissioner insisted that this statute does not authorize the OCC to exercise exclusive visitorial powers over operating subsidiary entities. The Commissioner's equivocal position on whether the OCC can authorize national banks to conduct banking business through operating subsidiaries requires the issue to be decided.

Both parties cite to the GLBA's definition of "financial subsidiary" as support for their respective positions on

Case 1:04-cv-11954-RCL    Document 13-6    Filed 03/24/2005    Page 60 of 68

265 F. Supp. 2d 1162; 2003 U.S. Dist. LEXIS 7870

whether the Act empowers a national bank to conduct banking business through an operating subsidiary. Plaintiffs and the OCC argue Congress acknowledged national banks' authority to conduct banking business in this manner in the GLBA's definition of "financial subsidiary." The Commissioner counters that definition [**16] evinces Congress never intended national banks to conduct business through operating subsidiaries.

The Commissioner's reliance on this definition is misplaced. The "financial subsidiary" definition recognizes that "operating subsidiaries" could exist by stating a [HN15]"'financial subsidiary' . . . is . . . other than a subsidiary that . . . engages solely in activities that national banks are permitted to engage in directly and are conducted subject to the same terms and conditions that govern the conduct of such activities by national banks." 12 U.S.C. § 24a(g)(3). Not only does this language reference operating subsidiaries, it indicates the OCC exercises visitorial authority over them. A Senate Report explaining the scope and purpose of the GLBA explicitly addresses the use of operating subsidiaries by national banks:For at least 30 years, national banks have been authorized to invest in operating subsidiaries that are engaged only in activities that national banks may engage in directly. For example, national banks are authorized directly to make mortgage loans and engage in related mortgage banking activities. Many banks choose to conduct these activities [**17] through subsidiary corporations. Nothing in this legislation is intended to affect the authority of national banks to engage in bank permissible activities through subsidiary corporations, or to invest in joint ventures to engage in bank permissible activities with other banks or nonbank companies.S. Rep. No. 106-44, at 8 (1999). n8

- - - - - - - - - - - - - - Footnotes - - - - - - - - - - - - - - - -

n8 The OCC also recognized several years ago, in 1966, that national banks are empowered to conduct authorized banking business through subsidiaries by its announcement in the Federal Register:The Comptroller of the Currency has confirmed his position that a national bank may acquire and hold the controlling stock interest in a subsidiary operations corporation. . . . A subsidiary operations corporation is a corporation the functions or activities of which are limited to one or several of the functions or activities that a national bank is authorized to carry on.

* * *

The authority of a national bank to purchase or otherwise acquire and hold stock of a subsidiary operations corporation may properly be found among 'such incidental powers' of the bank 'as shall be necessary to carry on the business of banking,' within the meaning of 12 U.S.C. 24 (7), or as an incident to another Federal banking statute which empowers a national bank to engage in a particular function or activity. . . . The visitorial powers vested in this Office are adequate to ascertain compliance by bank subsidiaries with the limitations and restrictions applicable to them and their parent national banks.

Acquisition of Controlling Stock Interest in Subsidiary Operations Corporation, 31 Fed. Reg. 11,459 at 11,459-60 (Aug. 31, 1966). This interpretative pronouncement reflected OCC's then-held view on existing law. Gibson Wine Co. v. Snyder, 90 U.S. App. D.C. 135, 194 F.2d 329, 331 (D.C. Cir. 1952 ("Administrative officials frequently announce their views as to the meaning of statutes or regulations.").

- - - - - - - - - - - - End Footnotes- - - - - - - - - - - - - -

[**18]

Moreover, [HN16]court decisions determining whether a particular activity is permissible [*1169] for a national bank have treated the activities of an operating subsidiary as being equivalent to the activities of the national bank. See NationsBank of North Carolina, N.A., 513 U.S. at 254 (brokerage subsidiary acting as an agent in the sale of annuities); Marquette Nat'l Bank of Minneapolis, 439 U.S. 299, 58 L. Ed. 2d 534, 99 S. Ct. 540 (credit card subsidiary); American Ins. Ass'n v. Clarke, 865 F.2d 278 (D.C. Cir. 1988) (subsidiary offering municipal bond insurance); M & M Leasing Corp. v. Seattle First Nat'l Bank, 563 F.2d 1377 (9th Cir. 1977) (motor vehicle leasing by subsidiary). It is pellucid that "'the powers of national banks must be construed so as to permit the use of new ways of conducting the very old business of banking.'" Bank of America, 309 F.3d at 563 (citation omitted). It is also clear "that the OCC has been delegated the authority to determine, with . . . considerable discretion[]," whether national banks may conduct banking business through operating subsidiaries. Wells Fargo Bank of Texas NA v. James, 321 F.3d 488, 493 (5th Cir. 2003). [**19]

265 F. Supp. 2d 1162; 2003 U.S. Dist. LEXIS 7870

[HN17]The OCC's regulation authorizing national banks to conduct permissible banking business activities through operating subsidiaries is within its discretionary authority delegated to it by Congress and is a reasonable interpretation of the Act. Since [HN18]the OCC's "determination as to what activities are authorized under the National Bank Act [is to] be sustained if reasonable," First Nat'l Bank of Eastern Arkansas v. Taylor, 907 F.2d 775, 777-78 (8th Cir. 1990), Plaintiffs prevail on their position that WFHMI is an operating subsidiary of a national bank.

C. OCC's Exclusive Visitorial Powers Over Operating Subsidiaries

Notwithstanding Wells Fargo's right to conduct business through an operating subsidiary, the Commissioner argues he has visitorial powers over WFHMI by virtue of state law, which the OCC seeks to extinguish by impermissibly asserting exclusive visitorial powers. The OCC asserts "because federal law prohibits the [Commissioner] from exercising visitorial powers over a national bank engaged in real estate lending pursuant to federal law, the [Commissioner] may not exercise visitorial power over the national bank conducting that activity through [**20] an operating subsidiary licensed by the OCC, absent federal law dictating a contrary result." n9 (OCC Amicus Br. at 14.)

- - - - - - - - - - - Footnotes - - - - - - - - - - - - - - - - -

n9 [HN19]Under 12 U.S.C. § 371, national banks "may make, arrange, purchase or sell loans or extensions of credit secured by liens on interests in real estate. . . ."

- - - - - - - - - - - - End Footnotes- - - - - - - - - - - - -

The issue is whether the OCC was empowered under the Act to enact 12 C.F.R. § 7.4006, which prescribes: "State laws apply to national bank operating subsidiaries to the same extent that those laws apply to the parent national bank." n10 [HN20]Section 7.4006 is to be upheld if it is "'a [*1170] reasonable interpretation of § 24 (Seventh).'" Bank of America, 309 F.3d at 562 (citation omitted). Since the OCC is the regulator of national banks and administrator of the Act, its position on its authority to enact § 7.4006 is entitled to "'great weight.'" Id. It is plain that the Act delegated the OCC the authority to promulgate § 7.4006 and § 7.4006 reflects a reasonable [**21] construction of the Act.

- - - - - - - - - - - - - - Footnotes - - - - - - - - - - - - - - - - - -

n10 Section 7.4006, considered in conjunction with 12 C.F.R. § 5.34(e)(3) and 12 U.S.C. § 484, evinces that the OCC is exercising exclusive visitorial powers over operating subsidiaries. Section 5.34(e)(3) provides: [HN21]"If, upon examination, the OCC determines that the operating subsidiary is operating in violation of law, regulation, or written condition, or in an unsafe or unsound manner or otherwise threatens the safety or soundness of the bank, the OCC will direct the bank or operating subsidiary to take appropriate remedial action, which may include requiring the bank to divest or liquidate the operating subsidiary, or discontinue specified activities."

- - - - - - - - - - - - End Footnotes- - - - - - - - - - - - - - - - -

Because WFHMI "is treated as a department or division of its parent [national bank] for regulatory purposes," the Commissioner lacks visitorial power over WFHMI just as it lacks visitorial power over WFHMI's national bank parent. WFS Financial, Inc. v. Dean, 79 F. Supp. 2d 1024, 1026 (W.D. Wis. 1999); [**22] see 12 U.S.C. § 484 (prescribing that "no national bank shall be subject to any visitorial powers except as authorized by Federal law . . ."); see also Nat'l State Bank, Elizabeth, N.J. v. Long, 630 F.2d 981, 988 (3d Cir. 1980) (indicating that where allowing a state agency to exercise visitorial powers over an instrumentality of a national bank would "result in unnecessary and wasteful duplication of effort on the part of the bank and the state agency," it is "reasonable and practical" for visitorial powers to be exercised exclusively by a federal agency). [HN22]"State attempts to control the conduct of national banks are void if they conflict with federal law, frustrate the purposes of the National Bank Act, or impair the efficiency of national banks to discharge their duties." Bank of America, 309 F.3d at 561. Therefore, the Commissioner has no visitorial powers over WFHMI.

D. Preemption Violates California's Sovereignty Under the Tenth Amendment

The Commissioner further argues that "by promulgating regulations seeking to regulate operating subsidiaries of national banks to the exclusion of states, the OCC is interfering [**23] with California's constitutional sovereignty under the Tenth Amendment and taking away the state's power to regulate and enforce its laws against state-chartered corporations such as WFHMI." (Def.'s Memo. at 10.) When

265 F. Supp. 2d 1162; 2003 U.S. Dist. LEXIS 7870

WFHMI became an OCC authorized operating subsidiary of a national bank it ceased being subject to the visitorial power of the Commissioner and became regulated by the OCC. This change in regulatory authority from the Commissioner to the OCC has not been shown to infringe California's rights under the Tenth Amendment.

The Tenth Amendment provides, [HN23]"The powers not delegated to the United States by the Constitution, nor prohibited by it to the States, are reserved to the States respectively, or to the People." [HN24]It has long been recognized that the Constitution authorizes Congress to establish national banks. See McCulloch v. State, 17 U.S. 316, 424-25, 4 L. Ed. 579 (1819). The National Bank Act's effect of "carving out from state control supervisory authority" over an OCC-authorized operating subsidiary of a national bank does not violate California's Tenth Amendment rights. First Union Nat'l Bank v. Burke, 48 F. Supp. 2d 132, 148 (D. Conn. 1999). [**24]

Under the national banking regulatory scheme, Congress does not direct the state executive to affirmatively function in any particular way, nor does the OCC's exercise of exclusive visitorial powers over national banks preclude the state statutory enactments from being applied to national banks, provided they are not in conflict with and thus preempted by federal banking laws. By creating such a scheme, Congress has not seized the machinery of state government [*1171] to achieve federal purposes. The relegation of regulatory and supervisory authority over federal instrumentalities to a single federal regulator does not interfere with the Commissioner's enforcement of state law against state banks, does not interfere with the state's enactment of non-preempted state banking laws applicable to national banks, does not preclude the Commissioner from seeking OCC enforcement of state laws, and expressly leaves available judicial remedies to compel national bank compliance with state law.

Id. at 148-49; see Clark v. U.S., 184 F.2d 952, 954 (10th Cir. 1950)("Congress has the power to enact legislation for the protection, preservation and regulation [**25] of [national banks]" (citing Westfall v. United States, 274 U.S. 256, 71 L. Ed. 1036, 47 S. Ct. 629 (1927); Farmers' and Mechanics' Nat'l Bank v. Dearing, 91 U.S. 29, 23 L. Ed. 196 (1875); McCulloch, 17 U.S. 316, 4 L. Ed. 579; Doherty v. United States, 94 F.2d 495, 497 (8th Cir. 1938); Weir v. United States, 92 F.2d 634, 636 (7th Cir. 1937))). Therefore, the OCC's regulation prescribing that it has exclusive visitorial powers over operating subsidiaries of national banks does not violate California's

constitutional sovereignty under the Tenth Amendment.

For the stated reasons, Plaintiffs' motion for summary judgment is granted on their claim that the Act preempts the Commissioner from exercising visitorial powers over WFHMI, a wholly-owned operating subsidiary of Wells Fargo, licensed by the OCC to engage in real estate lending activities in California." n11

- - - - - - - - - - - - - - Footnotes - - - - - - - - - - - - - - -

N11 The Commissioner also argues that 12 C.F.R. § 7.4006 cannot be applied retroactively but that argument is mooted by the preemptive ruling on California's per diem statutes, which are the only statutes at issue with respect to the regulatory dispute over which entity is authorized to exercise visitorial powers over WFHMI.

- - - - - - - - - - - - - End Footnotes- - - - - - - - - - - - - - -

[**26]

II. Preemption of California's Per Diem Statutes by Depository Institutions Deregulation and Monetary Control Act of 1980

Plaintiffs also contend California's per diem statutes cannot be enforced against WFHMI because DIDMCA expressly preempts them. Under DIDMCA,[HN25]The provisions of the constitution or the laws of any State expressly limiting the rate or amount of interest, discount points, finance charges, or other charges which may be charged, taken, received, or reserved shall not apply to any loan, mortgage, credit sale, or advance which is --

(A) secured by a first lien on residential real property. . .

(B) made after March 31, 1980; and

(C) [a federally related mortgage loan.]12 U.S.C. § 1735f-7a(a). [HN26]A "federally related mortgage" "(1) is secured by residential real property designed principally for the occupancy of from one to four families; and (2) . . . (D) is made in whole or in part by any 'creditor,' as defined in section 1602(f) of Title 15, who makes or invests in residential real estate loans aggregating more than $ 1,000,000 per year." 12 U.S.C. § 1735f-5(b). [HN27]A "creditor" [**27] is:a

265 F. Supp. 2d 1162; 2003 U.S. Dist. LEXIS 7870

person who both (1) regularly extends, whether in connection with loans, sales of property or services, or otherwise, consumer credit which is payable by agreement in more than four installments or for which the payment of a finance charge is or may be required, and (2) is the person to whom the debt arising from the consumer credit transaction is initially payable on the face of the evidence of indebtedness or, if there is no such evidence of indebtedness, by agreement. [*1172] 15 U.S.C. § 1602(f). WFHMI is a creditor within the meaning of the statute. (Pls.' SUF P 4.) States were able to override DIDMCA's express preemption by explicitly opting out of its terms prior to April 1, 1983. Id. § 1735f-7a(b)(2). California did not opt out of the DIDMCA's express preemption within the statutorily prescribed time period. (Pls.' SUF P 6.)

California's per diem statutes prohibit interest from being charged on loaned mortgage funds for a period in excess of one day prior to recording of the mortgage. Cal. Civ. Code § 2948.5; Cal. Fin. Code § 50204(o). California Civil Code § 2948.5 provides, [HN28]"[a] borrower shall not be required to pay interest [**28] on a principal obligation under a promissory note secured by a mortgage or deed of trust on real property improved with between one to four residential dwelling units for a period in excess of one day prior to recording of the mortgage or deed of trust if the loan proceeds are paid into escrow. . . ." In addition, [HN29]under the CRMLA, a licensee may not "require a borrower to pay interest on the mortgage loan for a period in excess of one day prior to recording of the mortgage or deed of trust," except under certain circumstances that are not relevant to the present action. Cal. Fin. Code § 50204(o).

Plaintiffs argue California's per diem statutes expressly limit the amount of interest that a lender may collect on federally related mortgage loans and are therefore preempted by the DIDMCA. (Pls.' Memo. at 18-19.) Plaintiffs support their position by relying primarily on Shelton v. Mutual Savings and Loan Ass'n, 738 F. Supp. 1050 (E.D. Mich. 1990). In Shelton, the plaintiffs argued defendant Bank "violated the Michigan usury statute, M.C.L. sections 438.31c(2) and (9), by charging interest before the loan proceeds were disbursed." Id. at 1053. The [**29] court explained, "the broadest possible interpretation of the exemption from state usury laws is consistent with the legislative purpose [of DIDMCA]," and therefore held Michigan's usury law was preempted by DIDMCA. Id. at 1057-58.

The Commissioner argues that the per diem statutes are unrelated to the California Usury Law n12 and "do nothing more than compel a close relationship between the date interest charges begin and the date of

recordation of the deed of trust." (Def.'s Memo. at 26.) Further, the Commissioner contends the purpose behind the per diem statutes' limitation on interest charges "is to protect the consumer from paying interest on money that has not bought him the benefit of his bargain." n13 [*1173] (Id.) Plaintiffs counter that DIDMCA is not limited to preempting only state usury statutes, arguing "if Congress had intended DIDMCA's preemption laws to apply only to a subset of state laws limiting the rate or amount of interest, Congress would have said so." (Pls.' Opp'n to Def.'s Mot. for Summ. J. ("Pls.' Opp'n") at 17.)

- - - - - - - - - - - - - - Footnotes - - - - - - - - - - - - - - - -

n12 California's usury law is found in California Constitution, Article XV, § 1.

[**30]

n13 During the May 5 hearing, light was shed on the usurious nature of California's per diem interest statutes and the benefit of the bargain the statutes are designed to help borrowers realize. At the hearing the Commissioner's counsel was asked, "What's a usury law?" In response he said, "I think [it] is a cap or ceiling on the actual amount -- the actual rate of interest charged . . . ." (RT at 9.) During the exchange with the Commissioner's counsel, he argued that "the benefit of the bargain is buying the house, i.e., getting clear title to the house, getting to live in the house, the keys to the house, really the issue is that that benefit only accrues or occurs when recordation occurs. It is - I would doubt very much that most banks would let me move into a house before they've recorded their mortgage on that house. (RT at 11.)

Further, the Commissioner's counsel argued that California's per diem statute seeks to encourage mortgage lenders to "keep the process moving fast . . . by limiting the interest to one day." (RT at 15-16.) When counsel was questioned about admitting that the statute limits the amount of interest, he said he mis-spoke and instead intended to use the word "controls," "because . . . this statute basically sets when the lender can begin to compute the interest on the loan." (RT at 16.)

The Commissioner's shift in analytic focus from the per diem statutes limiting interest

to one day to the word "controls" cannot be squared with his position on the real goal of the statutes, which is to prevent the lender from collecting interest on loaned mortgage funds in excess of one day prior to recordation.

- - - - - - - - - - - End Footnotes- - - - - - - - - - - - -

[**31]

[HN30]DIDMCA preempts "the provisions of the constitution or the laws of any State expressly limiting the rate or amount of interest, discount points, finance charges, or other charges which may be charged, taken, received, or reserved. . . " on particular types of loans. 12 U.S.C. § 1735f-7a(a). The language of the statute does not expressly limit the preemptive scope of DIDMCA to state usury laws. But the relevant legislative history makes clear that Congress just intended to create a limited preemption of state usury laws. See Brown v. Investors Mortgage Co., 121 F.3d 472, 476 (9th Cir. 1997) ("Congress made specific findings that modification of state usury laws was necessary for a stable national financial system."). The Senate Report that accompanied the bill containing what became 12 U.S.C. § 1735f-7a provides:

In order to ease the severity of the mortgage credit crunches of recent years and to provide financial institutions, particularly those with large mortgage portfolios, with the ability to offer higher interest rates on savings deposits, H.R. 4986 as reported by the Committee would preempt any state constitutional [**32] or statutory provision setting a limit on mortgage interest rates. . . .

H.R. 4986 as amended provides for a limited preemption of state usury laws. It provides that the state constitutional or statutory restrictions on the amount of interest, discount points or other charges on any loan, mortgage or advance secured by real estate which is described in section 527(b) of the National Housing Act are exempt from usury ceilings. . . .

The Committee believes that this limited modification in state usury laws will enhance the stability and viability of our nation's financial system and is needed to facilitate a national housing policy and the functioning of a national secondary market in mortgage lending. . . .

In exempting mortgage loans from state usury limitations, the Committee intends to exempt only those limitations that are included in the annual

percentage rate. The Committee does not intend to exempt limitations on prepayment charges, attorney fees, late charges or similar limitations designed to protect borrowers.S. Rep. No. 96-368, at 18-19 (1979), reprinted in 1980 U.S.C.C.A.N. 236, 254-55.

Plaintiffs contend the Commissioner's argument that the [**33] per diem statutes are not usury laws "is essentially a tautology, since usury laws are defined as 'collectively, the laws of a jurisdiction regulating the charging of interest.'" (Pls.' Opp'n at 17 (quoting Black's Law Dictionary 1545 (6th ed. 1990)).) [HN31]"Usury is the receiving, securing, or taking of a greater sum or value for the loan or forbearance of money, goods, or things in action than is allowed by law, the exaction of a greater sum for the use of money than the highest rate of interest allowed by law." 45 Laura Dietz & Anne M. Payne, American Jurisprudence, Interest and Usury § 2 (2d ed. 2002); see also Bernie's Custom Coach v. Small Business Admin., 987 F.2d 1195, 1197 [*1174] (5th Cir. 1990) ("A usurious contract consists of a loan of money 'which requires a greater interest than allowed by law.'"). In California, "usury" has been defined as "taking more than the law allows upon a loan or for forbearance of a debt." Hall v. Beneficial Finance Co., 118 Cal. App. 3d 652, 654, 173 Cal. Rptr. 450 (1981) (citation omitted). By prohibiting lenders from commencing to charge interest on loaned mortgage funds until one day prior to recordation, California's [**34] per diem statutes constitute usury laws.

Nevertheless, the Commissioner argues California's per diem statutes do not fall within the preemptive scope of DIDMCA because they are designed to protect consumers and do not expressly limit interest rates or amounts. (Def.'s Memo. at 28.) The Commissioner compares California's per diem statutes with the simple interest statute ("SIS") that was held not preempted by DIDMCA in Grunbeck v. Dime Savings Bank of New York, 74 F.3d 331 (1st Cir. 1996). The SIS requires that any interest rate or amount agreed to by the parties be computed on a "simple interest" basis. Grunbeck, 74 F.3d at 337. The court explained,

the SIS . . . does not "serve to . . . restrain" either the rate or the amount of simple interest which may be obtained, since the lender remains free to compensate by increasing the simple interest rate. Thus, the SIS does not "expressly" limit "the rate or amount of interest." Nor, in the alternative, does the SIS--as distinguished from market forces-- "limit" the rate or amount of interest if "limit" means a "final, utmost or furthest boundary" on the rate or amount of interest, since the SIS [**35] imposes no ceiling whatsoever on

265 F. Supp. 2d 1162; 2003 U.S. Dist. LEXIS 7870

either the rate or amount of simple interest that may be exacted.

Id. at 338 n. 6.

Plaintiffs retort Grunbeck is factually distinguishable. Unlike the SIS, California's per diem interest restriction does not leave "entirely to the parties the rate and amount of . . . interest to be exacted" because once the lender and borrower's loan transaction is finalized, the lender has no way of collecting interest on loaned mortgage funds that would have been collected absent delays in recording the deed of trust. Grunbeck, 74 F.3d at 337. WFHMI is unable to bargain for a higher interest rate to compensate it for the possible delay in recordation of the mortgage or deed of trust because such delay is typically caused by the actions of others: the settlement agents, the escrow company, and the county clerk who records the mortgage. Thus the statute in Grunbeck simply limited the manner in which the lender expressed its interest rate without limiting the total amount of interest charged over the course of the loan. In contrast, California's per diem statutes prevent the lender from charging a specific pre-determined [**36] amount of interest over the course of the loan by tying the total amount of interest charged to events outside the lender's control which will not occur until after the loan is made.

Plaintiffs further contend the per diem interest statutes do not protect consumers by ensuring they receive the benefit of their bargain because "the purpose of recording the deed of trust is to protect the lender, not the borrower." (Pls.' Opp'n at 15.) Therefore, "a delay in recording the deed of trust does not deprive the borrower of the 'benefit of his bargain' with the lender." (Id.)

The Commissioner's argument that the per diem statutes are designed to protect consumers from unseen costs is unpersuasive. n14 [HN32]Once the lender distributes funds **[*1175]** to the borrower, the borrower has received the "benefit of the bargain." The act of recordation of the mortgage or deed of trust simply provides "constructive notice" of the contents of the recorded documents to third parties. See Domarad v. Fisher & Burke, Inc., 270 Cal. App. 2d 543, 554, 76 Cal. Rptr. 529 (1969) ("The purpose of the recording statutes is to give notice to prospective purchasers or mortgagees of land of all existing and [**37] outstanding estates, titles or interest, whether valid or invalid, that may affect their rights as bona fide purchasers.").

- - - - - - - - - - - - - - Footnotes - - - - - - - - -
- - - - - -

n14 The Commissioner has also argued that this limitation is permitted under the DIDMCA's exception for "other charges," but it is implucid that the per diem statutes cover interest, not other charges.

- - - - - - - - - - - - End Footnotes- - - - - - - -
- - - - - -

Yet DIDMCA preempts only those state laws "expressly limiting the rate or amount of interest . . ." charged on particular residential mortgage loans. 12 U.S.C. § 1735f-7a(a). [HN33]"When engaged in the task of statutory interpretation, 'courts . . . should . . . attempt to give meaning to each word and phrase.'" Grunbeck, 74 F.3d at 338 (citation omitted). Thus, the question is whether the per diem statutes expressly place a ceiling on interest rates or amounts. [HN34]California's per diem statutes limit the time during which interest can be charged by prohibiting a lender from charging interest on loaned mortgage funds for a period in excess of one day [**38] prior to recordation of the mortgage. Cal. Civ. Code § 2948.5; Cal. Fin. Code § 50204(o). By restricting the time period in which a lender may collect interest on loaned mortgage funds, the language of the per diem statutes "expressly limit[s] the rate or amount of interest. . . which may be charged . . . ." Therefore, DIDMCA preempts California's per diem statutes. Plaintiffs' motion for summary judgment on this claim is granted.

## III. Retaliation Claim

The Commissioner argues his entitlement to summary judgment on Plaintiffs' retaliation claim, contending the record shows he did not institute administrative revocation proceedings to revoke WFHMI's CRMLA and CFLL licenses in retaliation for Plaintiffs' filing this federal lawsuit against his regulatory authority over WFHMI. Under Mt. Healthy City Sch. Dist. Bd. of Educ. v. Doyle, 429 U.S. 274, 286, 50 L. Ed. 2d 471, 97 S. Ct. 568 (1977), even if Plaintiffs show that the Commissioner's licensing revocation decision was motivated by Plaintiffs' filing this federal lawsuit, the Commissioner could still prevail on his motion if he demonstrates the absence of a genuine issue of material fact as to whether [**39] he would have reached the same decision even in the absence of Plaintiffs' filing this lawsuit.

### A. Undisputed Facts Applicable to Retaliation Claim

The uncontroverted evidence shows since 1996 until some time in 2003, WFHMI held CRMLA and CFLL licenses, which WFHMI used to engage in real estate lending activities in California. These licenses required

265 F. Supp. 2d 1162; 2003 U.S. Dist. LEXIS 7870

WFHMI to comply with the Commissioner's regulatory authority. See Cal. Fin. Code § 50124(a)(7).

Since August 2001, the Commissioner has conducted examinations of WFHMI under the CRMLA without any objection from WFHMI and commenced three examinations under CFLL. On or about December 4, 2002, the Commissioner demanded that WFHMI submit to an audit of its residential mortgage loans made in California during 2001 and 2002, so he could identify which loans existed where per diem interest was charged in violation of California law. Between December 2002 and January 2003, Plaintiffs' counsel requested and received more time to respond to the Commissioner's demand. On or about January 17, 2003, the Commissioner [*1176] sent a letter to WFHMI's counsel requesting WFHMI's compliance with the audit demand by January 23, 2003.

On or about [**40] January 22, 2003, WFHMI sent a letter to the Commissioner objecting to his request, and expressly stating since WFHMI is an operating subsidiary of a national bank it is only subject to the OCC's visitorial powers. Plaintiffs subsequently sued the Commissioner in this federal lawsuit, alleging federal preemption claims and seeking "to prevent the Commissioner from requiring WFHMI to be licensed in order to operate lawfully in California, or in the alternative, from taking away those [California] licenses." (First Am. Compl. P 3.)

On February 4, 2003, the Commissioner instituted two separate administrative proceedings to revoke WFHMI's CRMLA and CFLL licenses, based on the Commissioner's findings that WFHMI violated Financial Code §§ 50204, subdivisions (i), (j), (k) and (o) and 50307(b). The Commissioner opined that a fact or condition existed, which if known at the time of original licensure, would have justified the Commissioner's refusal to issue the license; and that therefore the information constituted grounds to revoke WFHMI's licenses. Because of the Commissioner's institution of license revocation proceedings, Plaintiffs added a retaliation claim to their Complaint. [**41]

B. Ruling on Retaliation Claim

Plaintiffs have not presented facts controverting the Commissioner's evidentiary showing that he was going to exercise his regulatory authority over WFHMI whether or not it challenged him in a lawsuit, and that his decision to invoke licensing revocation proceedings against WFHMI was not "infected with a retaliatory motive traceable to [Plaintiffs' filing this federal action]." Huang v. Bd. of Governors of Univ. of N.C., 902 F.2d 1134, 1141 (4th Cir. 1990).

Summary judgment jurisprudence required Plaintiffs to controvert the Commissioner's evidentiary showing

(that his licensing revocation decision was not infected by a retaliatory motive) with more evidence than the evidence indicating that the federal lawsuit played a role or was a motivating factor in the licensing revocation decision. Plaintiffs were obligated to show that "but for" the filing of this federal lawsuit the Commissioner would not have taken the alleged retaliatory action. Id. at 1140. The Commissioner points to WFHMI's violation of California Financial Code §§ 50204(i), (j), (k) and (o), 50307(b), and WFHMI's refusal to submit to his regulatory [**42] authority notwithstanding its obligation to do so as a California licensee as justification for his initiation of the license revocation proceedings. Since a jury could not reasonably find "the requisite 'but for' causation," the Commissioner's summary judgment motion on Plaintiffs' retaliation claim is granted. Id.

V. § 1983 and § 1988 Claims

The Commissioner also argues that Plaintiffs' claims in counts I-III of their Complaint are not actionable under § 1983 because they are premised solely upon preemption, which will not support a § 1983 action. The Commissioner contends since Plaintiffs have not established a § 1983 claim, Plaintiffs' requests for attorney's fees under § 1988 is also unavailing.

The Commissioner relies primarily on the White Mountain Apache Tribe v. Williams, 810 F.2d 844 (9th Cir. 1987), where the Ninth Circuit held, [HN35]"although the Supremacy Clause can be used to enjoin enforcement of a state statute that runs afoul of a federal legislative scheme, it does not provide a basis for a claim [*1177] under section 1983." Western Air Lines, Inc. v. Port Authority of New York and New Jersey, 817 F.2d 222, 226 (2d Cir. 1987) [**43] (discussing the holding in White Mountain.)

The primary function of the Supremacy Clause is to define the relationship between state and federal law. It is essentially a power conferring provision, one that allocates authority between the national and state governments; thus, it is not a rights conferring provision that protects the individual against government intrusion. The distinction between the two categories of constitutional controls has been enunciated by Professor Choper:

When a litigant contends that the national government (usually the Congress, but occasionally the executive, either alone or in concert with the Senate) has engaged in activity beyond its delegated authority, or when it is alleged that an attempted state regulation intrudes into an area of exclusively national concern, the constitutional issue is wholly different from that posed

by an assertion that certain government action abridges a personal liberty secured by the Constitution. The essence of a claim of the latter type -- which falls into the individual rights category of constitutional issues . . . -- is that no organ of government, national or state, may undertake the challenged activity. **[**44]** In contrast, when a person alleges that one of the federalism provisions of the constitution has been violated, he implicitly concedes that one of the two levels of government -- national or state -- has the power to engage in the questioned conduct. The core of the argument is simply that the particular government that has acted is the constitutionally improper one. To put it another way, a federalism attack on conduct of the national government contends that only the states may so act; a federalism challenge to a state practice asserts that only the central government possesses the exerted power; neither claim denies government power altogether. . . .

We believe that § 1983 was not intended to encompass those constitutional provisions which allocate power between the state and federal government.

White Mountain Apache Tribe, 810 F.2d at 848.

Plaintiffs counter that the viability of their § 1983 claims is governed by the United States Supreme Court's decision in Golden State Transit Corp. v. City of Los Angeles, 493 U.S. 103, 107 L. Ed. 2d 420, 110 S. Ct. 444 (1989), which Plaintiffs contend abrogated the holding in White Mountain **[**45]** Apache Tribe. In Golden State, "the Supreme Court held [HN36]an enforceable statutory 'right' arises when (1) the plaintiff is an intended beneficiary of the statutory provision at issue, (2) the statute creates a binding obligation rather than merely a congressional preference for a certain kind of conduct, and (3) the plaintiff's interest is not so vague and amorphous as to be beyond the competence of the judiciary to enforce." Eric L. By and Through Schierberl v. Bird, 848 F. Supp. 303, 308 (D.N.H. 1994) (citing Golden State).

Only the third element is decided since Plaintiffs' assertion of preemption interests in this case conflates WFHMI's federal interests with the state obligations WFHMI had as a California licensee in a manner that causes Plaintiffs' federal interests to lack a judicially manageable standard. In this lawsuit, Plaintiffs prosecuted conflicting claims: WFHMI held California licenses that subjected it to the Commissioner's visitorial powers to which it refused to submit and yet it fought the Commissioner's attempt to revoke those California licenses. The essence of the position WFHMI took was that it could **[*1178]** renege on its California licensing **[**46]** requirements and yet continue to be a California licensee, because as an instrumentality of a national bank, it could operate in California under the OCC's licensing and exclusive visitorial powers.

In light of the context in which Plaintiffs' allege § 1983 claims, the judiciary is ill-equipped by the Act's terms to determine the contours of those claims. Therefore, the Commissioner prevails on this issue.

Additionally, since Plaintiffs' § 1983 claim in count IV is premised on the retaliation that has been adjudicated in favor of the Commissioner, no § 1983 claims remain in this action. Since Plaintiffs' attorney's fees claim under 42 U.S.C. § 1988 is dependent on the § 1983 claims that have been decided in the Commissioner's favor, the § 1988 claim is dismissed.

IV. Permanent Injunction

A. Applicable Standards

[HN37]"The requirements for the issuance of a permanent injunction are the likelihood of substantial and immediate irreparable injury and the inadequacy of remedies at law." Easyriders Freedom F.I.G.H.T. v. Hannigan, 92 F.3d 1486, 1495 (9th Cir. 1996). "[To] meet this standard, the plaintiffs must establish actual **[**47]** success on the merits, and that the balance of equities favors injunctive relief." Walters v. Reno, 145 F.3d 1032, 1048 (9th Cir. 1998). Where an injunction is sought against an agency of state government, the injunction must be scrutinized closely "to make sure that the remedy protects the plaintiffs' federal constitutional and statutory rights but does not require more of state officials than is necessary to assure their compliance with federal law." Clark v. Coye, 60 F.3d 600, 604 (9th Cir. 1995). "This requires both that there be a determination that the conduct of the [Commissioner] violates federal constitutional law. . . and that the scope of the injunction is no broader than necessary to provide complete relief to the named plaintiffs. . . ." Easyriders Freedom F.I.G.H.T., 92 F.3d at 1496.

B. Irreparable Harm and Inadequate Remedy at Law

As already discussed, Plaintiffs have established actual success on the merits of their preemption claims. In addition, they are able to show "the likelihood of substantial and immediate irreparable injury and the inadequacy of remedies at law." Id. at 1495. The Commissioner **[**48]** has represented that "even if a claim of federal preemption were made, Article III, Section 3.5 of the California Constitution mandates that the Commissioner enforce the laws under his jurisdiction until an appellate court has made a determination that the enforcement of the law is prohibited by federal law or regulation." (Def.'s Memo.

265 F. Supp. 2d 1162; 2003 U.S. Dist. LEXIS 7870

at 35.) Therefore, despite this Court's ruling on the present motion, the Commissioner may still attempt to exercise visitorial powers over Plaintiffs and seek to enforce California's per diem statutes against them. Such action would significantly disrupt Plaintiffs' business activities and cause substantial irreparable economic loss.

Since Plaintiffs have shown the relevant provisions of the California law are preempted by federal law and that they will suffer irreparable harm if the Commissioner is not enjoined from enforcing those provisions, then "the question of harm to [California] and the matter of the public interest drop from the case, for [Plaintiffs] will be entitled to injunctive relief, [since] . . . the public interest will perforce be served by enjoining the enforcement of the [preempted] provisions of state law." Bank One, Utah v. Guttau, 190 F.3d 844, 847-48 (8th Cir. 1999). [**49] Therefore, Plaintiffs' motion for a permanent [*1179] injunction is granted. Accordingly, the Commissioner and agents acting on behalf of the Commissioner are enjoined from exercising visitorial powers over Plaintiffs and from enforcing California Financial Code § 50204(o) and California Civil Code § 2948.5 against Plaintiffs.

The Clerk of the Court is directed to enter judgment in favor of Plaintiffs on their Supremacy Clause preemption claims and in favor of the Commissioner on Plaintiffs' retaliation, § 1983, and § 1988 claims.

IT IS SO ORDERED.

DATED: May 9, 2003

GARLAND E. BURRELL, JR.

UNITED STATES DISTRICT JUDGE

**AMENDED JUDGMENT IN A CIVIL CASE**

**XX -- Decision by the Court.** This action came to trial or hearing before the Court. The issues have been tried or heard and a decision has been rendered.

IT IS ORDERED AND ADJUDGED**THAT JUDGMENT IS HEREBY ENTERED IN ACCORDANCE WITH THE COURT'S ORDER OF MAY 9, 2003.**ENTERED: May 12, 2003